1
2
3
4
5
6
7

Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

8
9
10
11
12
13
14
15
16
17
18
19

| | |
|---|---|
| KELLIE BLACK, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>SNAP INC., EVAN SPIEGEL, DEREK ANDERSEN, JEREMI GORMAN, and REBECCA MORROW,<br><br>    Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

20
21
22
23
24
25
26
27
28

Plaintiff Kellie Black ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, announcements, United States Securities and

– 1 –

Exchange Commission ("SEC") filings, wire and press releases published by and regarding Snap Inc. ("Snap" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Snap securities between July 22, 2020 and October 21, 2021, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Further, the Company is headquartered in Los Angeles County.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## PARTIES

6.   Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.   Defendant Snap purports to be a camera company, which offers the social media application Snapchat, an eyewear product that connects with Snapchat and captures video Spectacles, and advertising products including AR (augmented reality) and Snap ads. The Company was formerly known as Snapchat, Inc. and changed its name to Snap Inc. in September 2016.

8.   Defendant Snap is a Delaware corporation with its principal executive offices located at 3000 31st Street, Santa Monica, CA 90405. Snap's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SNAP."

9.   Defendant Evan Spiegel ("Spiegel") is a co-founder of Snap and has served as the Company's Chief Executive Officer and as a member of the Company's board of directors since May 2012.

10.   Defendant Derek Andersen ("Andersen") has served as Snap's Chief Financial Officer since May 2019.

11.   Defendant Jeremi Gorman ("Gorman") has served as Snap's Chief Business Officer since November 2018.

12.   Defendant Rebecca Morrow ("Morrow") has served as Snap's Chief Accounting Officer since September 2019.

13.   Defendants Spiegel, Andersen, Gorman, and Morrow are sometimes referred to herein as the "Individual Defendants."

14.   The Individual Defendants:

(a)   directly participated in the management of the Company;

– 3 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

(b)     were directly involved in the day-to-day operations of the Company at the highest levels;

(c)     were privy to confidential proprietary information concerning the Company and its business and operations;

(d)     were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     were directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

15.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

17.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

– 4 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## SUBSTANTIVE ALLEGATIONS

### Background

18.     In June 2020, as part of an ongoing privacy push, Apple Inc. ("Apple")—which developed and maintains the popular mobile operating system, iOS, for its mobile devices (the iPhone)—publicly announced new data privacy features for iOS. In April 2021, Apple released the new data privacy features for iOS.

19.     Snap relies on user data for its advertising business. Following Apple's June 2020 announcement, Snap continuously downplayed and misled investors regarding the impact of Apple's new data privacy features would have on its business.

### Materially False and Misleading Statements

20.     On July 22, 2020, Snap filed with the SEC a quarterly report on Form 10-Q for the period ended June 30, 2020 (the "2Q20 Report") which was signed by Defendants Andersen and Morrow. Attached to the 2Q20 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Andersen and Spiegel attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

21.     The 2Q20 Report stated the following, in pertinent part, regarding Snap's advertising business:

> ***We generate substantially all of our revenues by offering various advertising products on Snapchat***, which include Snap Ads and Sponsored Creative Tools, and measurement services, referred to as advertising revenue.

*     *     *

– 5 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

We sell advertising directly to advertisers ("Snap-sold" revenue) and certain partners that provide content on Snapchat ("media partners") also sell directly to advertisers ("partner-sold" revenue). …

\*      \*      \*

***We monetize our business primarily through advertising.*** Our advertising products include Snap Ads and Sponsored Creative Tools. We measure our business using ARPU [average revenue per user] because it helps us understand the rate at which we're monetizing our daily user base.

(Emphasis added.)

22.     Buried amongst other specific and general risks regarding advertising, the 2Q20 Report merely stated the following regarding Apple's publicly known privacy change:

… Furthermore, changes to iOS or Android operating systems' practices and policies, such as Apple's upcoming iOS update that ***may impose heightened restrictions on our access and use of user data***, ***may reduce the quantity and quality of the data and metrics that can be collected or used by us and our partners***, and adversely affect our ability to effectively target advertisements to users and demonstrate the value of our advertisements to advertisers, any of which could reduce the demand and pricing for our advertising products and seriously harm our business. ***The impact of these proposed changes on the overall mobile advertising ecosystem, our business, and the developers, partners, and advertisers within our community is uncertain*** depending on how these changes are implemented, how we and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, could seriously harm our business. Any adverse effects could be particularly material to us because we are still early in building our advertising business. Our advertising revenue could be seriously harmed by many other factors, including: … changes in our analytics and measurement solutions, including what we are

– 6 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS

permitted to collect and disclose under the terms of Apple's and Google's mobile operating system, that demonstrate the value of our advertisements and other commercial content; … our inability to collect and disclose data or access a user's Identifier for Advertising or similar deterministic identifier that new and existing advertisers may find useful[.]

(Emphasis added.)

23.     On February 4, 2021, during the fourth quarter 2020 earnings call, Defendant Gorman stated the following, in pertinent part, regarding the upcoming Apple update and the Company's purported privacy commitment:

I'll take the IDFA [Apple's Identifier for Advertisers] one first and the 4x growth as you're saying in our down funnel metrics, we're also thrilled to see that. But as it comes to IDFA and the changes, whether or not they will impact us. The reality is we admire Apple, and we believe that they are trying to do the right thing for their customers. ***Their focus on protecting privacy is aligned with our values and the way that we've built our business from the very beginning. So the change here that we're really focused on has less to do with IDFA for which Apple has long offered an opt-out.*** And instead on a much more broad policy change that requires Snapchatters to opt into tracking with other personal identifiers such as their e-mail address, which would make it harder for us and the overall digital ad ecosystem to match advertising outcomes. ***But we've been working really closely with Apple to implement SKAdNetwork, which is their privacy protective solution as well as building our own solutions that use aggregated data to protect privacy. We've been communicating very well with advertisers, we're educating them, talking about them deeply about these coming changes and encouraging them to implement our Conversion API and Measurement Kit to mitigate any of this.*** And then longer term, we're investing in using first-party data from our platform and providing more opportunities for on platform conversion, which will really help. ***Overall, we feel really well prepared for these changes.*** But changes to this ecosystem are usually disruptive and the outcome is uncertain.

– 7 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

(Emphasis added.)

24.     On February 5, 2021, Snap filed with the SEC its yearly report on Form 10-K for the period ended December 31, 2020 (the "2020 Annual Report") which was signed by Defendants Andersen and Morrow. Attached to the 2020 Annual Report were certifications pursuant to SOX signed by Defendants Andersen and Spiegel attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

25.     The 2020 Annual Report stated the following, in pertinent part, regarding Snap's advertising business:

**Our Advertising Products**

We connect both brand and direct response advertisers to Snapchatters globally. Our ad products are built on the same foundation that makes our consumer products successful. This means that we can take the things we learn while creating our consumer products and apply them to building innovative and engaging advertising products familiar to our community.

*AR Ads*: Advertising through Snap's AR tools unlocks the ability to reach a unique audience in a highly differentiated way. Ads can be served as Sponsored Lenses or Sponsored Filters. Lenses are designed through our camera to take advantage of the reach and scale of our augmented reality platform to create visually engaging 3D experiences. Filters are entertaining, artistic overlays that appear after you take a Snap. These Lenses and Filters can be memorialized on Snapchat, through Brand Profiles that aggregate content, filters, and lenses in a single, easy to find place.

*Snap Ads*: We let advertisers tell their stories the same way our users do, using full screen videos with sound. These also allow advertisers to

– 8 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

integrate additional experiences and actions directly within these advertisements, including watching a long-form video, visiting a website, or installing an app. Snap Ads include the following:

● Single Image or Video Ads: These are full screen ads that are skippable, and can contain an attachment to enable Snapchatters to swipe up and take action.
● Story Ads: Story Ads are branded tiles that live within the Discover section of the Stories tab that can be either video ads or a series of 3 to 20 images.
● Collection Ads: Collection Ads feature four tappable tiles to showcase multiple products, giving Snapchatters a frictionless way to browse and buy.
● Dynamic Ads: Dynamic ads leverage our machine learning algorithm to match a product catalog to serve the right ad to the right Snapchatter at the right time.
● Commercials: Commercials are non-skippable for six seconds, but can last up to three minutes. These ads appear within Snapchat's curated content.

*Campaign Management and Delivery*: ***We aim to continually improve the way ads are purchased and delivered. We have invested heavily to build our self-serve advertising platform, which provides automated, sophisticated, and scalable ad buying and campaign management.***

We offer the ability to bid for advertisements that are designated to drive Snapchatters to: visit a website, visit a local business, call or text a business, download an app, or return to an app. ***Additionally, our delivery framework continues to optimize relevance of ads across the entire platform by determining the best ad to show to any given user based on their real-time and historical attributes and activity. This decreases the number of wasted impressions while improving the effectiveness of the ads that are shown to our community. This helps advertisers increase their return on investment by providing more refined targeting, the ability to test and learn with different creatives or campaign attributes in real time, and the dynamics of our self-serve pricing.***

– 9 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*Measuring Advertising Effectiveness*: **We offer third-party and first-party solutions to provide a vast array of analytics on campaign attributes like reach, frequency, demographics, and viewability; changes in perceptions like brand favorability or purchase intent; and lifts in actual behavior like purchases, foot traffic, app installs, and online purchases.**

\*      \*      \*

**We monetize our business primarily through advertising.** Our advertising products include Snap Ads and AR Ads. We measure our business using ARPU because it helps us understand the rate at which we are monetizing our daily user base.

\*      \*      \*

*Revenue*

**We generate substantially all of our revenue through the sale of our advertising products**, which primarily include Snap Ads and AR Ads, and measurement services, referred to as advertising revenue. Snap Ads may be subject to revenue sharing arrangements between us and the media partner. We also generate revenue from sales of our hardware product, Spectacles. This revenue is reported net of allowances for returns.

\*      \*      \*

**We generate substantially all of our revenues by offering various advertising products on Snapchat**, which include Snap Ads and AR Ads, referred to as advertising revenue. AR Ads include Sponsored Filters and Sponsored Lenses. Sponsored Filters allow users to interact with an advertiser's brand by enabling stylized brand artwork to be overlaid on a Snap. Sponsored Lenses allow users to interact with an advertiser's brand by enabling branded augmented reality experiences.

(Emphasis added).

– 10 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

26.   The 2020 Annual Report stated the following, in pertinent part, regarding the Company's purported commitment to privacy, stating in part: :

**Our Commitment to Privacy**

*Our approach to privacy is simple: Be upfront, offer choices, and never forget that our community comes first.*

We built Snapchat as an antidote to the context-less communication that has plagued "social media." *Not so long ago, a conversation among friends would be just that: a private communication in which you knew exactly who you were talking to, what you were talking about, and whether what you were saying was being memorialized for eternity.* …

*When you read our Privacy Policy, we hope that you'll notice how much we care about the integrity of personal communication.* For starters, we've written our Privacy Policy in plain language because we think it's important that everyone understand exactly how we handle their information. Otherwise, it's hard to make informed choices about how you communicate. We've also created a robust Privacy Center where we show that context and choice are more than talking points. *There, we point out the many ways that users can control who sees their Snaps and Stories, and explain how long content will remain on our servers, how users can manage the information that we do have about them, and much more.* This is where you'll also find our Transparency Report.

We also understand that privacy policies—no matter how ambitious— are only as good as the people and practices behind those policies. *When someone trusts us to transmit or store their information, we know we have a responsibility to protect that information and we work hard to keep it secure. New features go through an intense privacy-review process—we debate pros and cons, and we work hard to build products we're proud of and that we'll want to use.* We use Snapchat constantly, both at work and in our personal lives, and we handle user information with the same care that we want for our family, our friends, and ourselves.

– 11 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

(Emphasis added.)

27.     Buried amongst other specific and general risks regarding advertising, the 2020 Annual Report merely stated the following regarding Apple's publicly known privacy change:

> … Furthermore, changes to iOS or Android operating systems' practices and policies, ***such as Apple's upcoming iOS update that may impose heightened restrictions on our access and use of user data, may reduce the quantity or quality of the data and metrics that can be collected or used by us and our partners***, or adversely affect our ability to effectively target advertisements to users or demonstrate the value of our advertisements to advertisers, any of which could reduce the demand and pricing for our advertising products and seriously harm our business. The impact of these proposed changes on the overall mobile advertising ecosystem, our business, and the developers, partners, and advertisers within our community is uncertain. Depending on how these changes are implemented, how we and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our business could be seriously harmed. Any adverse effects could be particularly material to us because we are still early in building our advertising business. Our advertising revenue could also be seriously harmed by many other factors, including: … changes in our analytics and measurement solutions, including what we are permitted to collect and disclose under the terms of Apple's and Google's mobile operating systems, that demonstrate the value of our advertisements and other commercial content … our inability to measure the effectiveness of our advertising or target the appropriate audience for advertisements[.]

(Emphasis added.)

28.     On July 22, 2021, during the second quarter 2021 earnings call, Defendant Gorman stated, in pertinent part, the following regarding the Apple's privacy update and the Company's position:

– 12 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Our ad platform is being utilized as an effective self-service tool to help advertisers of all types and sizes create, manage, and measure campaigns on Snapchat. ***Further, it is a reflection of our focus on privacy and innovation as we are delivering results for advertisers while also respecting the privacy of our community, which has been a core tenet since we launched ads on Snapchat.*** This year has clearly demonstrated how important it is to simultaneously meet these two objectives for our advertising partners. ***As Apple rolled-out its App Tracking Transparency-related changes near the end of Q2, we observed higher opt-in rates than we are seeing reported generally across the industry, which we believe is due in part to the trust our community has in our products and our business.*** Apple's rollout of the most recent iOS update came later in Q2 than initially anticipated, and the pace of updates by iPhone users has also been slower than we anticipated. ***This has given us more time with advertisers to navigate the transition*** but also means the effects of these changes will come later than we initially expected.

We continue to work with our advertising partners on privacy-safe solutions and other attribution techniques. ***For example, we fully rolled out support of SKAdnetwork version 3.0, which we believe will aid in improving attribution for advertisers who have implemented Apple's API.*** We also launched Advanced Conversions in Ads Manager, which allows advertisers to measure their campaigns via our privacy-protecting measurement stack. ***We are dedicated to delivering value for our advertising partners while respecting the privacy of our community, as we have worked to do for many years.*** That said, it remains very early in the adoption of the iOS platform changes, and we will continue to learn how these changes may impact our advertising partners, business, and the industry as a whole. We are seeing some initial signals as advertisers test and learn in this new environment and this is causing some interruptions to demand that we had anticipated would be part of the adoption process, particularly in the direct response e-commerce and gaming sectors. It is too early to determine how long it will take until these changes are fully adopted, the scale of the potential interruptions to demand, or the ultimate impact on the longer term growth of our business. …

– 13 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*We continue to invest heavily in video advertising*, with the goal of driving results for our advertising partners and connecting them to the Snapchat Generation. *For example, we worked with Nielsen to help US advertisers understand how to more efficiently reach their target audiences via Snap Ads.* The Total Ad Ratings (TAR) study analyzed how over thirty cross-platform advertising campaigns reached people on both Snapchat and television. The analysis showed that Snapchat campaigns contributed an average of 16 percent incremental reach to advertisers' target audiences, and over 70 percent of the Gen Z audience that was reached by Snapchat was not reached by TV-only campaigns. This is especially important as people are increasingly cutting the cord, and mobile content consumption continues to grow, *presenting us with a large opportunity to help advertisers reach the Snapchat Generation at scale*.

\*     \*     \*

I think the important thing about IDFA is to really understand that the solutions are not yet fully finalized. Everyone is still evolving, Apple, the entire industry is still evolving. *And we've said this before, and I just want to reiterate that we genuinely support Apple's approach. We've always believed that advertising should respect customer's privacy at its core at Snap and the products that this amazing team has built for the last almost 10 years now.* And we've been working really hard to make this transition smooth for our advertising partners as well as our businesses. *So where we are in the cycle right now is that we rolled out full support of SKAdnetwork version 3.0, which we know will aid or we believe will aid in attribution for advertisers.* And we've also implemented Apple's API. *In addition, we launched Advanced Conversions in Ads Manager so advertisers can measure their campaigns with our privacy conscious measurement stack. And then, you know, I think one of the things that we're observing here is that our opt in rates have been above what sort of widely reported in both the press as well as with the analyst community. So that's, that's good,* but it remains so early in these iOS changes and there's no question that it will be a change for the industry in and of itself. *But you know, I think we prepared it the best that we can. The product teams and the engineering teams have been working really closely*

– 14 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS

*with all of our partners and our sales teams to make sure that this transition for our advertisers is as smooth as possible.*

(Emphasis added.)

29.     The statements referenced in ¶¶ 20-28 above, made by or attributed to Defendants, were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Apple's privacy changes would have, and were having, a material impact on the Company's advertising business; (2) Snap overstated its ability to transition its advertising with Apple's privacy changes; (3) Snap knew of, but downplayed, the risks of the impact that Apple's privacy changes had on the Company's advertising business; (4) Snap overstated its commitment to privacy; and (5) as a result of the foregoing, Defendants' public statements and statements to journalists were materially false and/or misleading at all relevant times.

### The Truth Emerges

30.     On October 22, 2021, Snap filed its third quarter 2021 report for the period ending September 30, 2021 with the SEC on From 10-Q (the "3Q21 Report"), disclosing the Company's weaker-than-expected revenue and weaker-than-expected guidance because of its advertising business, including due to Apple's privacy changes.

31.     Further, the 3Q21 Report disclosed the risks of heighted restrictions on the Company's access and use of user data due to Apple's privacy update materialized, stating in pertinent part:

– 15 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Furthermore, ***in April 2021 Apple issued an iOS update that imposes heightened restrictions on our access and use of user data***. Google has announced that it will implement similar changes with respect to its Android operating system and major web browsers, like Safari and Chrome, may make similar changes as well. ***These changes have adversely affected our targeting, measurement, and optimization capabilities, and in turn affected our ability to measure the effectiveness of advertisements on our services. This has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business.*** The impact of these changes on the overall mobile advertising ecosystem, our competitors, our business, and the developers, partners, and advertisers within our community is uncertain, and depending on how we, our competitors, and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our business could be seriously harmed. In addition, if we are unable to mitigate these and future developments, and alternative methods do not become widely adopted by our advertisers, then our targeting, measurement, and optimization capabilities will be materially and adversely affected, which would in turn continue to negatively impact our advertising revenue. Any adverse effects could be particularly material to us because we are still early in building our advertising business. …

(Emphasis added.)

32.     On this news, Snap's stock price fell $19.97 per share, or 26%, to close at $55.14 per share on October 22, 2021, damaging investors.

33.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who

– 16 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

purchased or otherwise acquired the publicly traded securities of Snap during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

35. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

36. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

37. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

38. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

– 17 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

39. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

– 18 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

40.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on NYSE, and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)     Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

41.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

42.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

43.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

45.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

46.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

47.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

48.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

49.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a

– 21 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS

result of the Company's and the Individual Defendants' false and misleading statements.

50.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

51.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

52.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

53.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

54.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

– 22 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

55.     As officers of the Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company and to correct promptly any public statements issued by the Company which had become materially false or misleading.

56.     Because of their positions of control and authority as senior officers, Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

57.     The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

58.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

### **PRAYER FOR RELIEF**

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: November 11, 2021                    Respectfully submitted,

                                            /s/Laurence M. Rosen
                                            **THE ROSEN LAW FIRM, P.A.**
                                            Laurence M. Rosen, Esq. (SBN 219683)
                                            355 S. Grand Avenue, Suite 2450
                                            Los Angeles, CA 90071
                                            Telephone: (213) 785-2610
                                            Facsimile: (213) 226-4684
                                            Email: lrosen@rosenlegal.com

                                            *Counsel for Plaintiff*

– 24 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS