**SAXENA WHITE P.A.**
David R Kaplan (230144)
dkaplan@saxenawhite.com
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

*Lead Counsel for Lead Plaintiff
and the Class*

**BIENERT KATZMAN
LITTRELL WILLIAMS LLP**
John L. Littrell (221601)
jlittrell@bklwlaw.com
Michael R. Williams (192222)
mwilliams@bklwlaw.com
601 W. 5th Street, Suite 720
Los Angeles, CA 90071
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

*Liaison Counsel for Lead Plaintiff
and the Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| KELLIE BLACK, Individually and on Behalf of All Others Similarly Situated, | No. 2:21-cv-08892-GW(RAOx) |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND JURY TRIAL DEMAND** |
| SNAP INC., EVAN SPIEGEL and JEREMI GORMAN, | |
| Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ........................................................................ 1

II.     INTRODUCTION ....................................................................................... 2

III.    JURISDICTION AND VENUE .................................................................. 5

IV.     PARTIES .................................................................................................... 6

    A.     Lead Plaintiff ................................................................................... 6

    B.     Defendants ....................................................................................... 6

        1.     Snap ....................................................................................... 6

        2.     Evan Spiegel .......................................................................... 7

        3.     Jeremi Gorman ...................................................................... 7

V.      OVERVIEW OF THE FRAUD ................................................................. 9

    A.     Snap's Sole Business Is Selling Highly Targeted Mobile
        Advertising On Its Snapchat App ..................................................... 9

    B.     Apple Announces Privacy Changes To iOS That Will Allow
        Users To "Opt-Out" Of Being Tracked, Creating Investor
        Concerns Of Negative Impacts On Snap's Business ........................ 13

    C.     As Apple's IDFA Changes Loom, Snap Reassures Investors,
        Telling Them That A "Majority" Of Snap's Direct Response
        Advertisers Have Already "Successfully Implemented"
        SKAdNetwork ................................................................................ 15

    D.     The Truth Emerges ........................................................................ 19

    E.     A Former Snap Employee Who Worked Directly With
        Advertisers On The Transition To SKAN Confirmed That
        Snap's Advertisers Had Not "Successfully Implemented"
        SKAN By April 2021 ...................................................................... 22

VI.     DEFENDANT SPIEGEL CAPITALIZED ON DEFENDANTS'
    FRAUD THROUGH MASSIVE AND SUSPICIOUSLY TIMED
    INSIDER SALES ....................................................................................... 24

VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING
    STATEMENTS AND OMISSIONS ......................................................... 27

VIII.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ......... 34

IX.     LOSS CAUSATION ................................................................................. 41

X.      PRESUMPTION OF RELIANCE ............................................................ 43

XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ................................................... 44

XII.   CLASS ACTION ALLEGATIONS ............................................................ 45

XIII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................ 47

       COUNT ONE ............................................................................................ 47

       COUNT TWO ........................................................................................... 49

XIV.  PRAYER FOR RELIEF .............................................................................. 50

XV.    JURY DEMAND ........................................................................................ 51

# I.   NATURE OF THE ACTION

1.     Court-appointed Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters" or "Lead Plaintiff"), brings this securities class action on behalf of itself and all other persons and entities who purchased or otherwise acquired Snap Inc. ("Snap" or the "Company") publicly traded securities, and/or sold Snap put options, between February 5, 2021 and October 21, 2021, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").  Lead Plaintiff asserts claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Snap, and its co-founder, current Chief Executive Officer, and Director Evan Spiegel ("Spiegel"); and current Chief Business Officer Jeremi Gorman ("Gorman," together with Spiegel, the "Individual Defendants," and, together with Spiegel and Snap, "Defendants") and under Section 20(a) of the Exchange Act against the Individual Defendants.

2.     Oklahoma Firefighters alleges the following upon personal knowledge as to itself and its acts, and upon information and belief as to all other matters, based upon the ongoing investigation of its counsel. Lead Counsel's investigation included, among other things, review and analysis of: (i) Snap's public filings with the Securities and Exchange Commission (the "SEC"); (ii) in-depth research reports by securities and financial analysts; (iii) transcripts of Snap's conference calls with analysts and investors concerning Snap; (iv) presentations, press releases, and media reports regarding Snap; (v) interviews with former Snap employees; (vi) data reflecting the pricing of Snap shares; and (vii) consultations with relevant experts. Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery, as many of the facts are known only by Defendants, or are exclusively within Defendants' custody or control.

## II.    <u>INTRODUCTION</u>

3.     Snap is a social media company whose primary product is a free mobile chatting application called Snapchat.  Snap's business depends entirely on selling ads within Snapchat, and advertising makes up substantially all of the Company's revenue.  During the Class Period, roughly 70% of that advertising revenue came from ads displayed within Snapchat on Apple Inc. ("Apple") mobile devices using Apple's iOS operating system, including iPhones and iPads.

4.     Snap's advertising revenue depended on the Company's ability to track its users' activity on their devices, so that advertisers could both target their ads to specific users based on their interests and measure the effectiveness of their ads by observing how users were interacting with the ads.  Apple enabled this tracking on its devices through a system known as "Identifier for Advertisers" ("IDFA"), which allowed Snap and its advertisers to track individual users' activity and their interaction with advertisements in real time.

5.     In June 2020, Apple announced changes to privacy features on its devices that posed a potential threat to Snap's business.  Specifically, Apple announced that app companies like Snap would no longer be able to use IDFA to track the activity of users of iPhones and other Apple iOS devices unless those users expressly and affirmatively "opted in" to being tracked.  While industry observers expressed concerns that the changes could harm Snap and other social media companies if substantial numbers of iOS users did not "opt in," Snap claimed that Apple offered an alternative tool known as SKAdNetwork (or "SKAN") that would allow Snap and its advertisers to continue to target and measure their advertising, even if they could no longer track users on an individual basis.

6.     Both before and during the Class Period, "direct response" advertising—which consisted of in-app ads that would ask the user to take a specific action, such as making a purchase—was by far Snap's most critical business,

accounting for well over half of the Company's revenue and virtually all of its growth. Accordingly, statements relating to that business were highly material to investors. Throughout the Class Period, Snap directly represented that it would maintain the success of that business despite Apple's privacy changes by moving its direct response advertisers to Apple's SKAN platform. For example, Snap executives repeatedly reassured investors that the Company was "working closely with Apple to implement [SKAN]," and that Snap was "really well prepared" for the changes because it had made "design decisions" that put the Company in a "unique and beneficial position" to weather the changes relative to its competitors.

7.      Significantly, in April 2021, Defendants staunchly reassured the market that a majority of Snap's direct response advertisers were *already* successfully using SKAN for their Snap ad campaigns. Indeed, to assuage investor concerns about the potential impact of Apple's privacy changes on that critical business, Defendants stated—multiple times, in response to analyst's specific questions and in no uncertain terms—that "[a]dvertisers that represent a majority of our direct response advertising revenue have successfully implemented SKAdnetwork for their Snap campaigns." Analysts fully credited and heavily relied upon these assurances, and explicitly noted that they meant that a majority of Snap's advertisers had already fully implemented SKAN and were using it effectively to neutralize the impact of Apple's privacy changes—meaning that Snap was uniquely insulated from any significant business impact stemming from those changes. For example, Truist Securities noted that "[m]anagement stated that advertisers that represent a majority of its [direct response] ad revenue have successfully implemented [SKAN]," and concluded that this "should help mitigate against a meaningful adverse outcome for Snap." A Guggenheim report similarly concluded that, based on management's statements, the "majority of [Snap's] [direct response] advertisers [are] navigating [Apple's] new privacy initiatives with Snap via [SKAN]."

8.     On the strength of Defendants' representations, Snap's stock price soared, climbing 47% from $56.39 at the start of the Class Period to an all-time high closing price of $83.11 on September 24, 2021.  Meanwhile, Defendant Spiegel—Snap's founder and CEO, who was reported to have "centralized, unfettered control" over all aspects of the Company's business—fully capitalized, engaging in an unprecedented stock selling spree at prices artificially inflated by Defendants' fraud. Specifically, Spiegel sold *$700 million* worth of Snap stock over the course of less than 9 months, pocketing as much money in that brief time period as he had previously received from stock sales over Snap's *entire four-year history as a public company*.

9.     However, as Defendants were ultimately forced to admit, their representations regarding Snap's success using SKAN to weather Apple's privacy changes were completely false.  On October 21, 2021, Snap stunned the market by announcing that, precisely because of massive problems that its advertisers were experiencing with SKAN, the Company would, for the first time in its history as a public company, miss the lower end of its revenue guidance.  Moreover, these problems were so severe, and so pervasive and intractable, that Snap's business would be materially impacted <u>for at least the next year</u>.  Indeed, Snap was forced to reduce its guidance for its most important financial metric, Adjusted EBITDA, <u>by a staggering 50%</u> for the fourth quarter of 2021, and caused analysts to dramatically slash their 2022 adjusted EBITDA estimates by as much as 40%.

10.    Significantly, in announcing these disastrous results, Defendants explicitly contradicted the express assurances they had made to investors just a few months earlier.  Specifically, while Defendants had previously unequivocally assured investors that a majority of Snap's direct response advertisers had already "successfully implemented" SKAN by no later than April 2021, Defendants now admitted that the exact opposite was true.  In reality, the Company's advertisers <u>had</u>

only just started to "explore[] and test[] SKAN," and upon doing so, <u>had immediately determined that SKAN was a completely "unreliable" and ineffective replacement for IDFA</u>.  Indeed, Defendants admitted that, upon attempting to implement SKAN, Snap's advertisers had raised a laundry list of serious "concerns about [SKAN's] limitations"—including that SKAN had rendered them utterly unable to either effectively target their ads or monitor the success of their ad campaigns in real-time, two capabilities that were absolutely critical for their business.  Thus, directly contrary to Defendants' earlier statements, no "successful implement[ation]" of SKAN had ever occurred, or even come close to occurring.

11.  In response to these stunning disclosures, Snap's stock price collapsed, plummeting 26% in one day—the largest single-day stock drop in Snap's history. The massive decline wiped out an astonishing $27 billion in market capitalization, and analysts excoriated management for their prior representations.  For example, MKM Partners highlighted Defendants' reversal, stating that they were "<u>surprised with the change of management's tone with regards to the effect of Apple changes on Snap's ad business</u>."  Similarly, RBC Capital Markets stated that "<u>management almost couldn't have sounded worse around the effects [the IDFA change] is having</u>," and that "<u>management's credibility</u>" was both "<u>permanently damaged</u>" and "<u>likely gone given recent communications did not indicate these risks</u>."

12.  Investors have suffered substantial losses from Defendants' violations of the federal securities laws.  This action seeks redress on behalf of these aggrieved shareholders.

## III.   JURISDICTION AND VENUE

13.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the

subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Snap maintains its corporate headquarters in Santa Monica, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District. In connection with the acts alleged in this Consolidated Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. PARTIES

### A. Lead Plaintiff

15. Lead Plaintiff Oklahoma Firefighters provides retirement benefits to firefighters in the state of Oklahoma. It has approximately $3.5 billion in assets and over 26,000 participants. As set forth in its previously submitted certification, Oklahoma Firefighters purchased Snap common stock on the New York Stock Exchange ("NYSE") during the Class Period and suffered damages as a result of the federal securities laws alleged herein. *See* ECF No. 31-1.

### B. Defendants

#### 1. Snap

16. Defendant Snap is a Delaware corporation with its principal executive offices located at 3000 31st Street, Santa Monica, CA 90405. Snap began in 2011 as a picture messaging application for the iPhone called "Snapchat." Because Snapchat is a free application, Snap generates almost all its revenue from third-party advertising. Snap's shares trade on the NYSE under the ticker symbol "SNAP."

### 2.  Evan Spiegel

17.  Defendant Spiegel is a co-founder of Snap and has served as the Company's Chief Executive Officer ("CEO") and as a member of the Company's board of directors since May 2012.  Spiegel launched the Company with co-founder Bobby Murphy ("Murphy") in 2011.  As stated in Snap's 2021 Form 10-K, as CEO, "Mr. Spiegel has control over [Snap's] day-to-day management and the implementation of major strategic investments of [the] [C]ompany," and "has been responsible for [the] [C]ompany's strategic vision."  During the Class Period, Defendant Spiegel made materially false and misleading statements and omissions during conference calls and other public forums, including on February 4, 2021, February 5, 2021 and May 21, 2021 as alleged herein.

### 3.  Jeremi Gorman

18.  Defendant Gorman has served as Chief Business Officer since November 2018 and is responsible for Revenue and Customer Operations, including Global Advertising Sales and all of the Company's sales and advertising teams.  Prior to joining the Company, Defendant Gorman was employed at Amazon.com Inc., serving as Head of Global Field Advertising Sales from June 2018 to November 2018, as Head of Field Advertising Sales, U.S. from April 2015 to June 2018, and as Head of Entertainment Advertising Sales from 2012 to April 2015.  During the Class Period, Defendant Gorman made materially false and misleading statements and omissions during conference calls including on February 4, 2021, April 22, 2021, and July 22, 2021 as alleged herein.

19.  Defendants Spiegel and Gorman are collectively referred to herein as the "Individual Defendants."

20.  During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Snap, were privy to confidential, proprietary and material adverse non-public information concerning Snap, its operations, finances, financial condition and present and future business prospects via access to internal corporate

documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Snap's business.

22. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Snap's financial condition

and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Snap's common stock would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## V.   OVERVIEW OF THE FRAUD

### A.   Snap's Sole Business Is Selling Highly Targeted Mobile Advertising On Its Snapchat App

24.   Snap is a social media company headquartered in Santa Monica, CA. Snap's sole significant product is the Snapchat app for smartphones and tablets, which allows users to chat with each other and to send each other photo and video communications with a variety of digital enhancements.

25.   Snap was founded in 2011 by Defendant Spiegel and Bobby Murphy, and grew rapidly over the next five years as Snapchat's user base skyrocketed.  By 2016, the Company was valued at tens of billions of dollars, and in March 2017, Snap went public through an initial public offering that valued SNAP at almost $30 billion on the first day of trading.  By this time, Defendant Spiegel and Murphy had become billionaires on paper, with each respectively owning approximately 18% of the Company's outstanding shares post-IPO and, together, maintaining majority voting control over the Company through their Class B and Class C shares.

26.   As of the end of 2020, Snapchat had approximately 265 million daily active users.  Virtually all of those users used Snapchat either through an Apple iOS device (such as an iPhone or iPad) or through an Android-based device (such as a Samsung Galaxy or Google Pixel phone).  While the Company does not disclose the exact breakdown of its users by device or operating system, during the Class Period, a majority of Snapchat's users were believed to be doing so through Apple devices.

27.     Snap does not charge money for its Snapchat app, such that its revenue comes entirely from selling targeted advertising that appears within the app.[1]  As the Company's Form 10-K for the year ending December 31, 2020 explained, "[s]ubstantially all of [Snap's] revenue is generated from third parties advertising on Snapchat, a trend that we expect to continue.  For the years ended December 31, 2020, 2019, and 2018, advertising revenue accounted for approximately 99%, 98%, and 99% of total revenue, respectively."  Significantly, the vast majority of this amount was derived from ads placed on Apple devices.    For example, during the Class Period, a Needham analyst estimated that <u>ads on Apple devices accounted for roughly 70% of Snap's revenues</u>.  The ability to effectively advertise on Apple devices was therefore crucial to Snap's business.

28.     Leading up to and during the Class Period, Snap's "direct response" advertising platform was by far the most critical part of its advertising business. Direct response ads are in-app ads that ask a user to take an action, such as clicking through to a shopping website to make a purchase or to an app download page.  By mid-2020, direct response advertising made up well over half of Snap's revenue, and was widely seen as the Company's key growth engine and the reason for its breakout success.  As an April 2020 article on the advertising website Campaign explained, "Snapchat has found its groove as the go-to ad platform for <u>direct-response advertising, which has more than doubled in revenue and now makes up more than half of the company's total revenue</u>."  Similarly, an April 2020 CNBC article noted that Snap was "better insulated [from COVID-19 impacts] than its peers <u>because of its strong momentum with direct-response advertisers</u>."  And an October 2020 article on MarketingDive.com quoted a marketing analyst as emphasizing that "<u>Snap's outperformance is due to its rising stature as a direct response advertising platform</u>."

---

[1] Snap primarily sells two types of advertisements: "Snap Ads," which are traditional image- and video-based ads that appear within the Snapchat app, and "AR [Augmented Reality] Ads," which enable users of the app to utilize brand-sponsored "filters" and "lenses" that overlay images onto their own photos and videos.

29.     Defendants also repeatedly emphasized the success of Snap's direct response business during the Class Period, touting it as the source of a majority of the Company's revenue and the key to its growth.  For example, in the Company's February 4, 2021 earnings call, Defendant Gorman noted that she was "pleased to see our entertainment advertising partners increase spend as they pivoted to direct response," and on the Company's April 22, 2021 earnings call, Gorman emphasized that Snap "continue[d] to see over half our revenue come from direct response campaigns."   Analysts similarly focused on Snap's direct response advertising business.  For example, a February 2021 Truist Securities report emphasized that "Snap's investment into direct response (DR) ad products over the last two years continue to pay off," and an April 2021 Canaccord Genuity report noted that Snap's "[d]irect response strength drives accelerating advertising growth."

30.     Significantly, Snap's ability to collect its users' data and track their activity on an individual basis in real time was essential to the success of its direct response advertising business.

31.     First, this individualized data-tracking enabled Snap and its advertisers to precisely target ads to individual users based on their traits and attributes.  As Snap explained in its 2020 Form 10-K, the Company's main selling point to its advertisers were the "tools" it offered to "help[] advertisers increase their return on investment by providing more refined targeting" based on user data.   This functionality enabled Snap's advertisers to "optimize relevance of ads across the entire platform by determining the best ad to show to any given user based on their real-time and historical attributes and activity," which in turn would "decrease[] the number of wasted impressions [i.e. user views of an ad that did not result in any engagement or purchase] while improving the effectiveness of the ads that are shown."

32.     Second, and importantly, Snap's tracking of its users' activity enabled advertisers to measure the effectiveness of their ad campaigns with exacting detail and in real time.  As Snap's 2019 Form 10-K explained, Snap enabled advertisers to "measur[e] advertising effectiveness" through tools designed to "provide analytics on campaign attributes like reach, frequency, demographics, and viewability; changes in perceptions like brand favorability or purchase intent; and lifts in actual behavior like purchases, foot traffic, app installs, and online purchases." Significantly, all of these important advertising functions required detailed and precise tracking of user activity on their phone or tablet device.

33.     On Apple iOS devices, Snap's user tracking was enabled by an Apple platform known as Identifier for Advertisers, or IDFA.  As of the outset of the Class Period, Apple's IDFA enabled app makers like Snap, and its advertisers, to collect data on its users' interactions with advertisements, and to track users' activity on their devices even outside of the Snapchat app.  For example, if a mobile gaming company were to advertise a new game within Snapchat, IDFA would make it possible for both Snap and the gaming company to know whether individual users had clicked the ad for the game, whether they had subsequently downloaded and installed the game on their device, whether they had played the game, and whether they had spent money within it.  Similarly, IDFA could track whether a Snapchat user clicked on a designer clothing ad (which would open the user's web browser), and whether they subsequently purchased the clothing item advertised.

34.     As such, although Apple's IDFA made individual users anonymous and did not provide any personally identifying data, it enabled Snap and its advertisers to track these users' activity on an individual-by-individual basis, both with respect to specific ads and more generally.  This tracking enabled advertisers to more precisely target their ad campaigns to consumers likely to be interested in their products, and also gave them powerful tools to measure the effectiveness of

individual ads or ad campaigns within Snapchat.  Moreover, IDFA enabled Snap and its advertisers to measure the effectiveness of ads in real time, allowing them to tweak ads and ad campaigns for greater effectiveness within mere minutes.

35.     Consequently, the particular features and capabilities that IDFA offered to Snap's advertisers were absolutely critical to Snap's direct response advertising business—the bulk of which, as stated above, was derived from direct response advertising on Apple devices in particular.    Indeed, IDFA greatly aided Snap's success as a direct response advertising platform, enabling Snap to charge a premium for its advertising spots versus more traditional online and mobile advertising.  Thus, any changes to IDFA could materially impact the Company's financial success.

**B.     Apple Announces Privacy Changes To iOS That Will Allow Users To "Opt-Out" Of Being Tracked, Creating Investor Concerns Of Negative Impacts On Snap's Business**

36.     In June 2020, as part of an ongoing privacy push, Apple publicly announced a slew of new data privacy features for iOS.  Of particular concern to companies like Snap were Apple's planned changes to IDFA.  Specifically, prior to the changes, a user's activity would automatically be tracked by IDFA unless they affirmatively "opted out" of tracking.  Significantly, few iOS users took this extra step of opting out because it required users to actively seek out the opt out function within their iPhone settings—and few iOS users were even aware of this function.

37.     However, Apple's June 2020 announcement revealed that, once the planned changes were implemented, users would have to affirmatively "opt in" in order to be tracked by IDFA, and would have to do so for each app.  Specifically, under this change—which Apple referred to as "App Tracking Transparency" (or "ATT")—once iOS device users updated their devices, any app would have to display a prompt like the below example, asking users whether they wished to be tracked:

38.     Industry observers expressed concern that this could harm ad-dependent social media companies like Snap if too many Apple device users chose not to "Allow Tracking" of their app and website data, which could negatively impact the in-app ad revenue upon which Snap depended.  For example, a July 24, 2020 MacQuarie research report explained that "Apple's mobile IDFA has long been the mechanism by which publishers understand what device their apps are sitting on – but the new iOS will include a prompt to users forcing them to opt in to having their data tracked for advertising purposes, with IDFA shut off by default."  The report expressed concerns that "[o]pt-in rates could be very low, and mobile marketers will have to find other ways to attribute ad effectiveness."

39.     To help providers and advertisers cope with the changes, Apple promoted its own proprietary solution called SKAdNetwork, or SKAN.  Unlike IDFA, SKAN would not allow advertisers to track users' activity on an individual-by-individual basis, but instead would "aggregate" users' activity into groups and allow tracking only of these groups.  As the MacQuarie research report explained, SKAN would still "give[] advertisers some information primarily related to initial mobile app install recognition," but it would not provide "granular data on specific devices and users."  Instead, "these data will be aggregated – not provided at device level – and are delayed, not provided real-time."

40.     Some analysts voiced concerns about the risks that this transition to SKAN potentially posed for Snap's business.  For example, a January 31, 2021

Deutsche Bank report stated that analysts had "heard mixed things in terms of the potential impact to Snap from IDFA, some suggesting the company is quite exposed and others suggesting it has some insulation," and noted the Company's "exposure to iOS… and reliance on the IDFA" as potential risks.  As such, Snap was under intense pressure to reassure the market that its advertising business was well-equipped to withstand Apple's changes and thrive with SKAN.

**C.   As Apple's IDFA Changes Loom, Snap Reassures Investors, Telling Them That A "Majority" Of Snap's Direct Response Advertisers Have Already "Successfully Implemented" SKAdNetwork**

41.   By February 2021, investors were anxious about the impact of the pending changes on Snap's business.  Accordingly, Snap management began discussing the transition in greater detail, taking great pains to reassure investors that Snap was "well prepared" for the changes.  For example, during the Company's fourth quarter 2020 earnings call on February 4, 2021, Defendant Gorman asserted that Snap had "been working really closely with Apple to implement SKAdNetwork," and had also been successfully working closely with its advertisers to prepare for and "mitigate" the changes.  Specifically, Defendant Gorman stated that "[w]e've been communicating very well with advertisers, we're educating them, talking about them deeply about these coming changes and encouraging them to implement [certain tools developed by Snap] to mitigate any of this."  Gorman emphasized that as a result of Snap's efforts to acclimate its advertisers to the iOS changes, the Company "fe[lt] <u>really well prepared for these changes</u>."

42.   Defendant Gorman not only told investors that Snap's advertising business could withstand Apple's privacy changes, but assured investors that Snap's particular "design decisions" and its approach to privacy differed from other companies in ways that placed the Company in a "<u>unique and beneficial position</u>" to deal with the coming iOS changes.  Specifically, Gorman highlighted to the market that Snap was in a "really <u>unique and beneficial position</u>" to deal with the

Apple privacy changes better than its competitors because "from the beginning, in our business, <u>we made design decisions that help us avoid many of the issues seen on other platforms</u>."

43.     As the Class Period progressed, Defendants sought to strongly reassure investors that Apple's iOS changes had not negatively impacted Snap's business. Specifically, on April 22, 2021, Snap held its earnings conference call for the first quarter of 2021.  With analysts and investors clamoring to know about how Snap was weathering the privacy changes, Snap went to great lengths to reassure the market that its advertisers were <u>already</u> successfully using SKAN for their Snap campaigns, and thus the market could expect no significant disruptions to Snap's business.  Significantly, Defendants emphasized to investors that <u>the **majority** of Snap's direct response advertisers had already "**successfully implemented**</u>" SKAN. Specifically, during the earnings call, Defendant Gorman unequivocally stated, in no uncertain terms, that "<u>[a]dvertisers that represent a majority of our direct response advertising revenue have successfully implemented SKAdNetwork for their Snap campaigns</u>."

44.     Moreover, when analysts asked Defendant Gorman to elaborate on her claim that a "majority" of Snap's direct response advertisers had already "successfully implemented" SKAN for the Snap platform, <u>she explicitly reaffirmed it</u>.  For example, a Guggenheim Partners analyst asked Gorman "what defined success of that implementation" of SKAN, and whether Gorman "expect[ed] this to mitigate some of the IDFA headwinds <u>that have been a source of investor concern</u>." Gorman responded by unequivocally reiterating that "we're really pleased to see that <u>advertisers that represent the majority of our direct response revenue have implemented [SKAN] so far</u>."

45.     Tellingly, the market responded directly and favorably to Defendants' staunch reassurances that a "majority" of Snap's crucial direct response advertisers

had already "successfully implemented" SKAN for their Snap campaigns.  Indeed, numerous analysts expressly quoted or paraphrased Defendants' claim of "successful implementation," noting that it meant that the majority of Snap's advertisers were already successfully using SKAN to effectively monitor and track their ads despite Apple's privacy changes, and were not experiencing any serious negative impacts on their ad campaigns.  For example, an April 22, 2021 Truist Securities report noted that "[m]anagement stated that advertisers that represent a majority of its [direct response] ad revenue have successfully implemented [SKAN] for their Snap campaigns."  As such, Truist concluded that "[a]ll this should help mitigate against a meaningful adverse outcome for Snap," reiterated its buy rating and price target of $85, and noted Snap management's "relatively comfortable stance towards the potential impact of ATT (App Tracking Transparency) on its business."

46.    Truist was not alone: numerous analysts echoed these statements.  For example, Piper Sandler also took great comfort from Defendants' statements, noting that Snap management was "[c]onstructive on [u]pcoming iOS changes," precisely because "[t]he majority of SNAP's [direct response] advertisers have adopted SKAdNetwork and they continue to work closely with Apple to prepare for the changes."  Similarly, Guggenheim noted that Snap had not seen negative impacts from the iOS changes, stating that "[t]he company did not experience monetization impacts from Apple's ongoing App Tracking Transparency-related changes," and that the "majority of its DR advertisers [are] navigating these new privacy initiatives with Snap via SKAdnetwork."  An April 22, 2021 JMP analyst report similarly stated that management had "included this headwind [from the Apple privacy changes] in guidance" and opined that "given 50%+ of Snap's [direct response] advertising partners have adopted Apple's SKAdNetwork and Snap's planning, we view [Apple's App Tracking Transparency] changes as less of a risk than previously."

47.     Defendants continued to make reassuring statements that Snap's business had not been impacted by Apple's privacy changes, and that its advertisers' transition to SKAN had gone "smoothly," throughout the Class Period.   For example, in a May 21, 2021 interview with CNBC, Defendant Spiegel said Snap had "been able to help our advertising partners navigate those changes, migrate to SKAdNetwork…[a]nd so far, that transition has gone smoothly for our business." Then on July 22, 2021, during Snap's earnings conference call for the second quarter of 2021, Defendant Gorman claimed that Snap was observing higher tracking opt-in rates among Snap's users relative to its competitors, thus purportedly easing the transition to SKAN and lessening any impact of the privacy changes.   Specifically, Gorman stated that "[a]s Apple rolled-out its App Tracking Transparency-related changes near the end of Q2, we observed higher opt-in rates than we are seeing reported generally across the industry"—which Gorman attributed to Snap's extensive preparations for the privacy changes and its efforts to "work[] really closely with all of our partners and our sales teams to make sure that this transition for our advertisers is as smooth as possible."   Gorman further claimed that, in working with advertisers to "transition smoothly" through Apple's changes, Snap had "rolled out full support of SKAN version 3.0, which we know will aid or we believe will aid in attribution for advertisers," and had launched new software tools "so advertisers can measure their campaigns."

48.     Analysts were again reassured.  A July 22, 2021 Guggenheim report noted that "Snap is…proactively navigating iOS privacy changes via [SKAN] 3.0…which we view as a net positive for maintaining longer-term revenue growth targets."  A July 23, 2021 JPMorgan report specifically cited Defendants' claims as evidence that Snap was "managing" the transition to SKAN, noting that "SNAP saw higher opt-in rate[s] than others across the industry, & the strong 2Q results & the guid[ance] support our view that SNAP is managing through the changes."

49.    On July 23, 2021, the day after Snap's positive statements about the transition to SKAN, Snap's stock price rose almost 24% in one day, from $62.97 to $77.97 per share.  In total, Snap's stock rose 47% from $56.39 at the start of the Class Period to an all-time closing high of $83.11 on September 24, 2021.

## D.    The Truth Emerges

50.    The truth regarding Defendants' fraud was revealed on October 21, 2021, when the Company reported its financial results for the third quarter of 2021. In its earnings release that day, Snap stunned the market by announcing that it had missed the lower end of its revenue guidance—the first time this had happened in the Company's history.  Additionally, Snap dramatically reduced its guidance for fourth quarter Adjusted EBITDA,[2] its most important financial metric, to just $135-$175 million—as much as 55% below Wall Street consensus expectations of $300 million.  Moreover, Snap made clear that the impact of the privacy changes would materially impact its business for the next year, causing analysts to reduce their estimates for 2022 by as much as 40%.

51.    Significantly, in their earnings press release, Defendants directly attributed these catastrophic results to "headwinds" from Apple's privacy changes that, contrary to Defendants' positive statements made as recently as three months earlier, had in fact severely negatively impacted Snap's business precisely because of pervasive and intractable issues Snap's advertisers had experienced with SKAN.

52.    Specifically, in a complete about-face from Defendants' prior statements, Defendants now admitted that Snap's direct response advertisers had not "successfully implemented" SKAN by April 2021.  To the contrary, Defendant Gorman admitted that Snap's direct response advertisers had only just begun to "explore[] and test[] SKAN," and that, rather than having completed any

---

[2] Adjusted EBITDA is the Company's preferred measure of profitability, which, according to its SEC filings, enables "investors and others to evaluate our operating results in the same manner as does our management."

"successful" implementation of SKAN, SKAN had proven to be completely "unreliable" and utterly ineffective as an advertising tool.  Indeed, during Snap's 3Q21 earnings call, Defendant Gorman admitted that, when the Company's advertisers did actually attempt to implement SKAN, they had raised a "variety" of serious "concerns about [SKAN's] limitations"—including that SKAN had rendered them completely unable to effectively target their advertising or monitor the success of their ad campaigns, two capabilities that were absolutely critical for their business. For example, Defendants stated that advertisers using SKAN had been rendered (i) "unable to target advertising based on whether or not people have already installed their app;" (ii) were "no longer able to understand the impact of their unique campaigns"; and (iii) had lost their critical ability to observe their ad campaigns in real time, as "real-time campaign and creative management [wa]s hindered by extended reporting delays."  Gorman explained:

> [A]s our advertising partners have explored and tested SKAN solutions, they have surfaced a variety of concerns about its limitations. Every advertiser has their own unique fine-tune perspective on the optimal parameters to measure ROI for their business, but SKAN requires them to use Apple's fixed definitions of advertiser success. For example, advertisers are no longer able to understand the impact of their unique campaigns based on things like time between viewing an ad, and taking an action or the time spent viewing and ad. Additionally, real-time campaign and creative management is hindered by extended reporting delays and advertisers are unable to target advertising based on whether or not people have already installed their app.

In other words, far from any "successful" implementation, SKAN had in fact destroyed the very features that were critical to advertisers' business and had

previously made Snap's advertising platform so valuable to its advertising customers.

53.     In response to these shocking revelations, Snap's stock price collapsed. In just a matter of hours, Snap's stock fell $19.97 per share, or 26%, to close at $55.14 per share on October 22, 2021—representing an approximately $27 billion drop in market capitalization.  The drop was by far the largest one-day decline in the Company's history.

54.     Analysts excoriated management for their prior misrepresentations, and in particular called out management for their complete reversal from the claims they had made only a few months earlier.  For example, in a report mockingly titled, "'It's just a flesh wound.' Lowering estimates and price target," RBC Capital Markets reported that "management almost couldn't have sounded worse around the effects [the IDFA change] is having."  Indeed, RBC noted that Snap had now acknowledged that it would take "a few quarters to alleviate" the damage done by the IDFA changes, and slashed its 2022 adjusted EBITDA estimates for Snap by more than $500 million to just $780 million—a 40% reduction.     Moreover—and significantly—RBC explicitly noted that the Company's stunning disclosure directly contradicted the statements Defendants had been making for months, stating that "management's credibility is likely gone given recent communications did not indicate these risks," and going so far as to conclude that "management's credibility may be permanently damaged."

55.     Other analysts likewise highlighted the market's "surprise" at management's admission that their prior representations were false, and directly linked this disclosure to the Company's massive stock price drop.  For example, MKM Partners stated that their analysts were "surprised with the change of management's tone with regards to the effect of Apple changes on Snap's ad business."  Barron's also underscored that the Company's announcement "caught

the market by surprise and the company lost a quarter of its value in a matter of minutes."   In a report titled "The Perfect Storm," analysts from Evercore ISI noted that they were "surprised by the magnitude of its [second half] revenue challenges and believe the stock likely to be dead $ for 3-6 months."

56.     The same day, on October 21, 2021, Snap also filed its Form 10-Q for the third quarter of 2021 ("3Q 2021").   Significantly, in the 3Q 2021 10-Q, Defendants further confirmed that the privacy changes Apple had made back in April 2021 had had a severe and material negative impact on Snap's business:

> [I]n April 2021 Apple issued an iOS update that imposes heightened restrictions on our access and use of user data… These changes have adversely affected our targeting, measurement, and optimization capabilities, and in turn affected our ability to measure the effectiveness of advertisements on our services. This has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business.

**E.     A Former Snap Employee Who Worked Directly With Advertisers On The Transition To SKAN Confirmed That Snap's Advertisers Had Not "Successfully Implemented" SKAN By April 2021**

57.     CW 1, a former Snap Account Strategist who worked directly with the Company's advertising clients on the transition from IDFA to SKAN further confirmed that, rather than "successfully implement[ing]" SKAN, most of Snap's advertisers had avoided implementing SKAN for as long as possible due to concerns about its performance, and that those who did implement SKAN immediately found it to be unworkable because it rendered advertisers wholly unable to effectively track or monitor their ad campaigns.

58.    CW 1[3] said that she was intimately involved in transitioning Snap's advertisers from IDFA to SKAN from the very outset.  CW 1 observed that, rather than immediately implementing SKAN, "[a]dvertisers dragged their feet as long as possible" due to SKAN's severe drawbacks compared to IDFA.  Indeed, directly contradicting Defendants' claims that a "majority" of advertisers had "successfully implemented," SKAN by April 2021, CW 1 said that the exact opposite was true, as "[t]he performance of SKAN was terrible and there were very few adoptees in Q1 and Q2 of 2021."  As CW 1 stated, "[f]rom day one when SKAN support launched[,] [r]ight when it was launched in April 2021, I did not find it to be effective."  CW 1 thus explained that while Snap was "one of the first to go to market with SKAN compatibility," that "[did] not mean that the performance was good, because it was not."

59.    CW 1 further explained that the advertisers who did implement SKAN immediately experienced numerous issues severely hindering their ability to track and monitor their ads, and thus they had no insight as to the performance of their ad campaigns.  Specifically, upon implementing SKAN, advertisers immediately lost access to all of the legacy data they had previously collected on individual consumers—and any new data they received (which was no longer tied to individual users) was significantly delayed, severely hampering their ability to optimize ad campaigns in real time.  For example, once an advertiser launched a new ad campaign using SKAN, it took almost three days before any data would populate—and even when that data became available three days later, advertisers "were unable to know what the users were doing" and thus unable to collect critical purchase data (for example, advertisers were completely unable to determine whether a user who

---

[3] CW 1 worked for Snap as an Account Strategist from April 2020 through December 2021 in the gaming advertising group, and in that role reported to Meena Kallu, the Head of Emerging Gaming for North America.  CW 1 left the Company in December 2021 due to difficulties she was experiencing in selling advertising solutions because of the numerous issues advertisers were having with SKAN.  CW 1 is referred to in the feminine to protect their identity.

made a purchase after clicking on an ad were making a $5 or a $10 purchase). Moreover, CW 1 stated that the numerous issues advertisers were having with SKAN were exacerbated by the fact that, in reality, Snap's "support [for SKAN] was very limited and was nowhere near robust."  As such, while "clients were looking to Snap to answer [their] questions…we didn't know the answers."

## VI.  **DEFENDANT SPIEGEL CAPITALIZED ON DEFENDANTS' FRAUD THROUGH MASSIVE AND SUSPICIOUSLY TIMED INSIDER SALES**

60.    Defendant Spiegel capitalized on Defendants' fraud by engaging in massive and suspiciously timed stock sales, selling a total of more than 10 million shares for astonishing <u>total proceeds of nearly $700 million</u>.  Indeed, in less than nine months during the Class Period, Defendant Spiegel pocketed as much in proceeds from stock sales as he had received in the Company's entire four-year prior history since going public in March 2017, including his IPO sales, and roughly <u>4.6 times as much</u> as he received from stock sales in the previous same-length period.[4]



**Proceeds from Shares Sold by CEO Spiegel**
(Excluding Sales for Tax Withholdings)

[4] These calculations exclude stock sales that were enacted solely for purposes of mandatory tax withholding requirements according to Spiegel's Form 4s filed with the SEC.

61.     Defendant Spiegel's Class Period sales were extraordinarily well-timed, taking place at all-time high stock prices between $60 and $82.25 per share. Indeed, Defendant Spiegel sold over a million shares of his Snap stock at prices of $80 or more per share, and thus within a few dollars of the stock's all-time intraday



high price of $83.34—a price the stock has never since come close to reaching again.

62.     While most of Defendant Spiegel's stock sales during the Class Period were reportedly pursuant to a trading plan established under Rule 10b5-1, none of the details of any such plan, including even the date of the plan's adoption, were ever made public.  Indeed, a close analysis comparing Spiegel's 10b5-1 plan trading prior to and during the Class Period reveals that his trading pattern changed dramatically once the Company's stock price was inflated by fraud, strongly suggesting that he either modified his plan or adopted an entirely new plan during the Class Period to take advantage of the inflation.

63.     For example, during all of 2019, Spiegel made just five sales pursuant to a 10b5-1 trading plan, on only five different days.  Spiegel's 2020 trading plan selling followed a similar pattern, as he made just seven sales pursuant to his 10b5-1 trading plan on seven different days.  Yet, during the nine-month Class Period, Spiegel suddenly engaged in frequent and erratic sales, selling stock on <u>28 different days</u> that appear timed to take advantage of inflated prices.  As shown in the chart below, Defendant Spiegel's "trading plan" made only a few sales in the nine-month period prior to the Class Period, but numerous and frequent sales during the Class Period, and especially between June and September 2021.



64.     Spiegel's purportedly "automatic" stock trading pursuant to his trading plan became especially active after Defendants assured the market that "a majority" of Snap's direct response advertisers had "successfully implemented" SKAN. Between June and September 2021 alone—a four-month period—Spiegel sold approximately <u>8.3 million shares</u> though his trading plan for total proceeds of more than <u>$581 million</u>.

65.    Tellingly, notwithstanding his purported 10b5-1 trading plan, since October 2021, Defendant Spiegel has not sold a single share of Snap stock, further suggesting that Defendant Spiegel's "Class Period" trading plan was structured differently than any plan he held either prior to or subsequent to the Class Period, and was designed to take advantage of inflated prices.

## VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

66.    Defendants made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.   Throughout the Class Period, Snap's investor presentations included material misstatements and/or omissions concerning the Company's financial condition, which included, among other misrepresentations, statements concerning Snap's ability to contend with Apple's privacy changes.

67.    Defendants' representations were false.  These material misstatements had the cause and effect of creating in the market an unrealistically positive assessment of Snap's business, operational status and future growth prospects as, in truth, Defendants had falsely presented to investors a materially misleading portrayal of the success of its advertisers' implementation of SKAdNetwork and the effect of Apple's iOS changes on Snap's ad business throughout the Class Period.

### A.    February 2021

68.    On February 4, 2021, after the markets closed, Defendants held a conference call with analysts and investors to discuss the Company's results for the fourth quarter of 2020.  During the call, Defendants Spiegel and Gorman addressed the upcoming iOS platform changes, assuring investors that they were "working really closely with Apple to implement SKAdNetwork" and were "well prepared"— even in a "unique and beneficial position"—to deal with these changes due to

"design decisions that help[ed] [Snap] avoid many of the issues seen on other platforms."

69.    Specifically, a Deutsche Bank analyst asked Defendant Gorman how Snap management could "get comfortable that the momentum in these ad units is sustainable through these upcoming iOS changes that are going to effectively blind ad platforms."  Defendant Gorman responded by assuring investors that it had been "working closely with Apple to implement SKAdNetwork" as well as "building our own solutions," and that, as such, Snap was "really well prepared for these changes":

> But as it comes to IDFA and the changes, whether or not they will impact us. The reality is we admire Apple, and we believe that they are trying to do the right thing for their customers. Their focus on protecting privacy is aligned with our values and the way that we've built our business from the very beginning. So the change here that we're really focused on has less to do with IDFA for which Apple has long offered an opt-out. And instead on a much more broad policy change that requires Snapchatters to opt into tracking with other personal identifiers such as their e-mail address, which would make it harder for us and the overall digital ad ecosystem to match advertising outcomes. But we've been working really closely with Apple to implement SKAdNetwork, which is their privacy protective solution as well as building our own solutions that use aggregated data to protect privacy. We've been communicating very well with advertisers, we're educating them, talking about them deeply about these coming changes and encouraging them to implement our Conversion API and Measurement Kit to mitigate any of this. And then longer term, we're investing in using first-party data from our platform and providing more opportunities for

on platform conversion, which will really help. <u>Overall, we feel really well prepared for these changes.</u>

70.     Regarding the potential ad disruption, Defendant Spiegel stated that the changes were in fact an "opportunity" and "in line with how we've been thinking about building our business since the beginning."  Indeed, Defendant Gorman assured investors that "the growing focus on brand safety and privacy across the entire industry actually places us in a <u>really unique and beneficial position...which is that from the beginning, in our business, we made design decisions that help us avoid many of the issues seen on other platforms.</u>"[5]

71.     The statements in paragraphs 68-70 above were materially false and misleading and omitted material facts.  Defendants had no basis to claim that Snap was "well prepared" for, and in a "unique and beneficial position" to deal with, the IDFA changes, or that it was immune to the negative effects of Apple's privacy changes because of its "design decisions."  Instead, as Defendants admitted on October 21, 2021, Snap was severely impacted by Apple's privacy changes, which had destroyed its direct response advertisers' ability to effectively target or monitor their ads—capabilities that were absolutely critical to their business.  Indeed, in truth, SKAN was a completely ineffective replacement for IDFA, and was not being well-received by its advertisers—to the contrary, and as Defendants ultimately admitted, Snap's advertisers found SKAN to be completely "unreliable" and unworkable.

**B.     <u>April 2021</u>**

72.     On April 22, 2021, the same month that the iOS changes were to be rolled out, Defendants held a conference call with analysts and investors to discuss the Company's financial results for the first quarter of 2021.  During the call,

---

[5] Defendant Spiegel echoed these comments on February 5, 2021, when he appeared on CNBC and again emphasized that Defendants were "<u>well prepared for these changes.</u>"

Defendant Gorman unequivocally stated that Snap's advertisers had had ample time to adopt and test SKAN and were *already successfully using it*, stating, in no uncertain terms that a "majority" of Snap's direct response advertisers had already "successfully implemented" SKAN:

> The fact that these changes are coming later than we anticipated has provided additional time to adopt Apple's SKAdNetwork … <u>Advertisers that represent a majority of our direct response advertising revenue have successfully implemented SKAdNetwork for their Snap campaigns</u>. Beyond that, we are currently designing an array of privacy-centric solutions, both short and long-term, to ensure we deliver a privacy-first experience for our community and best-in-class offerings for our partners.

73.     Gorman's assurances were highly material, as reflected by the fact that analysts specifically asked Defendants to elaborate on their claims of "successful implementation" of SKAN.  In response, Defendant Gorman again expressly assured investors that advertisers that represent the majority of Snap's direct response revenue were successfully using SKAN:

> <u>Michael Morris</u> – Guggenheim Partners – Analyst: …First, you referenced the successful implementation of the SKAdNetwork for certain Snap campaigns with your partners. I'm curious what defined success of that implementation? And does this mean similar feedback to what you saw previously? Do you expect this to mitigate some of the IDFA headwinds that have been a source of investor concern? . . .
>
> <u>Jeremi Gorman</u> – Chief Business Officer: …We are really focused on helping our advertisers make the transition to the best possible measurement and optimization tools smoothly. The change happened

later than we expected, which gave us a lot of time to prepare and SKAdNetwork is one part of that. So <u>we're really pleased to see that advertisers that represent the majority of our direct response revenue have implemented it so far</u>...We're working closely with Apple to understand the rules of the road and we're prepared to follow them. And I think, importantly, we really support Apple's approach because we've always believed that great advertising and customer privacy are not mutually exclusive. And it's a huge core value of Snap privacy. And so we're excited to be implementing this alongside our partners that's been a huge cross-functional effort between products, engineering, the sales teams, the marketing teams to work with our customers to ensure that this transition goes as smoothly as possible.

74.    The statements in paragraphs 72-73 above were materially false and misleading and omitted material facts.  In reality, the "majority" of Snap's direct response advertisers had <u>not</u> already "successfully implemented SKAdNetwork for their Snap campaigns" by April 2021.  To the contrary, as Defendants admitted on October 21, 2021, Snap's advertisers did not even begin to "test" or "explore" SKAN until months later—and when they did begin to "test" SKAN, they immediately discovered that they were severely hampered by SKAN's significant and numerous "limitations"—including by being rendered (i) "no longer able to understand the impact of their unique campaigns"; (ii) unable to monitor their ads in real-time because "real-time campaign and creative management [was] hindered by extended reporting delays"; and (iii) "unable to target advertising based on whether or not people have already installed their app."  In other words, rather than advertisers "successfully implement[ing]" SKAN back in April, SKAN was in reality a completely ineffective replacement for IDFA, and in fact had destroyed the critical IDFA capabilities of ad tracking and real-time monitoring that had made Snap such

an attractive platform for advertisers.  As CW 1 succinctly stated, "[t]he performance of SKAN was terrible and [thus] there were very few adoptees in Q1 and Q2 of 2021."

**C.    May 2021**

75.    On May 21, 2021, nearly one month after the iOS update roll out, Defendant Spiegel appeared on CNBC.  In response to the question regarding whether the Company had "started to see an impact from Apple's operating system change in terms of [Snap's] ability to target ads," Defendant Spiegel responded that the Company had "been able to help [Snap's] advertising partners navigate those changes," and the "transition has gone smoothly for our business":

> So, Apple's been a great partner for us and really helped us to grow our business over time.  We're really aligned with them on the changes they're making to help protect privacy.  So far, the early investments we made, you know, starting almost 10 years ago protect user privacy on our platform are really paying off and we've been able to help our advertising partners navigate those changes, migrate to SKAdNetwork, which is, you know, Apple's, ah, way of measuring advertising efficacy. And so far, that transition has gone smoothly for our business.

76.    The statements in paragraph 75 above were materially false and misleading and omitted material facts.  In reality, Snap's advertisers' transition to SKAN had not gone "smoothly," nor had Snap helped its advertisers successfully "navigate" Apple's privacy changes, as the exact opposite was true.  As Defendants admitted on October 21, 2021, in truth, upon implementing SKAN, Snap's advertisers had been immediately confronted by a variety of significant issues caused by SKAN's limitations that rendered them completely unable to effectively target their ads or measure the effectiveness of their ad campaigns—activities that

were absolutely critical to their business.   As CW 1 succinctly stated, "[t]he performance of SKAN was terrible and [thus] there were very few adoptees in Q1 and Q2 of 2021."

**D.    July 2021**

77.   On July 22, 2021, Snap held an earnings conference call to discuss its results for the second quarter of 2021, during which Apple's changes went into effect.  On the call, Defendant Gorman claimed that Snap was having greater success contending with Apple's changes than others, stating that "[a]s Apple rolled-out its App Tracking Transparency-related changes near the end of Q2, [Snap] observed higher opt-in rates than we are seeing reported generally across the industry, which we believe is due in part to the trust our community has in our products and our business."

78.   Defendant Gorman added that because "Apple's rollout of the most recent iOS update came later in Q2 than initially anticipated, and the pace of updates by iPhone users has also been slower than we anticipated," the Company was very well prepared to handle the changes, as that had "given [Defendants] more time with advertisers to navigate the transition."

79.   During the call, one analyst directly asked Defendants for further clarity on the transition from IDFA to SKAN, asking: "Were there any unusual positive impacts in May or June or actually even a benefit to Snap shift and spend because of IDFA?...can [you] provide a little bit more details on what you're thinking around IDFA.  Is it actually affecting targeting?  And how do you think about some of the workarounds you're seeing or you're implementing so far?"  In response, Defendant Gorman claimed that the Company had helped its advertisers to "transition smooth[ly]" through Apple's changes by "roll[ing] out full support of SKAN version 3.0, which we know will aid, or we believe will aid, in attribution for advertisers.  And we've also implemented Apple's API," and "launch[ing] Advanced

Conversions in Ads Manager so advertisers can measure their campaigns with our privacy conscious measurement stack." Gorman elaborated that "[t]he product teams and the engineering teams have been working really closely with all of our partners and our sales teams to make sure that this transition for our advertisers is as smooth as possible."

80.    Regarding opt in rates, Gorman again noted that "<u>one of the things that we're observing here is that our opt in rates have been above what is sort of widely reported in both the press as well as with the analyst community</u>. So that's, that's good[.]"

81.    The statements in paragraphs 77-80 above were materially false and misleading and omitted material facts, as purportedly higher opt in rates, the "support" systems Snap had purportedly developed, and the extra time to "navigate" Apple's privacy changes had not actually helped Snap or its advertisers "smoothly transition" to SKAN. To the contrary, as Defendants admitted on October 21, 2021, in truth, upon implementing SKAN, Snap's advertisers had been immediately confronted by a variety of significant issues caused by SKAN's limitations that rendered them completely unable to effectively target their ads or measure the effectiveness of their ad campaigns—activities that were absolutely critical to their business. As CW1 stated, "[t]he performance of SKAN was terrible and [thus] there were very few adoptees in Q1 and Q2 of 2021."

## VIII.  <u>ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER</u>

82.    As alleged above, numerous facts raise a strong inference that Defendants knew, or were deliberately reckless in disregarding, the true facts regarding Snap's ability to contend with changes to Apple's consumer privacy policies, the implementation of SKAN by the Company's advertising customers, and the dramatic impact that ATT would have on Snap's ad revenues and financial results. These facts include the following:

83.     *Advertising made up the entirety of Snap's business, and ads on iOS devices were the majority of that business.*   The Company's revenue during the Class Period depended on advertising with 99% or "substantially all of [Snap's] revenue" coming from Snap's various advertising products.   As set forth above, approximately 70% of that advertising revenue came from ads on Apple's iOS devices, and the majority of Snap's ad revenue came from Snap's "Direct Response" advertising that was most severely impacted by the Apple iOS privacy changes and the ineffectiveness of SKAN.   Accordingly, there is no question that Snap's most senior officers were well aware of all aspects of advertising, Apple's privacy changes and the Company and its partners' ability to cope with the IDFA changes.

84.     *Snap had a highly intertwined relationship with Apple.*   Snapchat has been connected to Apple since its very beginning in 2011, when it was only available on iOS devices.   The Company primarily relied on Apple to operate their service and provide the mobile operating systems for Snap's applications.   As Defendant Spiegel himself noted on May 21, 2021, "Snapchat wouldn't exist without the iPhone and without the amazing platform that Apple has created."   Spiegel touted Apple's "technology that [they] provide to [Snap]" and how "Apple's been a great partner for [the Company] and really helped [Snap] to grow [its] business over time."

85.     Throughout the Class Period, Defendant Spiegel informed the market that Snap was "really aligned with [Apple]," and "work[ed] together with Apple."   Defendant Gorman also stated that "we've been working really closely with Apple to implement SKAdNetwork," "we're working closely with Apple to understand the rules of the road, and we're prepared to follow them," and "we really support Apple's approach."

86.     In light of Snap's extensive, intertwined relationship with Apple, there is no question that Snap and their executives were well informed about Apple's decision to make it significantly more difficult for advertisers to track Apple

customers and the true impact that it would have on the Company, and that SKAN was a completely ineffective replacement for IDFA as it destroyed key capabilities that advertisers heavily relied upon for their business.   Additionally, the fact that 70% of the Company's profits were directly attributable to advertising via Apple products, and that Snap's advertising business was considered to be potentially at risk from the iOS changes, also raises a strong inference of scienter, as it is implausible that the Company's executives would not be closely monitoring the success of such a critical contributor to the Company's profitability.

87.   *Defendant Spiegel's massive Class Period stock sales create a strong inference of scienter.*   As elaborated further at Section VI, *supra*, during the Class Period, Defendant Spiegel sold nearly $700 million in stock—more than 4.6x as much as he had sold during the prior same-length period, in well-timed sales near Class Period high prices.   Moreover, while Spiegel purportedly made most of these sales pursuant to a trading plan under Rule 10b5-1, his trading pattern during the Class Period differed dramatically from prior to the Class Period, suggesting that he entered into a new trading plan (or modified his trading plan) during the Class Period.   Defendant Spiegel has never disclosed the details of his purported trading plan, nor the date of its adoption.   Defendant Spiegel's massive and suspicious Class Period stock sales support a strong inference of scienter.

88.   *The Individual Defendants made specific, repeated representations regarding SKAN, holding themselves as personally knowledgeable on the subject, which they understood was of critical importance to the Company.*   For example, Defendant Gorman stated, "we've been working really closely with Apple to implement SKAdNetwork, which is their privacy protective solution." Gorman stated that Defendants had "a lot of time to prepare and SKAdNetwork is one part of that."   Defendant Gorman also specifically stated that "a majority" of Snap's direct response advertisers had "successfully implemented" SKAN, and Defendant

Spiegel stated that "we've been able to help our advertising partners navigate those changes, migrate to SKAdNetwork." Defendants' repeated, highly specific statements about SKAN, in which they held themselves out as knowledgeable of the details of its implementation with Snap's advertisers, are indicative of a strong inference of scienter. This is particularly true in light of the fact that, as Defendants themselves admitted on October 21, 2021, these statements were utterly false—in truth, Defendants admitted that Snap's advertisers had only just first begun to "explore" and "test" SKAN months after these statements were made, and rather than "successful," upon attempting to implement SKAN, advertisers immediately encountered numerous significant issues that were debilitating to their business.

89.     *Defendants directly responded to analysts' concerns about the transition to SKAN with highly specific assurances, and analysts relied on those assurances.* As detailed above, in investor calls throughout the Class Period, analysts specifically questioned Defendants about the impact of the iOS changes on Snap's business and whether a "majority" of the Company's advertisers had in fact already "successfully implemented" SKAN. In response, Defendants made highly specific claims affirming that the Company was "well prepared," and even in a "unique and beneficial position" relative to its competitors, for the iOS changes—and also staunchly assured investors that a "majority" of Snap's direct response advertisers had in fact successfully implemented SKAN.

90.     For example, during the Company's February 4, 2021 earnings call, a Deutsche Bank analyst asked Defendant Gorman how Snap management could "get comfortable that the momentum in these ad units is sustainable through these upcoming iOS changes that are going to effectively blind ad platforms." Defendant Gorman responded by making highly specific claims about the ways in which Snap had worked with Apple to manage the transition to SKAdNetwork, and Snap's extensive preparedness for the iOS changes. Similarly, on the Company's April 22,

2021 investor call, in response to Defendants' claims that "[a]dvertisers that represent a majority of our direct response advertising revenue have successfully implemented SKAdnetwork for their Snap campaigns," a Guggenheim analyst asked Defendants to elaborate on this implementation, and whether they "expect this to mitigate some of the IDFA headwinds that have been a source of investor concern?" In response, Defendant Gorman unequivocally reiterated her claim that a "majority" of Snap's direct response advertisers had in fact implemented SKAN.

91.     Moreover, Defendants were acutely aware that the market was heavily relying on their statements, as analysts published numerous reports that underscored Snap's and its advertisers' allegedly "successful[] implement[ation]" of SKAN and the supposed minimal impact that Apple's privacy changes would have.   JMP reported that "*given 50%+ of Snap's DR advertising partners* have adopted Apple's SKAdNetwork and Snap's planning, we view ATT changes as less of a risk than previously." Guggenheim's April 22, 2021 report noted "the majority of [Snap's] DR advertisers navigating these new privacy initiatives with Snap via SKAdnetwork." Truist parroted Defendants' claim that the Company's "advertisers that represent a majority of its DR ad revenue have successfully implemented SKAdnetwork for their Snap campaigns," concluding that "[a]ll this should help mitigate against a meaningful adverse outcome for Snap..." Piper Sandler noted that "management reiterated support for Apple's ATT changes" and "[t]he majority of SNAP's DR advertisers have adopted SKAdNetwork and they continue to work closely with Apple to prepare for the changes."

92.     Similarly, analysts relied on Defendants' July 2021 statements that purportedly higher opt-in rates and other steps taken by Snap were helping the Company to manage the transition to SKAN.   For example, on July 22, 2021, JPMorgan specifically cited Defendants' claims as evidence that Snap was "managing" the transition to SKAN, noting that "SNAP saw higher opt-in rates than

others across the industry, & the strong 2Q results & the guid[ance] support our view that SNAP is managing through the changes."   A July 22, 2021 Guggenheim report stated, "<u>Snap is also proactively navigating iOS privacy changes</u> via [SKAN] 3.0 (improved attribution features) and Advanced Conversions (privacy-protected measurements), which we view as <u>a net positive</u> for maintaining longer-term revenue growth targets."

93.     In sum, the interest from analysts and Defendants' false and misleading responses to analyst questions further illustrate that Defendants were at a minimum deliberately reckless in misrepresenting the highly material truth regarding the impact of Apple's privacy changes on Snap's ad business and revenues.

94.     *Defendants had since June 2020 to work with and test SKAN as an alternative to IDFA, giving them ample time to understand SKAN's shortcomings—and a former Snap employee confirmed the Company knew SKAN was "ineffective" "[f]rom day one."*   For example, according to a February 18, 2021 post on the blog of Branch—a mobile linking platform that partnered with Snap—"over the last several months, Branch has been working directly with the Snap team to make sense of the various SKAdNetwork complexities. We are excited to announce that integration testing with Snap is now complete, and SKAdNetwork support is available to all mutual customers."   Sheila Bhardwaj, Snap's Measurement Partnerships Manager, added that they "consider[ed] all of the moving parts, especially for partners and customers" and "set up our SKAdNetwork integration for success."

95.     Additionally, CW 1, an Account Strategist for Snap during the Class Period who was directly involved in transitioning the Company's advertisers from IDFA to SKAN, confirmed that "[f]rom day one when SKAN support launched[,] [r]ight when it was launched in April 2021," SKAN was clearly "ineffective," and had caused advertisers who attempted to implement it numerous issues that rendered

them unable to track or monitor their Snap ad campaigns.  CW 1 stated that, as a result of SKAN's "terrible" performance from the moment it was launched, "there were very few adoptees in Q1 and Q2 of 2021."

96.    Thus, contrary to Defendants' representations, the numerous issues with SKAN advertisers encountered that Defendants ultimately blamed for SKAN's failures could not have come as a surprise to Defendants.

97.    *Defendant Spiegel was a highly involved founder-CEO with "centralized, unfettered control" over the Company.*  As stated in Snap's 2021 Form 10-K, as CEO, "Mr. Spiegel has <u>control over [Snap's] day-to-day management</u> and the implementation of major strategic investments of [the] [C]ompany," and "has been responsible for [the] [C]ompany's strategic vision."

98.    Media articles through the years have described Spiegel's deep involvement in, and total control over all aspects of, the Company.  Vox's "Inside Evan Spiegel's very private Snapchat Story; It's Evan Spiegel's world — we're all just snapping in it" article reported that "[e]verything goes through Spiegel, and his opinions are final."  The article went on to discuss Spiegel's intimate involvement in the day-to-day operations of the Company's advertising business, noting that "former employees recall[ed] stories of Spiegel killing all-but-finalized ad deals at the very last minute."

99.    Vanity Fair quoted Bloomberg and stated that "Snap's day-to-day operations are closely controlled by its young C.E.O. Spiegel" who is "the only person who knows the full picture of the company's next steps," and "has the final sign-off on nearly everything the company does."  Business Insider discussed "CEO Evan Spiegel's tight grip on Snap" and his "centralized, unfettered control."  Wired stated that *"Snap is still a company that revolves around chief executive and co-founder…Evan Spiegel, and his system of grace and favours."*

100.   Furthermore, Defendant Gorman's role involved extensive and direct interaction with advertisers and ad buyers, and she was brought in by the Company specifically to work on advertising after working in advertising-related executive positions at Amazon.  Defendant Gorman's regular comments about the details of Snap's ad business are demonstrative of her intimate involvement in that business.

101.   *Defendants' credibility has been widely questioned by securities analysts*.  Snap was closely followed by securities analysts, including RBC and MKM Partners.  In the wake of Snap's stunning disclosures at the end of the Class Period, these analysts questioned the credibility of Snap's management, including the Individual Defendants. For example, analysts at RBC stated that "<u>management almost couldn't have sounded worse around the effects [the IDFA change] is having</u>," and that "<u>management's credibility is likely gone given recent communications did not indicate these risks</u>," causing that credibility to be "<u>permanently damaged</u>."  Analysts at MKM Partners who had also been following the Company for years, were "<u>surprised with the change of management's tone with regards to the effect of Apple changes on Snap's ad business</u>."

102.   The foregoing facts, particularly when considered collectively (as they must be), support a strong inference of Defendants' scienter.

## IX.   <u>LOSS CAUSATION</u>

103.   Throughout the Class Period, the price of Snap securities was artificially inflated as a result of Defendants' materially false and misleading statements identified above.  Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of Snap securities, by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Snap common stock fell precipitously as the prior artificial inflation dissipated.  As a result of their

purchases of Snap securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

104.   By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Snap's business.   Defendants' false and misleading statements had the intended effect, and caused Snap common stock to trade at artificially inflated levels throughout the Class Period, with shares of Snap common stock closing as high as $83.11 on September 24, 2021.   On October 21, 2021, the last trading day before Defendants' fraud was revealed, Snap common stock closed at $75.11 per share. From its Class Period high of $83.11 per share to its closing price of $55.14 per share on October 22, 2021, Snap's stock price dropped $27.97 per share, or 34%, wiping out more than $35.4 billion in market capitalization.

105.   Defendants' after-market disclosures on October 21, 2021 revealed to the market the false and misleading nature of Defendants' statements and omissions. On that day, as described above, Snap finally disclosed its inability to successfully navigate Apple's changes and for the first time admitted that its advertisers were dissatisfied with the metrics received from SKAN.

106.   In response to Defendants' disclosure, the price of Snap common stock precipitously declined.   The Company's share price plummeted by over 26%, closing down $19.97 per share from $75.11 per share on October 21, 2021 to $55.14 per share on October 22, 2021, wiping out approximately $27 billion in market capitalization, on unusually heavy trading volume.

107.   Analysts were stunned by the Company's admissions and negatively reacted to Snap's financial fallout caused by its declines in its advertising business as a result of Snap's inability to respond to Apple's iOS ad changes. For example, analysts at RBC Capital said "management almost couldn't have sounded worse,"

and their "credibility may be permanently damaged" and "likely gone given recent communications did not indicate these risks." Similarly, analysts at MKM Partners were "surprised with the change of management's tone with regards to the effect of Apple changes on Snap's ad business." Barron's also noted how the Company's announcement "caught the market by surprise and the company lost a quarter of its value in a matter of minutes." Likewise, analysts from Evercore ISI, "fully acknowledge[d] being surprised by the magnitude of [Snap's] H2 revenue challenges and believe the stock likely to be dead $ for 3-6 months."

108. As shown, the drastic and continuing decline in Snap's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the Company's stock price negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## X.  PRESUMPTION OF RELIANCE

109. At all relevant times, the market for Snap securities was an open, efficient and well-developed market for the following reasons, among others:

a. Snap's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, Snap filed periodic public reports with the SEC and the NYSE;

c. Snap regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services; and

        d.     Snap was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place;

110.  As a result of the foregoing, the market for Snap's securities reasonably and promptly digested current information regarding the Company from all publicly-available sources and reflected such information in the price of Snap's securities.  All purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

111.  A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Snap's business and operations— information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

112.  The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged

to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

113.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false and the statement was authorized and/or approved by an executive officer and/or director of Snap who knew that such statement was false when made.

## XII.    CLASS ACTION ALLEGATIONS

114.    Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased, or otherwise acquired publicly traded Snap securities, or who sold Snap put options, between February 5, 2021 and October 21, 2021, inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of Snap at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

115.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Snap shares were actively traded on the NYSE.  As of October 19, 2021, there were over 1.35 billion shares of Snap Class A common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class.  Class members who purchased publicly traded Snap securities or sold Snap put options may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

116.   Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

117.   Lead Plaintiff will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

118.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts, as alleged herein;

b.      whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

c.      whether Defendants acted with scienter; and

d.      the proper way to measure damages.

119.   A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is

impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT ONE

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against All Defendants)**

120.  Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

121.  This Count is asserted on behalf of all members of the Class against Snap and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

122.  During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or disregarded with deliberate recklessness, misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

123.  Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and other investors similarly situated in connection with their purchases of Snap securities during the Class Period.

124.   Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Snap securities, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other members of the Class, regarding, among other things, Snap's business and operations; (b) artificially inflate and maintain the market price of Snap securities; and (c) cause Lead Plaintiff and the other members of the Class to purchase the Company's securities at artificially inflated prices, and to suffer losses when the true facts became known.

125.   Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

126.   As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Snap securities, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

127.   Lead Plaintiff and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Snap securities, which inflation was removed from its price when the true facts became known. Lead Plaintiff and the other members of the Class

would not have purchased Snap common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

128.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Snap securities during the Class Period.

## COUNT TWO

### For Violations Of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

129.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

130.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

131.    During their tenures as officers and/or directors of Snap, each of these Individual Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act. *See* ¶¶17-23. By reason of their positions of control and authority as officers and/or directors of Snap, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Snap during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

132.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the

day-to-day operations of the Company, in reviewing and managing its regulatory compliance, accounting and reporting functions, including overseeing, reviewing and managing the Company's advertising and support for iOS ad campaigns. The Individual Defendants were directly involved in providing false information, and in certifying and approving the false statements disseminated by Snap during the Class Period. The Individual Defendants were also directly involved in providing false information, and the Individual Defendants certified and approved the false statements disseminated by Snap during the Class Period. As a result of the foregoing, the Individual Defendants, together and individually, were controlling persons of Snap within the meaning of Section 20(a) of the Exchange Act.

133.   As set forth above, Snap violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

134.   By virtue of their positions as controlling persons of Snap, and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff, and the other members of the Class, who purchased or otherwise acquired Snap securities. As detailed above in ¶¶17-23, during the respective times these Defendants served as officers and/or directors of Snap, each of these Defendants was culpable for the material misstatements and omissions made by the Company.

135.   As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the Class suffered damages in connection with their purchase or acquisition of the publicly traded securities of Snap and/or Snap put options.

## XIV.  PRAYER FOR RELIEF

136.   Wherefore, Lead Plaintiff prays for relief and judgment as follows:

a.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.      Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiff and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.      Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.      Such other and further relief as the court may deem just and proper.

## XV.   **JURY DEMAND**

137.   Lead Plaintiff hereby demands a trial by jury.

Dated: March 18, 2022              Respectfully submitted,

**SAXENA WHITE P.A.**

By:  */s/    David R. Kaplan*

David R. Kaplan (SBN 230144)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
E-mail:       dkaplan@saxenawhite.com

-and-

**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice* forthcoming)
Joseph E. White, III (*pro hac vice* forthcoming)
Lester R. Hooker (SBN 241590)
Dianne M. Pitre (SBN 286199)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone:   (561) 394-3399
Facsimile:   (561) 394-3382
E-mail:       msaxena@saxenawhite.com

jwhite@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com

-and-

**SAXENA WHITE P.A.**
Steven B. Singer (*pro hac vice* forthcoming)
Marisa N. DeMato (*pro hac vice*
 forthcoming)
Joshua H. Saltzman (*pro hac vice*
 forthcoming)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone:   (914) 437-8551
Facsimile:    (888) 631-3611
E-mail:        ssinger@saxenawhite.com
                    mdemato@saxenawhite.com
                    jsaltzman@saxenawhite.com

*Lead Counsel for Lead Plaintiff and the
Class*

**BIENERT KATZMAN LITTRELL
WILLIAMS LLP**
John L. Littrell (SBN 221601)
jlittrell@bklwlaw.com
Michael R. Williams (SBN 192222)
mwilliams@bklwlaw.com
601 W. 5th Street, Suite 720
Los Angeles, CA 90071
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

*Local Counsel for Lead Plaintiff and the
Class*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

I HEREBY CERTIFY that, on March 18, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 18, 2022.

*/s/ David R. Kaplan*