DANIEL J. KRAMER (*admitted pro hac vice*)
AUDRA J. SOLOWAY (*admitted pro hac vice*)
DANIEL S. SINNREICH (*admitted pro hac vice*)
KRISTINA A. BUNTING (*admitted pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
Fax:   (212) 757-3990
Email:      dkramer@paulweiss.com
Email:      asoloway@paulweiss.com
Email:      dsinnreich@paulweiss.com
Email:      kbunting@paulweiss.com

*Additional Counsel Listed on Signature Page*

*Attorneys for Snap Inc., Evan Spiegel, and Jeremi Gorman*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| KELLIE BLACK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>SNAP INC., EVAN SPIEGEL, and JEREMI GORMAN,<br><br>Defendants. | No. 2:21-cv-08892-GW (RAOx)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Filed Concurrently with Declaration of Kristina A. Bunting and Defendants' Request for Judicial Notice and Consideration of Documents Incorporated by Reference]<br><br>Date:    August 4, 2022<br>Time:    8:30 AM<br>Crtrm.:  9D<br><br>Assigned to Honorable George H. Wu |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on August 4, 2022 at 8:30 am in Courtroom 9D of the above-entitled Court before the Honorable George H. Wu, Defendants Snap Inc. ("Snap"), Evan Spiegel, and Jeremi Gorman (the "Individual Defendants") will, and hereby do, move to dismiss the Consolidated Class Action Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, on the basis that it fails to state a claim on which relief can be granted.

This Motion is based on the Consolidated Class Action Complaint, this Notice, the Memorandum of Points and Authorities attached hereto, the concurrently-filed Declaration of Kristina A. Bunting and the exhibits attached and referenced thereto, Defendants' Request for Judicial Notice and Consideration of Documents Incorporated by Reference, and such further evidence and argument as may be allowed by the Court prior to its decision.

Pursuant to Local Rule 7-3, counsel met and conferred about the contents of this motion on April 26, 2022.  *See* Declaration of Kristina A. Bunting ¶ 24.

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

DATED: May 3, 2022

DANIEL J. KRAMER (*admitted pro hac vice*)
AUDRA J. SOLOWAY (*admitted pro hac vice*)
DANIEL S. SINNREICH (*admitted pro hac vice*)
KRISTINA A. BUNTING (*admitted pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**


EKWAN E. RHOW (SBN 174604)
AHARON B. KASLOW (SBN 322769)
**BIRD, MARELLA, BOXER, WOLPERT, NEISSIM, DROOKS, LINCENBERG & RHOW P.C.**


By: _____*/s/ Daniel J. Kramer*_____
             Daniel J. Kramer

*Attorneys for Snap Inc., Evan Spiegel, and Jeremi Gorman*

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ............................................................................................ 1

II.    FACTUAL BACKGROUND .......................................................................... 5

III.   LEGAL STANDARD ................................................................................... 10

IV.    ARGUMENT ............................................................................................... 10

     A.   The Complaint Fails to Allege Any Actionable
          Misrepresentations ............................................................................ 11

          1.   The February 2021 Statements ............................................... 11

          2.   The April 2021 Statements ..................................................... 13

          3.   The May 2021 Statements ....................................................... 16

          4.   The July 2021 Statements ........................................................ 17

     B.   Plaintiff Fails to Allege a Strong Inference of Scienter ....................... 18

          1.   Plaintiff Fails to Plead Facts Showing Intent to Defraud or
              Deliberate Recklessness, and the Core Operations
              Inference Cannot Remedy This Pleading Failure ...................... 19

          2.   Spiegel's Stock Sales Do Not Support a Strong Inference
              of Scienter ............................................................................... 22

     C.   The Complaint Fails to Allege Loss Causation ................................... 25

V.     CONCLUSION ............................................................................................ 25

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alteryx, Inc. Sec. Litig.*,
2021 WL 4551201 (C.D. Cal. June 17, 2021)......................................................24

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020)................................................................13

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020)..............................................................................25

*Brendon* v. *Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019)................................................................22

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align
Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017).............................................................................12

*Curry* v. *Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017)......................................................19, 22, 24, 25

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010)...........................................................................15

*Eminence Cap., LLC* v. *Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003)...........................................................................18

*In re Facebook, Inc. Sec. Litig.*,
2021 WL 6000058 (N.D. Cal. Dec. 20, 2021)..................................................21

*In re Fastly, Inc. Sec. Litig.*,
2021 WL 5494249 (N.D. Cal. Nov. 23, 2021)..................................................23

*Hunt* v. *Bloom Energy Corp.*,
2021 WL 4461171 (N.D. Cal. Sept. 29, 2021)..................................................20

*Iron Workers Loc. 580 Joint Funds* v. *NVIDIA Corp.*,
522 F. Supp. 3d 660 (N.D. Cal. 2021)..............................................................15

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

*Irving Firemen's Relief & Ret. Fund* v. *Uber Techs.*,
398 F. Supp. 3d 549 (N.D. Cal. 2019)...................................................................10

*Lachman* v. *Revlon, Inc.*,
487 F. Supp. 3d 111 (E.D.N.Y. 2020).................................................................19

*Lipton* v. *Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002).............................................................................25

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)...................................................................23

*Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008).............................................................22, 23, 24

*Nguyen* v. *Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020)...............................................................................18

*Nozak* v. *N. Dynasty Mins. Ltd.*,
804 F. App'x 732 (9th Cir. 2020)........................................................................21

*Nursing Home Pension Fund, Local 144* v. *Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004).............................................................................25

*Okla. Firefighters Pension & Ret. Sys.* v. *Ixia*,
2015 WL 1775221 (C.D. Cal. Apr. 14, 2015)....................................................23

*Or. Pub. Emps. Ret. Fund* v. *Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014).................................................................10, 12, 18

*Park* v. *GoPro, Inc.*,
2019 WL 1231175 (N.D. Cal. Mar. 15, 2019)...................................................23

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
245 F. Supp. 3d 870 (S.D. Tex. 2017).................................................................12

*Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014).............................................................................20

*Prodanova* v. *H.C. Wainwright & Co., LLC*,
993 F.3d 1097 (9th Cir. 2021).......................................................................18, 20

*Rombach* v. *Chang*,
355 F.3d 164 (2d Cir. 2004).................................................................................16

iii

*Ronconi* v. *Larkin*,
253 F.3d 423 (9th Cir. 2001) .......................................................................11, 17, 22

*S. Ferry LP, No. 2* v. *Killinger*,
542 F.3d 776 (9th Cir. 2008) .........................................................................19, 20, 21

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ................................................................................23

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ..............................................................................................18

*In re Twitter, Inc. Sec. Litig.*,
506 F. Supp. 3d 867 (N.D. Cal. 2020)..................................................................22

*Weston Fam. P'ship LLLP* v. *Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022)........................................................................*passim*

*Wochos* v. *Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ..............................................................................16

*In re Yahoo! Inc. Shareholder Derivative Litigation*,
153 F. Supp. 3d 1107 (N.D. Cal. 2015)................................................................21

*Zucco Partners, LLC* v. *Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ................................................................................15

**Statutes**

15 U.S.C. § 78u-4(b)...................................................................................................10

Private Securities Litigation Reform Act of 1995 ("PSLRA") ....................10, 11, 18

**Other Authorities**

17 C.F.R. § 240.10b-5 ................................................................................................10

17 C.F.R. § 240.10b5-1(c) ..........................................................................................23

Fed. R. Civ. P. 9(b) ....................................................................................................10

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

This is a case about business disruption, not securities fraud.  Plaintiff claims otherwise only by ignoring the timing of key events and cherry-picking from Defendant Snap's public statements.

Snap's flagship product, Snapchat, is a mobile application for interacting with family and friends.  It makes money by selling advertising space within the app. Most people who use Snapchat do so on Apple or Android phones.  As a result, changes to Apple and Android's policies can impact Snapchat's ad business (and the ad businesses of other apps that rely on digital ad revenue).

This lawsuit stems from such a change.  In 2020, Apple announced it would significantly change its privacy policies.  Once the changes were rolled out, data from Apple devices that advertisers had long used to measure ad success would no longer be available.  The digital ad industry set to work preparing for the change. One task for app developers like Snap, and for advertisers, was setting up a tool called "SKAdNetwork," or "SKAN," which Apple developed to replace pre-existing ad measurement tools that would no longer work under Apple's new rules.

Two dates—when Apple rolled out its new rules, and when digital advertisers began relying on SKAN at scale—are critical to this case.  On *April 26, 2021*, Apple rolled out a new operating system with the new rules baked in.  And during *summer 2021*, iPhone users adopted the new operating system at scale.  That mass adoption prevented advertisers from relying on the old measurement tools and forced advertisers to rely on SKAN at scale.

Those two dates frame Snap's key disclosures.  Snap began warning investors many months before the Apple rollout that the new rules could "seriously harm" its ad business.  It warned that "changes to this ecosystem are usually disruptive," and that "[a]ny adverse effects could be particularly material to us because we are still early in building our advertising business."  Snap executives also provided updates

1

to the market each quarter.  In April 2021, prior to Apple's rollout of the privacy changes, Snap's Chief Business Officer Jeremi Gorman explained that a delay in Apple's rollout had given Snap "additional time to adopt [SKAN] and begin implementing and testing with [its] partners," but she cautioned that there was still "a lot of work to be done to transition smoothly."  And in July 2021—just as iPhone users were adopting the new Apple regime at scale—Gorman said that "Apple's rollout of the most recent iOS update came later in Q2 than initially anticipated, and the pace of updates by iPhone users has also been slower than we anticipated."  She said "it remains very early in the adoption of the iOS platform changes," and while Snap had seen "some interruptions to demand," it was "too early to determine how long it [would] take until the[] changes [were] fully adopted, the scale of the potential interruptions to demand, or the ultimate impact on the longer term growth" of Snap's revenue.  Snap, in short, told investors what it knew at the time:  It was working with advertisers on the transition; many were installing and starting to use SKAN; but it was still early, the impacts weren't yet clear, and there was potential for major harm to the business.

Later that summer and fall, it became clear that there *would* be some impact: Advertisers found SKAN to be a suboptimal tool and some cut back their advertising spend with Snap.  In part because of that issue, Snap missed its Q3 guidance by a whisker:  On October 21, 2021, Snap announced that it had "missed the lower end of [its revenue] guidance" of $1.07 billion by a mere $3 million—a miss of 0.3 percent.  The stock declined, and this lawsuit followed.

Plaintiff seeks to manipulate these facts to paint Snap as a company that hid the ball and then had to reverse course.  It argues that in April and July 2021, Snap assured the market that advertisers were ***already*** relying on SKAN and that everything was fine.  From that premise, it argues that Snap's later statement that advertisers were having issues with SKAN was a contradiction.  But the premise is wrong twice over.  First, the timing doesn't follow:  The challenged statements were

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

made *before* Apple rolled out its changes and/or *before* Apple device users adopted those changes and forced advertisers to rely on SKAN at scale.  It would have made no sense for Snap's executives to be saying at that early date that advertisers were already relying on SKAN—and unsurprisingly, their actual statements make clear they did no such thing.  Second, Snap did not assure the market that everything was fine.  Quite the contrary, Snap candidly cautioned investors about the uncertainty and repeatedly warned the market that serious harm could result.  Plaintiff simply ignores those warnings.

In short, Plaintiff attempts to plead a securities fraud claim based on Snap's *pre*-rollout failure to predict *post*-rollout challenges that arose when advertisers lost access to traditional measurement data.  The law does not require such clairvoyance.  Plaintiff's claims should be dismissed on multiple independent grounds.

*First*, Plaintiff fails to plead with particularity that Snap's statements were false or misleading.  Plaintiff does not plead any facts showing that the challenged statements, made months before the effects of the privacy changes were known, were false when made.  Plaintiff's main factual support for its contentions of falsity is one junior employee in one of Snap's 12 advertising verticals, who is not alleged to have had personal knowledge of company-wide operations and whose allegations do not address the challenged statements.  In any event, most of the challenged statements are non-actionable as puffery or honestly-held statements of opinion.

Lacking an actionable false statement, Plaintiff cherry-picks Defendants' words, taking them out of context and mischaracterizing their meaning.  For example, Plaintiff contends that Gorman misled investors into a belief that advertisers were already relying on, and satisfied with, SKAN when she said one category of advertisers had "successfully implemented" it.  That contention ignores key context.  Gorman—speaking in April 2021—said in the same passage that Snap had "*beg[u]n implementing and testing*" SKAN with partners, and that "we know that there's a lot of work to be done to transition smoothly."  Her statement

3

communicated that Snap was working with advertisers to set up and test SKAN, not that advertisers were already relying on it and fully satisfied with its capabilities. This interpretation is the only plausible one, given that—once again—in April 2021 the Apple privacy changes had not yet been rolled out and advertisers still had access to traditional measurement tools.  Plaintiff thus fails to identify any actionable false statement.

*Second*, Plaintiff fails to plead a strong inference of scienter.  Snap's repeated warnings to investors that Apple's changes could cause serious harm belie any intent to defraud.  Plaintiff also fails to allege facts showing that CEO Evan Spiegel and Gorman (the "Individual Defendants") received *any* information, internally or from Snap's advertisers, apprising them of facts contradicting the alleged misstatements. Plaintiff papers over this fatal pleading failure by invoking the rarely-accepted core operations inference—that scienter simply should be presumed based on the Individual Defendants' roles at Snap.  That inference does not apply, among other reasons, because Plaintiff fails to plead facts showing that the Individual Defendants were involved in the minutiae of helping implement SKAN or were aware of advertiser dissatisfaction.

In the end, Plaintiff relies almost entirely on Spiegel's stock sales to try to conjure a strong inference of scienter, but those allegations fail under well-established Ninth Circuit law because the sales were not suspicious in amount or timing, or in comparison to Spiegel's prior trading.  All sales (other than for tax or charity) were pursuant to a Rule 10b5-1 trading plan, under which Spiegel allocated discretion to a broker to trade within pre-determined parameters.  Spiegel also retained **93 percent** of his holdings and sold ***fewer*** shares during the putative Class Period than during the prior Control Period.  Plaintiff's allegations do not raise a strong inference of scienter as to any defendant.

*Third*, Plaintiff fails to plead loss causation with particularity because it fails adequately to allege that the October 21, 2021 disclosures corrected any of the

4

challenged statements.  The Court should dismiss the Complaint with prejudice.

## II.     FACTUAL BACKGROUND

Snap's flagship product is a free software application called "Snapchat," which users download on mobile devices, including those sold and operated by Apple, and can use to interact with family and friends.  (¶¶ 3, 24; Ex. 1-7.)[1]  Snap derives revenue from Snapchat by selling advertising.  (¶ 3.)  To measure ad effectiveness, advertisers rely on Snap's ability to collect information about Snapchat users (*e.g.*, whether they viewed a certain ad) and to combine that with information about desired outcomes (*e.g.*, whether users downloaded the advertised app or made a purchase from the advertiser's website).  (¶¶ 4, 30–34.)

Before mid-2021, companies like Snap collected information about Apple device users' activities through Apple's Identifier for Advertisers ("IDFA")—a unique identifier that Apple assigns to every iOS-supported device.  (¶¶ 4, 33–34.) Historically, Apple set devices to automatically "opt in" to IDFA sharing.  (¶¶ 4, 36.)  Market participants (including Snap, advertisers, and their mobile measurement partners ("MMPs")) could use IDFA and other identifying data to determine whether a user who viewed an ad took the desired action, such as making a purchase or downloading an app.  (¶¶ 4, 36–38.)  Advertisers could then use that data to understand how their ad campaigns were performing.  (¶¶ 4–5, 33–35.)

Snap repeatedly disclosed its dependence on Apple for access to user data.  It warned investors that its business depends on "effectively operating with mobile operating systems . . . that we do not control" and that any changes to those operating systems may "seriously harm" its business.  (Ex. 2-12.)  Snap further warned that its "advertising revenue could be seriously harmed" by its "inability to measure the effectiveness of our advertising."  (*Id* at 2-14.)

---

[1]  References to "Ex. _-_" refer to the exhibits to the attached Declaration of Kristina A. Bunting and the corresponding page citation.  References to "¶" refer to paragraphs in the Consolidated Class Action Complaint (the "Complaint").

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

**Apple Announces ATT.**  On June 22, 2020, Apple announced that it planned to release a new privacy initiative, the App Tracking Transparency ("ATT") framework.  (¶¶ 5, 36–37.)  Under ATT, companies like Snap could use certain user data only if the user affirmatively "opted in" to such data sharing.  (*Id.*)  Absent user opt-in, app developers like Snap could no longer share a user's identifying information (*e.g.*, email address, phone number, etc.) with advertisers, and would no longer have access to that user's IDFA.  (¶¶ 4–5, 30–31, 36–38.)  Moreover, for Snap and its advertisers to share user data, the user would have to opt in on **both** Snapchat and the advertiser's app.  (¶¶ 4–5, 36–38.)  These changes restricted Snap and its advertisers' ability to get robust measurement data from traditional MMPs.

When Apple announced ATT, it promoted its own proprietary measurement solution, SKAN, billed as a privacy-protective measurement solution that could replace traditional MMPs.  (¶¶ 5, 39.)  To use SKAN, **both** Snap **and** its advertisers had to install the technology and connect their data pipelines with SKAN.  (¶ 5.)

Far from hiding the ball, Snap made robust and specific disclosures regarding the potential impact of Apple's upcoming iOS changes.  (Ex. 3-18 to 3-19.)  For example, in its 2Q20 filing, Snap advised that the changes "may reduce the quantity and quality of the data and metrics that can be collected or used by us and our partners, and adversely affect our ability to effectively target advertisements to users and demonstrate the value of our advertisements to advertisers."  (*Id.* at 3-18.)  Snap cautioned that the impact "is uncertain depending on how these changes are implemented, how we and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond," "could seriously harm our business," and "could be particularly material" because of the infancy of Snap's advertising business.  (*Id.*)  Snap also identified for investors specific factors that could "seriously harm[]" its "advertising revenue," including:  (i) "inability to collect and disclose data or access a user's [IDFA] or similar deterministic identifier that new and existing advertisers may find useful," and (ii) "changes in [its]

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

analytics and measurement solutions." (*Id*. at 3-18 to 3-19.)

**ATT Is Delayed.** Apple's release of ATT was substantially delayed from Fall 2020 until April 26, 2021. (Ex. 12-106.) On February 4, 2021, Snap's CFO noted that it was "not clear yet what the longer term impact of those changes may be for" Snap's business. (Ex. 4-34.) Gorman noted that Snap had been "working really closely with Apple to implement [SKAN] . . . as well as building our own solutions that use aggregated data to protect privacy." (*Id*. at 4-41.) Gorman said: "[W]e feel really well prepared for these changes," noting that Snap had been "communicating very well with advertisers, we're educating them, talking about them deeply about these coming changes and encouraging them" to implement alternative solutions. (¶ 69.) But Gorman also immediately cautioned that "changes to this ecosystem are usually disruptive and the outcome is uncertain." (Ex. 4-41.)[2]

Snap continued to work with advertisers to implement alternative solutions. On Snap's April 22, 2021 earnings call—at which point Apple still had not yet rolled out ATT—Gorman explained that the rollout delay had given Snap "additional time to adopt Apple's [measurement solution, SKAN] and ***begin implementing and testing*** with [its] partners." (Ex. 6-56 (emphasis added).) Gorman noted that several advertisers had also set up SKAN for use, stating that "[a]dvertisers that represent a majority of our direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns." (*Id*.; *see also id*. at 6-70 to 6-71.) While Plaintiff challenges this statement, it omits that during this same call, Gorman cautioned that there was still "a lot of work to be done to transition smoothly" in anticipation of the iOS changes. (*Id*. at 6-70 to 6-71). Snap's CFO also cautioned—on that same call—that it was "not clear yet what the longer term impact" of ATT would be, noting that it "may not be clear until several

---

[2] Spiegel echoed Gorman on a February 5, 2021 CNBC interview, noting that "we feel like we're well prepared for these changes," explaining that Snap had "implemented" SKAN and started building its own solutions. (Ex. 5-48; ¶ 70 n.5.)

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

months or more after the changes are implemented." (*Id.* at 6-61.)[3]

Plaintiff contends that, through Gorman's statements, Defendants misled the market by communicating that advertisers were already "successfully using" SKAN as their go-to measurement tool and had ceased relying on other tools. (¶¶ 7, 43, 45, 72, 90.)  But the Complaint does not—and cannot—plead that Snap actually communicated to the market in April 2021, before the ATT rollout, that advertisers had discontinued use of other measurement tools, much less that advertisers were satisfied with SKAN as a stand-alone measurement solution.  Moreover, read in context with Gorman's other statements, Snap warned that preparations were ongoing and the delayed rollout of ATT would push the impact into later quarters.  Indeed, due to the delay, Snap repeated its warnings in its SEC filings between June 2020 and September 2021.  *See supra* 6–7.[4]  Thus, Snap continuously warned investors regarding the uncertain and potentially seriously harmful impact of ATT, while assisting advertisers to set up alternative solutions, including SKAN.

**Slow Adoption of ATT.**  On April 26, 2021—four days after Snap's 1Q21 earnings call—Apple launched the iOS 14.5 update, which incorporated ATT.  (*See* Ex. 12-106; Ex. 13-110.)  Spiegel touched on ATT's rollout in a May 21, 2021 CNBC appearance, explaining that Snap's "early investments" to "protect user privacy on our platform are really paying off and we've been able to help our advertising partners navigate those changes, migrate to [SKAN]," and "so far, that transition has gone smoothly for our business."  (¶ 75.)

Before the end of 2Q21, ATT had not yet reached mass adoption because iOS-device users had been slow to download the update.  (Ex. 14-127 to 14-128, 14-

---

[3] Around this time, Snap observed "promising results with some advertiser spending up against [SKAN] early in the going, but it was challenging" for Snap to "know how to evaluate that" because "advertisers still at [this] point had access to a lot of their legacy signals" to determine their advertising spend.  (Ex. 7-77.)

[4] (*See also* Ex. 8-90 to 8-91; Ex. 1-8 to 1-9; Ex. 9-94 to 9-95; Ex. 10-98 to 10-99; Ex. 11-102 to 11-103.)

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

131, 14-133.)  ATT was not installed on devices on a wide scale until June/July 2021, when Apple released an update *automatically* installing ATT.  (Ex. 15-148.)  Thus, before the end of 2Q21, advertisers had not been forced to rely solely on SKAN; until then, they could still rely on MMPs with access to IDFA data.

In its 2Q21 Form 10-Q, Snap again warned investors about ATT's potential impact.  (Ex. 10-98 to 10-99.)  On July 22, 2021, Gorman highlighted the ongoing uncertainty, explaining that "Apple's rollout of the . . . iOS update came later in Q2 than initially anticipated, and the pace of updates by iPhone users has also been slower than we anticipated."  (Ex. 14-127.)  She noted that "it remains very early in the adoption of the iOS platform changes," and while Snap had seen "some interruptions to demand," it was "too early to determine how long it [would] take until the[] changes [were] fully adopted, the scale of the potential interruptions to demand, or the ultimate impact on the longer term growth" of Snap.  (*Id.* at 14-128.)

Gorman noted that Snap had been "working really hard to make this transition smooth for our advertising partners as well as our businesses."  (*Id.* 14-143.)  She further noted that "near the end of Q2," Snap "observed higher opt-in rates than [it was] seeing reported generally across the industry."  (*Id.* at 14-127.)  However, as Plaintiff fails to acknowledge, Gorman cautioned that "it remains so early in these iOS changes and there's no question that it will be a change for the industry in and of itself."  (*Id.* at 14-143.)  She also cautioned that "the solutions," such as SKAN, "are not yet fully finalized."  (*Id.*)  She reiterated that Snap's teams had been "working really closely with all of our partners . . . to make sure that this transition for our advertisers is as smooth as possible."  (*Id.*)  Thus, during 2Q21 and even into 3Q21, Snap and its advertisers were not yet subject to ATT's full impact and were still working out the measurement landscape after the full rollout of ATT.

**Snap Discloses Q3 Developments.**  On October 21, 2021, Snap announced that it had "missed the lower end of [its revenue] guidance" of $1.07 billion by a mere $3 million—a miss of 0.3 percent—"due to a few key factors, including

changes to advertising tracking on iOS and macroeconomic factors . . . that have impacted our advertising partners"; Snap also revised its revenue guidance downward for 4Q21.  (Ex. 15-146.)  Snap noted that Apple's SKAN solution "did not scale" as Snap had hoped "making it more difficult for [Snap's] advertising partners to measure and manage their ad campaigns for iOS."  (*Id.*)  As Gorman explained, "[t]he initial results we observed using SKAN were generally aligned with prior industry standard solutions," but "over time, [Snap] saw SKAN measurement results diverge meaningfully from the results we observed on other first and third-party measurement solutions, making SKAN unreliable as a standalone measurement solution."  (*Id*. at 15-149.)  Gorman also noted that Snap's "advertising partners [had] explored and tested SKAN's solutions" and "surfaced a variety of concerns about its limitations."  (*Id.*)  On October 22, 2021, Snap's stock price declined by approximately 26 percent.  (¶¶ 11, 53, 106.)

## III.    LEGAL STANDARD

Plaintiff asserts Exchange Act claims against all Defendants under section 10(b) and Rule 10b-5 and control claims against Spiegel and Gorman under section 20(a).  Among other elements, under section 10(b), Plaintiff must plausibly allege (1) a material misrepresentation or omission by the defendant; (2) scienter; and (3) loss causation, *Weston Fam. P'ship LLLP* v. *Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (citation omitted)—all three of which must be pleaded with particularity under Rule 9(b) and/or the PSLRA, *Or. Pub. Emps. Ret. Fund* v. *Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014); 15 U.S.C. § 78u-4(b); Fed. R. Civ. P. 9(b).  Courts are not required to "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Irving Firemen's Relief & Ret. Fund* v. *Uber Techs.*, 398 F. Supp. 3d 549, 553 (N.D. Cal. 2019), *aff'd* 998 F.3d 397 (9th Cir. 2021) (citation omitted).

## IV.    ARGUMENT

Plaintiff's claims fail under Ninth Circuit law because it fails to plead falsity,

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

scienter, or loss causation with particularity.  Plaintiff advances the theory—based on cherry-picked, mischaracterized statements and challenges encountered in the second half of 2021—that Snap made false statements about its own or its advertisers' preparedness for ATT, including SKAN, in the first half of 2021 ***before the ATT rollout or its mass adoption***.  Plaintiff claims that Snap ***already knew at that time*** the extent of the impact ATT would have on Snap's business and the inadequacies of Apple's alternative measurement solution, SKAN.  This theory is implausible given the trajectory of the ATT rollout and adoption, and as detailed below, Plaintiff pleads no facts supporting it.  Indeed, Snap's own contemporaneous disclosures—which Plaintiff ignores—show that Snap was transparent with investors about its efforts and repeatedly warned investors that the changes could seriously harm its business.

> **A.      The Complaint Fails to Allege Any Actionable Misrepresentations**

To adequately plead falsity, a plaintiff must allege "the who, what, when, where, and how of the misconduct charged."  *Twitter*, 29 F.4th at 619 (citation omitted).  In addition, the PSLRA requires a complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B); *Ronconi* v. *Larkin*, 253 F.3d 423, 431 (9th Cir. 2001) (complaint must "specify facts or evidence that show why the statement was false").  Statements that are "qualified and factually true" are not false or misleading.  *Twitter*, 29 F.4th at 615.  The Complaint does not meet these demanding standards because Plaintiff fails to plead facts showing that the statements were false when made and the vast majority of the statements are inactionable as puffery or honestly-held opinions.

> **1.      The February 2021 Statements**

***Snap "feel[s] really well prepared."***  Any claims based on Gorman's and Spiegel's statements that Snap "feel[s] . . . well prepared" for ATT should be dismissed as classic honestly-held opinions, puffery, and not objectively false.

To plead a fraudulent opinion, "the plaintiff must allege both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017). Plaintiff pleads neither. *First*, the Complaint does not allege any specific facts suggesting that Gorman or Spiegel did not honestly believe Snap was well prepared for ATT in February 2021—months before the rollout of ATT and before advertisers were denied access to IDFA and traditional MMP solutions. For that reason alone, Plaintiff fails to plead falsity. *Second*, the statement that Defendants felt "well prepared" is not objectively false. The statements about readiness were made two months before the ATT rollout and four months before widespread adoption of ATT. *See supra* 7. That Snap and its advertisers *later* identified shortcomings in the SKAN measurement tool, after it was operated at scale across the digital ad industry, does not render false the statements Snap made months earlier that it felt "well prepared" for the upcoming changes. The Ninth Circuit recently rejected such fraud-by-hindsight theories, holding, "it is simply not enough to assume or implausibly infer that the defendants must have known about . . . issues [when alleged misstatements were made] based on later facts or developments." *Twitter*, 29 F.4th at 621. Indeed, Defendants' public statements identified specific preparatory steps that Snap took (*see* Ex. 4-41), and Plaintiff does not allege that any of those steps were not actually taken.

Gorman and Spiegel's statements are also inactionable puffery because they are "[v]ague statements of optimism" that are not "capable of objective verification." *Apollo Grp.*, 774 F.3d at 606; *see also Twitter*, 29 F.4th at 620–22. Courts have repeatedly held that statements that a company is "well prepared" for an event are puffery. *See, e.g.*, *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 914–15 (S.D. Tex. 2017), *aff'd sub nom.* 777 F. App'x 726 (5th Cir. 2019) (statement that company was "well prepared" inactionable).

***Snap is in a "unique and beneficial position" due to "design decisions."***

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

Gorman's statement on the February 4, 2021 earnings call that Snap was in a "unique and beneficial position" to deal with ATT because of its "design decisions" is not alleged to have been false when made. (¶¶ 6, 42, 68, 70, 71.)  Indeed, Gorman was not commenting on ATT at all; she was answering a question about whether Snap's "positioning as a curated and more brand-safe platform" "resonat[ed]" with advertisers. (Ex. 4-44.)  Gorman said:  "the growing focus on brand safety and privacy across the entire industry actually places us in a really unique and beneficial position" because Snap "made design decisions that helped [it] avoid many of the issues seen on other platforms," such as the absence of a comments feature. (*Id.*)  Plaintiff does not allege facts contradicting these assertions, all unrelated to ATT.

In addition, Gorman's statement is an inactionable statement of opinion because it is prefaced with the phrase "I think," (*id.*), and Plaintiff nowhere alleges that Gorman subjectively disbelieved it.  Nor does Plaintiff allege it was objectively false. *See supra* 12.  The statement is also inactionable puffery.  *See, e.g.*, *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 523–24 (S.D.N.Y. 2020) (statements about company's "unique position" are inactionable puffery).

### 2.    The April 2021 Statements

Plaintiff alleges that Gorman's statement on April 22, 2021—before Apple's rollout of ATT and well before advertisers put SKAN into use—that "[a]dvertisers that represent a majority of [Snap's] direct response advertising revenue have successfully implemented [SKAN]" was false and misleading because it suggested advertisers were "already successfully using SKAN." (¶¶ 7, 43, 45, 72, 90.)  This argument fails both because Plaintiff is mischaracterizing what Gorman actually said, and because Plaintiff fails to plead particularized facts showing falsity.

*First*, Plaintiff impermissibly attempts to rewrite the statement to "unequivocally stat[e] that Snap's advertisers had had ample time to adopt and test SKAN and were ***already successfully using it***." (¶ 72 (emphasis added).)  In other words, Plaintiff contends that Gorman represented—in April—that advertisers

representing a majority of Snap's direct response revenue had set up SKAN, started using it as their sole measurement tool, were satisfied it was an effective replacement for IDFA/traditional MMPs, and had adjusted their ad spend accordingly. Plaintiff's characterization is implausible given Gorman's actual words, when she said it, and the cautionary language accompanying her statements.

Significantly, the statement was made *before* Apple rolled out ATT and *months before* widescale adoption of ATT by users, when advertisers could no longer rely on IDFA measurement data. *See supra* 7–8. Plaintiff does not plead—because it cannot—that at this point in April Snap's advertisers had stopped using traditional measurement solutions, analyzed whether SKAN was a viable stand-alone measurement solution, or shifted their advertising campaigns to rely on SKAN. The early timing alone thus demonstrates that Plaintiff's characterization of Gorman's statements is implausible.

Moreover, Gorman was clear that she was addressing *preparation* for ATT, not offering a final assessment of advertisers' ultimate satisfaction with ATT. She began by noting that "[t]he fact that these changes are coming later than we anticipated has provided additional time [for Snap] to adopt Apple's [SKAN] and *begin implementing and testing with our partners*." (Ex. 6-56 (emphasis added).) The disclosure that advertisers had only just started "testing" SKAN belies Plaintiff's claim that Gorman was telling investors that Snap's advertisers had already verified the effectiveness of, and were successfully relying on, SKAN as their go-to measurement tool. Indeed, Gorman emphasized that there was still "a lot of work to be done to transition smoothly"—another statement Plaintiff conveniently omits from the Complaint. (*Id.* at 6-70 to 6-71.) Gorman thus clearly distinguished between advertisers' mere "implementation" of SKAN and advertisers verifying its effectiveness after mass adoption coupled with the loss of access to traditional data signals such as IDFA—the latter not having occurred at that point. Moreover, in 3Q21, Gorman specifically pointed to the fact that "over time" SKAN

14

became unreliable "as a standalone measurement solution," further underscoring that the issues with SKAN surfaced only after other measurement tools were no longer available. (Ex. 15-149.) Finally, contrary to Plaintiff's mischaracterization (¶¶ 7, 45–46), analyst reports cited in the Complaint confirm that the market understood Gorman as saying that SKAN had not been fully operationalized, with analysts acknowledging Gorman's statement that Snap had only "beg[un] implementing and testing it with partners." (*See, e.g.*, Ex. 16-167 to 16-168.)[5]

*Second*, even accepting Plaintiff's mischaracterization of Gorman's statement, Plaintiff fails to plead particularized facts showing that it was false. Plaintiff purports to rely on a confidential witness, CW1, to show that this statement was false or misleading (¶¶ 57–59); but CW1 was a junior sales employee who worked in only one of Snap's 12 advertising verticals. (¶ 58 n.3.) The Complaint merely alleges that CW1 said that "[t]he performance of SKAN was terrible" and that CW1 was aware of "very few adoptees" in the first half of 2021. (¶¶ 58, 74.) This information from CW1 does not purport to quantify company-wide data, and thus does not call Gorman's statement into question. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1110 n.4 (9th Cir. 2010) (finding no falsity alleged where CW's observation was not inconsistent with statements about company-wide trends). Indeed, Plaintiff fails to plead that CW1 even had access to company-wide information about direct response revenue, which defeats Plaintiff's reliance on CW1. In short, CW1 was "simply not positioned to know the information alleged." *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009), *as amended* (Feb. 10, 2009); *see Iron Workers Loc. 580 Joint Funds* v. *NVIDIA Corp.*,

_____

[5] Plaintiff asserts that Snap "admitted on October 21, 2021 [that its] advertisers did not even begin to 'test' or 'explore' SKAN until months" after April 2021. (¶ 74.) That is incorrect. Snap said that "as [their] advertising partners have explored and tested SKAN's solutions, they have surfaced a variety of concerns about its limitations." (Ex. 15-149.) Snap's October statement says nothing of when such testing happened and does not contradict the challenged statements.

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

522 F. Supp. 3d 660, 675 n.3 (N.D. Cal. 2021) (discrediting low-level CW where Plaintiff failed to establish CW's "reliability and personal knowledge as to statements about [company-wide] operations").

### 3. The May 2021 Statements

***Snap had "been able to help [its] advertising partners navigate" the ATT changes.*** Plaintiff fails to plead facts showing that Spiegel's statements during his May 21, 2021 CNBC appearance—that Snap had "been able to help [its] advertising partners navigate" the ATT changes—were false or misleading. (¶ 75.) Plaintiff alleges no facts showing Snap did not "help [its] advertising partners." *See Wochos* v. *Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021) (finding "great progress" actionable only if defendant had been "making no progress at all"). The mere fact that advertisers ultimately encountered challenges relying on SKAN as a stand-alone measurement tool says nothing about whether Snap failed to help its advertisers. In any event, Plaintiff pleads no facts showing that advertisers were "confronted" with SKAN's limitations as early as May 2021. In fact, Gorman stated on October 21, 2021 that "***over time***" Snap saw "measurement results diverge meaningfully." (Ex. 15-149 (emphasis added).)

***"So far, the transition has gone smoothly for our business."*** Plaintiff's claim also fails as to Spiegel's statement in the same interview that "so far, [the] transition" to ATT had "gone smoothly for our business." (¶¶ 75–76.) Again, Plaintiff fails to plead facts showing that in May 2021—before widespread adoption of ATT—the transition was ***not*** going smoothly for Snap. And as explained above, *supra* 15 n.5, Snap's October 2021 statement that advertisers had encountered limitations with SKAN says nothing as to whether Spiegel's May 2021 statements were false when made. In addition, Spiegel's statement is an opinion not alleged to be subjectively false, *supra* 12, as well as inactionable puffery because it is a "vaguely optimistic assessment" that is "imprecise and noncommittal." *Twitter*, 29 F.4th at 620–21. For example, in *Rombach* v. *Chang*, 355 F.3d 164, 168, 174–75

(2d Cir. 2004), the court found the statement that mergers were "progressing smoothly" was inactionable puffery.

### 4.    The July 2021 Statements

***Snap "observed higher opt-in rates than [it was] seeing reported."*** Plaintiff fails to allege any facts showing that Gorman's 2Q21 earnings call statement that Snap "observed higher opt-in rates than [it was] seeing reported" in the industry was false. (¶¶ 77, 80, 81.)  Plaintiff "fails to describe, chart or graph" or provide other evidence of what Snap's opt-in rate actually was and how it compared to the industry's rates. *Ronconi*, 253 F.3d at 431.  To the extent Plaintiff contends that the statement was misleading because it suggested that the higher opt-in rates would "eas[e] the transition to SKAN" and "lessen[] any impact of the privacy changes," (¶¶ 47, 81), Gorman's full statement shows that claim is meritless.  Gorman said nothing about how Snap's "higher opt-in rates" would assist with the transition to SKAN.  (Ex. 14-127; *see also id.* at 14-143.)  And after noting the higher opt-in rates, Gorman cautioned that "it remains so early in these iOS changes and there's no question that it will be a change for the industry in and of itself."  (*Id.* at 14-143.)

***More Time.*** Plaintiff also fails to plead falsity as to Gorman's statement that the delay in the ATT rollout had "given [Snap] more time with advertisers to navigate the transition."  (¶ 78.)  Plaintiff cannot credibly claim that Apple's rollout delay did not give Snap and its advertisers more time to navigate the transition.  Snap never represented that the additional time would guarantee an equally satisfactory measurement tool or no disruption to Snap's revenue.  To the contrary, Gorman noted that the additional time meant "the effects of these changes will come later than we initially expected."  (Ex. 14-127 to 14-128.)  Snap also repeatedly cautioned that the effect of ATT on advertising revenue was uncertain and could be material.  *Supra* 6–7.

*        *        *

None of the challenged misstatements is adequately alleged to be false or

misleading, and the vast majority are inactionable honestly-held opinions or puffery. At bottom, Plaintiff mischaracterizes the challenged statements and criticizes Snap for failing to predict the exact impact of ATT, the inadequacies of SKAN, or precisely how ATT would impact Snap's advertising revenue—while utterly ignoring Snap's repeated warnings that the changes could seriously harm its business.  The Complaint should be dismissed for failure to plead falsity alone.

**B.     The Complaint Fails to Allege a Strong Inference of Scienter**

Plaintiff also does not plead facts supporting the "strong inference" of scienter required by the PSLRA, which is an independent basis for dismissal.  "To meet the PSLRA's high burden for pleading scienter, a complaint cannot rely on 'mere motive and opportunity or recklessness, but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent.'" *Prodanova* v. *H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021).  Plaintiff's theory of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

The Ninth Circuit has repeatedly recognized that this standard is "not an easy standard to comply with—it is not intended to be—and plaintiff[] must be held to it." *Eminence Cap., LLC* v. *Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003); *see also Nguyen* v. *Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (describing standard as "exacting" and being "no small hurdle").  Plaintiff also must "allege scienter with respect to each of the individual defendants." *Apollo Grp.*, 774 F.3d at 607; *see also Prodanova*, 993 F.3d at 1108 ("[B]ecause a corporation can only act through its employees and agents, it can only have scienter through them.") (citation omitted).  Even viewed holistically, the Complaint's allegations fail to meet this "exacting" pleading standard with respect to any defendant.

The Complaint fails entirely to grapple with the numerous cautionary statements and robust risk disclosures Defendants issued before and during the Class

Period (*see supra* 5–7) which undercut any inference of scienter. Instead, Plaintiff asserts that this Court can infer scienter because (i) the "core operations" inference allows Plaintiff to sidestep the need for particularized facts showing scienter (¶¶ 83–86, 88–93, 97–100); and (ii) Spiegel received a large amount of proceeds from stock sales during the Class Period (¶¶ 60–65, 87). These circumstantial allegations do not support a strong inference of intent to defraud or deliberate recklessness. The far more plausible inference is that Defendants were transparent with investors about the potential impact of ATT, including by repeatedly warning investors before and throughout the purported Class Period that the ATT changes could "seriously harm" Snap's business and that the outcome was "uncertain." *See Lachman* v. *Revlon, Inc.*, 487 F. Supp. 3d 111, 138 (E.D.N.Y. 2020) (finding no scienter where defendant made "abundant disclosures" and warnings regarding impact of software rollout). The Court should therefore dismiss the Complaint for failure to plead a strong inference of scienter.

**1.    Plaintiff Fails to Plead Facts Showing Intent to Defraud or Deliberate Recklessness, and the Core Operations Inference Cannot Remedy This Pleading Failure**

Plaintiff does not plead any particularized facts showing that the Individual Defendants (or anyone else) received any information internally or from Snap's advertisers apprising them that the challenged statements were false, which is fatal to Plaintiff's claims. Plaintiff does not identify, for example, any specific meetings, calls, or briefings where preparedness for ATT, the expected smoothness of the transition to SKAN, or advertisers' preparation to use SKAN was discussed, much less ones involving the Individual Defendants. This alone requires dismissal. *Curry* v. *Yelp Inc.*, 875 F.3d 1219, 1227 (9th Cir. 2017) (Plaintiff must include "detailed and specific allegations about management's exposure to factual information"); *see S. Ferry LP, No. 2* v. *Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (same).

Acknowledging this fatal defect, Plaintiff resorts to asking this Court to infer that the Individual Defendants knew their statements were false and misleading

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

because of their "intimate involvement" in Snap's business. (¶¶ 83–86, 88–93, 97–100.)  But it is well established in the Ninth Circuit that the core operations inference requires "specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014).  The Ninth Circuit has made clear that the inference applies only in "exceedingly rare" cases. *S. Ferry*, 542 F.3d at 785 n.3.  The core operations inference may support scienter only (1) when combined "with other allegations" to "support a cogent and compelling" scienter inference, (2) when allegations are "particular" and show defendants "had actual access" to the information, or (3) "in the rare circumstances" where "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Prodanova*, 993 F.3d at 1111 (internal quotations marks omitted).  None of those three prongs is satisfied here, with respect to either Gorman or Spiegel.

The first two prongs of the core operations inference are not met with respect to either Gorman or Spiegel.  As to Gorman, Plaintiff fails to levy any "other allegations" of scienter aside from the core operations allegations (prong 1), and it does not allege any statements from witnesses or specific admissions by Gorman that she was involved in the minutia of the ATT rollout or advertisers' implementation of SKAN (prong 2).  *See Hunt* v. *Bloom Energy Corp.*, 2021 WL 4461171, at *17 (N.D. Cal. Sept. 29, 2021) (rejecting core operations theory because no facts showed defendants' "detailed involvement in the minutia of [the] company's operations").  Plaintiff also ignores the numerous warnings Gorman made *contemporaneously* with the challenged statements, which further undermine any inference of scienter.  *See supra* 6–9, 14–17.

As to Spiegel, the only other scienter allegations—his stock sales—do not support a strong inference of scienter for the reasons stated below.  Plaintiff also

20

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

does not allege any specific facts connecting Spiegel to information inconsistent with his public statements, much less the required admissions by Spiegel that, as CEO, he was involved in the minutia of the ATT rollout or advertisers' implementation of SKAN.  Plaintiff merely makes a generalized assertion that Spiegel is a "highly involved founder-CEO," (¶¶ 97–99)—an assertion that says nothing about his involvement with ATT or SKAN implementation.  *See Nozak* v. *N. Dynasty Mins. Ltd.*, 804 F. App'x 732, 734 (9th Cir. 2020) (finding no core operations inference where plaintiff had "not provided detailed and specific allegations about management's exposure to factual information within the company") (citation omitted).

The third prong also does not apply to Gorman or Spiegel because this case is not one of the "rare circumstances" where "it would be 'absurd' to suggest that management was without knowledge of the matter."  *S. Ferry*, 542 F.3d at 786.  The question is:  would it be "absurd" for the Individual Defendants not to know that third parties (advertisers) were having issues with a third-party (Apple) product, at a time when third parties had not yet been forced to rely on the product?  The answer for both Gorman and Spiegel is clearly no.  As explained in *In re Yahoo! Inc. Shareholder Derivative Litigation*, 153 F. Supp. 3d 1107, 1123 n.10 (N.D. Cal. 2015), "in securities cases, the core-operations inference only allows a court to infer executives' knowledge about their own company's core operations . . . not knowledge regarding the operations" of a third party.  That is particularly logical here, where the ultimate issue relates to advertisers' adjustments of their spending in the wake of Apple's ATT rollout, and their satisfaction with SKAN as a measurement tool.  In any event, the "absurdity" test is unavailing because Plaintiff does not plead any facts suggesting the Individual Defendants knew the challenged statements were false.  *See supra* 18–21; *In re Facebook, Inc. Sec. Litig.*, 2021 WL 6000058, at *6 (N.D. Cal. Dec. 20, 2021) (refusing to infer because plaintiff failed to allege facts showing executive defendants knew of falsity).

### 2.     Spiegel's Stock Sales Do Not Support a Strong Inference of Scienter

Plaintiff attempts to plead scienter almost entirely based on Spiegel's sales of stock.  (¶¶ 60–65.)  But the mere fact that Spiegel sold stock during the Class Period does not contribute to a strong inference of scienter.  *See Ronconi*, 253 F.3d at 435.  Rather, Plaintiff must allege stock sales that are "suspicious."  *Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*, 540 F.3d 1049, 1066–67 (9th Cir. 2008); *Ronconi* 253 F.3d at 435.  Stock sales by insiders are suspicious *only* when they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  *Curry*, 875 F.3d at 1226 (quoting *Ronconi*, 253 F.3d at 435).  "Three factors are relevant to this inquiry:  (1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history."  *Metzler*, 540 F.3d at 1067.  This test is not satisfied here under well-established law.

*First*, the far more compelling explanation for the amount and timing of Spiegel's trades during the Class Period is a nonculpable one set forth in the Complaint itself—that his trades were executed pursuant to Rule 10b5-1 trading plans.  (*See* Exs. 17, 18).  As the Ninth Circuit has held, "[s]ales according to pre-determined plans may 'rebut [] an inference of scienter.'"  *Metzler*, 540 F.3d at 1067 n.11 (citation omitted); *see In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020) *aff'd sub nom. Weston Fam. P'ship LLLP* v. *Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022) (trading plans undercut inference of scienter).[6]  Rule 10b5-1

---

[6] Spiegel sold shares during the Class Period pursuant to two 10b5-1 trading plans. (Exs. 17, 18.)  Although Plaintiff suggests that any plan entered into or modified during the Class Period should be ignored by this Court (¶¶ 62–63), Spiegel entered into the second plan just three weeks after the date Plaintiff arbitrarily chose to start the Class Period.  And while Plaintiff conclusorily asserts that Spiegel did so to "take advantage of the inflation," it fails to plead that Spiegel knew or was deliberately reckless as to any misconduct at that time—months before the ATT rollout and its mass adoption by users.  *See Brendon* v. *Allegiant Travel Co.*, 412 F.

permits company insiders to adopt written, pre-arranged trading plans under which specific amounts of stock are sold according to pre-established criteria, eliminating an individual's discretion over trading. *See* 17 C.F.R. § 240.10b5-1(c). Spiegel's Rule 10b5-1 plans thus allocated discretion to a broker to sell specified amounts of stock once Snap's stock reached certain prices. (Exs. 17, 18.) The timing of Spiegel's stock sales was therefore not determined by him at all—much less by any supposed knowledge he had about purported misstatements—but rather by his broker in accordance with the plans' terms. Plaintiff therefore cannot plausibly allege that Spiegel intended to sell his stock at inflated prices before an anticipated decline. *See In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *17 (N.D. Cal. Nov. 23, 2021) ("Defendants did not have immediate control over these planned sales, so these sales . . . cut against a finding of scienter"); *Park* v. *GoPro, Inc.*, 2019 WL 1231175, at *23 (N.D. Cal. Mar. 15, 2019) ("[T]he innocent alternative explanation that the sales were from a non-discretionary 10b5-1 plan negates scienter.").

*Second*, the amount sold by Spiegel was not suspicious. Plaintiff ignores the percentage of shares sold for good reason: Spiegel maintained approximately ***93 percent*** of his position during the Class Period and sold only 7 percent of his stock. (*See* Ex. 19.) Courts routinely decline to infer scienter even from far higher percentages of sales. *See Metzler*, 540 F.3d at 1067 (sales of 37 percent insufficient); *Okla. Firefighters Pension & Ret. Sys.* v. *Ixia*, 2015 WL 1775221, at *37 (C.D. Cal. Apr. 14, 2015) (sales of 22.52 percent insufficient); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999) (sales of about 44

---

Supp. 3d 1244, 1261–62 (D. Nev. 2019) (declining to infer scienter where plaintiffs failed to allege defendant entered into plan to "take advantage of the inflated stock price"). On those facts, both trading plans militate against scienter. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585–86 (S.D.N.Y. 2014) (plan undercuts scienter where the complaint pled "no facts that even remotely suggest[ed]" that the defendant entered into the plan "to capitalize on insider knowledge" of alleged undisclosed misconduct).

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

percent and 76 percent standing alone, not suspicious).

*Third*, Spiegel's trading during the putative Class Period was not "dramatically out of line" with his control period trading (*i.e.*, the nine months before the nine-month Class Period). *See Curry*, 875 F.3d at 1226. Although Plaintiff compares Spiegel's sales ***proceeds*** in the Class and Control Periods, (¶ 60), Plaintiff is silent on the ***number of shares*** sold in each period. And, again, for good reason: the amount of shares that Spiegel disposed of during the Class Period and Control Period are comparable.[7] The sales therefore were "consistent with [his] trading history" and do not support scienter. *Metzler*, 540 F.3d at 1067.

*Fourth*, the timing of Spiegel's trades was not suspicious for the additional reason that Spiegel's trades were not concentrated in the period when the price was at its peak just before the disclosure of bad news. Indeed, Spiegel made over 50 percent of his Class Period sales ***before*** Snap's stock price was, according to Plaintiff, in its "all time high" range of between $70 and $83.11. (Ex. 19.) And, as Plaintiff's own Complaint shows (¶ 63), Spiegel made ***no trades*** in the four weeks before the alleged corrective disclosure. (¶ 61.) If Spiegel was seeking to profit from artificial inflation he allegedly created, one would expect him to execute trades in the weeks before the stock drop. *See In re Alteryx, Inc. Sec. Litig.*, 2021 WL 4551201, at *5 (C.D. Cal. June 17, 2021) (defendant with scienter would make "bulk of their trades . . . when inflated revenue figures led to ballooning stock prices"). Plaintiff's assertion that Spiegel's trades were "extraordinarily well-timed" (¶ 61) is not borne out.

*Finally*, although Plaintiff relies primarily on the absolute dollar amount that Spiegel received (¶¶ 8, 60, 64), this is insufficient to raise a strong inference of

---

[7] Spiegel sold approximately 1.93 million *fewer* Class A shares during the Class Period than he did during the Control Period, including sales to satisfy tax withholding obligations and charitable contributions. (Ex. 19.)

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

scienter under the Ninth Circuit's test. *See Curry*, 875 F.3d at 1226. For example, in *Nursing Home Pension Fund, Local 144* v. *Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004), where a CEO made $900 million in proceeds, the court found scienter only in light of numerous other highly suspicious facts: the sales occurred within a ***nine-day*** period about one month before the company reported lower-than-expected quarterly results, and the defendant had not sold ***any*** stock in the previous ***five years***. *Id.* at 1232. No facts even remotely similar are alleged here. *See supra* 22–24.

### C.    The Complaint Fails to Allege Loss Causation

The Complaint should also be dismissed because Plaintiff fails to plead with particularity that "(1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020) (citation omitted). Snap's October 21, 2021 disclosures (¶¶ 103–108)—the purported corrective disclosures—did not "reveal to the market" that any of the challenged statements were false ***when made***. *See BofI Holding*, 762 F.3d at 793. For example, Gorman's April 2021 statements regarding advertisers' "successful[] implement[ation]" of SKAN referred to advertisers having set up or adopted SKAN, and did not address whether advertisers were fully satisfied with its outputs. *See supra* 13–15. Plaintiff does not even attempt to claim that October 21, 2021 disclosures addressed advertisers' set up or adoption of SKAN in April 2021, let alone revealed that the statements were false when made.

### V.    CONCLUSION

The Complaint should be dismissed with prejudice.[8]

---

[8] The section 20(a) claim should be dismissed because it is derivative of an underlying primary violation and the Complaint fails to allege any such violation. *Lipton* v. *Pathogenesis Corp.*, 284 F.3d 1027 n.15 (9th Cir. 2002).

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT

DATED:  May 3, 2022

By:  */s/ Daniel J. Kramer*

Daniel J. Kramer

DANIEL J. KRAMER (*admitted pro hac vice*)
AUDRA J. SOLOWAY (*admitted pro hac vice*)
DANIEL S. SINNREICH (*admitted pro hac vice*)
KRISTINA A. BUNTING (*admitted pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
Fax:   (212) 757-3990
Email:        dkramer@paulweiss.com
Email:        asoloway@paulweiss.com
Email:        dsinnreich@paulweiss.com
Email:        kbunting@paulweiss.com

EKWAN E. RHOW (SBN 174604)
AHARON B. KASLOW (SBN 322769)
**BIRD, MARELLA, BOXER, WOLPERT,
NEISSIM, DROOKS, LINCENBERG &
RHOW P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067-2561
Tel:   (310) 201-2100
Fax:   (310) 201-2110
Email:        erhow@birdmarella.com
Email:        akaslow@birdmarella.com

*Attorneys for Snap Inc., Evan Spiegel, and Jeremi Gorman*

SNAP'S MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT