# EXHIBIT 9

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2021**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission File Number: 001-38017**

# SNAP INC.

**(Exact name of registrant as specified in its charter)**

| Delaware | 45-5452795 |
|---|---|
| **(State or other jurisdiction of incorporation or organizations)** | **(I.R.S. Employer Identification Number)** |

**3000 31st Street**

**Santa Monica, California 90405**
**(Address of principal executive offices, including zip code)**

**(310) 399-3339**
**(Registrant's telephone, including area code)**

**2772 Donald Douglas Loop North**

**Santa Monica, California 90405**
**(Former name, former address, and former fiscal year, if changed since last report)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, par value $0.00001 per share | SNAP | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 (Exchange Act) during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

☒ Large accelerated filer          ☐ Accelerated filer

☐ Non-accelerated filer          ☐ Smaller reporting company

☐ Emerging growth company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Number of Shares Outstanding |
|---|---|
| Class A common stock, $0.00001 par value | 1,268,223,482 shares outstanding as of April 20, 2021 |
| Class B common stock, $0.00001 par value | 23,640,382 shares outstanding as of April 20, 2021 |
| Class C common stock, $0.00001 par value | 231,626,943 shares outstanding as of April 20, 2021 |

- modifying or interpreting its terms of service or other policies in a manner that impacts our ability to run our business and operations.

Google and Amazon each has broad discretion to change and interpret its terms of service and other policies with respect to us, and those actions may be unfavorable to us. They may also alter how we are able to process data on their cloud platforms. If Google or Amazon makes changes or interpretations that are unfavorable to us, our business could be seriously harmed.

***We generate substantially all of our revenue from advertising. The failure to attract new advertisers, the loss of advertisers, or a reduction in how much they spend could seriously harm our business.***

Substantially all of our revenue is generated from third parties advertising on Snapchat, a trend that we expect to continue. For the years ended December 31, 2020, 2019, and 2018, advertising revenue accounted for approximately 99%, 98%, and 99% of total revenue, respectively. Although we have and continue to try to establish longer-term advertising commitments with advertisers, most advertisers do not have long-term advertising commitments with us, and our efforts to establish long-term commitments may not succeed.

We are still early in developing our advertising business. Our advertising customers vary from small businesses to well-known brands. Many of our customers only recently started working with us and spend a relatively small portion of their overall advertising budget with us, but some customers have devoted meaningful budgets that contribute to our total revenue. Still, no individual customer accounts for more than 10% of our annual revenue. In addition, advertisers may view some of our products as experimental and unproven. Advertisers will not continue to do business with us if we do not deliver advertisements in an effective manner, or if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives. As our business continues to develop, including globally, there may be new or existing advertisers or resellers, or advertisers or resellers from different geographic regions that contribute more significantly to our total revenue. For example, greater China represented more than 10% of our revenue for the three months ended June 30, 2020. Any economic or political instability, whether as a result of the COVID-19 pandemic or otherwise, in a specific country or region may negatively impact the global or local economy, advertising ecosystem, our customers and their budgets with us, or our ability to forecast our advertising revenue, and our business would be seriously harmed.

Moreover, we rely heavily on our ability to collect and disclose data and metrics to and for our advertisers to attract new advertisers and retain existing advertisers. Any restriction, whether by law, regulation, policy, or other reason, on our ability to collect and disclose data and metrics which our advertisers find useful would impede our ability to attract and retain advertisers. For example, the General Data Protection Regulation, or GDPR, in the European Union, which went into effect in May 2018, expanded the rights of individuals to control how their personal data is collected and processed, and placed restrictions on the use of personal data of younger minors. In addition, the California Consumer Privacy Act, or CCPA, went into effect in January 2020 and places additional requirements on the handling of personal data for us, our partners, and our advertisers. The CCPA also provides for civil penalties for violations, as well as a private right of action for data breaches, which may increase the likelihood and cost of data breach litigation. The potential effects of this legislation, including any regulations implemented by the legislation, are far-reaching, uncertain, and evolving, and may require us to modify our data processing practices and policies and incur substantial costs and expenses in an effort to comply. Other state, federal, and foreign legislative and regulatory bodies have also implemented or may implement similar legislation regarding the handling of personal data. Changes in the European Union's Electronic Communications Code, which became effective in December 2020, may result in the expanded applicability of the European Union's ePrivacy Directive over parts of our services, requiring us to make changes to how we process and store certain types of communications data of users in the European Union, which could have a material impact on the availability of data we rely on to improve and personalize our products and features. Furthermore, changes to iOS or Android operating systems' practices and policies, such as Apple's upcoming iOS update that may impose heightened restrictions on our access and use of user data, may reduce the quantity or quality of the data and metrics that can be collected or used by us and our partners, or adversely affect our ability to effectively target advertisements to users or demonstrate the value of our advertisements to advertisers, any of which could reduce the demand and pricing for our advertising products and seriously harm our business. The impact of these proposed changes on the overall mobile advertising ecosystem, our competitors, our business, and the developers, partners, and advertisers within our community is uncertain. Depending on how these changes are implemented, how we, our competitors, and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our business could be seriously harmed. Any adverse effects could be particularly material to us because we are still early in building our advertising business. Our advertising revenue could also be seriously harmed by many other factors, including:

- a diminished or stagnant growth in the total and regional number of DAUs on Snapchat, or our inability to deliver advertisements to all of our users due to hardware, software, or network limitations;

42

Ex. 9 - 94

- a decrease in the amount of time spent on Snapchat, a decrease in the amount of content that our users share, or decreases in usage of our Camera, Communication, Snap Map, Stories, and Spotlight platforms;

- our inability to create new products that sustain or increase the value of our advertisements;

- changes in our user demographics that make us less attractive to advertisers;

- lack of ad creative availability by our advertising partners;

- our partners who provide content to us may not renew agreements or devote the resources to create engaging content or do not provide content exclusively to us;

- decreases in the perceived quantity, quality, usefulness, or relevance of the content provided by our users or partners;

- changes in our analytics and measurement solutions, including what we are permitted to collect and disclose under the terms of Apple's and Google's mobile operating systems, that demonstrate the value of our advertisements and other commercial content;

- competitive developments or advertiser perception of the value of our products that change the rates we can charge for advertising or the volume of advertising on Snapchat;

- product changes or advertising inventory management decisions we may make that change the type, size, or frequency of advertisements displayed on Snapchat or the method used by advertisers to purchase advertisements;

- adverse legal developments relating to advertising, including changes mandated or prompted by legislation, regulation, executive actions, or litigation;

- adverse media reports or other negative publicity involving us, our founders, our partners, or other companies in our industry segment;

- advertiser or user perception that content published by us, our users, or our partners is objectionable;

- the degree to which users skip advertisements and therefore diminish the value of those advertisements to advertisers;

- changes in the way advertising is priced or its effectiveness is measured;

- our inability to measure the effectiveness of our advertising or target the appropriate audience for advertisements;

- our inability to collect and disclose data or access a user's Identifier for Advertising or similar deterministic identifier that new and existing advertisers may find useful;

- difficulty and frustration from advertisers who may need to reformat or change their advertisements to comply with our guidelines; and

- the macroeconomic climate and the status of the advertising industry in general.

These and other factors could reduce demand for our advertising products, which may lower the prices we receive, or cause advertisers to stop advertising with us altogether. Either of these would seriously harm our business.

***Our two co-founders have control over all stockholder decisions because they control a substantial majority of our voting stock.***

Our two co-founders, Evan Spiegel and Robert Murphy, own or control voting shares of our capital stock that represent over 99% of the voting power of our outstanding capital stock as of March 31, 2021, and Mr. Spiegel alone can exercise voting control over a majority of our voting power. As a result, Mr. Spiegel and Mr. Murphy, or in many instances Mr. Spiegel acting alone, have the ability to control the outcome of all matters submitted to our stockholders for approval, including the election, removal, and replacement of our directors and any merger, consolidation, or sale of all or substantially all of our assets.

If Mr. Spiegel's or Mr. Murphy's employment with us is terminated, they will continue to have the ability to exercise the same significant voting power and potentially control the outcome of all matters submitted to our stockholders for approval. Either of our co-founders' shares of Class C common stock will automatically convert into Class B common stock, on a one-to-one basis, nine months following his death or on the date on which the number of outstanding shares of Class C common stock held by such holder represents less than 30% of the Class C common stock held by such holder on the closing of our IPO, or 32,383,178 shares of Class C common stock. Should either of our co-founders' Class C common stock be converted