DANIEL J. KRAMER (*admitted pro hac vice*)
AUDRA J. SOLOWAY (*admitted pro hac vice*)
DANIEL S. SINNREICH (*admitted pro hac vice*)
KRISTINA A. BUNTING (*admitted pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
Fax:   (212) 757-3990
Email:      dkramer@paulweiss.com
Email:      asoloway@paulweiss.com
Email:      dsinnreich@paulweiss.com
Email:      kbunting@paulweiss.com

*Additional Counsel Listed on Signature Page*

*Attorneys for Snap Inc., Evan Spiegel, and Jeremi Gorman*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| KELLIE BLACK, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> SNAP INC., EVAN SPIEGEL, and JEREMI GORMAN, <br><br> Defendants. | No. 2:21-cv-08892-GW-RAOx <br><br> **DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> Date:   January 19, 2023 <br> Time:   8:30 AM <br> Crtrm.:  9D <br> Assigned to Honorable George H. Wu |

# TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ........................................................................ 1

II.  ARGUMENT ................................................................................................... 4

    A.   Plaintiff Fails to Identify Any Actionable Misrepresentations ............... 4

       1.   The February 4 and 5, 2021 Statements ....................................... 4

       2.   The April 2021 Statement .............................................................. 7

       3.   The May 2021 Statements ............................................................ 12

       4.   The July 2021 Statements ............................................................ 13

       5.   Snap's Projections Are Opinions and Also Subject to PSLRA Safe Harbor Protection ...................................................... 14

    B.   Plaintiff's Opposition Brief Fails to Identify Facts Supporting a Strong Inference of Scienter ................................................................ 17

       1.   Plaintiff Fails to Plead Facts Showing Intent to Defraud or Deliberate Recklessness.............................................................. 17

       2.   The Core Operations Inference Is Unavailable .......................... 21

       3.   Spiegel's Stock Sales Add Nothing to Any Scienter Inference ..................................................................................... 22

III. CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AnaptysBio, Inc.*,
2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) ....................................................24

*In re Ariba, Inc. Sec. Litig.*,
2005 WL 608278 (N.D. Cal. Mar. 16, 2005) ......................................................19

*Ark. Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ................................................................................24

*Batwin* v. *Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008) .......................................................23

*Berson* v. *Applied Signal Tech.*,
527 F.3d 982 (9th Cir. 2008) ..........................................................................8, 18

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ................................................................................5

*City of Roseville Emps.' Ret. Sys.* v. *Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) ..................................................................................................8

*In re Cloudera, Inc.*,
2021 WL 2115303 (N.D. Cal. May 25, 2021) ......................................................7

*In re Cloudera, Inc. Securities Litigation*,
2022 WL 14813896 (N.D. Cal. Oct. 25, 2022) .....................................................8

*Curry* v. *Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017) .......................................................................18, 22

*Davis* v. *Yelp, Inc.*,
2021 WL 4923359 (N.D. Cal. Sept. 17, 2021) .....................................................6

*Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund* v. *Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004) ............................................................................16

*In re Fibrogen, Inc.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022) .....................................................20

ii

*Freudenberg* v. *E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..................................................................25

*Garcia* v. *J2 Global*,
2021 WL 1558331 (C.D. Cal. Mar. 5, 2021) ........................................................17

*Hatamian* v. *Advanced Micro Devices, Inc.*,
87 F. Supp. 3d 1149 (N.D. Cal. 2015) ....................................................................7

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................................12

*In re Leapfrog Enterprise, Inc. Sec. Litig.*,
200 F. Supp. 3d 987 (N.D. Cal. 2016) ....................................................................9

*Lipton* v. *Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ..............................................................................25

*Lopes* v. *Fitbit, Inc.*,
2020 WL 1465932 (N.D. Cal. Mar. 23, 2020) .....................................................12

*McCasland* v. *FormFactor, Inc.*,
2009 WL 2086168 (N.D. Cal. July 14, 2009) ........................................................6

*Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ...............................................................22, 23, 24

*Mulligan* v. *Impax Labs., Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ......................................................................6

*Nguyen* v. *New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018) ..................................................................25

*Nursing Home Pension Fund, Local 144* v. *Oracle*,
380 F.3d 1226 (9th Cir. 2004) ..............................................................................23

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ..............................................................................20

*Okla. Police Pension & Ret. Sys.* v. *LifeLock, Inc.*,
780 F. App'x 480 (9th Cir. 2019) .........................................................................12

*Or. Pub. Emps. Ret. Fund* v. *Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ................................................................................17

iii

*Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ...................................................................21

*Prodanova* v. *H.C. Wainwright & Co. LLC*,
993 F.3d 1097 (9th Cir. 2021) ...................................................................21

*In re Qualcomm Sec. Inc. Litig.*,
2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) .......................................18

*In re QuantumScape Sec. Class Action Litig.*,
580 F. Supp. 3d 714 (N.D. Cal. 2022) ....................................................19

*In re Questcor Sec. Litig.*,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ..........................................25

*Reese* v. *Malone*,
747 F.3d 557 (9th Cir. 2014) .....................................................................18

*Ronconi* v. *Larkin*,
253 F.3d 423 (9th Cir. 2001) .....................................................................22

*S. Ferry LP, No. 2* v. *Killinger*,
542 F.3d 776 (9th Cir. 2008) .....................................................................22

*Salameh* v. *Tarsadia Hotel*,
726 F.3d 1124 (9th Cir. 2013) ...................................................................25

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) .........................................................................20

*Shenwick* v. *Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017)............................................10, 18, 20

*In re Snap Inc. Sec. Litig.*,
2018 WL 2972528 (C.D. Cal. June 7, 2018)................................7, 8, 16

*In re STEC Inc. Sec. Litig.*,
2011 WL 2669217 (C.D. Cal. June 17, 2011)........................................10

*Tung* v. *Dycom Indus.*,
Inc., 454 F. Supp. 3d 1244 (S.D. Fla. 2020)..........................................12

*Weston Fam. P'ship LLLP* v. *Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022).................................................................4, 13

iv

*Wochos* v. *Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021)..........................................................................8, 12

*Zee* v. *Green Dot Corp.*,
   2013 WL 12133841 (C.D. Cal. May 2, 2013)...................................................15

*Zucco Partners, LLC* v. *Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009).............................................................................17

**Statutes**

15 U.S.C. § 78u-5 ....................................................................................................15

**Other Authorities**

Fed. R. Civ. P. 9(b) ..................................................................................................17

Rule 10b5-1, 17 CFR § 240.10b5-1 .........................................................................24

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CLASS
ACTION COMPLAINT (2:21-cv-8892-GW-RAOx)

## I.    PRELIMINARY STATEMENT

In its opposition brief, Plaintiff attempts to rewrite Defendants' statements so it can challenge what it wishes Defendants said, rather than what Defendants actually said.  Plaintiff's inability to address Defendants' actual statements only confirms that it cannot plead fraud.

The premise of Plaintiff's opposition brief is that Defendants told the market that Snap was "Immune To ATT."  In particular, Plaintiff says that Defendants: "repeatedly conveyed to the market that they did not expect any material negative impact from ATT"; "continued to staunchly reassure investors that Snap's business was not impacted"; "repeatedly assure[d] investors that ATT did not pose a major threat to Snap's business"; and claimed that Snap was "successfully weathering ATT."  Plaintiff then claims that Defendants "admitted" at the end of the class period that these purported statements were false because Snap had "already observed the negative material impact of ATT" by July 2021.  That does indeed sound like a stark contrast.

But Snap never made those purported statements or admissions.  Here is what Snap actually said: "there's no question that [ATT] will be a change for the industry in and of itself," ATT could "reduce the demand and pricing for [Snap's] advertising products and seriously harm [Snap's] business"; ATT's impact was "uncertain"; and Snap's business could be "seriously harmed" depending on how its "partners, advertisers, and users respond."  To be sure, Snap also expressed cautious optimism regarding its preparations, but it immediately followed those statements by cautioning that "the solutions are not yet fully finalized," "there's a lot of work to be done to transition smoothly," and "[i]t is too early to determine how long it will take until these changes are fully adopted, the scale of the potential interruptions to demand, or the ultimate impact on the longer term growth of our business."  And at the end of the class period, far from admitting that it knew of a negative material impact as early as July 2021, Snap stated that it did not even see "meaningful adoption" of ATT until

1

June and July 2021, and that "over time" it saw results from Apple's new SKAN product "diverge meaningfully" from results using traditional measurement tools.

Further, contrary to Plaintiff's claims, Snap did not promise that alternative measurement solutions, such as Apple's SKAN product, would meet advertisers' needs. Rather, as late as July 2021, Snap warned that it "continued to work with [its] advertising partners on . . . solutions" to Apple's changes, such as SKAN, but they were "not yet fully finalized" and thus it was "too early" to assess whether the solutions would meet advertisers' needs. In this regard, Plaintiff egregiously mischaracterizes Gorman's comment that certain direct response ("DR") advertisers had "successfully implemented" SKAN. Plaintiff rewrites that statement, charging that Gorman told investors that "Snap's crucial DR advertisers had concluded that SKAN was a workable alternative to IDFA." Gorman never said, however, that SKAN was a "workable alternative" or that advertisers had "concluded" anything at all about SKAN; she said that certain advertisers had "successfully implemented" the new measurement tool, which is significantly different. Plaintiff's revision of Gorman's statement is completely undermined by the plain meaning of Gorman's words (implementing a new tool does not mean concluding it meets all needs); the context in which the statement was made (Gorman said, in that same statement, that Snap had only "beg[un] implementing and testing" SKAN with advertisers); and the timing of her statement (the ATT rollout had not yet occurred, so advertisers necessarily had not yet assessed SKAN's effectiveness at scale).

Plaintiff also fails to plead with particularity facts showing that any challenged statement was false or misleading when made. Plaintiff continues to rely on the limited allegations of its confidential witnesses, CW1 and CW2, while failing to grapple with the fact that neither CW had company-wide knowledge of preparations for ATT, SKAN's operationalization, or Snap's public reporting. In any event, the CW allegations are irrelevant because they do not reveal any inconsistency between the internal information Defendants had and the content of their public statements.

2

Plaintiff also contends that Snap "admitted" in October 2021 (two quarters after Gorman's statement) that "a 'majority' of Snap's DR advertisers had not 'successfully implemented' SKAN by April 2021" and that Snap knew about SKAN's "severe deficiencies" as early as June and July.  But Snap made no such admission.  Rather, Snap disclosed that *after* Gorman's statement, and *after* ATT's rollout, Snap's advertisers "surfaced a variety of concerns about [SKAN's] limitations" as its "advertising partners [had] explored and tested" SKAN.  Snap did not "admit" that advertisers had raised "severe deficiencies" with SKAN before the rollout; and, in any event, Snap never warranted to investors that SKAN would prove a suitable substitute for the legacy IDFA data.

Plaintiff also fails to plead facts supporting a strong inference of scienter.  Plaintiff's opposition ignores Snap's repeated warnings about ATT, which show that the most plausible inference is a non-culpable one:  Snap was transparent with its investors and, while it made some positive statements about its preparations for ATT, it repeatedly warned investors that (a) ATT could seriously harm Snap's business and (b) Snap and its advertisers were working on setting up solutions such as SKAN but those solutions were not finalized and therefore their effectiveness could not be assessed.  Significantly, Plaintiff does not point to any facts showing that either Gorman or Spiegel (or other senior management) received any information showing that their statements were false.  Although Plaintiff relies on allegations by CW1 and CW2, both were junior employees without company-wide insight into ATT's impact or SKAN, and neither alleges that she communicated any information to Spiegel or Gorman that contradicted Snap's public statements.

Plaintiff's other scienter theories are equally unavailing.  The core operations inference is unavailable because that inference is invoked only in extremely rare cases and certainly not here, where Plaintiff fails to plead any facts showing Spiegel or Gorman were involved in the minutiae of the ATT rollout or Snap's advertisers' evaluation of SKAN.  Finally, Plaintiff does not allege that Spiegel's stock sales were

3

suspicious, as required by Ninth Circuit precedent. Although Plaintiff notes that Spiegel entered into his 10b5-1 trading plan three weeks into the putative class period chosen by Plaintiff, it fails to show that Spiegel had any material nonpublic information about ATT or SKAN at that early date that would defeat the plan's effect of negating any scienter inference.

Plaintiff has already amended its complaint in response to Defendants' initial motion to dismiss, which raised all of these deficiencies, but has failed to cure its basic defects. Defendants simply did not say what Plaintiff claims they said, and that defect is incurable. Accordingly, Plaintiff's claims should be dismissed with prejudice.

## II.    ARGUMENT[1]

### A.    Plaintiff Fails to Identify Any Actionable Misrepresentations

#### 1.    The February 4 and 5, 2021 Statements

As Defendants demonstrated in their opening brief, Defendants' February 4 and 5, 2021 statements (made months before ATT's rollout in April 2021) that Snap "feel[s] really well prepared" for ATT and was in a "really unique and beneficial position" due to "design decisions"[2]—are not actionable because they are statements of opinion and Plaintiff fails to plead facts showing that the statements were false or that Defendants did not honestly believe those opinions when offered. (Br. 12–14.)[3]

In response, Plaintiff rewrites Snap's statements, incorrectly stating that—

---

[1] Br. __ refers to Defendants' Motion to Dismiss the SAC, ECF 100. Opp. __ refers to Plaintiff's Opposition Brief, ECF 105. Ex. _-_ refers to exhibits to the Declaration of Kristina A. Bunting, ECF 100-1. ¶ __ refers to the SAC, ECF 94-1.

[2] The reference to "design decisions" did not concern ATT. That *Spiegel* responded by referring to ATT does not make *Gorman's* response also about ATT. (Opp. 13 n.3; Ex. 5-49.)

[3] Defendants also established that the statements are not actionable because they are not concrete and objectively verifiable. (Br. 13–14.) *E.g.*, *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 615, 621 (9th Cir. 2022) (statements about an "important driver of Twitter's future revenue growth" were inactionable because they were "incapable of objective verification"). Plaintiff also fails to identify any embedded false facts.

4

before ATT's rollout—Snap "represented to investors that Snap had determined that SKAN was effective and would prevent any material impact from ATT," and that Snap was "successfully weathering ATT with SKAN," or was "immune" to it. (Opp. 12, 22.) But Snap never said that. In fact, it said *the opposite*. While Gorman expressed some optimism regarding Snap's preparations for ATT, she cautioned investors that ATT would "make it harder for us and the overall digital ad ecosystem to match advertising outcomes" and warned that "changes to this ecosystem are usually disruptive and the outcome is uncertain." (Ex. 5-46.) Similarly, in his February 5, 2021 CNBC interview, Spiegel warned that "the policy changes that Apple is making" would "impact [Snap's] ability to effectively measure and optimize advertising." (Ex. 6-52 to 6-53.) As to SKAN, neither Gorman nor Spiegel said that SKAN would prove a workable IDFA alternative once the rollout actually happened. To the contrary, Gorman simply said that Snap was "working really closely with Apple" to implement SKAN (Ex. 5-46), and Spiegel said "we feel like we're well prepared" because *Snap* had "implemented" SKAN and was "building [its] own solutions" "in addition to [its] conversion API and measurement kit" (Ex. 6-53).

Plaintiff also cites the fact that *Snap* had itself implemented SKAN before the rollout (Opp. 15 n.7)—which says nothing about whether Snap's advertisers had experienced and reported concerns about SKAN's deficiencies. Plaintiff does not plead anything about Snap's experience with SKAN once Snap implemented it, much less how Snap's experience would give it insight into advertisers' experience with SKAN once ATT was rolled out and they lost access to traditional measurement tools.

Plaintiff also fails to identify facts showing that the statements Defendants actually made were false or that Defendants did not believe those statements when they made them, both of which are required to state a claim regarding opinion statements. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017) (opinions actionable if objectively and subjectively false). As for objective falsity, the SAC does not allege facts showing

5

that Defendants failed to prepare for ATT. As for subjective falsity, Plaintiff does not allege facts showing that Defendants did not believe that Snap was "well prepared" when Defendants made these statements in February 2021. (Br. 12–14.)

Plaintiff responds by relying solely on CW2's vague allegations that "it was well known internally" "throughout 2021" "that Snap expected a significant negative impact from ATT," and the entirely conclusory charge that Spiegel and Gorman "absolutely knew that there would be an impact." (Opp. 13.) This is plainly insufficient as CW2 was not qualified to make these observations. Plaintiff pleads no facts suggesting CW2 was involved in ATT preparedness or public reporting, or had access to company-wide information. Significantly, Plaintiff cannot point to a single fact supplied to Gorman or Spiegel that contradicted any public statement. *McCasland* v. *FormFactor, Inc.*, 2009 WL 2086168, at *5 (N.D. Cal. July 14, 2009) (fraud was inadequately alleged where there were no allegations that anyone "provided any specific information to defendants that contradicts any public statement made by defendants").[4] Moreover, CW2's vague allegations are consistent with Snap's public statements that, although Snap felt "well prepared" for ATT, there would be an impact and that "the outcome is uncertain." (Ex. 5-46.)[5] Finally, Plaintiff relies on CW2 to assert that "Snap deliberately never completed any revenue impact analysis of ATT at any point during the Class Period" for fear of "shareholder fraud." (Opp. 14.) But that is not what the SAC alleges. Instead, it alleges that Snap's Finance team *was* "also working to quantify the expected impact" of ATT in August

---

[4] It is not sufficient to simply number each CW and indicate their job titles and responsibilities. (Opp. 14 n.4.) As Plaintiff's cases demonstrate, allegations must be reliable and based on personal knowledge. *See, e.g.*, *Mulligan* v. *Impax Labs., Inc.*, 36 F. Supp. 3d 942, 946, 962–63 (N.D. Cal. 2014) (finding "allegations regarding the reliability and personal knowledge" of each CW sufficient).

[5] *Davis* v. *Yelp, Inc.*, 2021 WL 4923359, at *11 (N.D. Cal. Sept. 17, 2021), is inapposite. There, defendants announced "we're not alarmed in any way" despite "ample evidence in the record that [d]efendants" knew "that Yelp had a systemic problem." *Id.* at *10. Snap did the opposite by warning investors.

2021.  (¶ 84.)  Plaintiff thus concedes that Snap *did* do a financial impact analysis after the rollout, in the very same quarter that ATT's effects were experienced, and that Snap promptly disclosed the downturn.  (*Id.*)[6]

The fact that Snap and advertisers *later* identified shortcomings in SKAN, after ATT's rollout, also cannot possibly render these statements false **when made**.[7]  As the court explained in *In re Cloudera, Inc.*, "Plaintiffs must allege 'contemporaneous facts that would establish a contradiction between the alleged materially misleading statements and reality.'"  2021 WL 2115303, at *11 (N.D. Cal. May 25, 2021).

## 2.   The April 2021 Statement

Plaintiff also cannot sustain a challenge to Gorman's statement on April 22, 2021 (during Snap's 1Q21 earnings call) that "[a]dvertisers that represent a majority of our direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns."  (Opp. 15–20.)  Again, unable to address what Gorman actually said, Plaintiff improperly rewrites the statement.  According to Plaintiff's contorted version of Gorman's statement, Gorman "assured investors that 'a majority' of Snap's crucial DR advertisers had concluded that SKAN was a workable alternative to IDFA."  (Opp. 1–2.)[8]  This argument fails for several reasons.

---

[6] Plaintiff claims that CW2 never admitted that Finance was "tasked with conducting the revenue impact analysis of ATT" (Opp. 14 n.4), but this admission is in paragraph 84 of the SAC.  Plaintiff also asserts that Finance never completed this analysis, but the SAC nowhere alleges that, and the results that quarter were promptly reported.

[7] Contrary to Plaintiff's cases, Defendants' supposed "admissions" here (Opp. 13) do not establish that any contrary facts existed **at the time of** the statements.  *See In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, *3, *7 (C.D. Cal. June 7, 2018) (statement that company avoided "growth hacking techniques" false when defendants later "admitted" the company "drove a portion of its [] growth through such techniques"); *Hatamian* v. *Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1159–60 (N.D. Cal. 2015) (statements that sales were "on target" false after company later admitted that customers were not fully supplied with products back then).

[8] Plaintiff suggests in its opposition that it has pled that fewer than a majority of DR advertisers had implemented SKAN when Gorman spoke in April 2021 (Opp. 9), but

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT (2:21-cv-8892-GW-RAOx)

*First*, it fails the plain meaning test.  Saying that some advertisers "successfully implemented" SKAN is not the same as saying that those advertisers found SKAN to be a "workable alternative to IDFA."  (*Id.*)   While "successful implementation" indicates that some advertisers had set up SKAN, it does not imply that those advertisers had "concluded" that it solved the problem caused by the loss of IDFA because SKAN is a measurement tool and, by its nature, its effectiveness as a replacement for IDFA would only become apparent over time.  (*Id*.)  As the Ninth Circuit held in *Wochos* v. *Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021), dismissal is appropriate where, as here, plaintiffs do not plead "sufficient facts to establish that the actual term used had the distinctive, and false, meaning that [p]laintiffs claim."[9] *See also City of Roseville Emps.' Ret. Sys.* v. *Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1121 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) (plaintiff's definition, "[a]bsent any support," insufficient to establish term had "specific and well-understood meaning by investors").[10]

*Second*, Plaintiff's rewriting is foreclosed by other statements made in the very same comments by Gorman.  Gorman was clear that she was addressing **preparation** for ATT, not assessing advertisers' ultimate navigation through ATT and satisfaction

no alleged facts support that claim.  That CW1 allegedly was aware of "few adoptees" is irrelevant since CW1 worked on one of 12 advertising verticals, and had no basis to know what percentage of DR advertising revenue adopting advertisers constituted.
[9] Plaintiff mischaracterizes *Berson* v. *Applied Signal Tech*., 527 F.3d 982 (9th Cir. 2008).  There, the plaintiffs offered sufficient evidence supporting their interpretation of counting "stopped work."  *Id.* at 985–87.  Plaintiff's reliance on *Snap*, 2018 WL 2972528, *7, is also misplaced.  There, the question before the court was interpretation of a "growth hacking" admission, not an earlier alleged misstatement.
[10] *In re Cloudera, Inc. Securities Litigation*, 2022 WL 14813896 (N.D. Cal. Oct. 25, 2022), is instructive.  There, the court dismissed for failure to plead falsity because plaintiffs relied on later factual allegations, not contemporaneous facts, to establish that the terms "had 'the distinctive . . . meaning that [p]laintiffs claim[ed].'" *Id.* at *8. So, too, here.  Nowhere in the SAC does Plaintiff plead contemporaneous facts sufficient to show "successfully implemented" meant advertisers had "concluded" that SKAN was a "workable alternative."

8

with SKAN.  She began by noting "[t]he fact that these changes are coming later than we anticipated has provided additional time to adopt Apple's [SKAN] and begin implementing and testing with our partners." (Ex. 9-88.)  Plaintiff's argument in its opposition (*see* Opp. 19)—that this context supports its interpretation—plainly ignores Gorman's use of the word "begin" before "implementing and testing." (Ex. 9-88.)  That advertisers had only just "beg[un] . . . testing" SKAN is at odds with Plaintiff's assertion that Gorman was telling investors that Snap's advertisers had already verified the effectiveness of, and were content relying on, SKAN as their go-to, standalone measurement tool.  As Andersen explained on the same call, it "may not be clear until several months or more" "what the longer term impact of the iOS platform changes may be." (Ex. 9-93.)  *See In re Leapfrog Enterprise, Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1003–04 (N.D. Cal. 2016) (defendant's other statements "put the alleged misleading statements . . . in context" and "substantially mitigate[d] the potentially misleading nature of the challenged statements").

*Third*, Plaintiff's interpretation makes no sense given the timing of the statement.  Gorman made her comments **before the ATT rollout and months before widescale adoption of ATT**.  (*See* Br. 9–10, 16–18.)  Advertisers had not yet lost access to traditional measurement tools.  Plaintiff's argument that "a determination of SKAN's success did *not* need to await the full rollout of ATT" (Opp. 19) misses the point.  Plaintiff does not plead—nor would it be logical—that advertisers had actually started using SKAN as their sole measurement tool when they still had access to old solutions, much less that significant deficiencies in SKAN had already surfaced and been communicated to Snap when Gorman made her statement on the 1Q21 call.[11] The pre-rollout timing of the statement—coupled with Plaintiff's failure to plead that advertisers had started relying on SKAN at scale—precludes Plaintiff's interpretation.

---

[11] Plaintiff also fails to plead (let alone with particularized facts) that an app's IDFA opt-in rate was irrelevant.  (Opp. 19.)  This is belied by Plaintiff's own analyst report which cites opt-in rates when predicting the future impact of SKAN.  (Ex. 22-210.)

9

In opposition, Plaintiff contends that "successfully implemented" cannot mean successfully "set up SKAN for use" because it reduces the phrase's meaning down to nothing. (Opp. 17–19.) Plaintiff again ignores the statement's plain meaning. As Snap warned, the eventual rollout of ATT at scale was expected to disrupt advertisers' access to the IDFA information they had previously used to plan advertising campaigns. That certain advertisers had "successfully implemented" SKAN for use was meaningful, because it meant that those advertisers would be able to receive *some* measurement data—rather than none at all. That preparation would help mitigate against the risk of an adverse outcome—complete signal loss for Snap's advertisers— and so was worth mentioning. But whether the data received from SKAN was adequate as compared to IDFA, and how it would impact advertisers' post-rollout spending, was necessarily uncertain pre-rollout (as Snap repeatedly warned).

Plaintiff also incorrectly claims that analyst reports support its interpretation.[12] Plaintiff does not identify any analyst who interpreted Gorman's words about implementing SKAN to mean that "SKAN worked as an alternative for IDFA," much less as a guarantee that Snap and its advertisers would face no material impact from ATT once it was rolled out and adopted *en masse*. (Opp. 18–19.) On the contrary, one analyst highlighted the risk to Snap's revenue growth from ATT, stating "[w]hat [w]orries [u]s" is "IDFA risk to 2021 revenue growth estimates." (Ex. 26-268.) And

---

[12] Plaintiff's case law in support of the argument that analyst and market reaction demonstrated the "clear meaning" of the April 2021 statement (Opp. 18) is distinguishable because plaintiffs there pleaded a clear divergence between internal information and external communications. *See Shenwick* v. *Twitter, Inc.*, 282 F. Supp. 3d 1115, 1128, 1137, 1140 (N.D. Cal. 2017) (statements to analysts that user growth metric "trend ha[d] already turned around" and "we're in a great place" conveyed that metric "was tren[d]ing positively, and they were interpreted by analysts as such," when in reality "the opposite was true" because contemporaneous facts made such user growth implausible); *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *7 (C.D. Cal. June 17, 2011) (company's statement announcing deal created misleading impression that the deal was an ordinary course contract when plaintiff alleged that defendant admitted that the deal "was a one-off type of deal").

10

several analysts read Gorman's statement about the progress in SKAN implementation, coupled with the delayed ATT rollout, as merely "help[ing] mitigate against a meaningful adverse outcome for Snap," not as an assurance that Snap would feel no impact. (Ex. 15-131; *see also* Ex. 31-339.) As these analysts recognized, adverse outcomes were still possible and preparing for an expected event helps "mitigate" an adverse outcome—just as *not* preparing increases the risk. Plaintiff cites no analyst supporting its interpretation that Gorman assured investors about advertisers' future SKAN satisfaction.[13]

Plaintiff's argument about the April 2021 statement fails for another reason: Even if one assumes that Plaintiff is correct that "successfully implemented" means that advertisers were already relying on SKAN for advertising decisions, Plaintiff must still plead that SKAN's inadequacy had surfaced to Snap when the statement was made. But Plaintiff does not plead that advertisers had raised concerns *to Snap* as of April 2021. CW1's allegations do not undermine Gorman's statement; Plaintiff fails to plead that CW1 had access to company-wide information about DR revenue or access to information about the experience most advertisers had with SKAN. (Br. 18.) Unable to address this pleading deficiency, Plaintiff looks to events occurring months later to argue that Defendants "admitted on October 21, 2021" that a majority of Snap's DR advertisers had not "successfully implemented" SKAN by April 2021, but instead had "immediately" been "severely hampered by SKAN's significant and numerous 'limitations.'" (Opp. 9, 16.) Yet again, Snap said nothing of the sort. What Snap actually said was that "[t]he initial results we observed using SKAN were generally aligned with prior industry standard solutions . . . . However, *over time*, we saw SKAN measurement results diverge meaningfully from the results

[13] Plaintiff suggests that Snap's stock price went up "over 7%" in response to Gorman's April 22, 2021 "successfully implemented" statement. (Opp. 18.) Plaintiff pleads no facts showing that *this statement* caused the stock price to rise as opposed to other factors, such as macroeconomic factors or Snap's 1Q21 financial results.

11

we observed on other first and third-party measurement solutions"; and "as our advertising partners have explored and tested SKAN's solutions, they have surfaced a variety of concerns about its limitations."[14] (Ex. 18-165 (emphasis added).) Nowhere in this statement did Snap admit that the advertisers' concerns had surfaced as early as April 2021, at the time Gorman spoke. Plaintiff's allegations, therefore, do not adequately plead falsity. *Lopes* v. *Fitbit, Inc.*, 2020 WL 1465932, at *11 (N.D. Cal. Mar. 23, 2020) (after-the-fact statement is not an admission "unless it contradicts the substance of an earlier statement and essentially states 'I knew it all along'").

### 3. The May 2021 Statements

Plaintiff challenges Spiegel's May 21, 2021 statement during an interview on CNBC that Snap has been "able to help our advertising partners navigate [Apple's] changes, migrate to [SKAN] and so far, that transition has gone smoothly for our business." (Ex. 16-136.) Significantly, Plaintiff does not dispute the truth of this statement. Nor could it, as Snap *was* taking several steps to "help [its] advertising partners" navigate ATT, including "working really closely with Apple to implement SKAN," and "investing in using first-party data from [Snap's] platform and providing more opportunity for on platform conversion." (Ex. 5-46.) Plaintiff does not claim Snap did not take these steps. *See Tesla*, 985 F.3d at 1196 (finding "great progress" actionable only if defendant had been "making no progress at all"); *Tung* v. *Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020) (statement that company

---

[14] Plaintiff's case law is distinguishable as Plaintiff has not pled that Snap failed to disclose known issues. *See Okla. Police Pension & Ret. Sys.* v. *LifeLock, Inc.*, 780 F. App'x 480, 483–85 (9th Cir. 2019) (statements "repeatedly tout[ing] the 'real-time' nature of [security company's] identity theft alerts" misleading where complaint pled that "more than 70% of" a certain "important" category of alerts were "stale" and executive "received detailed information about them"); *Khoja* v. *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1010 (9th Cir. 2018) (statements touting positive drug study results were misleading when company failed to disclose that the FDA told company that data suffered from "high degree of uncertainty" and was "likely to change").

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT (2:21-cv-8892-GW-RAOx)

was "working aggressively with our customers to help them gear up" meant company was taking actions such as "establishing relationships," not guaranteeing ultimate success). Plaintiff also pleads no facts showing that the ATT transition had not "gone smoothly for [*Snap's*] business" as of May 2021. Plaintiff's sole response is that Spiegel's statements were "directly contradicted" by CW1's allegations about SKAN and Snap's purported October 2021 "admissions," but CW1 had no insight into SKAN's performance for the vast majority of Snap's advertisers, and Snap made no admissions in October 2021 about SKAN's May 2021 performance. (*See* Br. 18–19.)

Spiegel's comment also is inactionably vague. Plaintiff attempts to distinguish Defendants' cases (Opp. 22 n.14), but Plaintiff confuses the PSLRA safe harbor with puffery. Under binding Ninth Circuit case law, statements that are "imprecise and noncommittal [such] that they are incapable of objective verification" are inactionable. *Twitter, Inc.*, 29 F.4th at 621. Plaintiff does not explain how one could objectively verify that a transition had been "smooth."

### 4. The July 2021 Statements

Plaintiff also fails to point to any facts showing that, in July 2021, it was not true that Snap "observed higher opt-in rates" for continued IDFA tracking than what was being reported generally across the industry. (Br. 21.)[15] Plaintiff also focuses on Snap's statements that it "believe[d]" SKAN version 3.0 would "aid in attribution for advertisers" and that Snap was "working really closely with all of [its] partners and [its] sales team to make sure that [the ATT transition] was as smooth as possible" "for [its] advertisers." (Ex. 17-159.)[16] Plaintiff relies solely on Defendants' supposed

---

[15] Plaintiff claims this statement about Snap's "higher opt-in rates" to IDFA tracking was misleading because it presented an overly positive picture to investors of ATT's impact. (Opp. 21.) This ignores the plain language, which accurately addressed IDFA opt-in rates and not ATT's overall impact. Gorman also warned that Snap had experienced "some interruptions to demand," and it was "too early to determine . . . the scale of the potential interruptions to demand." (Ex. 17-144.)

[16] Even assuming that these statements were false, they are inactionable puffery or statements of opinion not alleged to be subjectively disbelieved. (Br. 20.)

13

admissions at the end of the class period to argue that these statements were false because Snap "had already observed the severe deficiencies of SKAN back in 'June and July' when Apple had 'pushed all of its users' to download ATT." (Opp. 20–21.) That is not what Snap said. On the 3Q21 earnings call, Gorman said that Snap "saw meaningful adoption" of ATT "in June and July, when Apple pushed all of its users to update to the new version of iOS." (Ex. 18-164.) She said nothing about Snap observing severe deficiencies of SKAN at that time.[17]

### 5. Snap's Projections Are Opinions and Also Subject to PSLRA Safe Harbor Protection

None of Plaintiff's claims premised on three of Snap's revenue projections are viable, both because they are not false and because they are opinion statements and forward-looking statements protected by the PSLRA safe harbor.

***No Falsity.*** None of the projections Snap made are alleged to have been false because Snap largely achieved or surpassed its revenue projections.

|  | **Projection** | **Actual Result** |
| --- | --- | --- |
| 1Q21 Revenue Growth | 56–60% (¶ 102) | 66% (Ex. 19-183) |
| YoY Revenue Growth | 50% or better (¶ 104) | 64% (Ex. 21-203) |
| 3Q21 Revenue Growth | 58–60% (¶ 116) | 57.3% (Ex. 25-253) |

As a matter of law, projections that are achieved are not actionable. (Br. 15.)[18]

Plaintiff does not dispute any of this, but complains that, after the purported class period, Snap withdrew its multi-year projection for future periods.[19] But

---

[17] Plaintiff mischaracterizes Defendants' references to "June/July 2021." Those references are to when ATT was "installed on devices on a wide scale." (Br. 9; Ex. 18-164.) Advertisers did not instantaneously recognize the flaws in SKAN, develop and execute an alternative ad strategy, and switch ad spending.

[18] Plaintiff cites CW2 to claim that Spiegel falsely stated that ATT had been "factored into" Snap's revenue guidance. (Opp. 15 n.8.) But the SAC does not allege that CW2 was involved in calculating 1Q21 guidance or had any role in forecasting the revenue impact of ATT. (Br. 24.)

[19] Plaintiff misreports Snap's actual guidance. Plaintiff incorrectly argues that Snap "dramatically reduced its fourth quarter revenue guidance to just $135-$175 million—

14

withdrawing guidance after the class period for future periods says nothing about the interim projections that Snap met during the class period. As for the long-term projection, Andersen explicitly noted that Snap's ability to "achieve this [target] will require a favorable operating environment and strong execution among many other factors." (Ex. 7-62.) That a change in operating environment necessitated the withdrawal of this guidance does not render the guidance false when made.

*Opinion.* In addition, none of Snap's projections are actionable because they are statements of opinion and Plaintiff does not plead particularized facts showing that Defendants "actually knew their projections could not be achieved." *Zee* v. *Green Dot Corp.*, 2013 WL 12133841, at *7–8 (C.D. Cal. May 2, 2013) (Wu, J.). While Plaintiff claims it "clearly alleges facts showing that Defendants were well aware . . . that their revenue projections were unachievable" (Opp. 14 n.5), it fails to cite any factual allegations, merely repeating its unsupported claim that "Defendants had already observed the material negative impact of ATT" in July 2021. *See supra* 14.

Plaintiff suggests that Defendants "had no basis to issue the 50%+ multi-year growth guidance they announced in February 2021" because "Snap deliberately never completed any revenue impact analysis of ATT at any point during the Class Period." (Opp. 14.) This claim relies entirely on CW2, who alleges that no analysis was done "to [her] knowledge." (¶ 81.) But there is no basis to assume CW2 would know, as CW2 was a junior-level employee lacking access to company-wide information (Br. 12–13), and CW2 admitted that Finance "appeared to have a 'better grip' on" (and later analyzed) the ATT impact after ATT's rollout. (¶¶ 81, 84; *see also* Br. 15–16.)

*Safe Harbor.* Defendants demonstrated in their opening brief that Snap's revenue projections were forward-looking statements that are inactionable under the

---

55% below Wall Street consensus of $300 million." (Opp. 9.) In fact, Snap had not previously released 4Q guidance (Plaintiff is comparing analysts' predictions of Snap's 4Q guidance to what Snap ultimately announced). Also, Plaintiff is not discussing revenue but adjusted EBITDA, a measure of profitability. (Ex. 18-172.)

15

PSLRA's safe harbor either because they were "accompanied by meaningful cautionary language" or because Plaintiff failed to show that they "were made with actual knowledge that they were false or misleading." (Br. 16); 15 U.S.C. § 78u-5(i)(1)(A) & (B). Plaintiff's responses fail to defeat the safe harbor's application.

*First*, Plaintiff improperly ignores the cautionary language accompanying Snap's projections. Plaintiff notes that Andersen did not specifically "mention any risks related to ATT, IDFA or SKAN" during Snap's February 23 Investor Day presentation. (Opp. 5–6, 24.) But Snap *did* exactly what the PSLRA contemplates, 15 U.S.C. § 78u-5(c)(2)—it warned investors at the start of the presentation that the challenged projections were subject to risk, cautioning that "[a]ny statement that refers to [] projections . . . is a forward-looking statement," "[o]ur actual results may differ materially from these forward looking statements," and "[f]or more information about factors that may cause actual results to differ from forward-looking statements, please refer to our filings with the SEC." (Ex. 7-56.) Snap's SEC filings **explicitly** warned of the ATT-related risks, which Plaintiff claims were omitted. (Br. 16 n.6; Opp. 24.) This cautionary language is sufficient to warn investors of the risk. *Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund* v. *Clorox Co.*, 353 F.3d 1125, 1132–33 (9th Cir. 2004) (finding "actual results will depend on a number of competitive and economic factors" and reference to forms "filed with the SEC" which discuss "the most important" factors to be meaningful cautionary language).

Plaintiff also does not address the actual cautionary language, criticizing only the fact that certain cautionary language was purportedly "buried" in Form 10-Ks and 10-Qs. (Opp. 24.) But this does not preclude application of the safe harbor. *Clorox,* 353 F.3d at 1133 (risk disclosures in "Form 10K" sufficient to invoke safe harbor provision).[20]

---

[20] *In re Snap Inc. Securities Litigation* is inapposite. The court did not analyze whether cautionary language was adequate, but whether the risk disclosures themselves were misleading. 2018 WL 2972528, at *2, *6.

16

*Second*, Plaintiff fails to offer any facts showing that Andersen believed on February 23, 2021 that Snap's Investor Day projection was unachievable. *Supra* 15. The same is true with respect to Spiegel's February and March statements. *See infra* 17–25. This failure independently supports application of the PSLRA safe harbor.

\* \* \* \* \*

For all of these reasons, Plaintiff fails to identify any materially false statement, requiring dismissal of the SAC.

### B.    Plaintiff's Opposition Brief Fails to Identify Facts Supporting a Strong Inference of Scienter

The SAC also fails to plead the required strong inference of fraudulent intent, an independent basis for dismissal. Plaintiff does not dispute that, to meet its unusually high pleading burden, it must plead particular facts raising a strong inference that *each Defendant* knew about, or was deliberately reckless regarding, information contradicting their public statements. *See, e.g.*, *Or. Pub. Emps. Ret. Fund* v. *Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014). If Plaintiff does not allege facts that raise a strong inference of scienter as to either Gorman or Spiegel, Plaintiff's claims against them (and Snap) fail. *Garcia* v. *J2 Global*, 2021 WL 1558331, at \*18–20 (C.D. Cal. Mar. 5, 2021).

As explained in Defendants' opening brief, this Court "must take into account plausible opposing inferences," an inquiry that "is inherently comparative." *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (citing *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007)). Applying that comparative standard to the allegations, any inference of fraud is severely undermined by Defendants' qualifications of their cautious optimism with repeated and robust warnings that ATT could seriously harm Snap. Plaintiff does not address the warnings, let alone explain why they make a fraudulent inference more compelling.

#### 1.    Plaintiff Fails to Plead Facts Showing Intent to Defraud or Deliberate Recklessness

Plaintiff concedes that it cannot point to any particularized facts showing that

17

either Gorman or Spiegel (or other senior management) received any information apprising them that the challenged statements were false. (*See* Br. 23; Opp. 24–30.) Plaintiff does not identify any specific meetings, calls, or briefings where preparedness for ATT or the progress of the transition to SKAN was discussed, much less ones involving Spiegel and Gorman. This alone requires dismissal. *See Curry* v. *Yelp Inc.*, 875 F.3d 1219, 1227 (9th Cir. 2017) (requiring "detailed and specific allegations about management's exposure to . . . information").

None of the arguments Plaintiff raises in response to these deficiencies work.

*First*, Plaintiff claims that scienter can be strongly inferred because "Defendants spoke repeatedly about these changes and made crystal clear . . . that they had intimate and detailed knowledge of them." (Opp. 25.) But even if one assumes that the statements were false (which they were not), the fact that Gorman and Spiegel made statements about ATT and SKAN, coupled with their senior positions at Snap, does not show that they *knew* or even had access to information that these statements were false. Indeed, the Ninth Circuit has rejected the notion that any time a C-suite executive merely speaks on a topic, that executive can be presumed to possess scienter. *See Berson*, 527 F.3d at 989 ("Where defendants make cheerful predictions that do not come to pass," plaintiffs cannot merely argue that "defendants' prominent positions" mean "they ought to have known better."). In contrast to Plaintiff's cases,[21] the SAC contains no facts showing Spiegel or Gorman knew the

---

[21] The cases relied on by Plaintiff are distinguishable because plaintiffs there pleaded that the executives had intimate involvement in or knowledge of the relevant subject area. *See Reese* v. *Malone*, 747 F.3d 557, 570–72 (9th Cir. 2014) (finding leader of pipeline's statement about low corrosion possessed scienter where she was "directly responsible" for pipeline operations, reviewed corrosion data, and was considered "among the first to know" corrosion information); *Shenwick*, 282 F. Supp. 3d at 1147 (executive's statements about the nature of a particular engagement metric "strongly impl[ied] that he had access to the disputed information"); *In re Qualcomm Sec. Inc. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) ("[E]xecutive defendants were directly and extensively involved in developing and maintaining the licensing

18

details of SKAN—a highly technical proposed engineering solution—nor that they were made aware of third-party advertisers' experiences with SKAN.

*Second*, Plaintiff contends that Defendants' "own admissions" at the end of the class period that "Snap's DR advertisers had been unable to 'successfully implement' SKAN at all" during the class period demonstrates scienter. (Opp. 25.) Tellingly, Plaintiff does not *quote* Defendants' October 2021 statements because Defendants "admitted" no such thing. (*Id.*; Br. 19.) Spiegel said only that SKAN "did not scale" as Snap hoped, "making it more difficult for [Snap's] advertising partners to measure and manage their ad campaigns for iOS." (Ex. 18-162.) Gorman explained that as Snap's "advertising partners [had] explored and tested SKAN's solutions," they "surfaced a variety of concerns about its limitations." (Ex. 18-165.) These statements do not contradict Gorman's earlier statements. It is entirely consistent that advertisers "successfully implemented" SKAN for use before the rollout, and then surfaced concerns post-rollout after "explor[ing] and test[ing]" it. *Id.*[22]

*Third*, Plaintiff argues that analysts' adverse reaction to the October 2021 disclosures supports a strong inference of scienter. But as Defendants explained in their opening brief (Br. 21 n.11), and as Plaintiff concedes, the analyst reports do not cite any statements by Snap that analysts claim later turned out to be false. The mere fact that the management team was initially optimistic that SKAN might work, and was criticized by an analyst after SKAN's limitations became known, does not support Plaintiff's fraud claim. *In re Ariba, Inc. Sec. Litig.*, 2005 WL 608278 at *1, *8 (N.D. Cal. Mar. 16, 2005) (no inference of scienter even though analysts "openly

[22] *In re QuantumScape Securities Class Action Litigation,* 580 F. Supp. 3d 714 (N.D. Cal. 2022)*,* is inapposite. There, defendants admitted to using "compromised testing conditions" after repeatedly publicly stating that they did not. *Id.* at 741. Here, Defendants did not admit in October 2021 that, in April 2021, advertisers representing a majority of DR revenue had not set up SKAN for use.

model and sales agreement . . . [and] participated in and supervised negotiations that tied together technology licensing and . . . sales").

19

question[ed] the credibility of [company] management").[23]  Indeed, several analysts were not surprised, noting that Snap had continued to highlight the risks posed by ATT after 2Q21.  *See, e.g.*, Ex. 22-212 ("Risks" include "negative effects" from "IDFA"); Ex. 26-268 (noting "IDFA risk to 2021 revenue growth estimates").

*Finally*, Plaintiff now attempts to put forward allegations by CW1 and CW2 that are not pleaded in the SAC and, in fact, are undermined by the SAC.  For example, Plaintiff's brief states that CW1 worked on "transitioning Snap's advertisers to SKAN" and makes the general and vague charge that "from day one, Snap received highly negative feedback from its advertisers regarding SKAN, such that . . . by April 2021 there were virtually no adoptees of SKAN."  (Opp. 27.)  But the SAC does not allege facts showing that CW1 was in a position to observe what the vast majority of Snap's advertisers did, as Plaintiff concedes that CW1 worked with advertisers in only one of the company's 12 advertising verticals.  (¶ 76 n.4; *see* Br. 18, 23; Ex. 5-33; Ex. 9-88.)  The SAC also fails to allege that CW1 interacted with Spiegel, Gorman, or any other executive, much less conveyed facts contradicting public statements, which precludes reliance on her allegations.  *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014) (rejecting allegations of CW lacking "personal knowledge" that "management team received specific information" contradicting statements); *Shenwick*, 282 F. Supp. 3d at 1149 (similar).

Similarly, Plaintiff's opposition brief incorrectly states that CW2 "described in detail how no revenue impact analysis of ATT was ever completed."  (Opp. 27.)  But, like CW1, CW2 was not in a position to make this statement and, actually, did not make it.  CW2 did not say that no analysis was done, merely that *she* was not personally aware of one being done (although she was aware that Finance was tasked

---

[23] *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 76 (2d Cir. 2001), is inapposite because analysts' "sharp criticism" supported *materiality* not scienter.  *In re Fibrogen, Inc.*, 2022 WL 2793032, *22 (N.D. Cal. July 15, 2022), is distinguishable as plaintiffs alleged that "the scientific and financial community universally concluded that [d]efendants' manipulations [of data] were intentional."

with doing so in August 2021). (¶ 81 ("[T]o CW2's knowledge, no revenue impact analysis of Apple's ATT changes was ever completed."); ¶ 84.) And Plaintiff does not dispute that CW2 was not in a position to make this statement as CW2 was a junior-level Data Scientist who is not alleged to have been involved in or had any company-wide insight into ATT preparedness, advertisers' use of SKAN, or Snap's public financial reporting. Plaintiff does not even allege that CW2 had any role in forecasting the revenue impact of Apple's privacy changes. (Br. 25.) In any event, Plaintiff does not contend that ATT had any revenue impact on Snap until 3Q21, after which Snap promptly made the disclosure to the market about SKAN's drawbacks—a transparent disclosure that undercuts any inference of scienter.

Plaintiff thus fails to identify any facts showing Defendants' intent to defraud.

### 2. The Core Operations Inference Is Unavailable

Plaintiff concedes that the "core operations" inference is available only in "exceedingly rare" cases. (Br. 25.) It requires "specific admissions by . . . corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating . . . actual involvement in creating false reports." *Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). It may support scienter only (1) when combined "with other allegations" to support a strong inference, (2) when "particular" allegations show defendants "had actual access" to the information, or (3) in "rare" cases, where "the nature of the relevant fact" is so prominent "that it would be absurd to suggest" lack of actual knowledge. *Prodanova* v. *H.C. Wainwright & Co. LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021). Plaintiff's reliance on the inference is deficient in multiple respects.

*First*, Plaintiff merely asserts that "[t]here can be no dispute here that Defendants Gorman and Spiegel . . . had 'actual access' to information underlying their public statements." (Opp. 26.) But Plaintiff fails to plead what information Spiegel and Gorman had access to, much less whether they received information that *contradicted* their statements. Without such allegations, the core operations inference

21

is unavailable.  *See S. Ferry LP, No. 2* v. *Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("[A]llegations that management had an important role in the company" not sufficient absent "detailed allegations about the defendants' actual exposure to information.").

*Second*, Plaintiff merely asserts that it would be "absurd" for Gorman and Spiegel not to know information contradicting their public statements because "ATT posed an existential threat to Snap's business."  (Opp. 26.)  As explained in Defendants' opening brief, Plaintiff does not plead any facts suggesting why Gorman or Spiegel would have had access to third-party information—information from advertisers about their difficulties with SKAN—before Apple rolled out ATT and advertisers were forced to rely on SKAN.  (Br. 26–27.)  Plaintiff's repeated assertion that Apple's product, SKAN, was "integral to Snap's success" cannot replace particularized allegations that the Individual Defendants had access to information held by third-party advertisers at the time Defendants made the alleged misstatements.

**3.      Spiegel's Stock Sales Add Nothing to Any Scienter Inference**

Plaintiff concedes that neither Gorman nor Andersen (two of the three persons who allegedly made false statements) had any suspicious stock sales.  (*See* Opp. 24–30; Br. 30.)  Rather, Plaintiff cites only Spiegel's stock sales.  Given the lack of suspicious sales by Gorman and Andersen, Spiegel's sales could create at most a weak inference of scienter and, here, they do not even do that.  *See Ronconi* v. *Larkin*, 253 F.3d 423, 436 (9th Cir. 2001) (One insider's "trading supports only a weak inference, not a strong one, in light of what . . . equally knowledgeable, insiders were doing.").

Under binding Ninth Circuit precedent, Plaintiff must allege stock sales that are "suspicious."  *Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*, 540 F.3d 1049, 1066–67 (9th Cir. 2008).  Insider sales are suspicious *only* if they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  *Curry*, 875 F.3d at 1226.  "Three factors are relevant to this inquiry: (1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading

22

history." *Metzler*, 540 F.3d at 1067.

As to the first factor, Plaintiff concedes that Spiegel's "amount and percentage of the shares sold" are not suspicious, as Spiegel's sales represented only 7% of his holdings. (Br. 29.) As to the third factor, Plaintiff concedes that the number of shares Spiegel sold was consistent with his trading history, and therefore not suspicious, either. Rather, Plaintiff addresses only the sale *proceeds* and their timing. (Opp. 28–30.) This is both wrong and insufficient.

*First*, Ninth Circuit precedent shows that the proceeds of Spiegel's sales are, without more, irrelevant to whether sales are suspicious. Plaintiff relies on *Nursing Home Pension Fund, Local 144* v. *Oracle*, 380 F.3d 1226 (9th Cir. 2004), but does not dispute that there were numerous highly suspicious facts pleaded there but missing here—i.e., the executive's sales occurred exclusively within a **nine-day** period about **one month** before the corrective disclosure, and defendant had not sold **any** stock in the prior **five years**. *Id.* at 1232. Plaintiff concedes that Spiegel's sales occurred over a six-month period (not nine days) and does not dispute that Spiegel sold a comparable amount of shares during the period before the purported class period. (¶ 95; Opp. 11, 28–29 & n.19.) Plaintiff cites no case suggesting that proceeds alone are relevant to whether stock sales are "suspicious."[24] Rather, the standard is what the Ninth Circuit has repeated: "amount and percentage of the shares sold." *Metzler*, 540 F.3d at 1067.

*Second*, Plaintiff contends that Spiegel's stock sales were "suspiciously timed" because they purportedly "accelerated" as Snap's stock price rose and were "concentrated" between March and September 2021. (Opp. 28–29.) But this argument ignores that these trades were made **pursuant to a 10b5-1 plan**. Under the 10b5-1 plan—entered into in February 2021—Spiegel surrendered all discretion, and Spiegel's broker was required under the plan to sell when pre-specified conditions were met, namely when certain stock prices were reached. Thus, Spiegel did not

---

[24] *Batwin* v. *Occam Networks, Inc.*, 2008 WL 2676364, at *14 (C.D. Cal. July 1, 2008) does not even address whether proceeds can contribute to a scienter finding.

23

*choose* to sell at particular times based on insider information—rather his 10b5-1 plan triggered sales automatically at particular prices. Spiegel had no control over the timing of his sales, so the timing cannot be probative of his state of mind. (Br. 27–28.) Plaintiff also does not dispute that Spiegel made no sales in the four weeks before the alleged corrective disclosure and made over 50% of his class period sales before Snap's stock price was at its purported all-time high. (Br. 29–30.) This also undermines any claim that Spiegel's sales were motivated by inside information.

*Finally*, Plaintiff fails to undermine Spiegel's Rule 10b5-1 plan, which rebuts any inference of scienter. *See Metzler*, 540 F.3d at 1067 n.11. First, Plaintiff notes that Spiegel entered into his plan three weeks into the purported class period. But that actually undermines Plaintiff's claim. Plaintiff must show that Spiegel possessed information contradicting his public statements when he entered into his plan and that he did so to capitalize on that information. The earlier in the purported class period the plan is executed, the less likely it is that the defendant had improper information. *See In re AnaptysBio, Inc.*, 2021 WL 4267413, at *9 (S.D. Cal. Sept. 20, 2021) (Plaintiffs "fail[ed] to allege any facts support[ing] th[e] claim" that defendant "entered into his 10b5-1 trading plan knowing that 'the Company's statements . . . were false.'"); *see also Ark. Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb Co.*, 28 F.4th 343, 356 n.4 (2d Cir. 2022) (no specific pleaded facts showed "that the purpose of the plan [entered into in the class period] was to take advantage of an inflated stock price" so plaintiffs failed to plead "plan was not 'given or entered into in good faith'").

Here, Spiegel entered into his plan in February 2021, only three weeks after the start of the class period and *months before* the ATT rollout.[25] Plaintiff offers no particularized factual allegations showing that at this time Spiegel knew information undermining his public statements. Plaintiff points only to Spiegel's statement that Snap had "implemented [SKAN]" by February 2021. (Opp. 29–30.) But Plaintiff

---

[25] Moreover, the first trade under this plan was only permitted to occur at least three months after its entry. (Br. 28.)

points to no factual allegations showing that this statement was false, let alone that Spiegel knew it was false.  And although Plaintiff asserts that "by February 2021 . . . Defendants surely immediately evaluated how [SKAN] compared to IDFA" (Opp. 29–30), Plaintiff does not explain how Snap could have done so when *ATT had not even been rolled out at that time*.  (Br. 9–10.)  SKAN's performance depended on Snap's advertisers' use of SKAN and their evaluation of its performance—Plaintiff does not explain how Snap could learn that information before ATT was even rolled out.  Plaintiff's cases are distinguishable because, unlike here, the defendants knew information undermining their statements when they adopted their trading plans.[26]

Second, Plaintiff offers no facts to support its claim there was something "highly suspicious" about the design of Spiegel's 10b5-1 plan, vaguely claiming it was "highly focused . . . on the amount of profits he would reap" and distinguishing it from Spiegel's prior plans.  (Opp. 30.)  Yet even assuming the plan differed from prior plans, Plaintiff cites no support for its assertion that a 10b5-1 plan in which sales are triggered by stock prices, i.e., a limit-order plan, is inherently "suspicious."

## III.  CONCLUSION

Plaintiff already has filed two amended complaints, including in response to Defendants' first motion to dismiss.  In requesting leave to amend again, Plaintiff fails to explain how it could rectify the foregoing deficiencies.  As such, dismissal should be with prejudice.  *See Salameh* v. *Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013).[27]

---

[26] *See Freudenberg* v. *E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) (Defendants "already aware of the Company's mortgage exposure time bombs at the time [they] adopted their trading plans."); *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013) (Defendant had *already* "observ[ed] the success of Questcor's aggressive and misleading marketing strategies"); *Nguyen* v. *New Link Genetics Corp.*, 297 F. Supp. 3d 472, 495 (S.D.N.Y. 2018) ("[Defendants] were aware of the compromised patient enrollment figures at" adoption).

[27] The section 20(a) claim fails because the SAC fails to allege a primary violation. *Lipton* v. *Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

25

DATED:  December 1, 2022         By:            */s/ Daniel J. Kramer*
                                               Daniel J. Kramer

DANIEL J. KRAMER (*admitted pro hac vice*)
AUDRA J. SOLOWAY (*admitted pro hac vice*)
DANIEL S. SINNREICH (*admitted pro hac vice*)
KRISTINA A. BUNTING (*admitted pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, NY  10019-6064
Tel:   (212) 373-3000
Fax:   (212) 757-3990
Email:        dkramer@paulweiss.com
Email:        asoloway@paulweiss.com
Email:        dsinnreich@paulweiss.com
Email:        kbunting@paulweiss.com

EKWAN E. RHOW (SBN 174604)
AHARON B. KASLOW (SBN 322769)
**BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG & RHOW
P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, CA  90067-2561
Tel:   (310) 201-2100
Fax:   (310) 201-2110
Email:        erhow@birdmarella.com
Email:        akaslow@birdmarella.com

*Attorneys for Snap Inc., Evan Spiegel, and Jeremi
Gorman*

26