# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 21-8892-GW-RAOx | Date | March 13, 2023 |
|---|---|---|---|
| Title | *Kellie Black v. Snap, Inc., et al.* | | |

Present: The Honorable      GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Terri A. Hourigan | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Lester R. Hooker | Kristina A. Bunting |
| John L. Littrell | Ekwan E. Rhow |
| Kyla Grant | Audra J. Soloway |
| | Daniel J. Kramer |

**PROCEEDINGS:       DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED
CLASS ACTION COMPLAINT [100]**

The Court's *redacted* Tentative Ruling is circulated and attached hereto. Court hears oral argument. The Tentative Ruling is adopted as the Court's Final Ruling. The Court GRANTS the Motion with leave to amend. Plaintiff will have until April 12, 2023 to file a Third Amended Complaint.

|  | : | 55 |
|---|---|---|
| Initials of Preparer | JG | |

***Kellie Black v. Snap, Inc., et al.***; Case No. 2:21-cv-08892-GW-(RAOx)
Tentative Ruling on Motion to Dismiss Second Amended Class Action Complaint

## I.   <u>Background</u>

Court-appointed Lead Plaintiff Oklahoma Firefighters Pension & Retirement System ("Plaintiff"), individually and on behalf of all others similarly situated, sues Snap Inc. ("Snap"); Evan Spiegel, and Jeremi Gorman (collectively, "Defendants") for:  (1) violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder; and (2) violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  *See generally* Second Amended Class Action Complaint ("SACAC"), Docket No. 95.

Before the Court is Defendants' motion to dismiss the SACAC.  *See generally* Motion to Dismiss Plaintiff's SACAC ("Motion" or "Mot."), Docket No. 100.  Plaintiff opposes the Motion.  *See generally* Opposition to Motion to Dismiss ("Opp."), Docket No. 105 (sealed[1]).  Defendants filed a reply.  *See generally* Reply ISO Motion ("Reply"), Docket No. 106.

### A.  Factual Background[2]

#### 1.   <u>The Parties</u>

Plaintiff provides retirement benefits to firefighters in the state of Oklahoma.  SACAC ¶ 17.  Plaintiff "purchased Snap common stock" and was allegedly damaged by Defendants' misrepresentations and omissions.  *Id.*  Plaintiff brings this securities action individually and on behalf of "all other persons and entities who purchased or otherwise acquired Snap . . . publicly traded securities, and/or sold Snap put options" between February 5, 2021, and October 21, 2021, inclusive (the "Class Period").  *Id.* ¶ 1.

Snap is a Delaware corporation with its principal executive offices located in Santa Monica, California.  *Id.* ¶ 18.  Snap's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SNAP."  *Id.*  Defendant Evan Spiegel ("Spiegel") is Snap's co-founder, CEO, and Director.  *Id.* ¶ 19.  Per Snap's 2021 Form 10-K, as CEO, "Mr. Spiegel has control over [Snap's] day-to-day management and the implementation of major strategic investments of

---

[1] At the hearing on said Motion, the parties shall advise the Court whether they request that any portion of this tentative ruling remain sealed in the final version of the order.

[2] The facts in this section are derived from the SACAC and judicially noticeable documents.

[the] [C]ompany," and "has been responsible for [the] [C]ompany's strategic vision." *Id.* Defendant Jeremi Gorman ("Gorman") serves as the Chief Business Officer of Snap. *Id.* ¶ 20.

### 2. Snap's Business

Snap is a "social media company" whose primary product is a free mobile chatting application, Snapchat. *Id.* ¶ 3. Snap generates revenue from Snapchat by selling advertising. *Id.* To deliver advertisements to Snapchat users, Snap tracks its users' activity on their devices, which enables advertisers to (1) target their ads to specific users based on their interests and (2) measure the effectiveness of their ads based on how users interact with the ads. *Id.* Prior to mid-2021, Snap's ability to collect user activity, at least on Apple iOS devices, was through Apple's Identifier for Advertisers ("IDFA"). *Id.* ¶ 4. IDFA allowed advertisers to target their ad campaigns more precisely to consumers likely to be interested in their products, and also gave them powerful tools to measure the effectiveness of individual ads or ad campaigns within Snapchat. *Id.* ¶ 36.[3]

### 3. Apple Announces iOS Changes

In June 2020, Apple announced changes to privacy features on its devices through an initiative called App Tracking Transparency ("ATT"). *Id.* ¶ 5. Under ATT, companies like Snap would no longer be able to use IDFA to track and collect user activity unless the user "opted in" to such data sharing. *Id.* Before these changes, IDFA automatically tracked a user's data unless the user affirmatively "opted out" of IDFA sharing. *Id.* ¶ 38. Absent user opt-in, Snap would no longer be able to share a user's identifying information, and would no longer have access to that user's IDFA. *Id.* ¶¶ 38-40. As a result, ATT posed a potential threat to Snap's advertising business, which Snap depended on for revenue. *Id.* ¶ 40.[4]

Following this announcement, Apple promoted its own proprietary measurement solution, SKAdNetwork ("SKAN"), which would allow Snap and its advertisers to continue to target and measure their advertising, albeit on a group basis rather than on an individual-by-

---

[3] For example, IDFA allowed Snap and advertisers to know whether users downloaded the advertised app or made a purchase from the advertiser's website, and enabled real-time measurement of the effectiveness of ads. *Id.* ¶¶ 35-36.

[4] As stated in Snap's 2019 Form 10-K, Snap "generate[s] substantially all of [its] revenue from advertising." Declaration of Kristina A. Bunting ("Bunting Decl."), Docket No. 100-1, ¶ 3, Ex. 2 at 14. Accordingly, Snap warned that because "Snapchat depends on effectively operating with mobile operating systems . . . that we do not control . . . [c]hanges . . . to those operating systems . . . may seriously harm our user retention, growth, and engagement." *Id.* Snap also warned that its "advertising revenue could be seriously harmed" by its "inability to measure the effectiveness of [its] advertising or target the appropriate audience for advertisements." *Id.*, Ex. 2 at 16.

individual basis. *Id.* ¶¶ 5, 41.[5]  Yet, even with SKAN, ATT still posed potential risks to Snap's business. *Id.* 42.  For example, in its Form 10-Q filing for 2Q 2020, Snap recognized that "Apple's upcoming iOS update [] may impose heightened restrictions on our access and use of user data, may reduce the quantity and quality of the data and metrics that can be collected or used by us and our partners, and adversely affect our ability to effectively target advertisements to users and demonstrate the value of our advertisements to advertisers, any of which could reduce the demand and pricing for our advertising products and seriously harm our business." Ex. 3 at 20.[6]  Snap noted that the impact of ATT "is uncertain depending on how these changes are implemented, how we and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond" and "could seriously harm our business." *Id.*  Although Apple announced that the ATT rollout would take place in Fall 2020, it was delayed until April 26, 2021.  SACAC ¶ 90; *see also* Ex. 4.

       4.  <u>Snap's Response to ATT</u>

Because "[s]ubstantially all of [Snap's] revenue is generated from third parties advertising on Snapchat," *see* Ex. 2 at 14, investors were anxious about the impact of the pending Apple iOS changes on Snap's business.  SACAC ¶ 43.  As such, statements relating to Snap's advertising business "were highly material to investors." *Id.* ¶ 6.  On February 4, 2021, during Snap's fourth quarter 2020 earnings conference call, a Deutsche Bank analyst asked Defendant Gorman how Snap management could "get comfortable that the momentum in these ad units is sustainable through these upcoming iOS changes that are going to effectively blind ad platforms to down funnel measurement?" *Id.* ¶¶ 44, 100; *see also* Ex. 5 at 45-46.  Gorman responded that Snap had "been working really closely with Apple to implement [SKAN]" and that Snap had "been communicating very well with advertisers, we're educating them, talking about them deeply about these coming changes and encouraging them to implement [tools developed by Snap] to mitigate any of this."  SACAC ¶ 100.  Gorman added that "we feel really well prepared for these changes," but cautioned that "changes to this ecosystem are usually disruptive and the outcome is uncertain." *Id.*; *see also* Ex. 5 at 46.  Later on in the call, Gorman

---

[5] Unlike IDFA, SKAN would "aggregate" users' activity into groups and allow tracking only of these groups. *Id.* ¶ 41.

[6] All citations to "Ex." in this tentative ruling refer to the exhibits attached to the Bunting declaration filed in support of this Motion.

said: "I think when we look at the overall industry, the growing focus on brand safety and privacy across the entire industry actually places us in a really unique and beneficial position given what Evan just said, which is that from the beginning of our business, we made design decisions that helped us avoid many of the issues seen on other platforms." SACAC ¶ 101; *see also* Ex. 5 at 49.

Defendant Spiegel echoed Gorman's statements during a CNBC interview the next day, on February 5, 2021. SACAC ¶ 45. After acknowledging that Spiegel had stated that he "expect[ed] [ATT] to have a meaningful impact on [Snap's] results" and that he did not "know how big the impact [would] be," the interviewer asked Spiegel what the "potential greatest impact" of Apple's iOS changes would be. *Id.* ¶ 102; *see also* Ex. 6 at 52. Spiegel stated that Snap had "factored that impact into our guidance," which projected "56-60% year over year revenue growth in Q1." *Id.* Spiegel also noted that Snap had "implemented" SKAN and started building its own solutions. SACAC ¶¶ 45, 102; *see also* Ex. 6 at 53. In addition, echoing Gorman, Spiegel stated that "we feel like we're well prepared for these changes . . . even if it's a little disruptive for advertisers in the near term." *Id.*

Shortly thereafter, on February 22, 2021, Spiegel entered into a brand new Rule 10b5-1 plan, which authorized him to make up to ███████ in Snap stock sales. SACAC ¶ 46. The following day, on February 23, 2021, Snap held its first ever Investor Day, where Snap's Chief Financial Officer Derek Andersen ("Andersen") announced that Snap "believe[d] . . . that [it could] grow [its] topline revenue at 50 percent or better year over year for at least the next several years." *Id.* ¶¶ 47, 104; *see also* Ex. 7 at 62. Snap also "believe[d] [it could] sustain approximately 50 percent topline growth rates for the next several years under favorable operating conditions." SACAC ¶ 104; *see also* Ex. 7 at 63. However, Andersen noted that he "would be remiss if [he] didn't point out that there are risks to this estimate" as it required "a favorable operating environment and strong execution among many other factors." Ex. 7 at 62. Following the Investor Day conference, Snap's share price soared by 11%, with the stock closing at a then all-time high of $70.45 per share. SACAC ¶ 48. On March 3, 2021, at the Morgan Stanley Technology, Media, and Telecom Virtual Conference, Spiegel confirmed the 50 percent revenue growth estimate, noting that Snap "feel[s] good about [its] ability to execute against that goal in a good operating environment." Ex. 8 at 80; *see also* SACAC ¶ 107. He explained that "the 50% number actually isn't predicated on any further user growth or any engagement growth

. . . [s]o that's just looking at like the steady state opportunity actually in terms of our inventory, on our core platforms . . ." and that Snap "ha[s] a lot of advertising inventory." Ex. 8 at 77, 80.

A few weeks later, on April 22, 2021, Snap held its earnings conference call for the first quarter of 2021. *Id.* ¶ 50. During the call, Gorman stated that Snap is "committed to working with [its] advertisers as we navigate the [ATT]-related changes from Apple." Ex. 9 at 88. Gorman explained that the "fact that these changes are coming later than we anticipated has provided additional time to adopt [] [SKAN] and begin implementing and testing with our partners." *Id.* Gorman also noted that "[a]dvertisers that represent a majority of [Snap's] direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns." *Id.*; *see also* SACAC ¶ 110.[7]

During the call, an analyst from Guggenheim Partners asked the following:

> First, you referenced the successful implementation of [] [SKAN] for certain Snap campaigns with your partners. I'm curious what defined success of that implementation? And does this mean similar feedback to what you saw previously? Do you expect this to mitigate some of the IDFA headwinds that have been a source of investor concern?...

Ex. 9 at 102. To which, Gorman responded as follows:

> Sure. Thank you so much for the question. I can take the part about [SKAN]. We are really focused on helping our advertisers make the transition to the best possible measurement and optimization tools smoothly. The change happened later than we expected, which gave us a lot of time to prepare, and [SKAN] is one part of that. So we're really pleased to see that advertisers that represent the majority of our direct response revenue have implemented it so far. But we know there's a lot of work to be done to transition smoothly.

*Id.*

As alleged in the SACAC, the market responded favorably to Snap's assurances that a "majority" of Snap's direct response advertisers had already "successfully implemented" SKAN for their Snap campaigns, as Snap's stock price surged by over 7% from $57.05 per share to $61.30 per share the following day. SACAC ¶ 52. In addition, analysts quoted or paraphrased Gorman's comments about a "successful implementation" and the additional time to adopt, test,

---

[7] On this same call, Andersen noted that Snap "anticipated disruptions associated with [ATT]" and that it was "not clear yet what the longer term impact of the iOS platform changes may be for the topline momentum of [Snap's] business, and this may not be clear until several months or more after the changes are implemented." Ex. 9 at 93.

and implement SKAN, due to Apple's delayed rollout of ATT. *Id.* ¶¶ 7, 52, 53. For example, an April 22, 2021 Truist Securities report opined that these efforts "should help mitigate against a meaningful adverse outcome for Snap, in our view." *Id.* ¶ 52; *see also* Ex. 15 at 131.

About a month after the ATT rollout,[8] Spiegel appeared on CNBC, on May 21, 2021. SACAC ¶ 114. During the interview, Spiegel was asked whether Snap had "started to see an impact from Apple's operating system change in terms of [Snap's] ability to target ads." *Id.* Spiegel responded that "we've been able to help our advertising partners navigate those changes, migrate to [SKAN], which is Apple's way of measuring advertising efficacy and so far, that transition has gone smoothly for our business." *Id.*; *see also* Ex. 16 at 136.

On July 22, 2021, Snap held its earnings conference call for the second quarter of 2021. SACAC ¶ 116. On the call, Andersen noted that Snap expected "year-over-year revenue growth of approximately 58 to 60 percent in Q3," reflecting Snap's "best current estimate of the potential impact of anticipated disruptions associated with the iOS platform changes." *Id.*; *see also* Ex. 17 at 149. Andersen also noted that the "iOS platform changes have been adopted more slowly than [Snap] had anticipated, and the interruptions to demand are therefore expected to come later than [Snap] initially anticipated." Ex. 17 at 149. Accordingly, Andersen cautioned that "it is still not clear what the longer term impact of the iOS platform changes may be, and this may not be clear until at least several months or more after the changes are fully implemented." *Id.*

In addition, on the earnings call, Gorman noted that "[a]s Apple rolled-out its [ATT]-related changes near the end of Q2, [Snap] observed higher opt-in rates than [it was] seeing reported generally across the industry, which [Snap] believe[d] was due in part to the trust our community has in our products and our business." SACAC ¶ 116. And because Apple's rollout of ATT came later in Q2 than initially anticipated, "the pace of updates by iPhone users ha[d] also been slower than [Snap] anticipated." *Id.* ¶ 117. Nevertheless, this gave Snap "more time with advertisers to navigate the transition." *Id.* However, echoing Andersen, Gorman cautioned that the delayed rollout meant that "the effects of these changes [would] come later than [Snap] initially expected." *Id.*; *see also* Ex. 17 at 143-144. Gorman warned that "it remain[ed] very

---

[8] While the rollout occurred on April 26, 2021, "meaningful adoption" of Apple's iOS changes did not take place until June and July of 2021, when Apple pushed all of its users to update to the new version of iOS. *See* Ex. 18 at 164.

early in the adoption of the iOS platform changes, and [Snap] w[ould] continue to learn how these changes may impact our advertising partners, business, and the industry as a whole."  Ex. 17 at 144.  She noted that Snap had seen "some interruptions to demands," but it was "too early to determine how long it [would] take until these changes [were] fully adopted, the scale of the potential interruptions to demand, or the ultimate impact on the longer term growth of our business."  *Id.*

At the end of the call, an analyst from Bank of America raised the following questions regarding Snap's transition from IDFA to SKAN:

> Were there any unusual positive impacts in May or June or actually even a benefit to Snap shift and spend because of IDFA?  And then, secondly, just maybe you can provide a little bit more details on what you're thinking around IDFA.  Is it actually affecting targeting?  And how do you think about some of the workarounds you're seeing or you're implementing so far?

SACAC ¶ 118.  Gorman responded that Snap had "been working really hard to make this transition smooth for our advertising partners as well as our businesses" and also noted observing opt in rates "above what is sort of widely reported in both the press as well as with the analyst community."  Ex. 17 at 159.  Once again, Gorman, however, cautioned that "it remains so early in these iOS changes that there's no question that it will be a change for the industry in and of itself.  But you know, I think we prepared it the best that we can."  *Id.*  The following day Snap's stock price rose almost 24% from $62.97 to $77.97 per share.  SACAC ¶ 57.

Plaintiff contends that the "truth emerged" on October 21, 2021, when Snap announced that it had "missed the lower end of [its revenue] guidance by $3 million due to a few key factors, including changes to advertising tracking on iOS and macroeconomic factors that have impacted our advertising partners."  Ex. 18 at 162.  As Andersen explained:

> Our advertising business was disrupted by changes to iOS ad tracking that were broadly rolled out by Apple in June and July.  While we anticipated some degree of business disruption, the new Apple provided measurement solution did not scale as we had expected, making it more difficult for our advertising partners to measure and manage their ad campaigns for iOS.  We have remained very focused on driving ROI for our advertising partners, and we continue to see strong, consistent performance on our ad platform based on first-party data and conversion lift studies, and are working on building flexible first-party tooling and measurement solutions to serve the diverse needs of our advertising partners.

> This impact was compounded by the ongoing macroeconomic effects of the global pandemic, with our advertising partners facing a variety of supply chain interruptions and labor shortages.…

*Id.*; *see also* SACAC ¶ 59.

Gorman added that:

> The initial results we observed using SKAN were generally aligned with prior industry standard solutions, and we were among the first platforms to lean into this solution and push for widespread industry adoption.  However, over time, we saw SKAN measurement results diverge meaningfully from the results we observed on other first and third-party measurement solutions, making SKAN unreliable as a standalone measurement solution.

> Furthermore, as our advertising partners have explored and tested SKAN's solutions, they have surfaced a variety of concerns about its limitations.  Every advertiser has their own unique, fine-tuned perspective on the optimal parameters to measure ROI for their business, but SKAN requires them to use Apple's fixed definitions of advertiser success.  For example, advertisers are no longer able to understand the impact of their unique campaigns based on things like the time between viewing an ad and taking an action or the time spent viewing an ad.  Additionally, real-time campaign and creative management is hindered by extended reporting delays, and advertisers are unable to target advertising based on whether or not people have already installed their app.

Ex. 18 at 165; *see also* SACAC ¶ 60.

That same day, on October 21, 2021, Snap filed its Form 10-Q filing for 3Q 2021. SACAC ¶ 66.  In its filing, Snap noted that Apple issued an iOS update in April 2021 and that "[t]hese changes have adversely affected our targeting, measurement, and optimization capabilities, and in turn affected our ability to measure the effectiveness of advertisements on our services." *Id.*; *see also* Ex. 14 at 127.  Snap further advised that "[t]his has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business."  Ex. 14 at 127.

The next day, on October 22, 2021, Snap's stock price declined by approximately 26%, or $19.97 per share, to close at $55.14 per share – representing an approximately $27 billion drop in market capitalization.  SACAC ¶ 62.  Plaintiff notes that upon this news, analysts "excoriated" Snap management.  *Id.* ¶ 63.  For example, a RBC Capital Markets report commented that "management's credibility is likely gone given recent communications did not

indicate these risks," such as accelerating IDFA headwinds in the latter part of Q3 and growing holiday advertising headwinds due to supply constraints. *Id.*; *see also* Ex. 25 at 251. Other analysts were "surprised with the change of management's tone with regards to the effect of Apple changes on Snap's ad business." SACAC ¶ 64.[9]

At the November 17, 2021 Morgan Stanley European Technology, Media & Telecom Conference, Andersen remarked on SKAN's impact on Snap's business. *Id.* ¶ 67. He stated that "[e]arly on" Snap "worked with [its] advertising partners to develop, to adopt [SKAN] . . . [a]nd advertisers were initially excited about SKAN as a solution." Ex. 10 at 108. Snap observed "some early promising results with some advertiser spending up against [SKAN] early in the going, but it was challenging [for Snap] to know how to evaluate that [because] advertisers still at that point had access to a lot of their legacy signals to calibrate their [advertising] spending." *Id.* at 109. However, as Snap moved through Q3 and saw the adoption of newer versions of iOS accelerate, "the limitations of [SKAN] became far more apparent as [Snap] moved through that period." *Id.*

     5.  Summary of Alleged False and Misleading Statements

Plaintiff alleges that Defendants made several false or misleading statements, causing Plaintiff and other putative class members to purchase Snap securities at "artificially inflated prices." SACAC ¶ 167. These false or misleading statements were allegedly made in interviews, earning conference calls, and presentations. *See generally id.* The Court has organized these statements chronologically and by source in the table below.

| Date | Source | False and/or Misleading Statements |
|---|---|---|
| February 4, 2021 | Gorman at Snap's fourth quarter 2020 earnings conference call | Snap "feel[s] really well prepared for [the iOS] changes" and that Snap is "in a really unique and beneficial position . . . [because] [Snap] made design decisions that helped [it] avoid many of the issues seen on other platforms." *Id.* ¶¶ 99-101. |
| February 5, 2021 | Spiegel during CNBC interview | Snap "factored [Apple's iOS changes] impact into our guidance," projecting "56-60% year over year revenue growth in Q1," that Snap had "implemented" SKAN and started "building [its] own solutions," and that Snap felt "well prepared for these changes." *Id.* ¶ 102. |
| February 23, 2021 | Andersen at Snap's Investor Day | Snap "believe[d] . . . that [it could] grow [its] topline revenue at 50 percent or better year over year for at least the next several years" and that it "believe[d] [it could] sustain approximately 50 |

---

[9] Snap also reduced its fourth quarter revenue guidance to $135-$175 million, which was 55% below Wall Street consensus expectations of $300 million. *Id.* ¶ 58.

| Date | Source | False and/or Misleading Statements |
|---|---|---|
| | | percent topline growth rates for the next several years under favorable operating conditions." *Id.* ¶¶ 47, 104. |
| March 3, 2021 | Spiegel at Morgan Stanley's Technology, Media, and Telecom Virtual Conference | Snap "feel[s] good about [its] ability to execute against [the 50 percent revenue growth estimate] in a good operating environment," that "the 50% number actually isn't predicated on any further user growth or any engagement growth . . . [s]o that's just looking at like the steady state opportunity actually in terms of our inventory," and that Snap "ha[s] a lot of advertising inventory." *Id.* ¶¶ 107-09. |
| April 22, 2021 | Gorman at Snap's first quarter 2021 earnings conference call | "Advertisers that represent a majority of [Snap's] direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns." *Id.* ¶ 110. |
| May 21, 2021 | Spiegel during CNBC interview | Snap had "been able to help our advertising partners navigate those changes, migrate to [SKAN]," and that "so far, [the] transition [to ATT] has gone smoothly for our business." *Id.* ¶ 114. |
| July 22, 2021 | Anderson at Snap's second quarter 2021 earnings conference call | Snap expected "year-over-year revenue growth of approximately 58 to 60 percent in Q3," reflecting Snap's "best current estimate of the potential impact of anticipated disruptions associated with the iOS platform changes." *Id.* ¶ 116. |
| July 22, 2021 | Gorman at Snap's second quarter 2021 earnings conference call | "As Apple rolled-out its [ATT]-related changes near the end of Q2, [Snap] observed higher opt-in rates than [it was] seeing reported generally across the industry, which [Snap] believe[d] was due in part to the trust our community has in our products and our business" and that Snap's opt-in rates were "above what is sort of widely reported in both the press as well as with the analyst community." *Id.* ¶¶ 116, 119.<br><br>Snap "rolled out full support of [SKAN] version 3.0, which we know will aid or we believe will aid in attribution for advertisers." *Id.* ¶ 118.<br><br>Snap had "been working really hard to make this transition smooth for our advertising partners as well as our businesses" and although "Apple's rollout of the most recent iOS update came later in Q2 than initially anticipated, and the pace of updates by iPhone users ha[d] also been slower than [Snap] anticipated," it had "given [Snap] more time with advertisers to navigate the transition." *Id.* ¶¶ 117-18. |

## II.   Legal Standard

### A.  Rule 12(b)(6)

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon

which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

The court must construe the complaint in the light most favorable to the plaintiff, by accepting all allegations of material fact as true, and drawing all reasonable inferences from well-pleaded factual allegations in favor of the plaintiff.  *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002).  The court is not required to accept as true legal conclusions couched as factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion, the plaintiff must provide grounds demonstrating its entitlement to relief.  *Twombly*, 550 U.S. at 555.  Under the Supreme Court's decisions in *Twombly* and *Iqbal*, this requires that the complaint contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

### B.  Rule 9(b)

"It is well established that claims brought under Rule 10b-5 and section 10(b) must meet the particularity requirements of Federal Rule of Civil Procedure 9(b)."  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005).  Under Rule 9(b), the plaintiff must plead the "who, what, when, where, and how" of the alleged misconduct.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124-25 (9th Cir. 2009).  This requires the plaintiff to allege "an account of the time, place, and specific content" of the false or misleading statements.  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam) (internal quotation marks and citation omitted).  In addition, the "plaintiff must set forth what is false or misleading about a statement, and why."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

### III.   Request for Judicial Notice

In connection with the Motion, Defendants request judicial notice of thirty-three documents, including excerpts of documents Snap filed with the SEC, transcripts of quarterly earnings calls, transcripts of Spiegel's interviews, and analyst reports.  *See* Defendants' Request for Judicial Notice ("RJN"), Docket No. 101.

"Although generally the scope of review on a motion to dismiss for failure to state a claim is limited to the [c]omplaint, a court may consider evidence on which the complaint

necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiffs' claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation marks and citations omitted). Courts may "treat such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).

Exhibits 1-2, 5-10, 14-18, 20, 22-23, 27-31 to Defendants' request for judicial notice are referenced in the SACAC, and are thus incorporated by reference. Additionally, Plaintiff does not dispute the authenticity of these documents and the request for judicial notice is not opposed. As a result, the Court can consider these exhibits in deciding Defendants' Motion under the "incorporation by reference" doctrine.[10] *See, e.g.*, *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (holding that the district court properly considered SEC filings under the incorporation by reference doctrine because their contents were alleged in the complaint), *abrogated on other grounds as recognized in S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004) (taking judicial notice of an analyst report referenced in the complaint); *In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 994 n.1 (N.D. Cal. 2001) ("In a securities-fraud suit, judicial notice can be had of documents directly related to documents referenced in the complaint that bear on the adequacy of the disclosure" (citations omitted)).

In addition, under Federal Rule of Evidence 201, courts may take judicial notice of facts that are "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Accordingly, a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records." *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 999 (9th Cir. 2018) (citation and quotations omitted).

Exhibits 3-4, 11-13, 19, 21, and 26 are not specifically referenced in the SACAC. Exhibits 3 and 11-13 are Snap's Forms 10-Q filed on July 22, 2020, October 21, 2020, April 23,

---

[10] The Court will also use this doctrine to take judicial notice of Spiegel's 10b5-1 trading plans. *See* Docket Nos. 77-1, 77-2.

2021, and July 23, 2021, respectively.  Because courts can take judicial notice of SEC filings that are publicly available, the Court will take judicial notice of Exhibits 3 and 11-13.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (stating that SEC filings may be judicially noticed).  Exhibits 19 and 21 are two of Snap's press releases, Exhibit 26 is an analyst report, and Exhibit 4 is a webpage.  *See In re White Elec. Designs Corp. Sec. Litig.*, 416 F. Supp. 2d 754, 760 (D. Ariz. 2006) ("[J]udicial notice is appropriate for SEC filings, press releases, and accounting rules as they are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned" (internal quotations and citations omitted)); *see also Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020) ("In general, websites and their contents may be judicially noticed.").  The Court will take judicial notice of Exhibits 4, 19, 21, and 26; however, the Court can do so only to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true."  *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (citing *Premier Growth Fund v. All. Cap. Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006)).

Finally, Defendants include a chart to its request for judicial notice, Exhibit 24, that summarizes the sales of Snap stock by Spiegel between May 23, 2020 and October 21, 2021. Federal Rule of Evidence 1006 provides that a party submitting "voluminous" data to a court may present that data "in the form of a chart, summary, or calculation," so long as the originals or duplicates of the originals are made available for inspection.  Fed. R. Evid. 1006.  "Because [defendants have submitted] the underlying documents . . . for consideration, the [court declines to disregard the] summaries, tables and charts . . ., [but] will not . . . consider[ ] [them] without reference to underlying documents," all of which were incorporated by reference in the complaint.  *See Malin v. XL Cap. Ltd.*, 499 F.Supp.2d 117, 134 (D. Conn. 2007) (relying on charts and summaries involving insider stock sales); *see also Amsted Indus. Inc. v. Nat'l Castings, Inc.*, No. 88 CV 924, 1990 WL 106548, at *22 (N.D. Ill. July 11, 1990) ("Thus, charts and graphs summarizing data culled from the financial records of the parties have often been admitted in the recognition that such summaries are a reasonable and efficient means of presenting the relevant information").  Here, the chart clearly identifies that the underlying data is derived by Spiegel's Forms 4, which, as noted above, are incorporated by reference in the SACAC.  Accordingly, the Court will consider Exhibit 24, but only with reference to Spiegel's

Forms 4.

In sum, the Court would grant Defendants' request for judicial notice.  However, to the extent any facts in these documents are subject to reasonable dispute, the Court will not take judicial notice of those facts.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

## IV.   Discussion

Section 10(b) of the Exchange Act provides that it shall be unlawful for any person "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements this provision by making it unlawful for any person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  In order to allege a violation of Section 10(b) of the Exchange Act, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016).  In addition to the heightened pleading standards for claims sounding in fraud under Fed. R. Civ. P. Rule 9(b), the Private Securities Litigation Reform Act in 1995 (the "Reform Act") requires that a complaint "plead with particularity both falsity and scienter."  *Daou*, 411 F.3d at 1014.  "Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u–4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' 15 U.S.C. § 78u–4(b)(2)."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007).

Here, Defendants argue that Plaintiff has failed to allege: (1) a false or misleading statement, *see* Mot. at 12-22; and (2) scienter, *see id.* at 22-30.  The Court will address each argument in turn.

### A.  False or Misleading Statements

For a statement or omission to be false or misleading, "it must affirmatively create an

impression of a state of affairs that differs in a material way from the one that actually exists."
*Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  A false or misleading
statement is material when "there is a substantial likelihood that the disclosure of the omitted fact
would have been viewed by the reasonable investor as having significantly altered the 'total mix'
of information made available." *See Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988).

Defendants argue that Plaintiff fails to plead any actionable misrepresentations.  Mot. at
12.  Specifically, Defendants claim that many of the alleged misrepresentations are either: (1)
forward-looking statements accompanied by meaningful cautionary language, and therefore are
inactionable under the PSLRA's safe harbor provision; (2) not actionable as statements of
puffery or corporate optimism; or (3) that Plaintiff fails to plead that the statements were false
when made.  *Id.* at 12-22.

    1.  Forward-Looking Statements

The Court begins with Defendants' PSLRA safe harbor arguments.  The PSLRA's safe
harbor provision exempts, under certain circumstances, a forward-looking statement, which is
"any statement regarding (1) financial projections, (2) plans and objectives of management for
future operations, (3) future economic performance, or (4) the assumptions underlying or related
to any of these issues." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W.
Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (internal quotation marks omitted).  The safe
harbor provision applies:

> [I]f the forward-looking statement is "(i) identified as a forward-
> looking statement, and is accompanied by meaningful cautionary
> statements identifying important factors that could cause actual
> results to differ materially from those in the forward-looking
> statement," or (ii) if it is not identified as a forward-looking
> statement and not accompanied by cautionary language, unless the
> statement was "made with actual knowledge . . . that the statement
> was false or misleading."

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014)
(quoting 15 U.S.C. § 78u-5(c)(1).[11]  "The PSLRA's safe harbor is designed to protect companies

---

[11]  The safe harbor provision − 15 U.S.C. § 78u-5(c)(1) − states in relevant part:

    a person . . . shall not be liable with respect to any forward-looking statement, whether written or
    oral, if and to the extent that−
        (A) the forward-looking statement is--
          (i) identified as a forward-looking statement, and is accompanied by meaningful
          cautionary statements identifying important factors that could cause actual results to

and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).  The PSLRA forward-looking safe harbor provides that a speaker "shall not be liable" for "an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading" if: a forward-looking statement is properly identified and accompanied by meaningful cautionary language; or the plaintiff fails to prove that the person making the statement had "actual knowledge" of its falsity.  15 U.S.C. § 78u–5(c)(1)(A)-(B).  The Ninth Circuit has held that either one of the test's prongs, on its own, sufficiently shields a speaker, such that if the first prong is met, the scienter of the speaker is irrelevant.  *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112-13 (9th Cir. 2010).

Defendants contend that the following statements concerning Snap's revenue projections are forward-looking and therefore protected under the safe harbor: (1) Spiegel's February 5, 2021 statement; (2) Andersen's February 23, 2021 statements; (3) Spiegel's March 3, 2021 statements; and (4) Andersen's July 22, 2021 statements.  *See* Mot. at 14-16, 20-21.  The Court would agree that these statements are forward-looking and possibly subject to the PSLRA's safe harbor.

Here, these statements concern "financial projections."  For example, Spiegel's February 5, 2021 statement asserts that Snap projected "56-60% year over year revenue growth in Q1."  SACAC ¶ 102.  In addition, Andersen's February 23, 2021 statements concern Snap's belief "that [it could] grow [its] topline revenue at 50 percent or better year over year for at least the next several years" and that it "believe[d] [it could] sustain approximately 50 percent topline growth rates for the next several years under favorable operating conditions."  *Id.* ¶¶ 47, 104.[12]

---

differ materially from those in the forward-looking statement; or
    (ii) immaterial; or
(B) the plaintiff fails to prove that the forward-looking statement−
  (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
  (ii) if made by a business entity;[,] was−
      (I) made by or with the approval of an executive officer of that entity; and
      (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

[12] Similarly, Spiegel's March 3, 2021 statements consist of Snap "feel[ing] good about [its] ability to execute against [the 50 percent revenue growth estimate] in a good operating environment."  Ex. 8 at 80; *see also* SACAC ¶ 107. Likewise, Andersen's July 22, 2021 statements concern Snap's expectation of "year-over-year revenue growth of approximately 58 to 60 percent in Q3," reflecting Snap's "best current estimate of the potential impact of anticipated disruptions associated with the iOS platform changes."  SACAC ¶ 116.

When examined as a whole, the Court finds that these statements are forward-looking since they are "related to future expectations and performance" of Snap. *See Intuitive Surgical*, 759 F.3d at 1059 ("The alleged misstatements in analyst calls are classic growth and revenue projections, which are forward-looking on their face."). "A forward-looking statement is 'a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items.'" *In re Cutera*, 619 F.3d at 1112-13 (quoting 15 U.S.C. § 78u–5(i)(1)(A)). Thus, the only question is whether the statements were identified as such and accompanied by sufficient cautions.

Defendants argue that Andersen's February 23, 2021 statements, Spiegel's March 3, 2021 statements, and Andersen's July 22, 2021 statements were identified as forward-looking and accompanied by meaningful cautionary language. Mot. at 16 n.6, 21 n.11. Thus, according to Defendants, these statements are protected by the PSLRA safe harbor. *Id.*

The Court would agree with Defendants. These statements were all made in the context of earnings calls or presentations. Specifically, Andersen's statements, both in February and July of 2021, were made on earnings calls. At the outset of these calls, Defendants made the following (or a substantially similar) warning:

> This conference call includes forward-looking statements which are based on our assumptions as of today. Actual results may differ materially from those expressed in these forward-looking statements, and we make no obligation to update our disclosures. For more information about factors that may cause actual results to differ materially from forward-looking statements, please refer to the press release we issued today, as well as risks described in our most recent Form 10-Q, particularly in the section titled Risk Factors.

Ex. 17 at 139; *see also* Ex. 7 at 56.[13] Similarly, Spiegel's March 3, 2021 statements were made in the course of a presentation, and were preceded by similar warnings. *See* Ex. 8 at 73.[14]

---

[13] Snap's Investor Day transcript contains the following declarations: "Before we start, I must let you know that we will be making forward looking statements in today's presentation so please do take the time to read this disclaimer on the screen. Any statement that refers to expectations, projections, guidance, or other characterizations of future events, including financial projections or future market conditions, is a forward-looking statement based on our assumptions today. Our actual results may differ materially from these forward-looking statements, and we make no obligation to update these statements. For more information about factors that may cause actual results to differ from forward-looking statements, please refer to our filings with the SEC." Ex. 7 at 56.

[14] The transcript contains the following cautionary language: "Some of the statements made today by Snap, maybe

In addition, the referenced SEC filings themselves contain cautionary language, including explicit warnings about ATT.  For example, Snap's Form 10-K for 2020 warned that "Apple's upcoming iOS update . . . may . . . adversely affect our ability to effectively target advertisements to users or demonstrate the value of our advertisements to advertisers, any of which could reduce the demand and pricing for our advertising products and seriously harm our business."  Ex. 1 at 10-11; *see also* Ex. 13 (Snap's Form 10-Q for 2Q 2021) at 123-124; Ex. 14 (Snap's Form 10-Q for 3Q 2021) at 127-128.

The cautionary language used by Defendants is almost identical to language approved by the Ninth Circuit in instances in which forward-looking statements were protected under the PSLRA's safe harbor.  *See, e.g., Intuitive Surgical*, 759 F.3d at 1059-60 (approving cautionary language in earnings call that warned that comments may contain forward-looking statements, that such statements may differ based on "certain risks and uncertainties," and referring investors to "the company's [SEC] filings"); *In re Cutera*, 610 F.3d at 1112 (approving cautionary language at beginning of quarterly earnings call that the conversation would contain forward-looking statements "concerning future financial performance and guidance").  The Court would therefore conclude that Defendants' cautionary language is sufficient under the PSLRA's safe harbor.

Nevertheless, Plaintiff argues that these statements are not protected by the PSLRA's safe harbor for two reasons.[15]  First, Plaintiff argues that Defendants' statements are not protected by the safe harbor simply because the statements were false when made.  *See* Opp. at 23.  However, the Ninth Circuit has squarely foreclosed this argument.  In *In re Cutera*, 610 F.3d at 1112-13, it was initially noted that the plain language of 15 U.S.C.S. § 78u-5(c)(1) is delineated in the disjunctive as to the two subsections.  As written, the statute provides a safe harbor for: (A)(i) identified forward-looking statements with sufficient cautionary language or (A)(ii) immaterial statements, and (B)(i)-(ii) unidentified forward-looking statements or forward-looking statements

---

consider[ed] forward-looking.  These statements involve a number of risks and uncertainties that could cause actual results to differ materially.  Any forward-looking statements made today by Snap are based on assumptions as of today and Snap undertakes no obligation to update them.  Please refer to Snap's Form 10-K for discussion of the risk factors that may impact actual results."  *Id.*

[15] Plaintiff also argues that Snap's April and May 2021 statements regarding the transition to SKAN, as well as July 2021 statements about ATT, are past-tense statements or statements that "misrepresented current facts" and therefore cannot be couched as forward-looking statements.  Opp. at 23.  Because Defendants do not assert that these statements are forward-looking, *see generally* Mot., the Court need not address this argument.

lacking sufficient cautionary language where the plaintiff fails to prove actual knowledge that the statement was false or misleading.  *Id.*   The Circuit went on to state "the logical reading of the [PSLRA] is simply to take it as written −subsections (A) and (B) and their subpoints each offer safe harbors for different categories of forward-looking statements."   As to forward-looking statements which fall within subpart A(1) and (ii), the safe harbor is not precluded merely because the statements are false when made so long as the statements either were sufficiently identified as forward-looking and were accompanied with sufficient cautionary language or the statements were immaterial.  *Id.*; *see also Mueller v. San Diego Entertainment Partners, LLC*, 260 F. Supp. 3d 1283, 1293 (S.D. Cal. 2017) ("[C]orporations and individual defendants may avoid liability for forward-looking statements that prove false if the statement is 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;'" quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999)).   Further, under subsection B, while an unidentified forward-looking statement or forward-looking statement lacking sufficient cautionary language which is false can fall outside of the safe harbor provision, the plaintiff must still prove the defendant's actual knowledge that the statement was false or misleading.  *In re Cutera*, 610 F.3d at 1113.  Here, Plaintiff has not pled particularized facts showing that Defendants "actually knew their projections could not be achieved." *Zee v. Green Dot Corp.*, No. CV 12-6492-GW (CWx), 2013 WL 12133841, at *7-8 (C.D. Cal. May 2, 2013).[16]  In sum, even assuming Plaintiff pled sufficient facts to show that Defendants supposedly knew their forward-looking statements were false, this would be irrelevant where, as here, the statements are identified as forward-looking and accompanied by meaningful cautionary language.  *See In re Cutera*, 610 F.3d at 1112 ("[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant.").[17]

Second, Plaintiff argues that Defendants' statements are not protected by the safe harbor because: (1) Andersen did not "mention any risks related to ATT, IDFA or SKAN" during Snap's February 23, 2021 Investor Day, and (2) Defendants "repeatedly falsely emphasized" that "Snap would not suffer any material negative impact from ATT."  Opp. at 24.  Plaintiff also

---

[16] In fact, Snap achieved the challenged projection for Q1.  Mot. at 15.  While Spiegel projected "56-60% year over year revenue growth in Q1," Snap's revenue growth was 66%.  *Id.*

[17] To the extent Plaintiff relies on the accounts of confidential witnesses to support Plaintiff's argument that these revenue projections were false when made, the Court would find that this argument fails for the same reasons discussed in Section IV.A.3, *infra*.

contends that Snap's "hypothetical warnings buried in Snap's SEC filings about what 'could' happen as a result of ATT are ineffective." *Id.*  Cautionary language is adequate under the PSLRA if it identifies "important factors that could cause actual results to differ materially from those in the forward-looking statement." *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).  And courts may consider, as part of cautionary statements, SEC filings incorporated by reference in conference calls. *See In re Tibco Software, Inc. Sec. Litig.*, No. 05-cv-2146-SBA, 2006 WL 1469654, at *27 (N.D. Cal. May 25, 2006).  For example, as noted above, Snap's Form 10-K for 2020 warned that "Apple's upcoming iOS update . . . may . . . seriously harm [Snap's] business." Ex. 1 at 10-11.[18]  These cautionary statements identified the risks Plaintiff alleges ultimately materialized, specifically, the risk that ATT would harm Snap's advertising business.  Further, while Plaintiff contends that Snap's warnings were "buried"[19] in SEC filings, Plaintiff cites no authority for its argument that the placement of Snap's cautionary language in a properly issued SEC Form 10-K could ever render them futile.  Rather, these cautions directly addressed the very subjects Plaintiff challenges.  Accordingly, Plaintiff has not established that Snap's cautionary statements were not specific enough or otherwise inadequate.

In addition, the Court would disagree with Plaintiff's characterization that Defendants "repeatedly falsely emphasized" that "Snap would not suffer *any* material negative impact from ATT." Opp. at 24 (emphasis added).  Preliminarily, Plaintiff does not point to any specific statements where Defendants made this remark.  Rather, contrary to Plaintiff's assertion, the SACAC and the judicially noticeable documents it quotes from are replete with examples where Defendants disclosed the potential adverse impact of ATT on Snap's business. *See, e.g.,* Ex. 3 at 20 (Snap's Form 10-Q for 2Q 2020) (noting that the impact of ATT was "uncertain" and "could seriously harm [Snap's] business"); Ex. 5 at 45-46 (transcript of Snap's fourth quarter 2020 earnings conference call) (noting that changes like transitioning to ATT and SKAN "are usually disruptive and the outcome is uncertain"); SACAC ¶ 102 (Spiegel stating that he "expect[ed] [ATT] to have a meaningful impact on [Snap's] results" and that he did not "know how big the impact [would] be"); Ex. 17 at 149 (transcript of Snap's second quarter 2021 earnings

---

[18] Other SEC filings also included similar warnings. *See, e.g.*, Ex. 3 (Snap's Form 10-Q for 2Q 2020) at 20; Ex. 12 (Snap's Form 10-Q for 1Q 2021) at 119; Ex. 13 (Snap's Form 10-Q for 2Q 2021) at 123.

[19] Plaintiff does not explain what it means by the term "buried," nor does it reference the specific locations in the SEC filings which it contends shows that the cautionary language was so placed as to render it difficult or impossible to find or see.

conference call) (noting that "it is still not clear what the longer term impact of the iOS platform changes may be, and this may not be clear until at least several months or more after the changes are fully implemented").  Far from stating that Snap would not suffer *any* material negative impact, Defendants repeatedly disclosed that ATT could have a meaningful impact, including serious harm, on Snap's business.  Therefore, Plaintiff's argument is not only unavailing, but an inaccurate representation of the many disclosures and warnings Defendants made about the potential impact of Apple's iOS changes on Snap's business.

In sum, the Court would conclude that Andersen's February 23, 2021 and July 22, 2021 statements and Spiegel's March 3, 2021 statements (as outlined above) are subject to the PSLRA's safe harbor.  Therefore, the Court would grant Defendants' motion to dismiss as to these statements.

### 2. Statements of Corporate Optimism

Defendants also argue that many of the statements identified in the SACAC are nonactionable statements of corporate optimism, or "puffery."  In particular, Defendants contend that the following statements cannot serve as material misrepresentations:

- Spiegel's February 5, 2021 statement that Snap "feel[s] . . . well prepared for these changes," SACAC ¶ 102;

- Gorman's February 4, 2021 statements "we feel really well prepared for these changes" and "I think . . . [Snap is] in a really unique and beneficial position . . . [because Snap] made design decisions that helped [it] avoid many of the issues seen on other platforms," *id.* ¶¶ 99-101; and

- Spiegel's May 21, 2021 statement that "so far, [the] transition [to ATT] has gone smoothly for our business," *id.* ¶ 114.

*See* Mot. at 12-14, 20.

Puffery consists of general statements of corporate optimism that are not capable of objective verification.  *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) ("'Puffing' concerns expressions of opinion, as opposed to knowingly false statements of fact," and routinely applies to "vague statements of optimism" or "mildly optimistic, subjective assessment[s]."); *see also Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) ("'[P]uffing – expressing an opinion rather than a knowingly false statement of fact – is not misleading.").  This is because

"[w]hen valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Quality Sys.*, 865 F.3d at 1143 (citation omitted). "[P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Id.*

For example, in *City of Royal Oak Retirement System v. Juniper Networks, Inc.*, the court held that statements that "merely express[ed] confidence in [defendants'] business and outlook" were "vague assertions of corporate optimism and therefore [] not actionable." 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012).[20]   Similarly, in *Wozniak v. Align Tech., Inc.*, the court held that statements that "[w]e are very pleased with the learning from our pilot launch," "so far we're getting really great feedback," "we are very pleased with our progress to date on key strategic initiatives," and "[w]e are confident the improved features in user experience . . . will increase and sustain utilization," were mere puffery. 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012).

Here, the Court would conclude that the above statements constitute corporate puffery. The proposition that Snap was "well prepared" for the ATT rollout and that the transition was progressing "smoothly" are the kind of feel-good corporate speak that is not actionable. *See Wozniak*, 850 F. Supp. 2d at 1036-37 (explaining that assertions such as "so far we're getting really great feedback" are nonactionable corporate optimism). In fact, these statements are very similar to those made in *In re Splash Technology Holdings, Inc. Securities Litigation ("Splash")*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001).

In *Splash*, the plaintiff challenged the defendants' statements about (1) Splash's "strong" demand; (2) that Splash's results were "better than expected" or "robust"; (3) that Splash's growth strategy "was unfolding as planned;" (4) that it was "well positioned;" and (5) that its position was "solid," among others. *Id.* at 1076. When "considering whether general expressions of optimism [are] actionable," the court noted that "the defining question is whether the statement is immaterial; that is whether the statement is so 'exaggerated' or 'vague' that no reasonable investor would rely on it when considering the total mix of available information." *Id.* (quoting *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 200 (3d Cir. 1990)). "Based on these principles," the court held that phrases such as "strong," "better than expected," "robust," "well-positioned," "solid," and "improved," when used to describe demand, results,

---

[20] Such statements included: "we have strong demand metrics and good momentum," "our demand indicators are strong, our product portfolio is robust," and "growth drivers give us . . . confidence." *Id.*

and growth strategy, were "vague and nonactionable." *Id.* at 1077. In addition, the court concluded that "conclusory statements," like that things were "unfolding as planned," "constituted hyperbole, and did not convey a false or misleading impression of the future on which a reasonable investor would rely." *Id.*

As the court in *Splash* recognized, the phrases and words "well prepared" and "smoothly," like the words "well-positioned" and "strong," are such vague expressions of optimism that would not have conveyed a misleading impression of the future on which a reasonable investor would rely. *See In re Copper Mountain*, 311 F. Supp. 2d at 880 (concluding that "characterizations of businesses as 'solid' and 'on track' are best characterized as inactionable puffery"). Moreover, these statements are not capable of objective verification. *See, e.g.*, *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087-88 (N.D. Cal. 2005) (finding that CEO's statements describing "record achievements" and attributing company's accomplishments to "continuing improvements in operations and increased cash flows from acquisitions and internal growth" were "mere puffing" because they are "not capable of objective verification").

Further, it is clear from the context of Spiegel's and Gorman's statements that they were describing the general environment surrounding Apple's iOS changes and expressing optimism about Snap's ability to adapt (and continue to adapt) to ATT going forward. As such, the Court would conclude that the statements about being "well prepared" and transitioning "smoothly" are nonactionable as examples of corporate puffery.

Another example of corporate puffery is Gorman's statement that Snap was in a "unique and beneficial position." SACAC ¶ 101. In *In re Pivotal Securities Litigation*, the court concluded that statements describing the defendant's products and business as "uniquely position[ed]," "strong across sectors," "best-in-class," and "industry-leading" were unactionable statements of corporate puffery. *In re Pivotal Sec. Litig.*, No. 3:19-cv-03589-CRB, 2020 WL 4193384, at *14 (N.D. Cal. July 21, 2020); *see also In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 523-24 (S.D.N.Y. 2020) (concluding that statements about the company's "unique position" were non-actionable puffery). The Court would reach the same conclusion here.[21]

---

[21] The Court notes that the parties dispute whether Gorman's statement about Snap being in a "unique and beneficial position" was in reference to ATT at all. *See* Mot. at 14; *see also* Opp. at 13 n.3. Regardless, the complete statement is as follows: "*I think* . . . [Snap is] in a really unique and beneficial position . . . [because Snap] made design decisions that helped us avoid many of the issues seen on other platforms." Ex. 5 at 49 (emphasis added).

In its Opposition, Plaintiff argues that these statements cannot be mere puffery because direct response "advertising revenue was indisputably crucial to Snap, and ATT posed an existential threat to that business." Opp. at 22.  However, generalized statements of corporate optimism are not actionable even where those statements concern a company's important business sector.  *See, e.g., Juniper Networks, Inc.*, 880 F. Supp. 2d at 1064 (statements that company has "strong demand metrics and good momentum" and "our demand indicators are strong, our product portfolio is robust" were non-actionable statements of mere corporate optimism); *In re Cornerstone Propane Partners,* 35 F. Supp. 2d at 1087 (finding defendant's "claims of 'industry leading' growth, growth that 'positions us beautifully,' 'measurable progress,' 'continuing improvements,' 'accomplishments we have achieved,' expressions of pride in [our] staff, 'outstanding retail results,' and other similar comments all constitute vague, unspecific assertions of corporate optimism"); *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095 (N.D. Cal. 1994) (holding as nonactionable puffery the phrases "[w]e're doing well and I think we have a great future, [b]usiness will be good this year . . . [w]e expect the second half of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be stronger than the first . . ., everything is clicking [for the 1990s] . . . new products are coming in a wave, not in a trickle . . . old products are doing very well, and that I am optimistic about [our] performance during this decade" (internal quotations omitted)).  As such, "[t]hese statements are nothing more than 'puffing,' which reasonable investors know do not guarantee future success." *In re Syntex Corp.*, 855 F. Supp. at 1095.

Plaintiff also argues that these statements are not mere puffery because they "represented to investors that Snap had determined that SKAN was effective and would prevent any material impact from ATT." Opp. at 22.  However, Plaintiff fails to point the Court to where exactly Defendants expressed this sentiment.  As discussed above, *see* Section IV.A.1, Defendants never stated that ATT would not have *any* material impact on Snap.  Moreover, the statements that Snap was "well prepared" and that the transition was going "smoothly" do not shed any light on whether or not SKAN was effective.  Instead, Defendants were commenting on Snap's ability to

---

District courts in California have concluded that similar statements beginning with "I think" constituted nonactionable corporate optimism.  *See, e.g., In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 994-95 (N.D. Cal. 2017) (finding statements such as "I think we'll see a lot more growth in Q3 . . ." and "I think we had a great Q2 . . ." were nonactionable statements of corporate optimism).  Here, Gorman's statement is one of opinion concerning optimistic predictions regarding Snap's future.  Again, the Court would find that this statement amounts to no more than "feel good speak" that characterizes "non-actionable puffing." *Intuitive Surgical*, 759 F.3d at 1060.

(1) work with Apple to implement SKAN, and (2) help advertising partners migrate to SKAN. *See* SACAC ¶¶ 99-102, 114.  These statements do not opine about the effectiveness of SKAN at all.  Finally, Plaintiff asserts that these statements are false.  Opp. at 22.  As discussed in Section IV.A.3, *infra,* Plaintiff has not sufficiently pled falsity with respect to these statements.

For the reasons discussed above, the Court would find that Gorman's February 4, 2021 statements and Spiegel's February 5, 2021 and May 21, 2021 statements (as outlined above) are nonactionable corporate puffery.  Therefore, the Court would grant Defendants' motion to dismiss as to these statements.

3. Falsity

To assert a claim under the PSLRA, the plaintiff must plead with particularity the element of falsity.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). "The PSLRA has exacting requirements for pleading 'falsity.'"  *Metzler*, 540 F.3d at 1070.  To satisfy these "exacting requirements," a plaintiff must plead "specific facts indicating why" the statements at issue were false.  *Id.*; *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Plaintiffs' complaint was required to allege specific facts that show" how statements were false).  Moreover, to be actionable, a statement must be false "at [the] time by the people who made them."  *Larkin*, 253 F.3d at 430.  "The fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made."  *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993).

Defendants contend that Plaintiff has failed to adequately plead falsity with respect to four other challenged statements.  Specifically, Defendants argue that Plaintiff fails to plead facts showing that the following statements are false or misleading:

- Spiegel's February 5, 2021 statement that Snap had "implemented" SKAN and started building [its] own solutions," SACAC ¶ 102;

- Spiegel's March 3, 2021 statement that Snap "ha[s] a lot of advertising inventory," *id.* ¶ 107; and

- Spiegel's May 21, 2021 statement that Snap had "been able to help our advertising partners navigate those changes, migrate to [SKAN]," *id.* ¶ 114.

*See* Mot. at 12-13, 19-20.  In addition, Defendants argue that Plaintiff fails to allege any facts showing that Gorman's statements during Snap's second quarter 2021 earnings conference call

were false. *Id.* at 21-22.[22]

Although Plaintiff alleges that these statements were false when made, the Court would conclude that Plaintiff's argument fails for several reasons. First, Plaintiff alleges that these statements (as well as every statement at issue in the SACAC) were false because Defendants knew "there would be a material negative impact from ATT" and "that implementing SKAN would not mitigate that impact in any way." *Id.* at 14; *see also* SACAC ¶ 103. However, Plaintiff does not plead "specific facts indicating why" these statements were false when made. *Metzler*, 540 F.3d at 1070. Plaintiff bases its allegations of falsity primarily on Snap's purported admission, on October 21, 2021, that "SKAN [was] unreliable as a standalone measurement solution." Ex. 18 at 165; SACAC ¶ 60; *see also* Opp. at 13 ("Defendants would later admit, SKAN completely destroyed the tracking capabilities that were crucial for [direct response] advertisers' business and was entirely unworkable"). In other words, Plaintiff alleges that because subsequent admissions allegedly undermined the earlier statements of Spiegel and Gorman, those statements were false. *See* Opp. at 13.

However, as the Ninth Circuit has held, it is "clearly insufficient for plaintiffs to say that [a] later, sobering revelation[ ] make[s] [an] earlier, cheerier statement a falsehood." *Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999) (alterations in original). It is also well-settled in the Ninth Circuit that "fraud by hindsight is not actionable." *Larkin*, 253 F.3d at 430 n.12 (internal quotation marks omitted). That Spiegel and Gorman made statements which, in retrospect, may have been wrong or optimistic, are not facts "that would support an inference that the company's more optimistic [statements] were known to be false or misleading at that time by the people who made them." *Id.* at 430.

In support of its argument, Plaintiff relies on *In re Snap Inc. Securities Litigation*, No. 2:17-cv-03679-SVW-AGR, 2018 WL 2972528, at *7 (C.D. Cal. June 7, 2018) and *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1160 (N.D. Cal. 2015). In *In re Snap*, the court concluded that the defendants' statements about avoiding "growth hacking" techniques was false when defendants later admitted that the company "drove a portion of its DAU growth through such techniques." 2018 WL 2972528, at *7. Similarly, in *Hatamian*, the court found that statements that the yield was "on target" were false when the company later admitted that

---

[22] For Gorman's complete statements, refer to the table in Section I.A.5, *supra.*

"customers were not fully supplied with [] products" when statements were made. 87 F. Supp. 3d at 1160. In both cases, the plaintiffs alleged facts to support their contentions that at time the statements were made they were false. Here, however, Plaintiff has not established that any contrary facts existed *at the time* these statements were made. Instead, Plaintiff relies on Defendants' later admissions, which is insufficient. *See In re VeriFone*, 11 F.3d at 871 ("The fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made.").

Second, Plaintiff relies on the accounts of confidential witnesses to support is allegations regarding falsity. Plaintiff principally relies on the confidential witness identified in the SACAC as "CW2." *See* Opp. at 13; *see also* SACAC ¶ 79. "[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco*, 552 F.3d at 995. "First, the confidential witnesses . . . must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of" falsity. *Id.*

Here, the Court would find that the SACAC sufficiently describes CW2's specific job title, role, and responsibilities. The SACAC alleges that CW2 was "a former Data Scientist on the Revenue Product Team at Snap who was tasked with revenue forecasting for the Company from 2018 through the first quarter of 2022." SACAC ¶ 79. In that role, CW2 "directly participated in regular pre-earnings release meetings with Defendant Gorman, as well as Snap's CFO Derek Andersen—both of whom reported to Defendant Spiegel—which occurred approximately one month prior to each of the Company's earnings releases during the Class Period (including the Company's quarterly releases)." *Id.* ¶ 80. Although CW2 is described with enough specificity to be reliable, the allegations in the SACAC do not permit the Court to conclude that CW2 had personal knowledge of Spiegel's or Gorman's state of mind. CW2 alleges that she attended meetings where Gorman and Andersen were present; however, critically, CW2 does not report communicating directly with Spiegel, Gorman, or Andersen.

Nevertheless, the Court has a few concerns with CW2's account. First, it is not entirely clear from the SACAC whether CW2's account is contemporaneous with the above statements. The SACAC alleges that "throughout 2021" "it was well known internally that Snap expected a significant negative revenue impact from the Apple iOS privacy changes." *Id.* However, it is

not clear that CW2's account of internal concern surrounding ATT is a contemporaneous fact which suggests the falsity of these statements. *See In re Stratosphere Corp. Sec. Litig.*, No. CV–S–96–708–PMP, 1997 WL 581032, at *13 (D. Nev. May 20, 1997) (to adequately plead falsity, plaintiff must provide "evidentiary *facts* contemporary to the alleged false or misleading statements"); *see also In re Cloudera, Inc.*, No. 19-CV-03221-LHK, 2021 WL 2115303, at *11 (N.D. Cal. May 25, 2021) (plaintiff must allege "contemporaneous facts that would establish a contradiction between the alleged materially misleading statements and reality" (citations and internal quotation marks omitted)).

Next, the Court would find that CW2's account does not provide sufficient factual support for Plaintiff's allegation of falsity as to the above statements. While CW2 was involved in revenue forecasting, CW2's account does not mention Snap's implementation of SKAN, its ability to build its own solutions, its advertising inventory, or its ability to help advertising partners navigate the Apple iOS changes. Indeed, Plaintiff does not allege that CW2 was involved in the implementation of SKAN or helped advertising partners transition to SKAN. Rather, CW2 merely states that Spiegel and Gorman "absolutely knew that there would be an impact" from these changes and "would routinely share their concerns in that regard." SACAC ¶ 80. Here, the Court would conclude that CW2's statements are too general to support the inference that the above statements were false when made.

Moreover, Plaintiff has not pled any facts that these statements were false or misleading. For example, no pleaded facts show that Snap did not have "a lot of advertising inventory" or that it did not "help [its] advertising partners navigate" the ATT changes. *See* SACAC ¶¶ 107, 114. Likewise, Plaintiff does not point to any facts showing that, in July 2021, it was not true that Snap "observed higher opt-in rates" for continued IDFA tracking than what was being reported generally across the industry.[23]  *Id.* ¶ 116. Nor has Plaintiff alleged that Snap had not

---

[23] Plaintiff asserts that Defendants' argument about "higher opt-in rates" "misses the mark" because Gorman's statements were false as "Defendants had already observed a material negative impact from ATT yet continued to paint an entirely different picture to investors that gave no indication of that reality at all." Opp. at 21. However, Plaintiff ignores the plain language of Gorman's statement, which addressed the opt-in rates and not the overall impact from ATT. While Plaintiff avers that Defendants "had already observed a material negative impact from ATT," Plaintiff does not plead facts supporting this contention. It appears that Plaintiff is relying on Defendants' statement that meaningful adoption of ATT occurred in June and July. Ex. 18 at 164. However, contrary to Plaintiff's assertion, Defendants never stated that "they had already observed the severe deficiencies of SKAN back in 'June and July.'" Opp. at 20. Instead, Defendants' references to June and July reflect when "Apple pushed all of its users to update to the new version of iOS." Ex. 18 at 164. Furthermore, Plaintiff ignores that, on this same call, Gorman warned that Snap had experienced "some interruptions to demands," but it was "too early to determine how

been working hard to make the ATT transition smooth for its advertising partners or that the delayed rollout had not given Snap more time to work with advertisers on the transition.[24]  *Id.* ¶¶ 117-18.

For similar reasons, Plaintiff has not sufficiently alleged the falsity of Spiegel's February 5, 2021 and May 21, 2021 statements and Gorman's February 4, 2021 statements.  As previously discussed in Section IV.A.2, *supra*, the Court would conclude that these statements constitute inactionable statements of corporate optimism.  For completeness, the Court will also discuss whether Plaintiff has sufficiently alleged falsity as to these statements.  These statements concern Snap's preparedness for the iOS changes and transition to ATT (as of May 2021).  SACAC ¶¶ 99-102, 114.  Again, Plaintiff has not alleged sufficient facts from which the Court can imply that these statements were false when made.[25]

Because Defendants later admitted that SKAN was "unreliable as a standalone measurement solution," *see* Ex. 18 at 165, Plaintiff argues these statements were false.  Opp. at 13.  "But it is simply not enough to assume or implausibly infer that [] [D]efendants must have known about these issues in [February] based on later facts or developments."  *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 621 (9th Cir. 2022).  Plaintiff does not adequately allege that Defendants knew of SKAN's shortcomings as of February 2021 when they discussed Snap's preparedness for ATT's rollout.  Because nothing in the SACAC suggests that Defendants knew of SKAN's deficiencies in February, Plaintiff has not adequately alleged that Defendants even knew about these problems with SKAN when they discussed their optimism for dealing with the Apple iOS change in February 2021.[26]

The SACAC also alleges that CW2 was "surprised" when "Spiegel and Gorman publicly reported to investors during this time 'that everything was going to be fine' regarding Apple's

---

long it [would] take until these changes [were] fully adopted, the scale of the potential interruptions to demand, or the ultimate impact on the longer term growth of our business."  Ex. 18 at 144.

[24] In addition, there are no allegations that Snap failed to rollout full support of SKAN 3.0 or that Gorman did not believe this new version would aid in attribution for advertisers.  *See id.* ¶ 118.

[25] Plaintiff also has not adequately alleged that Defendants did not honestly believe these opinions when offered.

[26] Additionally, Plaintiff asserts that Defendants' statements about being "well prepared" for ATT were false when made because "Spiegel admitted that by this time <u>Snap itself had already implemented SKAN</u>—meaning that Snap was unquestionably well aware of the numerous limitations the Company's advertisers immediately discovered upon attempting to implement SKAN."  Opp. at 15 n.7.  However, Plaintiff does not plead any facts about Snap's experience with SKAN upon implementing it that would make it "unquestionably well aware of [SKAN's] numerous limitations" back in February 2021.

privacy changes." *Id.* 80.   However, far from saying "everything was going to be fine," Defendants expressed uncertainty about the changes and noted that disruptions would be likely. While Spiegel and Gorman expressed their belief that Snap was "well prepared" for the changes, they both expressed caution.   For example, after saying she felt Snap was well prepared for ATT, Gorman cautioned that "changes to this ecosystem are usually disruptive and the outcome is uncertain." Ex. 5 at 45-46.   In addition, Spiegel said he "expect[ed] [ATT] to have a meaningful impact on [Snap's] results" and that he did not "know how big the impact [would] be" and also noted that the changes could be "a little disruptive for advertisers in the near term." Ex. 6 at 52. Thus, the Court would agree that CW2's allegations about internal concerns regarding the impact of ATT are not inconsistent with Defendants' public statements.[27]

In addition, Plaintiff relies on CW2's account to assert that "Snap <u>deliberately</u> never completed any revenue impact analysis of ATT at any point during the Class Period" for fear of "shareholder fraud." Opp. at 14.   However, the SACAC also alleges that Snap's "Finance group was [] working to quantify the expected impact of Apple's privacy changes on Snap's revenue and appeared to have a 'better grip' on what the impact was."   SACAC ¶ 84.   While Plaintiff contends that "no revenue impact analysis of ATT was <u>ever</u> completed during the Class Period," *see* Opp. at 14 n.4, the SACAC is devoid of any facts supporting this allegation.   Rather, the SACAC suggests that the Finance group was conducting a revenue impact analysis, and there are no allegations in the SACAC to conclude otherwise.[28]

Finally, Plaintiff relies on the CW identified in the SACAC as "CW1" to show that the ATT transition had not "gone smoothly for [Snap's] business," as claimed by Spiegel in May 2021.   *See* SACAC ¶¶ 76-78.   The SACAC alleges that CW1 is a "former Snap Account

---

[27] For the same reasons, Plaintiff's reliance on *Davis v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2021 WL 4923359, at *11 (N.D. Cal. Sept. 17, 2021) is unavailing.   There, the court concluded that the plaintiff alleged falsity where defendants announced, "we're not alarmed in any way" despite "ample evidence in the record that [d]efendants knew "that Yelp had a systemic problem." *Id.* at *10.   While Plaintiff argues that Defendants "gave no indication of any [] concerns regarding ATT," this is inconsistent with the many examples where Defendants disclosed the potential impact of ATT on Snap's business, which the Court summarized above, *see* Section IV.A.1.

[28] The Court notes that Plaintiff also relies on CW2 to argue that Spiegel's February 5, 2021 statement that Snap had "factored [the impact of the Apple privacy changes] into our guidance" was false.   *See* Opp. 15 n.8; *see also* SACAC ¶ 103.   The SACAC alleges that "to CW2's knowledge, no revenue impact analysis of Apple's ATT changes was ever completed in or around April 2021." SACAC ¶ 81.   CW2 was merely not personally aware of an analysis being done at that time.   Plaintiff does not plead any facts that Snap failed to factor ATT into its guidance when Spiegel made this statement in February 5, 2021.   Accordingly, as currently pled, CW2's account does not provide sufficient factual support for Plaintiff's allegation of falsity as to this statement.

Strategist who worked directly with the Company's advertising clients on the transition from IDFA to SKAN" and "was intimately involved in transitioning Snap's advertisers from IDFA to SKAN." *Id.* ¶¶ 76-77. As with CW2, the Court is concerned about the contemporaneous nature of CW1's account. It is not clear from the SACAC that CW1's alleged account of the ineffectiveness of SKAN is a contemporaneous fact suggesting the falsity of this statement. Nor does the SACAC allege that CW1 communicated directly with Spiegel. In any amended complaint, Plaintiff should plead additional facts linking CW1's account with the alleged falsity of Spiegel's May 21, 2021 statements.

Accordingly, the Court would conclude that Plaintiff has failed to plead falsity with respect to these statements and would therefore grant Defendants' motion to dismiss.

### 4. Gorman's April 22, 2021 Statement

The only remaining statement is Gorman's April 22, 2021 statement that "[a]dvertisers that represent a majority of [Snap's] direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns." SACAC ¶ 110. Plaintiff argues that this statement was false when made because Defendants later admitted that a "majority" of Snap's "advertisers had <u>not</u> 'successfully implemented' SKAN by April 2021—or at all." Opp. at 16.[29] Specifically, Plaintiff points to Gorman's comments on October 21, 2021, where she noted that "over time" Defendants learned that "SKAN [was] unreliable as a standalone measurement solution." Ex. 18 at 165. In addition, Gorman highlighted the deficiencies in SKAN that "surfaced" "as [Snap's] advertising partners [] explored and tested SKAN[]." *Id.* These problems included: (1) advertisers no longer being "able to understand the impact of their unique campaigns," (2) the inability to "target advertising based on whether or not people have already installed their app," and (3) extended reporting delays hindering "real-time campaign and creative management." *Id.* Plaintiff also relies on CW1's account that "there were very few adoptees" of SKAN in April 2021 due to its numerous flaws. Opp. at 16; *see also* SACAC ¶ 77. As such, Plaintiff argues that this statement falsely "assured investors that 'a majority' of Snap's crucial [direct response] advertisers had concluded that SKAN was a workable alternative to IDFA." Opp. at 1-2.

Defendants primarily counter by offering a different interpretation of Gorman's

---

[29] Contrary to Plaintiff's assertion, Defendants never made this explicit admission. *See* Ex. 18. Rather, Defendants later "admitted" that advertisers encountered several issues with SKAN. *See id.*

statement.  Defendants argue that "[s]aying that some advertisers 'successfully implemented' SKAN is not the same as saying that those advertisers found SKAN to be a 'workable alternative to IDFA."  Reply at 8.  Further, they argue that "[w]hile 'successful implementation' indicates that some advertisers had set up SKAN, it does not imply that those advertisers had 'concluded' that it solved the problem caused by the loss of IDFA because SKAN is a measurement tool and, by its nature, its effectiveness as a replacement for IDFA would only become apparent over time." *Id.*

The Court takes issue with Defendants' argument.  First, Defendants frame Gorman's statement as "*some* advertisers 'successfully implemented' SKAN."  *Id.* (emphasis added). However, this is not what Gorman said.  She said a *majority* of Snap's advertisers had "successfully implemented SKAN."  Ex. 18 at 165.  Second, and more importantly, Defendants' alternative interpretation of Gorman's statement "only demonstrates that a factual dispute exists which cannot be resolved at the pleading stage."  *In re Snap*, 2018 WL 2972528, at *7.  While Defendants' interpretation of this statement is entirely conceivable, it is just as likely that investors would interpret Gorman's statement as a sign that SKAN worked and would "mitigate against a meaningful adverse outcome for Snap."  SACAC ¶ 52.  Accordingly, at this stage, the Court cannot conclude as a matter of law that this statement is not false or misleading.  The Court would thus find that Plaintiff has plausibly alleged a material misrepresentation.

     5.  Summary

In summation, the Court would conclude that, other than Gorman's April 22, 2021 statement, the challenged statements are either (1) subject to the PSLRA safe harbor, (2) constitute nonactionable statements of corporate optimism, and/or (3) were not false when made.

**B.  Scienter**

The Court next considers whether Plaintiff has sufficiently alleged scienter.  The Court only addresses scienter as to the statement that Plaintiff has adequately alleged to have been a material misrepresentation (*i.e.*, Gorman's April 22, 2021 statement).

"To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.  The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 324.  The inference of

scienter, however, must be "more than merely 'reasonable' or 'permissible' – it must be compelling and cogent, thus strong in light of other explanations." *Id.*

In the Ninth Circuit, courts "conduct a dual inquiry," where they will first ask whether "plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter." *Zucco*, 552 F.3d at 992. If the allegations are not sufficient alone, courts "will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* Under this holistic determination, scienter is adequately pleaded if "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Intuitive Surgical*, 759 F.3d at 1061-62.

Here, Plaintiff argues that it has adequately pled scienter through (1) the alleged misstatements themselves; (2) the core operations doctrine; (3) analysts' reactions; (4) the CW allegations; and (5) improper stock sales. Opp. at 24-30. Defendants argue, by contrast, that none of these factors support a strong inference of scienter. *See* Reply at 17-25.

       1.   Knowledge of SKAN

Plaintiff first argues that a strong inference of scienter is supported by the fact that "Defendants spoke repeatedly about [the Apple iOS changes] and made crystal clear to investors that they had intimate and detailed knowledge of them and how they were impacting Snap's business." Opp. at 25. However, even accepting these allegations as true, Plaintiff has failed to demonstrate a strong inference of scienter because they have failed to allege that Gorman or Spiegel themselves knew or had access to information that these statements were false. In the Ninth Circuit, "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler*, 540 F.3d at 1068. Here, Plaintiff has failed to plead any specific allegations that demonstrate that relevant information was conveyed to Gorman or Spiegel or that they accessed that information. Instead, Plaintiff has pled only their general awareness of the day-to-day workings of Snap's business. This is insufficient to create a strong inference of scienter.

       2.   Confidential Witnesses

Plaintiff next argues that the detailed accounts of CW1 and CW2 establish Defendants' scienter. For the reasons discussed above in Section IV.A.3, the Court would disagree with Plaintiff. The SACACC does not allege that CW1 or CW2 shared the purportedly contradictory

information with Gorman (or Spiegel) before she made the challenged statements.  *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) (allegation of access to disputed information was inadequately particularized where plaintiff failed to allege that defendants personally accessed information, or that witnesses disclosed the purportedly contradictory information to defendants); *see also Metzler*, 540 F.3d at 1068 (explaining that "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud").  As a result, the confidential witness statements do not raise a strong inference of scienter.

3.  Spiegel's Stock Sales

First, the Court notes that Gorman is not alleged to have had any suspicious stock sales.  *See generally* SACAC.  Nevertheless, Plaintiff points to Spiegel's "massive Class Period stock sales" to further support the inference of scienter here.  *Id.* ¶ 127.  To determine whether stock sales are indicative of knowledge, the Court must look to three relevant factors: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history."  *Ronconi*, 253 F.3d at 435 (quoting *In re Silicon Graphics*, 183 F.3d at 986).  Based on these factors, the Court would agree with Defendants that the stock sales do not support an inference of scienter.

First, Spiegel's sales amounted to only 7% of his holdings.  Ex. 23.  This is hardly suspicious.  *See Ronconi*, 253 F.3d at 435 (finding sales of ten percent and seventeen percent were not suspicious).  Second, Plaintiff fails to show that the number of shares Spiegel sold was inconsistent with his trading history.  As Defendants point out, the number of shares Spiegel disposed of during the Class Period and Control Period are comparable.  Mot. at 29; *see also* Ex. 23.  While Plaintiff alleges that Spiegel's stock sales were "suspiciously timed," Plaintiff ignores that these trades were made pursuant to a 10b5-1 plan – meaning that Spiegel had no control over the timing of his sales.  Mot. at 27-28.  However, even assuming the timing of the sales was sufficient, this factor is not enough given the weakness of Plaintiff's showing as to the other two factors.

Because Spiegel's stock sales were sold according to a pre-determined 10b5-1 trading plan, *see* SACAC ¶ 127, he had set these sales beforehand, thereby undermining an inference of scienter here.  *See In re Twitter, Inc. Sec. Litig.*, No. 19-CV-07149-YGR, 2020 WL 7260479, at

*14 (N.D. Cal. Dec. 10, 2020) ("In general, automatic sales made pursuant to Rule 10b5-1 plans do not support a strong inference of scienter."). Still, Plaintiff argues, Spiegel entered into his 10b5-1 trading plan knowing that Snap's statements about ATT and SKAN were false. Opp. at 29. But Plaintiff fails to allege any facts to support that claim, and making a blanket claim that Spiegel knew about the misleading statements without any factual support falls short of that standard.[30]

### 4. Defendants' Admissions

Plaintiff also contends that later statements made by Gorman confirm her scienter because she must have known in April 2021 that a "majority" of Snap's advertisers had not actually been able to "successfully implement" SKAN. As described in Section IV.A.4, Gorman admitted in October 2021 that advertisers had, over time, encountered numerous issues with SKAN. "A later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003). Here, Gorman's October 2021 statements do not directly contradict her earlier statement.[31] Thus, the issue is whether her later statements were inconsistent. Defendants argue that it is "entirely consistent that advertisers 'successfully implemented' SKAN for use before the rollout, and then surfaced concerns post-rollout after 'explor[ing] and test[ing]' it." Reply at 19.

Viewing the SACAC in its totality, these statements do not raise a "strong inference" of scienter. Gorman's October 2021 statements are capable of being read in the manner Plaintiff suggests – *i.e.*, that Gorman was admitting that advertisers had not actually successfully implemented SKAN due its deficiencies. "But the *Tellabs* Court's directive that a complaint must be read in its entirety cuts both ways. Although a defendant cannot gain dismissal by de-

---

[30] Plaintiff also argues that the proceeds from Spiegel's stock sales – nearly $700 million – indicate that they were suspicious. Opp. at 28. Plaintiff relies on *Nursing Home Pension Fund, Local 144 v. Oracle*, 380 F.3d 1226 (9th Cir. 2004), which held that "where, as here, stock sales result in a truly astronomical figure, less weight should be given to the fact that they may represent a small portion of the defendant's holdings." *Id.* at 1232. However, in *Oracle*, the court found the trades were highly inconsistent with the executive's prior trading history and determined the timing of the sales was also suspicious. *Id.* For example, the executive sold $900 million worth of stock in a span of nine days and had not sold any stock in the previous five years. *Id.* Here, by contrast, the trades were made pursuant to a 10b5-1 plan and were not inconsistent with Spiegel's trading history. Therefore, the Court would find *Nursing Home* distinguishable.

[31] Gorman never admitted in October 2021 that, in April 2021, advertisers representing a majority of direct response advertising had not set up SKAN for use. *See* Ex. 18.

contextualizing every statement in a complaint that goes to scienter, a plaintiff cannot *avoid* dismissal by reliance on an isolated statement that stands in contrast to a host of other insufficient allegations." *Metzler*, 540 F.3d at 1069; *see also Tellabs*, 127 S. Ct. at 2509 ("*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard" (emphasis in original)).

Here, while Gorman's statement is susceptible to Plaintiff's characterization, it is equally susceptible to Defendants' interpretation. Therefore, "[i]n light of the [Ninth Circuit's] guidance in *Tellabs* and PSLRA's heightened standards for plaintiffs' securities fraud cases generally," the Court would conclude that Gorman's later statements are "not so indicative of fraudulent intent that [they] carr[y] the weight of the entire [78]–page complaint for purposes of establishing a 'strong inference' of scienter." *Metzler*, 540 F.3d at 1069.

               5.   <u>Core Operations Theory</u>

Plaintiff next argues that because "Defendants' misstatement unquestionably concerned Snap's 'core operations,' and specifically the third party advertising that made up the entirety of Snap's business," there is a strong inference of scienter. Opp. at 25. "The core operations theory of scienter relies on the principle that corporate officers have knowledge of the critical core operation of their companies." *Intuitive Surgical*, 759 F.3d at 1062 (quoting *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). "Proof under this theory is not easy. A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Id.* A plaintiff may also meet the standard "[i]n rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Killinger*, 542 F.3d at 786.

Under the first prong, Plaintiff argues that "[t]here can be no dispute here that Defendants Gorman and Spiegel . . . had 'actual access' to information underlying their public statements" because they "spoke repeatedly about [the Apple iOS] changes and made crystal clear to investors that they had intimate and detailed knowledge of them and how they were impacting Snap's business." Opp. at 25-26. However, pointing to Defendants' statements does not suffice under the core operations theory. Instead, Plaintiff must produce "specific admissions. . . of detailed involvement in the minutia of a company's operations," and none of Defendants' alleged

misstatements provide such admissions.

Under the second prong, Plaintiff argues that because "ATT posted an existential threat to Snap's business" it would be "absurd to suggest" that Defendants were "unaware of negative information directly contradicting their repeated positive proclamations about SKAN." Opp. at 26. The Court would find this to be a close call. On the one hand, simply alleging that advertising is Snap's core business does not give rise to an inference of scienter. *See, e.g.*, *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014) (denying application of the core operations theory even when "the problem concerned [NVIDIA's] flagship product and was cause for concern to [NVIDIA's] two largest customers"); *Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*, No. 18-CV-07669-HSG, 2020 WL 1244936, at *12 (N.D. Cal. Mar. 16, 2020) ("Simply alleging that gaming is NVIDIA's core business does not give rise to an inference of scienter.").

Nevertheless, the Court would agree with Plaintiff that this could be one of the "rare circumstances" where "such allegations may be sufficient, without accompanying particularized allegations," because "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Reese*, 747 F.3d at 576. Such a determination could be merited here because Plaintiff has alleged that Snap generates substantially all of its revenue from advertising, *see* SACAC ¶¶ 3, 40, and that any deficiencies with SKAN would be of such prominence that "it would be 'absurd' to suggest that management was without knowledge of the matter." *Reese*, 747 F.3d at 576. However, the Court has already determined that Plaintiff has failed to adequately allege specific facts showing that Gorman knew of SKAN's deficiencies at the time her allegedly false statements were made. Accordingly, the Court would find that Plaintiff's argument for scienter under a core operations theory fails as currently pled.

### 6. Holistic Review of Scienter Allegations

Having determined that Plaintiff's allegations, standing alone, are insufficient to create a strong inference of scienter, the Court now considers the "allegations holistically to determine whether they create a strong inference of scienter taken together." *In re NVIDIA*, 768 F.3d at 1056. "When conducting this holistic review . . . [the Court] must also take into account plausible opposing inferences that could weigh against a finding of scienter. Even if a set of

allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco*, 552 F.3d at 1006.

Here, the Court would conclude that none of Plaintiff's allegations, either standing alone or considered holistically, establish a strong inference of scienter. "Although the allegations in this case are legion, even together they are not as cogent or compelling as a plausible alternative inference," namely, that, instead of an intent to defraud investors, Defendants were trying to respond to uncertainty created by ATT and SKAN, and their optimistic predictions did not pan out. *Id.* at 1007. This is the more plausible alternative explanation for the events detailed in the SACAC. Despite Plaintiff's attempts, "[f]aulting a company for poor business decisions does not equal scienter." *In re Jones Soda Co. Secs. Litig.*, 393 F. App'x 507, 509 (9th Cir. 2010). Accordingly, the Court would find that even when viewed holistically, Plaintiff's allegations do not create a strong inference of scienter. [32]

### C. Section 20(a) Claim

To state a claim for control person liability under Section 20(a) of the Exchange Act, a plaintiff must first allege an underlying violation of Section 10(b). *See Zucco*, 552 F.3d at 990, 1008 (affirming dismissal of Section 20(a) claims where plaintiffs failed to allege violation of Section 10(b)). Defendants argue that Plaintiff's Section 20(a) claim fails "because the [SACAC] alleges no primary violation of the securities laws." Mot. at 30 n.16. Because the Court has found that Plaintiff has failed to state a claim under Section 10(b) and SEC Rule 10b-5, the Court would dismiss Plaintiff's second cause of action as well.

### D. Leave to Amend

As a general rule, leave to amend a dismissed complaint should be freely granted. *See* Fed. R. Civ. P. 15(a). In exercising this discretion, the court must consider Rule 15's purpose, which is to "facilitate decision on the merits, rather than on the pleadings or technicalities."

---

[32] Plaintiff also argues that motive and analysts' reactions support a finding of scienter here. Opp. at 26, 28. The Court is unconvinced. "[M]otive is not sufficient to raise a strong inference of scienter. Plaintiff must come forward with particularized allegations indicating no less than a degree of recklessness that strongly suggests actual intent." *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1072 (N.D. Cal. 2002). Here, even if Defendants had a motive to "live up to their 50%+ multi-year growth target," Plaintiff must still allege that Defendants knew or were deliberately reckless about the accuracy of these projections, which Plaintiff has failed to do. Moreover, analysts' strong reaction questioning management's credibility will not, alone, rescue Plaintiff's scienter allegations. *See In re Fibrogen, Inc., Sec. Litig.*, No. 21-cv-02623-EMC, 2022 WL 2793032, at *22 (N.D. Cal. July 15, 2022) (noting that while analyst reports could "lend some support," they "do not establish scienter by themselves").

*United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).  The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).  Although this is the second time Plaintiff has amended its claims, the Court will grant Plaintiff leave to amend, since the Court has not previously considered Plaintiff's allegations.[33]

## V.   <u>Conclusion</u>

Based on the foregoing discussion, the Court would **GRANT** the Motion with leave to amend.

---

[33] Following the consolidation of this action, the Court ordered Plaintiff to file an amended complaint by March 18, 2022.  Docket No. 54.  Thereafter, the parties filed a stipulation permitting Plaintiff to file a second amended complaint, which was granted by the Court.  *See* Docket Nos. 90, 92.