

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

KELLIE BLACK,

                 Plaintiffs,

     vs.                     Case No. CV 21-8892

SNAP INC., et al,

                 Defendants.

_____/

REPORTER'S TRANSCRIPT OF
MOTION TO DISMISS HEARING
Monday, March 13, 2023
8:30 a.m.
LOS ANGELES, CALIFORNIA

_____

TERRI A. HOURIGAN, CSR NO. 3838, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CALIFORNIA  90012
(213) 894-2849

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

SAXENA WHITE PA
BY:  KYLA GRANT
        Attorney at Law
10 Bank Street, 8th Floor
White Plains, New York  10606

SAXENA WHITE PA
BY:  LESTER R HOOKER
        DIANE M. PITRE
        Attorneys at Law
7777 Glades Road, Suite 300
Boca Raton, Florida 33434

BRAGAR EAGEL and SQUIRE PC
BY:  MELISSA A. FORTUNATO
        Attorney at Law
445 South Figueroa Street, Suite 3100
Los Angeles, California  90071

BIENERT KATZMAN LITTRELL WILLIAMS LLP
BY:  JOHN LITTRELL
        Attorney at Law
601 W. 5th Street, Suite 720
Los Angeles, California  90071

**FOR THE DEFENDANT:**

BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
LINCENBERG and RHOW PC
BY:  EKWAN E. RHOW
        Attorney at Law
1875 Century Park East, Suite 2300
Los Angeles, California  90067

**FOR THE DEFENDANT:**

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
BY:  AUDRA J. SOLOWAY
        KRISTINE A. BUNTING
        Attorneys at Law
1285 Avenue of the Americas
New York, New York  10019

**UNITED STATES DISTRICT COURT**

LOS ANGELES, CALIFORNIA; Monday, March 13, 2023

8:30 a.m.

--oOo--

THE COURT:  Let me call the matter -- let me just ask, on the matters of *Black versus Snap*, and the related cases are *Speer versus Spiegel*, I presume I should call the Black matter first, and whatever remains, I could discuss it with the *Speer versus Dodds* people.

So let me call the *Black* matter first.

All right.  Let me hear from the appearances from the plaintiff's side first.

MS. GRANT:  Good morning, Your Honor, Kyla Grant from Saxena White on behalf of the plaintiff.

MS. PITRE:  Diane Pitre from Saxena White for plaintiff.

THE COURT:  All right.

MR. HOOKER:  Mr. Hooker from Saxena White on behalf of lead plaintiff.

MR. LITTRELL:  John Littrell for the plaintiff.

MS. GRANT:  Your Honor, let me also introduce, we have a client representative here today.  This is Trace Rankin who is the executive director of Oklahoma Fire.

THE COURT:  All right.  Thank you.  For the defense?

THE REPORTER:  I can't hear you.

UNITED STATES DISTRICT COURT

THE COURT: Please use the microphone, you should know about that by now.

MR. RHOW: Good morning, Your Honor. Ekwan Rhow behalf of the defendants.

THE COURT: All right.

MS. SOLOWAY: Good morning, Your Honor. Audra Soloway from Paul Weiss also on behalf of defendants.

MR. KRAMER: Dan Kramer from Paul Weiss for the defendants.

MS. BUNTING: Kristine Bunting from Paul Weiss for the defendants as well.

THE COURT: All right. We are here on the motion to dismiss the second amended complaint.

I issued a tentative on this, I presume both sides have seen it?

MS. GRANT: Yes, Your Honor.

THE COURT: Does somebody want to argue something?

MS. GRANT: Yes, Your Honor.

THE COURT: All right.

MS. GRANT: Your Honor, Kyla Grant for the plaintiff.

Your Honor, we have reviewed your tentative order, and while plaintiff disagrees with the order, in general, I'm going to focus my comments today on defendant Gorman's statements in April --

THE COURT:  It might be better if you take your mask off.  I can hear you better.

MS. GRANT:  I'm going to focus my comments today on defendant Gorman's statement in April of 2021.

Would Your Honor -- plaintiff agrees with Your Honor's tentative order that statement was materially false and misleading, and this was defendant Gorman's statement stating that a majority of the company's direct response advertisers had successfully implemented SKAN, which was Apple's alternative ad tracking tool to IDFA.

And I will be focusing on Your Honor's analysis of that statement.

I wanted to start with the core operations analysis.  Your Honor described that as a close call on page 37 of your tentative order.

Particularly, with respect to the absurdity analysis, under the core operations doctrine there are two ways to show scienter.

One, is actual access in this case defendant Gorman had actual access to the information that you were speaking about --

THE COURT:  You have to speak slower, only I can speak that fast.

MS. GRANT:  My apologies, Your Honor, I will slow down.

And the other prong is absurdity, which is where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.

And I will just note that under the absurdity prong, that is an independent basis to find an inference of scienter.  Plaintiff does not need to show actual access to the information if the absurdity prong applies.

So I would just first like to set the context for defendant Gorman's statement, which I think is important here.

As Your Honor acknowledged in the tentative order virtually all of Snap's revenue during the class period, 99 percent, 98 percent during the class period was dependent upon advertising revenue.

The majority of this revenue was for so-called direct response advertisers, and these were ads that pop up in the SnapChat ad where a user has to do something, has to click on the ad or download an app.

IDFA was an ad tracking service that Apple provided that was critical for these advertisers, it allowed them to track user's activity, which ads they click on, which products did they purchase.  Were these ad campaigns effective, were they ineffective, and they were able to do that in realtime.

THE REPORTER:  Slow down.  I don't understand what

UNITED STATES DISTRICT COURT

you are saying.

MS. GRANT:  I apologize, I will slow down.

Prior to the class period, Apple announced these privacy changes that are known as ATT app tracking transparency changes.  I will refer to them as ATT.  And these changes were going to discontinue the automatic tracking under IDFA.

So the main change here was that after the changes were implemented, now a user was going to get a pop-up window on their screen and they would choose to opt in or opt out -- do you allow this ad to track -- this advertiser to track or not.

And the expectation of the market and the industry was that most users were going to opt out; most users are going say no, I don't want to be tracked because most users are concerned about their privacy and they would rather not be tracked.

So this is where SKAN comes in.  Apple rolled out SKAN at the same time and SKAN was supposed to be this alternative tracking tool to IDFA.  It was supposed to allow companies like Snap to track the opt out.

Again, the expectation was that most people were going to opt out.

So SKAN was absolutely critical for Snap's business, which again, was almost virtually entirely dependent upon this advertising revenue.

**UNITED STATES DISTRICT COURT**

So whether or not SKAN work was critical with whether or not how well Snap could weather these changes.

So, during the class period, the company is obviously talking about the changes and talking about SKAN and talking about what is going to happen, and I will just note in terms of the absurdity analysis, under the core operations theory, the defendant Gorman had over 20 years of experience of the advertising industry.  She served as the chief business officer of Snap.

She was directly in charge of global advertising sales of the company.  She was in fact brought in specifically to oversee Snap's advertising teams.  This was her role.

When the class period began in February 2021, she held herself out as being the point person with Snap's advertisers.

She described her communications and direct conversations with advertisers about the ATT changes and about what the impact was going to be.

So, the timing of her statement on April 22nd, 2021, and I will just note that just two months prior to that statement, Snap held its first analyst day, and that was February 23rd, 2021.

And during that analyst day, the company announced this very bullish growth projection of 50 percent plus annual growth for the next several years.

So just two months later, the next time that investors heard from Snap about the ATT changes was during this April 22nd 2021 call.

I will also note that just after Gorman's statement she made her statements basically simultaneous within a few days before the ATT changes were about to be rolled out, and the market was hyper-focused on whether or not SKAN worked, because again, everybody expected when the changes were rolled out, most people were going to opt out.

That wasn't a surprise to anybody.  Everyone expected that to happen, so the question in investors' minds was:  Does SKAN work.

So during this April 22nd, 2021 first quarter earnings call Gorman makes this statement, and she says: Apple's delay in rolling out the changes had benefited the company, and I'm quoting her now:  The fact that these changes are coming later than we anticipated has provided additional time to adopt Scan and begin implementing and testing with our partners.  Advertisers that represent a majority of our direct response advertising revenue, and again, the direct response advertisers are the critical advertising cohort for Snap.

Direct response advertisers are basically responsible for all of Snap's growth, for why it's so competitive as a social media platform.

She quantifies it:  Advertisers that represent a

majority of our direct response advertising revenue --

THE COURT:  You need to slow down.

MS. GRANT:  Okay, I'm sorry.

Advertisers that represent a majority of our direct response advertising revenue have successfully implemented Scan for their Snap campaign.

So first, I would say the Court rightfully held this statement that was --

THE COURT:  Let me stop you.  You are obviously reading, which I don't mind because actually that is very good, but just read slower.

MS. GRANT:  Okay, Your Honor.

So plaintiff agrees with the Court's tentative order that the Court rightfully held that this statement was materially false and misleading.

I just want to note for Your Honor that this was not an optimistic statement that didn't pan out.  This was a concrete past tense statement.

Gorman specifically quantified that it was a majority of advertisers that represent our direct response advertising revenue that successfully implemented SKAN.  She specifically quantified it, and the analysts noted that.  They said 50 percent plus, 50 percent plus have successfully implemented SKAN.

She also didn't just say that they have

implemented SKAN, she said successfully implemented SKAN for their Snap campaigns.  They successfully implemented it for their Snap campaigns implying that they are successfully using SKAN as an alternative tracking tool for their Snap campaigns.

Defendants have made several points, falsity and also scienter about how she only meant that it was set up for use, and at this time, these advertisers were still using the old stuff so they had no idea how SKAN actually worked.

I just wanted to note that Gorman did not include any of those qualifications in the statement that she made and that she had every opportunity to do so.

And how do we know that?  Because later on this call, an analyst directly asked her, saying:  First, you referenced the successful implementation of SKAN for certain Snap campaigns with your partners.  I am curious what defined the success -- again, this analyst is focused on the word, "success," what defined the success of that implementation?  Do you expect this to mitigate some of the IDFA headwinds that have been a source of investor concern?

At this point in time Gorman had every opportunity to qualify her statement.  She could have said, I only meant that it was set up for use.  They have only downloaded it, but they haven't tried it out yet.

She could have said the advertisers aren't really using it yet, they are still heavily relying on IDFA -- they

really haven't --

THE COURT:  Slower.  I feel like Hannibal Lecter, slower, Clarice.

MS. GRANT:  I am a fast talker.

So she had the opportunity to qualify her statement here.  She could have set up for you, she could have said they are still relying on the old legacy systems and she didn't say that.

THE COURT:  What did she exactly say?  Refresh my recollection.

MS. GRANT:  Your Honor, I will do so.

She instead said, in direct response to this question about whether implementation would mitigate the IDFA headwinds, she repeats that the change happened later than we expected, gave us more time to prepare.  SKAN is apart of that, and then she says:  We are really pleased to see -- really pleased to see -- indicating her own personal knowledge and witnessing of this, I will note, really pleased to see that advertisers that represent the majority of our direct response revenue have implemented SKAN so far.

So she repeated herself.  She didn't qualify the statement in any way, the defendants have included in their briefing.

THE COURT:  But at that point in time, she didn't say "successfully implemented," she just said "implemented."

UNITED STATES DISTRICT COURT

MS. GRANT:  That is true, Your Honor, but she didn't qualify her earlier statement saying "successfully implemented" and she said:  We're really pleased to see that advertisers that represent the majority of our direct response revenue have implemented SKAN.

THE COURT:  I suppose you could make the argument that the questions from I guess the individual who questioned her at that point in time was directed towards what she meant by "successful implementation."

She doesn't respond, at that point in time, she just says "implemented."

MS. GRANT:  Yes, Your Honor.  He did frame that in his question, and that is likely the reason why she didn't repeat "successful implementation."

But you could also see how the market took it. By the way, this wouldn't have been lost on Gorman.

Again, this is very material threat to Snap.  ATT is an existential threat to Snap as a company.

Virtually all of their revenue depends on advertising.  These changes are about to be rolled out.  They just made this 50 percent plus revenue growth projection for the next several years.

So when she says that a majority of our most critical advertising cohorts successfully implemented SKAN cannot be lost on her that this was a material statement that

analysts and investors were going to pay attention to, and in fact, they did.

First, by this analyst immediately seizing upon her statement and wanting to know more; and second, by the plethora of analyst's reports that quoted what she said and concluded that the risk wasn't likely not material because of what she said.  I am quoting from a True Security's report.  IDFA's impact not likely material, Truist again, all this shit helped mitigate against a meaningful adverse outcome for Snap.

THE COURT:  Slow down again.

MS. GRANT:  Guggenheim:  The company did not experience monetization impacts from Apple's ongoing ATT changes.

JMP:  We view ATT changes as less than of a risk than previously.

And upon seeing this market reaction, it's not as if defendants issued a corrective statement or qualified later what they said.

They never did so.  They continued to say that everything was going just smoothly, the transition was going smoothly.

I will also note that just to emphasize --

THE COURT:  In other words, this simply boils down to the word "successfully," doesn't it?

MS. GRANT:  Your Honor, I would say it boils down to

the entire context.  Again, it's a critical time and successfully implemented SKAN, what could that mean?  You see what the analysts interpreted it to mean, and how else were they supposed to interpret it?

She could have said "just implemented."  She could have said set up for use.  She could have said we don't really know yet, they are still relying on the old stuff.  She could have said the first part of the sentence.  We had additional time to begin implementing and testing with our partners.  She could have stopped there.  She didn't.

She made a very material statement, concrete quantification that a majority of our direct response advertising --

THE COURT:  What would successfully implement actually mean at that point, because she wouldn't have known whether or not it was successful or not.

MS. GRANT:  Your Honor, at this point, I would just note that SKAN has been -- it's true that the ATT rollout hasn't happened yet.  Again, that is that pop-out window -- are you going to opt in or opt out?

SKAN has been rolled out for Apple for months.  This is what they have been doing.  Every single time it delays, they are testing it.  She is saying here, we're testing it with out partners.  They are testing SKAN's capabilities.

Whether or not SKAN worked as an ad tracking

tool, it didn't have to wait the rollout, it doesn't have the same capabilities as IDFA asks the question.

THE COURT:  But SKAN wasn't the defendant's program.  SKAN was somebody else's program, and so what was the comment in the industry about SKAN's success right at the time?

MS. GRANT:  Your Honor, I don't think anybody knew SKAN's success rate at the time.  I do know that Snap is an outlier in making a statement of this nature about SKAN, about a majority of its advertising clients successfully implementing SKAN.

Companies like Facebook were warning about this.  They weren't saying that SKAN was going to make everything fine, but SKAN had been out for months.

Yes, it's Apple's product, but they say in the public statements, we're working closely with Apple to understand this, and we're working closely with Apple to implement SKAN.

THE COURT:  What was Apple saying about SKAN at the time?

MS. GRANT:  Apple said, it's going to work as an alternative.  It will let you track users on an aggregated basis.  Apple was, of course, promoting its alternative solution.

THE COURT:  Well, couldn't one interpret the phrase "successfully implement" SKAN as being -- they have loaded it

up SKAN, and it's going to do hopefully what Apple is saying it is supposed to do, in which case, it will accomplish this purpose.

Why can't one say that that's a reasonable interpretation of what Gorman was saying at the time?

MS. GRANT:  Your Honor, I would say that Gorman did not say those words.  She did not qualify it.  She did not explain what it meant.  An analyst directly asked her, what defined -- he actually used the word "defined," what defined the success --

THE COURT:  Yeah, but when she responded to that one, she didn't use the word "successfully implemented."  She just said, well, they have implemented it.

MS. GRANT:  She didn't just say, well, they have implemented it.  She said we're really pleased to see that a majority of our direct response advertisers, again, the most critical advertising cohort Snap has, successfully implemented SKAN.

THE COURT:  Well at best, you are saying that, you know, she was not being truthful because I guess the defense had an expectation that SKAN would be this wonderful Savior of their industry, and it turns out it wasn't.

MS. GRANT:  Your Honor, but her statement was not projecting, it was not optimistic, it was not hopeful.  It was a concrete statement about what had already occurred.

She said first before that, that the delay had provided them additional time to implement and test SKAN with their partners implying they had already done the implementing and the testing, and then she says advertisers that represent --

THE COURT:  But the problem is, I think at this point in time, what you are saying is that nobody knew how successful the SKAN would actually be, because it hadn't really gone through that entire process.

Had SKAN actually worked, then whatever she said wouldn't have been a problem, but SKAN apparently did not work.

MS. GRANT:  I just want to point out that SKAN did not work at all.  It destroyed the tracking capabilities.  They were not able to track their ads in realtime; they weren't able to see what users were doing; they were basically blinded.

THE COURT:  Well, what you are basically saying is that the defendant, or at least Gorman, was reckless because she relied on the expectation of SKAN's success, and there wasn't any evidence to base, you know, success at that point in time because nobody knew exactly what SKAN was capable of or if it was capable of doing that which Apple had said.

MS. GRANT:  Yes, Your Honor.  I would agree with that statement.  I think they effectively admitted after the class period when they do qualify that earlier statement a lot more, saying, we only saw a few initial positive signals.  We

**UNITED STATES DISTRICT COURT**

didn't really know anything at that time.  Everyone was still using the old stuff, nobody was trying out SKAN by itself.

But there was testing that had been happening, there was testing that had been going on, but yes, I would agree with Your Honor, it was deliberately reckless for her to say that at a time where she didn't have a basis to do so.

If she was confused about how the market took it or was going to take it, and I would argue she wasn't, you can see it in the analyst's reaction.

Your Honor, we do have some slides showing the analyst's reaction, I don't know if you are interested in seeing them, we can provide them to you.

THE COURT:  I presume the slides -- you have them in a booklet form?  I presume the defense -- you have given a copy to the defense?

MS. GRANT:  Yes.

THE COURT:  All right.

MS. SOLOWAY:  No.  We have not seen the slides.

MS. GRANT:  We are just handing it to them now.

THE COURT:  Well, you can see them now.

MS SOLOWAY:  Yes, thank you.

THE COURT:  Can you give a copy to my clerk as well?

MS. GRANT:  Yes.  The only thing I will note about the analyst's reaction, which is not on the slide, but there were also analysts that concluded this because of this, that

50 percent growth projection now looked achievable.

Now, they think it's achievable.  It seemed kind of bullshit first, but now we think they are going to do it. That is from a JMP report and also the Truist report, which I can provide Your Honor if you would like to review that.

It basically led to credence to this projection that they had given.

THE COURT:  I understand your position on this stuff.

Let me hear a response from the defense.

MS. SOLOWAY:  Your Honor, do you mind if I remove my mask while I speak?

THE COURT:  Sure.

MS. SOLOWAY:  Thank you, Your Honor.

So look, I think the place where defendants agree with plaintiffs is that we should be laser focused on April 22nd, 2021, because under Your Honor's tentative, that really is the only area in this case where there is any question raised about an allegedly false and misleading statement.

So, turning to the scienter analysis, Your Honor, that means we have to focus like a laser on what it is that Ms. Gorman allegedly knew in April of 2021 about SKAN and advertisers' reactions to SKAN at that time.

Now, the plaintiffs have focused on the core

operations doctrine, and in particular, on this absurdity prong.

But what the Ninth Circuit was very clear on, Your Honor, is that absurdity requires the plaintiffs, nonetheless, to plead either that there was actual access -- I think the plaintiff said this -- or that it would be absurd to suggest that Ms. Gorman at the time did not know, and here, I think the way you would frame the question is, that advertisers were having issues with SKAN, because if successfully implement means put it into place and/or happily using it, then the question is, what did Ms. Gorman know in April of 2021 that they were not in fact putting it in place and also satisfied with the results that they were getting from it.

THE COURT: How could she have possibly thought that they were satisfied with the results?

MS. SOLOWAY: Exactly, Your Honor. That is exactly the problem, because in April of 2021, there are no facts pleaded that any advertiser had expressed concern that had made its way to Ms. Gorman that suggested that they were not satisfied with SKAN at that time.

In fact, this is before the rollout has even happened, this is before --

THE COURT: Well, had anybody -- nobody had made a determination as to SKAN's success and whether or not it would be successful, so, therefore, when she says that a sustainment

in regards prior problems, saying, well, SKAN is being used and SKAN has been successfully implemented by X percentage of advertisers or whoever is going to use it, if she doesn't know what the results of using SKAN will be, why is she talking about this at all?

MS. SOLOWAY:  Well, Your Honor, I think at this stage, and you know our interpretation of the statement of what does it mean to implement something is that it means that advertisers representing a certain amount of direct response revenue, which is just one of the revenue streams had implemented the tool, meaning they had put it into place.

As Your Honor pointed out, when she was asked on that conference call:  What does it mean to successfully implement something, she said "implemented."

Now, Your Honor said "implement" is a word of capable of multiple interpretations, and the plaintiffs interpret "implement" as put it into place and are in fact relying on it.

We interpret implement as putting it into place at a time before the rollout has happened, and before this new system, the ATT system has even been pushed to people's iPhones which doesn't happen until the summer.

So there is obviously a divergence of opinion here about what the word "implement" even means in this context and therefore, what "successfully implement" means.

But I think the critical point here, Your Honor, is that the complaint is lacking factual allegations from either the CW or from the purported admissions at the end of the class period that Ms. Gorman would have had any cause for concern at the time that the April statement was made.

If successfully implemented as the plaintiff's claim means more than putting it into place, then what did she know in April of 2021?  That, Your Honor, is what the problem is.

Neither of the two CWs in this case can speak at all to what Ms. Gorman knew in April of 2021, right?  The first CW, who is the one who worked in the gaming vertical of the company's business and said purportedly that very few advertisers had put it into place, early, like, during the 2021 time period, that particular CW isn't alleged to have ever spoken to Gorman, and in fact, she doesn't even have company-wide information because CW-1 works in one vertical, the gaming business, and she doesn't even know what the full direct revenue -- so, Your Honor, you will recall the actual statement by Ms. Gorman isn't that a majority of advertisers put this into place, but rather, advertisers representing a majority of direct response revenue.

CW-1 doesn't speak about direct response revenue. In fact, she doesn't even have company-wide information.

So CW-1 clearly can't be the source of any

conflicting information.

THE COURT:  Well, let me ask you, had advertisers that represent a majority of defendant's direct response advertising revenue, had they implemented Snap -- I'm sorry, SKAN?

MS. SOLOWAY:  Yes, Your Honor.

What Ms. Gorman is talking about, just to take a step back, isn't the total number of advertisers.

THE COURT:  The statement -- I'm looking at the statement -- the statement is that advertisers that represent a majority of our direct response advertising revenue has successfully implemented SKAN for their Snap campaign.  That is what she said.

MS. SOLOWAY:  Correct.

THE COURT:  So the question is, is that in and of itself a correct statement, and you are saying it is correct because it is describing the fact that if one looks at the number of direct response advertising revenue, you know, what is it -- participants in Snap, well, they have done that.

So you are saying that that is not incorrect or false.

MS. SOLOWAY:  That's exactly right, Your Honor.

So one of the issues that we raised in the papers, Your Honor, is we believed that successfully implement means getting this piece of software put into place, it has a

pipeline, it has to connect between Snap, it has to connect with the advertiser, it's something that is happening across the industry, but in order to get their advertisers ready, Snap has to have their advertisers actually implement -- put this thing into place.

Even, Your Honor, if you assume the word "implement" is capable of multiple interpretations, and here the plaintiffs we think are arguing that implement means not just putting this into place, but advertisers are actually relying on it, even though the rollout hasn't happened, and even though no advertiser has been forced yet to rely on the new system, because all of the old legacy systems still remain in effect.

THE COURT:  I think the argument is:  One, is as to whether or not the statement in and of itself is actually false.

MS. SOLOWAY:  Exactly.

THE COURT:  And the second question is if one says that yes, it is false in the sense that one says that successfully implement does sufficiently imply this, there is a question of whether or not Mr. Gorman had the requisite scienter at the time the statement was made such that she knew or should have known, that yeah, it's false.

MS. SOLOWAY:  I think those are two different questions.

THE COURT:  They are two questions.

MS. SOLOWAY:  They are.  Going to the falsity question, though, Your Honor, what I was pointing out is there is a disconnect between what CW-1 says, which is that in CW-1's visibility, she saw very few adoptees of SKAN, and what Ms. Gorman said, which was speaking about advertisers that make up a certain percentage of a certain revenue stream, so, what I'm saying, Your Honor, is we don't think the statement has been pleaded to be factually false, no matter how you interpret the words "successfully implement."

But then, Your Honor, as you correctly point out, there is this separate scienter issue.

And I want to make just a couple of points on the scienter issue that I think sort of augments some of the findings that Your Honor made in the tentative.

One of the reasons that the core operations doctrine exists is because there is certain information that you might assume senior people at companies know.  But it's still a very high standard, Your Honor, to prove that someone knowingly deceived investors about something.

So the Ninth Circuit -- you could look, Your Honor, I think the most recent articulation is in the *Prodanova* case says it is still a high burden of proof because the plaintiffs need to prove by specific admissions by the executives that they were involved in the details, with respect

to that particular issue here, it would be the implementation of SKAN and advertisers purported dissatisfaction with it, or that the executives were specifically involved in producing the false reports.

So here, we think Your Honor correctly held in the tentative that that standard isn't met because there are no allegations showing that Ms. Gorman had any knowledge about these outside third-party advertisers reactions to SKAN as of April of 2021, which is when even CW-1 agrees this is just being launched, and we, of course, know that Ms. Gorman is saying we're just beginning testing this with our partners.

So the question is what could she have even known?  Even CW-1 says this is at the very beginning of the launch of the product.

But I think there is another very important problem here, Your Honor.  Very often in core operations cases, it's because there is some significant issue that is so impactful on the company's revenue stream that Courts will make an assumption, they will link something with something else.

Here, we are talking about April, no CW and the plaintiffs do not allege that any issues with SKAN are having any impact on Snap's revenue in April of 2021, when the statement is made.

So the presumption that the plaintiffs are asking you to adopt, Your Honor, is that this is so central that

Ms. Gorman would have somehow known that these third party advertisers were dissatisfied with this product when it's not having any revenue impact whatsoever in April.

In fact, Snap meets its quarterly projections for that quarter. April is, of course, the first month in the second quarter, and Snap meets its revenue projections. There is no alleged revenue impact from this transition to SKAN during that quarter.

THE COURT: Well, I mean, there is an event happening on the horizon, and even though you said, well, they made it this far, but again, this is a major thing on the horizon.

MS. SOLOWAY: There is, Your Honor, but when you get to the third quarter, which is the June/July time period when the product is actually pushed out to people's phones, that is when Snap misses its guidance by .3 percent in the quarter.

So the revenue impact that the plaintiffs are talking about is part of the so-called corrective disclosure in this case, isn't alleged to have happened until months after Gorman made the alleged statement.

All of that, I think, supports, Your Honor, the proposition that we can't just assume Ms. Gorman's knowledge in April, which is at the very beginning of the launch of SKAN, as even CW-1 admits in the complaint.

So I think the core operations doctrine just

doesn't help the plaintiffs on that point.

And then what we know from the Ninth Circuit law, you still have to take a step back, Your Honor, even with the core operations doctrine at play, and you have to ask yourself if I take all of this holistically, taking all of the facts we know about Ms. Gorman and all of the facts we know about the April time period, is there enough to believe that there is strong inference of fraudulent intent, an inference that she intentionally deceived investors that is more compelling than a non-fraudulent inference.

The fundamental problem is, Your Honor, that Ms. Gorman is the speaker of many of the cautionary statements that Your Honor describes throughout the decision.

So as Your Honor noted in the tentative, Snap right at the beginning of the class period, starts issuing really significant cautionary language to shareholders about the fact that this is going to be a major change for the industry, that it's going to have an uncertain revenue impact and starts warning its shareholders about it.

Ms. Gorman herself is the speaker of I think we counted them between February, April, and July, eight of the alleged cautionary statements that are made by Snap over that time period are actually things that Ms. Gorman herself is saying on calls.

So it's inconsistent with any intent to deceive

shareholders that she also is issuing those types of cautionary words, including things like, we know there is a lot of work to be done to transition smoothly, changes to this ecosystem are usually disruptive and the outcome is uncertain.

And she reminds everyone repeatedly that it's very early in the adoption of these changes, and that everyone is continuing to learn and adapt to them.

So if she intended to mislead shareholders, you know, it's totally inconsistent with constantly reminding people how uncertain it is and how long it's going to take for everyone to understand this --

THE COURT:  Well, I understand, but it is kind of like a disconnect between the law -- I mean forward -- what do you call it -- forward leaning statements -- and as long as you have sufficient -- I can't remember the catch word for this stuff.

MS. SOLOWAY:  Cautionary language, Your Honor.

THE COURT:  Yeah, cautionary language, that always struck me as somewhat strange, but it is what it is.

But I think the problem is that there is a difference between the forward -- is it forward leaning --

MS. SOLOWAY:  Forward looking, Your Honor.

THE COURT:  Forward looking, and the cautionary is different from the situation where there is supposedly actually something that is a statement of factual statement, so there is

a distinction there.

And what the plaintiff is arguing at this point in time when she makes this statement, she may have made the forward looking statements with cautionary -- sufficient cautionary language, but this statement is not forward looking, so therefore, you don't use it with the same type of analysis.

Therefore, the question is taking this statement in and of itself, how are we supposed to look at it and weigh it?

But conversely, however, again, there is a lot -- also cautionary language from the Circuit, especially in regards to scienter, what you are supposed to do.

So I understand, but let me just put it this way, the tentative is here, what everybody said so far hasn't caused me to change my tentative, but it just -- what I find usually in these types of situations or these types of cases, what I have always said, was that they file a first complaint, it's 90 pages, and it gets dismissed, and then the next one is 180 pages, and therefore, sometimes when it gets around the 270 mark, the Courts will say, oh, I think there is enough now, that is the way the Ninth Circuit seems to phrase these things.

But let me put it this way, I have pointed out my problems with the plaintiff's case.  I'm not saying the plaintiffs cannot amend, because obviously, I'm giving the plaintiffs an opportunity to amend, but I am saying these are

the issues, these are the problem areas that I see in this case going forward and whether or not the plaintiff can amend sufficiently, I will have see when they try to amend.

MS. SOLOWAY:  Understood, Your Honor.

Actually, your observation about how these complaints tend to multiple in size over time, prompts a request for clarification from me, Your Honor.

We think it would be really constructive in the next round of briefing to focus like a laser on what is left in the case, and the statements that are forward looking, that are accompanied by sufficient cautionary language, the puffery statements, none of that is actionable as a matter of law.  We would like to clarify that in the next round of briefing, we should focus on what is left.

THE COURT:  Before I say yes to that, let me ask the plaintiff's counsel, you haven't made any of the arguments about puffery, forward looking, cautionary language.  I have said something very strong on this point.

Are you guys going to be arguing against that position at this stage?

MS. GRANT:  I don't know that we have abandoned those statements.  We didn't choose to focus on them for purposes of this hearing.

As you stated, your tentative order was worded very strongly, but I wouldn't be prepared to say right now

we're completely abandoning those statements.

THE COURT:  All right.  I can't force them at this point.  I have given them leave to amend, although, what we could say is that -- let's put it this way, I'm giving them the opportunity to even amend that portion, because if you have some different approach, then I would be willing to look at it.

I will just simply allow them to amend as they see fit.

MS. SOLOWAY:  Okay, Your Honor.  When we see the complaint, if we think there is some reason to raise concerns about how that gets briefed, we will just raise it with you at that time.

THE COURT:  Sure.

MS. SOLOWAY:  Your Honor, do you have any other questions?

THE COURT:  I have lots of questions, I just don't know if you can answer them.

MS. SOLOWAY:  I would do my best to try, sir.

THE COURT:  What are the winning lottery numbers? How does electricity work?

MS. SOLOWAY:  Your Honor, I have three sons who were all born on the third of the month, so three is our lucky number in my family, so I will share that with you for what it is worth.

THE COURT:  I like three as well.  I like five and

eight as well and 47.

MS. SOLOWAY:  I'm a big believer in three.  Thank you very much, Your Honor.

THE COURT:  Plaintiffs, anything else you want to argue?

MS. GRANT:  Yes, Your Honor.

Your Honor, just first, briefly on the falsity point, obviously, we agree with your tentative order on that point.

I would just say that this -- the question at the time she makes this statement is right before the ATT roll-out is whether or not SKAN works as an alternative tracking tool.  This is what they have been testing it for, and to go to CW-1, actually that is what CW-1 describes.

THE COURT:  You need to go slower.

MS. GRANT:  I apologize, Your Honor, it's engrained in me.

THE COURT:  Let me stop, take your mask off and go slower.

MS. GRANT:  Okay.  So CW-1 describes in April of 2021, this is what the advertisers are doing.  They are testing SKAN, they are seeing does it work, does it have ad tracking capabilities, and what they concluded, according to the advertisers that CW-1 was working with, was that it didn't work.  That's why they dragged their feet implementing it.

They didn't want to implement it.  It didn't have any of the tracking capabilities that IDFA had.

THE COURT:  Did Gorman know that at that point?

MS. GRANT:  Your Honor, we would say because of what she said, two choices:  Either she knew that SKAN didn't work and she spoke to this again, personally she's speaking about it and I will get back to that in a minute, when I get back to core operations, but either she knew it didn't work and that she had no basis to say what she said, or she didn't know and she still had no basis to say what she said.

THE COURT:  Well, but then again, that gets to the point where those things she supposedly said there was a successful implementation.

And I suppose if one were to take the most charitable view of that is that it may be correct, and they are not talking about all of the participants, they are only talking about -- limited to the majority of the direct response advertising revenue.

MS. GRANT:  Yes, Your Honor.  Direct response is over half of their advertiser revenue.  It's the most critical group of advertisers at Snap.

THE COURT:  Yes, but if in fact a majority of their direct response advertising clients have implemented Snap, well then, is that factually wrong?

MS. GRANT:  Your Honor, first, I would say it's a

fact issue at this stage.  Their interpretation versus ours.
It is a fact issue --

THE COURT:  Actually, at this point in time, however, I think the requirement is to show a falsity aspect of it.

You can't say, well, you have to do discovery on whether or not that is false, unless there is some basis for thinking that it's false, and I presume that would be what, for example, one would use a confidential CW for.

MS. GRANT:  Yes, Your Honor, we did use CW-1 for that purpose and also defendant's admission at the end of the class period, and again, this is in Your Honor's analysis and the tentative order.

THE COURT:  Let me stop you.  How many times do I have to say slower?

MS. GRANT:  I apologize, Your Honor.

THE COURT:  Your arguments aren't bad, it's just that when you say them so fast, I can't keep up with them, let alone my reporter.

MS. GRANT:  I apologize, Your Honor.

In your tentative order, one of the things that you point out are defendant's admissions at the end of the class period where Gorman admits that as the advertisers are exploring and testing SKAN, which, by the way, she said they were doing in April, they surfaced a variety of concerns.  The

advertisers weren't able to understand the impact of their campaign anymore.  They couldn't target advertising based on whether people installed an app.  They couldn't evaluate the success of their ads in realtime.  These were critical capabilities for them.

In other words, SKAN didn't work at all, seeing how it compares to IDFA, it wasn't a close call SKAN didn't work, it rendered them blind.

THE COURT:  When you say tested, the defendant wasn't testing, Apple was testing.

MS. GRANT:  No, Your Honor.  Gorman is talking about Snap testing with its advertisers, that is what she says in her response of 2021.

THE COURT:  Let me hear a response to that contention.

MS. SOLOWAY:  If you actually look -- Your Honor, let me speak into the microphone -- Your Honor, if you actually look at what CW-1 actually said, and this is in Paragraphs 76 and 77 of the complaint, first of all CW-1 only has limited visibility into one vertical out of 12 out of the entire company, so it doesn't have visibility into this broader issue, which means she can't possibly be the basis on which we say the whole thing didn't work and everyone hated it.  She would have no way of knowing that.

But what she actually says is the performance of

SKAN was terrible and there were very few adoptees in Q1 and Q2 of 2021.

She then goes on to say from day one when SKAN support launched, right when it launched in April 2021, I did not find it to be effective, and that is her opinion from the time it lunched, it was effective.

THE COURT:  What about Apple?

MS. SOLOWAY:  That is the question, Your Honor. SKAN is an Apple product.  It's being rolled out by Apple. Snap is only one of many app companies across the country who were trying to figure out what alternate solutions to put into place, now that these ATT privacy changes are going into effect.

There is no allegation here from CW-1 or otherwise that -- excuse me, Snap had some unique knowledge about SKAN's limitations as of April other than CW-1's opinion, quote, the performance was terrible, you know, that others would not have had in the industry.

I mean, CW-1 is offering an opinion that from the time it launched in April, it was terrible, but that is a third-party product and there is no allegations she shared that with Ms. Gorman, and with respect to the end of the class period when Snap comes out and says it didn't scale the way we hoped it would, that happens after April.

What they are saying is that as we have had to

rely on this third-party measurement system, as this is rolled out to the group and as people have lost the ability to rely on IDFA, advertisers have lost of the ability to rely on IDFA, we have discovered limitations on SKAN's capabilities.

That is not an admission that Gorman knew in April that SKAN had those limitations.

And I understand Your Honor is inclined to adopt the tentative and give plaintiffs another round for leave to rebrief this, but neither of their CWs have any line of visibility into that issue.

One only worked for one portion of the company and had very limited visibility, and the other one is somebody who alleged participated in one meeting a quarter where they talked about forecasting, and that CW isn't alleged to have known anything about SKAN implementation or even to have worked in the advertising business.

THE COURT:  I understand your position.

Let me ask you this question that I didn't ask you before:  Did you address -- I'm going to a totally different issue, and you can go back to whatever you wanted to argue -- but I have a question for the defense counsel, did you address the absurdity argument under the core operations doctrine?

MS. SOLOWAY:  Yes, Your Honor.

I think the absurdity doctrine under the core

operations doctrine nonetheless requires the plaintiff to either provide specific admissions by the executives that they were involved in the details of the company's operations or witness statements that the executives were specifically involved in producing the false reports. That is language, Your Honor, from the Ninth Circuit's decision in *Prodanova* which is a fairly recent Ninth Circuit case on this.

THE COURT: Are you saying at the end that the present situation would not fall within the theory?

MS. SOLOWAY: Either of them, Your Honor.

Neither were there admissions nor were there CWs who had visibility. Again, laser focused on April 2021 time period and what Ms. Gorman herself is alleged to have known, there is no CW who offers any insight into what she would have known, again, about a third party advertiser's reactions to this product.

THE COURT: Let me ask, is it the defense's position that at this point the only thing that the plaintiffs can go forward on is the April 22nd call? There is nothing else that they can --

MS. SOLOWAY: It is, Your Honor.

THE COURT: -- base a claim on?

MS. SOLOWAY: It is, Your Honor. And the reason for that is the other statements that Your Honor addressed in the opinion are either forward looking statements that were

accompanied by meaningful cautionary language, which in and of itself means that there is nothing the plaintiffs can say to change that, right?

If they are forward looking, they are forward looking, and if they are accompanied by cautionary language, they are accompanied by it, so that is not going to change in the next round of briefing.

Then the other statements Your Honor held or puffery, which means they are immaterial as a matter of law, so that was actually why I asked Your Honor for the clarification. I just was hoping we could have another round of briefing in this case if it's necessary where we focus like a laser on what is really left.

THE COURT:  They may be able to say something else that would cause me to rethink my initial position.

MS. SOLOWAY:  Look, it is our position, Your Honor, that as a matter of law if the --

THE COURT:  Let me put it this way, it may be very hard for them to do so after what I have said in the tentative, but I'm not precluding them from attempting to do so.

MS. SOLOWAY:  Understood, Your Honor.

THE COURT:  Let me ask plaintiff's counsel, what else do you want to argue, anything?

MS. GRANT:  Well, Your Honor, first I just want to point out on CW-1 in Paragraph 78 of the complaint, CW-1 does

describe the specific experience of the advertisers that she worked with and how they immediately experienced numerous issues severely hindering their ability to track and monitor their ads and had no insight into the performance of their ad campaign.

She goes on to describe in detail specifically upon implementing SKAN, advertisers lost access to all of the legacy data they previously collected on individual consumers and any new data they received was significantly delayed severely hampering their ability to optimize ad campaigns in realtime.

THE COURT:  But the question is, and I understand those statements, but the question is to the extent to which Gorman either knew or should have known of that and whether or not that was something that the problems as to SKAN should have been addressed or would have been addressed by Apple.

MS. GRANT:  And, Your Honor, to get to that point now which I meant to get to earlier, but getting back to the core operations, and now I'm going to talk to the access prong of it.  So we covered absurdity, but I also want to talk about actual access.

Gorman, again in her position, she was directly overseeing the global advertising sales of the company.  She also made numerous public statements during the class period demonstrating her intimate and direct involvement in overseeing

43

the transition to SKAN, and the ATT changes, generally.

So on the February 4th, 2021 earnings call, for example, she described working really closely with Apple to implement SKAN.

She said we have been communicating very well with advertisers, and educating them and talking to them deeply about these coming changes to mitigate any of this.

THE COURT:  I understand she says that, the question is whether or not she said that to the members of the public --

MS. GRANT:  I'm sorry, Your Honor, could you repeat that?

THE COURT:  Whether or not she said that to members of the public such that when she makes statements about SKAN, she seemingly is making a statement not only for Snap, but also for her understanding of the success of SKAN.

MS. GRANT:  Your Honor, I'm speaking about these in terms of her direct -- in other words, she had a direct involvement with advertisers, she was the point person, she was speaking to them about this.

Even if you go to the April statements, she says it provided us additional time to adopt SKAN and begin implementing and testing with our partners.  She is speaking from a place of knowledge.  When the analyst asks her, the analyst asks her the question on the April 2021 call, he is asking what the feedback from the advertisers, what defined the

success of the implementation, and she describes the effort at length.

She says, we're really focused on helping our advertisers to make the transition.  We're really pleased to see the majority of our directors response implementing SKAN, and then she says implementing SKAN was a huge cross-functional effort between products, engineering, the sales team, the marketing teams.

She is describing this huge effort that she personally oversaw.

In July of 2021, in that call, she also talks about what she's experiencing, and an analyst is asking her what is going on, is ATT affecting your targeting, and what are the work-arounds you are seeing, what is going on.

She says this is where we are on the cycle.  We have ruled out SKAN Version 3.0.  She is speaking from a place of knowledge.

I do think this case is a lot closer to the Ninth Circuit case of *Reese* than the *Nividia* cases that Your Honor cited in the tentative order, so I will briefly run through just a few points there.

In *Reese*, the Court said that under *Tulabs* the Supreme Court imposed a duty to weigh the most plausible -- or to weigh only plausible competing inferences.

So in that case, it said here while it's possible

UNITED STATES DISTRICT COURT

that Johnson, the defendant in that case, misunderstand the data she was speaking about corrosion in the oil pipes, despite her position or have access to it, such a scenario is unlikely under the circumstances.

I would say here due to the prominence of ATT, that it was an existential threat to the company, the critical importance of SKAN and whether it worked, it may be possible that she didn't know what she was talking about when she was speaking, but it's not plausible.

Considering her position what she spoke about, that she spoke from a place of knowledge repeatedly to direct investor questions what is happening, what are you seeing, and she is describing, this is what I'm seeing. We are pleased to see that a majority of the advertisers representing direct response of revenue have implemented SKAN.

And the other points, the *Reese* case found compelling that this defendant Johnson repeatedly spoke to the press about what was going on with corrosion rates in the oil pipes.

Similarly here, Gorman did the same thing. She repeatedly spoke about what was happening with the ATT transition, what was happening with SKAN, you know, the successfully implemented statement.

THE COURT: Well again, the plaintiff has only cited to these series of statements in the April 22nd 2021 call.

UNITED STATES DISTRICT COURT

46

If you have more than that, then you should put it somewhere in the complaint.

At this point in time, apparently the only thing the plaintiffs have is the statements from the April 22nd.

MS. GRANT:  Well, Your Honor, we did plea other statements that Gorman stated.  We have a slide showing the various times that she spoke about her involvement.  I don't know if you are interested in seeing that.

THE COURT:  I don't really care about necessarily the involvement, it's the false statements that I'm primarily concerned about.

In other words, other statements about her involvement and stuff come into play once we make a determination, that yeah, these are some false statements here that we have to get resolved one way or the other.  You are saying it provides the basis for the claim or it doesn't provide a basis for the claim.

But I think what you have to start with is allegedly false statements, and that's the question.

I mean, is there anything else other than the ones that were made on April 22nd?

And then, there is only a couple of statements that are apparently the subject at this point in time, the subject of dispute.

MS. GRANT:  No, Your Honor.  We will take the

**UNITED STATES DISTRICT COURT**

opportunity to amend with respect to those statements.  We really just focused on April 22nd.

THE COURT:  If you find any other statements that can be the basis, feel free to add them in, the more the merrier.

It is what it is at this point.  I will adopt my tentative as my final.  I will allow amendment.

Let me ask, how long is it going to take for the plaintiff to file an amended complaint?

MS. GRANT:  If we could ask for 30 days?

THE COURT:  Thirty days, all right.

I will require an amended complaint to be filed by the 12th of April.

Anything else I need to discuss with you all?

MS. SOLOWAY:  Your Honor, should we meet and confer about a briefing schedule and then propose something to you?

THE COURT:  You are assuming that you are going to file another motion to dismiss?

MS. SOLOWAY:  I am, Your Honor.

THE COURT:  Talk with them first and whatever you guys agree upon, I will probably agree with you.

MS. SOLOWAY:  We will do that, Your Honor.

THE COURT:  Let me excuse you, and let me call the *Speer versus Spiegel*, and *Dodds versus Spiegel* matter.

MS. SOLOWAY:  Your Honor, I think there may have

been some confusion about whether that was happening by telephone or in person today, and I believe the derivative plaintiffs are on the telephone right now.

THE COURT:  Okay.  Are they on the telephone, Javier?

THE COURTROOM DEPUTY:  Yes.

THE COURT:  If they are on the telephone, they are on the telephone, I thought there were some people in the court for that.

All right on the Speer and Dodds matters, for the plaintiffs we have?

MS. FORTUNATO:  Melissa Fortunato for the plaintiff.

THE COURT:  All right.  Anyone else for the plaintiffs?

No?  For the defense.  The same people for the defense, right?

MS. SOLOWAY:  It's the same people for the defense.

THE COURT:  Let me just ask, we're here for status conference.  You heard what transpired.  I presume that I will just continue your matter to trail this matter, and we will see where it goes at that point.

MS. SOLOWAY:  Defendants would agree with that, Your Honor.

THE COURT:  Let me ask plaintiff's counsel, is that all right with the plaintiffs?

**UNITED STATES DISTRICT COURT**

MS. FORTUNATO:  Yes.  That is agreeable to us.

THE COURT:  I won't coordinate these matters.  I will just schedule them for the same time.  So whenever there is a motion, and I guess everybody expects another motion to the amended complaint, so I will also put your matter down for that day as well.  I obviously understand you wouldn't be participating in the motion itself, okay?

MS. SOLOWAY:  Thank you, Your Honor.

THE COURT:  All right.  Everybody, have a nice day.

Let me ask counsel in the back of the courtroom, are you guys in this case as well or are you in for another case?

UNIDENTIFIED PERSON:  This case, Your Honor.

THE COURT:  All right.  Thank you.

(The proceedings concluded at 9:54 a.m.)

* * *

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


     I, TERRI A. HOURIGAN, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date: 14th day of March, 2023.



                             /s/ TERRI A. HOURIGAN
_____
             TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                  Federal Court Reporter


**UNITED STATES DISTRICT COURT**

1

**/**

**/s** [1] - 50:19

**1**

**10** [1] - 2:5
**10019** [1] - 2:24
**10606** [1] - 2:6
**12** [1] - 37:20
**1285** [1] - 2:24
**12th** [1] - 47:13
**13** [2] - 1:13, 3:1
**14th** [1] - 50:16
**180** [1] - 31:18
**1875** [1] - 2:19

**2**

**20** [1] - 8:7
**2021** [24] - 5:4, 8:13, 8:20, 8:22, 9:3, 9:13, 20:17, 20:23, 21:11, 21:17, 23:8, 23:11, 23:14, 27:9, 27:22, 34:21, 37:13, 38:2, 38:4, 40:12, 43:2, 43:24, 44:11, 45:25
**2023** [3] - 1:13, 3:1, 50:16
**21-8892** [1] - 1:7
**213** [1] - 1:24
**22nd** [9] - 8:19, 9:3, 9:13, 20:17, 40:19, 45:25, 46:4, 46:21, 47:2
**2300** [1] - 2:19
**23rd** [1] - 8:22
**270** [1] - 31:19
**28** [1] - 50:9

**3**

**3** [1] - 28:16
**3.0** [1] - 44:16
**30** [1] - 47:10
**300** [1] - 2:9
**3100** [1] - 2:12
**33434** [1] - 2:9
**350** [1] - 1:23
**37** [1] - 5:14
**3838** [2] - 1:22, 50:20

**4**

**4311** [1] - 1:23
**445** [1] - 2:12
**47** [1] - 34:1
**4th** [1] - 43:2

**5**

**50** [5] - 8:24, 10:23, 13:21, 20:1
**5th** [1] - 2:15

**6**

**601** [1] - 2:15

**7**

**720** [1] - 2:15
**753** [1] - 50:9
**76** [1] - 37:18
**77** [1] - 37:19
**7777** [1] - 2:9
**78** [1] - 41:25

**8**

**894-2849** [1] - 1:24
**8:30** [2] - 1:14, 3:2
**8th** [1] - 2:5

**9**

**90** [1] - 31:17
**90012** [1] - 1:24
**90067** [1] - 2:20
**90071** [2] - 2:12, 2:15
**98** [1] - 6:13
**99** [1] - 6:12
**9:54** [1] - 49:15

**A**

**a.m** [3] - 1:14, 3:2, 49:15
**abandoned** [1] - 32:21
**abandoning** [1] - 33:1
**ability** [4] - 39:2, 39:3, 42:3, 42:10
**able** [5] - 6:23, 18:14, 37:1, 41:14
**above-entitled** [1] - 50:12
**absolutely** [1] - 7:23
**absurd** [2] - 6:3, 21:6
**absurdity** [10] - 5:16, 6:1, 6:5, 6:8, 8:6, 21:1, 21:4, 39:22, 39:25, 42:20
**access** [8] - 5:19, 5:20, 6:7, 21:5, 42:7, 42:19, 42:21, 45:3
**accompanied** [4] - 32:11, 41:1, 41:5, 41:6
**accomplish** [1] - 17:2
**according** [1] - 34:23
**achievable** [2] - 20:1, 20:2
**acknowledged** [1] - 6:11
**actionable** [1] - 32:12
**activity** [1] - 6:21
**actual** [6] - 5:19, 5:20, 6:7, 21:5, 23:19, 42:21
**ad** [10] - 5:10, 6:17, 6:18, 6:19, 6:22, 7:10, 15:25, 34:22, 42:4, 42:10
**adapt** [1] - 30:7
**add** [1] - 47:4
**additional** [4] - 9:17, 15:9, 18:2, 43:21
**address** [2] - 39:19, 39:22
**addressed** [3] - 40:24, 42:16
**admission** [2] - 36:11, 39:5
**admissions** [5] - 23:3, 26:24, 36:22, 40:2, 40:11
**admits** [2] - 28:24, 36:23
**admitted** [1] - 18:23
**adopt** [5] - 9:18, 27:25, 39:7, 43:21, 47:6
**adoptees** [2] - 26:5, 38:1
**adoption** [1] - 30:6
**ads** [5] - 6:16, 6:21, 18:14, 37:4, 42:4
**adverse** [1] - 14:9
**advertiser** [5] - 7:10, 21:18, 25:2, 25:11, 35:20
**advertiser's** [1] - 40:15
**advertisers** [47] - 5:8, 6:16, 6:20, 8:15, 8:17, 9:19, 9:21, 9:22, 9:25, 10:4, 10:20, 11:7, 11:24, 12:19, 13:3, 17:16, 18:4, 21:8, 22:3, 22:9, 23:14, 23:20, 23:21, 24:2, 24:8, 24:10, 25:3, 25:4, 25:9, 26:6, 27:2, 27:8, 28:2, 34:21, 34:24, 35:21, 36:23, 37:1, 37:12, 39:3, 42:1, 42:7, 43:6, 43:18, 43:25, 44:4, 45:14
**advertisers'** [1] - 20:24
**advertising** [23] - 6:14, 7:25, 8:8, 8:10, 8:12, 9:20, 9:21, 10:1, 10:5, 10:21, 13:20, 13:24, 15:13, 16:9, 17:17, 24:4, 24:11, 24:18, 35:18, 35:23, 37:2, 39:16, 42:23
**affecting** [1] - 44:13
**aggregated** [1] - 16:21
**agree** [7] - 18:22, 19:5, 20:15, 34:8, 47:21, 48:22
**agreeable** [1] - 49:1
**agrees** [3] - 5:5, 10:13, 27:9
**al** [1] - 1:8
**allegation** [1] - 38:14
**allegations** [3] - 23:2, 27:7, 38:21
**allege** [1] - 27:21
**alleged** [8] - 23:15, 28:7, 28:19, 28:20, 29:22, 39:13, 39:14, 40:13
**allegedly** [3] - 20:19, 20:23, 46:19
**allow** [4] - 7:10, 7:19, 33:7, 47:7
**allowed** [1] - 6:20
**almost** [1] - 7:24
**alone** [1] - 36:19
**alternate** [1] - 38:11
**alternative** [6] - 5:10, 7:19, 11:4, 16:21, 16:22, 34:12
**amend** [8] - 31:24, 31:25, 32:2, 32:3, 33:3, 33:5, 33:7, 47:1
**amended** [4] - 4:13, 47:9, 47:12, 49:5
**amendment** [1] - 47:7
**Americas** [1] - 2:24
**amount** [1] - 22:9
**analysis** [7] - 5:11, 5:14, 5:17, 8:6, 20:21, 31:6, 36:12
**analyst** [9] - 8:21, 8:23, 11:13, 11:16, 14:3, 17:8, 43:23, 43:24, 44:12
**analyst's** [4] - 14:5,
**analysts** [4] - 10:22, 14:1, 15:3, 19:25
**Angeles** [3] - 2:12, 2:15, 2:20
**ANGELES** [4] - 1:14, 1:24, 3:1, 50:3
**announced** [2] - 7:3, 8:24
**annual** [1] - 8:25
**answer** [1] - 33:17
**anticipated** [1] - 9:17
**apart** [1] - 12:15
**apologies** [1] - 5:24
**apologize** [4] - 7:2, 34:16, 36:16, 36:20
**app** [4] - 6:18, 7:4, 37:3, 38:10
**appearances** [1] - 3:11
**APPEARANCES** [1] - 2:1
**Apple** [17] - 6:19, 7:3, 7:17, 15:21, 16:15, 16:16, 16:18, 16:20, 16:22, 17:1, 18:21, 37:10, 38:7, 38:9, 42:16, 43:3
**Apple's** [4] - 5:9, 9:15, 14:12, 16:14
**applies** [1] - 6:8
**approach** [1] - 33:6
**April** [36] - 4:25, 5:4, 8:19, 9:3, 9:13, 20:17, 20:23, 21:11, 21:17, 23:5, 23:8, 23:11, 27:9, 27:20, 27:22, 28:3, 28:5, 28:23, 29:7, 29:21, 34:20, 36:25, 38:4, 38:16, 38:20, 38:24, 39:6, 40:12, 40:19, 43:20, 43:24, 45:25, 46:4, 46:21, 47:2, 47:13
**area** [1] - 20:18
**areas** [1] - 32:1
**argue** [5] - 4:17, 19:8, 34:5, 39:21, 41:23
**arguing** [3] - 25:8, 31:2, 32:19
**argument** [3] - 13:6, 25:14, 39:22
**arguments** [2] - 32:16, 36:17
**arounds** [1] - 44:14
**articulation** [1] - 26:22
**aspect** [1] - 36:4
**assume** [3] - 25:6,

**UNITED STATES DISTRICT COURT**

26:18, 28:22
**assuming** [1] - 47:17
**assumption** [1] - 27:19
**ATT** [16] - 7:4, 7:5, 8:17, 9:2, 9:6, 13:17, 14:12, 14:14, 15:18, 22:21, 34:11, 38:12, 43:1, 44:13, 45:5, 45:21
**attempting** [1] - 41:20
**attention** [1] - 14:1
**Attorney** [4] - 2:5, 2:11, 2:14, 2:19
**Attorneys** [2] - 2:8, 2:23
**AUDRA** [1] - 2:22
**Audra** [1] - 4:6
**augments** [1] - 26:14
**automatic** [1] - 7:6
**Avenue** [1] - 2:24

# B

**bad** [1] - 36:17
**Bank** [1] - 2:5
**base** [2] - 18:19, 40:22
**based** [1] - 37:2
**basis** [10] - 6:6, 16:22, 19:6, 35:9, 35:10, 36:7, 37:22, 46:16, 46:17, 47:4
**began** [1] - 8:13
**begin** [3] - 9:18, 15:9, 43:21
**beginning** [4] - 27:11, 27:13, 28:23, 29:15
**behalf** [4] - 3:14, 3:18, 4:4, 4:7
**believer** [1] - 34:2
**benefited** [1] - 9:15
**best** [2] - 17:19, 33:18
**better** [2] - 5:1, 5:2
**between** [6] - 25:1, 26:4, 29:21, 30:13, 30:21, 44:7
**BIENERT** [1] - 2:13
**big** [1] - 34:2
**BIRD** [1] - 2:17
**Black** [3] - 3:6, 3:7, 3:10
**BLACK** [1] - 1:5
**blind** [1] - 37:8
**blinded** [1] - 18:15
**Boca** [1] - 2:9
**boils** [2] - 14:23,

14:25
**booklet** [1] - 19:14
**born** [1] - 33:22
**BOXER** [1] - 2:17
**BRAGAR** [1] - 2:10
**briefed** [1] - 33:11
**briefing** [6] - 12:23, 32:9, 32:13, 41:7, 41:11, 47:16
**briefly** [2] - 34:7, 44:20
**broader** [1] - 37:21
**brought** [1] - 8:11
**bullish** [1] - 8:24
**bullshit** [1] - 20:3
**BUNTING** [2] - 2:23, 4:10
**Bunting** [1] - 4:10
**burden** [1] - 26:23
**business** [5] - 7:24, 8:8, 23:13, 23:18, 39:16
**BY** [6] - 2:4, 2:7, 2:11, 2:14, 2:18, 2:22

# C

**CALIFORNIA** [5] - 1:2, 1:14, 1:24, 3:1, 50:4
**California** [4] - 2:12, 2:15, 2:20, 50:8
**campaign** [4] - 10:6, 24:12, 37:2, 42:5
**campaigns** [6] - 6:22, 11:2, 11:3, 11:4, 11:15, 42:10
**cannot** [2] - 13:25, 31:24
**capabilities** [7] - 15:24, 16:2, 18:13, 34:23, 35:2, 37:5, 39:4
**capable** [4] - 18:20, 18:21, 22:16, 25:7
**care** [1] - 46:9
**Case** [1] - 1:7
**case** [19] - 5:19, 17:2, 20:18, 23:10, 26:23, 28:19, 31:23, 32:1, 32:10, 40:7, 41:12, 44:18, 44:19, 44:25, 45:1, 45:16, 49:11, 49:12, 49:13
**cases** [4] - 3:6, 27:16, 31:16, 44:19
**catch** [1] - 30:15
**caused** [1] - 31:14
**cautionary** [14] - 29:12, 29:16, 29:22,

30:1, 30:17, 30:18, 30:23, 31:4, 31:5, 31:11, 32:11, 32:17, 41:1, 41:5
**CCRR** [1] - 1:22
**Central** [1] - 50:8
**central** [1] - 27:25
**CENTRAL** [2] - 1:2
**Century** [1] - 2:19
**certain** [5] - 11:14, 22:9, 26:7, 26:17
**CERTIFICATE** [1] - 50:1
**certify** [1] - 50:8
**change** [6] - 7:7, 12:14, 29:17, 31:15, 41:3, 41:6
**changes** [20] - 7:4, 7:5, 7:8, 8:2, 8:4, 8:17, 9:2, 9:6, 9:8, 9:15, 9:16, 13:20, 14:13, 14:14, 30:3, 30:6, 38:12, 43:1, 43:7
**charge** [1] - 8:10
**charitable** [1] - 35:15
**chief** [1] - 8:8
**choices** [1] - 35:5
**choose** [2] - 7:9, 32:22
**Circuit** [7] - 21:3, 26:21, 29:2, 31:11, 31:21, 40:7, 44:19
**Circuit's** [1] - 40:6
**circumstances** [1] - 45:4
**cited** [2] - 44:20, 45:24
**claim** [4] - 23:7, 40:22, 46:16, 46:17
**Clarice** [1] - 12:3
**clarification** [2] - 32:7, 41:10
**clarify** [1] - 32:13
**class** [12] - 6:12, 6:13, 7:3, 8:3, 8:13, 18:24, 23:4, 29:15, 36:12, 36:23, 38:22, 42:24
**clear** [1] - 21:3
**clearly** [1] - 23:25
**clerk** [1] - 19:22
**click** [2] - 6:17, 6:21
**client** [1] - 3:22
**clients** [2] - 16:9, 35:23
**close** [2] - 5:14, 37:7
**closely** [3] - 16:15, 16:16, 43:3
**closer** [1] - 44:18

**Code** [1] - 50:9
**cohort** [2] - 9:21, 17:17
**cohorts** [1] - 13:24
**collected** [1] - 42:8
**coming** [2] - 9:17, 43:7
**comment** [1] - 16:4
**comments** [2] - 4:24, 5:3
**communicating** [1] - 43:5
**communications** [1] - 8:16
**companies** [4] - 7:20, 16:11, 26:18, 38:10
**company** [12] - 8:3, 8:11, 8:23, 9:16, 13:18, 14:11, 23:17, 23:24, 37:21, 39:11, 42:23, 45:6
**company's** [4] - 5:8, 23:13, 27:18, 40:3
**company-wide** [2] - 23:17, 23:24
**compares** [1] - 37:7
**compelling** [2] - 29:9, 45:17
**competing** [1] - 44:24
**competitive** [1] - 9:24
**complaint** [11] - 4:13, 23:2, 28:24, 31:17, 33:10, 37:19, 41:25, 46:2, 47:9, 47:12, 49:5
**complaints** [1] - 32:6
**completely** [1] - 33:1
**concern** [3] - 11:19, 21:18, 23:5
**concerned** [2] - 7:15, 46:11
**concerns** [2] - 33:10, 36:25
**concluded** [4] - 14:6, 19:25, 34:23, 49:15
**concrete** [3] - 10:18, 15:11, 17:25
**confer** [1] - 47:15
**conference** [3] - 22:13, 48:19, 50:13
**confidential** [1] - 36:9
**conflicting** [1] - 24:1
**conformance** [1] - 50:13
**confused** [1] - 19:7
**confusion** [1] - 48:1

**connect** [2] - 25:1
**considering** [1] - 45:10
**constantly** [1] - 30:9
**constructive** [1] - 32:8
**consumers** [1] - 42:8
**contention** [1] - 37:15
**context** [3] - 6:9, 15:1, 22:24
**continue** [1] - 48:20
**continued** [1] - 14:19
**continuing** [1] - 30:7
**conversations** [1] - 8:17
**conversely** [1] - 31:10
**coordinate** [1] - 49:2
**copy** [2] - 19:14, 19:22
**core** [12] - 5:13, 5:17, 8:6, 20:25, 26:16, 27:16, 28:25, 29:4, 35:8, 39:22, 39:25, 42:19
**correct** [5] - 24:14, 24:16, 35:15, 50:10
**corrective** [2] - 14:17, 28:18
**correctly** [2] - 26:11, 27:5
**corrosion** [2] - 45:2, 45:18
**COUNSEL** [1] - 2:1
**counsel** [5] - 32:16, 39:21, 41:22, 48:24, 49:10
**counted** [1] - 29:21
**country** [1] - 38:10
**COUNTY** [1] - 50:3
**couple** [2] - 26:13, 46:22
**course** [3] - 16:22, 27:10, 28:5
**court** [1] - 48:8
**Court** [7] - 10:7, 10:14, 44:22, 44:23, 50:7, 50:20
**COURT** [89] - 1:1, 1:23, 3:5, 3:17, 3:24, 4:1, 4:5, 4:12, 4:17, 4:19, 5:1, 5:22, 10:2, 10:9, 12:2, 12:9, 12:24, 13:6, 14:10, 14:23, 15:14, 16:3, 16:18, 16:24, 17:11, 17:19, 18:6, 18:16, 19:13, 19:17, 19:20, 19:22, 20:8, 20:13,

**UNITED STATES DISTRICT COURT**

21:14, 21:23, 24:2, 24:9, 24:15, 25:14, 25:18, 26:1, 28:9, 30:12, 30:18, 30:23, 32:15, 33:2, 33:13, 33:16, 33:19, 33:25, 34:4, 34:15, 34:18, 35:3, 35:11, 35:22, 36:3, 36:14, 36:17, 37:9, 37:14, 38:7, 39:17, 40:8, 40:17, 40:22, 41:14, 41:18, 41:22, 42:12, 43:8, 43:12, 45:24, 46:9, 47:3, 47:11, 47:17, 47:20, 47:23, 48:4, 48:7, 48:13, 48:18, 48:24, 49:2, 49:9, 49:14

**Court's** [1] - 10:13
**COURTROOM** [1] - 48:6
**courtroom** [1] - 49:10
**Courts** [2] - 27:18, 31:20
**covered** [1] - 42:20
**credence** [1] - 20:6
**critical** [11] - 6:20, 7:23, 8:1, 9:21, 13:24, 15:1, 17:17, 23:1, 35:20, 37:4, 45:6
**cross** [1] - 44:6
**cross-functional** [1] - 44:6
**CRR** [1] - 50:20
**CSR** [2] - 1:22, 50:20
**curious** [1] - 11:15
**CV** [1] - 1:7
**CW** [7] - 23:3, 23:12, 23:15, 27:20, 36:9, 39:14, 40:14
**CW-1** [18] - 23:17, 23:23, 23:25, 26:4, 27:9, 27:13, 28:24, 34:13, 34:14, 34:20, 34:24, 36:10, 37:18, 37:19, 38:14, 38:19, 41:25
**CW-1's** [2] - 26:4, 38:16
**CWs** [3] - 23:10, 39:9, 40:11
**cycle** [1] - 44:15

## D

**Dan** [1] - 4:8
**data** [3] - 42:8, 42:9, 45:2

**Date** [1] - 50:16
**days** [3] - 9:6, 47:10, 47:11
**deceive** [1] - 29:25
**deceived** [2] - 26:20, 29:9
**decision** [2] - 29:13, 40:6
**deeply** [1] - 43:6
**defendant** [10] - 4:24, 5:4, 5:7, 5:19, 6:10, 8:7, 18:17, 37:9, 45:1, 45:17
**DEFENDANT** [2] - 2:16, 2:21
**defendant's** [4] - 16:3, 24:3, 36:11, 36:22
**Defendants** [2] - 1:9, 11:5
**defendants** [8] - 4:4, 4:7, 4:9, 4:11, 12:22, 14:17, 20:15, 48:22
**defense** [9] - 3:24, 17:20, 19:14, 19:15, 20:10, 39:21, 48:15, 48:16, 48:17
**defense's** [1] - 40:17
**defined** [6] - 11:15, 11:17, 17:9, 43:25
**delay** [2] - 9:15, 18:1
**delayed** [1] - 42:9
**delays** [1] - 15:23
**deliberately** [1] - 19:5
**demonstrating** [1] - 42:25
**dependent** [2] - 6:13, 7:24
**DEPUTY** [1] - 48:6
**derivative** [1] - 48:2
**describe** [2] - 42:1, 42:6
**described** [3] - 5:14, 8:16, 43:3
**describes** [4] - 29:13, 34:14, 34:20, 44:1
**describing** [3] - 24:17, 44:9, 45:13
**despite** [1] - 45:2
**destroyed** [1] - 18:13
**detail** [1] - 42:6
**details** [2] - 26:25, 40:3
**determination** [2] - 21:24, 46:14
**Diane** [1] - 3:15
**DIANE** [1] - 2:8
**difference** [1] - 30:21

**different** [4] - 25:24, 30:24, 33:6, 39:20
**direct** [29] - 5:8, 6:16, 8:16, 9:19, 9:20, 9:22, 10:1, 10:5, 10:20, 12:12, 12:19, 13:4, 15:12, 17:16, 22:9, 23:19, 23:22, 23:23, 24:3, 24:11, 24:18, 35:17, 35:19, 35:23, 42:25, 43:17, 45:11, 45:14
**directed** [1] - 13:8
**directly** [4] - 8:10, 11:13, 17:8, 42:22
**director** [1] - 3:23
**directors** [1] - 44:5
**disagrees** [1] - 4:23
**disclosure** [1] - 28:18
**disconnect** [2] - 26:4, 30:13
**discontinue** [1] - 7:6
**discovered** [1] - 39:4
**discovery** [1] - 36:6
**discuss** [2] - 3:8, 47:14
**dismiss** [2] - 4:13, 47:18
**DISMISS** [1] - 1:13
**dismissed** [1] - 31:18
**dispute** [1] - 46:24
**disruptive** [1] - 30:4
**dissatisfaction** [1] - 27:2
**dissatisfied** [1] - 28:2
**distinction** [1] - 31:1
**DISTRICT** [3] - 1:1, 1:2, 1:3
**District** [2] - 50:7, 50:8
**divergence** [1] - 22:23
**DIVISION** [1] - 1:2
**doctrine** [8] - 5:17, 21:1, 26:17, 28:25, 29:4, 39:23, 39:25, 40:1
**Dodds** [3] - 3:9, 47:24, 48:10
**done** [3] - 18:3, 24:19, 30:3
**down** [8] - 5:25, 6:25, 7:2, 10:2, 14:10, 14:23, 14:25, 49:5
**download** [1] - 6:18
**downloaded** [1] - 11:23

**dragged** [1] - 34:25
**DROOKS** [1] - 2:17
**due** [1] - 45:5
**during** [9] - 6:12, 6:13, 8:3, 8:23, 9:2, 9:13, 23:14, 28:8, 42:24
**duty** [1] - 44:23

## E

**EAGEL** [1] - 2:10
**early** [2] - 23:14, 30:6
**earnings** [2] - 9:14, 43:2
**East** [1] - 2:19
**ecosystem** [1] - 30:3
**educating** [1] - 43:6
**effect** [2] - 25:13, 38:13
**effective** [3] - 6:22, 38:5, 38:6
**effectively** [1] - 18:23
**effort** [3] - 44:1, 44:7, 44:9
**eight** [2] - 29:21, 34:1
**either** [8] - 21:5, 23:3, 35:5, 35:8, 40:2, 40:10, 40:25, 42:14
**EKWAN** [1] - 2:18
**Ekwan** [1] - 4:3
**electricity** [1] - 33:20
**emphasize** [1] - 14:22
**end** [5] - 23:3, 36:11, 36:22, 38:22, 40:8
**engineering** [1] - 44:7
**engrained** [1] - 34:16
**entire** [3] - 15:1, 18:9, 37:20
**entirely** [1] - 7:24
**entitled** [1] - 50:12
**especially** [1] - 31:11
**et** [1] - 1:8
**evaluate** [1] - 37:3
**event** [1] - 28:9
**evidence** [1] - 18:19
**exactly** [6] - 12:9, 18:20, 21:16, 24:22, 25:17
**example** [2] - 36:9, 43:3
**excuse** [2] - 38:15, 47:23
**executive** [1] - 3:23
**executives** [4] - 26:25, 27:3, 40:2,

40:4
**existential** [2] - 13:18, 45:6
**exists** [1] - 26:17
**expect** [1] - 11:18
**expectation** [4] - 7:12, 7:21, 17:21, 18:18
**expected** [3] - 9:8, 9:11, 12:15
**expects** [1] - 49:4
**experience** [3] - 8:7, 14:12, 42:1
**experienced** [1] - 42:2
**experiencing** [1] - 44:12
**explain** [1] - 17:8
**exploring** [1] - 36:24
**expressed** [1] - 21:18
**extent** [1] - 42:13

## F

**Facebook** [1] - 16:11
**fact** [15] - 6:2, 8:11, 9:16, 14:2, 21:12, 21:21, 22:17, 23:16, 23:24, 24:17, 28:4, 29:17, 35:22, 36:1, 36:2
**facts** [3] - 21:17, 29:5, 29:6
**factual** [2] - 23:2, 30:25
**factually** [2] - 26:9, 35:24
**fairly** [1] - 40:7
**fall** [1] - 40:9
**false** [15] - 5:6, 10:15, 20:19, 24:21, 25:16, 25:19, 25:23, 26:9, 27:4, 36:7, 36:8, 40:5, 46:10, 46:14, 46:19
**falsity** [4] - 11:5, 26:2, 34:7, 36:4
**family** [1] - 33:23
**far** [3] - 12:20, 28:11, 31:14
**fast** [3] - 5:23, 12:4, 36:18
**February** [4] - 8:13, 8:22, 29:21, 43:2
**FEDERAL** [1] - 1:23
**Federal** [2] - 50:6, 50:20
**feedback** [1] - 43:25
**feet** [1] - 34:25

few [6] - 9:6, 18:25, 23:13, 26:5, 38:1, 44:21
Figueroa [1] - 2:12
figure [1] - 38:11
file [3] - 31:17, 47:9, 47:18
filed [1] - 47:12
final [1] - 47:7
findings [1] - 26:15
fine [1] - 16:13
Fire [1] - 3:23
FIRST [1] - 1:23
first [20] - 3:8, 3:10, 3:12, 6:9, 8:21, 9:13, 10:7, 11:13, 14:3, 15:8, 18:1, 20:3, 23:11, 28:5, 31:17, 34:7, 35:25, 37:19, 41:24, 47:20
fit [1] - 33:8
five [1] - 33:25
Floor [1] - 2:5
Florida [1] - 2:9
focus [7] - 4:24, 5:3, 20:22, 32:9, 32:14, 32:22, 41:12
focused [7] - 9:7, 11:16, 20:16, 20:25, 40:12, 44:3, 47:2
focusing [1] - 5:11
FOR [3] - 2:3, 2:16, 2:21
force [1] - 33:2
forced [1] - 25:11
forecasting [1] - 39:14
foregoing [1] - 50:10
form [1] - 19:14
format [1] - 50:12
Fortunato [1] - 48:12
FORTUNATO [3] - 2:11, 48:12, 49:1
forward [15] - 30:13, 30:14, 30:21, 30:22, 30:23, 31:4, 31:5, 32:2, 32:10, 32:17, 40:19, 40:25, 41:4
frame [2] - 13:12, 21:8
fraudulent [2] - 29:8, 29:10
free [1] - 47:4
full [1] - 23:18
functional [1] - 44:6
fundamental [1] - 29:11

## G

gaming [2] - 23:12, 23:18
GARRISON [1] - 2:22
general [1] - 4:24
generally [1] - 43:1
GEORGE [1] - 1:3
given [3] - 19:14, 20:7, 33:3
Glades [1] - 2:9
global [2] - 8:10, 42:23
Gorman [39] - 5:20, 8:7, 9:14, 10:19, 11:9, 11:20, 13:16, 17:5, 17:6, 18:17, 20:23, 21:7, 21:11, 21:19, 23:4, 23:11, 23:16, 23:20, 24:7, 25:21, 26:6, 27:7, 27:10, 28:1, 28:20, 29:6, 29:12, 29:20, 29:23, 35:3, 36:23, 37:11, 38:22, 39:5, 40:13, 42:14, 42:22, 45:20, 46:6
Gorman's [6] - 4:25, 5:4, 5:7, 6:10, 9:4, 28:22
GRANT [46] - 2:4, 3:13, 3:21, 4:16, 4:18, 4:20, 5:3, 5:24, 7:2, 10:3, 10:12, 12:4, 12:11, 13:1, 13:12, 14:11, 14:25, 15:17, 16:6, 16:20, 17:6, 17:14, 17:23, 18:12, 18:22, 19:16, 19:19, 19:23, 32:21, 34:6, 34:16, 34:20, 35:4, 35:19, 35:25, 36:10, 36:16, 36:20, 37:11, 41:24, 42:17, 43:10, 43:16, 46:5, 46:25, 47:10
Grant [2] - 3:13, 4:20
group [2] - 35:21, 39:2
growth [5] - 8:24, 8:25, 9:23, 13:21, 20:1
guess [3] - 13:7, 17:20, 49:4
Guggenheim [1] - 14:11
guidance [1] - 28:16
guys [3] - 32:19, 47:21, 49:11

## H

half [1] - 35:20
hampering [1] - 42:10
handing [1] - 19:19
Hannibal [1] - 12:2
happily [1] - 21:10
hard [1] - 41:19
hated [1] - 37:23
headwinds [2] - 11:18, 12:14
hear [5] - 3:11, 3:25, 5:2, 20:10, 37:14
heard [2] - 9:2, 48:19
HEARING [1] - 1:13
hearing [1] - 32:23
heavily [1] - 11:25
held [7] - 8:14, 8:21, 10:7, 10:14, 27:5, 41:8, 50:11
help [1] - 29:1
helped [1] - 14:9
helping [1] - 44:3
hereby [1] - 50:8
herself [5] - 8:14, 12:21, 29:20, 29:23, 40:13
high [2] - 26:19, 26:23
hindering [1] - 42:3
holistically [1] - 29:5
Honor [102] - 3:13, 3:21, 4:3, 4:6, 4:16, 4:18, 4:20, 4:22, 5:5, 5:14, 5:24, 6:11, 10:12, 10:16, 12:11, 13:1, 13:12, 14:25, 15:17, 16:6, 17:6, 17:23, 18:22, 19:5, 19:10, 20:5, 20:11, 20:14, 20:21, 21:4, 21:16, 22:6, 22:12, 22:15, 23:1, 23:8, 23:19, 24:6, 24:22, 24:24, 25:6, 26:3, 26:8, 26:11, 26:15, 26:19, 26:22, 27:5, 27:16, 27:25, 28:13, 28:21, 29:3, 29:11, 29:13, 29:14, 30:17, 30:22, 32:4, 32:7, 33:9, 33:14, 33:21, 34:3, 34:6, 34:7, 34:16, 35:4, 35:19, 35:25, 36:10, 36:16, 36:20, 37:11, 37:16, 37:17, 38:8, 39:7, 39:24, 40:6, 40:10, 40:21, 40:23, 40:24,

41:8, 41:10, 41:16, 41:21, 41:24, 42:17, 43:10, 43:16, 44:19, 46:5, 46:25, 47:15, 47:19, 47:22, 47:25, 48:23, 49:8, 49:13
Honor's [4] - 5:6, 5:11, 20:17, 36:12
HONORABLE [1] - 1:3
Hooker [1] - 3:18
HOOKER [2] - 2:7, 3:18
hoped [1] - 38:24
hopeful [1] - 17:24
hopefully [1] - 17:1
hoping [1] - 41:11
horizon [2] - 28:10, 28:12
HOURIGAN [4] - 1:22, 50:6, 50:19, 50:20
huge [2] - 44:6, 44:9
hyper [1] - 9:7
hyper-focused [1] - 9:7

## I

idea [1] - 11:8
IDFA [12] - 5:10, 6:19, 7:6, 7:19, 11:18, 11:25, 12:13, 16:2, 35:2, 37:7, 39:3
iDFA's [1] - 14:8
immaterial [1] - 41:9
immediately [2] - 14:3, 42:2
impact [8] - 8:18, 14:8, 27:22, 28:3, 28:7, 28:17, 29:18, 37:1
impactful [1] - 27:18
impacts [1] - 14:12
implement [20] - 15:14, 16:17, 16:25, 18:2, 21:9, 22:8, 22:14, 22:15, 22:17, 22:19, 22:24, 22:25, 24:24, 25:4, 25:7, 25:8, 25:20, 26:10, 35:1, 43:4
implementation [9] - 11:14, 11:17, 12:13, 13:9, 13:14, 27:1, 35:13, 39:15, 44:1
implemented [30] - 5:9, 7:8, 10:6, 10:21, 10:24, 11:1, 11:2, 12:20, 12:25, 13:2,

13:5, 13:11, 13:24, 15:2, 15:5, 17:12, 17:13, 17:15, 17:17, 22:2, 22:11, 22:14, 23:6, 24:4, 24:12, 35:23, 45:15, 45:23
implementing [9] - 9:18, 15:9, 16:9, 18:3, 34:25, 42:7, 43:22, 44:5, 44:6
imply [1] - 25:20
implying [2] - 11:3, 18:3
importance [1] - 45:7
important [2] - 6:10, 27:15
imposed [1] - 44:23
INC [1] - 1:8
inclined [1] - 39:7
include [1] - 11:9
included [1] - 12:22
including [1] - 30:2
inconsistent [2] - 29:25, 30:9
incorrect [1] - 24:20
independent [1] - 6:6
indicating [1] - 12:17
individual [2] - 13:7, 42:8
industry [7] - 7:13, 8:8, 16:5, 17:22, 25:3, 29:18, 38:18
ineffective [1] - 6:23
inference [4] - 6:6, 29:8, 29:10
inferences [1] - 44:24
information [6] - 5:20, 6:8, 23:17, 23:24, 24:1, 26:17
initial [2] - 18:25, 41:15
insight [2] - 40:14, 42:4
installed [1] - 37:3
instead [1] - 12:12
intended [1] - 30:8
intent [2] - 29:8, 29:25
intentionally [1] - 29:9
interested [2] - 19:11, 46:8
interpret [5] - 15:4, 16:24, 22:17, 22:19, 26:9
interpretation [3] - 17:5, 22:7, 36:1

**UNITED STATES DISTRICT COURT**

**interpretations** [2] - 22:16, 25:7
**interpreted** [1] - 15:3
**intimate** [1] - 42:25
**introduce** [1] - 3:21
**investor** [2] - 11:19, 45:12
**investors** [4] - 9:2, 14:1, 26:20, 29:9
**investors'** [1] - 9:11
**involved** [4] - 26:25, 27:3, 40:3, 40:5
**involvement** [5] - 42:25, 43:18, 46:7, 46:10, 46:13
**iPhones** [1] - 22:21
**issue** [9] - 26:12, 26:14, 27:1, 27:17, 36:1, 36:2, 37:21, 39:10, 39:20
**issued** [2] - 4:14, 14:17
**issues** [5] - 21:9, 24:23, 27:21, 32:1, 42:3
**issuing** [2] - 29:15, 30:1
**itself** [6] - 19:2, 24:16, 25:15, 31:8, 41:2, 49:7

## J

**Javier** [1] - 48:5
**JMP** [2] - 14:14, 20:4
**JOHN** [1] - 2:14
**John** [1] - 3:20
**Johnson** [2] - 45:1, 45:17
**JUDGE** [1] - 1:3
**judicial** [1] - 50:13
**July** [2] - 29:21, 44:11
**June/July** [1] - 28:14

## K

**KATZMAN** [1] - 2:13
**keep** [1] - 36:18
**KELLIE** [1] - 1:5
**kind** [2] - 20:2, 30:12
**knowing** [1] - 37:24
**knowingly** [1] - 26:20
**knowledge** [8] - 6:4, 12:17, 27:7, 28:22, 38:15, 43:23, 44:17, 45:11
**known** [9] - 7:4, 15:15, 25:23, 27:13,

28:1, 39:15, 40:13, 40:15, 42:14
**KRAMER** [1] - 4:8
**Kramer** [1] - 4:8
**KRISTINE** [1] - 2:23
**Kristine** [1] - 4:10
**KYLA** [1] - 2:4
**Kyla** [2] - 3:13, 4:20

## L

**lacking** [1] - 23:2
**language** [10] - 29:16, 30:17, 30:18, 31:5, 31:11, 32:11, 32:17, 40:5, 41:1, 41:5
**laser** [5] - 20:16, 20:22, 32:9, 40:12, 41:12
**launch** [2] - 27:14, 28:23
**launched** [4] - 27:10, 38:4, 38:20
**law** [5] - 29:2, 30:13, 32:12, 41:9, 41:17
**Law** [6] - 2:5, 2:8, 2:11, 2:14, 2:19, 2:23
**lead** [1] - 3:19
**leaning** [2] - 30:14, 30:21
**learn** [1] - 30:7
**least** [1] - 18:17
**leave** [2] - 33:3, 39:8
**Lecter** [1] - 12:2
**led** [1] - 20:6
**left** [3] - 32:9, 32:14, 41:13
**legacy** [3] - 12:7, 25:12, 42:8
**length** [1] - 44:2
**less** [1] - 14:14
**LESTER** [1] - 2:7
**likely** [3] - 13:13, 14:6, 14:8
**limitations** [3] - 38:16, 39:4, 39:6
**limited** [3] - 35:17, 37:19, 39:12
**LINCENBERG** [1] - 2:18
**line** [1] - 39:9
**link** [1] - 27:19
**LITTRELL** [3] - 2:13, 2:14, 3:20
**Littrell** [1] - 3:20
**LLP** [2] - 2:13, 2:22
**loaded** [1] - 16:25
**look** [7] - 20:15, 26:21, 31:8, 33:6,

37:16, 37:18, 41:16
**looked** [1] - 20:1
**looking** [10] - 24:9, 30:22, 30:23, 31:4, 31:5, 32:10, 32:17, 40:25, 41:4, 41:5
**looks** [1] - 24:17
**Los** [3] - 2:12, 2:15, 2:20
**LOS** [4] - 1:14, 1:24, 3:1, 50:3
**lost** [5] - 13:16, 13:25, 39:2, 39:3, 42:7
**lottery** [1] - 33:19
**lucky** [1] - 33:22
**lunched** [1] - 38:6

## M

**main** [1] - 7:7
**major** [2] - 28:11, 29:17
**majority** [20] - 5:8, 6:15, 9:19, 10:1, 10:4, 10:20, 12:19, 13:4, 13:23, 15:12, 16:9, 17:16, 23:20, 23:22, 24:3, 24:11, 35:17, 35:22, 44:5, 45:14
**management** [1] - 6:3
**March** [3] - 1:13, 3:1, 50:16
**MARELLA** [1] - 2:17
**mark** [1] - 31:20
**market** [5] - 7:12, 9:7, 13:15, 14:16, 19:7
**marketing** [1] - 44:8
**mask** [3] - 5:1, 20:12, 34:18
**material** [5] - 13:17, 13:25, 14:6, 14:8, 15:11
**materially** [2] - 5:6, 10:15
**matter** [13] - 3:5, 3:8, 3:10, 6:4, 26:9, 32:12, 41:9, 41:17, 47:24, 48:20, 49:5, 50:12
**matters** [3] - 3:6, 48:10, 49:2
**mean** [9] - 15:2, 15:3, 15:15, 22:8, 22:13, 28:9, 30:13, 38:19, 46:20
**meaning** [1] - 22:11
**meaningful** [2] - 14:9, 41:1

**means** [11] - 20:22, 21:10, 22:8, 22:24, 22:25, 23:7, 24:25, 25:8, 37:22, 41:2, 41:9
**meant** [5] - 11:6, 11:22, 13:8, 17:8, 42:18
**measurement** [1] - 39:1
**media** [1] - 9:24
**meet** [1] - 47:15
**meeting** [1] - 39:13
**meets** [2] - 28:4, 28:6
**MELISSA** [1] - 2:11
**Melissa** [1] - 48:12
**members** [2] - 43:9, 43:12
**merrier** [1] - 47:5
**met** [1] - 27:6
**microphone** [2] - 4:1, 37:17
**might** [2] - 5:1, 26:18
**mind** [2] - 10:10, 20:11
**minds** [1] - 9:11
**minute** [1] - 35:7
**mislead** [1] - 30:8
**misleading** [3] - 5:7, 10:15, 20:19
**misses** [1] - 28:16
**misunderstand** [1] - 45:1
**mitigate** [4] - 11:18, 12:13, 14:9, 43:7
**Monday** [2] - 1:13, 3:1
**monetization** [1] - 14:12
**monitor** [1] - 42:3
**month** [2] - 28:5, 33:22
**months** [5] - 8:20, 9:1, 15:21, 16:13, 28:19
**morning** [3] - 3:13, 4:3, 4:6
**most** [11] - 7:13, 7:14, 7:21, 9:9, 13:23, 17:16, 26:22, 35:14, 35:20, 44:23
**motion** [5] - 4:12, 47:18, 49:4, 49:7
**MOTION** [1] - 1:13
**MR** [4] - 3:18, 3:20, 4:3, 4:8
**MS** [86] - 3:13, 3:15, 3:21, 4:6, 4:10, 4:16, 4:18, 4:20, 5:3, 5:24,

7:2, 10:3, 10:12, 12:4, 12:11, 13:1, 13:12, 14:11, 14:25, 15:17, 16:6, 16:20, 17:6, 17:14, 17:23, 18:12, 18:22, 19:16, 19:18, 19:19, 19:21, 19:23, 20:11, 20:14, 21:16, 22:6, 24:6, 24:14, 24:22, 25:17, 25:24, 26:2, 28:13, 30:17, 30:22, 32:4, 32:21, 33:9, 33:14, 33:18, 33:21, 34:2, 34:6, 34:16, 34:20, 35:4, 35:19, 35:25, 36:10, 36:16, 36:20, 37:11, 37:16, 38:8, 39:24, 40:10, 40:21, 40:23, 41:16, 41:21, 41:24, 42:17, 43:10, 43:16, 46:5, 46:25, 47:10, 47:15, 47:19, 47:22, 47:25, 48:12, 48:17, 48:22, 49:1, 49:8
**multiple** [3] - 22:16, 25:7, 32:6

## N

**nature** [2] - 6:2, 16:8
**necessarily** [1] - 46:9
**necessary** [1] - 41:12
**need** [5] - 6:7, 10:2, 26:24, 34:15, 47:14
**NESSIM** [1] - 2:17
**never** [1] - 14:19
**New** [3] - 2:6, 2:24
**new** [3] - 22:20, 25:12, 42:9
**next** [7] - 8:25, 9:1, 13:22, 31:18, 32:9, 32:13, 41:7
**nice** [1] - 49:9
**Ninth** [7] - 21:3, 26:21, 29:2, 31:21, 40:6, 40:7, 44:18
**Nividia** [1] - 44:19
**NO** [2] - 1:22, 50:20
**nobody** [4] - 18:7, 18:20, 19:2, 21:23
**non** [1] - 29:10
**non-fraudulent** [1] - 29:10
**none** [1] - 32:12
**nonetheless** [2] - 21:5, 40:1
**note** [10] - 6:5, 8:5,

8:20, 9:4, 10:16, 11:9, 12:18, 14:22, 15:18, 19:23
**noted** [2] - 10:22, 29:14
**nothing** [2] - 40:19, 41:2
**number** [3] - 24:8, 24:18, 33:23
**numbers** [1] - 33:19
**numerous** [2] - 42:2, 42:24

## O

**observation** [1] - 32:5
**obviously** [6] - 8:4, 10:9, 22:23, 31:24, 34:8, 49:6
**occurred** [1] - 17:25
**OF** [6] - 1:2, 1:12, 2:1, 50:1, 50:3, 50:4
**offering** [1] - 38:19
**offers** [1] - 40:14
**officer** [1] - 8:9
**OFFICIAL** [2] - 1:23, 50:1
**Official** [1] - 50:6
**often** [1] - 27:16
**oil** [2] - 45:2, 45:18
**Oklahoma** [1] - 3:23
**old** [5] - 11:8, 12:7, 15:7, 19:2, 25:12
**once** [1] - 46:13
**one** [25] - 5:19, 16:24, 17:4, 17:12, 22:10, 23:12, 23:17, 24:17, 24:23, 25:14, 25:18, 25:19, 26:16, 31:18, 35:14, 36:9, 36:21, 37:20, 38:3, 38:10, 39:11, 39:12, 39:13, 46:15
**ones** [1] - 46:21
**ongoing** [1] - 14:12
**oOo** [1] - 3:3
**operations** [13] - 5:13, 5:17, 8:6, 21:1, 26:16, 27:16, 28:25, 29:4, 35:8, 39:22, 40:1, 40:3, 42:19
**opinion** [5] - 22:23, 38:5, 38:16, 38:19, 40:25
**opportunity** [6] - 11:11, 11:21, 12:5, 31:25, 33:5, 47:1
**opt** [8] - 7:9, 7:13, 7:20, 7:22, 9:9, 15:20

**optimistic** [2] - 10:17, 17:24
**optimize** [1] - 42:10
**order** [12] - 4:23, 5:6, 5:15, 6:11, 10:14, 25:3, 32:24, 34:8, 36:13, 36:21, 44:20
**otherwise** [1] - 38:15
**outcome** [2] - 14:9, 30:4
**outlier** [1] - 16:8
**outside** [1] - 27:8
**oversaw** [1] - 44:10
**oversee** [1] - 8:12
**overseeing** [2] - 42:23, 42:25
**own** [1] - 12:17

## P

**PA** [2] - 2:4, 2:7
**page** [2] - 5:14, 50:12
**pages** [2] - 31:18, 31:19
**pan** [1] - 10:17
**papers** [1] - 24:24
**Paragraph** [1] - 41:25
**Paragraphs** [1] - 37:18
**Park** [1] - 2:19
**part** [2] - 15:8, 28:18
**participants** [2] - 24:19, 35:16
**participated** [1] - 39:13
**participating** [1] - 49:7
**particular** [3] - 21:1, 23:15, 27:1
**particularly** [1] - 5:16
**partners** [7] - 9:19, 11:15, 15:10, 15:24, 18:3, 27:11, 43:22
**party** [5] - 27:8, 28:1, 38:21, 39:1, 40:15
**past** [1] - 10:18
**Paul** [3] - 4:7, 4:8, 4:10
**PAUL** [1] - 2:22
**pay** [1] - 14:1
**PC** [2] - 2:10, 2:18
**people** [10] - 3:9, 7:21, 9:9, 26:18, 30:10, 37:3, 39:2, 48:8, 48:15, 48:17
**people's** [2] - 22:21, 28:15

**percent** [8] - 6:13, 8:24, 10:23, 13:21, 20:1, 28:16
**percentage** [2] - 22:2, 26:7
**performance** [3] - 37:25, 38:17, 42:4
**period** [17] - 6:12, 6:13, 7:3, 8:3, 8:13, 18:24, 23:4, 23:15, 28:14, 29:7, 29:15, 29:23, 36:12, 36:23, 38:23, 40:13, 42:24
**person** [3] - 8:14, 43:18, 48:2
**PERSON** [1] - 49:13
**personal** [1] - 12:17
**personally** [2] - 35:6, 44:10
**phones** [1] - 28:15
**phrase** [2] - 16:24, 31:21
**piece** [1] - 24:25
**pipeline** [1] - 25:1
**pipes** [2] - 45:2, 45:19
**Pitre** [1] - 3:15
**PITRE** [2] - 2:8, 3:15
**place** [16] - 20:15, 21:10, 21:12, 22:11, 22:17, 22:19, 23:7, 23:14, 23:21, 24:25, 25:5, 25:9, 38:12, 43:23, 44:16, 45:11
**Plains** [1] - 2:6
**PLAINTIFF** [1] - 2:3
**plaintiff** [16] - 3:14, 3:16, 3:19, 3:20, 4:21, 4:23, 5:5, 6:7, 10:13, 21:6, 31:2, 32:2, 40:1, 45:24, 47:9, 48:12
**plaintiff's** [6] - 3:12, 23:6, 31:23, 32:16, 41:22, 48:24
**plaintiffs** [21] - 20:16, 20:25, 21:4, 22:16, 25:8, 26:24, 27:21, 27:24, 28:17, 29:1, 31:24, 31:25, 34:4, 39:8, 40:18, 41:2, 46:4, 48:3, 48:11, 48:14, 48:25
**Plaintiffs** [1] - 1:6
**platform** [1] - 9:24
**plausible** [3] - 44:23, 44:24, 45:9
**play** [2] - 29:4, 46:13
**plea** [1] - 46:5
**plead** [1] - 21:5
**pleaded** [2] - 21:18,

26:9
**pleased** [7] - 12:16, 12:17, 12:18, 13:3, 17:15, 44:4, 45:13
**plethora** [1] - 14:5
**plus** [4] - 8:25, 10:23, 13:21
**point** [30] - 8:14, 11:20, 12:24, 13:8, 13:10, 15:15, 15:17, 18:7, 18:12, 18:19, 23:1, 26:11, 29:1, 31:2, 32:18, 33:3, 34:8, 34:9, 35:3, 35:12, 36:3, 36:22, 40:18, 41:25, 42:17, 43:18, 46:3, 46:23, 47:6, 48:21
**pointed** [2] - 22:12, 31:22
**pointing** [1] - 26:3
**points** [4] - 11:5, 26:13, 44:21, 45:16
**pop** [3] - 6:16, 7:8, 15:19
**pop-out** [1] - 15:19
**pop-up** [1] - 7:8
**portion** [2] - 33:5, 39:11
**position** [9] - 20:8, 32:20, 39:17, 40:17, 41:15, 41:16, 42:22, 45:3, 45:10
**positive** [1] - 18:25
**possible** [2] - 44:25, 45:7
**possibly** [2] - 21:14, 37:22
**precluding** [1] - 41:20
**prepare** [1] - 12:15
**prepared** [1] - 32:25
**present** [1] - 40:9
**press** [1] - 45:18
**presume** [6] - 3:7, 4:14, 19:13, 19:14, 36:8, 48:19
**presumption** [1] - 27:24
**previously** [2] - 14:15, 42:8
**primarily** [1] - 46:10
**privacy** [3] - 7:4, 7:15, 38:12
**problem** [8] - 18:6, 18:11, 21:17, 23:8, 27:16, 29:11, 30:20, 32:1
**problems** [3] - 22:1, 31:23, 42:15

**proceedings** [2] - 49:15, 50:11
**process** [1] - 18:9
**Prodanova** [2] - 26:22, 40:6
**producing** [2] - 27:3, 40:5
**product** [7] - 16:14, 27:14, 28:2, 28:15, 38:9, 38:21, 40:16
**products** [2] - 6:22, 44:7
**program** [2] - 16:3, 16:4
**projecting** [1] - 17:24
**projection** [4] - 8:24, 13:21, 20:1, 20:6
**projections** [2] - 28:4, 28:6
**prominence** [2] - 6:2, 45:5
**promoting** [1] - 16:22
**prompts** [1] - 32:6
**prong** [5] - 6:1, 6:6, 6:8, 21:2, 42:19
**proof** [1] - 26:23
**propose** [1] - 47:16
**proposition** [1] - 28:22
**prove** [2] - 26:19, 26:24
**provide** [4] - 19:12, 20:5, 40:2, 46:17
**provided** [4] - 6:20, 9:17, 18:2, 43:21
**provides** [1] - 46:16
**public** [4] - 16:15, 42:24, 43:9, 43:13
**puffery** [3] - 32:11, 32:17, 41:9
**purchase** [1] - 6:22
**purported** [2] - 23:3, 27:2
**purportedly** [1] - 23:13
**purpose** [2] - 17:3, 36:11
**purposes** [1] - 32:23
**pursuant** [1] - 50:9
**pushed** [2] - 22:21, 28:15
**put** [14] - 21:10, 22:11, 22:17, 23:14, 23:21, 24:25, 25:4, 31:13, 31:22, 33:4, 38:11, 41:18, 46:1, 49:5
**putting** [4] - 21:12,

22:19, 23:7, 25:9

**Q**

**Q1** [1] - 38:1
**Q2** [1] - 38:1
**qualifications** [1] - 11:10
**qualified** [1] - 14:17
**qualify** [6] - 11:21, 12:5, 12:21, 13:2, 17:7, 18:24
**quantification** [1] - 15:12
**quantified** [2] - 10:19, 10:22
**quantifies** [1] - 9:25
**quarter** [7] - 9:13, 28:5, 28:6, 28:8, 28:14, 28:16, 39:13
**quarterly** [1] - 28:4
**questioned** [1] - 13:7
**questions** [6] - 13:7, 25:25, 26:1, 33:15, 33:16, 45:12
**quote** [1] - 38:17
**quoted** [1] - 14:5
**quoting** [2] - 9:16, 14:7

**R**

**raise** [2] - 33:10, 33:11
**raised** [2] - 20:19, 24:23
**Rankin** [1] - 3:22
**rate** [1] - 16:7
**rates** [1] - 45:18
**rather** [2] - 7:15, 23:21
**Raton** [1] - 2:9
**reaction** [4] - 14:16, 19:9, 19:11, 19:24
**reactions** [3] - 20:24, 27:8, 40:15
**read** [1] - 10:11
**reading** [1] - 10:10
**ready** [1] - 25:3
**really** [19] - 11:24, 12:1, 12:16, 12:18, 13:3, 15:7, 17:15, 18:8, 19:1, 20:18, 29:16, 32:8, 41:13, 43:3, 44:3, 44:4, 46:9, 47:2
**realtime** [4] - 6:24, 18:14, 37:4, 42:11
**Realtime** [1] - 50:6
**reason** [3] - 13:13,

33:10, 40:23
**reasonable** [1] - 17:4
**reasons** [1] - 26:16
**rebrief** [1] - 39:9
**received** [1] - 42:9
**recent** [2] - 26:22, 40:7
**reckless** [2] - 18:17, 19:5
**recollection** [1] - 12:10
**Reese** [3] - 44:19, 44:22, 45:16
**refer** [1] - 7:5
**referenced** [1] - 11:14
**refresh** [1] - 12:9
**regards** [2] - 22:1, 31:12
**regulations** [1] - 50:13
**related** [1] - 3:6
**relevant** [1] - 6:2
**relied** [1] - 18:18
**rely** [4] - 25:11, 39:1, 39:2, 39:3
**relying** [5] - 11:25, 12:7, 15:7, 22:18, 25:10
**remain** [1] - 25:12
**remains** [1] - 3:8
**remember** [1] - 30:15
**reminding** [1] - 30:9
**reminds** [1] - 30:5
**remove** [1] - 20:11
**rendered** [1] - 37:8
**repeat** [2] - 13:14, 43:10
**repeated** [1] - 12:21
**repeatedly** [4] - 30:5, 45:11, 45:17, 45:21
**repeats** [1] - 12:14
**report** [3] - 14:7, 20:4
**reported** [1] - 50:11
**reporter** [1] - 36:19
**Reporter** [2] - 50:7, 50:20
**REPORTER** [4] - 1:23, 3:25, 6:25, 50:1
**REPORTER'S** [1] - 1:12
**reports** [3] - 14:5, 27:4, 40:5
**represent** [9] - 9:19, 9:25, 10:4, 10:20, 12:19, 13:4, 18:5, 24:3, 24:10
**representative** [1] - 3:22

**representing** [3] - 22:9, 23:21, 45:14
**request** [1] - 32:7
**require** [1] - 47:12
**requirement** [1] - 36:4
**requires** [2] - 21:4, 40:1
**requisite** [1] - 25:21
**resolved** [1] - 46:15
**respect** [4] - 5:16, 26:25, 38:22, 47:1
**respond** [1] - 13:10
**responded** [1] - 17:11
**response** [27] - 5:8, 6:16, 9:20, 9:22, 10:1, 10:5, 10:20, 12:12, 12:19, 13:4, 15:12, 17:16, 20:10, 22:9, 23:22, 23:23, 24:3, 24:11, 24:18, 35:17, 35:19, 35:23, 37:13, 37:14, 44:5, 45:15
**responsible** [1] - 9:23
**results** [3] - 21:13, 21:15, 22:4
**rethink** [1] - 41:15
**revenue** [31] - 6:12, 6:14, 6:15, 7:25, 9:20, 10:1, 10:5, 10:21, 12:20, 13:4, 13:19, 13:21, 22:10, 23:19, 23:22, 23:23, 24:4, 24:11, 24:18, 26:7, 27:18, 27:22, 28:3, 28:6, 28:7, 28:17, 29:18, 35:18, 35:20, 45:15
**review** [1] - 20:5
**reviewed** [1] - 4:22
**RHOW** [3] - 2:18, 2:18, 4:3
**Rhow** [1] - 4:3
**RIFKIND** [1] - 2:22
**rightfully** [2] - 10:7, 10:14
**risk** [2] - 14:6, 14:14
**Road** [1] - 2:9
**role** [1] - 8:12
**roll** [1] - 34:11
**roll-out** [1] - 34:11
**rolled** [7] - 7:17, 9:6, 9:8, 13:20, 15:21, 38:9, 39:1
**rolling** [1] - 9:15
**rollout** [5] - 15:18, 16:1, 21:21, 22:20, 25:10

**ROOM** [1] - 1:23
**round** [5] - 32:9, 32:13, 39:8, 41:7, 41:11
**RPR** [1] - 50:20
**ruled** [1] - 44:16
**run** [1] - 44:20

**S**

**sales** [3] - 8:11, 42:23, 44:7
**satisfied** [3] - 21:12, 21:15, 21:20
**Savior** [1] - 17:21
**saw** [2] - 18:25, 26:5
**Saxena** [3] - 3:14, 3:15, 3:18
**SAXENA** [2] - 2:4, 2:7
**scale** [1] - 38:23
**Scan** [2] - 9:18, 10:6
**scenario** [1] - 45:3
**schedule** [2] - 47:16, 49:3
**scienter** [8] - 5:18, 6:7, 11:6, 20:21, 25:22, 26:12, 26:14, 31:12
**screen** [1] - 7:9
**second** [4] - 4:13, 14:4, 25:18, 28:6
**Section** [1] - 50:9
**Security's** [1] - 14:7
**see** [17] - 12:16, 12:17, 12:18, 13:3, 13:15, 15:2, 17:15, 18:15, 19:9, 19:20, 32:1, 32:3, 33:8, 33:9, 44:5, 45:14, 48:20
**seeing** [8] - 14:16, 19:12, 34:22, 37:6, 44:14, 45:12, 45:13, 46:8
**seemingly** [1] - 43:14
**seizing** [1] - 14:3
**senior** [1] - 26:18
**sense** [1] - 25:19
**sentence** [1] - 15:8
**separate** [1] - 26:12
**series** [1] - 45:25
**served** [1] - 8:8
**service** [1] - 6:19
**set** [5] - 6:9, 11:6, 11:22, 12:6, 15:6
**several** [3] - 8:25, 11:5, 13:22
**severely** [2] - 42:3, 42:10

**share** [1] - 33:23
**shared** [1] - 38:21
**shareholders** [4] - 29:16, 29:19, 30:1, 30:8
**shit** [1] - 14:8
**show** [3] - 5:18, 6:7, 36:4
**showing** [3] - 19:10, 27:7, 46:6
**side** [1] - 3:12
**sides** [1] - 4:15
**signals** [1] - 18:25
**significant** [2] - 27:17, 29:16
**significantly** [1] - 42:9
**similarly** [1] - 45:20
**simply** [2] - 14:23, 33:7
**simultaneous** [1] - 9:5
**single** [1] - 15:22
**situation** [2] - 30:24, 40:9
**situations** [1] - 31:16
**size** [1] - 32:6
**SKAN** [82] - 5:9, 7:17, 7:18, 7:23, 8:1, 8:4, 9:7, 9:12, 10:21, 10:24, 11:1, 11:4, 11:8, 11:14, 12:15, 12:20, 13:5, 13:24, 15:2, 15:18, 15:21, 15:25, 16:3, 16:4, 16:8, 16:10, 16:12, 16:13, 16:17, 16:18, 16:25, 17:1, 17:18, 17:21, 18:2, 18:8, 18:10, 18:11, 18:12, 18:20, 19:2, 20:23, 20:24, 21:9, 21:20, 22:1, 22:2, 22:4, 24:5, 24:12, 26:5, 27:2, 27:8, 27:21, 28:7, 28:23, 34:12, 34:22, 35:5, 36:24, 37:6, 37:7, 38:1, 38:3, 38:9, 39:6, 39:15, 42:7, 42:15, 43:1, 43:4, 43:13, 43:15, 43:21, 44:5, 44:6, 44:16, 45:7, 45:15, 45:22
**SKAN's** [7] - 15:24, 16:5, 16:7, 18:18, 21:24, 38:16, 39:4
**slide** [2] - 19:24, 46:6
**slides** [3] - 19:10, 19:13, 19:18
**slow** [5] - 5:24, 6:25,

7:2, 10:2, 14:10
**Slower** [1] - 12:2
**slower** [6] - 5:22, 10:11, 12:3, 34:15, 34:19, 36:15
**smoothly** [3] - 14:20, 14:21, 30:3
**SNAP** [1] - 1:8
**Snap** [33] - 3:6, 7:20, 8:2, 8:9, 8:21, 9:2, 9:21, 10:6, 11:2, 11:3, 11:4, 11:15, 13:17, 13:18, 14:9, 16:7, 17:17, 24:4, 24:12, 24:19, 25:1, 25:3, 28:4, 28:6, 28:16, 29:14, 29:22, 35:21, 35:23, 37:12, 38:15, 38:23, 43:14
**snap** [1] - 38:10
**Snap's** [6] - 6:12, 7:23, 8:12, 8:14, 9:23, 27:22
**SnapChat** [1] - 6:17
**so-called** [2] - 6:15, 28:18
**social** [1] - 9:24
**software** [1] - 24:25
**SOLOWAY** [38] - 2:22, 4:6, 19:18, 19:21, 20:11, 20:14, 21:16, 22:6, 24:6, 24:14, 24:22, 25:17, 25:24, 26:2, 28:13, 30:17, 30:22, 32:4, 33:9, 33:14, 33:18, 33:21, 34:2, 37:16, 38:8, 39:24, 40:10, 40:21, 40:23, 41:16, 41:21, 47:15, 47:19, 47:22, 47:25, 48:17, 48:22, 49:8
**Soloway** [1] - 4:7
**solution** [1] - 16:23
**solutions** [1] - 38:11
**someone** [1] - 26:19
**sometimes** [1] - 31:19
**somewhat** [1] - 30:19
**somewhere** [1] - 46:2
**sons** [1] - 33:21
**sorry** [3] - 10:3, 24:4, 43:10
**sort** [1] - 26:14
**source** [2] - 11:19, 23:25
**South** [1] - 2:12
**speaker** [2] - 29:12,

29:20
**speaking** [9] - 5:21, 26:6, 35:6, 43:16, 43:19, 43:22, 44:16, 45:2, 45:9
**specific** [3] - 26:24, 40:2, 42:1
**specifically** [6] - 8:11, 10:19, 10:22, 27:3, 40:4, 42:6
**Speer** [4] - 3:7, 3:9, 47:24, 48:10
**Spiegel** [3] - 3:7, 47:24
**spoken** [1] - 23:16
**SQUIRE** [1] - 2:10
**stage** [3] - 22:7, 32:20, 36:1
**standard** [2] - 26:19, 27:6
**start** [2] - 5:13, 46:18
**starts** [2] - 29:15, 29:19
**STATE** [1] - 50:4
**statement** [48] - 5:4, 5:6, 5:7, 5:12, 6:10, 8:19, 8:21, 9:5, 9:14, 10:8, 10:14, 10:17, 10:18, 11:10, 11:21, 12:6, 12:22, 13:2, 13:25, 14:4, 14:17, 15:11, 16:8, 17:23, 17:25, 18:23, 18:24, 20:20, 22:7, 23:5, 23:20, 24:9, 24:10, 24:16, 25:15, 25:22, 26:8, 27:23, 28:20, 30:25, 31:3, 31:5, 31:7, 34:11, 43:14, 45:23
**statements** [29] - 4:25, 9:5, 16:15, 29:12, 29:22, 30:14, 31:4, 32:10, 32:12, 32:22, 33:1, 40:4, 40:24, 40:25, 41:8, 42:13, 42:24, 43:13, 43:20, 45:25, 46:4, 46:6, 46:10, 46:12, 46:14, 46:19, 46:22, 47:1, 47:3
**STATES** [1] - 1:1
**States** [3] - 50:7, 50:9, 50:14
**stating** [1] - 5:7
**status** [1] - 48:18
**stenographically** [1] - 50:11
**step** [2] - 24:8, 29:3
**still** [10] - 11:7,

11:25, 12:7, 15:7, 19:1, 25:12, 26:19, 26:23, 29:3, 35:10
**stop** [3] - 10:9, 34:18, 36:14
**stopped** [1] - 15:10
**strange** [1] - 30:19
**stream** [2] - 26:7, 27:18
**streams** [1] - 22:10
**STREET** [1] - 1:23
**Street** [3] - 2:5, 2:12, 2:15
**strong** [2] - 29:8, 32:18
**strongly** [1] - 32:25
**struck** [1] - 30:19
**stuff** [6] - 11:8, 15:7, 19:2, 20:9, 30:16, 46:13
**subject** [2] - 46:23, 46:24
**success** [12] - 11:16, 11:17, 16:5, 16:7, 17:10, 18:18, 18:19, 21:24, 37:4, 43:15, 44:1
**successful** [7] - 11:14, 13:9, 13:14, 15:16, 18:8, 21:25, 35:13
**successfully** [27] - 5:9, 10:5, 10:21, 10:23, 11:1, 11:2, 11:3, 12:25, 13:2, 13:24, 14:24, 15:2, 15:14, 16:9, 16:25, 17:12, 17:17, 21:9, 22:2, 22:13, 22:25, 23:6, 24:12, 24:24, 25:20, 26:10, 45:23
**sufficient** [3] - 30:15, 31:4, 32:11
**sufficiently** [2] - 25:20, 32:3
**suggest** [2] - 6:3, 21:7
**suggested** [1] - 21:19
**Suite** [4] - 2:9, 2:12, 2:15, 2:19
**summer** [1] - 22:22
**support** [1] - 38:4
**supports** [1] - 28:21
**suppose** [2] - 13:6, 35:14
**supposed** [6] - 7:18, 7:19, 15:4, 17:2, 31:8, 31:12
**supposedly** [2] -

30:24, 35:12
**Supreme** [1] - 44:23
**surfaced** [1] - 36:25
**surprise** [1] - 9:10
**sustainment** [1] - 21:25
**system** [4] - 22:21, 25:12, 39:1
**systems** [2] - 12:7, 25:12

---

**T**

---

**talker** [1] - 12:4
**talks** [1] - 44:11
**target** [1] - 37:2
**targeting** [1] - 44:13
**team** [1] - 44:7
**teams** [2] - 8:12, 44:8
**telephone** [5] - 48:2, 48:3, 48:4, 48:7, 48:8
**tend** [1] - 32:6
**tense** [1] - 10:18
**tentative** [20] - 4:14, 4:22, 5:6, 5:15, 6:11, 10:13, 20:17, 26:15, 27:6, 29:14, 31:14, 31:15, 32:24, 34:8, 36:13, 36:21, 39:8, 41:19, 44:20, 47:7
**terms** [2] - 8:6, 43:17
**TERRI** [4] - 1:22, 50:6, 50:19, 50:20
**terrible** [3] - 38:1, 38:17, 38:20
**test** [1] - 18:2
**tested** [1] - 37:9
**testing** [16] - 9:18, 15:9, 15:23, 15:24, 18:4, 19:3, 19:4, 27:11, 34:13, 34:22, 36:24, 37:10, 37:12, 43:22
**THE** [93] - 2:3, 2:16, 2:21, 3:5, 3:17, 3:24, 3:25, 4:1, 4:5, 4:12, 4:17, 4:19, 5:1, 5:22, 6:25, 10:2, 10:9, 12:2, 12:9, 12:24, 13:6, 14:10, 14:23, 15:14, 16:3, 16:18, 16:24, 17:11, 17:19, 18:6, 18:16, 19:13, 19:17, 19:20, 19:22, 20:8, 20:13, 21:14, 21:23, 24:2, 24:9, 24:15, 25:14, 25:18, 26:1, 28:9, 30:12, 30:18, 30:23, 32:15, 33:2,

33:13, 33:16, 33:19, 33:25, 34:4, 34:15, 34:18, 35:3, 35:11, 35:22, 36:3, 36:14, 36:17, 37:9, 37:14, 38:7, 39:17, 40:8, 40:17, 40:22, 41:14, 41:18, 41:22, 42:12, 43:8, 43:12, 45:24, 46:9, 47:3, 47:11, 47:17, 47:20, 47:23, 48:4, 48:6, 48:7, 48:13, 48:18, 48:24, 49:2, 49:9, 49:14
**theory** [2] - 8:7, 40:9
**therefore** [5] - 21:25, 22:25, 31:6, 31:7, 31:19
**thinking** [1] - 36:8
**third** [7] - 27:8, 28:1, 28:14, 33:22, 38:21, 39:1, 40:15
**third-party** [3] - 27:8, 38:21, 39:1
**thirty** [1] - 47:11
**threat** [3] - 13:17, 13:18, 45:6
**three** [4] - 33:21, 33:22, 33:25, 34:2
**throughout** [1] - 29:13
**timing** [1] - 8:19
**Title** [1] - 50:9
**TO** [1] - 1:13
**today** [4] - 3:22, 4:24, 5:3, 48:2
**took** [2] - 13:15, 19:7
**tool** [6] - 5:10, 7:19, 11:4, 16:1, 22:11, 34:12
**total** [1] - 24:8
**totally** [2] - 30:9, 39:19
**towards** [1] - 13:8
**Trace** [1] - 3:22
**track** [7] - 6:21, 7:10, 7:11, 7:20, 16:21, 18:14, 42:3
**tracked** [2] - 7:14, 7:16
**tracking** [11] - 5:10, 6:19, 7:4, 7:6, 7:19, 11:4, 15:25, 18:13, 34:12, 34:23, 35:2
**trail** [1] - 48:20
**TRANSCRIPT** [1] - 1:12
**transcript** [2] - 50:10, 50:12
**transition** [6] -

14:20, 28:7, 30:3, 43:1, 44:4, 45:22
**transparency** [1] - 7:4
**transpired** [1] - 48:19
**tried** [1] - 11:23
**true** [3] - 13:1, 15:18, 50:10
**True** [1] - 14:7
**Truist** [2] - 14:8, 20:4
**truthful** [1] - 17:20
**try** [2] - 32:3, 33:18
**trying** [2] - 19:2, 38:11
**Tulabs** [1] - 44:22
**turning** [1] - 20:21
**turns** [1] - 17:22
**two** [7] - 5:17, 8:20, 9:1, 23:10, 25:24, 26:1, 35:5
**type** [1] - 31:6
**types** [3] - 30:1, 31:16

## U

**U.S** [1] - 1:3
**uncertain** [3] - 29:18, 30:4, 30:10
**under** [9] - 5:17, 6:5, 7:6, 8:6, 20:17, 39:22, 39:25, 44:22, 45:4
**Understood** [1] - 32:4
**understood** [1] - 41:21
**UNIDENTIFIED** [1] - 49:13
**unique** [1] - 38:15
**United** [3] - 50:7, 50:9, 50:14
**UNITED** [1] - 1:1
**unless** [1] - 36:7
**unlikely** [1] - 45:3
**up** [9] - 6:16, 7:8, 11:6, 11:22, 12:6, 15:6, 17:1, 26:7, 36:18
**user** [2] - 6:17, 7:8
**user's** [1] - 6:21
**users** [5] - 7:13, 7:14, 16:21, 18:15

## V

**variety** [1] - 36:25
**various** [1] - 46:7
**Version** [1] - 44:16
**versus** [6] - 3:6, 3:7,

3:9, 36:1, 47:24
**vertical** [3] - 23:12, 23:17, 37:20
**view** [2] - 14:14, 35:15
**virtually** [3] - 6:12, 7:24, 13:19
**visibility** [6] - 26:5, 37:20, 37:21, 39:10, 39:12, 40:12
**vs** [1] - 1:7

## W

**wait** [1] - 16:1
**warning** [2] - 16:11, 29:19
**ways** [1] - 5:17
**weather** [1] - 8:2
**weigh** [3] - 31:8, 44:23, 44:24
**Weiss** [3] - 4:7, 4:8, 4:10
**WEISS** [1] - 2:22
**WEST** [1] - 1:23
**WHARTON** [1] - 2:22
**whatsoever** [1] - 28:3
**WHITE** [2] - 2:4, 2:7
**White** [4] - 2:6, 3:14, 3:15, 3:18
**whole** [1] - 37:23
**wide** [2] - 23:17, 23:24
**WILLIAMS** [1] - 2:13
**willing** [1] - 33:6
**window** [2] - 7:9, 15:19
**winning** [1] - 33:19
**witness** [1] - 40:4
**witnessing** [1] - 12:18
**WOLPERT** [1] - 2:17
**wonderful** [1] - 17:21
**word** [8] - 11:16, 14:24, 17:9, 17:12, 22:15, 22:24, 25:6, 30:15
**worded** [1] - 32:24
**words** [7] - 14:23, 17:7, 26:10, 30:2, 37:6, 43:17, 46:12
**work-arounds** [1] - 44:14
**works** [2] - 23:17, 34:12
**worth** [1] - 33:24
**WU** [1] - 1:3

## Y

**years** [3] - 8:7, 8:25, 13:22
**York** [3] - 2:6, 2:24
**yourself** [1] - 29:4

**UNITED STATES DISTRICT COURT**