**SAXENA WHITE P.A.**
David R Kaplan (230144)
dkaplan@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

*Lead Counsel for Lead Plaintiff*
*and the Class*

**BIENERT KATZMAN LITTRELL WILLIAMS LLP**
John L. Littrell (221601)
jlittrell@bklwlaw.com
Michael R. Williams (192222)
mwilliams@bklwlaw.com
601 W. 5th Street, Suite 720
Los Angeles, CA 90071
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

*Liaison Counsel for Lead Plaintiff*
*and the Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

|  |  |
|---|---|
| KELLIE BLACK, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>SNAP INC., JEREMI GORMAN, and EVAN SPIEGEL,<br><br>        Defendants. | No. 2:21-cv-08892-GW(RAOx)<br><br><u>CLASS ACTION</u><br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <u>AND JURY TRIAL DEMAND</u>** |

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ........................................................................ 1

II.   INTRODUCTION ...................................................................................... 2

III.  JURISDICTION AND VENUE ................................................................ 10

IV.   PARTIES ................................................................................................... 11

    A.   Lead Plaintiff .................................................................................. 11

    B.   Defendants ....................................................................................... 11

        1.   Snap ....................................................................................... 11

        2.   Jeremi Gorman ...................................................................... 11

        3.   Evan Spiegel .......................................................................... 14

    C.   Other Relevant Party ...................................................................... 15

V.    OVERVIEW OF THE FRAUD ................................................................ 15

    A.   Snap's Direct Response Business Was By Far The Most Critical
        Part Of Its Advertising Business .................................................... 15

    B.   Snap's Direct Response Advertising Business Was Directly
        Dependent On Snap's Ability To Track Users' Data And
        Activity—Which On Apple Devices, Was Enabled By IDFA ............ 18

    C.   After Apple Announces Privacy Changes That Will Require
        Users To "Opt-In" To IDFA Data Tracking, Investors Are
        Concerned About The Potential Negative Impacts On Snap's
        Business ............................................................................................ 20

    D.   Prior To The Class Period, Analysts And Commentators Raise
        Concerns About SKAN's Viability As A Replacement For IDFA ...... 22

    E.   In Sharp Contrast To Its Principal Competitors, Snap
        Repeatedly Touts SKAN As An Effective Replacement For
        IDFA ................................................................................................ 23

    F.   Apple's Six-Month Delay Rolling Out ATT Gives Snap
        Extensive Time To Test SKAN's Capabilities As Compared To
        IDFA ................................................................................................ 28

    G.   Gorman Twice Falsely Proclaims That Advertisers That
        Represent A "Majority" Of Snap's Critical Direct Response
        Revenue Had "Successfully Implemented" SKAN ........................... 31

    H.   A Plethora Of Highly Sophisticated Analysts Explicitly Cited
        And Relied On Defendant Gorman's Representations To

Conclude: "ATT Changes As Less Of A Risk Than Previously" And "IDFA's Impact Not Likely Material"..........................................34

I.   Defendant Gorman Was Clearly Aware Of The Materiality Of Her Statements When She Twice Affirmed The Successful Implementation Of SKAN By The Majority Of Snap's DR Advertisers—Thereby "Mitigating" The IDFA Risk......................41

J.   Gorman's April 22, 2021 Statements Had A Lasting Impact On Snap Investors, Who Believed Until The End Of The Class Period That ATT's Risk To Snap Was "Minimal" .............................45

K.   The Truth Is Revealed ........................................................48

L.   Post-Class Period Events Confirm That The Fallout From Defendants' Fraud Continues To This Day .........................................55

M.   Former Snap Employees Confirm That Snap's Advertisers Did Not "Successfully Implement" SKAN By April 2021—And That Snap Management Explicitly Instructed Employees To Not Document Anything About The Expected Significant Negative Impact On Snap's Revenue I Order To Avoid Public Disclosure Obligations ........................................................................56

  i.   A Former Snap Employee Confirms That The Company Knew SKAN Was Unworkable From Day One, Severely Impacting Snap's Advertising Performance............................57

  ii.   Former Snap Revenue Forecaster Confirms Gorman Had No Basis For April 2021 Statements—And Describes How Snap Management Instructed Employees To Not Quantify Or Document Anything About The Negative Impact Of ATT In Order To Avoid Public Disclosure ............59

  iii.   "She Just Made That Up": Another Former Company Employee Confirms That Defendant Gorman Had No Basis For Her April 2021 Statements ........................................68

  iv.   Former Manager With Snap's Advertising Partner Describes "Super Drastic" Impact Of ATT On Snap's Business Shortly After ATT Rollout—Causing Snap Advertisers To "Shut Down" Their Snap Campaigns.............69

VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS....................................................71

VII.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ..........74

VIII.  LOSS CAUSATION ........................................................84

IX.   PRESUMPTION OF RELIANCE ................................................86

X.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE.................................................87

XI.     CLASS ACTION ALLEGATIONS ........................................................... 88

XII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ......................... 90

        COUNT ONE ................................................................................ 90

        COUNT TWO ................................................................................ 92

XIII.   PRAYER FOR RELIEF ....................................................................... 94

XIV.    JURY DEMAND ................................................................................ 95

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.     <u>NATURE OF THE ACTION</u>

1.     Court-appointed Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters" or "Lead Plaintiff") brings this securities class action on behalf of itself and all other persons and entities who purchased or otherwise acquired Snap Inc. ("Snap" or the "Company") publicly traded securities, and/or sold Snap put options, between April 23, 2021 and October 21, 2021, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").  Lead Plaintiff asserts claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Snap and the Company's former Chief Business Officer Jeremi Gorman ("Gorman," and together with Snap, "Defendants"), and under Section 20(a) of the Exchange Act against Gorman and Snap's Chief Executive Officer, co-founder and Director, Evan Spiegel ("Spiegel").

2.     Oklahoma Firefighters alleges the following upon personal knowledge as to itself and its acts, and upon information and belief as to all other matters, based upon the ongoing investigation of its counsel. Lead Counsel's investigation included, among other things, review and analysis of: (i) Snap's public filings with the Securities and Exchange Commission (the "SEC"); (ii) in-depth research reports by securities and financial analysts; (iii) transcripts of Snap's conference calls with analysts and investors concerning Snap; (iv) presentations, press releases, and media reports regarding the Company; (v) interviews with former Snap employees and Company Partners; (vi) data reflecting the pricing of Snap shares; and (vii) consultations with relevant experts. Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery, as many of the facts are known only by Defendants, or are exclusively within Defendants' custody or control.

3.      Lead Plaintiff's Third Amended Class Action Complaint ("TAC") incorporates the Court's determinations in its March 13, 2023 Order (the "MTD Order," ECF No. 115), which held that "Plaintiff ha[d] plausibly alleged a material misrepresentation"—namely, Defendant Gorman's April 22, 2021 statement that "[a]dvertisers that represent a majority of [Snap's] direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns"—but ultimately granted Defendants' motion to dismiss Plaintiff's Second Amended Class Action Complaint ("SAC").   *See* MTD Order at 32, 39.   Reflecting the Court's determinations in the MTD Order, the TAC (i) removes allegations concerning the statements that the Court determined were not actionable on falsity grounds; (ii) retains allegations concerning Defendant Gorman's April 22, 2021 false and misleading statement, which the Court determined was a material misrepresentation (MTD Order at 32, *see, e.g.,* ¶¶155-56); and (iii) provides numerous additional facts supporting scienter for Gorman's April 22, 2021 statement, which the Court previously described as a "close call." (MTD Order at 37, *see*, *e.g.*, ¶¶161-81).

## II.   **INTRODUCTION**

4.      Snap is a social media company whose primary product is a free mobile chatting application called Snapchat.  Snap's business depends entirely on selling ads within Snapchat, which comprises substantially all of the Company's revenue. Significantly, during the Class Period, roughly 70% of that advertising revenue was derived from users of Apple devices, including iPhones and iPads.

5.      Both before and during the Class Period, the most critical segment of Snap's business by far was "direct response" or "DR" advertising, which consisted of in-app ads that would ask the user to take a specific action, such as downloading an app or making a purchase.  DR advertising revenue accounted for well <u>over half</u> of the Company's overall revenue and <u>virtually all</u> of its growth.  Significantly, Snap's DR advertising business heavily depended on the Company's ability to track

users' activity on their devices, so that advertisers could both target their ads to specific users based on their interests and measure the effectiveness of those ads. This tracking on Apple devices was enabled through a system known as "Identifier for Advertisers" ("IDFA"), which allowed Snap and its advertisers to track individual users' activity and their interaction with advertisements in real time.

6.    In June 2020, Apple announced privacy changes to its devices that posed a highly significant threat to Snap's business.  Specifically, Apple announced that app companies like Snap would no longer be able to use IDFA to track user activity on Apple devices unless those users expressly and affirmatively "opted in" to being tracked—a change that Apple referred to as "App Tracking Transparency" ("ATT").  Because users would most likely <u>not</u> consent to being tracked, industry observers expressed concern that the ATT changes could significantly harm Snap and other social media companies whose DR advertising revenue was dependent on IDFA's tracking capabilities.  While Apple offered an alternative tool known as SKAdNetwork (or "SKAN") that would purportedly allow Snap and its advertisers to continue to target and measure advertising, investors were concerned that SKAN would not provide the functionality to be a viable ad tracking tool.

7.    Accordingly, leading up to the Class Period, Snap was under intense pressure to strongly reassure the market that its advertising business was well-equipped to withstand the ATT changes and maintain what had been record advertising and revenue growth.  Snap set the stage for that reassurance beginning in February 2021, when Defendant Gorman, who was Snap's Chief Business Officer in charge of the Company's advertising business, told investors that Snap fully supported the ATT changes and was "really well prepared" to weather them because the Company had "<u>been working really closely with Apple to implement [SKAN]</u>," and had been "communicating very well with advertisers" about SKAN to "<u>mitigate</u>" the changes.  Snap's positive statements carried substantial weight.

Moreover, and significantly, these statements stood in stark contrast to those of Snap's primary competitor, Facebook, which had launched a high-profile public campaign criticizing Apple's changes, while explicitly warning that ATT would "severely impact [advertisers'] ability to monetize" their Facebook ad campaigns and would "have a significant impact" on Facebook's direct response business. Indeed, market analysts expressed great relief in response to Snap's contrary and wholly positive assurances, concluding that, because Snap's statements about ATT were of "<u>far lesser prospective negative impact</u>" than what Facebook was reporting, "<u>Snap is clearly not worried</u>" about ATT negatively impacting the Company's business.

8.      Significantly, while Apple's changes were scheduled to be rolled out in September 2020, Apple announced that month that the ATT changes would be delayed by at least a half-year, to "early 2021," to give companies like Snap more time to prepare for them.  Media reports hailed this delay as a welcome "stay of execution" because it gave companies ample time to test SKAN's capabilities as compared to IDFA.  Indeed, because industry and market commentators already expected the vast majority of Apple users to opt out of IDFA tracking, the critical question for Snap investors leading into the Class Period—particularly in light of Defendant Gorman's earlier statements claiming that Snap would weather ATT better than its competitors with SKAN—was whether SKAN had proven to be a workable alternative for IDFA.

9.      As Apple was finally rolling out ATT in late April 2021 at the outset of the Class Period, Defendant Gorman provided investors with the exact reassurance for which they had been clamoring.  Specifically, not once, <u>but twice</u>, on Snap's April 22, 2021 earnings call, Gorman staunchly reassured the market that any prospective negative impact on Snap's business from the ATT changes would be "mitigated" precisely because a "majority" of Snap's critical DR advertisers had

purportedly ***already*** "successfully implemented" SKAN for their Snap ad campaigns.  Indeed, Gorman specifically noted that the substantial seven-month delay in the ATT rollout had allowed both Snap and its DR advertisers ample time to test and implement SKAN—in Gorman's own words, the delay "gave us a lot of time to prepare" for the changes, and "[t]he fact that [Apple's] changes are coming later than we anticipated has provided additional time to adopt [SKAN] and begin implementing and testing with our partners."  Then, Gorman explicitly stated— ***multiple times***, in response to analysts' specific questions and in no uncertain terms—that as a result of those efforts, "[a]dvertisers that represent a majority of our direct response advertising revenue have successfully implemented SKAdNetwork for their Snap campaigns."  Significantly, when an analyst immediately asked Gorman "what defined [the] success of that implementation," and whether investors should "***expect [it] to mitigate some of the IDFA headwinds that have been a source of investor concern***," Gorman did not qualify or hedge her earlier statement in any way.  To the contrary, Gorman responded affirmatively, unequivocally repeating: "we're really pleased to see that advertisers that represent the majority of our direct response revenue have implemented [SKAN] so far."

10.     There can be no credible debate as to the import of Defendant Gorman's representations.  Indeed, ATT indisputably posed the biggest threat at this time to Snap's most critical advertising business, and a plethora of sophisticated analysts fully credited and heavily relied upon Gorman's assurances, explicitly noting that they clearly meant that a majority of Snap's advertisers had already fully implemented SKAN and were using it effectively to neutralize the impact of Apple's privacy changes—meaning that Snap was uniquely insulated from any significant business impact stemming from those changes.  For example, Truist Securities highlighted that Snap's ability to handle the changes gave the Company a competitive advantage over its largest and most significant competitors, writing that

the delay in the ATT rollout had "provided the company with additional time to adopt [SKAN] and begin implementing and testing it with partners," and that "[u]nlike [Facebook]," Snap was successfully weathering ATT because "[m]anagement stated that advertisers that represent a majority of its [direct response] ad revenue have successfully implemented [SKAN]." In fact, Gorman's statements were so material that they caused Truist to conclude that "IDFA's Impact [was] Not Likely Material," and numerous other analysts similarly concluded that, based on Gorman's confirmation that Snap had "mitigate[ed]" the ATT risk because a "majority" of Snap's critical direct response advertisers had "successfully implemented" SKAN, Snap would not suffer a material impact from ATT. For example, Guggenheim concluded that Snap had "not experience[d] monetization impacts" from ATT; Oppenheimer opined that "we now see reduced risks from [Apple's] removal of IDFA[] as the delayed rollout allowed more time to work with advertisers to adopt [SKAN]"; and JMP concluded that a negative impact from the ATT changes was "less of a risk than previously" thought.

11.    On the strength of Defendant Gorman's representations, Snap's stock price soared, climbing 46% from a $57.05 closing price on April 22, 2021 to an all-time high closing price of $83.11 on September 24, 2021.

12.    Significantly, Defendant Gorman was unquestionably acutely aware of the obvious materiality of her statements. Indeed, Gorman was a seasoned executive, serving as Snap's Chief Business Officer in charge of Global Advertising Sales who had directly and repeatedly spoken to Snap's investors for years about the Company's crucial DR advertising business on each and every earnings call. Moreover, Gorman was the officer charged by the Company's CEO with the primary responsibility of communicating with investors about the import of ATT on Snap's business; Defendant Spiegel himself deferred to Gorman when questioned about this topic by analysts. Tellingly, despite the fact that, as shown above, analysts fully

credited and adopted the plain meaning of Gorman's statements during the April 22, 2021 earnings call, at no point through the remainder of the Class Period did Gorman ever once further explain, qualify, or in any way retract her statement that a "majority" of Snap's DR advertisers had "successfully implemented" SKAN—despite having numerous opportunities to do so.

13.     In fact, even months later, analysts were still crediting Defendant Gorman's statements in concluding that ATT not only did not pose any material threat to Snap's business, but that the risk was in fact "minimal." For example, following Snap's July 2021 earnings call, Evercore stated "we increasingly believe [the IDFA risk] is likely minimal"; Jefferies "estimate[d] [that the ATT risk] will be minimal"; and Morningstar concluded that "we believe the impact of Apple's moves will remain minimal"—precisely because, as Gorman had represented, "Snap has already been working with Apple to use [SKAN]."  Even up until mere days before the truth would be revealed in October 2021, Truist noted that, based on Gorman's representations, it "expect[ed] IDFA to have a minor impact on [Snap's] results"; J.P Morgan opined that, as opposed to Facebook, Snap had only "limited exposure" to ATT while Facebook struggled in comparison; and MKM Partners commented that Snap had "clearly mitigated" the impact of the ATT changes.

14.     As Defendants were ultimately forced to admit only days later, their representations regarding Snap's success using SKAN to weather Apple's privacy changes were completely false.  On October 21, 2021, Snap stunned the market by announcing that, precisely because of massive problems that its advertisers were experiencing with SKAN, the Company would, for the first time in its history as a public company, miss the lower end of its revenue guidance.  Moreover, these problems were so severe, and so pervasive and intractable, that Snap's business would be materially impacted for at least the next year.  Indeed, Snap was forced to reduce its guidance for its most important financial metric, Adjusted EBITDA, by a

staggering <u>50%</u> for the fourth quarter of 2021, causing analysts to dramatically slash their 2022 Adjusted EBITDA estimates by as much as 40%.

15.   Significantly, in announcing these disastrous results, Defendants explicitly contradicted the express assurances they had made to investors just a few months earlier.   Specifically, while Defendants had previously unequivocally assured investors that a "majority" of Snap's direct response advertisers had already "successfully implemented" SKAN by no later than April 2021, Defendants now admitted that the ***<u>exact opposite</u>*** was true.   In reality, as Snap's advertisers had "<u>explored and tested SKAN</u>," they had immediately determined that SKAN was a completely "<u>unreliable</u>" and ineffective replacement for IDFA.   Indeed, Defendants admitted that, upon attempting to implement SKAN, Snap's advertisers had raised a laundry list of serious "concerns about [SKAN's] limitations," including that SKAN had rendered them utterly unable to either effectively target their ads or monitor the success of their ad campaigns in real-time—two capabilities that were absolutely critical for their business.   Thus, directly contrary to Defendants' earlier statements, no "successful implement[ation]" of SKAN had <u>ever</u> occurred.

16.   In response to these stunning disclosures, Snap's stock price collapsed, plummeting over 26% in one day—the then-largest single-day stock drop in Snap's history, wiping out $27 billion in market capitalization.   Analysts excoriated management for their lack of candor, with RBC Capital Markets stating that "***<u>management almost couldn't have sounded worse around the effects [the IDFA change] is having</u>***," and that "***<u>management's credibility</u>***" was both "***<u>permanently damaged</u>***" and "***<u>likely gone given recent communications did not indicate these risks</u>***."   Similarly, MKM Partners highlighted Defendants' reversal compared to their prior statements, stating that they were "<u>surprised with the change of management's tone</u> with regards to the effect of Apple changes on Snap's ad business."

17.     Defendants' contemporaneous internal knowledge of SKAN's severe limitations and the expected negative impact of the ATT changes on the Company's crucial advertising revenue has been confirmed by the detailed accounts of former Snap employees and former employees of Snap's partners.  Significantly, these former employees not only confirmed that SKAN was unworkable from day one—such that Defendants knew from the outset that Apple's privacy changes would inevitably negatively impact Snap's revenues—they also confirmed that Defendant Gorman had absolutely no basis to make the statements she made in April 2021.

18.     Specifically, a former Snap employee who was directly in charge of revenue forecasting for the Company's Revenue Product group confirmed that, based on internal Company documents, in April 2021, a "majority" of the Company's DR advertisers **_had not_** "successfully implemented" SKAN—rather, the exact opposite was true:  even by as late as August 2021, a majority of Snap's DR advertisers had not even taken the initial steps necessary to "opt in" to SKAN, let alone "successfully implement" it.  In a rarity for securities fraud litigation, this former employee occupied an extraordinarily high-level position at Snap and had extremely close professional and personal relationships with Snap's most senior officers.  As detailed herein, this former employee routinely attended revenue forecasting meetings with Defendant Gorman and CFO Derek Andersen, and her work was regularly praised by the senior-most officers of the Company, with Defendant Spiegel going so far as to send her flowers and a handwritten note personally thanking her for her analyses, and Defendant Gorman sending her direct text messages likewise reflecting the importance of this former employee's role at Snap—and pictures of those notes are included below.

19.     Other former Snap employees confirmed that Defendant Gorman had no basis whatsoever to proclaim in April 2021 that a "majority" of the Company's direct response advertisers had "successfully implemented" SKAN.  For example, a

former Snap Account Strategist who was directly involved in transitioning Snap's advertisers to SKAN detailed how advertisers immediately identified SKAN as completely unworkable from the moment ATT was launched in April 2021—such that, rather than "successfully implementing" SKAN by that time, Snap's advertisers in fact dragged their feet as long as possible due to SKAN's numerous severe limitations. Another former Snap employee who was a Partner of Product Marketing stated that "***there is no way that Jeremi Gorman could have made a statement like that based on actual data***," that "***there is no way that was accurate***" and that "***she just made that up***."

20.   In the wake of the disclosure of Defendants' fraud, Snap's stock price has never recovered, currently trading at approximately $10 per share—a small fraction of the Class Period high of over $83 per share. Investors have suffered substantial losses from Defendants' violations of the federal securities laws. This action seeks redress on behalf of these aggrieved shareholders.

## III.   <u>JURISDICTION AND VENUE</u>

21.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

22.   Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Snap maintains its corporate headquarters in Santa Monica, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District. In connection with the acts alleged in this Third Amended Class Action Complaint, Defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. PARTIES

### A. Lead Plaintiff

23. Lead Plaintiff Oklahoma Firefighters provides retirement benefits to firefighters in the state of Oklahoma. It has approximately $3.3 billion in assets and over 25,000 participants. As set forth in its previously submitted certification, Oklahoma Firefighters purchased Snap common stock on the New York Stock Exchange ("NYSE") during the Class Period and suffered damages as a result of the federal securities laws alleged herein. *See* ECF No. 31-1.

### B. Defendants

#### 1. Snap

24. Defendant Snap is a Delaware corporation with its principal executive offices located at 3000 31st Street, Santa Monica, CA 90405. Snap began its operations in 2011 as a picture messaging application for the iPhone called "Snapchat." Because Snapchat is a free application, Snap generates almost all its revenue from third-party advertising. Snap's shares trade on the NYSE under the ticker symbol "SNAP."

#### 2. Jeremi Gorman

25. Defendant Gorman served as Chief Business Officer from November 2018 to September 2022. During her tenure at Snap, Gorman, an over 20-year digital advertising industry veteran, was responsible for Revenue and Customer Operations, including Global Advertising Sales and oversight over all of the Company's sales and advertising teams. Gorman also led the overhaul of Snap's ad business through "verticalization" pivoting from a regional structure to one focusing on key categories like direct-response clients—the goal of which, according to Gorman, was to have

"Snap team members become deep experts in their partners' businesses and industries." As noted by CNBC, Gorman "surrounded herself with a team of figures that are well-known to the advertising community," with Ad Week commenting that while at Snap, Gorman "hir[ed] a number of employees from Amazon and other companies focused on direct response advertising" in order to build Snap's direct response advertising business. Since joining Defendant Spiegel on the Company's fourth-quarter 2018 earnings call to discuss the Company's advertising business, Gorman was featured prominently on the Company's earnings and conference calls, speaking to investors about Snap's direct response advertising business every single quarter until her departure. Additionally, as Defendant Gorman herself told CNN Business, she also regularly spoke on internal panels and participated in monthly all-hands meetings at Snap.

26. Prior to joining the Company, Defendant Gorman was employed at Amazon.com Inc., serving as Head of Global Field Advertising Sales from June 2018 to November 2018, as Head of Field Advertising Sales, U.S. from April 2015 to June 2018, and as Head of Entertainment Advertising Sales from 2012 to April 2015. Gorman's career has been focused on digital media, as she also served in advertising and marketing roles at Yahoo, Variety Magazine, and Monster.com. Several media outlets and analyst reports noted that marketers and advertisers have worked with Defendant Gorman for years. Gorman is currently the President of Worldwide Advertising at Netflix.

27. During the Class Period, Defendant Gorman as a senior executive officer of Snap, was privy to confidential, proprietary and material adverse non-public information concerning Snap, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees

thereof, and via reports and other information provided to them in connection therewith.  Because of her possession of such information, Defendant Gorman knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

28.     Defendant Gorman is liable as a direct participant in the wrongs complained of herein.  In addition, Defendant Gorman, by reason of her status as a senior executive officer, was a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of her position of control, Defendant Gorman was able to and did, directly or indirectly, control the conduct of Snap's business.  Defendant Gorman, because of her position with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public.  Thus, Defendant Gorman had the opportunity to commit the fraudulent acts alleged herein.

29.     As a senior executive officer and as a controlling person of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, Defendant Gorman had a duty to disseminate promptly accurate and truthful information with respect to Snap's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Snap's securities would be based on truthful and accurate information. Defendant Gorman's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

### 3.   Evan Spiegel

30.   Defendant Spiegel is named as a defendant in this action solely as a control person pursuant to Section 20(a) of the Exchange Act.  Defendant Spiegel co-founded Snap in 2011 and has served as the Company's Chief Executive Officer ("CEO"), and as a member of the Company's Board of Directors, since May 2012. According to Snap's 2020 Form 10-K (filed on February 5, 2021), together with co-founder Robert Murphy, during the Class Period, Spiegel "<u>own[ed] or control[led] voting shares</u>" of Snap "<u>that represent[ed] approximately 99% of the voting power of [Snap's] outstanding capital stock</u>"—and "<u>Spiegel alone c[ould] exercise voting control over a majority of [Snap's] voting power</u>."   As a result, <u>Spiegel, "acting alone," had "the ability to control the outcome of all matters submitted to [Snap's] stockholders for approval</u>, including the election, removal and replacement of [Snap's] directors and any merger, consolidation, or sale of all or substantially all of [Snap's] assets."   Snap's 2020 Form 10-K further stated that, "[a]s our Chief Executive Officer," Spiegel was "responsible for [Snap's] strategic vision" and had "<u>control over [Snap's] day-to-day management and the implementation of major strategic investments</u>" of the Company.

31.   Additionally, in his role as Snap's CEO, Spiegel participated in the Company's earnings and conference calls both prior to and during the Class Period, including on February 4, 2021, February 23, 2021, April 22, 2021 and July 22, 2021. Spiegel also specifically spoke to investors about ATT and SKAN both prior to and during the Class Period at other public forums, and specifically during CNBC programs that aired on February 5, 2021 and May 21, 2021.

32.   Defendant Spiegel, by reason of his status as a senior executive officer, was a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of his position of control, Defendant Spiegel was able to and did, directly or indirectly, control the conduct of Snap's business.

Defendant Spiegel, because of his position with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public.

### C.   Other Relevant Party

33.    Derek Andersen has served as Snap's Chief Financial Officer ("CFO") since May 2019 and reports to Defendant Spiegel.  Andersen previously served as Snap's Vice President of Finance since July 2018.

## V.    OVERVIEW OF THE FRAUD

### A.   Snap's Direct Response Business Was By Far The Most Critical Part Of Its Advertising Business

34.    Snap is a social media company whose sole product is the Snapchat app for smartphones and tablets, which allows users to chat with each other and to send each other photo and video communications with a variety of digital enhancements. Snap does not charge users for its Snapchat app, and thus its entire revenue stream comes from selling targeted advertising that appears within the app.  Indeed, as the Company's Form 10-K for the year ending December 31, 2020 explained, "[s]ubstantially all of [Snap's] revenue is generated from third parties advertising on Snapchat, a trend that we expect to continue.  For the years ended December 31, 2020, 2019, and 2018, advertising revenue accounted for approximately 99%, 98%, and 99% of total revenue, respectively."

35.    Following its 2011 launch, Snap grew rapidly as Snapchat's user base skyrocketed.  By the end of 2020, Snapchat had grown to approximately 265 million daily active users, with the vast majority of those users accessing Snapchat through Apple iOS devices (such as iPhones or iPads).  Accordingly, Snapchat's success on the Apple platform was of vital importance to the Company's business prospects, as the vast majority of Snap's revenue was derived from ads placed on Apple devices. For example, during the Class Period, a Needham analyst estimated that ads on

Apple devices accounted for roughly 70% of Snap's revenues.  The ability to effectively advertise on Apple devices was therefore crucial to Snap's business.

36.     Leading up to and during the Class Period, Snap's "direct response" advertising platform was by far the most critical part of its advertising business. Direct response ads are in-app ads that ask a user to take a specific action, such as clicking through to a shopping website to make a purchase or to download an app. By mid-2020, direct response advertising made up well over half of Snap's revenue, and was responsible for the vast majority of Snap's explosive revenue growth.

37.     Indeed, direct response advertising was widely seen as the Company's key growth engine and the reason for its breakout success.  As an April 2020 article on the advertising website *Campaign* explained, "Snapchat has found its groove as the go-to ad platform for direct-response advertising, which has more than doubled in revenue and now makes up more than half of the company's total revenue." Similarly, an April 2020 CNBC article noted that Snap was "better insulated [from COVID-19 impacts] than its peers because of its strong momentum with direct-response advertisers."   And an October 2020 article on MarketingDive.com emphasized that "Snap's outperformance is due to its rising stature as a direct response advertising platform."

38.     Snap's top management also repeatedly stressed the significance of the Company's direct response business.  For example, on April 21, 2020, Defendant Gorman noted that due to "the majority of our revenue being [direct response], we are less impacted by single events than we were a couple of years ago," and Defendant Spiegel highlighted how Snap had "built this very big [direct response] business, and that's really an important driver of [] growth."  Similarly, at a May 12, 2020 J.P. Morgan conference, Spiegel called direct response "critical" to Snap's business, and on Snap's October 20, 2020 earnings call, Gorman stressed the

"continued resilience from direct response advertisers, reinforcing our confidence in the long-term positioning of our business."

39.    In the months leading up to and throughout the Class Period, Defendant Gorman continued to highlight the importance and success of Snap's direct response advertising business, touting it as the main source of the Company's "all time high" advertiser growth and the key to its consistent 50%+ year-over-year quarterly revenue growth.  For example, on the Company's February 4, 2021 earnings call, Gorman stated that Snap had "exited 2020" with "the best momentum we've ever had in our advertising business, more than doubling advertiser count year-over-year" to "put[] up [the] highest number of advertisers of all time"—and specifically noted that it was the Company's "direct response advertisers" that had "dr[iven] [Snap's] active advertisers to an all time high."  Similarly, on the Company's April 22, 2021 earnings call at the outset of the Class Period, Gorman touted that Snap's "advertiser base approximately doubled year-over-year" and emphasized that Snap "continue[d] to see over half our revenue come from direct response campaigns."  And on the July 22, 2021 earnings call, Gorman noted that Snap "benefited from" its "continued success with [] direct response" advertisers.

40.    Analysts also focused on Snap's direct response advertising business as being critical to the Company's advertiser and revenue growth.  For example, in February 2021, Truist Securities stated that "Snap's investment into direct response (DR) ad products over the last two years continue[s] to pay off," and emphasized that Snap's reported "record high" number of advertisers had been "fueled by continued strength from DR [direct response] advertisers."  Similarly, in April 2021, Canaccord Genuity noted that Snap's "[d]irect response strength" had "drive[n] accelerating advertising growth," while J.P. Morgan commented that Snap had reached its "highest growth rate in 3 years" and "doubled" its advertiser base with "DR [direct response] continuing to drive the majority of revenue."

**B.      Snap's Direct Response Advertising Business Was Directly Dependent On Snap's Ability To Track Users' Data And Activity— Which On Apple Devices, Was Enabled By IDFA**

41.      Significantly, the success of Snap's direct response advertising business depended on Snap's ability to collect its users' data and track their activity on an individual basis in real time.  That is because, as explained below, Snap's direct response advertisers needed to obtain precise and detailed user information in order to craft successful advertising campaigns.

42.      First, individualized data-tracking enabled Snap and its advertisers to precisely target ads to individual users based on their traits and attributes.  As stated in Snap's 2020 Form 10-K, the Company's main selling point to its advertisers were the "tools" it offered to "help[] advertisers increase their return on investment <u>by providing more refined targeting</u>" of ads based on user data.  This functionality enabled Snap's advertisers to "optimize relevance of ads across the entire platform by determining the best ad to show to any given user based on their real-time and historical attributes and activity."  This in turn would "decrease[] the number of wasted impressions [i.e. user views of an ad that did not result in any engagement or purchase] while improving the effectiveness of the ads that are shown."

43.      Second, and importantly, Snap's ability to track its users' activity enabled advertisers to measure the effectiveness of their ad campaigns with exacting detail and in real time.  As Snap's 2019 Form 10-K explained, Snap enabled advertisers to "measur[e] advertising effectiveness" through tools designed to "provide analytics on campaign attributes like reach, frequency, demographics, and viewability; changes in perceptions like brand favorability or purchase intent; and lifts in actual behavior like purchases, foot traffic, app installs, and online purchases."  Significantly, all of these important advertising functions required detailed and precise tracking of user activity on their phone or tablet device.

44.      On Apple iOS devices, Snap's user tracking was enabled by an Apple platform known as Identifier for Advertisers, or IDFA.  As of the outset of the Class

Period, Apple's IDFA enabled app makers like Snap, and its advertisers, to collect detailed data on its users' interactions with advertisements, and to track users' activity on their devices even outside of the Snapchat app.  For example, if a mobile gaming company were to advertise a new game within Snapchat, IDFA would make it possible for both Snap and the gaming company to know whether individual users had clicked the ad for the game, whether they had subsequently downloaded and installed the game on their device, whether they had played the game, and whether they had spent money within it.  Similarly, IDFA could track whether a Snapchat user clicked on a designer clothing ad (which would open the user's web browser), and whether they subsequently purchased the clothing item advertised.

45.     As such, although Apple's IDFA made individual users anonymous and did not provide any personally identifying data, it enabled Snap and its advertisers to track these users' activity on an individual-by-individual basis, both with respect to specific ads and more generally.  This tracking enabled advertisers to more precisely target their ad campaigns to consumers likely to be interested in their products, and also gave them powerful tools to measure the effectiveness of individual ads or ad campaigns within Snapchat.  Moreover, IDFA enabled Snap and its advertisers to measure the effectiveness of ads in real time, allowing them to tweak ads and ad campaigns for greater effectiveness within mere minutes.

46.     Consequently, these detailed features and capabilities that IDFA offered to Snap's advertisers were absolutely critical to Snap's direct response advertising business—the vast majority of which, as stated above, was derived from Apple devices in particular.  Indeed, IDFA's tracking features greatly aided Snap's success as a direct response advertising platform, enabling Snap to charge a premium for its advertising spots versus more traditional online and mobile advertising.  Thus, any changes to IDFA could materially impact the Company's financial success.

**C.    After Apple Announces Privacy Changes That Will Require Users To "Opt-In" To IDFA Data Tracking, Investors Are Concerned About The Potential Negative Impacts On Snap's Business**

47.    In June 2020, as part of an ongoing privacy push, Apple publicly announced a slew of new data privacy features for iOS.  Of particular concern to social media companies like Snap were Apple's planned changes to IDFA. Specifically, prior to the changes, users' activity was <u>automatically</u> tracked by IDFA unless they affirmatively "opted out" of tracking—a function that few iOS users were even aware of, much less enabled, because it required users to actively seek out the opt out function within their iPhone settings.

48.    However, Apple's June 2020 announcement revealed that the planned privacy changes, which were scheduled to roll out in September 2020, would now require users to affirmatively "opt in" to IDFA data tracking, and users would have to take the affirmative step of "opting in" to enable tracking for each app. Specifically, under this change—which Apple referred to as "App Tracking Transparency" (or "ATT")—once iOS device users updated their devices, apps like Snapchat would have to display a prompt like the below example, asking users whether they wished to provide permission to companies to track them across apps and websites to collect their personal data for advertising purposes:



49.    Significantly, analysts, journalists, and investors expected that most users would <u>not</u> agree to "Allow Tracking" of their app and website data for advertising purposes, which would greatly hinder advertisers' ability to track the

effectiveness of their ads and thus negatively impact the in-app ad revenue upon which companies like Snap heavily depended.

50.    For example, Vox stated in a June 22, 2020 article that "[a]ssuming most people decide not to allow their apps to track them, this could fundamentally change the mobile app ad tech industry. The ads will still be there, of course, but they're worth a lot less if advertisers can't target them to certain audiences—which means less money for the companies that make the apps." A July 24, 2020 MacQuarie report similarly explained that "Apple's mobile IDFA has long been the mechanism by which publishers understand what device their apps are sitting on – but the new iOS will include a prompt to users forcing them to opt in to having their data tracked for advertising purposes, with IDFA shut off by default."  The report expressed concerns that "[o]pt-in rates could be very low, and mobile marketers will have to find other ways to attribute ad effectiveness."  A January 28, 2021 Needham & Company report also opined that "as soon as iPhone owners can opt out of advertising via the new iOS 14 permissions, they will."  As a result, *Forbes* stated that Apple was "sending an $80 billion industry into upheaval," and that ATT was a "huge problem for a massive industry" as "Snapchat . . . and literally thousands of other services that we depend on . . . would be at risk.  Without a means of tracking the effectiveness of advertising, those platforms can't prove effectiveness, or adequately value the worth of their users to advertisers."

51.    To help providers and advertisers cope with these coming changes, Apple promoted its own proprietary solution called SKAdNetwork, or SKAN, which was meant to serve as a replacement for IDFA for the majority of users who were expected to opt out of IDFA tracking.  SKAN was first rolled out by Apple as far back as <u>2018</u>, and had thus long been available for advertisers to use to track the small minority of Apple users who opted out of IDFA tracking prior to the ATT changes.  However, when the ATT changes went into effect, advertisers would now

be forced to rely primarily on SKAN to track the vast majority of Apple users who were expected to opt out of IDFA.  As a result, whether or not SKAN proved to be a workable alternative to IDFA was absolutely critical to determining the degree to which advertisers—and thus social media companies who heavily depended upon advertising revenue, like Snap—would be impacted by ATT.

**D.    Prior To The Class Period, Analysts And Commentators Raise Concerns About SKAN's Viability As A Replacement For IDFA**

52.    Unlike IDFA, SKAN did not allow advertisers to track users' activity on an individual-by-individual basis, but instead "aggregated" users' activity into groups and allowed tracking only of these groups.  As a result, numerous industry commentators raised concerns about whether SKAN had the proper functionality for advertisers to effectively optimize their ad campaigns for the majority of Apple users who were expected to opt out of IDFA tracking.

53.    For example, on July 24, 2020, MacQuarie commented that while SKAN would still "give[] advertisers some information primarily related to initial mobile app install recognition," it would not provide "granular data on specific devices and users" that direct response advertisers in particular had come to rely on. Instead, with SKAN, "these data will be aggregated – not provided at device level – and are delayed, not provided real-time."  A December 15, 2020 CNBC article similarly noted that SKAN "won't provide data that's as granular as what [advertisers] received before" with IDFA—and that as a result, "advertisers aren't keen on what [SKAN] can offer."

54.    In addition, several of Snap's own Mobile Measurement Partners ("MMPs")—which were third party companies Snap directly partnered with in order to collect data from its advertisers' Snapchat marketing campaigns and measure their effectiveness—raised concerns about SKAN's potentially significant limitations as an ad tracking tool.  For example, one of Snap's main MMP partners, a company called Branch, published an article on July 14, 2020 detailing "The Limitations of

SKAdNetwork"—including that it could render "[r]eal-time [ad] optimization" as "a thing of the past," leave advertisers with no ability to track "impressions" (*i.e.*, users' specific interactions with ads), and could discontinue "device ID or user-level visibility" that was critical for effective ad targeting.  Similarly, a November 2020 article by AppsFlyer—another of Snap's main MMP partners—also remarked that "[c]onfidence in [SKAN] is low amid concerns over measurement granularity." AppsFlyer further detailed advertisers' general reluctance to use SKAN due to its limitations, stating that "[o]nly one third of [advertisers] stated that they were somewhat-to-very likely to adopt [SKAN]" while "[t]he vast majority of marketers remain on the fence about [SKAN]."

### E.   In Sharp Contrast To Its Principal Competitors, Snap Repeatedly Touts SKAN As An Effective Replacement For IDFA

55.   As a result of growing market concern about whether Snap would be heavily and disproportionately impacted by ATT, the Company was under intense pressure to strongly reassure the market that its advertising business was well-equipped to withstand ATT and maintain its record advertiser and revenue growth. This was particularly true given that Facebook—which was Snap's largest and most significant competitor—was explicitly informing its own investors that it expected the privacy changes to have a material impact on its business.  Indeed, Facebook had begun warning as early as June 2020 that, based on a test it had run on its own direct response business to assess the potential impact of ATT, it had observed a "***50% drop***" in advertiser revenue due to the privacy changes.  Then, in August 2020, Facebook published a blog post stating that ATT was expected to "***severely impact [advertisers'] ability to monetize***" and "render Audience Network [Facebook's own direct response platform] so ineffective" that "it may not make sense to offer it on iOS 14 in the future."  Analysts and media reports commented that, based on Facebook's "comments from [its] earnings call[s]" regarding ATT and analysts'

"conversation[s] with the company" about the potential risk the ATT changes posed, Facebook was "***bracing for [ATT] to be a potential huge disruption***," with the privacy changes "***threaten[ing] billions in Facebook revenue***."

56.     As the Class Period approached, Facebook's warnings about the expected significant negative impact of ATT became even more strident.   For example, Facebook launched a wide-ranging public attack against Apple—including by running a series of full-page newspaper ads in major publications such as *The New York Times*, *The Wall Street Journal*, and *The Washington Post*, publishing a new website, and running a blog—all of which called upon Apple to table ATT due to the expected damage it would cause to advertisers.   Facebook simultaneously continued to consistently warn its investors that the ATT changes were "very problematic" and would "have a negative impact on a number of [advertisers]"— and that, as a result, the company "expect[ed] to have more significant ad targeting headwinds in 2021" that would "impact our growth rates as we go [] further into 2021."   Facebook further made clear to investors that ATT would "obviously . . . have a significant impact" on its direct response business in particular, which relied on effective ad targeting.[1]

57.     Significantly, however, while Facebook waged a public campaign against Apple and repeatedly warned investors of the expected significant negative impact on its business from ATT, Snap took a starkly different approach. Specifically, in sharp contrast to Facebook, Snap repeatedly assured investors that

---

[1] Additionally, while Snap's SEC filings during this period vaguely warned in hypothetical terms that the coming ATT changes only "may" impair Snap's ad tracking capabilities, which in turn only "could" harm its business, Facebook's warnings were far more meaningful, definite and clear.   For example, Facebook's Form 10-K filed on January 28, 2021 expressly warned that "Apple has announced changes to iOS 14 that ***will limit*** our ability . . . to target and measure ads effectively," which "***will in turn reduce*** the budgets marketers are willing to commit to us." Facebook further warned that "[t]hese developments have limited our ability to target and measure the effectiveness of ads on our platform, and [have] negatively impacted our advertising revenue."

its strong revenue and advertiser growth would continue because, unlike Facebook, Snap fully supported Apple's privacy changes and was "really well prepared" to deal with them by "working really closely with Apple to implement [SKAN]." Such positive statements caused analysts to conclude that ATT would not be nearly as significant of a headwind for Snap as it was for Facebook.

58.   For example, on February 4, 2021—at which point Apple's ATT changes were scheduled to roll out the following month (after having been delayed from September 2020 to give advertisers more time to prepare)—Snap held its fourth quarter earnings call for 2020. The Company announced nearly $1 billion in revenue—representing a 62% year-over-year increase—that Defendant Gorman directly attributed to the fact that Snap had "more than doubled the number of active advertisers" on the platform to reach an "all time high," driven by Snap's direct response advertisers.

59.   During the call, and in light of the looming threat of ATT, an analyst directly questioned Gorman about how Snap could "get comfortable" that its "spectacular" revenue and advertiser growth was "sustainable through these upcoming iOS changes" that were expected to "effectively blind" advertisers. In stark contrast to Facebook, rather than acknowledge that ATT posed any significant threat to Snap's business, Gorman instead responded by assuring investors that Snap was "really well prepared for these changes" precisely because it had "been working really closely with Apple to implement [SKAN]" and had been "communicating very well with advertisers" about ATT and SKAN to "mitigate" the changes. To give investors even more comfort, Defendant Gorman further claimed that, based on her direct conversations with the Company's advertisers about ATT, those advertisers recognized that Snap was in a "really unique and beneficial position" to weather ATT compared to competitors like Facebook—because, unlike Facebook,

Snap welcomed and supported Apple's changes since they purportedly "aligned with [Snap's] values" of protecting users' privacy.

60.     The next day, during a CNBC appearance, Defendant Spiegel—in response to the host's question about what "the potential greatest impact" of Apple's privacy changes was on Snap's business—reiterated Gorman's statements that the Company was "well prepared for these changes" because Snap had "implemented [SKAN]."   To emphasize the point, and in contrast to Facebook's warnings of "increasing impact [from ATT] through the year," Spiegel claimed that ATT was expected to be no more than "a little disruptive for [Snap's] advertisers in the near term"—and echoed Gorman's comments by again averring that ATT was "a good thing [for Snap] overall" because Apple's changes were purportedly "in line with" the Company's "protective stance when it comes to our users' data."

61.     Snap's highly positive statements about the Company's ability to weather ATT—which stood in stark contrast to Facebook's far more negative and clear warnings of a significant, long-term impact from ATT—had their intended effect, as numerous market analysts concluded that ATT posed a far less significant threat to Snap's business.   For example, a February 4, 2021 Guggenheim report concluded that Snap's record revenue growth would not be significantly impacted by ATT because "management sees the business at the early stages of an inflection point and views iOS changes as likely to have [only a] temporary impact on demand."   Similarly, a February 5, 2021 Pivotal Research report took great comfort in the fact that Snap's comments regarding the ATT risk were of "far lesser prospective negative impact" than what competitor Facebook had been warning of.

62.     Additionally, on February 4, 2021, Rich Greenfield—a longtime prominent Wall Street analyst for the tech industry who regularly attended Snap's earnings calls and served as a partner of LightShed Partners, a boutique market research firm that focused on tech stocks—commented from his official Twitter

account (boasting over 50,000 followers) that, based on Defendants' statements during the fourth quarter earnings call, it *"[l]ooks like Snapchat spells #IDFA differently than others, more like #DOESNTMATTER."* Greenfield further commented that Defendant Gorman's statements during the call that Snap purportedly "admires Apple's focus to protect consumer privacy," and that Snap had been successfully "working hard with Apple to utilize alternatives post IDFA" such as SKAN, confirmed that ***"Snap is clearly not worried" about ATT***.

63.   Then, on February 23, 2021, Snap held its first ever Investor Day, during which Snap management—including Defendants Gorman and Spiegel—made very positive presentations about Snap's ability to continue aggressively growing its advertiser base and revenue. Specifically, during that conference, Andersen announced for the first time that, based on the Company's consistent revenue and advertiser growth, Snap expected to "grow [its] top line revenue at 50% or better year-over-year for at least the next several years." Defendant Gorman similarly emphasized that given the Company's "success in major advertising markets, we believe that we can continue to grow revenue at high rates for years to come." Significantly, in making these proclamations, Gorman made ***no mention at all*** of any risks related to ATT, SKAN, or the upcoming IDFA change. Even when analysts directly asked Gorman what the "largest hurdles" were that could prevent the Company from delivering on multi-year 50%-plus annual growth, Gorman said absolutely nothing about ATT, IDFA or SKAN.

64.   In response to Snap's direct and repeated assurances to investors that ATT would have virtually no impact on Snap's advertising revenue or its continuing exponential growth, Snap's share price soared by 11%, with the stock closing at a then all-time high of $70.45 per share on February 23, 2021. This surge pushed Snap's market capitalization over $100 billion, to approximately $106 billion.

65.     Analysts again responded highly favorably to the Company's positive statements, significantly increasing their price targets for Snap's stock.  For example, Guggenheim raised its price target for Snap from $60 to $80 per share, citing the discussion of "[m]ulti-year revenue growth opportunity of 50% or more"—which Guggenheim opined Snap would "deliver" based on Snap's "strong, consistent results."  Jefferies similarly raised its price target from $65 to $81 per share, opining that "50%+ revenue growth over the next several years is achievable."  Piper Sandler analysts raised their price target for Snap from $66 to $83 per share, commenting that "management seems confident that recent strong growth is sustainable."  Pivotal Research Group also raised its price target for Snap—from an already high $81.50 to $95 per share—and called Snap's Investor Day a "resounding success," as "the fireworks really got going" when it was stated "that the company saw revenue growth north of 50% for multiple years."  Notably, in substantially raising their target prices for Snap's stock—and in line with Snap management's own complete omission during the Investor Day of any discussion of the risks pertaining to ATT, IDFA or SKAN—<u>none of these analysts even mentioned ATT as posing any risk at all to the Company's ability to achieve 50%+ multi-year revenue growth</u>.

**F.     Apple's Six-Month Delay Rolling Out ATT Gives Snap Extensive Time To Test SKAN's Capabilities As Compared To IDFA**

66.     While Apple originally stated that ATT would be rolled out in September 2020, on September 3, 2020, Apple announced that it was delaying the rollout of ATT until "early 2021" in order "to give developers [*i.e.*, Snap, Facebook, etc.] time to make necessary changes."  As a result, industry commentators concluded that ATT would not be rolled out until the end of the first quarter in March 2021.  Significantly, market analysts and media reports widely celebrated this development as a very "positive outcome" for the industry because, as Defendant Gorman herself would subsequently acknowledge, this significant six-month delay

"provided additional time to adopt [SKAN] and begin implementing and testing with our [advertising] partners."

67.    For example, a September 3, 2020 *Forbes* article entitled "IDFA Stay of Execution:  Apple Delays New iOS 14 Privacy Measures Until 2021," commented that "[m]obile marketers are sighing with relief at [Apple's] delay" because it would give them time to test SKAN's ad tracking capabilities compared to IDFA.  As the article stated:  "One thing that marketers are particularly pleased about with regard to the delay is that now they will have the ability to compare measurement in the old model—granular per-user marketing measurement using the IDFA—with marketing measurement in Apple's preferred new [SKAN] model."  Similarly, a September 14, 2020 Berenberg report noted that Apple's delay was "a positive outcome," with "[t]he most important point" being that "the delay creates an overlap period of at least four months which will allow the mobile advertising ecosystem to [] run existing solutions in parallel with testing Apple's [SKAN], which Apple has just released new testing functionality for."

68.    This was precisely the testing Snap purported to undertake during Apple's months-long delay.  Specifically, on February 18, 2021, several of Snap's main MMP partners announced that—after working "directly" with Snap for the past "several months" to "make sense of [SKAN's] complexities" as an ad tracking and measuring tool—SKAN was now fully available on the Snapchat platform for Snap's advertisers to test and use.  These MMPs also shared the Company's own guidance to advertisers expressly instructing them to immediately begin testing SKAN to ensure no disruption to their Snapchat campaigns once ATT was rolled out and IDFA was effectively discontinued.

69.    For example, Branch announced on its website that "[o]ver the last several months, Branch has been working directly with the Snap team to make sense of the various SKAdNetwork complexities" in preparation for the ATT rollout.

Branch stated that its "integration testing with Snap [was] now complete," and that SKAN was accordingly "available to all mutual customers," *i.e.*, to Snap's advertisers.  Branch then expressly instructed Snap's advertisers, pursuant to the Company's own guidance to advertisers, to start "testing the new [SKAN] functionality as soon as possible" in order to "ensure there will be no disruption to measurement or scale of iOS app acquisition campaigns on Snapchat when Apple releases [ATT]."

70.     AppsFlyer, another of Snap's main MMPs, similarly reported at this time that it had partnered with Snap to make SKAN available to Snap's advertising clients.  Notably, AppsFlyer had also reported several months earlier on September 3, 2020—when Apple had announced the months-long delay—that it had worked with Snap to implement a "SKAdNetwork Simulation" that would use advertisers' "real data" to give them "a sense of what their SKAdNetwork data will look like." AppsFlyer emphasized that "[b]y experimenting with [SKAN]," advertisers could explore SKAN's capabilities compared to IDFA "***ahead*** of the public [ATT] release" (emphasis in original).  Then, on February 18, 2021, AppsFlyer announced along with Snap's other MMP partners that SKAN itself was officially "available in Snapchat Manager for all advertisers" to begin testing and using for their Snapchat campaigns.  AppsFlyer also directly quoted Snap's own guidance for advertisers with respect to implementing SKAN, which stated that advertisers should "configure and begin to test [SKAN] [] to ensure no disruption to measurement or scale for app acquisition iOS 14 campaigns on Snapchat."

71.     Snap's other major MMP partners—including Adjust, Singular, and Kochava—similarly made announcements on or around February 18, 2021 that they had partnered with Snap to provide SKAN to Snap's advertising clients, that SKAN was now fully available to Snap's advertisers for testing and use, and that advertisers should "configure the integration with [SKAN] and begin to test as soon as possible"

1   in order to "ensure no disruption to measurement or scale for app acquisition iOS 14

2   campaigns on Snapchat."

3      **G.    Gorman Twice Falsely Proclaims That Advertisers That Represent A "Majority" Of Snap's Critical Direct Response Revenue Had "Successfully Implemented" SKAN**

4

5      72.    In March 2021, the rollout of the ATT changes was delayed yet again,

6   giving Snap even more time to implement SKAN.  Finally, on April 20, 2021—

7   nearly a year after Apple had first announced the ATT changes, and seven full

8   months after those changes had been originally scheduled to be released—Apple

9   announced that the ATT changes would be rolled out on April 26, 2021.

10  Significantly, by this time, the only critical question as far as the market was

11  concerned was whether SKAN was a viable, workable alternative to IDFA.  In light

12  of this—and based on Defendants' prior statements that Snap expected to weather

13  ATT better than its competitors with SKAN—analysts and investors were clamoring

14  to know whether SKAN had proven to be an effective replacement for IDFA.   In

15  response to this investor concern, Defendant Gorman doubled down on her earlier

16  positive statements, going to great lengths to specifically reassure the market that a

17  "***majority***" of Snap's critical direct response advertisers had already "***successfully***

18  ***implemented [SKAN] for their Snap campaigns***"—such that the market could

19  safely expect no significant disruptions to Snap's business as a result of ATT.

20     73.    Specifically, on April 22, 2021, Snap held its earnings call for the first

21  quarter of 2021.  During the call, Snap announced another quarter of record results:

22  $770 million in revenue for the quarter—66% over the prior year—representing the

23  Company's "highest year-over-year" revenue growth "in over three years," and the

24  "the third quarter in a row that we've grown the top line more than 50% year over

25  year."  Gorman attributed this impressive revenue growth to the fact that "[m]ore

26  advertisers were active on our platform than ever," with "over half [of Snap's]

27  revenue" coming directly "from direct response campaigns."  To strongly reassure

28

investors that this record revenue growth would continue unabated, Defendant Gorman proclaimed that the "***majority***" of Snap's critical direct response advertisers had already "***successfully implemented***" SKAN for their Snap campaigns—thus successfully "mitigat[ing]" the impact of ATT, which unquestionably posed the most significant threat to Snap's business at this time.

74.     Specifically, during the earnings call, Defendant Gorman reiterated that Snap was purportedly strongly "supportive" of Apple's ATT changes, and then made clear that the significant seven-month delay in the rollout of the changes had given both Snap and its direct response advertisers significant "additional" time to begin implement and testing SKAN:  "The fact that [Apple's] changes are coming later than we anticipated has provided additional time to adopt [SKAN] and begin implementing and testing with our partners."  Immediately after telling investors that Apple's delay had given Snap more time to "implement[]" and "test[]" SKAN with its advertisers, Gorman then explicitly proclaimed, in no uncertain terms, that "***[a]dvertisers that represent a majority of our direct response advertising revenue have successfully implemented SKAdNetwork for their Snap campaigns***."  In other words, a "majority" of Snap's direct response advertisers had now completed their "implementing and testing" of SKAN during Apple's delay, and the verdict was in: these advertisers had "successfully implemented [SKAN]" as an alternative ad tracking tool for their Snap campaigns.

75.     Moreover, when analysts asked Gorman to elaborate on her proclamation that a "majority" of Snap's direct response advertisers had already "successfully implemented" SKAN for their Snap campaigns, Gorman explicitly reaffirmed her prior statements and confirmed that those statements should be understood by investors to mean that the IDFA risk had been "mitigate[d]."  For

example, Guggenheim Partners analyst Michael C. Morris[2] specifically cited to Gorman's statements "referenc[ing] the successful implementation of [SKAN]" and then directly asked Gorman "***what defined success of that implementation***," and whether Gorman "***expect[ed] this to mitigate some of the IDFA headwinds that have been a source of investor concern***."  Gorman responded in the affirmative, first emphasizing again that the seven-month-long delay in the rollout of ATT had "g[iven] us a lot of time to prepare" with SKAN, and then unequivocally reiterating that "we're really pleased to see that advertisers that represent the majority of our direct response revenue have implemented [SKAN] so far."

76.    Significantly, in giving this response, Gorman did not qualify her prior statements that a "majority" of the Company's crucial direct response advertisers had "successfully implemented" SKAN in any way whatsoever.  Gorman did not, for example, state that the IDFA risk may not be "mitigated" because neither Defendants nor Snap's advertisers had yet tested or concluded anything about the effectiveness of SKAN's ad tracking capabilities compared to IDFA.  Gorman also did not warn of or describe any potential limitations of SKAN compared to IDFA that could jeopardize SKAN's ability to "mitigate" the IDFA risk when ATT was fully rolled out.  Rather, despite having every opportunity to qualify or further explain her statements about Snap's advertisers' "successful implementation" of SKAN and the significance of this development with respect to the biggest threat facing the Company at this time, Gorman instead chose to repeat her prior statements—while also directly and expressly confirming to investors that her statements should be interpreted to mean that the impact of ATT to Snap's business had been successfully "mitigated" by SKAN and would not be material.

---

[2] Michael Morris is Guggenheim Partners' Senior Managing Director. With nearly two decades of experience, Morris, a "veteran media analyst," with "vast experience and expertise" is "highly regarded in the investment and corporate communities." *See* https://www.prnewswire.com/news-releases/guggenheim-securities-hires-veteran-analyst-michael-morris-to-lead-its-media-research-effort-224214061.html.

77.     Tellingly, the market responded directly and favorably to Defendants' staunch reassurances that a "majority" of Snap's crucial direct response advertisers had already "successfully implemented" SKAN for their Snap campaigns.  Indeed, on this news, Snap's stock price surged by over 7%, from $57.05 per share to close at $61.30 per share the following day.

**H.     A Plethora Of Highly Sophisticated Analysts Explicitly Cited And Relied On Defendant Gorman's Representations To Conclude: "ATT Changes As Less Of A Risk Than Previously" And "IDFA's Impact Not Likely Material"**

78.     Numerous highly experienced, sophisticated and extraordinarily knowledgeable industry analysts heavily relied on Gorman's words, with a multitude of analysts expressly quoting or paraphrasing Gorman's claim of the "successful implementation" of SKAN by a "majority" of Snap's crucial direct response advertisers.  Significantly, the analysts made clear in their reports that Gorman's strong assurances had caused them to conclude that Snap's direct response advertisers were already successfully using SKAN as a replacement for IDFA, and that as a result, the impact of ATT on Snap's business was "***less of a risk than previously***" thought and "***[n]ot [l]ikely [m]aterial***."

79.     For example, an April 22, 2021 Truist Securities report[3] lauded Snap's "record high" advertiser growth—which had been directly "fueled by continued strength from [direct response] advertisers"—and expressed relief that  "***IDFA's Impact [was] Not Likely Material***" given that "[m]anagement stated that advertisers that represent a majority of [Snap's] [direct response] ad revenue have successfully

---

[3] The report was authored by five research analysts focused on internet and digital media stocks for Truist, including Youssef Squali, Truist's Managing Director; Head of Internet and Digital Media Research Group, and Naved Khan, Truist's Senior Equity Research Analyst; Director.  Squali and Khan were named in the top 1 percentile of research analysts on Wall Street with Squali ranked number 5 in the Technology sector.  *See*  https://www.prnewswire.com/news-releases/cantor-fitzgerald--cos-youssef-squali-and-naved-khan-named-in-top-1-percentile-of-tipranks-annual-ranking-of-wall-street-research-analysts-for-2015-300199292.html.

implemented [SKAN] for their Snap campaigns." Truist further stated that Gorman's statements reflected Snap's "comfortable stance towards the potential impact of [ATT] on [Snap's] business," and would "*__help mitigate against a meaningful adverse outcome for Snap__*"—such that Snap would "continue to grow much faster than the overall ad market" and successfully "sustain rates of ~50% [growth] over the next three years." Significantly, Truist further opined that Snap's "successful implementation" of SKAN differentiated Snap and provided it with a competitive advantage over Facebook, which had made no such claims regarding any "successful implementation" of SKAN. Truist concluded that, "unlike [Facebook]," Snap had welcomed the ATT changes, and had apparently fared better with respect to achieving a "successful implementation" of SKAN as a result:

> **Upcoming IDFA Deprecation Likely Manageable; Unlike FB, SNAP Plays Nice With Apple.**
>
> * * *
>
> **IDFA's Impact Not Likely Material**. . . We view management's strong top line guide for 2Q21 reflects a relatively comfortable stance towards the potential impact of [ATT] on its business. We believe that unlike FB, which has taken a confrontational tone with Apple, Snap has decided to be much friendlier. The fact that ATT changes are coming more than a month later than anticipated has provided the company with additional time to adopt [SKAN] and begin implementing and testing it with partners. Management stated that advertisers that represent a majority of its DR ad revenue have ***successfully implemented*** [SKAN] for their Snap campaigns. All this should help mitigate against a meaningful adverse outcome for Snap, in our view.

80.     Truist was not alone in relying upon Gorman's statements to conclude that the IDFA risk was not likely material for Snap: numerous other analysts echoed

these statements, expressly noting that Defendants' representations meant that Snap was not experiencing any "monetization impacts" from Apple's changes and that ATT was "less of a risk than previously."  For example, Guggenheim highlighted Snap's "revenue acceleration" for the "third quarter in a row," and specifically noted that Gorman had represented that the "***majority of [Snap's] DR advertisers [are] navigating these new privacy initiatives with Snap via [SKAN]***."  As a result, Guggenheim concluded that Snap had not seen any negative impacts on the Company's ability to monetize its advertising due to ATT: "***The company did not experience monetization impacts from Apple's ongoing App Tracking Transparency-related changes***."[4]

81.  Similarly, <u>directly relying on Gorman's statement</u>, JMP[5] raised its target price for Snap from an already high $75 per share to $89 per share.  Indeed, JMP wrote that "Snap is clearly executing very well," noting that "<u>given 50%+ of Snap's [direct response] advertising partners have adopted Apple's SKAdNetwork and Snap's planning, we view [Apple's App Tracking Transparency] changes as ***less of a risk than previously***</u>."  JMP further concluded that, as a result, "<u>Snap's goal of 50%+ revenue growth over the next several years as disclosed at its Analyst Day in February is not a stretch, but increasingly achievable</u>."

---

[4] Guggenheim's report was written by three analysts including Michael Morris, who had specifically asked Gorman about "the successful implementation of [SKAN]."

[5] JMP's report was authored by JMP's Managing Director Senior Internet Analyst Ronald V. Josey and Managing Director Andrew Boone, both of whom have covered the internet sector for years.  Josey is "well regarded by the institutional investment community as a result of a technology-focused career. . . including consumer Internet and e-commerce, <u>online advertising, social media and the mobile Internet</u>."
https://www.businesswire.com/news/home/20121113005857/en/JMP-Group-Announces-Addition-of-Ronald-Josey-and-John-Newman-as-Senior-Equity-Research-Analysts.

82.     An April 22, 2021 Oppenheimer[6] report highlighted that "SNAP is showing strong improvements in monetization" due to its "leading ad platform," and likewise opined that, based on Gorman's statements, "***we now see reduced risks from [Apple]'s removal of IDFA***[] as the delayed rollout allowed more time to work with advertisers to adopt [Apple]'s [SKAN]." Piper Sandler[7] also took great comfort from Defendants' statements, commenting that Snap's consecutive strong quarterly revenue growth evidenced that it had successfully become a "[m]ainstream [a]d [p]roduct," and noting that Snap management was "[c]onstructive on [u]pcoming iOS changes" precisely because "[t]he majority of SNAP's DR [direct response] advertisers have adopted SKAdNetwork."

83.     Numerous other analysts similarly relied and commented on the import of Gorman's statements with respect to Snap's ability to sustain its record revenue growth after ATT.   For example, Raymond James[8] cited Snap's "strong 1Q revenues" and emphasized Gorman's representations about SKAN, stating: "***Snap noted that advertisers that represent a majority of its direct response ad revenue have successfully implemented [SKAN] for their Snap campaigns***." Canaccord Genuity[9] likewise cited Snap's "strong Q1 results" showing "both user and revenue

---

[6] Oppenheimer's report was prepared by four analysts including Jason Helfstein, Managing Director and Senior Analyst covering the Internet sector who "oversees all aspects of the firm's Internet strategy and his coverage includes Consumer Internet, eCommerce, Online Advertising and Digital Media." https://www.oppenheimer.com/corporations-institutions/equities/technology.aspx

[7] Piper Sandler's April 22, 2021 report was authored by James Callahan, CPA and "technology senior research analyst" Thomas Champion who had 15 "years of technology research experience." *See* https://www.pipersandler.com/news/piper-sandler-expands-technology-equity-research.

[8] The analysts primarily responsible for Raymond James' report were Aaron Kessler, Managing Director, Internet and Andrew Marok, Vice President, Internet. Kessler "has covered the internet sector since 2002" and Marok focuses on "the online advertising and digital media sectors."

[9] Canaccord Genuity's report was authored by Michael Graham, Senior Managing Director; Head of US Research; Internet Analyst, Maria Ripps, Managing Director, Senior Research Analyst and Jason Tilchen, Vice President, Equity Research (Internet).

growth at their highest levels since 2017," and expressly relied on Gorman's words, stating that "***the delayed roll out of Apple's privacy changes has given Snap time to implement and test Apple's [SKAN] with a majority of its DR [direct response] advertisers***." J.P. Morgan[10] also noted that Snap had achieved "its highest growth rate in 3 years," and that Snap's "advertiser base" had "doubled" with "[direct response] continuing to drive the majority of revenue"—while taking great comfort in the fact that "SNAP noted that Apple's delay in implementing ATT helped SNAP get more marketers onto the SKAdNetwork" such that Snap "now ha[d]" a "[b]etter [u]nderstanding of IDFA" and "more clarity on the changes & rules of the road."

84.     Financial analysts were not the only ones who relied on and credited Gorman's highly material statements. Media reports similarly echoed and relied upon Gorman's representations to conclude that ATT would not meaningfully impact Snap. For example, *SocialMediaToday*[11] reported in an article dated April 22, 2021 that although "[r]eports have suggested both Snapchat and Facebook will be most significantly impacted by the change," Defendant Gorman had represented "that both Snap and its ad partners are prepared" because "[a]dvertisers that represent a majority of [Snap's] direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns"—which the article commented was a "positive report for Snap" with respect to the ATT risk compared to its competitors. Additionally, Bloomberg's April 23, 2021 article entitled "Snap Results Ease Concerns Over Apple Policy Impact" emphasized analysts' reliance on Gorman's statements "that advertisers representing a majority of [Snap's] direct response ad revenue 'have successfully implemented SKAdNetwork for their Snap campaigns,'" which "could diminish the impact of the policy change."

---

[10] J.P. Morgan's report was written by three analysts including Doug Anmuth, the Head of U.S. Internet Equity Research at J.P. Morgan.

[11] https://www.socialmediatoday.com/news/snapchat-rises-to-280-million-users-reports-strong-take-up-of-tiktok-like/598926/

85.     Indeed, Gorman's statements were so meaningful to investors that, even weeks and months later, analysts continued to heavily rely on and take comfort from Defendant Gorman's representations regarding the "successful implementation" of SKAN by a "majority" of the Company's critical direct response advertisers.  For example, a July 15, 2021 J.P. Morgan report opined that Snap was successfully "managing through" ATT because it had gotten "more marketers onto [SKAN]," stating:  "While we acknowledge iOS14.5+ is a concern & is embedded within guidance, we believe bigger platforms are managing through, & SNAP got more marketers onto [SKAN] when ATT implementation was delayed, ultimately yielding greater visibility."

86.     Significantly, not a single analyst or media report interpreted Gorman's words to mean that a "majority" of Snap's critical direct response advertisers had merely downloaded or set up SKAN for future use, without having even tested any of its ad tracking capabilities.  To the contrary, as set forth above, analysts uniformly understood Gorman's words to mean that Apple's significant seven-month delay had given Snap's direct response advertisers ample time to determine that SKAN was a workable alternative ad tracking tool, such that they had "successfully implemented" it and ATT no longer posed a material risk to the Company's business.  The direct and significant impact that Gorman's statements had on these highly sophisticated industry analysts is summarized in the chart below:

[Remainder of this page left intentionally blank]

1

2

### GORMAN'S REPRESENTATIONS AT APRIL 22, 2021 CALL

3

**DEFENDANT GORMAN:**

"We are also committed to working with our advertisers as we navigate the App Tracking Transparency-related changes from Apple . . . The fact that these changes are coming later than we anticipated has provided additional time to adopt Apple's SKAdNetwork and begin implementing and testing with our partners. *Advertisers that represent a majority of our direct-response advertising revenue have successfully implemented SKAdNetwork for their Snap campaigns.*"

4

5

6

**MICHAEL MORRIS, GUGGENHEIM SECURITIES ANALYST:**

*"[Y]ou referenced the successful implementation of the SKAdNetwork for certain Snap campaigns with your partners . . . Do you expect this to mitigate some of the IDFA headwinds that have been a source of investor concern?"*

7

8

**DEFENDANT GORMAN IN RESPONSE TO MR. MORRIS' QUESTION:**

". . . The change happened later than we expected, which gave us a lot of time to prepare, and SKAdNetwork is one part of that. So *we're really pleased to see that advertisers that represent the majority of our direct-response revenue have implemented it so far.*"

9

10

11

### ANALYSTS DIRECTLY RELY ON GORMAN'S STATEMENTS

12

**Truist Securities:** *"IDFA's Impact Not Likely Material . . .* We view management's strong top line guide for 2Q21 reflects *a relatively comfortable stance towards the potential impact of ATT (App Tracking Transparency) on its business. . . .* The fact that ATT changes are coming more than a month later than anticipated has provided the company with additional time to adopt Apple's SKAdNetwork and begin implementing and testing with partners. *Management stated that advertisers that represent a majority of its DR ad revenue have successfully implemented SKAdNetwork for their Snap campaigns. All this should help mitigate against a meaningful adverse outcome for Snap."*

13

14

15

**Piper Sandler:** *"Constructive on Upcoming iOS Changes:* Management reiterated support for Apple's ATT changes. *The majority of SNAP's DR advertisers have adopted SKAdNetwork and they continue to work closely with Apple to prepare for the changes."*

16

17

**Guggenheim Securities LLC:** "*The company did not experience monetization impacts from Apple's ongoing [ATT] changes and noted that the majority of its DR advertisers [are] navigating these new privacy initiatives with Snap via SKAdnetwork."*

18

19

**JMP:** *"[G]iven 50%+ of Snap's DR advertising partners have adopted Apple's SKAdNetwork and Snap's planning, we view ATT changes as less of a risk than previously."*

20

**Raymond James:** "Snap noted that advertisers that represent a majority of its direct response ad revenue *have successfully implemented [SKAN]* for their Snap campaigns."

21

**Canaccord Genuity:** *"[T]he delayed roll out of Apple's privacy changes has given Snap time to implement and test [SKAN] with a majority of its DR advertisers."*

22

**J.P. Morgan:** *"SNAP noted that Apple's delay in implementing ATT helped SNAP get more marketers onto [SKAN]."*

23

**Oppenheimer:** *"[W]e now see reduced risks from [Apple's] removal of IDFA, as the delayed rollout allowed more time to work with advertisers to adopt [Apple's] [SKAN]."*

24

**Bloomberg:** *"Snap said that advertisers representing a majority of its direct response ad revenue 'have successfully implemented SKAdNetwork for their Snap campaigns,' which could diminish the impact of the policy change."*

25

### *Following these Representations, Snap's Stock Surges Over 7%*

26

27

28

87.     As one of Snap's most senior executives who was directly in charge of its advertising business, Gorman was obviously and unquestionably aware of this strong market reaction, and of analysts' heavy reliance on her words to mean that the "IDFA [risk was] Not Likely Material."  Indeed, as set forth further below, Gorman was a highly experienced digital advertising executive who <u>for years</u> had been speaking to Snap's investors about its advertising business on each and every one of the Company's earnings calls.  Significantly, however—and tellingly—at no time through the remainder of the Class Period did Defendant Gorman or Defendant Spiegel ever attempt to clarify or walk back Gorman's highly material remarks, despite repeated opportunities to do so as analysts continued to ask questions about the effectiveness of SKAN in limiting the impact of ATT on Snap's business.

**I.     Defendant Gorman Was Clearly Aware Of The Materiality Of Her Statements When She Twice Affirmed The Successful Implementation Of SKAN By The Majority Of Snap's DR Advertisers—Thereby "Mitigating" The IDFA Risk**

88.     There is no doubt that Defendant Gorman knew that the market would be heavily relying on her statements regarding the supposedly "successful implementation" of SKAN by a "majority" of the Company's direct response advertisers when she made those statements.  Gorman was a seasoned digital advertising executive who, both before and during the Class Period, served as the Company's principal spokesperson when addressing investors about the impact of ATT on Snap's business.  In fact, for years Gorman had been charged with the responsibility of addressing all aspects of the Company's advertising business to investors—including its direct response business that comprised the majority of the Company's revenues and was set to be most heavily impacted by ATT.

89.     First, the vast majority of Gorman's decades-long career has been dedicated to digital advertising for major online companies like Snap.  From 1999 to 2005, Gorman served as a Marketing Communications Manager at Monster.com, and subsequently as Director of Sales for Variety from 2005 to 2007.  Over the next

five years (from April 2007 to April 2012), Gorman worked for Yahoo as its Director of Advertising Sales. Then, for over six years prior to joining Snap, Gorman directly oversaw advertising sales for Amazon, becoming its Head of Global Field Sales for Amazon Advertising. Gorman then served as the Chief Business Officer of Snap, a role she retained throughout the Class Period.

90. As Chief Business Officer of Snap, Defendant Gorman was directly responsible for Global Advertising Sales for the Company—and in fact was brought in by Snap specifically to oversee its digital advertising sales teams and simplify the Company's ad business for clients and agencies. For example, on Snap's very first earnings call after Gorman was hired—which was the Company's fourth quarter earnings call for 2018—Gorman discussed how she was personally responsible for completely reshaping Snap's advertising sales teams by adopting a new vertical model that was designed to "enhance [the Company's] relationships with [its] advertising partners" to allow for a more hands-on approach. Indeed, Gorman stated the goal of her new sales model was "to really understand our customers and the industries in which they operate so that we can be consultative sellers and go deep" with advertisers to optimize their Snapchat campaigns. Gorman further emphasized that each sales team would have someone with "[direct response] expertise" so that Snap had the capability to go "deep on [direct response] optimization" in particular with its advertisers.

91. Second, Defendant Gorman was front and center with investors for years regarding Snap's advertising business both prior to and throughout the Class Period, and gave detailed reports on, and answered numerous analyst questions about, the Company's advertising business—including its direct response business—on each and every earnings call during her tenure at Snap. Specifically, Gorman regularly reported detailed information about Snap's advertising business, including sources of revenue, the inner workings of Snap's advertising sales teams

and the Company's specific hands-on efforts to improve ad optimization for its direct response advertisers—a business Gorman stated that Snap had begun "from scratch" shortly before her arrival and that she had personally helped build up to be "nearly at feature parity with industry leaders on things like targeting and delivery capabilities." For example, during Snap's first quarter earnings call for 2019, Gorman described in detail the Company's strategies for improving its "optimization capabilities" and "return on ad spend" for two of its specific direct response advertisers, namely Wish and Pocket Gems. Gorman further described Snap's hands-on efforts to optimize its direct response advertisers' Snapchat campaigns, stating that Snap "learn[ed] alongside close partners like Pocket Gems, improving measurement, optimization and relevance to drive stronger downstream results for performance-oriented campaigns."

92.     Gorman also reported regularly on the number of advertisers that had been added to Snap's platform each quarter, Snap's efforts to retain those advertisers, and the importance of direct response advertisers in particular to Snap's revenue growth. For example, Gorman routinely responded to analyst questions about why "the direct response product is doing as well as it is" (which Gorman repeatedly attributed to Snap's focus on "improving measurement, ranking and optimization"—three capabilities severely threatened by ATT), and about what percentage of Snap's revenue was attributable to direct response advertisers. In so doing, Gorman repeatedly described her "relentless focus" on her "key priorities" for growing Snap's advertising business, including "show[ing] consistent and predictable results for [Snap's] advertisers, driving ROI [return on investment] and enabling [advertisers] to optimize" their ad campaigns. Gorman also emphasized her direct personal involvement in overseeing the Company's day-to-day advertising operations. For example, in an interview with J.P Morgan Chase in mid-2020, Gorman stated that she was directly responsible for "the sales team, sales operation

teams, revenue strategy teams, and then interestingly, I'm also responsible for a lot of our customer operations," including Snap's "ad review teams."

93.     Third, Defendant Spiegel regularly commented on Defendant Gorman's primary role in overseeing the Company's advertising business, communicating directly with Snap's advertisers, and communicating about the details of those matters to investors.  For example, at the start of Snap's earnings calls, Spiegel regularly called on Gorman to "talk more about our advertising business," "share more about our advertising business," "discuss the progress we have made in growing our advertising business," and routinely directed analysts to Gorman as the knowledgeable party who could respond to specific questions about Snap's advertising business, the advertiser feedback Snap was receiving, and the success of Snap's direct response campaigns.

94.     Fourth, during the Class Period, Gorman regularly spoke to investors in a highly detailed manner—including in response to direct analyst inquiries— about the risk posed by ATT, the effectiveness of SKAN, and Snap's communications with advertisers about those issues.  For example, during the Company's February 4, 2021 earnings call, and in response to an analyst question about the advertiser feedback Snap was receiving regarding ATT, Spiegel responded that "[Gorman] might be better positioned to talk about how our position is resonating with advertisers. I know she's having a lot of conversations with our partners." Gorman then confirmed that she could indeed speak to "what advertisers and agencies are saying to us," and went on to describe "a lot of the conversations we're having with advertisers" about Snap's preparations for ATT.

95.     Similarly, during the Company's April 22, 2021 first quarter earnings call, Gorman made (and repeated) her specific, concrete representation quantifying that a "majority" of Snap's direct response advertisers "ha[d] successfully implemented [SKAN] for their Snap campaigns." Gorman also described

advertisers' transition to SKAN in detail, explaining that Apple's delay in rolling out the changes had "provided [Snap] additional time to adopt [SKAN] and begin implementing and testing with our partners"; that Snap was "really focused on helping our advertisers make the transition" to SKAN; that she was "really pleased to see that advertisers that represent the majority of our direct response revenue have implemented [SKAN] so far"; and that the transition to SKAN had involved "a huge cross-functional effort between products, engineering, the sales teams, [and] the marketing teams to work with our customers to ensure that this transition goes as smoothly as possible."

96.    In sum, given Defendant Gorman's position directly overseeing Snap's advertising business and advertisers' transition to SKAN, the critical importance of that transition to Snap's business, and Gorman's extensive experience communicating with analysts and the market—Gorman clearly had intimate knowledge of what she told investors about ATT and SKAN, and knew that her statements would have a dramatic and significant impact on the market.

**J.    Gorman's April 22, 2021 Statements Had A Lasting Impact On Snap Investors, Who Believed Until The End Of The Class Period That ATT's Risk To Snap Was "Minimal"**

97.    Throughout the remainder of the Class Period, Gorman continued to aver to investors that Snap was not being significantly impacted by ATT and that SKAN was effective—without ever once at all clarifying, retracting or qualifying her earlier April 22, 2021 statement that a "majority" of the Company's direct response advertisers had "successfully implemented" SKAN.  As a result, through the remainder of the Class Period and up until mere days before Snap would be forced to reveal the truth, market analysts continued to conclude that ATT not only did not pose any material risk to Snap's business, but that the risk to Snap was in fact "***minimal***."

98.     For example, on July 22, 2021, Snap held its second quarter earnings call, during which the Company announced that it had "g[rown] revenue . . . at the highest rates we have achieved in the last 4 years," which Gorman attributed to the "continued success" of "direct response."  Gorman further represented that, even nearly one month into the third quarter—and nearly three months after ATT was rolled out—the Company was seeing only "some interruptions to demand."  With respect to SKAN, in line with Gorman's prior positive statements on the Company's April 22, 2021 earnings call, Gorman asserted that Snap continued to believe that SKAN "<u>will aid in improving attribution [*i.e.*, measurement of ad efficacy] for advertisers</u>."  Additionally, when an analyst directly asked Gorman if ATT was "actually affecting targeting," and whether the Company's "workarounds" (such as SKAN) had proven to be effective, Gorman responded by first again claiming that Snap "genuinely support[ed]" the ATT changes, and then repeated that the Company had "rolled out full support of [SKAN], <u>which we know will aid, or we believe will aid, in attribution for advertisers</u>."

99.     Analysts were again strongly reassured by Gorman's' statements—which, coupled with Gorman's April statements, caused them to conclude that the risk of ATT posed to Snap's business must be "***minimal***."  For example, a July 22, 2021 Evercore ISI report noted Snap's "explosive" revenue growth, listing Snap's "DR [direct response] Ads platform" as being among the Company's "distinct advantages" over its competition—while concluding that, based on Gorman's continued positive statements about ATT, "we increasingly believe ***[the IDFA risk] is likely minimal***."  Jefferies raised its target price for Snap from $81 to $90, noting that Snap had "delivered its fastest [year-over-year] rev[enue] [] growth since early 2017"—and stated that, based on Snap's continued positive statements about the impact of ATT, it "***estimate[d] [that the ATT risk] will be minimal***."  Jefferies concluded that, as a result, "we are incrementally more confident in [Snap's] ability

to sustainably drive 50% rev[enue] growth for the next several years" as Defendants had previously represented during Snap's Investor Day.

100.   Analysts also specifically referenced Gorman's statements regarding the effectiveness of SKAN in concluding that the ATT risk was "<u>minimal</u>."  For example, a July 23, 2021 Morningstar report noted Snap's "very impressive" revenue growth, and expressed relief that, based on Gorman's statements, "<u>it appears that the overall impact of [ATT] may not be as much as initially anticipated</u>."  In reaching this conclusion, Morningstar stated that "<u>we believe the impact of Apple's moves will remain minimal</u>" precisely because "***Snap has already been working with Apple to use its SKAdNetwork data*** with the platform's and its advertisers' first-party data."  A July 22, 2021 Truist report noted Snap's "industry-leading growth" that was "fueled by continued strength from DR [direct response] advertisers," and commented that Snap's comments regarding ATT "<u>reflect[ed] a relatively comfortable stance toward the potential impact of [ATT] on its business</u>."  In reaching this conclusion, Truist specifically continued to take comfort in Gorman's statements that Apple's delay in rolling out ATT had given Snap "additional time to adopt Apple's [SKAN]," which Truist concluded "<u>should help mitigate against a meaningful adverse outcome for Snap</u>."  Guggenheim similarly lauded that Snap had "achieved revenue acceleration . . . for its fourth quarter in a row," and took great comfort in Defendants' statements that "***Snap [is] proactively navigating iOS privacy changes via [SKAN]***," which "we view as a net positive for maintaining longer-term revenue growth targets."

101.   On July 23, 2021, the day after Snap's continued positive statements on its second quarter earnings call about the transition to SKAN and the minimal risk posed by ATT, Snap's stock price rose almost 24% in one day, from $62.97 to $77.97 per share.  In total, Snap's stock rose 46% from a $57.05 closing price on

April 22, 2021, to an all-time closing high of $83.11 on September 24, 2021—less than a month before the truth would be revealed.

102.   Indeed, mere days before the Company's third quarter earnings release when Defendants would be forced to reveal the truth, analysts continued to conclude that Snap's exposure to ATT was "<u>minor</u>," and even theorized that ATT was "<u>benefitting</u>" Snap compared to its competitors.  For example, an October 18, 2021 J.P. Morgan report opined that "<u>SNAP has limited exposure to [Apple's] privacy changes</u>," and concluded that Snap was "<u>likely benefitting</u>" from ATT because marketers were most likely "<u>shifting spend away from [Facebook]</u>" and over to Snap due to Facebook's difficulty weathering the changes.  Truist also issued reports in mid-October 2021 opining that while Apple's changes were "likely to have a bigger impact on [Facebook's] financials," causing "material growth deceleration" in the second half of 2021, Truist "***<u>expect[ed] IDFA to have a minor impact on [Snap's] results</u>***" with Snap's direct response business "driv[ing] [] robust performance[]" and "set[ting] the company positively for its seasonally strong 4Q21."  Similarly, an October 19, 2021 MKM Partners report stated that it continued to take great comfort in the fact that Snap's strong third quarter guidance had included only "<u>a modest headwind from Apple's [] iOS changes related to IDFA</u>" in comparison to the more severe impact Facebook had acknowledged, causing it to conclude that Snap's workaround efforts "<u>have clearly mitigated that headwind</u>."

**K.    The Truth Is Revealed**

103.   The truth regarding Defendants' fraud was revealed on October 21, 2021, when the Company reported extraordinarily disappointing financial results for the third quarter of 2021.  Specifically, just days after analysts had expressed confidence that Snap had "clearly mitigated" ATT such that any impact would be "minor," Snap stunned the market by announcing that it had completely missed the lower end of its third quarter revenue guidance issued just three months earlier due

to ATT—the first time in the Company's history that it had failed to meet this critical threshold—which marked an abrupt halt to the Company's consecutive quarterly revenue growth of above 50%. Additionally, Snap dramatically reduced its guidance for fourth quarter revenue growth to just 30%—significantly below the Company's Investor Day projection of over 50% growth. Snap similarly dramatically reduced its guidance for fourth quarter Adjusted EBITDA, an important financial metric that measured Snap's profitability, to just $135-$175 million—<u>as much as 55% below Wall Street consensus expectations</u> of $300 million. Moreover, Snap made clear that the impact of ATT would materially impact its business <u>for at least the next year</u>, causing analysts to reduce their estimates for 2022 by as much as <u>40%</u>.

104. In their earnings press release, Defendants directly attributed these catastrophic results to "headwinds" from ATT. Contrary to Defendants' prior statements about Snap's ability to successfully weather ATT with SKAN, Defendants admitted that ATT had in fact severely impacted Snap's direct response business precisely because of pervasive and intractable issues Snap's advertisers had experienced with SKAN. For example, during the Company's earnings conference call that same day, CFO Andersen confirmed that "[o]ur [direct response] business, which is the majority of our revenue, is facing the headwinds directly from [Apple's] iOS changes"—and that "the primary driver of the [Q3 impact [was] really about the impacts and headwinds associated with the platform changes on iOS." Andersen further emphasized that the impact from ATT was disproportionately negative for Snap because not only had direct response "comprised the majority of our business for some time now," it was also primarily responsible for the Company's record revenue growth, as that business had consistently "been growing at relatively higher rates [than Snap's other business sectors] in recent quarters."

105. Then, significantly, in a complete about-face from Defendants' prior statements, Defendants now admitted that a "majority" of Snap's direct response

advertisers had not "successfully implemented" SKAN by April 2021.  To the contrary, Defendant Gorman admitted that rather than having completed any "successful" implementation of SKAN by that time, SKAN had instead proven to be completely "unreliable" and utterly ineffective as an advertising tracking tool—with Defendant Spiegel also confirming that advertisers had in truth been "rendered blind" by SKAN because it had "ma[de] it more difficult for our advertising partners to measure and manage their ad campaigns for iOS."  Indeed, Gorman admitted that, far from "successfully implementing" SKAN by April 2021, in reality, as soon as Snap's direct response advertisers had begun "explor[ing] and test[ing] SKAN," they had "surfaced a variety" of serious "concerns about [SKAN's] limitations." Significantly, these "concerns" included that SKAN had rendered advertisers completely unable to effectively target their advertising or monitor the success of their ad campaigns—two capabilities that were absolutely critical for their business.

106.   Specifically, Defendant Gorman admitted that advertisers using SKAN had been rendered (i) "unable to target advertising based on whether or not people have already installed their app;" (ii) were "no longer able to understand the impact of their unique campaigns"; and (iii) had lost their critical ability to observe their ad campaigns in real time, as "real-time campaign and creative management [wa]s hindered by extended reporting delays."  Defendant Gorman explained:

> [A]s our advertising partners have explored and tested SKAN solutions, they have surfaced a variety of concerns about its limitations. Every advertiser has their own unique fine-tune perspective on the optimal parameters to measure ROI for their business, but SKAN requires them to use Apple's fixed definitions of advertiser success. For example, advertisers are no longer able to understand the impact of their unique campaigns based on things like time between viewing an ad, and taking an action or the time spent viewing and [sic] ad. Additionally, real-time

1   campaign and creative management is hindered by extended reporting

2   delays and advertisers are unable to target advertising based on whether

3   or not people have already installed their app.

4   107.   Defendant Spiegel likewise confirmed that, in reality, with SKAN,

5   "[t]he reporting is delayed for a significant period of time and often unavailable,"

6   such that it was "very hard to see" ad performance.  Spiegel further admitted that

7   because the IDFA change had completely discontinued "tooling [that Snap's direct

8   response advertisers] [had] been using for over a decade," the "process" of "adopting

9   [SKAN]" for these advertisers was in truth very lengthy and "really challenging"—

10   such that that no "successful implementation" of SKAN was even possible in April

11   2021.   Thus, far from Snap having achieved any "successful" implementation of

12   SKAN by April 2021, in reality, SKAN had completely and immediately destroyed

13   the very IDFA features that were absolutely critical to direct response advertisers'

14   business and had previously made Snap's advertising platform so valuable to its

15   advertising customers.

16   108.   In issuing dramatically reduced fourth quarter guidance, Snap also

17   finally acknowledged the true seismic significance of the ATT changes with respect

18   to Snap's business—which Andersen admitted constituted "significant changes" to

19   the very "foundations" of ad "measurement and optimization" for the industry that

20   Snap was in truth not at all immune from and in fact disproportionately impacted by.

21   As a result, Andersen stated that Snap "expect[ed] these headwinds to continue to

22   impact our business through Q4," as the Company's efforts to develop alternative

23   measuring tools that actually worked to address the IDFA change would "take time."

24   109.   In response to these shocking revelations, Snap's stock price collapsed.

25   In just a matter of hours, Snap's stock fell $19.97 per share, or over 26%, to close at

26   $55.14 per share on October 22, 2021—representing an approximately $27 billion

27

28

drop in market capitalization.  The drop was by far the largest one-day decline in the Company's history.

110.   Analysts excoriated management for their prior misrepresentations, and in particular called out management for their complete reversal from the claims they had made only a few months earlier.  For example, in a report mockingly titled, "'It's just a flesh wound.' Lowering estimates and price target," RBC Capital Markets reported that "***management almost couldn't have sounded worse around the effects [the IDFA change] is having***."  Indeed, RBC noted that Snap now acknowledged that it would take "a few quarters to alleviate" the damage done by the ATT changes, and slashed its 2022 adjusted EBITDA estimates for Snap by more than $500 million to just $780 million—a 40% reduction.  Moreover—and significantly—RBC explicitly noted that Snap's stunning disclosure directly contradicted the statements Defendants had been making for months, stating that "***management's credibility is likely gone given recent communications did not indicate these risks***," and going so far as to conclude: "***management's credibility may be permanently damaged***."

111.   Other analysts likewise highlighted the market's "surprise" at management's admissions, and directly linked this disclosure to Snap's massive stock price drop.  For example, MKM Partners stated that their analysts were "surprised with the change of management's tone with regards to the effect of Apple changes on Snap's ad business."  Barron's also underscored that the Company's announcement "caught the market by surprise and the company lost a quarter of its value in a matter of minutes."  In a report titled "The Perfect Storm," analysts from Evercore ISI noted that they were "surprised by the magnitude of its [second half] revenue challenges and believe the stock likely to be dead $ for 3-6 months."

112.   Analysts further directly linked Snap's revenue miss and fourth quarter guide-down to the Company's significant and unexpected issues with SKAN, which had also come as a surprise to the market.  For example, UBS issued a report stating

that Snap was "Feeling the Pain from IDFA," and commented that "[t]he impact of the iOS privacy changes has been more severe than anticipated primarily due to issues around the measurement quality of Apple's [SKAN]."  UBS further noted that Snap had unexpectedly "confirmed" investors' "chief fear[]" that "the SKAdNetwork measurement solution out of Apple does not appear to be reliable when tested against other measurement solutions"—which UBS concluded would now "revive" investors' "concerns around iOS changes."  Similarly, Jefferies commented that while it had previously viewed Snap's already strong third quarter growth guidance as "conservative," the fact that Snap had "missed the low-end of [that] guidance for the first time in company history" confirmed that "SNAP clearly underappreciated the headwinds from iOS privacy changes"—because, in reality, "[SKAN] has not given advertisers the granularity they need to understand campaign performance, which in turn impacted rev[enue] growth."  Jefferies concluded that "[b]ased on the disappointing performance and advertiser adoption of [SKAN], we believe it could take several quarters before SNAP solves the post-iOS14 measurement issues."

113.  Analysts also strongly reacted to the fact that the Company's dramatically reduced fourth quarter revenue growth guidance to only 30% meant that Snap's prior Investor Day announcement of 50%-plus multi-year annual growth was in truth infeasible.  For example, an October 22, 2021 Wells Fargo report cited "*[c]redibility*" concerns about Snap's management because "[management's] aggressive target, issued at the February 2021 analyst day, for several years of 50%+ revenue growth[]" now "seem[ed] ill-considered."  A Susquehanna report lowered its price target for the Company, noting that Snap's fourth quarter revenue guidance "represent[ed] roughly 30% y/y growth at the midpoint, well below our estimate of 48% y/y and consensus of 50% y/y."  Finally, Guggenheim also lowered its price

target for Snap, similarly stating that the fourth quarter revenue guide "impl[ied] ~30% growth," which "was well below the 50% multi-year growth guide."

114.    The same day, on October 21, 2021, Snap also filed its Form 10-Q for the third quarter of 2021 ("3Q 2021").  Significantly, in the 3Q 2021 Form 10-Q, Defendants further confirmed that the privacy changes Apple had made back in April 2021 had had a severe and material negative impact on Snap's business:

> [I]n April 2021 Apple issued an iOS update that imposes heightened restrictions on our access and use of user data… These changes have adversely affected our targeting, measurement, and optimization capabilities, and in turn affected our ability to measure the effectiveness of advertisements on our services. This has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business.

115.    Defendants further confirmed the falsity of their earlier statements when, at the November 17, 2021 Morgan Stanley European Technology, Media & Telecom Conference, less than a month after the Class Period ended, they changed their story entirely about what had actually happened with respect to SKAN in April 2021.  Specifically, Defendants expressly confirmed that nothing close to any "successful implementation" of SKAN by a "majority" of Snap's direct response advertisers (or, for that matter, any of Snap's advertisers) had ever occurred at that time.  Rather, Andersen admitted that when Apple first rolled out ATT back in April 2021, it was in fact "challenging [for Snap] to know how to evaluate" the effectiveness of SKAN for the Company's advertisers "[b]ecause advertisers still at that point had access to a lot of their legacy signals to calibrate their spending"– statements that sharply conflicted with Gorman's earlier unequivocal representation that a "majority" of the Company's direct response advertisers had "successfully implemented" SKAN.

116.   Thus, Andersen confirmed that, in April 2021, Defendants had <u>no basis whatsoever</u> to publicly proclaim that a "majority" of Snap's direct response advertisers had "successfully implemented" SKAN.  Rather, in reality, as Andersen expressly admitted, at that time Snap's advertisers were not using SKAN <u>at all</u>— advertisers were still relying on their old legacy systems that had the optimization and targeting functionality that they required (and which SKAN did not).

### L.   Post-Class Period Events Confirm That The Fallout From Defendants' Fraud Continues To This Day

117.   Post-Class Period events confirm that the fallout from Defendants' fraud regarding Apple's ATT changes continues to severely impact the Company's financial condition to this day.

118.   For example, on July 21, 2022—over a year after Snap falsely proclaimed that a "majority" of its DR advertisers had "successfully implemented" SKAN, and nine months after the end of the Class Period—the Company announced a second-quarter net loss of $422 million and disappointing year-over-year revenue growth of only 13%, a mere fraction of the 50% plus year-over-year annual revenue growth the Company had promised during its Investor Day the prior year.

119.   In an Investor Letter the Company issued the same day, Snap admitted that the 50% annual revenue growth target was clearly unattainable because the Company would not recover from the impact of Apple's ATT changes for some time—such that Defendants were not even willing to provide any third-quarter forecast at all.  Moreover, the Company admitted that, rather than any of its advertisers having "successfully implemented" SKAN back in April 2021, in truth, even over a year later, the Company was "still early in the journey of adjusting our core ranking models to properly incorporate SKAN-based signals."

120.   Then, on October 20, 2022, Snap reported its slowest-ever quarter for revenue growth (merely 9% compared to a promised over 50%) since going public in 2017.  The Company noted that revenue growth continued to be impacted by

platform policy changes, or as Evercore ISI called it "the lingering impact of the Apple privacy changes, which have undercut direct response ad tracking."   In addition, Snap did not provide revenue or earnings guidance for the fourth quarter. In its report titled "Snap shares plunge nearly 30%, closing at lowest since early 2019," CNBC stated: "Apple's data privacy update in 2021 has limited the ability of social media companies to track users online, which has continued to hurt [Snap]."

121.   Even the Company's most recent earnings report on January 31, 2023—during which the Company forecasted a quarterly revenue *decline* for the first time in its history—showed how, as the *Financial Times* put it, "[Snap] continues to be dogged by changes to Apple's privacy policies that have upended its ability to tailor advertising to users."   Bloomberg similarly commented that Snap was "roiled by more than a year of upheaval prompted by [Apple's] privacy changes that made it more difficult to personalize and track the success of ads on their apps."   And Business Insider opined that "Snap's ads business [was] cratering" due to the "lasting effects of Apple's privacy changes in 2021," and concluded that "the future looks grim [for Snap]" because ATT had proven to be "more of a whammy for Snap than its competitors."

122.   Due to the continuing fallout from Defendants' fraud, the price of the Company's common stock has never recovered.  As of the date of this filing, Snap's stock continues to trade in the $10 per share range—a staggering decline of nearly 90% from its Class Period high of over $83 per share.

**M.**   **Former Snap Employees Confirm That Snap's Advertisers Did Not "Successfully Implement" SKAN By April 2021—And That Snap Management Explicitly Instructed Employees To Not Document Anything About The Expected Significant Negative Impact On Snap's Revenue In Order To Avoid Public Disclosure Obligations**

123.   Former Snap employees—who held positions at Snap that caused them to be directly involved in either transitioning Snap's advertisers to SKAN, or in determining the impact of Apple's privacy changes on the Company's revenue—

have confirmed that Defendants knew that SKAN was unworkable from the outset, such that Snap's critical advertising revenue would inevitably be significantly negatively impacted by Apple's privacy changes.  Indeed, as detailed further below, these former employee accounts show that: (i) dating back to April 2021, advertisers had already determined that SKAN's significant limitations severely hampered Snap's advertising performance—such that Gorman had no basis to proclaim that the "majority" of Snap's direct response advertisers had "successfully implemented" SKAN; and (ii) Company management explicitly instructed Snap employees who were tasked with forecasting the negative impact of Apple's privacy changes on the Company's revenue to not document anything about the expected impact because Snap wanted to avoid triggering public disclosure obligations that would give rise to "shareholder fraud."[12]

### i. A Former Snap Employee Confirms That The Company Knew SKAN Was Unworkable From Day One, Severely Impacting Snap's Advertising Performance

124.   CW 1, a former Snap Account Strategist who worked directly with the Company's advertising clients on the transition from IDFA to SKAN, confirmed that, rather than "successfully implement[ing]" SKAN in April 2021, most of Snap's advertisers had <u>avoided</u> implementing SKAN for as long as possible due to significant concerns about its performance.[13]  According to CW 1, those who did implement SKAN immediately found it to be unworkable because it rendered advertisers wholly unable to effectively track or monitor their ad campaigns.

---

[12] Former Snap employees and employees of Snap advertising partners are referred to herein as Confidential Witness "CW __" and are referenced in the feminine form to maintain their confidentiality.

[13] CW 1 worked for Snap as an Account Strategist from April 2020 through December 2021 in the gaming advertising group, and in that role reported to Meena Kallu, the Head of Emerging Gaming for North America.  CW 1 left the Company in December 2021 due to difficulties she was experiencing in selling advertising solutions because of the numerous issues advertisers were having with SKAN.

125.   CW 1 said that she was intimately involved in transitioning Snap's advertisers from IDFA to SKAN from the very outset.  CW 1 observed that, rather than immediately implementing SKAN, "[a]dvertisers dragged their feet as long as possible" due to SKAN's severe drawbacks compared to IDFA.  Indeed, directly contradicting Defendant Gorman's claims that a "majority" of advertisers had "successfully implemented" SKAN by April 2021, CW 1 said that the exact opposite was true, as "[t]he performance of SKAN was terrible and there were very few adoptees in Q1 and Q2 of 2021."  As CW 1 stated, "[f]rom day one when SKAN support launched[,] [r]ight when it was launched in April 2021, I did not find it to be effective."  CW 1 thus explained that while Snap was "one of the first to go to market with SKAN compatibility," that "[did] not mean that the performance was good, because it was not."

126.   CW 1 further explained that—as Defendants admitted at the end of the Class Period—the advertisers who did implement SKAN immediately experienced numerous issues severely hindering their ability to track and monitor their ads, and thus they had no insight as to the performance of their ad campaigns.  Specifically, upon implementing SKAN, advertisers immediately lost access to all of the legacy data they had previously collected on individual consumers—and any new data they received (which was no longer tied to individual users) was significantly delayed, severely hampering their ability to optimize ad campaigns in real time.  For example, once an advertiser launched a new ad campaign using SKAN, it took almost three days before any data would populate—and even when that data became available three days later, advertisers "were unable to know what the users were doing" and thus unable to collect critical purchase data (for example, advertisers were completely unable to determine whether a user who made a purchase after clicking on an ad was making a $5 or a $10 purchase).

127.   Moreover, CW 1 stated that the numerous issues advertisers were having with SKAN were exacerbated by the fact that, in reality, Snap's "support [for SKAN] was very limited and was nowhere near robust."   As such, while "clients were looking to Snap to answer [their] questions…we didn't know the answers."

        **ii.**        **Former Snap Revenue Forecaster Confirms Gorman Had No Basis For April 2021 Statements—And Describes How Snap Management Instructed Employees To Not Quantify Or Document Anything About The Negative Impact Of ATT In Order To Avoid Public Disclosure**

128.   CW 2 was a former Data Scientist on the Revenue Product Team at Snap who was tasked with revenue forecasting for the Company from 2018 through the first quarter of 2022.[14]

129.   Significantly, CW 2 contacted Lead Plaintiff's counsel on her own initiative in or around May 2022, after Lead Plaintiff filed its first amended complaint (ECF No. 65), because CW 2 reasonably believed that she had material information concerning Defendants' alleged unlawful conduct that corroborated Lead Plaintiff's allegations.   As she stressed to Lead Counsel, "[if the case proceeds to discovery], you will find a lot of information" confirming Defendants' fraud.

130.   Indeed, in remarkably detailed fashion—and as supported by CW 2's review of her contemporaneous notes—CW 2 (i) confirmed that Defendant Gorman had no basis to proclaim on April 22, 2021 that a "majority" of the Company's direct response advertisers had "successfully implemented" SKAN; and (ii) described how Snap employees in charge of revenue forecasting, including herself, were internally instructed by Company management not to quantify or document anything regarding the negative impact of Apple's privacy changes because doing so would, in the view

---

[14] CW 2 worked as a Data Scientist at Snap from 2017 through 2022, and was assigned to do revenue forecasting for the Company from 2018 through the first quarter of 2022.  Imran Khan, Snap's former Chief Strategy Officer and second-in-command to Defendant Spiegel, initially asked CW 2 directly to forecast revenue. CW 2 reported to Chris DiFeliciantonio, the Data Science Manger for the Revenue Product Team at Snap.  CW 2 stated that there were three teams involved in revenue forecasting:  Revenue Strategy, Finance, and Product.

of Snap's senior management, trigger disclosure obligations that would give rise to "shareholder fraud" in the event that such information was not disclosed to investors. CW 2 stated that based on what she witnessed in her tenure on Snap's revenue forecasting team during the alleged Class Period—detailed further below—CW 2 had a reasonable belief that Defendants engaged in unlawful conduct with respect to their public statements to investors during the Class Period regarding the impact of Apple's privacy changes on Snap's business.

131.   As set forth above, CW 2 stated that she was assigned to conduct revenue forecasting for Snap from approximately 2018 until the first quarter of 2022. In that role, CW 2 directly worked with, and interacted regularly with, Snap's top management—including Defendant Gorman, Defendant Spiegel, and CFO Andersen.   Indeed, CW 2 directly participated in regular pre-earnings release meetings with Defendant Gorman and Andersen, which occurred approximately one month prior to each of the Company's earnings releases during the Class Period (including the Company's quarterly releases), and lasted for at least an hour.  CW 2 thus recalled, including based on her review of her own <u>contemporaneous</u> notes, that revenue forecasting meetings with Defendant Gorman and Andersen occurred on December 16, 2020, in or around mid-March 2021, and on June 16, 2021.  CW 2 stated that these meetings were small, consisting of only two Data Scientists (one of which was CW 2), in addition to Defendant Gorman and Andersen and a few other finance or revenue strategy analysts—amounting to six to seven people total.

132.   CW 2 stated that she was known as the "revenue forecasting" person at Snap due to her internal reputation for regularly calculating "the most reliable forecast," meaning the one closest to actual results.  As CW 2 stated, "I was that person from Revenue Product" at Snap.  CW 2 was therefore integral to the Company's revenue forecasting meetings, as it was mainly CW 2 and only two others—Philippe Browning, the head of Revenue Strategy, and Raghu Makonahalli,

the head of Finance—who did the majority of the talking at these meetings while Defendant Gorman and Andersen listened and asked questions.  Andersen referred to these pre-earnings release meetings of the Revenue Product, Revenue Strategy and Finance groups as the "meetings of the five families," a reference to the movie "The Godfather," which was meant to mark the significance of these meetings to the Company.

133.   As a result of CW 2's prominent role in these meetings, she developed extremely close, personal working relationships with Defendant Gorman and Andersen, as they trusted her "tried and true method of doing revenue forecasting." For example, CW 2 recalled that CFO Andersen completely reconsidered revenue forecasts for the Company one quarter given concerns that CW 2 had raised.  CW 2 also had an extremely close relationship with Defendant Gorman.  CW 2 recalled that, in connection with her revenue forecasting work, she regularly communicated with Gorman via Snapchat, with Andersen also included in the messages, and often communicated with Gorman via email as well (along with other members of the "five families" team).  CW 2 also frequently communicated with Gorman directly via text.  For example, on April 15, 2021—mere days before Gorman's April 22, 2021 representation proclaiming that a "majority" of the Company's direct response

advertisers had "successfully implemented" SKAN—Gorman sent CW 2 the following message:



134.   CW 2 also had direct, personal interactions with Defendant Spiegel, who was specifically aware of the work CW 2 did for the Company.  For example, in March 2020 right before the start of the COVID-19 pandemic, Defendant Spiegel sent CW 2 flowers and a handwritten note personally thanking her for her analyses contributing to Snap's growth.   The handwritten note, which was written on embossed "Spiegel" stationery and is shown in the photograph below, stated:  "[CW 2], Thank you so much for your analysis on our advertiser funnel + your creative solutions!  Improving our funnel is key for growth and we so appreciate your insights and support.  Thank you especially for the collaboration you demonstrated with our broader team."  The note was then personally signed by Spiegel, who annotated his signature with an emoji.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    135.   CW 2 thus had frequent direct, personal interactions with Snap's most

16  senior officers, and was very familiar with Snap's business and ATT.   CW 2

17  stated that, throughout 2021, it was well known internally that Snap expected a

18  significant negative revenue impact from the Apple iOS privacy changes, as those

19  changes were a central focus for the "entire Company" for all of that year.   CW 2

20  explicitly stated in no uncertain terms that Snap's senior-most leadership—including

21  Defendants Spiegel and Gorman—"absolutely knew that there would be an impact"

22  from Apple's changes, as Defendant Gorman and Andersen would routinely share

23  their concerns in that regard during the pre-earnings release revenue forecasting

24  meetings CW 2 attended.   As a result, CW 2 recalled that she and her colleagues

25  were "surprised" when Defendants Gorman and Spiegel repeatedly publicly reported

26  to investors during this time "that everything was going to be fine" regarding

27  Apple's privacy changes.

28

136.   With respect to Gorman's April 22, 2021 statement that a "majority" of Snap's advertisers had "successfully implemented" SKAN, according to CW 2, Gorman could not "***justify saying things were successfully implemented***."   CW 2 explained that, at that time, Snap had barely begun working with its advertisers on SKAN, and there was no way that Gorman could have represented at that time that any implementation of SKAN had occurred or been "successful."

137.   Indeed, CW 2 recalled viewing a colleague's spreadsheet in August 2021 evidencing that a majority of Snap's direct response advertisers had <u>not</u> adopted SKAN.[15]   Specifically, when CW 2 was initially tasked with forecasting the impact of Apple's privacy changes in August 2021 (as further detailed below), she consulted with Ruxan Ouyang—the Data Scientist at Snap who was in charge of attribution (or ad efficacy measurement) for the Company's direct response advertisers—to inquire about those advertisers' adoption of SKAN to measure their conversions and ad campaigns.   CW 2 stated that, in response, Ouyang showed her a spreadsheet that, far from showing that a "majority" of Snap's direct response advertisers had "successfully implemented" SKAN, in fact showed <u>exactly the opposite</u>:   even by as late as August 2021, the majority of the Company's direct response advertisers ***had not*** taken the initial steps to "opt in" to SKAN, let alone "successfully implement" it.   CW 2 stated that, as a result, Ouyang's sentiment expressed to CW 2 at the time was that "<u>it's not looking good</u>."   CW 2 added, "[Ouyang] was having meetings weekly with the product manager, Sammy Chopra," who was in charge of developing alternative ad measurement solutions to work around ATT.   "They were trying their best to quickly come up with a solution because <u>people weren't adopting [SKAN]</u>."   CW 2 further explained that while Chopra was frantically trying to develop workaround solutions for ATT during this

_____

[15] According to CW 2: "there is definitely a spreadsheet out there."

time due to the unworkability of SKAN, it was a well-known fact within the Company that nothing was succeeding.

138.   Regarding Defendant Gorman's knowledge of advertisers' adoption of SKAN at this time, CW 2 emphasized Gorman's heavy and intimate involvement in managing Snap's advertising business, stating that "Jeremi [Gorman] was ear to the ground" and was known for connecting on a first-name basis with Snap's advertising sales representatives.  Additionally, according to CW 2, Gorman was "meeting with key advertisers all the time."  CW 2 stated that, as a result, with respect to the impact of Apple's privacy changes and advertisers' experience with SKAN, "[Gorman] would have heard from multiple people" about any issues—including from Snap's Product Managers, who directly provided updates to senior leadership, and from Snap's Data Scientists, who regularly updated Snap's Vice Presidents of Product, Jacob Andreou and Peter Sellis, who in turn would have updated Gorman.  Indeed, regarding Gorman's relationship with Sellis, Defendant Gorman herself stated during Snap's Investor Day: "There is no person at Snap with whom I work more closely than Peter Sellis . . . Sales leadership and revenue product are joined at the head, listening to the market and developing products to solve advertiser problems." CW 2 stated that she fully expected that there would be internal correspondence stating that SKAN adoption was not as great as hoped.

139.   CW 2 further stated that because Snap's business "lived" on direct response—with that business comprising the vast majority of Snap's revenue, between 65-70%—it was absolutely the case that there was no way Defendant Gorman would not have known about SKAN not working well, particularly considering that ATT posed an existential threat to the direct response business.  CW 2 explained that direct response advertisers had campaigns where the entire objective was to measure conversions—and after ATT, conversions would not be measurable. CW 2 added that it was no secret at Snap that the Company's business was heavily

"over-indexed" on iOS, with iOS users comprising upwards of 70% of Snap's revenue—a major concern at the Company as it began to lose revenue from users of iOS devices. CW 2 stated that, due to the fact that Snap was so dependent on iOS for its revenue, if Snap did not have a well-working solution for ATT by the time it rolled out, Snap would be "screwed."

140.   Additionally, despite Snap's senior leadership repeatedly internally voicing concerns about the expected negative impact of Apple's privacy changes throughout 2021, CW 2 described concerted efforts by Company management to ensure that the impact was never internally quantified or documented—because the Company wanted to avoid triggering any public disclosure obligations that could give rise to "shareholder fraud." Indeed, although it was Snap's regular practice to prepare detailed revenue forecasts before each earnings release—and although Defendants repeatedly publicly claimed that the "potential greatest impact" of the ATT changes was fully factored into their revenue forecasts announced during the Class Period—CW 2 stated in no uncertain terms that <u>no revenue impact analysis of Apple's ATT changes was ever completed in or around April 2021, or at any time during the Class Period before the October 21, 2021 third quarter earnings release</u>.

141.   As stated by CW 2, "Evan [Spiegel] made this [public] statement that we had taken into consideration [the] impact for these privacy change[s]," but CW 2 had "noted in my revenue forecast notes [from June 16, 2021]" that ATT <u>still</u> "wasn't baked into the actual revenue forecast" even by that point. CW 2 added, "I had made that note to go over it in a meeting with Derek [Andersen], Jacob [Andreou] and Jeremi [Gorman]," and that "We had these meetings quarterly." CW 2 recalled that during the June 16, 2021 meeting, ATT was "<u>expressed as potentially a very big material issue</u>, but we didn't know the exact amount." CW 2 stated that she would definitely have known if the ATT impact had been factored into any revenue forecasts prior to the Company's third quarter earnings release, as that was

something that would have been discussed during the revenue forecasting meetings. However, it was never "baked in," and even when CW 2 was finally asked to calculate the impact of ATT in August 2021—two months prior to the October 21, 2021 third quarter earnings release—she was told by Company management to stop.

142.   Indeed, CW 2 soon learned that the Company's failure to include the ATT impact in any of its revenue forecasts was no accident, but rather a deliberate choice by Snap management to avoid quantifying what Defendants <u>knew</u> would be a highly material negative impact from Apple's privacy changes on Snap's business. Indeed, CW 2 recalled that she was not asked to quantify the impact of Apple's privacy changes until August 2021—however, CW 2 was immediately instructed by Company management to not complete that task in order to avoid creating a paper trail that could trigger public disclosure obligations.  Specifically, in August 2021, Per Sandell—who was at that time the Director of the Revenue Product team and Monetization at Snap—asked CW 2 to forecast the expected impact of Apple's privacy changes on Snap's revenue.  Upon receiving this request, CW 2 recalled being "surprised we didn't have that answer yet," as Apple's privacy changes had been a key internal concern Company-wide for months, and Snap's regular business practice would have ensured that a risk of the magnitude represented by Apple's ATT rollout was incorporated into the Company's revenue forecasts.

143.   Shortly thereafter, CW 2 attended her weekly one-on-one meeting with her direct supervisor, Chris DiFeliciantonio.  During that meeting, CW 2 went through her task list for the week with DiFeliciantonio and mentioned that Sandell had asked her to quantify the impact of Apple's privacy changes on Snap's revenue. Upon learning this information, DiFeliciantonio stated that he would "take that off your plate" and speak separately to Sandell about how the forecast should not be done.  Remarkably, when CW 2 inquired as to why DiFeliciantonio was instructing CW 2 not to perform the analysis, DiFeliciantonio responded: "***if someone above a***

***certain paygrade sees a quantifiable material impact, they are legally required to disclose it to the public or else it is shareholder fraud***."  DiFeliciantonio explained that if CW 2 did the revenue impact analysis Sandell had requested, "we would have to disclose it" to investors, which the Company did not want to do.   CW 2 recalled that DiFeliciantonio further commented that "***they've been very intentional about not doing that [analysis]***," and "there's a reason why there's not one document." When asked who "they" referred to, CW 2 replied Snap's senior leadership team, commenting that Andersen in particular would have been very cognizant of the liability risk of it.

144.   CW 2 stated that, after this meeting, DiFeliciantonio told CW 2 that he had spoken to Sandell about the requested revenue impact analysis, and CW 2 did not hear about it again—nor was any formal revenue impact analysis of the Apple privacy changes completed at this time.  CW 2 further recalled that, around this same time in August 2021, the Snap Finance group was also working to quantify the expected impact of the ATT changes on Snap's revenue and appeared to have a "better grip" on what the impact was—but CW 2 was told that the Finance group had similarly been instructed by Snap management to "***be very careful about what we put into documentation***."  CW 2 further explained that, if Finance ever did look into this issue prior to the third quarter earnings call, it did not share that information, in any documented form or otherwise, with Snap's revenue forecasting team.

### iii.   "She Just Made That Up": Another Former Company Employee Confirms That Defendant Gorman Had No Basis For Her April 2021 Statements

145.   CW 3 was a former Partner of Product Marketing at Snap from 2020 until 2022 who reported directly to Head of Global Product Marketing Badi Badkube, who in turn reported to the Director of Revenue Product, Per Sandell. During her tenure at Snap, CW 3 was responsible for working with Product

1  Management and Product Partnerships teams to scale their platforms and grow those
2  platforms' adoption within the developer community.

3      146.   CW 3 recalled that in the first few months of 2021, leading up to
4  Defendant Gorman's statements on April 22, 2021, Snap had no solution to
5  effectively deal with Apple's privacy changes—contrary to Defendants' public
6  representations about the "success" of SKAN.  CW 3 stated: "<u>We had no solution
7  and if we did, we would have implemented it</u>.  Gorman said that we had a solution
8  that was going to take care of everything, and I wished that were the case."

9      147.   Significantly, with regard to Defendant Gorman's April 22, 2021
10 statement that a "majority" of Snap's direct response advertisers had "successfully
11 implemented SKAN," CW 3 commented that it was "no secret" that "Snap screwed
12 this up." CW 3 explained: "<u>[T]here is no way that Jeremi Gorman could have made
13 a statement like that based on actual data.  Gorman was shooting from the hip</u>." As
14 CW 3 stated, "<u>no one gave [Gorman] a report that said that.  **I think that she just
15 made that up**</u>." CW 3 continued: "For Gorman to have that kind of confidence that
16 everything was all sorted out, <u>**there is no way that was accurate**</u>."

17     148.   82.   CW 3 further commented that Gorman's April 22, 2021
18 statement was made just two months after Snap's Investor Day, when Snap had
19 touted its projected 50%+ revenue growth and conspicuously did not mention ATT
20 or SKAN at all.  As CW 3 described, Defendants' statements beginning with the
21 Investor Day and through the second quarter of 2021 rocketed Snap's stock.  CW 3
22 added:  "<u>It was insane, people were staggered.  Snap's stock went through the roof</u>."

23
24      **iv.   Former Manager With Snap's Advertising Partner
            Describes "Super Drastic" Impact Of ATT On Snap's
25          Business Shortly After ATT Rollout—Causing Snap
            Advertisers To "Shut Down" Their Snap Campaigns**

26
27      149.   CW 4 was a Paid Media Manager with adMixt, a Snap MMP partner,
28 from August 2020 to September 2022.  CW 4 managed Snapchat advertising

campaigns on behalf of adMixt clients. For instance, Snap's advertising clients would collect data about visitors to their website and then have adMixt direct ad campaigns on behalf of the client to various social media sites, such as Snapchat, so that those who had been previously tracked now received advertising directed to them while on Snapchat. In her role, CW 4 regularly launched ad campaigns on Snapchat and then monitored the effectiveness of those campaigns on behalf of her advertising clients. CW 4 communicated with Snap employees on a regular basis, including before and after the Apple privacy changes, discussing ways "to improve business."

150. CW 4 first commented that Plaintiffs' allegations were "1000%" correct based on her experience with Snap and its advertisers. CW 4 recalled that in the period prior to the ATT rollout, adMixt personnel, including adMixt executives and CW 4, had been asking Snap about the Company's plans to respond to ATT— but week after week went by without Snap presenting a solution. By contrast, Facebook had already been coming up with recommendations and guidance on how it intended to deal with the pending changes. CW 4 elaborated that internally at adMixt, "we were concerned" ahead of the launch of iOS 14 about the impact it would have. She added that advertisers had already been experiencing inconsistent results from Snapchat ad campaigns and that Snap had been "going down in popularity" amongst advertisers, and that with iOS14 it "went out the window."

151. CW 4 recalled that, very shortly after Apple's April 2021 ATT rollout—by no later than May 2021—the impact of the Apple privacy changes on Snap was "super drastic." CW 4 explained that the conversion rate for Snapchat ad campaigns became "so bad" after the iOS changes that advertisers whose relationships CW 4 managed for adMixt had to "shut down their campaigns on Snapchat" (*i.e.*, discontinued their advertising on Snapchat) because the campaigns were "no longer producing" results. Furthermore, CW 4 stated that based on her

team meetings with other Paid Media Managers who handled Snapchat campaigns, the same problems she was experiencing were happening "across the board," in that clients were not getting returns on their Snapchat advertising campaigns.

152.   Significantly, CW 4 stated that the impact of the iOS14 changes did not affect other social media platforms to the same degree as it did Snap, which was disproportionately negatively impacted by the changes.  For instance, Facebook had been able to work out a solution that allowed it to still effectively track and target the effectiveness of advertising campaigns on the Facebook platform.   CW 4 stated that, in contrast, Snap was unable to present any workable solution, particularly given the poor results Snap's advertisers experienced just weeks following the ATT changes.  CW 4 stated that while she regularly communicated with Snap employees (including Snap Account Managers in charge of specific advertising clients) about how to "improve business" after the changes, Snap's employees "never had any answers" to respond to the situation.

## VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

153.   Defendants made false and misleading statements and material omissions in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

154.   Defendants' representations set forth below were false.  These material misstatements had the cause and effect of creating in the market an unrealistically positive assessment of Snap's business, operational status and future growth prospects as, in truth, Defendants had falsely presented to investors a materially misleading portrayal of the success of its advertisers' implementation of SKAdNetwork and the effect of Apple's iOS changes on Snap's ad business.

155.   On April 22, 2021, Defendants held a conference call with analysts and investors to discuss the Company's financial results for the first quarter of 2021.

During the call, Defendant Gorman unequivocally stated that Snap's advertisers had had ample time to adopt and test SKAN and were <u>already successfully using it</u>, stating, in no uncertain terms that a "majority" of Snap's direct response advertisers had already "successfully implemented" SKAN:

> The fact that these changes are coming later than we anticipated has provided additional time to adopt Apple's SKAdNetwork … <u>Advertisers that represent a majority of our direct response advertising revenue have successfully implemented SKAdNetwork for their Snap campaigns</u>.

156.   Gorman's assurances were highly material, as reflected by the fact that analysts specifically asked her to elaborate on her claims of direct response advertisers' "successful implementation" of SKAN.   Significantly, in response, Gorman again expressly assured investors that advertisers that represent the majority of Snap's direct response revenue were successfully using SKAN:

> <u>Michael Morris</u> – Guggenheim Partners – Analyst: …First, you referenced the successful implementation of the SKAdNetwork for certain Snap campaigns with your partners. I'm curious what defined success of that implementation? And does this mean similar feedback to what you saw previously? Do you expect this to mitigate some of the IDFA headwinds that have been a source of investor concern? . . .
>
> <u>Jeremi Gorman</u> – Chief Business Officer: …We are really focused on helping our advertisers make the transition to the best possible measurement and optimization tools smoothly. The change happened later than we expected, which gave us a lot of time to prepare and SKAdNetwork is one part of that. So <u>we're really pleased to see that advertisers that represent the majority of our direct response revenue</u>

have implemented it so far…We're working closely with Apple to understand the rules of the road, and we're prepared to follow them. And I think, importantly, we really support Apple's approach because we've always believed that great advertising and customer privacy are not mutually exclusive. And it's a huge core value of Snap privacy. And so we're excited to be implementing this alongside our partners.  It's been a huge cross-functional effort between products, engineering, the sales teams, the marketing teams, to work with our customers to ensure that this transition goes as smoothly as possible.

157.   The statements in paragraphs 155-56 above were materially false and misleading and omitted material facts.  In reality, the "majority" of Snap's direct response advertisers had not already "successfully implemented SKAdNetwork for their Snap campaigns" by April 2021.  As Defendants admitted on October 21, 2021, Snap's advertisers did not even begin to "test" or "explore" SKAN until months later—and when they did begin to "test" SKAN, they immediately discovered that they were severely hampered by SKAN's significant and numerous "limitations," including by being rendered (i) "no longer able to understand the impact of their unique campaigns"; (ii) unable to monitor their ads in real-time because "real-time campaign and creative management [was] hindered by extended reporting delays"; and (iii) "unable to target advertising based on whether or not people have already installed their app."

158.   In other words, rather than advertisers "successfully implement[ing]" SKAN in April 2021, SKAN was in reality a completely ineffective replacement for IDFA, and in fact had destroyed the critical IDFA capabilities of ad tracking and real-time monitoring that had made Snap such an attractive platform for advertisers. Indeed, CFO Andersen further admitted after the Class Period ended that Defendants had no basis whatsoever to publicly proclaim that a "majority" of the Company's

direct response advertisers had "successfully implemented" SKAN.  To the contrary, Andersen admitted that in April 2021, Snap's advertisers were not using SKAN at all, and instead were still relying on their legacy systems that provided them with the optimization and targeting functionality that SKAN could not provide.

159.   The falsity of Defendants' statements about the purported "successful implementation" of SKAN is also demonstrated by information provided by Plaintiff's CWs.  As CW 1—a former Snap Account Strategist who worked directly on transitioning Snap's advertisers to SKAN—stated, contrary to Defendant Gorman's statements, "[t]he performance of SKAN was terrible and [thus] there were very few adoptees in Q1 and Q2 of 2021."  Similarly, CW 2 confirmed that Gorman could not "justify saying things were successfully implemented" in April 2021, as even by as late as August 2021, the exact opposite was true: CW 2 viewed an internal Company spreadsheet evidencing that a majority of Snap's direct response advertisers had not even yet opted in to SKAN, let alone "successfully implemented" it.  CW 3 similarly confirmed that Gorman had "just made that up" and "was shooting from the hip," as her statement that a "majority" of Snap's direct response advertisers had "successfully implemented" SKAN at this time could not have been based on actual Company data.  Finally, CW 4 confirmed that just weeks after Apple's ATT rollout in April 2021, far from any "successful implementation" of SKAN that "mitigate[d]" ATT ever having occurred, the impact of ATT on Snap's advertisers was instead immediate and "super drastic" as advertisers "shut down their campaigns on Snapchat" because they were "no longer producing" results.

## VII.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

160.   As alleged above, numerous facts raise a strong inference that Defendants knew, or were deliberately reckless in disregarding, the true facts regarding Snap's ability to weather the ATT changes, the implementation of SKAN

by the Company's advertising customers, and the dramatic impact that ATT would have on Snap's ad revenues and financial results.  These facts include the following:

161.   *Apple's ATT posed an existential threat to Snap's business*.  Snap's revenue during the Class Period depended entirely on advertising, with 99% or "substantially all of [Snap's] revenue" coming from Snap's various advertising products.  As set forth above, approximately 70% of that advertising revenue came from ads on Apple's iOS devices, and the majority of Snap's ad revenue came from Snap's "Direct Response" advertising that was most severely impacted by the ATT changes and the ineffectiveness of SKAN.  Additionally, for years, on numerous occasions, Defendants touted the importance of Snap's DR business, with Defendant Gorman noting that the Company's "direct response advertisers" had "dr[iven] active advertisers to an all time high." *See, e.g.* ¶¶38-39.  Defendant Spiegel summarized the vital nature of that business in one word: "***critical***."   Analysts also continuously noted the strength of the Company's direct response advertising business and the importance of that business to the Company's revenue.  *See, e.g.*, ¶¶37, 40.

162.   Accordingly, numerous media and analyst reports stressed that Apple's ATT changes posed a highly significant risk to the Company.  *See, e.g.*, ¶¶50, 53.  For example, a January 2021 CNBC report noted that ATT was "expected to dramatically impact the ability of advertisers to target ads"—and cited a recent MKM Partners analysis that had concluded that "Facebook and Snap have the highest potential headwind due to IDFA changes."  A December 16, 2020 Bank of America report similarly commented that out of Snap and its peer companies— including Google, Twitter, Facebook, and Pinterest—Snap and Facebook were most at risk from ATT, with Snap expected to experience an even more significant revenue headwind than Facebook.  Additionally, a January 31, 2021 Deutsche Bank

report noted that "[Snap] is quite exposed" due to its "high exposure to iOS" and its advertisers' heavy "reliance on [] IDFA."

163. Furthermore, Plaintiff's confidential witnesses confirmed the significance of the threat posed by ATT.  For example, CW 2 stated that because Snap's business "lived" on direct response—with that business comprising the vast majority of Snap's revenue, between 65-70%—it was absolutely the case that there was no way Defendant Gorman would not have known about SKAN not working well, particularly considering that ATT posed an existential threat to the DR business.  CW 2 explained that DR advertisers had campaigns where the entire objective was to measure conversions—and after ATT, conversions would not be measurable.  CW 2 added that, due to the fact that Snap was so dependent on iOS for its revenue, if Snap did not have a well-working solution for ATT by the time it rolled out, Snap would be "screwed."

164.  *Gorman was acutely aware that the market was heavily relying on her statements, as analysts published numerous reports that underscored her words about advertisers' "successful[] implement[ation]" of SKAN and the supposed "minimal" impact that Apple's privacy changes would have as a result.*  There can be no question that investors heavily relied on Defendant Gorman's repeated public statements on April 22, 2021—an obvious fact of which she was indisputably aware.  ¶¶78-86.  For example, JMP reported that "<u>given 50%+ of Snap's DR advertising partners</u> have adopted Apple's SKAdNetwork and <u>Snap's planning, we view ATT changes as less of a risk than previously.</u>" Guggenheim's April 22, 2021 report noted "the <u>majority of [Snap's] DR advertisers [are] navigating these new privacy initiatives with Snap via SKAdnetwork.</u>" Truist parroted Defendants' claim that the Company's "advertisers that represent a majority of its DR ad revenue have <u>successfully implemented</u> SKAdnetwork for their Snap campaigns," concluding that "[a]ll this should help <u>mitigate against a meaningful adverse outcome for Snap</u>..."

Piper Sandler noted that "<u>management reiterated support for Apple's ATT changes</u>" and "<u>[t]he majority of SNAP's DR advertisers have adopted SKAdNetwork and they continue to work closely with Apple to prepare for the changes</u>."

165. Similarly, analysts such as Jefferies, Morningstar and Evercore all relied on Defendants' additional statements regarding the effectiveness of SKAN in concluding that the ATT risk was "<u>minimal</u>." ¶¶97-102. For example, a July 23, 2021 Morningstar report noted Snap's "very impressive" revenue growth, and expressed relief that, based on Defendants' statements, "it appears that the overall impact of [ATT] may not be as much as initially anticipated." In reaching this conclusion, Morningstar stated that "we believe the impact of Apple's moves will remain minimal" precisely because "<u>Snap has already been working with Apple to use its SKAdNetwork data with the platform's and its advertisers' first-party data</u>." Additionally, Truist found that management had shown "a relatively comfortable stance toward the potential impact of [ATT] on its business." Truist relied on Gorman's statements that Apple's delay in rolling out ATT had given Snap "additional time to adopt Apple's [SKAN]," which Truist concluded "<u>should help mitigate against a meaningful adverse outcome for Snap</u>."

166. Even up until mere days before the truth would be revealed, Truist published an October 2021 report stating that, based on Defendants' prior representations, it "<u>expect[ed] IDFA to have a minor impact on [Snap's] results</u>"; J.P Morgan opined that, as opposed to Facebook, Snap had only "<u>limited exposure</u>" to ATT and was likely "benefitting" from the changes due to Facebook's struggles in comparison; and MKM Partners commented that Snap had indicated that it would suffer only a "<u>modest headwind</u>" from ATT that Snap had "<u>clearly mitigated</u>."

167. Tellingly, notwithstanding the fact that Defendant Gorman knew full well that analysts were expressly relying upon and repeating the plain meaning of

her words from Gorman's April 22, 2021 statements, Gorman never once attempted to clarify or correct those statements, despite having ample opportunities to do so.

168.   *Defendant Gorman admitted that she was intimately involved in Snap's direct response business.*   In an interview with JPMorgan, Gorman detailed all aspects of Snap's business that she was in charge of: "I'm responsible for the revenue side of the organization. So the sales team, sales operations teams, revenue strategy teams . . . I'm also responsible for a lot of our customer operations. So our content review, our ad review teams, our customer service teams, our business operations teams, trust and safety . . . So many different pieces."   Defendant Gorman stressed to investors how it is "always positive to engage at the highest levels of an organization, and . . . to do that extremely frequently at the CEO and CMO level" and how "sales teams [held] many productive C-level conversations to discuss [Snap's] brand safety positioning and privacy-by-design principles."

169.   Defendant Gorman detailed the multiple ways that she was involved with all employees at the Company in an interview with CNN Business exclusive, that described how "[s]he is part of an employee resource group for women . . . which puts on events and meets regularly. She has also spoken on internal panels and participates in monthly all-hands meetings and in one-on-one lunches Spiegel holds in the main cafeteria, where employees can come up and ask him and the executive with whom he's dining questions."   Clearly, Gorman portrayed herself as a hands-on executive who was not only responsible for multiple teams, but made herself available to all Company employees, and was one that would be aware of any issues through various meetings, panels, and conversations.

170.   In addition, Defendant Gorman's role involved extensive and direct interaction with not only Snap's employees, but also with Snap advertisers and ad buyers, and she was brought in by Snap specifically to work on advertising after working in advertising-related executive positions in the tech industry, including

at Amazon.  Upon arrival, Gorman was personally responsible for restructuring Snap's advertising business, transitioning it from a regionalized to vertical sales structure and streamlining the sales process to better work with advertisers.

171.  Indeed, multiple analysts and media outlets detailed Defendant Gorman's involvement in various ways at Snap and with its partners.  For example, a March 2019 Ad Week article described the vertical shift and overhaul of Snap's ad sales structure as being "a new team of executives, led by Gorman, [] deployed to rub elbows with marketers and agencies…" A March 2021 Digiday article described Gorman's involvement as "collaborat[ive]," stating that "industry executives who have worked with the platform say she has pounded the pavement, married Snap's product and sales teams, hired heavy hitters" and "[s]he's known to ask a lot of questions." The article added that Gorman was "at the wheel" in getting in front of Snap's marketers and advertisers.

172.  *Defendant Gorman's specific, regular public remarks to investors, including in response to direct analyst inquiries, about the details of Snap's ad business and the "success" of SKAN are demonstrative of her intimate knowledge about those subjects.*  Gorman made numerous public statements demonstrating her direct involvement in overseeing Snap's advertisers' transition to SKAN and her detailed knowledge of those matters.  Indeed, Gorman was the Snap officer principally responsible for communicating with investors on these issues.

173.  For example, on February 4, 2021, in response to an analyst question about the potential impact of the ATT changes, Defendant Gorman stated "we've been working really closely with Apple to implement [SKAN]. . . We've been communicating very well with advertisers, we're educating them, talking [to] them deeply about these coming changes…to mitigate any of this."  Also on that call, Defendant Spiegel stated in response to an analyst question about advertiser feedback regarding the impending ATT changes that "[Gorman] might be better

positioned to talk about how our position is resonating with advertisers. I know she's having a lot of conversations with our partners." Gorman then stated that she could speak to "what advertisers and agencies are saying to us," and went on to describe "a lot of the conversations we're having with advertisers" about Snap's preparations for ATT.

174.   On Snap's April 22, 2021 earnings call, Gorman spoke with knowledge about how Apple's delay in rolling out ATT "ha[s] provided additional time to adopt [SKAN] and begin implementing and testing with our partners" in conveying to investors that advertisers that represent a majority of direct response revenue had already successfully implemented SKAN.   Thereafter, Gorman responded in detail to an investor question about what "***defined***" advertisers' "***successful implementation***" of SKAN, and in particular, ***whether that successful implementation would "mitigate" the IDFA risk***, and what specific "advertiser feedback" Snap had received about SKAN.   In response to these specific and critical questions, Gorman stated "[w]e are really focused on helping our advertisers make the transition" to SKAN; that the ATT delay "gave us a lot of time to prepare, and [SKAN] is one part of that"; that "we're really pleased to see that advertisers that represent the majority of our direct response revenue have implemented [SKAN] so far"; and that implementing SKAN was "a huge cross-functional effort between products, engineering, the sales teams, the marketing teams to work with our customers to ensure that this transition goes as smoothly as possible."   There can be no doubt that Gorman would be aware of a "huge cross-functional effort" across multiple departments at the Company, especially ones that she herself admitted that she was responsible for, as detailed above.

175.   Defendant Gorman's very specific, repeated representations regarding SKAN conveyed to investors that she was personally knowledgeable regarding

Apple's privacy changes and SKAN's effect on advertising at Snap, which she understood was of critical importance to the Company.

176.  *The ATT rollout was delayed by seven months until April 2021—nearly a year after the ATT changes were first announced—thereby providing Snap with ample time to test and implement SKAN.*  Significantly, Defendant Gorman explicitly emphasized to investors that the seven-month delay in the ATT rollout had allowed both Snap and its direct response advertisers ample time to adopt, test and implement SKAN.  Indeed, in Gorman's own words, the delay had "given us a lot of time to prepare" for the ATT changes, and "[t]he fact that [Apple's] changes are coming later than we anticipated has provided additional time to adopt [SKAN] and begin implementing and testing with our partners."  Tellingly, Gorman ***never*** told the market during the Class Period that Snap did not have enough time to adequately implement SKAN or was otherwise in the dark about its viability.

177.  Moreover, sophisticated market analysts specifically credited Defendant Gorman's representations concerning the benefits of the half-year delay in the ATT rollout.  For example, Truist echoed Gorman's words in stating: "The fact that ATT changes are coming more than a month later than anticipated has provided the company with additional time to adopt [SKAN] and begin implementing and testing it with partners."  Oppenheimer likewise opined that, based on Gorman's representations, "we now see reduced risks from [ATT] as the delayed rollout allowed more time to work with advertisers to adopt [] [SKAN]."  Similarly, Canaccord Genuity expressly relied on Gorman's statements in stating: "the delayed roll out of Apple's privacy changes has given Snap time to implement and test Apple's [SKAN] with a majority of its DR [direct response] advertisers."  And JP Morgan also took great comfort in Gorman's assurances, stating: "SNAP noted that Apple's delay in implementing ATT helped SNAP get more marketers onto the SKAdNetwork[.]"

178. *Snap's admissions at the end of the Class Period confirm that advertisers representing a majority of Snap's direct response advertising revenue had not "successfully implemented" SKAN.* On October 21, 2021, Defendants admitted that Snap's direct response advertisers had only just first begun to "explore" and "test" SKAN months after these statements were made, and rather than "successful," upon attempting to implement SKAN, advertisers had instead immediately encountered numerous significant issues that were debilitating to their business. *See* ¶¶105-07, 123-52. Significantly, these "concerns" included that SKAN had rendered advertisers completely unable to effectively target their advertising or monitor the success of their ad campaigns—two capabilities that were absolutely critical for their business—and in fact comprised the very same limitations of SKAN that market and industry commentators (including Snap's own MMP partners) had previously raised concerns about prior to the Class Period.

179. *Snap's representations contrasted sharply from Facebook's definite and clear warnings of ATT's impact, which Snap was obviously aware of in light of the fact that Snap itself identified Facebook as its main direct competitor.* In response to Apple's ATT changes, Facebook waged a wide-ranging public battle against Apple and consistently warned that the changes would have a "significant" and "disproportionate" negative impact on its business, and particularly its direct response advertising business. Yet, despite the fact that industry analysts widely viewed Facebook and Snap as facing the same high exposure to ATT, Snap's own public statements to investors stood in stark contrast to Facebook's. Indeed, while Facebook made clear to investors that its advertising business absolutely would suffer a negative impact from ATT, Snap consistently claimed the <u>exact opposite was true</u>, causing market analysts to erroneously conclude that the ATT risk to Snap was "***<u>minimal</u>***."

180.   *Detailed accounts of former Snap and Company partner employees confirm Defendants' fraud.*  Numerous former employees of Snap and its advertising partners corroborated Plaintiff's allegations and confirmed that Defendants had no basis whatsoever to make the positive representations they made in the April 22, 2021 earnings call.  Indeed, these CWs confirmed that contrary to Defendants' representations, it is inconceivable that SKAN's failures could have come as a surprise to Defendants; that "[f]rom day one when SKAN support launched," SKAN was clearly "ineffective"; that "there were very few adoptees in Q1 and Q2 of 2021"; and that in the first few months of 2021, leading up to Defendant Gorman's statements on April 22, 2021, Snap had no solution to deal with Apple's privacy changes.  These former employees confirm that during the April 22, 2021 call, "Gorman was shooting from the hip"; that Gorman "just made [her April 2021 statements] up" without any "actual data" to support those statements; and that Gorman could not "justify saying things were successfully implemented" as internal documents confirm that the exact opposite was true.  These accounts from former employees are extraordinarily detailed and remarkable, coming from individuals in positions to know the information being attributed to them, including through direct, face-to-face meetings with the senior most officers of the Company and through close professional and personal relationships with the Individual Defendants.

181.   *Following the disclosure of Defendants' fraud, securities analysts that closely follow the Company widely excoriated Defendants' credibility and specifically highlighted the stark contrast from Defendants' Class Period representations*.  Snap was closely followed by securities analysts, including RBC and MKM Partners.  In the wake of Snap's stunning disclosures at the end of the Class Period, these analysts questioned the credibility of Snap's management, including the Individual Defendants. For example, analysts at RBC stated that "***management almost couldn't have sounded worse around the effects [the IDFA***

***change] is having***," and that "***management's credibility is likely gone given recent communications did not indicate these risks***," causing that credibility to be "***permanently damaged***."  Analysts at MKM Partners who had also been following the Company for years, were "surprised with the change of management's tone with regards to the effect of Apple changes on Snap's ad business."

182.   The foregoing facts, particularly when considered holistically and in the light most favorable to the Plaintiff (as they must be), support a strong inference of Defendants' scienter.

## VIII. LOSS CAUSATION

183.   Throughout the Class Period, the price of Snap securities was artificially inflated as a result of Defendants' materially false and misleading statements identified above.  Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of Snap securities and/or sellers of Snap put options, by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Snap securities fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of Snap securities and/or sale of Snap put options during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

184.   By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Snap's business.  Defendants' false and misleading statements had the intended effect, and caused Snap securities to trade at artificially inflated levels throughout the Class Period, with shares of Snap common stock closing as high as $83.11 on September 24, 2021.  On October 21, 2021, the last trading day before Defendants' fraud was revealed, Snap common stock closed at $75.11 per share.  From its Class

Period high of $83.11 per share to its closing price of $55.14 per share on October 22, 2021, Snap's stock price dropped $27.97 per share, or 34%, wiping out more than $35.4 billion in market capitalization.

185.   Defendants' after-market disclosures on October 21, 2021 revealed to the market the false and misleading nature of Defendants' statements and omissions. On that day, as described above, Snap finally disclosed its inability to successfully navigate the ATT changes and for the first time admitted the severe limitations of SKAN as a viable alternative ad tracking tool to IDFA.

186.   In response to Defendants' disclosure, the price of Snap securities precipitously declined.   The Company's share price plummeted by over 26%, closing down $19.97 per share from $75.11 per share on October 21, 2021 to $55.14 per share on October 22, 2021, wiping out approximately $27 billion in market capitalization, on unusually heavy trading volume.

187.   Analysts were stunned by the Company's admissions and negatively reacted to Snap's financial fallout caused by its declines in its advertising business as a result of Snap's inability to respond to the ATT changes. Moreover, as detailed above, analysts excoriated Defendants for their lack of candor.   For example, analysts at RBC Capital said "management almost couldn't have sounded worse," and that Defendants' "credibility may be permanently damaged" and "likely gone given recent communications did not indicate these risks." Similarly, analysts at MKM Partners were "surprised with the change of management's tone with regards to the effect of Apple changes on Snap's ad business." Barron's also noted how the Company's announcement "caught the market by surprise and the company lost a quarter of its value in a matter of minutes."   Likewise, analysts from Evercore ISI, "fully acknowledge[d] being surprised by the magnitude of [Snap's] H2 revenue challenges and believe the stock likely to be dead $ for 3-6 months."

188.   As shown above, the drastic and continuing decline in Snap's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.   The timing and magnitude of the decline in the Company's stock price negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## IX.   PRESUMPTION OF RELIANCE

189.   At all relevant times, the market for Snap securities was an open, efficient and well-developed market for the following reasons, among others:

a.   Snap's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.   As a regulated issuer, Snap filed periodic public reports with the SEC and the NYSE;

c.   Snap regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.   Snap was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.   Each of these reports was publicly available and entered the public market place;

190.   As a result of the foregoing, the market for Snap's securities reasonably and promptly digested current information regarding the Company from all publicly-available sources and reflected such information in the price of Snap's securities.

All purchasers of the Company's securities and/or sellers of the Company's put options during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and/or sale of the Company's put options at artificially deflated prices and a presumption of reliance applies.

191.   A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Snap's business and operations— information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

192.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

193.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-

looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false and the statement was authorized and/or approved by an executive officer and/or director of Snap who knew that such statement was false when made.

## XI.    CLASS ACTION ALLEGATIONS

194.    Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased, or otherwise acquired publicly traded Snap securities, or who sold Snap put options, between April 23, 2021 and October 21, 2021, inclusive (the "Class"), and who were damaged thereby.   Excluded from the Class are Defendants, the officers and directors of Snap at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

195.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Snap shares were actively traded on the NYSE.   As of October 19, 2021, there were over 1.35 billion shares of Snap Class A common stock outstanding.   While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class.   Class members who purchased publicly traded Snap securities and/or sold Snap put options may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class

action using a form of notice similar to that customarily used in securities class actions.

196.   Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

197.   Lead Plaintiff will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

198.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a.   whether the federal securities laws were violated by Defendants' acts, as alleged herein;

b.   whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

c.   whether Defendants acted with scienter; and

d.   the proper way to measure damages.

199.   A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT ONE

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against Defendants Snap and Gorman)**

200.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

201.   This Count is asserted on behalf of all members of the Class against Snap and Defendant Gorman for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

202.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or disregarded with deliberate recklessness, misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

203.   Defendants Snap and Gorman violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and other investors similarly situated in connection with their purchases of Snap securities and/or sale of Snap put options during the Class Period.

204.   Defendants Snap and Gorman, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Snap securities and/or sale of Snap put options, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other members of the Class, regarding, among other things, Snap's business and operations; (b) artificially inflate and maintain the market price of Snap securities; and (c) cause Lead Plaintiff and the other members of the Class to purchase the Company's securities at artificially inflated prices and/or selling Snap's put options at artificially deflated prices, and to suffer losses when the true facts became known.

205.   Defendants Snap and Gorman are liable for all materially false and misleading statements made during the Class Period, as alleged above.

206.   As described above, Defendants Snap and Gorman acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Snap securities and/or sellers of Snap put options, were either known to Defendants Snap and Gorman, or were so obvious that these Defendants should have been aware of them.

207.   Lead Plaintiff and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Snap securities, which inflation was removed from its price when the true facts became known. Lead Plaintiff and the other members of the Class would not have purchased Snap securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

208.   As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Snap securities and/or sale of Snap put options during the Class Period.

### COUNT TWO

**For Violations Of Section 20(a) Of The Exchange Act**
**(Against Defendants Spiegel And Gorman)**

209.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

210.   This Count is asserted on behalf of all members of the Class against Defendants Spiegel and Gorman for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

211.   During their tenure as officers of Snap, Defendants Spiegel and Gorman were controlling persons of the Company, within the meaning of Section 20(a) of the Exchange Act. *See, e.g.,* ¶¶28, 30. By reason of their position of control and authority as officers of Snap, Defendants Spiegel and Gorman had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. Defendants Spiegel and Gorman were able to and did control, directly and indirectly, the content of the public statements made by Snap during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

212.   In their capacity as senior corporate officers of the Company, and as more fully described above, Defendants Spiegel and Gorman had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory compliance, accounting and reporting functions, including overseeing, reviewing and managing the Company's advertising and support for iOS ad campaigns. Defendants Spiegel and Gorman were directly involved in providing

false information, and in certifying and approving the false statements disseminated by Snap during the Class Period.  Defendants Spiegel and Gorman were also directly involved in providing false information, and Defendants Spiegel and Gorman certified and approved the false statements disseminated by Snap during the Class Period.  As a result of the foregoing, Defendants Spiegel and Gorman were controlling persons of Snap within the meaning of Section 20(a) of the Exchange Act.

213.   Additionally, Defendant Spiegel made statements directly to investors concerning ATT and SKAN in his capacity as Snap's CEO just prior to and during the Class Period that mirrored statements Defendant Gorman made during this same period, including during CNBC interviews that aired on February 5, 2021 and May 21, 2021.  Specifically, on February 5, 2021, Spiegel echoed Defendant Gorman's statements about SKAN during the Company's February 4, 2021 earnings call when he appeared on a CNBC program and assured investors that Snap was "<u>well prepared for [Apple's] changes</u>" precisely because Snap had "<u>implemented [SKAN]</u>." Spiegel further represented, in response to the host's question about what the "potential greatest impact" of ATT on Snap's business was, that ATT was expected to be no more than "<u>a little disruptive for advertisers in the near term</u>," and again averred (as Gorman had the day before) that Snap viewed ATT as "a good thing overall" because Apple's changes were purportedly "in line with [Snap's] privacy philosophy" and its "protective stance when it comes to our users' data."

214.   On May 21, 2021, Defendant Spiegel participated in another CNBC interview, which occurred approximately one month after Defendant Gorman had falsely represented during the April 22, 2021 earnings call that a "majority" of the Company's direct response advertisers had "successfully implemented" SKAN. During the interview, the CNBC host asked Spiegel if Snap had "started to see an impact from [ATT] in terms of your ability to target ads."  In response, Spiegel first

again asserted that Snap was purportedly "really aligned with [Apple] on the changes they're making to help protect privacy"—which Spiegel claimed had "really pai[d] off" for Snap—and then echoed Gorman's April 22, 2021 statements about SKAN by stating that Snap had "been able to help our advertising partners navigate those changes, migrate to [SKAN], which is Apple's way of measuring advertising efficacy . . . [a]nd so far, that transition has gone smoothly for our business."

215.   As set forth above, Snap violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

216.   By virtue of their positions as controlling persons of Snap, and as a result of their own aforementioned conduct, Defendants Spiegel and Gorman are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff, and the other members of the Class, who purchased or otherwise acquired Snap securities and/or sold Snap put options. As detailed above in ¶¶25-32, during the respective times Defendants Spiegel and Gorman served as officers of Snap, they were culpable for the material misstatements and omissions made by the Company.

217.   As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the Class suffered damages in connection with their purchase or acquisition of the publicly traded securities of Snap and/or sale of Snap put options.

## XIII. PRAYER FOR RELIEF

218.   Wherefore, Lead Plaintiff prays for relief and judgment as follows:

a.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.      Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiff and all other members of the Class

against Defendants in an amount to be proven at trial, including interest thereon;

     c.    Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

     d.    Such other and further relief as the court may deem just and proper.

## XIV. <u>JURY DEMAND</u>

219. Lead Plaintiff hereby demands a trial by jury.

Dated: April 21, 2023

Respectfully submitted,

**SAXENA WHITE P.A.**

By: _/s/    David R. Kaplan_

David R. Kaplan (SBN 230144)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
E-mail:    dkaplan@saxenawhite.com

-and-

**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice*)
Joseph E. White, III (*pro hac vice* forthcoming)
Lester R. Hooker (SBN 241590)
Dianne M. Pitre (SBN 286199)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone:  (561) 394-3399
Facsimile:   (561) 394-3382
E-mail:    msaxena@saxenawhite.com
              jwhite@saxenawhite.com
              lhooker@saxenawhite.com
              dpitre@saxenawhite.com

-and-

**SAXENA WHITE P.A.**
Steven B. Singer (*pro hac vice*)
Kyla Grant (*pro hac vice*)
Marisa N. DeMato (*pro hac vice*)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Joshua H. Saltzman (*pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone:  (914) 437-8551
Facsimile:  (888) 631-3611
E-mail:       ssinger@saxenawhite.com
                  kgrant@saxenawhite.com
                  mdemato@saxenawhite.com
                  jsaltzman@saxenawhite.com

*Lead Counsel for Lead Plaintiff and the Class*

**BIENERT KATZMAN LITTRELL WILLIAMS LLP**
John L. Littrell (SBN 221601)
jlittrell@bklwlaw.com
Michael R. Williams (SBN 192222)
mwilliams@bklwlaw.com
601 W. 5th Street, Suite 720
Los Angeles, CA 90071
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

*Local Counsel for Lead Plaintiff and the Class*

1  **PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO**
2  **CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES**
   **AND ECF GENERAL ORDER NO. 10-07**
3

4      I HEREBY CERTIFY that, on April 21, 2023, I electronically filed the

5  foregoing with the Clerk of Court using the CM/ECF system, which will send a

6  notice of electronic filing to all registered users. I certify under penalty of perjury

7  under the laws of the United States of America that the foregoing is true and correct.

8      Executed on April 21, 2023.

9

10      */s/ David R. Kaplan*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28