1  DANIEL J. KRAMER (*admitted pro hac vice*)
2  AUDRA J. SOLOWAY (*admitted pro hac vice*)
   DANIEL S. SINNREICH (*admitted pro hac vice*)
3  KRISTINA A. BUNTING (*admitted pro hac vice*)
4  **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
   1285 Avenue of the Americas
5  New York, NY 10019-6064
6  Tel:   (212) 373-3000
   Fax:   (212) 757-3990
7  Email:       dkramer@paulweiss.com
8  Email:       asoloway@paulweiss.com
   Email:       dsinnreich@paulweiss.com
9  Email:       kbunting@paulweiss.com
10
   *Additional Counsel Listed on Signature Page*
11
12 *Attorneys for Snap Inc., Evan Spiegel, and Jeremi Gorman*

13            **UNITED STATES DISTRICT COURT**

14      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

15
16 | KELLIE BLACK, Individually and on Behalf of All Others Similarly Situated, | No. 2:21-cv-08892-GW (RAO) |
17

18                    Plaintiffs,

19 v.

20 SNAP INC., EVAN SPIEGEL, and
   JEREMI GORMAN,
21
22                    Defendants.
23
24
25
26
27
28

No. 2:21-cv-08892-GW (RAO)

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**

[Filed Concurrently with Declaration of Kristina A. Bunting and Defendants' Request for Judicial Notice and Consideration of Documents Incorporated by Reference]

Date:    September 11, 2023
Time:    8:30 AM
Crtrm.:  9D

Assigned to Honorable George H. Wu

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on September 11, 2023 at 8:30 a.m. in Courtroom 9D of the above-entitled Court before the Honorable George H. Wu, Defendants Snap Inc. ("Snap"), Evan Spiegel, and Jeremi Gorman (the "Individual Defendants") will, and hereby do, move to dismiss the Third Amended Class Action Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, on the basis that it fails to state a claim on which relief can be granted.

This Motion is based on the Third Amended Class Action Complaint, this Notice, the Memorandum of Points and Authorities attached hereto, the concurrently filed Declaration of Kristina A. Bunting and the exhibits attached thereto and referenced therein, Defendants' Request for Judicial Notice and Consideration of Documents Incorporated by Reference, and such further evidence and argument as may be allowed by the Court prior to its decision.

Pursuant to Local Rule 7-3, counsel met and conferred about the contents of this motion on June 2, 2023. *See* Declaration of Kristina A. Bunting ¶ 12.

| | |
|---|---|
| 1 | DATED: June 9, 2023 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |

DATED: June 9, 2023

DANIEL J. KRAMER (*admitted pro hac vice*)
AUDRA J. SOLOWAY (*admitted pro hac vice*)
DANIEL S. SINNREICH (*admitted pro hac vice*)
KRISTINA A. BUNTING (*admitted pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

EKWAN E. RHOW (SBN 174604)
AHARON B. KASLOW (SBN 322769)
**BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW P.C.**

By:   _____/s/ Daniel J. Kramer_____
                  Daniel J. Kramer

*Attorneys for Snap Inc., Evan Spiegel, and Jeremi Gorman*

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................ 4

III.    DISMISSAL OF THE SECOND AMENDED COMPLAINT ....................... 7

IV.     LEGAL STANDARD .......................................................................... 9

V.      THE TAC FAILS TO RAISE A STRONG INFERENCE THAT
        GORMAN MADE THE APRIL 22 STATEMENT WITH SCIENTER ....... 10

        A.      Plaintiff Fails to Plead Facts Showing Gorman Intended to
                Defraud or Acted with Deliberate Recklessness.................... 11

        B.      The Core Operations Inference Is Unavailable.................... 17

VI.     PLAINTIFF FAILS TO PLEAD A SECTION 20(a) CLAIM .................. 21

VII.    CONCLUSION ................................................................................ 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bodri* v. *GoPro, Inc.*,
    252 F. Supp. 3d 912 (N.D. Cal. 2017)...............................................................10

*Brodsky* v. *Yahoo! Inc.*,
    630 F. Supp. 2d 1104 (N.D. Cal. 2009).................................................13, 16, 17

*In re Cadence Design Sys., Inc. Sec. Litig.*,
    654 F. Supp. 2d 1037 (N.D. Cal. 2009) ............................................................19

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align*
    *Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ...........................................................................15

*Curry* v. *Yelp Inc.*,
    875 F.3d 1219 (9th Cir. 2017) .........................................................................11

*Dresner* v. *Silverback Therapeutics, Inc.*,
    2023 WL 2913755 (W.D. Wash. Apr. 12, 2023) ............................................15

*In re Dura Pharms., Inc. Sec. Litig.*,
    2000 WL 33176043 (S.D. Cal. July 11, 2000).................................................17

*In re Franklin Bank Corp. Sec. Litig.*,
    782 F. Supp. 2d 364, 400 (S.D. Tex. 2011),
    *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72* v. *Nocella*,
    464 F. App'x 334 (5th Cir. 2012)  ...................................................................11

*Gammel* v. *Hewlett-Packard Co.*,
    905 F. Supp. 2d 1052 (C.D. Cal. 2012)............................................................16

*Glazer Capital Mgmt., LP* v. *Magistri*,
    549 F.3d 736 (9th Cir. 2008) ...........................................................................11

*In re Gupta Corp. Sec. Litig.*,
    900 F. Supp. 1217 (N.D. Cal. 1994).................................................................22

*Howard* v. *Everex Sys, Inc.*,
    228 F.3d 1057 (9th Cir. 2000) .........................................................................21

*Jasin* v. *Vivus, Inc.*,
    2016 WL 1570164 (N.D. Cal. Apr. 19, 2016), *aff'd*, 721 F. App'x
    665 (9th Cir. 2018) .......................................................................................... 12

*Jun Shi* v. *Ampio Pharms., Inc.*,
    2020 WL 5092910 (C.D. Cal. June 19, 2020).................................................... 20

*Lloyd* v. *CVB Fin. Corp.*,
    2012 WL 12883517 (C.D. Cal. Aug. 21, 2012) .................................................. 19

*McGovney* v. *Aerohive Networks, Inc.*,
    2019 WL 8137143 (N.D. Cal. Aug. 7, 2019)....................................................... 18

*Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ...................................................................... 4, 15

*Nguyen* v. *Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ........................................................................ 9, 11

*Nozak* v. *N. Dynasty Mins. Ltd.*,
    804 F. App'x 732 (9th Cir. 2020) ...................................................................... 19

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) .............................................................. 13, 16, 17

*Or. Pub. Emps. Ret. Fund* v. *Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ............................................................................ 10

*Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ......................................................................3, 17

*Prodanova* v. *H.C. Wainwright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021) ...........................................................9, 10, 18, 21

*S. Ferry LP, No. 2* v. *Killinger*,
    542 F.3d 776 (9th Cir. 2008) ......................................................................17, 18

*Schechter* v. *Smith*,
    2011 WL 13174954 (C.D. Cal. Dec. 6, 2011)..................................................... 14

*ScripsAmerica, Inc.* v. *Ironridge Glob. LLC*,
    119 F. Supp. 3d 1213 (C.D. Cal. 2015)............................................................. 12

*S.E.C.* v. *Todd*,
    642 F.3d 1207 (9th Cir. 2011) .......................................................................... 21

*In re Twitter, Inc.*,
    506 F. Supp. 3d 867 (N.D. Cal. 2020)......................................................20

*Webb* v. *SolarCity Corp.*,
    884 F.3d 844 (9th Cir. 2018) .................................................................21

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) .................................................................12

*Wozniak* v. *Align Tech., Inc.*,
    2011 WL 2269418 (N.D. Cal. June 8, 2011) .........................................14

*Wozniak* v. *Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012).............................................14, 16

*In re Yahoo! Inc. S'holder Derivative Litig.*,
    153 F. Supp. 3d 1107 (N.D. Cal. 2015).................................................20

*Zucco Partners, LLC* v. *Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .................................................................10

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A) ..........................................................................9

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

In the Third Amended Complaint ("TAC"), Plaintiff tries for a third time to plead a securities fraud claim.  But the TAC does not correct any of the bases for dismissal this Court addressed in its prior ruling.  If anything, the additional allegations underscore that no fraud claim can be sustained.

This Court already rejected 17 of the 18 allegedly "false" statements Plaintiff charged.  Accordingly, the TAC relies on a single statement:  on April 22, 2021, before the ATT rollout, Snap's Chief Business Officer Jeremi Gorman said that "[a]dvertisers that represent a majority of [Snap's] direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns" (the "April 22 Statement").  Defendants argued that this statement conveyed that the advertisers had *put SKAN in place*; Plaintiff argued that Gorman affirmatively conveyed that these advertisers had put SKAN in place *and* were *satisfied with SKAN's performance*.  Calling Defendants' reading "entirely conceivable" and Plaintiff's reading "just as likely," the Court nonetheless dismissed the Second Amended Complaint ("SAC") in full because Plaintiff had not pleaded scienter as to this ambiguous statement.

In its ruling, this Court instructed Plaintiff how to cure this defect:  Plaintiff must plead specific facts showing either (a) that Gorman had information that contradicted her statement or (b) the way in which advertisers were implementing SKAN was of "such prominence" in April 2021 that it was "absurd" that Gorman did not know her statement was false, such that the exceedingly rare core operations inference could apply.  (Court's Final Ruling on Motion to Dismiss SAC, Dkt. 115 ("Ruling") 37.)  Even then, Plaintiff's allegations would have to overcome the "more plausible alternative explanation" that "Defendants were trying to respond to uncertainty created by ATT and SKAN, and their optimistic predictions did not pan out." (*Id.* at 38.)

Plaintiff has not met its burden of raising a *strong inference* that Gorman *intended to deceive shareholders* with the April 22 Statement. The TAC does not connect Gorman to any information contradicting her public statement. Plaintiff does not allege that any CW ever communicated with Gorman about how advertisers were implementing SKAN or that any CW has any factual basis to believe that Gorman knew her statement was inaccurate. Plaintiff focuses on new allegations from CW2— a former employee who is *not* alleged to have communicated with Gorman about SKAN, and who this Court previously observed was *not* "involved in the implementation of SKAN or help[ing] advertising partners transition to SKAN." (Ruling at 28.) Thus, the most CW2 can say is that, in August 2021 (months after the April 22 Statement), CW2 "recalled viewing a colleague's spreadsheet" that purportedly showed that "the majority of the Company's direct response advertisers had not taken the initial steps to 'opt in' to SKAN, let alone 'successfully implement' it." (¶ 137.)[1]

As an initial matter, this allegation is sleight of hand. Gorman did not refer to a majority of DR *advertisers* (as defined below), but rather to "[a]dvertisers that represent a majority of our [DR] advertising *revenue*." CW2's allegations address a metric **different** from the metric Gorman addressed in her statement and therefore do not contradict it. Additionally, CW2 provides no particularized facts about the "spreadsheet"—what data it purported to show, who saw it, or where it was located, other than to assert "there is definitely a spreadsheet out there"—undermining the reliability of CW2's allegations. (¶ 137 & n.15.) And CW2 does not allege she or anyone else communicated about this spreadsheet—or any other purportedly conflicting information—with Gorman. Indeed, CW2 alleges that she first saw the spreadsheet months after Gorman made her statement. Thus, even if this alleged spreadsheet lends support to Plaintiff's falsity argument—itself a highly dubious

---

[1] References to "¶" refer to paragraphs in the TAC, unless otherwise indicated.

1  proposition—the alleged spreadsheet does nothing to buttress its scienter allegations,

2  which remain wholly inadequate.

3      Plaintiff's scienter arguments also fail because they offer absolutely no motive

4  for Gorman to lie:  Gorman is not alleged to have sold stock or otherwise benefitted

5  from the alleged fraud.   And as the Court held, Snap and Gorman "repeatedly

6  disclosed that ATT could have a meaningful impact, including serious harm, on

7  Snap's business."  (Ruling at 21.)   Plaintiff fails to explain why Gorman would

8  repeatedly warn investors about the potential harm of ATT, but simultaneously seek

9  to mislead investors about advertisers' satisfaction with a third-party product, Apple's

10  SKAN.

11      In the absence of well-pleaded facts, Plaintiff attempts again to invoke the core

12  operations inference, which this Court rejected in dismissing the SAC.  As the Ninth

13  Circuit has recognized, invoking this doctrine is "not easy" because it is available

14  only when certain narrow prerequisites are met.  *Police Ret. Sys. of St. Louis* v.

15  *Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014).  Like the SAC, the TAC

16  fails these prerequisites:  the TAC identifies no basis simply to *assume* that Gorman

17  would have known advertisers were experiencing challenges using Apple's SKAN

18  product **before** the ATT rollout and months **before** users adopted ATT *en masse*.

19  Indeed, no CW alleges that, as of April 2021, when Gorman made her statement, Snap

20  had received any negative feedback from advertisers about SKAN or experienced any

21  revenue impact on advertisers' spending.  Especially given how early in the rollout

22  Gorman was speaking, it was not "absurd" for Gorman to be unaware that third-party

23  advertisers were purportedly having issues with a third-party product (SKAN).

24      In sum, this Court pointed Plaintiff to the facts it needed to plead to revive its

25  fraud claim, but Plaintiff has failed to plead any such facts.  If Plaintiff is unable to

26  plead a claim after three attempts and clear instructions from this Court, Plaintiff will

27  never be able to do so.  For these reasons, the Court should put an end to this litigation

28

1  and dismiss the TAC without further leave to amend.  *E.g.*, *Metzler Inv. GMBH* v.

2  *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1072 (9th Cir. 2008).

## II.   FACTUAL BACKGROUND

Snap's flagship product is a free software application called "Snapchat," which users download on mobile devices—including those sold and operated by Apple. (¶ 4.)  Snap derives revenue from Snapchat by selling advertising.  (*Id*.)

Direct response ("DR") advertisers—one segment of Snap's advertisers—offer ads intended to inspire users to take a specific action after viewing the ad, *e.g.*, downloading an app or making an online purchase.  (¶¶ 5, 36.)  To measure ad effectiveness, advertisers collect information about whether Snapchat users viewed their ad, and whether they thereafter took the desired action.  (¶¶ 5, 44–46.)

Before mid-2021, advertising market participants, such as Snap, advertisers, and their mobile measurement partners ("MMPs"),[2] collected information about Apple device users' activities through Apple's Identifier for Advertisers ("IDFA"). IDFA is a unique identifier that Apple assigns to every iOS supported device.  (¶¶ 5, 44–46.)  Market participants used IDFA and other data to determine whether a user who viewed an ad later took the desired action.  (¶¶ 5, 44–46.)  Advertisers could then use that data to understand how their digital ads were performing.  (*Id*.)

In June 2020, Apple announced a new privacy initiative called App Tracking Transparency ("ATT") where companies like Snap (and Facebook, Twitter, etc.) could use certain user data only if the user "opted in" to such data sharing.  (¶ 48.) Absent user opt-in, app developers like Snap could no longer share a user's identifying information (*e.g.*, email address) with advertisers, and would no longer have access to that user's IDFA.  (¶¶ 6, 47–49.)  ATT would restrict Snap's and advertisers' ability to get robust measurement data from traditional MMPs.

---

[2] MMPs attribute, collect, and organize data for app companies.  (¶ 54.)

When Apple announced ATT, it promoted its own proprietary measurement solution, SKAN.  (¶ 51.)  While IDFA could "track users' activity on an individual-by-individual basis," SKAN was designed to "aggregate[] users' activity into groups and allow[] tracking only of these groups."  (¶ 52.)  It was publicly reported that SKAN would not provide the same granular and instantaneous data that was available through IDFA, but would still give advertisers visibility into their ad campaign performance.  (¶ 53.)  To use SKAN, both Snap and its advertisers had to install the technology and connect their data pipelines with SKAN.  (¶¶ 6, 54.)

Far from hiding the ball, Snap specifically disclosed the potential impact of Apple's iOS changes.  (Ex. 1-10.)[3]  As this Court recognized, after Apple announced ATT, Snap "repeatedly disclosed that ATT could have a meaningful impact, including serious harm, to Snap's business."  (Ruling at 21; *e.g.,* Ex. 1-10.)  From April 22, 2021 to October 21, 2021, Snap made at least 11 such cautionary statements, 6 of which Gorman personally made.[4]

Apple's release of ATT was substantially delayed from Fall 2020 until April 26, 2021.  (¶ 72.)  Before the rollout, on April 22, 2021 (Snap's 1Q21 earnings call), Gorman explained that the delay had given Snap "additional time to adopt Apple's [measurement solution, SKAN] and begin implementing and testing with [Snap's] partners."  (Ex. 2-18.)  Gorman also stated that some advertisers had set up SKAN for use:  "Advertisers that represent a majority of our direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns."  (*Id*.; *see also id.* at 2-32.)  Significantly, Gorman said nothing about the number of *advertisers* that had successfully implemented SKAN, but instead spoke only of advertisers representing a certain percentage of *DR revenue*.

---

[3] References to "Ex. _-_" refer to the exhibits to the attached Declaration of Kristina A. Bunting and the corresponding page citation.

[4] (*See* Exs. 2-18, 2-21, 2-23, 2-33, 3-40, 4-47, 5-54 to 5-55, 5-60, 5-70.)

During that call, an analyst asked Gorman "what defined success of that implementation?" (Ex. 2-32.) Gorman responded: "we're really pleased to see that advertisers that represent the majority of our direct response revenue have implemented it so far." (*Id.*) Gorman candidly defined "success" simply as advertisers having "implemented it so far." Gorman also warned: "we know that there's a lot of work to be done to transition smoothly." (Ex. 2-32 to 2-33). Gorman did not offer any promises that advertisers were pleased with SKAN as a substitute for IDFA (which was still available at that time).

At the time of Gorman's statement—April 22, 2021—it is not alleged that Snap had experienced any revenue impact from ATT. There is no allegation that any purported shortcomings of SKAN had caused any impact on advertisers' spending or on Snap's revenue. Indeed, in 2Q21, which ended June 30, 2021 (two months after Gorman's statement), Snap exceeded its guidance, with its revenue increasing 116% from the prior year. (Ex. 6-75; Ex. 7-86.) It was not until 3Q21—when advertisers were finally forced to rely solely on SKAN and other non-IDFA solutions after ATT's mass adoption in June/July 2021—that Snap is alleged to have experienced lower revenue due to ATT. Even then, Snap missed its guidance by only 0.3 percent, "due to a few key factors, including changes to advertising tracking on iOS" and other macroeconomic factors. (Ex. 8-101.)

In October 2021, six months after the April 22 Statement, Snap explained that Apple's SKAN solution "did not scale" as Snap had hoped, "making it more difficult for [Snap's] advertising partners to measure and manage their ad campaigns for iOS." (*Id.*) As Gorman explained, SKAN's "initial results" were "generally aligned with prior industry standard solutions." But "over time," Snap "saw SKAN measurement results diverge meaningfully from [other] measurement solutions, making SKAN unreliable as a standalone measurement solution." (Ex. 8-104.) Gorman also noted that, after implementing SKAN, as Snap's "advertising partners [had] explored and tested SKAN's solutions," they "surfaced a variety of concerns about its limitations."

1  (*Id.*)  Snap's stock price subsequently declined by approximately 26 percent.  (¶¶ 109,
2  184.)

3  **III.   DISMISSAL OF THE SECOND AMENDED COMPLAINT**

4          Plaintiff filed its Amended Complaint on March 18, 2022.  (Dkt. 65.)  After
5  Defendants filed their first motion to dismiss (Dkt. 78), Plaintiff informed the Court
6  of its intention to amend.  Plaintiff filed its Second Amended Complaint ("SAC") on
7  August 3, 2022.  (Dkt. 95-1.)  After briefing and oral argument, the Court issued a 39-
8  page opinion and dismissed the SAC in its entirety.  (Dkt. 115.)

9          **One Alleged Misrepresentation Remains.**  This Court held that 17 of the 18
10 misrepresentations alleged in the SAC were inactionable because they were either
11 forward-looking statements protected by the PSLRA safe harbor, generalized
12 statements of corporate optimism or opinion, or not adequately alleged to be false.
13 (Ruling at 25–31.)

14         The Court rejected Plaintiff's contention that "Defendants 'repeatedly falsely
15 emphasized' that 'Snap would not suffer any material negative impact from ATT,'"
16 finding that "contrary to Plaintiff's assertion, the [SAC] and the judicially noticeable
17 documents it quotes from are replete with examples where Defendants disclosed the
18 potential adverse impact of ATT on Snap's business."  (*Id.* at 20.)  The Court called
19 Plaintiff's argument "not only unavailing, but an inaccurate representation of the
20 many disclosures and warnings Defendants made about the potential impact of
21 Apple's iOS changes on Snap's business."  (*Id.* at 21.)  As to the April 22 Statement,
22 the Court found that while Defendants' interpretation was "entirely conceivable,"
23 Plaintiff's interpretation was "just as likely," and, the Court was unable to "conclude
24 as a matter of law that this statement is not false or misleading."  (*Id.* at 31–32.)[5]

25
26
27 _____
   [5] Defendants reserve their right to argue that the April 22 Statement was not false or
28 misleading.  (*See* Dkt. 100 at 16–19.)

**CW1 and CW2**.  The Court declined to credit the allegations attributed to the two confidential witnesses, CW1 and CW2, as to the purported ineffectiveness of SKAN.  As to CW1, the Court was "concerned about the contemporaneous nature of CW1's account" and concluded that it was "not clear from the [SAC] that CW1's alleged account of the ineffectiveness of SKAN [was] a contemporaneous fact suggesting the falsity of the statement." (Ruling at 31.)  As to CW2, the Court recognized that she was not alleged to have been "involved in the implementation of SKAN or helped advertising partners transition to SKAN." (*Id.* at 28.)  The Court also rejected Plaintiff's reliance on CW2 for its claim that "no revenue impact analysis of ATT was ever completed during the Class Period." (*Id.* at 30.)

**Failure to Plead Strong Inference of Scienter.**  Having held that only one statement was plausibly alleged to be false—Gorman's April 22 Statement—the Court next examined whether Plaintiff had adequately pleaded that Gorman acted with scienter when she said "[a]dvertisers that represent a majority of [Snap's] direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns." (*Id.* at 31–38.)

The Court determined that "none of Plaintiff's allegations, either standing alone or considered holistically, establish a strong inference of scienter." (*Id.* at 38.) Rather, the more "plausible alternative inference" was that "instead of an intent to defraud investors, Defendants were trying to respond to uncertainty created by ATT and SKAN, and their optimistic predictions did not pan out." (*Id.*)  Specifically, the Court held that Plaintiff had "failed to demonstrate a strong inference of scienter because [Plaintiff] failed to allege that Gorman or Spiegel knew or had access to information that the[] statements were false." (*Id.* at 33.)

Significantly, the Court "disagree[d]" that the CW allegations raised a strong inference of scienter.  The Court concluded that the SAC did not "allege that CW1 or CW2 shared [any] purportedly contradictory information with Gorman (or Spiegel) before she made the challenged statements." (*Id.* at 33–34; *id.* at 27 ("[T]he

allegations in the [SAC did] not permit the Court to conclude that CW2 had personal knowledge of Spiegel's or Gorman's state of mind.").)  The Court recognized that CW2 allegedly "attended meetings where Gorman and [Snap's CFO] Andersen were present," but noted that "critically, CW2 [did] not report communicating directly with Spiegel, Gorman, or Andersen." (*Id.* at 27.)

The Court also concluded that the core operations theory did not apply.  It held that Plaintiff had failed to produce "specific admissions" of "detailed involvement in the minutia of a company's operations." (*Id.* at 36–37.)  Additionally, Plaintiff could not rely on the "absurdity" prong of the core operations theory because it failed to allege any facts showing "Gorman knew of SKAN's deficiencies at the time her allegedly false statements were made." (*Id.* at 37.)[6]

*     *     *

Plaintiff filed its TAC on April 21, 2023.  Plaintiff asserts a section 10(b) claim against Snap and Gorman based on the April 22 Statement.  Plaintiff no longer asserts such a claim against Spiegel, alleging only that Spiegel is liable as a control person under section 20(a).

## IV.  LEGAL STANDARD

Plaintiff is required to plead facts giving rise to a "strong inference" that Gorman acted with scienter.   15 U.S.C. § 78u-4(b)(2)(A).   The PSLRA's requirements for pleading scienter are "exacting" and "no small hurdle." *Nguyen* v. *Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020).  "To meet the PSLRA's high burden" Plaintiff "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Prodanova* v. *H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021).  Plaintiff must "allege scienter with

---

[6] The Court dismissed the section 20(a) claim because Plaintiff failed to plead a primary violation of the securities laws.  (Ruling at 38.)

1   respect to each of the individual defendants." *Or. Pub. Emps. Ret. Fund* v. *Apollo*

2   *Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014).

3       Unlike with other motions to dismiss, a court assessing scienter allegations

4   under the PSLRA "must take into account plausible opposing inferences," an inquiry

5   that "is inherently comparative." *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d

6   981, 991 (9th Cir. 2009).  Even if some allegations might permit inferring scienter,

7   the Court must conduct a "holistic review" of the allegations and materials subject to

8   judicial notice and "take into account plausible opposing inferences that could weigh

9   against a finding of scienter." (Ruling at 37–38.)

10  **V.    THE TAC FAILS TO RAISE A STRONG INFERENCE THAT
        GORMAN MADE THE APRIL 22 STATEMENT WITH SCIENTER**

11

12      In dismissing the SAC, the Court specifically held that Plaintiff failed to raise

13  a strong inference that Gorman made the April 22 Statement with scienter.  Rather,

14  "the more plausible alternative explanation" was that "Defendants were trying to

15  respond to uncertainty created by ATT and SKAN, and their optimistic predictions

16  did not pan out." (*Id.* at 38.)  Nothing in the TAC disrupts this reasoned conclusion.

17      Like the SAC, the TAC offers no motive for Gorman to lie.  Plaintiff identifies

18  no suspicious stock sales or any other financial motive for Gorman to mislead

19  investors.  "[T]he lack of a plausible motive certainly makes it much less likely that a

20  plaintiff can show a strong inference of scienter." *Prodanova*, 993 F.3d at 1108; *see*

21  *also Bodri* v. *GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017).

22      The TAC instead attempts to plead scienter by alleging that Gorman had access

23  to internal information that contradicted her public statement.  But as the Court made

24  clear, to raise a strong inference of scienter, Plaintiff needed to allege facts showing

25  that Gorman *received* or otherwise *accessed* information contradicting her April 22

26  Statement before she made it.  (Ruling at 33.)  Plaintiff has failed to do so.

27

28

### A.   Plaintiff Fails to Plead Facts Showing Gorman Intended to Defraud or Acted with Deliberate Recklessness

The TAC does not contain any particularized facts showing that Gorman received any information apprising her that the April 22 Statement was false.  Plaintiff does not identify, for example, specific meetings, calls, or briefings involving Gorman during which advertisers' experience using SKAN was discussed.  This alone requires dismissal.  *See Curry* v. *Yelp Inc.*, 875 F.3d 1219, 1227 (9th Cir. 2017) (requiring "detailed and specific allegations about management's exposure to factual information"); *Glazer Capital Mgmt., LP* v. *Magistri*, 549 F.3d 736, 745–46 (9th Cir. 2008).

The Court's conclusion that Gorman's statement was ambiguous further undermines scienter.  (Ruling at 32.)  That Gorman's statement is subject to multiple interpretations is fundamentally inconsistent with any intent to defraud.  *See Nguyen*, 962 F.3d at 418 n.3 (misstatement "too unclear to support a strong inference of scienter"); *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 400 (S.D. Tex. 2011) ("If an ambiguous statement is susceptible to many interpretations, including innocent ones, it will not contribute to an inference of scienter."), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72* v. *Nocella*, 464 F. App'x 334 (5th Cir. 2012).

Moreover, when asked on the call about the meaning of "successfully implemented," Gorman stated that advertisers representing a majority of Snap's DR revenue had "implemented" SKAN, omitting the word "successfully."  (Ex. 2-32.)  If Gorman intended to mislead investors, she would have seized the opportunity to confirm or even expand on the significance of advertisers' implementation of SKAN, or tout it as a workable alternative to traditional IDFA measurement.  She did not.

Any scienter inference is further undermined by the fact that on ***the very same call*** during which she made the April 22 Statement, Gorman warned that Snap was just "begin[ning] [to] implement[] and test[]" SKAN with its partners and there was "a lot of work to be done to transition smoothly."  (Ex. 2-18, 2-33.)  Several months

later Gorman similarly warned that ATT adoption "remains very early" and it is "causing some interruptions to demand," that "the solutions are not yet fully finalized," and that it was "too early to determine . . . the scale of the potential interruptions to demand, or the ultimate impact on the longer term growth of our business." (Ex. 5-55, 5-70.) Courts routinely find that such "detailed risk disclosure[s] . . . negate[] an inference of scienter."[7] *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994); *see, e.g.*, *Jasin* v. *Vivus, Inc.*, 2016 WL 1570164, at \*22 (N.D. Cal. Apr. 19, 2016) ("[T]he thoroughness of [defendants'] risk disclosures . . . negate[s] any inference of scienter even further."), *aff'd*, 721 F. App'x 665 (9th Cir. 2018); *ScripsAmerica, Inc.* v. *Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1259 (C.D. Cal. 2015) (risk disclosures inconsistent with scienter and support non-culpable inference).

Finally, the TAC does not allege that any of the four CWs identified in the TAC ever knew any information that contradicted Gorman's April 22 statement, much less that they—or anyone else—communicated that information to Gorman before she made her statement.

***CW1***. Plaintiff restates the SAC's allegations from CW1 that this Court found deficient—namely, that she was a junior sales employee without a company-wide perspective, as she worked in only one of Snap's 12 advertising verticals (each focused on selling to advertisers in a specific industry). (*See* ¶ 124 n.13; Ex. 2-18; Ex. 10-133.) The Court discounted CW1's alleged observation that "[t]he performance of SKAN was terrible" and that there were "very few adoptees" of

---

[7] Plaintiff attempts to contrast Facebook's and Snap's disclosures (¶¶ 55–61), but both companies made similar warnings about ATT's potential impact. (*Compare* Ex. 9-123 *with* Ex. 1-10; *see also supra* 5 n.4.) In any event, these disclosures only highlight why the alleged fraudulent scheme is so implausible: why would Snap be motivated to overstate purported benefits of a third-party product offered to an entire industry, in the face of an industry-wide change? It had no such motive.

SKAN in the first half of 2021 because "advertisers dragged their feet" (¶ 125), finding it failed to raise a strong inference of scienter because the SAC did not allege that CW1 "shared the purportedly contradictory information with Gorman (or Spiegel) before she made the challenged statements." (Ruling at 33–34.)  These allegations are unchanged from the SAC to the TAC (*compare* TAC ¶¶ 124–27 *with* SAC ¶¶ 76–78), and remain deficient for the same reasons (*see In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014); *Brodsky* v. *Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1117–18 (N.D. Cal. 2009)).  Moreover, CW1's allegations should be disregarded for an independent reason—like CW2's allegations, they do not contradict Gorman's statement.  CW1 says nothing about what advertisers told Snap of SKAN and when, or what **percentage of DR revenue** the "few adoptees" represented.

*CW2*.  The Court recognized that Plaintiff did not allege that CW2—a former Data Scientist involved in revenue forecasting at Snap—was "involved in the implementation of SKAN or helped advertising partners transition to SKAN." (Ruling at 28.)  The Court also found that the SAC failed to raise a strong inference of scienter based on CW2's allegations because it did not allege that "CW2 shared the purportedly contradictory information with Gorman (or Spiegel) before [Gorman] made the challenged statements." (*Id.* at 33–34.)  The Court observed that "the allegations in the [SAC] do not permit the Court to conclude that CW2 had personal knowledge of Spiegel's or Gorman's state of mind." (*Id.* at 27.)  Plaintiff's new allegations based on CW2 do not remedy these fundamental pleading failures.

*First*, Plaintiff alleges for the first time in the TAC that CW2 "recalled viewing a colleague's spreadsheet in August 2021 evidencing that . . . the majority of the Company's direct response advertisers had not taken the initial steps to 'opt in' to SKAN, let alone 'successfully implement' it." (¶ 137.)  CW2 provides no details corroborating the spreadsheet's existence, such as what it purported to show, where it was located, or who had access to it and when.  Instead, CW2 merely asserts "there is

definitely a spreadsheet out there." (¶ 137 n.15.) These deficiencies alone render CW2's allegations unreliable. *See Wozniak* v. *Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1042 (N.D. Cal. 2012) (allegations regarding internal reports insufficient where "plaintiff refer[red] to the existence of . . . data and ma[de] a general assertion about what the data showed" but "allege[d] no hard numbers or other specific information").

More fundamentally, this purported spreadsheet does not contradict the April 22 Statement. Gorman spoke of advertisers "represent[ing] a majority of [Snap's] direct response advertising revenue," whereas CW2's allegations speak to the number of advertisers that had implemented SKAN, regardless of the amount of revenue they generated. (Ex. 2-18; *see also* Ex. 2-32.) CW2's allegations say nothing about the percentage of DR revenue represented by implementing advertisers. This disconnect between Gorman's statement and CW2's allegations nullifies Plaintiff's new scienter allegations. *See, e.g.*, *Wozniak* v. *Align Tech., Inc.*, 2011 WL 2269418, at *12 (N.D. Cal. June 8, 2011) (CW allegations insufficient to plead scienter where "[t]here is no allegation as to . . . numbers that would serve to contradict" allegedly misleading statements); *Schechter* v. *Smith*, 2011 WL 13174954, at *20 (C.D. Cal. Dec. 6, 2011) (CW's allegations did not raise strong inference of scienter as they did not contradict the alleged misrepresentation). Indeed, CW2's silence on how much DR revenue the advertisers represent is highly significant: she claims she saw a spreadsheet showing that the majority of advertisers had not implemented SKAN but, even after Defendants highlighted the distinction,[8] does not contend that Gorman's statement was false.

*Second*, CW2 opines that "Gorman could not 'justify saying things were successfully implemented'" because "at that time, Snap had barely begun working

---

[8] (Dkt. 106 at 7–8 n.8 (explaining that the number of adoptees was irrelevant because the CW "had no basis to know what percentage of DR advertising revenue adopting advertisers constituted").)

with its advertisers on SKAN." (¶ 136.)  But CW2 is a junior-level employee who, as the Court recognized in its opinion, is not alleged to have been "involved in the implementation of SKAN" or to have "helped advertising partners transition to SKAN." (Ruling at 28.)  The TAC does not allege otherwise.  Moreover, on the same call, Gorman and Anderson warned that there was still "a lot of work to be done to transition smoothly" and that "the longer term impact" of ATT was "not clear yet." (Ex. 2-23, 2-33.)  CW2's allegations about the early stage of working with advertisers on SKAN are fully consistent with Gorman's and Snap's disclosures that day.

*Third*, Plaintiff alleges that CW2 had an "extremely close working relationship" and "regularly communicated" with Gorman.  (¶ 133.)  But CW2 does not allege that she ever communicated with Gorman (or any other senior management) *about SKAN*, let alone how advertisers were implementing SKAN. This pleading failure is fatal.  *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) (no strong inference of scienter where plaintiff "does not allege" that CWs "personally disclosed [the third party's business practice at issue] to" defendant executives); *Metzler*, 540 F.3d 1049 at 1068 ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter . . . absent some additional allegation of specific information conveyed to management and related to the fraud."). CW2's receipt of a text message from Gorman and a thank you note from Spiegel fails to connect Gorman to any knowledge of fraud.  (¶¶ 133–35.)  Similarly, CW2 fails to say anything about the *content* of quarterly pre-earnings release meetings with Gorman and other Snap employees (¶¶ 131–32, 141), let alone suggest that Gorman received information contradicting her April 22 Statement.  These allegations are therefore irrelevant.  *See, e.g.*, *Dresner* v. *Silverback Therapeutics, Inc.*, 2023 WL 2913755, at *14 (W.D. Wash. Apr. 12, 2023) (upholding dismissal where CW "put forth no specific details about what was discussed during the meetings that would demonstrate" scienter).

Finally, CW2 alleges that Gorman was "meeting with key advertisers all the time" and "would have heard from multiple people" about any issues with SKAN. (¶ 138.)  But CW2 has no basis to speculate about what advertisers did or did not say to Gorman in April 2022 meetings that CW2 did not attend.  *Wozniak*, 850 F. Supp. 2d at 1043 ("[CW]'s speculation about what was conveyed at meetings he did not attend" does not establish a strong inference of scienter).  Indeed, CW2's role at Snap had nothing to do with SKAN implementation or interacting with advertisers. (Ruling at 28.)

*CW3*.   CW3—a former junior employee in Snap's Product Marketing department—says nothing about SKAN, let alone about how advertisers were implementing SKAN as of April 2021. (*See* ¶¶ 145–52.)  CW3 merely opines that, in the first few months of 2021, Snap "had no solution" to "effectively" deal with Apple's privacy changes, and she "think[s]" Gorman had no basis to make her April 22 Statement, suggesting that Gorman "just made that up." (¶¶ 146–47.)  CW3's unadorned speculation that none of the solutions available in early 2021 was "effective" lacks any factual support.  Further, these allegations say nothing about whether advertisers representing a majority of DR revenue had implemented SKAN as of April 22.

Moreover, CW3 is not alleged to have had any personal contact with Gorman or any other senior management, rendering her allegations irrelevant.  *See NVIDIA*, 768 F.3d at 1064; *Brodsky*, 630 F. Supp. 2d at 1117–18.  "[M]ere speculation regarding what [Gorman] must have known is not an adequate substitute for allegations purporting to show what [Gorman] actually knew" when she made the statement.  *Gammel* v. *Hewlett-Packard Co.,* 905 F. Supp. 2d 1052, 1079 (C.D. Cal. 2012).

*CW4*.  CW4 is not alleged to have ever worked at Snap, but rather is a former junior employee of one of Snap's MMPs.  CW4 believes "Plaintiff's allegations were '1000%' correct" because CW4 had difficulty communicating with unnamed Snap

1  employees about Snap's "plans to respond to ATT." (¶¶ 150–51.)  CW4's allegations

2  are devoid of any supporting facts, rendering them unreliable. (*See* ¶¶ 149–52.) CW4

3  also says nothing about SKAN, let alone about advertisers' implementation of SKAN

4  as of April 2021. (*See id.*)  And, as with CW3, the SAC does not allege that CW4 had

5  any personal contact with Gorman or any other senior management, so CW4's

6  allegations are irrelevant as to whether Gorman possessed scienter. *See NVIDIA*, 768

7  F.3d at 1064; *Brodsky*, 630 F. Supp. 2d at 1117–18.[9]

8        In sum, no CW allegation undercuts the Court's prior conclusion:  that, instead

9  of an intent to defraud, "Defendants were trying to respond to uncertainty created by

10  ATT and SKAN, and their optimistic predictions did not pan out." (Ruling at 38.)

11        **B.     The Core Operations Inference Is Unavailable**

12        Despite the fact the TAC lacks particularized facts showing that Gorman knew,

13  or was deliberately reckless in not knowing, that her statement was incorrect, Plaintiff

14  nevertheless asks this Court to infer scienter because of Gorman's purported "intimate

15  involvement" in Snap's advertising business. (¶¶ 160–78.)  But the core operations

16  inference suffices only in "exceedingly rare" cases. *S. Ferry LP, No. 2* v. *Killinger*,

17  542 F.3d 776, 785 n.3 (9th Cir. 2008).  It requires "specific admissions" by "corporate

18  executives of detailed involvement in the minutia of a company's operations" or

19  "witness accounts demonstrating . . . actual involvement in creating false reports."

20  *Intuitive Surgical, Inc.*, 759 F.3d at 1062.  It may support scienter only (1) when

21  combined "with other allegations" to "support a cogent and compelling" inference of

22  scienter, (2) when allegations are "particular" *and* show defendants "had actual

23

---

24  [9] Attempting to allege scienter, Plaintiff relies on media and analyst reactions to the

25  April 22 Statement and Snap's October 21, 2021 disclosures (¶ 10; *see* ¶¶ 78–87, 164–71, 177).  That Snap was initially optimistic that SKAN might work, and was

26  criticized after SKAN's limitations became known, does not support Plaintiff's claim.

27  *In re Dura Pharms., Inc. Sec. Litig.*, 2000 WL 33176043, at *4, 7–11 (S.D. Cal. July 11, 2000) (no scienter inference despite allegation that analyst "stat[ed] that

28  management credibility had been severely damaged").

access" to the information, or (3) "in the rare circumstances" where "the nature of the relevant fact" is so prominent "that it would be absurd to suggest" lack of actual knowledge. *Prodanova*, 993 F.3d at 1111.

In dismissing the SAC, this Court concluded that the core operations theory was inapplicable because Plaintiff had failed to produce "specific admissions" that Gorman had "detailed involvement in the minutia of a company's operations." (Ruling at 36.)  The Court also found that Plaintiff could not rely on the "absurdity" prong because Plaintiff failed to allege any facts showing "Gorman knew of SKAN's deficiencies at the time her allegedly false statements were made." (*Id.* at 37.) Plaintiff has not fixed these defects.

As to the first prong, as explained above, no "other allegations" support a "cogent and compelling" inference that Gorman knew that advertisers representing a majority of Snap's DR advertising revenue had not successfully implemented SKAN. There are no allegations that Gorman received information contradicting her statement before she made it and no allegations of suspicious stock sales. *Supra* 11–17.   Gorman's own contemporaneous disclosures to Snap's investors further undermine any scienter inference. *See, e.g.*, *McGovney* v. *Aerohive Networks, Inc.*, 2019 WL 8137143, at *23 (N.D. Cal. Aug. 7, 2019) ("repeated disclosure of negative information on the very topics they supposedly concealed undermines" scienter); *supra* 11–12.

As to the second prong—actual access to contradictory information—this Court previously held that the SAC failed to allege that Gorman "had access to information" that her April 22 Statement was false or "specific admissions" of "detailed involvement in the minutia of [Snap's] operations." (Ruling at 33, 36.) Plaintiff pleads additional allegations regarding Gorman's role at Snap, but still pleads no facts showing she had access to information contradicting her April 22 Statement, which is fatal. *Killinger*, 542 F.3d at 784 ("[A]llegations that management had an

important role in the company" are insufficient absent "detailed allegations about the defendants' actual exposure to information.").

Specifically, Plaintiff now alleges, via CW2, that "Jeremi [Gorman] was ear to the ground," "known for connecting on a first-name basis with Snap's advertising sales representatives" and "meeting with key advertisers all the time." (¶ 138.)  But CW2—"a former Data Scientist"—is not alleged to have any personal knowledge about advertisers' implementation of SKAN or their communications with Gorman (or anyone else at Snap).  (¶ 128; *see* ¶¶ 128–44.)  In any event, these generalized allegations do not support a theory that Gorman was had actual access to information contradicting her April 22 Statement before it was made; they lack specificity as to timing, the number of "key" advertisers, or the percentage of Snap's revenue that they represented.  *See, e.g.*, *In re Cadence Design Sys., Inc. Sec. Litig.*, 654 F. Supp. 2d 1037, 1048 (N.D. Cal. 2009) (CW allegations about defendants' roles and that they "spent time" with customers insufficient); *Lloyd* v. *CVB Fin. Corp.*, 2012 WL 12883517, at *21 (C.D. Cal. Aug. 21, 2012) ("vague testimony of confidential witnesses" regarding meetings "is not a substitute for concrete factual allegations").

Plaintiff also alleges that Gorman "admitted" that she was intimately involved in the advertising business.  (¶¶ 168–71.)  Such allegations, however, are equivalent to allegations of "general awareness of the day-to-day workings of the company's business" since Snap's business is primarily selling advertising, and therefore fail to support the core operations inference.  *Nozak* v. *N. Dynasty Mins. Ltd.*, 804 F. App'x 732, 734 (9th Cir. 2020).  Plaintiff further alleges that Gorman made "specific, regular public remarks" to investors (¶¶ 172–75), but the Court has already rejected such allegations as insufficient without allegations that Gorman "knew or had access to information that [her] statements were false" (Ruling at 33).

The third prong—absurdity—also is not met.  Plaintiff fails to show that it is absurd that Gorman would not have known as of April 22, 2021—before ATT was rolled out *en masse* and Snap had suffered any revenue impact—that third-party

SNAP'S MOTION TO DISMISS THIRD AMENDED CLASS ACTION COMPLAINT

advertisers were dissatisfied with a third-party product that the entire industry was being offered as a substitute for IDFA.  Plaintiff does not allege that, as of April 22, 2021, any issues with SKAN, a third-party product, were so pervasive that the Court should infer that Gorman knew there were problems.  Indeed, there are no allegations that, as of April 22, 2021, advertisers had surfaced specific concerns about SKAN to Snap.  (*Supra* 11–17; *see also* Ex. 8-104 ("***over time***" Snap "saw SKAN measurement results diverge").)  There also are no allegations that issues with SKAN affected Snap's revenue until months after the April 22 Statement and then it was only by an immaterial amount.  *Supra* 6.

This absence of allegations makes sense:  as of April 22, 2021, ATT had not been rolled out (¶ 72), so advertisers had not been forced to rely on SKAN and Snap's advertising revenue had not yet been affected (Ex. 6-75; Ex. 7-86)—those events did not happen until Q3, months later.  It would not have been "absurd" for Gorman not to know on April 22, 2021 that third parties (advertisers) were having issues with a third-party product (SKAN) when those third parties had not yet been forced to rely on it.  *See In re Yahoo! Inc. S'holder Derivative Litig.*, 153 F. Supp. 3d 1107, 1123 n.10 (N.D. Cal. 2015) (the inference "only allows a court to infer executives' knowledge about their own company's core operations . . . not knowledge regarding the operations" of a third party); *Jun Shi* v. *Ampio Pharms., Inc.*, 2020 WL 5092910, at *6 (C.D. Cal. June 19, 2020) (no core operations inference absent "contemporaneous information ***within*** [the company] that contradicted or undermined" statements) (emphasis added).

*In re Twitter, Inc.*, 506 F. Supp. 3d 867 (N.D. Cal. 2020), is instructive.  There, plaintiffs alleged that Twitter's ability to target advertising was so important to its advertising business that the court should infer scienter.  *Id.* at 888.  Judge Gonzalez Rogers refused to apply the core operations inference, holding that plaintiffs had failed to provide either specific admissions by defendants that they were involved in the minutia of operations or witness accounts demonstrating that the executives had

actual involvement in creating false reports. *Id.* at 889. She also held that plaintiffs had "not alleged facts supporting the inference that the [privacy setting change]'s impact on the company's financials was so dramatic that it would be absurd to think that [defendants] did not know that something was wrong." *Id.* (citing *Webb* v. *SolarCity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018)).

Finally, even if the core operations inference could apply, the Court would still be required to consider the plausible, non-fraudulent explanations for Gorman's statement. *Prodanova*, 993 F.3d at 1113. Here, the statement's ambiguity, Gorman's lack of motive, and her cautionary statements regarding ATT's impact (including those made contemporaneously with the April 22 Statement), *supra* 10–12, support the far more compelling inference that Gorman was "trying to respond to uncertainty created by ATT and SKAN" (Ruling at 38) rather than defraud investors. This is fatal to Plaintiff's scienter argument.

## VI.   PLAINTIFF FAILS TO PLEAD A SECTION 20(A) CLAIM

To plead a section 20(a) claim, Plaintiff must allege "'(1) a primary violation of federal securities laws' and '(2) that the defendant exercised actual power or control over the primary violator.'" *SolarCity*, 884 F.3d at 858. Plaintiff's claims fail.

*First*, because Plaintiff fails to allege any primary violation of the federal securities laws, Plaintiff cannot sustain its section 20(a) claim against either Individual Defendant. *Id.*

*Second*, Plaintiff fails to allege that Spiegel "exercised power or control" over Gorman (or Snap) when Gorman made the April 22 Statement. It is not presumed that a CEO is a "control person." *S.E.C.* v. *Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011). Rather, a plaintiff must plead "indicia of 'control,'" *id.*, such as that a defendant had "authority over the process of preparing and releasing" the challenged statements. *Howard* v. *Everex Sys, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). The TAC's conclusory allegations (¶¶ 30–32, 211–16) say nothing about Spiegel's actual control over preparing and presenting the April 22 Statement, warranting dismissal of the

section 20(a) claim against Spiegel. *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1242–43 (N.D. Cal. 1994) ("[S]tatements attributable to specific individuals are presumed to be the actions of those individuals only.").

## VII.   CONCLUSION

After three attempts—with guidance from the Court and focusing on a single alleged misstatement—Plaintiff has still failed to adequately allege securities fraud. The TAC should be dismissed without further leave to amend.

1

DATED:  June 9, 2023

By: _____/s/ Daniel J. Kramer_____
          Daniel J. Kramer

2

3

DANIEL J. KRAMER (*admitted pro hac vice*)

AUDRA J. SOLOWAY (*admitted pro hac vice*)

4

DANIEL S. SINNREICH (*admitted pro hac vice*)

KRISTINA A. BUNTING (*admitted pro hac vice*)

5

**PAUL, WEISS, RIFKIND, WHARTON &**

6

**GARRISON LLP**

1285 Avenue of the Americas

7

New York, NY 10019-6064

8

Tel:   (212) 373-3000

Fax:   (212) 757-3990

9

Email:      dkramer@paulweiss.com

10

Email:      asoloway@paulweiss.com

Email:      dsinnreich@paulweiss.com

11

Email:      kbunting@paulweiss.com

12

13

EKWAN E. RHOW (SBN 174604)

AHARON B. KASLOW (SBN 322769)

14

**BIRD, MARELLA, BOXER, WOLPERT,**

**NESSIM, DROOKS, LINCENBERG & RHOW**

15

**P.C.**

16

1875 Century Park East, 23rd Floor

Los Angeles, CA 90067-2561

17

Tel:   (310) 201-2100

18

Fax:   (310) 201-2110

Email:      erhow@birdmarella.com

19

Email:      akaslow@birdmarella.com

20

21

*Attorneys for Snap Inc., Evan Spiegel, and Jeremi Gorman*

22

23

24

25

26

27

28

SNAP'S MOTION TO DISMISS THIRD AMENDED CLASS ACTION COMPLAINT

1

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Defendants Snap Inc., Evan Spiegel, and Jeremi Gorman, certifies that this brief contains 6,999 words, which complies with the word limit of L.R. 11-6.1.

<u>/s/ *Daniel J. Kramer*</u>
Daniel J. Kramer

Dated:  June 9, 2023

SNAP'S MOTION TO DISMISS THIRD AMENDED CLASS ACTION COMPLAINT