**SAXENA WHITE P.A.**
David R Kaplan (230144)
dkaplan@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

*Additional Counsel listed on signature page*

*Lead Counsel for Lead Plaintiff
and the Class*

**BIENERT KATZMAN
LITTRELL WILLIAMS LLP**
John L. Littrell (221601)
jlittrell@bklwlaw.com
Michael R. Williams (192222)
mwilliams@bklwlaw.com
360 E. 2nd Street, Suite 265
Los Angeles, CA 90012
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

*Liaison Counsel for Lead Plaintiff
and the Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

KELLIE BLACK, individually and on behalf of all others similarly situated,

    Plaintiff,

    vs.

SNAP INC., EVAN SPIEGEL, and JEREMI GORMAN,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 2:21-cv-08892-GW (RAOx)

<u>CLASS ACTION</u>

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT

Date:  September 11, 2023
Time:  8:30 A.M.
Courtroom.: 9D
Assigned to Honorable George H. Wu

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1

II.   THE TAC'S ALLEGATIONS ESTABLISH SCIENTER ........................6

    A.    ATT Posed An Existential Threat To Snap's Most Critical Business; Thus, SKAN's Viability As An Alternative Tracking Tool Was The Single Most Important Issue Facing The Company ........................................................................................6

    B.    Apple Delays The ATT Rollout A Half-Year To Provide Ample Time To Prepare For The Changes And Test SKAN's Capabilities ........................................................................................6

    C.    Gorman Twice Assures Investors That The ATT Rollout Delay "Gave Us A Lot Of Time To Prepare," And As A Result, Advertisers That Represent A "Majority" Of Snap's Critical DR Revenue "*Have Successfully Implemented*" SKAN ......................7

    D.    Highly Sophisticated Analysts Uniformly Cited And Relied On Gorman's Words To Conclude That "IDFA's Impact [Was] Not Likely Material" For Snap ...............................................................8

    E.    Despite Multiple Opportunities, Gorman Never Walks Back Her Comments—Prompting Investors To Conclude Up Until The End Of The Class Period That The ATT Risk Was "Minimal" .........................................................................................9

    F.    Snap Shocks The Market, Admitting That, In Reality, SKAN Was Unworkable And ATT Had Severely Impacted Snap's Business ..............................................................................................10

    G.    Former Employees Confirm That Gorman Had No Basis To Proclaim That Advertisers Representing A "Majority" Of Snap's DR Revenue Had "Successfully Implemented" SKAN .........11

III.  ARGUMENT ............................................................................................ 13

    A.    The TAC Adequately Pleads A Strong Inference of Scienter ............13

        1.    As Snap's Chief Business Officer Directly Responsible For Snap's Response To ATT, Gorman Knew Full Well That The Effectiveness Of SKAN Was Unquestionably The Most Critical Issue Facing Snap During The Class Period ..............................................................................13

        2.    Gorman Was Acutely Aware That The Market Heavily Relied On Her April 2021 Statements In Concluding That The ATT Changes Were "Not Likely Material" To Snap ..............................................................................15

3.    Well-Placed CW Accounts Further Confirm That Gorman Had No Reasonable Basis To Proclaim Any "Successful Implementation" Of SKAN On April 22, 2021—Or Ever.................................................................18

4.    Analysts Questioned Defendants' Credibility Precisely Because Snap's Disclosure Did Not Align With Defendants' Prior Statements, Thereby Supporting Gorman's Scienter ...............................................................20

5.    Under Ninth Circuit Precedent And This Court's Prior Order, The Fact That Gorman's False Statement Concerned Snap's Core Business Supports Scienter.................21

B.    The TAC Adequately Alleges A §20(A) Claim Against Spiegel.......25

IV.    CONCLUSION…………………………………………………… 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Azar v. Yelp, Inc.*,
   2018 WL 6182756 (N.D. Cal. Nov. 27, 2018).....................................................23

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008).........................................................................22, 23

*Commc'ns Workers of Am. Plan for Emp.' Pension & Death Benefits v.
   CSK Auto Corp.*,
   525 F. Supp. 2d 1116 (D. Ariz. 2007)...............................................................13

*Evanston Police Pension Fund v. McKesson Corp.*,
   411 F. Supp. 3d 580 (N.D. Cal. 2019)..........................................................15, 24

*Fosbre v. Las Vegas Sands Corp.*,
   2013 WL 5970250 (D. Nev. Nov. 7, 2013)........................................................13

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000).............................................................................25

*In re Apple Inc. Sec. Litig.*,
   2020 WL 6482014 (N.D. Cal. Nov. 4, 2020)......................................................25

*In re Energy Recovery Inc. Sec. Litig.*,
   2016 WL 324150 (N.D. Cal. Jan. 27, 2016) ......................................................25

*In re FibroGen, Inc.*,
   2022 WL 2793032 (N.D. Cal. July 15, 2022) ....................................................21

*In re Finisar Corp. Sec. Litig.*,
   2017 WL 1549485 (N.D. Cal. May 1, 2017) ......................................................17

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017).............................................................................14

*In re Ramp Networks, Inc. Sec.*,
   201 F. Supp. 2d 1051 (N.D. Cal. 2002)..............................................................24

*In re Twitter, Inc.*,
   506 F. Supp. 3d 867 (N.D. Cal. 2020).................................................................23

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994)...............................................................................17

*In re Zillow Grp., Inc. Sec. Litig.,*
2019 WL 1755293 (W.D. Wash. Apr. 19, 2019) ..................................................15

*Jaeger v. Zillow Grp., Inc.,*
2022 WL 17486297 (W.D. Wash. Dec. 7, 2022) ...........................................20, 21

*Jasin v. Vivus,*
2016 WL 1570164 (N.D. Cal. Apr. 19, 2016) ....................................................17

*Longo v. OSI Sys.,*
2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ....................................................14

*McGovney v. Auerohive Networks, Inc.,*
2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) .....................................................17

*Mulderrig v. Amyris, Inc.,*
492 F. Supp. 3d 999 (N.D. Cal. 2020) ................................................................19

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
*Am. W. Holding Corp.,*
320 F.3d 920 (9th Cir. 2003) ..............................................................................24

*Patel v. Axesstel, Inc.,*
2015 WL 631525 (S.D. Cal. Feb. 13, 2015) .......................................................24

*Reese v. Malone,*
747 F.3d 557 (9th Cir. 2014) .......................................................13, 14, 21, 22, 23

*Schueneman v. Arena Pharm., Inc.,*
840 F.3d 698 (9th Cir. 2016) ..............................................................................13

*ScripsAmerica, Inc. v. Ironridge Global LLC,*
119 F. Supp. 3d 1213 (C.D. Cal. 2015) ..............................................................17

*Shenwick v. Twitter, Inc.,*
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..............................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007) ............................................................................................13

*Weston v. DocuSign, Inc.,*
2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) ....................................................15

## I.    **INTRODUCTION**[1]

Leading up to the Class Period, Snap faced an existential threat to its business. In June 2020, Apple announced privacy changes to its operating system called "ATT."  Once rolled out, ATT would effectively eliminate automatic user activity tracking (called "IDFA"), which Snap depended on to run the most important aspect of its business: direct response ("DR") advertising.  Without IDFA, Snap's DR advertisers would not be able to track user activity, and as a result, the Company's advertising revenue would suffer dramatically.  In order to help companies like Snap adapt to the coming ATT changes, Apple provided an alternative tracking tool called "SKAN"—and in September 2020, Apple announced that it would delay ATT's release for at least a half-year, to "early 2021," to allow companies like Snap more time to implement and test SKAN's capabilities.  Thus, by the start of the Class Period, the question of whether SKAN was viable as a tracking tool was indisputably the single most important issue facing the Company.

It was within this context that, at the start of the Class Period—after the ATT release had been delayed yet again to give companies even more time to adopt SKAN—Defendant Gorman provided investors with the exact reassurance they wanted to hear.  Specifically, on April 22, 2021, Gorman stated that the extended delay had "provided additional time to adopt [SKAN] and begin implementing and testing with our partners," and then triumphantly proclaimed that "[a]dvertisers that represent a majority of [Snap's] direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns."  Gorman's statement was so important that analysts immediately asked "what defined [the] success of that implementation," and whether investors should "expect [it] to mitigate some of the

---

[1] All references to "¶ " are to the Third Amended Class Action Complaint ("TAC" or "Complaint"). "DM" refers to Defendants Snap Inc. ("Snap" or the "Company"), Evan Spiegel ("Spiegel"), and Jeremi Gorman's ("Gorman") Motion to Dismiss, ECF No. 121. Unless otherwise stated, all emphasis is added.  The "Class Period" is from April 23, 2021 to October 21, 2021.  ¶1.

IDFA headwinds that have been a source of investor concern." In response, Gorman did not in any way retract or back away from her statement. To the contrary, she again represented that the extended delay "gave us a lot of time to prepare" for ATT, and then reiterated that "we're really pleased to see that advertisers that represent the majority of our [DR] revenue have implemented [SKAN] so far." The market celebrated this news: Snap's stock price surged by over 7%, and a multitude of analysts specifically repeated verbatim Gorman's assurances in concluding that the upcoming ATT changes were "not likely material" to Snap's business.

However, as Defendants would soon be forced to admit, Gorman's statement was utterly false. On October 21, 2021, Defendants admitted that, in reality, SKAN was completely unworkable as a tracking tool and had "rendered [advertisers] blind." As a result, Snap's business cratered, forcing it to reduce revenue guidance by a staggering 50% for the fourth quarter of 2021, and analysts dramatically slashed 2022 adjusted EBITDA estimates by as much as 40%. On this shocking news, Snap's stock price plunged 26% in a single day, wiping out $27 billion in market capitalization, and analysts excoriated Defendants for their prior misrepresentations.

In its March 13, 2023 Order, the Court held that Plaintiff had "plausibly alleged" that Gorman's April 22, 2021 statement was materially false and misleading because investors "interpret[ed] Gorman's statement as a sign that SKAN worked and would 'mitigate against a meaningful adverse outcome for Snap.'" ECF No. 115 ("Order") at 32. The Court further determined that while Plaintiff had fallen short of alleging scienter, it was a "close call." Order at 37. Accordingly, in line with the Court's determinations, the TAC (i) removed the statements dismissed on falsity grounds; (ii) retained allegations concerning the falsity of Gorman's April 22, 2021 statement; and (iii) added numerous allegations that readily establish, at a minimum, that Gorman was reckless when she made her false April 22, 2021 statement.

*First*, the TAC includes detailed new allegations establishing that Gorman

was Snap's most senior officer specifically charged with directing Snap's response to ATT and its implementation of SKAN.  Indeed, Gorman was personally responsible for and extensively spoke with investors about these subjects for several months, between the June 2020 announcement of ATT and through the end of the Class Period.  Significantly, Snap's own CEO, Defendant Spiegel, repeatedly underscored that Gorman was the most knowledgeable person at the Company about these issues—to the extent that Spiegel specifically stated, in response to analysts' questions about ATT and SKAN, that Gorman was "better positioned" to address those queries.  Gorman was thus undeniably aware of both the import and the impact of her April 22, 2021 statements proclaiming that advertisers representing a majority of Snap's crucial DR advertising revenue had "successfully implemented" SKAN.

*Second*, the TAC's detailed new allegations establish that the ATT rollout was delayed over six months precisely to give companies like Snap additional time to adopt and test SKAN, and that analysts specifically heralded this delay as a "positive outcome" for this very reason.  Gorman herself emphasized that the extended delay "gave us a lot of time to prepare" and had "provided [Snap] additional time to adopt [SKAN] and begin implementing and testing with our partners."  Thus, when Gorman made her "successfully implemented" statement, it was clear what her intended meaning was: after months of testing, SKAN had proven to be an effective replacement for IDFA, such that the ATT risk was "mitigat[ed]."

*Third*, the TAC establishes that Gorman knew that the market was heavily relying on her statement and knew that analysts specifically cited her words to conclude that SKAN's "successful implementation" "would 'mitigate against a meaningful adverse outcome for Snap."  Order at 32.  Indeed, the TAC includes reports from numerous highly sophisticated analysts, all of which uniformly cited and relied upon Gorman's false assurances in concluding that "IDFA's Impact [was] Not Likely Material" and that they "now see reduced risks" from ATT, precisely

because—as Gorman had represented—"the delayed rollout allowed more time to work with advertisers to adopt [SKAN]."  Significantly, numerous analysts also concluded that Snap's "successful implementation" of SKAN distinguished it from primary competitor Facebook—which had waged a public campaign against ATT and issued dire warnings that ATT would "severely impact" its DR business—such that the ATT risk to Snap was "manageable" and "minor" in comparison.

*Fourth*, the TAC includes additional accounts from well-placed former employees—including individuals with close working and personal relationships with Gorman—that confirm that Gorman had no basis whatsoever to proclaim on April 22, 2021 that advertisers representing a "majority" of the Company's critical DR advertising revenue had "successfully implemented" SKAN.  These former employees stated that Gorman could not "justify" her statement because in April 2021, Snap had only barely begun to work with its DR advertisers on SKAN, and that even as late as August 2021, a majority of Snap's DR advertisers had not even taken the initial steps to "opt in" to SKAN—let alone "successfully implement" it. As a result, "there [was] no way that Jeremi Gorman could have made a statement like that [in April 2021] based on actual data"—"she just made that up."

In the face of these compelling allegations, Defendants' motion is more remarkable for what it does not dispute than what it does.  Indeed, Defendants do not dispute (because they cannot) that Gorman was the officer responsible for communicating with investors about SKAN, and that Gorman knew that the market relied heavily on her statements about SKAN's "successful implementation" in concluding that Snap had "mitigated" ATT.  Instead, Defendants ask the Court to conclude, at the pleading stage, that when Gorman said that advertisers representing a "majority" of Snap's crucial DR revenue had "successfully implemented" SKAN, she really meant that only "some" advertisers had merely "put SKAN in place." DM at 1.  But this assertion is completely contradicted by both Gorman's own words and

the avalanche of analyst reports that cited those words and concluded that they meant the exact opposite of what she says now. Tellingly, Defendants utterly ignore these critical analyst reports, relegating their response to a single footnote in which they implausibly assert that the analysts were merely noting Gorman's "optimis[m]" about SKAN. DM at 17, n. 9. That is simply not true—the analysts repeated and cited her words verbatim in concluding that the ATT risk was "not likely material." There was nothing unclear or confusing about her statements. And significantly, while she now claims that she was misunderstood, Gorman never once tried to retract or clarify her statements, despite having numerous opportunities to do so.

Defendants' other argument—that Gorman could not have been aware of any issues with SKAN because April 2021 was too "early in the [ATT] rollout"—also fails. DM at 3, 19-20. Again, Defendants' assertion is completely contradicted by Gorman's own words: she did not say that Snap had insufficient time to test SKAN, or that it was too early in the ATT rollout to know if SKAN worked. Instead, Gorman emphasized that the multi-month delay "gave us a lot of time" to implement SKAN—which analysts again cited and repeated in concluding that ATT was "not likely material" for Snap. Moreover, even if this assertion were true, it would only confirm that Gorman had no basis whatsoever to proclaim to investors that any "successful implementation" of SKAN had occurred. As this Court aptly observed during the hearing on the prior motion to dismiss, even if by April 22, 2021 "nobody had [yet] made [any] determination as to SKAN's success and whether or not it would be successful" (Mar. 13, 2023 Hr'g Tr. at 21:23-22:5), then Gorman had no business making her proclamation—the very definition of recklessness.

In sum, Defendants cannot escape liability simply by saying: "I meant something else"—particularly when that excuse is completely contradicted by the plain meaning of Gorman's own words, and the visceral reaction of the market.

For all of these reasons, Defendants' motion should be denied in its entirety.

## II.    THE TAC'S ALLEGATIONS ESTABLISH SCIENTER

### A.    ATT Posed An Existential Threat To Snap's Most Critical Business; Thus, SKAN's Viability As An Alternative Tracking Tool Was The Single Most Important Issue Facing The Company

During the Class Period, DR advertising—which prompts a user to make a purchase or download an app—was by far Snap's most critical business, representing between 65 and 70% of the Company's revenue.  ¶¶34-36, 139. Defendants repeatedly stressed the great significance of DR advertising to Snap's business, with Defendant Spiegel calling it "critical" to Snap's success, and Defendant Gorman repeatedly describing it as the key driver of Snap's advertiser and revenue growth leading up to the Class Period.  ¶¶38-39.  Snap's DR advertising revenue was heavily dependent upon advertisers' ability to track users' activity, and on Apple devices, this tracking was enabled by Apple's IDFA. ¶¶41-46.

However, in June 2020, Apple announced ATT privacy changes that would discontinue "automatic" IDFA tracking and would instead require users to "opt in." ¶¶47-48.  Significantly, industry participants widely expected most Apple users to "opt out" of IDFA tracking, and as a result, analysts specifically highlighted that ATT was an existential threat for Snap.  For example, *Forbes* noted that ATT was a "huge problem" and that "Snapchat…would be at risk," and MacQuarie opined that advertisers "will have to find other ways to attribute ad effectiveness." ¶¶49-50.  To address this issue, Apple rolled out SKAN, an alternative tracking tool that could be used in place of IDFA tracking. ¶51.  As a result, SKAN's viability was the <u>single most important issue</u> facing Snap leading up to the Class Period.

### B.    Apple Delays The ATT Rollout A Half-Year To Provide Ample Time To Prepare For The Changes And Test SKAN's Capabilities

On September 3, 2020, Apple announced that the ATT rollout would be delayed by six months in order "to give developers [i.e., Snap and its competitors] time to make necessary changes." ¶66. Analysts widely celebrated this delay as a "positive outcome" for the industry precisely because it would allow providers like

Snap ample time to test SKAN's capabilities compared to IDFA.  *Id.*  For example, *Forbes* reported that companies like Snap were "sighing with relief at [Apple's] delay" because "now they will have the ability to compare measurement [using IDFA] with marketing measurement in Apple's preferred new [SKAN] model." ¶67.

Significantly, Defendant Gorman specifically represented to the market that Snap took full advantage of this extensive delay by conducting this exact testing with its advertisers.  For example, on Snap's February 4, 2021 earnings call, Gorman stated that Snap was "really well prepared" to deal with ATT precisely because Snap had been "working really closely with Apple to implement [SKAN]" and "communicating very well with advertisers" about ATT and SKAN to "mitigate" ATT. ¶59.  Gorman further confirmed that she could speak to "what advertisers and agencies are saying to us," and described "a lot of conversations we're having with advertisers" about ATT and SKAN. ¶94.  Likewise, on February 18, 2021, Snap's own marketing partners announced—after working "directly" with Snap for the past "several months"—that SKAN was now fully set up for Snap's advertisers to test and use so that they could "ensure there will be no disruption" to their Snapchat campaigns "when Apple releases [ATT]."  ¶¶68-71.

**C.  Gorman Twice Assures Investors That The ATT Rollout Delay "Gave Us A Lot Of Time To Prepare," And As A Result, Advertisers That Represent A "Majority" Of Snap's Critical DR Revenue "*Have Successfully Implemented*" SKAN**

In March 2021, Apple delayed the ATT rollout again, giving Snap even more time to test and implement SKAN.  ¶72.  Finally, on April 20, 2021—a full ten months after the ATT changes had been initially announced—Apple announced that ATT would roll out on April 26, 2021.  *Id.*  By this time, the only remaining question for the market was whether SKAN was a viable alternative to IDFA.

Two days later, Gorman gave investors that exact reassurance.  Specifically, on Snap's April 22, 2021 earnings call, Gorman first confirmed that Apple's months-long delay "ha[d] provided [Snap with] additional time to adopt [SKAN] and begin

implementing and testing" with Snap's advertisers. ¶74. Immediately thereafter, Gorman explicitly proclaimed that, after a months-long period of "implementing and testing," "[a]dvertisers that represent a majority of our direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns." *Id*.

There was no question that Gorman's words were highly important to investors, and analysts on the call immediately seized upon them. Indeed, a Guggenheim analyst immediately asked her to clarify "what defined success of that implementation," and whether it would "mitigate some of the IDFA headwinds that have been a source of investor concern." ¶75. Significantly, in response, Gorman did not qualify or correct her statement in any way. To the contrary, Gorman repeated that "[t]he change happened later than we expected, which gave us a lot of time to prepare and [SKAN] is one part of that." ¶156. Gorman then unequivocally repeated that "we're really pleased to see that advertisers that represent the majority of our [DR] revenue have implemented [SKAN] so far." *Id*.

### D.    Highly Sophisticated Analysts Uniformly Cited And Relied On Gorman's Words To Conclude That "IDFA's Impact [Was] Not Likely Material" For Snap

Tellingly, the market responded immediately and extraordinarily positively to Gorman's statements. Snap's stock price surged by over 7%, and a multitude of highly experienced tech and market analysts directly quoted and relied upon Gorman's words. ¶77. Significantly, as the TAC makes clear, analyst after analyst repeated verbatim Gorman's assurances about the successful implementation of SKAN, specifically noting Gorman's representation that the extended delay had provided Snap's advertisers with ample time to implement SKAN, including:

- **Truist:** "IDFA's Impact [was] Not Likely Material" because "advertisers that represent a majority of [Snap's] [DR] ad revenue have successfully implemented [SKAN] for their Snap campaigns"—which reflected Snap's "comfortable stance toward the potential impact of [ATT]" and "would help mitigate against a meaningful adverse outcome for Snap." ¶79.

- **Guggenheim:** highlighted that the "majority of [Snap's] DR advertisers [are] navigating [ATT] with Snap via [SKAN]"—causing it to conclude that Snap "did not experience monetization impacts from [ATT]." ¶80.

- **JMP:** raised its price target for Snap by 20%, and concluded that "given 50%+ of Snap's [DR] advertising partners have adopted [SKAN] . . . we view [ATT] as less of a risk than previously." ¶81.

- **Oppenheimer:** similarly echoed Gorman, stating "we now see reduced risks from [Apple's] removal of IDFA[] as the delayed rollout allowed more time to work with advertisers to adopt [SKAN]." ¶82.

- **Piper Sandler:** Snap was "[c]onstructive" on ATT precisely because "[t]he majority of SNAP's DR advertisers have adopted [SKAN]." ¶82.

- **Raymond James:** emphasized that "Snap noted that advertisers that represent a majority of its [DR] ad revenue have successfully implemented [SKAN] for their Snap campaigns." ¶83.

- **Canaccord Genuity:** noted "the delayed roll out [] has given Snap time to implement and test [SKAN] with a majority of its DR advertisers." ¶83.

- **J.P. Morgan:** took great comfort that "Apple's delay in implementing ATT helped SNAP get more marketers onto [SKAN]." ¶83.

- **Bloomberg:** emphasized "that advertisers representing a majority of [Snap's] [] ad revenue 'have successfully implemented [SKAN],'" which "[e]as[ed] [c]oncerns [o]ver Apple [p]olicy [i]mpact." ¶84.

Gorman's statements were so significant that analysts specifically noted that they gave the Company a competitive advantage, as they sharply contrasted with those of its primary competitor Facebook—which had repeatedly warned of a "severe" impact from ATT, and was widely viewed by the market as facing the same high exposure to ATT as Snap.  For example, Truist concluded, based on Gorman's assurances, that "[u]nlike [Facebook]"—"which ha[d] taken a confrontational tone with Apple"—the "[u]pcoming IDFA [d]eprecation [w]as [l]ikely [m]anageable" for Snap.  ¶79.  *SocialMediaToday* similarly highlighted that Gorman's representation that "[a]dvertisers that represent a majority of [Snap's] [DR] advertising revenue have successfully implemented [SKAN] for their Snap campaigns" was a "positive report for Snap" compared to its competitors.  ¶84.

### E.    Despite Multiple Opportunities, Gorman Never Walks Back Her Comments—Prompting Investors To Conclude Up Until The End Of The Class Period That The ATT Risk Was "Minimal"

At no point through the remainder of the Class Period did Gorman ever clarify or walk back her highly material remarks, despite having repeated opportunities to

do so.  To the contrary, Gorman continued to assure investors that SKAN was effective and that Snap's business would not be severely impacted by ATT—leading analysts to conclude up until the truth was revealed that the risk ATT posed to Snap's business was "minimal."  ¶¶97-98.  For example, on a July 22, 2021 earnings call—when Snap would later admit that it had observed a significant negative impact from ATT—Gorman touted the "continued success" of Snap's DR business, and asserted that Snap continued to believe that SKAN "will aid in improving attribution [*i.e.*, measurement of ad efficacy]" for advertisers.  ¶98.  Even when an analyst directly asked Gorman if ATT was "actually affecting targeting" and whether SKAN was proving to be effective, Gorman repeated that "we know [that SKAN] will aid, or we believe [that it] will aid, in attribution for advertisers."  *Id.*

Based on Gorman's repeated assurances, analysts concluded that, in contrast to Facebook, the ATT risk to Snap's business was "minimal." ¶¶99-102. For example, Evercore noted that Snap's DR business was its "distinct advantage[]" over its competitors, and concluded that "[the IDFA risk] is likely minimal." ¶99.  Jefferies likewise "estimat[ed] [that the ATT risk] will be minimal." *Id*.  Morningstar reported that "the impact of [ATT] will remain minimal" because "Snap has already been working with Apple to use its [SKAN] data with the platform's and its advertisers' first party data." ¶100. Indeed, even mere days before the truth was revealed, J.P. Morgan, Truist and MKM Partners all concluded that "SNAP has limited exposure to [ATT]," that IDFA would have a "minor impact" on Snap, and that, in stark contrast to Facebook, Snap had "clearly mitigated [the ATT] headwind." ¶102.

Gorman's assurances had the intended effect.  Snap's stock price skyrocketed 46% from $57.05 at the start of the Class Period to an all-time high of $83.11 on September 24, 2021—less than a month before the truth was revealed. ¶101.

### F.    Snap Shocks The Market, Admitting That, In Reality, SKAN Was Unworkable And ATT Had Severely Impacted Snap's Business

On October 21, 2021, Snap stunned the market by announcing that it had

completely missed the lower end of its third quarter revenue guidance <u>for the first time in Company history</u>.  ¶103. Snap also dramatically reduced its fourth quarter revenue guidance to just $135-$175 million, <u>55% below</u> Wall Street consensus.  *Id.*

Significantly, Snap directly attributed these dismal results to SKAN's utter failure as an ad tracking tool. ¶104.  Indeed, Defendants admitted that, far from advertisers achieving any "successful implementation" of SKAN by April 2021, the opposite was true: SKAN was completely "unreliable" and ineffective, such that advertisers had been "rendered blind." ¶105-08.  Specifically, Gorman admitted that Snap's DR advertisers had in fact only barely begun to "explore[] and test[] [SKAN]," and upon doing so, had immediately "surfaced a variety of concerns about its limitations" as they were: (i) "unable to target advertising"; (ii) "no longer able to understand the impact of their unique campaigns"; and (iii) unable to observe their ad campaigns in real time.  ¶105-06.  In other words, SKAN was completely devoid of the key IDFA features that were absolutely critical to DR advertisers' business.

In response to this news, Snap's stock price plunged by 26% in a matter of hours, wiping out a staggering $27 billion in market capitalization in a single day—the largest one-day decline in the Company's history. ¶109.

**G.    Former Employees Confirm That Gorman Had No Basis To Proclaim That Advertisers Representing A "Majority" Of Snap's DR Revenue Had "Successfully Implemented" SKAN**

The TAC includes compelling allegations from well-placed CWs that confirmed that Gorman had no basis whatsoever for her April 22, 2021 statements.

CW 1, a former Snap Account Strategist who worked directly on transitioning Snap's DR advertisers from IDFA to SKAN, stated that, in sharp contrast to Gorman's April 2021 statement, the exact opposite was true. ¶¶124-25. CW 1 stated that, in reality, the "majority" of Snap's DR advertisers had instead "dragged their feet as long as possible" due to SKAN's severe drawbacks, and as a result, by April 2021, "<u>there were very few adoptees [of SKAN] in Q1 and Q2 of 2021</u>."  ¶125.

CW 2, internally known as the "revenue forecasting" person at Snap, had an extremely close working relationship with Gorman, as evidenced by personal messages she received from Gorman mere days before Gorman's April 22 statement. ¶¶128, 131-35.  CW 2 stated that Gorman could not "justify saying things were successfully implemented" in April 2021 because Snap barely had any data regarding SKAN's viability at that time.  ¶136.  CW 2 explained that as late as August 2021, when she was tasked with forecasting the impact of ATT on Snap's business—a task Snap's senior management later instructed her not to complete lest it give rise to "shareholder fraud"—CW 2 consulted with Ruxan Ouyang, the Snap Data Scientist directly in charge of ad efficacy measurement for Snap's DR advertisers, about DR advertisers' adoption of SKAN.  ¶¶137, 141-44.  Ouyang showed CW 2 an internal Company spreadsheet that confirmed that, even by that late date, a majority of Snap's DR advertisers had not even taken the initial steps to "opt in" to SKAN—let alone "successfully implement" it.  *Id*.  As a result, Ouyang told CW 2: "[I]t's not looking good." *Id*.

CW 3 was a Partner of Product Marketing at Snap during the Class Period, and confirmed that Gorman had no basis for her April 22, 2021 statement, as Snap had "no solution" to effectively deal with ATT at that time. ¶¶145-46. "[T]here is no way that Jeremi Gorman could have made a statement like that based on actual data. Gorman was shooting from the hip."  ¶147.  CW 3 stated that there was no "report" or other support for Gorman's statement: "I think that she just made that up." *Id*.

CW 4—who was a Paid Media Manager with adMixt (a Snap marketing partner) during the Class Period—similarly confirmed that leading up to the ATT rollout in April 2021, Snap did not offer any meaningful solution for ATT despite repeated requests.  ¶¶149-52.  As a result, by no later than May 2021, the impact of ATT on Snap's business was "super drastic," and became "so bad" that advertisers had to "shut down their campaigns on Snapchat."  ¶151.

## III.    ARGUMENT

### A.    The TAC Adequately Pleads A Strong Inference of Scienter

The Ninth Circuit has held that scienter is a "mental state that not only covers intent to deceive, manipulate, or defraud, but also <u>deliberate recklessness</u>." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016).  A defendant is deliberately reckless "if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). A "strong inference" "need not be irrefutable . . . or even the most plausible," and no "smoking gun" is required— rather, the standard is "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter <u>at least as strong as</u> any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324-26 (2007).  Indeed, the "Supreme Court [] made clear [in *Tellabs*]" that "[i]f the Plaintiff presents facts from which an inference of scienter may be drawn, and <u>that inference is as likely as any nonculpable explanation</u>," then "<u>a tie goes to the plaintiff</u>."  *Commc'ns Workers of Am. Plan for Emp.' Pension & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007); *see also Fosbre v. Las Vegas Sands Corp.*, 2013 WL 5970250, at *5 (D. Nev. Nov. 7, 2013).

#### 1.    As Snap's Chief Business Officer Directly Responsible For Snap's Response To ATT, Gorman Knew Full Well That The Effectiveness Of SKAN Was Unquestionably The Most Critical Issue Facing Snap During The Class Period

As this Court recognized, ATT posed an existential threat to Snap's business because "Snap generates substantially all of its revenue from advertising"—with 70% of that revenue derived from users of Apple devices, and well over half from DR advertising, which Defendants touted as "critical" to Snap's success.  *See* Order at 37; ¶¶34-39, 161-163.  Thus, as the TAC alleges, analysts specifically identified ATT as a "huge problem" for Snap in particular (¶50), causing the viability of SKAN

to be the single most important issue facing Snap during the Class Period.

As the most senior officer directly charged with overseeing Snap's response to ATT, Gorman knew the import of SKAN all too well.  Far from a mere "general awareness of the day-to-day workings of the company's business" (DM at 19), Gorman instead explicitly represented herself as having first-hand, intimate knowledge about Snap's DR business, ATT and the Company's progress in implementing SKAN.  ¶¶25, 39, 59, 73-76, 88-98, 168-76.  For example, leading up to the Class Period, both Spiegel and Gorman repeatedly described Gorman as a hands-on executive with "detailed involvement in the minutia of [Snap's] operations" (*see* Order at 36), and as being personally responsible for overhauling Snap's ad sales business and building up its DR business "from scratch."  ¶¶25-26, 88-96, 168-75.  Just prior to the Class Period, Gorman specifically asserted that she could personally speak to "what advertisers and agencies [were] saying to [Snap]" about ATT and SKAN, and reported that Snap was "really well prepared" for ATT precisely because Snap had been "working really closely with Apple to implement [SKAN]."  ¶¶59, 94.  Similarly, Spiegel routinely directed analyst questions about Snap's DR business, ATT and SKAN to Gorman because she was "<u>better positioned</u>" to discuss those issues and "[was] having a lot of conversations with [Snap's advertisers]" about those crucial topics.  ¶¶93-94.  Then, after both Snap and Gorman had repeatedly held Gorman out as being intimately knowledgeable about the single most vital issue facing the Company, Gorman proceeded to make materially false and misleading statements about that very issue.  On April 22, 2021, Gorman proclaimed that a "majority" of advertisers representing Snap's crucial DR revenue had "successfully implemented" SKAN, which she expressly confirmed had "mitigat[ed]" the biggest threat facing Snap at that time.  ¶¶155-56.

As numerous courts have held under highly similar circumstances, Gorman "'<u>bridge[d] the [scienter] gap</u>' herself by referencing the data directly."  *Reese*, 747

F.3d at 572; *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (scienter where defendants "repeatedly described the state of [the company's] sales pipeline to analysts and investors"); *Longo v. OSI Sys.*, 2021 WL 1232678, at *9-10 (C.D. Cal. Mar. 31, 2021) (Olguin, J.) ("defendants monitored and specifically discussed" contract at issue and made "numerous public statements" discussing its importance). Indeed, "[i]f [Gorman] really had the intimate knowledge of [ATT and SKAN] and conditions in [Snap's DR business] that [she] claimed, it was at least deliberately reckless not to investigate the accuracy of [her] statements." *Evanston Police Pension Fund v. McKesson Corp.,* 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019); *see also Weston v. DocuSign, Inc.,* 2023 WL 3000583, at *21 (N.D. Cal. Apr. 18, 2023) ("statements on different earnings calls that indicate[d] [defendants] closely tracked [] data" supported scienter); *In re Zillow Grp., Inc. Sec. Litig.,* 2019 WL 1755293, at *20 (W.D. Wash. Apr. 19, 2019) (scienter found where defendants "display[ed] their familiarity with how the [] program was designed and operated").

### 2. Gorman Was Acutely Aware That The Market Heavily Relied On Her April 2021 Statements In Concluding That The ATT Changes Were "Not Likely Material" To Snap

The fact that analyst after analyst repeated verbatim the very statement that this Court has determined was materially false and misleading readily establishes Gorman's scienter. Indeed, Gorman—a highly seasoned senior executive who had served as Snap's spokesperson about its critical DR business for years—understood full well that the market adopted the plain meaning of her April 22, 2021 proclamation that a "majority" of advertisers representing Snap's crucial DR revenue "ha[d] successfully implemented SKAN," and that her assurance gave investors great comfort with respect to the biggest threat facing Snap at the time.

In fact, during the earnings call, a prominent analyst immediately seized upon the import of Gorman's words, asking her "what defined [the] success of that implementation," and whether Gorman "expect[ed] this to mitigate" ATT. ¶¶75, 156. Rather than retract or qualify her statement, Gorman instead reiterated that the

extensive delay in rolling out ATT "gave us a lot of time to prepare," and repeated that "we're really pleased to see that advertisers that represent the majority of our [DR] revenue have implemented [SKAN] so far."[2] *Id*.  Immediately after the April 22, 2021 earnings call, Snap's stock price surged, and a litany of analysts <u>directly quoted</u> Gorman's words in concluding that Snap was insulated from ATT's impact. ¶78-84, 86.  Indeed, Gorman's assurances were so significant that numerous analysts expressly concluded that Snap's "successful implementation" of SKAN gave it a competitive advantage and distinguished it from its main competitor Facebook— which was widely viewed as facing the same high exposure to ATT as Snap—such that ATT was now "manageable" and "minor" for Snap in comparison. ¶79, 84, 102.[3]

In response, Defendants' principal argument is to claim that Gorman really meant that only "some" of Snap's advertisers had merely "put SKAN in place" or "set SKAN up for use." DM at 1, 5, 11.  Not only is this clearly <u>not</u> what Gorman said, it is belied by the fact that <u>not a single analyst or media report</u> interpreted

[2] While Defendants assert that Gorman qualified her response by omitting the word "success" (DM 11), Defendants ignore that <u>the word "success" was already included in the analyst's question</u>, obviating any need to repeat it. ¶156. Rather than clarifying that "successfully implemented" only meant that advertisers had "put SKAN in place," as Defendants now argue (DM 1), Gorman instead directly confirmed that it should be understood to mean that the "IDFA headwinds" that represented the biggest threat by far facing Snap's business at the time were "mitigated"—which was exactly what analysts interpreted her words to mean.  Moreover, it bears noting that, even omitting the word "success," Gorman's statements were still misleading on their face: "implement" is defined by Merriam-Webster's Dictionary to mean "carry out, accomplish, especially:  to give practical effect to and ensure of actual fulfillment by concrete measure"—a far cry from merely "putting SKAN in place."

[3] Defendants barely respond to this compelling fact, stating in passing in a footnote that it purportedly renders Defendants' alleged fraud "implausible" because it would amount to Snap "overstat[ing]" the benefits of SKAN when SKAN had been offered to the entire industry. DM at 12, n.7. However, contrary to Defendants' assertions, the fact that Defendants' statements made the market believe that Snap would weather ATT much better than its main competitor only adds to the plausibility of Defendants' fraud. ¶61-62, 79, 84, 102, 166. Indeed, Defendants repeatedly touted Snap's purportedly positive relationship with Apple, in contrast to Facebook, which had launched a wide-ranging public attack on Apple to stop ATT. ¶55-57, 59-60, 179. This caused analysts to conclude that, "unlike Facebook," Snap had "play[ed] nice" with Apple and reaped the benefits by achieving a "successful implementation" of SKAN.  ¶79.

Gorman's statement in such a manner. Instead, throughout the Class Period, highly sophisticated analysts continued to credit Gorman's words in concluding that Snap's risk from ATT was "minimal" and "minor"—and Gorman never once walked back or retracted her statements to set the record straight, despite numerous opportunities to do so. If Gorman were truly misinterpreted, then surely she would have taken steps to clarify her critical statement on the single most important issue facing the Company. Instead, Gorman did the opposite, continuing to tout SKAN for the remainder of the Class Period. ¶¶97-102; *see In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017) (scienter found where analysts' "substantial interest" in inventory issue caused "any statement made by [defendants] on the topic [to be] of significant interest and importance to the market").

Tellingly, Defendants barely even attempt to contend with the damning market reaction to Gorman's statement, relegating their response to a footnote in which they claim that the market was merely reacting to Gorman's "initial[] optimis[m] that SKAN might work." DM at 17, n.9. However, Gorman's statement was clearly not "ambiguous" or an "optimistic prediction [that did not] pan out" (DM at 10, 11)—it was, instead, a concrete, past-tense statement specifically quantifying that advertisers representing a "majority" of Snap's most critical revenue stream "ha[d] successfully implemented" SKAN. And as shown above and in the TAC, that is exactly how the market understood her statement. ¶¶78-87.[4]

---

[4] Defendants cite a handful of cases in support of their assertion that warnings in their SEC filings or on conference calls negate Gorman's scienter. DM at 12. However, in each of those cases—which involved highly distinguishable facts and largely forward-looking statements—the court determined that the plaintiff had failed to allege false or misleading statements in the first instance. DM at 12, 18; *see In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424 (9th Cir. 1994) (no false or misleading statements in prospectus or IPO); *Jasin v. Vivus*, 2016 WL 1570164, at *15 (N.D. Cal. Apr. 19, 2016) (statement that regulatory body might request a further clinical study not false); *ScripsAmerica, Inc. v. Ironridge Global* LLC, 119 F. Supp. 3d 1213, 1259 (C.D. Cal. 2015) (no false or misleading statements in voluntary agreement between sophisticated parties); *McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *23 (N.D. Cal. Aug. 7, 2019) (no false or misleading statements because alleged omitted negative information was disclosed).

Similarly, Defendants' argument that Gorman's scienter is negated because she purportedly stated that Snap was "just beginning to implement and test" SKAN (DM at 11-12) <u>fundamentally distorts what Gorman actually said</u>.  Specifically, Gorman highlighted that Apple's months-long delay had given Snap ample time to implement and test SKAN's capabilities compared to IDFA, stating—in past-tense no less—that "[t]he fact that [ATT is] coming later than we anticipated <u>has provided additional time</u> to adopt [SKAN] and begin implementing and testing with our partners." ¶66.  Gorman's assurance was entirely consistent with the expectation of market commentators, who widely celebrated the delay as a "positive outcome" and a "sigh[] [of] relief" precisely because it would allow Snap to "run existing solutions <u>in parallel with testing Apple's [SKAN]</u>." ¶67.  It is for this reason that the numerous analysts who credited Gorman's April 22, 2021 statement took great comfort in the significance of Apple's delay, because as Gorman had confirmed, "<u>the delayed rollout allowed [Snap] more time to work with advertisers to adopt [SKAN]</u>." ¶177.

### 3. Well-Placed CW Accounts Further Confirm That Gorman Had No Reasonable Basis To Proclaim Any "Successful Implementation" Of SKAN On April 22, 2021—Or Ever

The TAC includes new accounts from CWs that further corroborate Plaintiff's allegations establishing that Gorman had no basis whatsoever for her April 22, 2021 false and misleading statements.  For example, CW 1, who directly worked on helping Snap's advertisers transition to SKAN, stated that SKAN had obvious and severe limitations from "day one"—such that advertisers did not want to implement it. ¶125.  As a result, and directly contrary to Gorman's statements, "there were very few adoptees in Q1 and Q2 of 2021." *Id*. Similarly, CW 2, who had a close working relationship with Gorman, also confirmed that Gorman had no basis for her statements because Snap had only barely begun working with advertisers on SKAN

---

In contrast, here, this Court has already held that Plaintiff adequately alleged that Gorman's concrete, past-tense April 22, 2021 statement was materially false and misleading.  Order at 32.  No amount of "warning" could negate Gorman's scienter under these circumstances.

at that time. ¶131-36. CW 2 emphasized that Gorman was "ear to the ground" at Snap and met with key advertisers "all the time," such that she "would have heard from multiple people" about SKAN's issues. ¶138. Significantly, in August 2021, CW 2 personally reviewed an internal spreadsheet that tracked DR advertisers' adoption of SKAN, and CW 2 confirmed that this spreadsheet showed that even at that late date—months after Gorman's statement—a "majority" of advertisers had not even "opted into" SKAN, let alone "successfully implemented" it. ¶137; *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1027 (N.D. Cal. 2020) (scienter found where "CW stated that [defendant] 'worked closely with the [relevant department], especially with [the VP of the relevant department]'").

Defendants' assertion (DM at 2) that this spreadsheet is meaningless because it showed that a majority of DR advertisers—as opposed to advertisers representing a majority of DR revenue—had not opted into SKAN is a distinction without a difference. Indeed, Defendants themselves later admitted that advertisers representing a majority of Snap's DR revenue did <u>not</u> "successfully implement" SKAN because SKAN <u>simply did not work</u>, which dramatically impacted Snap's crucial DR revenue. ¶¶105-08. Moreover, CW 2 described how Ouyang specifically commented based on what the spreadsheet showed that DR advertisers' adoption of SKAN was "<u>not looking good</u>," such that Snap was desperately trying to find other solutions for ATT—allegations Defendants completely ignore, and facts that would make no sense if SKAN had, in fact, been "successfully implemented" by advertisers representing a "majority" of the Company's crucial DR revenue. ¶¶136-37.[5]

CW 3, a former Partner of Product Marketing for Snap who directly reported

---

[5] Defendants' other attacks on CW 2 fall flat. DM at 13. Defendants continue to call CW 2 "junior level," despite CW 2's extremely close working relationship with Gorman, substantiated by documentary evidence, which included frequent texts and intimate revenue forecasting meetings. Defendants also assert that CW 2's account of the DR advertiser spreadsheet is unreliable because CW 2 shared no details about it, but this not true. CW 2 stated she viewed the spreadsheet in August 2021, that Data Scientist Ruxan Ouyang who was overseeing the spreadsheet personally showed it to her, and that it showed the rate of DR advertisers' adoption of SKAN.

to the Head of Global Product Marketing, likewise confirmed Snap "had no solution" for ATT, and that there was "no way" that "Gorman could have made a statement like that based on actual data." ¶145-47. CW 4, a former employee of one of Snap's partners, also confirmed that Snap had no workable solution for ATT when it was rolled out in April 2021—resulting in Snap suffering a "super drastic" impact from the changes by no later than May 2021, with advertisers widely "shut[ting] down their campaigns on Snapchat." ¶149-52. The numerous additional accounts from well-placed CWs, each of whom were in a position to know the information attributed to them, provide compelling support for scienter. *Jaeger v. Zillow Grp., Inc.,* 2022 WL 17486297, at *9 (W.D. Wash. Dec. 7, 2022) (former employee accounts and core operations inference supported strong inference of scienter).

Defendants' remaining attacks on Plaintiff's CWs are unavailing. DM at 12-17. While Defendants argue that these CWs did not directly share negative information about SKAN with Gorman, as the TAC's new allegations make clear, and as CW 2 explained, Gorman was heavily and intimately involved in Snap's DR business and would have received reports on these critical matters from "multiple people." ¶138. Moreover, the CW accounts are corroborated by Defendants' own admissions at the end of the Class Period that SKAN was "unreliable" and "rendered [advertisers] blind," such that no "successful implementation" of SKAN was ever even possible—thus confirming that, as the CWs described, Gorman never had any basis to proclaim that SKAN had been "successfully implemented." ¶105.

### 4. Analysts Questioned Defendants' Credibility Precisely Because Snap's Disclosure Did Not Align With Defendants' Prior Statements, Thereby Supporting Gorman's Scienter

At the end of the Class Period, analysts excoriated Snap's management precisely because Snap's admissions did not align with Defendants' prior statements about the risk that ATT posed to Snap. RBC emphasized that "<u>management's credibility is likely gone given recent communications did not indicate these risks [regarding ATT]</u>," and MKM Partners similarly opined that it was "<u>surprised with</u>

the change of management's tone with regards to the effect of [ATT] on Snap's ad business." ¶¶110-11, 181.  The fact that these highly experienced tech analysts who closely followed Snap uniformly concluded that Defendants' credibility was "likely gone" due to their misrepresentations bolsters an inference of scienter.  *See In re FibroGen, Inc.*, 2022 WL 2793032, at *22 (N.D. Cal. July 15, 2022).

**5. Under Ninth Circuit Precedent And This Court's Prior Order, The Fact That Gorman's False Statement Concerned Snap's Core Business Supports Scienter**

While the Court's prior Order determined that the scienter analysis under the Ninth Circuit's core operations doctrine was a "close call" (Order at 37), Plaintiff respectfully submits that the TAC's new allegations satisfy the PSLRA's scienter requirement under that doctrine as part of a holistic analysis.  *Reese*, 747 F.3d at 575; *see also Jaeger,* 2022 WL 17486297, at *9 ("The Court may infer 'that facts critical to a business's core operations ... are known to a company's key officers.'").  In addition, the Ninth Circuit has found that core operations allegations can "independently" give rise to a strong inference of scienter in two circumstances:  (1) where the complaint's allegations "are particular and suggest that defendants had <u>actual access</u> to the disputed information"; and (2) "where the nature of the relevant fact is of such prominence that it would be '<u>absurd</u>' to suggest that management was without knowledge of the matter."  *Reese*, 747 F.3d at 575-76.  Plaintiff respectfully submits that both prongs are satisfied here.

*First*, the TAC's allegations satisfy the "actual access" prong.  Indeed, the TAC readily establishes that Gorman made <u>numerous</u> public statements demonstrating her intimate, direct involvement overseeing Snap's advertisers' transition to SKAN.  ¶¶94-95, 98, 173-74.  As the Ninth Circuit has explained, where a defendant makes misleading misstatements concerning matters about which they claim to have detailed knowledge, "[i]t is unclear what further facts plaintiffs would need to plead to create a stronger inference that [they] had access to [the] information [they] discussed publicly."  *Reese*, 747 F.3d at 572.  Similar to *Reese*, the inference

that Gorman did not have access to advertisers' feedback regarding SKAN is directly contradicted by her own concrete, specific (and repeated) statements to investors that a "majority" of the Company's critical DR advertisers "ha[d] successfully implemented SKAN"—at a time when the impending ATT changes posed the biggest threat by far to Snap's business.  Indeed, considering Gorman's position and role at Snap, she "would be among the first to know" of these issues.  *Id*.

*Second*, with respect to the "absurdity" prong, this Court previously found that whether Plaintiff had adequately pleaded scienter was a "close call" because Plaintiff had adequately alleged that "any deficiencies with SKAN would be of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."  Order at 37.  Critically, however, the Court nonetheless determined that Plaintiff fell short of meeting the absurdity test absent "specific facts showing that Gorman knew of SKAN's deficiencies at the time her allegedly false statements were made."  *Id.*  Plaintiff respectfully submits that, under settled Ninth Circuit law, where a plaintiff has alleged (as the Court previously determined here) that "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter" (Order at 37), such allegations are sufficient on their own to support a strong inference of scienter—"without accompanying particularized allegations" that management had access to contrary information.  *Reese*, 747 F.3d at 576; *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (under absurdity prong plaintiff did not need to allege "particular facts indicating that [defendants] actually knew" information contradicting their false statements).

Moreover, the TAC includes numerous new allegations that confirm that it would have indeed been "absurd" for Gorman not to have understood the falsity and materiality of her statements, particularly in light of the critical importance of SKAN.  The Ninth Circuit's decision in *Reese* is instructive.  In that case, the Ninth

Circuit found that the "absurdity" prong was satisfied even if plaintiffs "did not allege *any* specific facts showing that [Johnson] actually knew" about information contradicting her public statements regarding pipeline corrosion rates because she was the "head of the Prudhoe Bay operations and an experienced chemical engineer," and had taken "an active role in communicating to the press regarding the condition of the pipelines." 747 F.3d at 172. Similarly, here, Gorman oversaw Snap's DR business and served as its spokesperson about ATT and SKAN, the single most critical issue facing Snap at the time. ¶25, 59, 90-95. Thus, it would be "absurd to believe that [Gorman] did not have knowledge of information contradicting her statements," or, "[a]t the very least," knowledge "that it would be deliberately reckless" to proclaim a "successful implementation" of SKAN. *Reese*, 747 F.3d at 576; *see also Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1145 (N.D. Cal. 2017) ("DAU and MAU were so integral to Twitter's success that it would be 'absurd' to argue" that defendants were unaware of downward trends in those metrics); *Azar v. Yelp, Inc.,* 2018 WL 6182756, at \*20 (N.D. Cal. Nov. 27, 2018) (defendants could "be presumed to have knowledge" about advertiser program representing majority of Yelp's revenue); *Berson*, 527 F.3d at 987 ("absurd" for defendants to be unaware of stop-work orders that would have a "devastating effect" on company's business).[6]

Defendants argue that the core operations inference is inapplicable because there is no basis to assume Gorman knew about the problems Snap's DR advertisers were experiencing with SKAN on April 22, 2021, before ATT was fully rolled out. DM at 19. But this ignores the fact that the Court already held that Gorman's statement was materially false. Order at 32. So even if, as Defendants assert,

---

[6] Defendants' reliance on *In re Twitter, Inc.*, 506 F. Supp. 3d 867, 876 (N.D. Cal. 2020) is misplaced. DM at 20-21. In *Twitter*, the court refused to apply the core operations inference because plaintiffs did not allege "facts supporting the inference that the [privacy change]'s impact on the company's financials was so dramatic that it would be absurd to think that [defendants] did not know that something was wrong." *Id.* at 889. However, Twitter's advertising only represented 20% of its revenue, while advertising represents substantially all of Snap's revenue here.

Gorman had no information about SKAN's capabilities in April 2021, then Gorman was <u>deliberately reckless</u> in proclaiming that it had been "successfully implemented." As this Court observed, if in April 2021 "nobody had made a determination as to SKAN's success," then Gorman had no business "talking about this at all." ECF No. 115 at 21-22; *McKesson,* 411 F. Supp. 3d at 602 (scienter found where defendants attributed generic drug price increases to legitimate factors without investigating the accuracy of their statements); *Patel v. Axesstel, Inc.*, 2015 WL 631525, at *11 (S.D. Cal. Feb. 13, 2015) (defendants were "deliberately reckless" by not "confirming the existence of contracts with set payment terms in place").

Moreover, as noted above, the TAC's new allegations establish that, by April 2021, Snap had been testing SKAN's capabilities extensively with its advertisers <u>for months</u>—a fact Gorman <u>herself</u> highlighted. ¶68-71, 74. Defendants also argue that Gorman would not have known about issues DR advertisers were having with SKAN because SKAN was a third-party product used by third party advertisers, but this is illogical. DM at 20. Snap's sole product is Snapchat, which can only run on devices manufactured by third parties (Apple, Samsung, etc.)—and virtually all of Snap's revenue comes from third party advertisers in the Snapchat app who in turn depended on Apple's IDFA tracking—rendering it indeed "absurd" that management would fail to pay attention to such critical aspects of Snap's business.[7]

Finally, Defendants' argument that the more "plausible" inference is that Gorman made an "optimistic prediction[] [that] did not pan out," and was merely "trying to respond to uncertainty created by ATT and SKAN," is belied by the facts.

_____

[7] Defendants half-heartedly argue that Plaintiff has failed to plead motive (DM at 3)—but it is well settled that motive "is not a required element of scienter or of fraud in general[,] [n]or is insider trading required to show scienter." *In re Ramp Networks, Inc. Sec.*, 201 F. Supp. 2d 1051, 174 n.6 (N.D. Cal. 2002); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period.")

DM at 1, 21. Indeed, in light of the TAC's new allegations, any notion that Gorman was somehow unaware of the misleading nature of her statement—concerning what she <u>knew</u> was by far the key investor concern at the time—is simply implausible. At best, the Court's prior holding on falsity applies equally to scienter: "<u>Defendants' alternative interpretation of Gorman's statement 'only demonstrates that a factual dispute exists which cannot be resolved at the pleading stage</u>.'" Order at 32.

### B.    The TAC Adequately Alleges A §20(A) Claim Against Spiegel

The Ninth Circuit has held that "in order to prove a prima facie case under Section 20(a), plaintiff must prove: (1) a primary violation of federal securities laws ... and (2) that the defendant exercised actual power or control over the primary violator"—which "is an intensely factual question." *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1065 (9th Cir. 2000). Here, contrary to Defendants' assertions (DM at 21-22), there is no question that Spiegel was a control person. Indeed, Snap's own SEC filings note that "Spiegel alone c[ould] exercise voting control over a majority of [Snap's] voting power," and that he had "control over [Snap's] day-to-day management and the implementation of major strategic investments." ¶30.

Spiegel also made public statements that mirrored Gorman's false statements during the Class Period (¶¶213-14), and he co-hosted the conference call "where the challenged statements were made, and he could have corrected the record, disclosed omitted facts, and explained that [Snap] faced issues [] that may undermine its earnings." *In re Apple Inc. Sec. Litig.,* 2020 WL 6482014, at *14 (N.D. Cal. Nov. 4, 2020). Accordingly, Spiegel can be held liable as a control person at the pleading stage. *In re Energy Recovery Inc. Sec. Litig.,* 2016 WL 324150, at *25 (N.D. Cal. Jan. 27, 2016) (allegations that CEO "ran the day-to-day operations" of company sufficient at pleadings stage "to state a claim for control person liability").

### IV.    CONCLUSION

For all of these reasons, Defendants' motion should be denied in its entirety.

Dated: July 28, 2023

Respectfully submitted,

**SAXENA WHITE P.A.**

By: */s/    David R. Kaplan*

David R. Kaplan (SBN 230144)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

Maya Saxena
Joseph E. White, III
Lester R. Hooker (241590)
Dianne M. Pitre (286199)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone:   (561) 394-3399
Facsimile:   (561) 394-3382
E-mail:       msaxena@saxenawhite.com
              jwhite@saxenawhite.com
              lhooker@saxenawhite.com
              dpitre@saxenawhite.com

Steven B. Singer
Kyla Grant
Marisa N. DeMato
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone:   (914) 437-8551
Facsimile:   (888) 631-3611
E-mail:       ssinger@saxenawhite.com
              kgrant@saxenawhite.com
              mdemato@saxenawhite.com

*Lead Counsel for Lead Plaintiff and the Class*

**BIENERT KATZMAN LITTRELL WILLIAMS LLP**
John L. Littrell (SBN 221601)
jlittrell@bklwlaw.com
Michael R. Williams (SBN 192222)
mwilliams@bklwlaw.com
360 E. 2nd St., Suite 265
Los Angeles, CA 90012
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

*Local Counsel for Lead Plaintiff and the Class*

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

I HEREBY CERTIFY that, on July 28, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 28, 2023.


*/s/ David R. Kaplan*