**SAXENA WHITE P.A.**
David R Kaplan (230144)
dkaplan@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

*Additional Counsel listed on signature page*

*Lead Counsel for Lead Plaintiff
and the Class*

**BIENERT KATZMAN
LITTRELL WILLIAMS LLP**
John L. Littrell (221601)
jlittrell@bklwlaw.com
Michael R. Williams (192222)
mwilliams@bklwlaw.com
360 E. 2nd Street, Suite 265
Los Angeles, CA 90012
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

*Liaison Counsel for Lead Plaintiff
and the Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| KELLIE BLACK, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>SNAP INC., EVAN SPIEGEL, and JEREMI GORMAN,<br><br>　　　　Defendants. | No. 2:21-cv-08892-GW (RAOx)<br><br>CLASS ACTION<br><br>LEAD PLAINTIFF'S [CORRECTED] OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT<br><br>Date:  September 11, 2023<br>Time:  8:30 A.M.<br>Courtroom: 9D<br>Assigned to Honorable George H. Wu |

# **TABLE OF CONTENTS**

I.      INTRODUCTION………………………………………………………………..1

II.     THE TAC'S ALLEGATIONS ESTABLISH SCIENTER ………………… 5

    A.  During The Class Period, SKAN's Viability As A Tracking Tool Was The Single Most Important Issue Facing Snap ...................5

    B.  Apple Delays ATT A Half-Year To Provide Ample Time To Prepare For The Changes And Test SKAN's Capabilities.................6

    C.  Gorman Twice Assures Investors That Advertisers Representing A "Majority" Of Snap's Critical DR Revenue "*Have Successfully Implemented*" SKAN .......................................6

    D.  Analysts Repeated Gorman's Words To Conclude That "IDFA's Impact [Was] Not Likely Material" For Snap ......................7

    E.  Gorman Never Walks Back Her Statements.........................................8

    F.  Snap Shocks The Market, Admitting That SKAN Was Unworkable And ATT Had Severely Impacted Snap's Business ........9

    G.  CWs Confirm That Gorman Had No Basis For Her Statement..........10

III.    ARGUMENT……………………………………………………………….. 11

    A.  The TAC Adequately Pleads Scienter .............................................11

        1.  As The Senior Most Officer Responsible For Snap's Response To ATT, Gorman Knew Full Well That SKAN's Viability Was The Most Critical Issue Facing The Company....................................................................11

        2.  Gorman Was Acutely Aware That The Market Heavily Relied On Her April 2021 Statements In Concluding That The ATT Changes Were "Not Likely Material" To Snap .................................................................................13

        3.  Well-Placed CW Accounts Further Confirm That Gorman Had No Reasonable Basis To Proclaim Any "Successful Implementation" Of SKAN On April 22, 2021—Or Ever....................................................................15

        4.  The Fact That Gorman's False Statement Concerned Snap's Core Business Supports Scienter................................17

    B.  The TAC Adequately Alleges A §20(A) Claim Against Spiegel.......21

IV.    CONCLUSION……………………………………………………………… 21

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Azar v. Yelp, Inc.,*
  2018 WL 6182756 (N.D. Cal. Nov. 27, 2018)......................................................19

*Berson v. Applied Signal Tech., Inc.,*
  527 F.3d 982 (9th Cir. 2008) ...................................................................18, 19

*Commc'ns Workers of Am. Plan for Emp.' Pension & Death*
  *Benefits v. CSK Auto Corp.,*
  525 F. Supp. 2d 1116 (D. Ariz. 2007) ...............................................................11

*Evanston Police Pension Fund v. McKesson Corp.,*
  411 F. Supp. 3d 580 (N.D. Cal. 2019)..........................................................13, 20

*Howard v. Everex Sys., Inc.,*
  228 F.3d 1057 (9th Cir. 2000) ..........................................................................21

*In re Apple Inc. Sec. Litig.,*
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .......................................................21

*In re Energy Recovery Inc. Sec. Litig.,*
  2016 WL 324150 (N.D. Cal. Jan. 27, 2016) ........................................................21

*In re FibroGen, Inc.,*
  2022 WL 2793032 (N.D. Cal. July 15, 2022) .....................................................17

*In re Finisar Corp. Sec. Litig.,*
  2017 WL 1549485 (N.D. Cal. May 1, 2017) .......................................................13

*In re Quality Sys., Inc. Sec. Litig.,*
  865 F.3d 1130 (9th Cir. 2017)..........................................................................12

*In re Ramp Networks, Inc., Sec.,*
  201 F. Supp. 2d 1051 (N.D. Cal. 2002)...............................................................20

*In re Twitter, Inc.,*
  506 F. Supp. 3d 867 (N.D. Cal. 2020)................................................................19

*In re Worlds of Wonder Sec. Litig.,*
  35 F.3d 1407 (9th Cir. 1994) ...........................................................................14

*In re Zillow Grp., Inc. Sec. Litig.*,
   2019 WL 1755293 (W.D. Wash. Apr. 19, 2019) ................................................. 13

*Jaeger v. Zillow Grp., Inc.*,
   2022 WL 17486297 (W.D. Wash. Dec. 7, 2022) ................................................ 17

*Jasin v. Vivus*,
   2016 WL 1570164 (N.D. Cal. Apr. 19, 2016) ..................................................... 15

*Longo v. OSI Sys.*,
   2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) .................................................... 12

*McGovney v. Aerohive Networks, Inc.*,
   2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) ...................................................... 15

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp. 3d 999 (N.D. Cal. 2020) ................................................................ 16

*No. 84 Employer-Teamster Joint Council Pension Trust*
   *Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ............................................................................... 20

*Patel v. Axesstel, Inc.*,
   2015 WL 631525 (S.D. Cal. Feb. 13, 2015) ...................................................... 20

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ....................................................................... *passim*

*Schueneman v. Arena Pharm., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ............................................................................... 11

*ScripsAmerica, Inc. v. Ironridge Global LLC*,
   119 F. Supp. 3d 1213 (C.D. Cal. 2015) .............................................................. 15

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) .............................................................. 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................................................. 11

*Weston v. DocuSign, Inc.*,
   2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) ................................................... 13

# I. __INTRODUCTION__[1]

Leading up to the Class Period, Snap faced an existential threat to its business. In June 2020, Apple announced privacy changes to its operating system called "ATT." Once rolled out, ATT would effectively <u>eliminate</u> automatic user activity tracking (called "IDFA"), which Snap depended on to run the most important aspect of its business: direct response ("DR") advertising. Without IDFA, Snap's DR advertisers would not be able to track user activity, and as a result, Snap's advertising revenue would suffer dramatically. To help companies like Snap adapt to the coming changes, Apple provided an alternative tracking tool called "SKAN"—and in September 2020, Apple announced that it would delay ATT for at least a half-year, to "early 2021," to allow companies like Snap more time to implement and test SKAN's capabilities. Thus, by the start of the Class Period, the question of whether SKAN was a viable tracking tool was indisputably the single most important issue facing Snap.

It was within this context that, at the start of the Class Period, Defendant Gorman provided investors with the reassurance they wanted to hear. Specifically, on April 22, 2021, Gorman stated that the extended delay had "provided additional time to adopt [SKAN] and begin implementing and testing with our partners," and then triumphantly proclaimed that "<u>[a]dvertisers that represent a majority of [Snap's] direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns</u>." Gorman's statement was so important that analysts immediately asked "what defined [the] success of that implementation," and whether investors should "expect [it] to mitigate some of the IDFA headwinds that have been <u>a source of investor concern</u>." In response, Gorman did not in any way retract or back away from her statement. To the contrary, she reiterated that the extended delay "gave us a lot of time to prepare" for ATT, and that "<u>we're really pleased to</u>

---

[1] "¶ " refers to the "TAC" or "Complaint," ECF No. 120. "DM" refers to Defendants' Motion to Dismiss, ECF No. 121.

see that advertisers that represent the majority of our [DR] revenue have implemented [SKAN] so far." The market celebrated: Snap's stock price surged over 7%, and a multitude of analysts specifically repeated verbatim Gorman's assurances in concluding that the upcoming ATT changes were "not likely material" to Snap's business.

However, as Defendants would be forced to admit, Gorman's statement was utterly false. On October 21, 2021, Defendants admitted that, in reality, SKAN was completely unworkable as a tracking tool and had "rendered [advertisers] blind." As a result, Snap's business cratered, forcing it to reduce revenue guidance by 50% for the fourth quarter of 2021, and analysts dramatically slashed 2022 EBITDA estimates by as much as 40%. Snap's stock price plunged 26% in a single day, wiping out $27 billion in market capitalization, and analysts excoriated Defendants for their misrepresentations.

In its March 13, 2023 Order, the Court held that Plaintiff had "plausibly alleged" that Gorman's April 22, 2021 statement was materially false and misleading because investors "interpret[ed] Gorman's statement as a sign that SKAN worked and would 'mitigate against a meaningful adverse outcome for Snap.'" ECF No. 115 ("Order") at 32. The Court further determined that while Plaintiff had fallen short of alleging scienter, it was a "close call." Order at 37. Accordingly, in line with the Court's determinations, the TAC (i) removed statements dismissed on falsity grounds, and (ii) added numerous allegations that readily establish, at a minimum, that Gorman was reckless when she made her false statement.

*First*, the TAC includes detailed new allegations establishing that Gorman was Snap's most senior officer specifically charged with directing Snap's response to ATT and its implementation of SKAN. Significantly, Snap's own CEO, Defendant Spiegel, repeatedly underscored that Gorman was the most knowledgeable person at Snap about these issues—to the extent that Spiegel

specifically stated, in response to analysts' questions about ATT and SKAN, that Gorman was "<u>better positioned</u>" to address those queries.   Gorman was thus undeniably aware of both the import and the impact of her false statement.

*Second*, the TAC establishes that the ATT rollout was delayed <u>over six months</u> precisely to give companies like Snap additional time to adopt and test SKAN. Gorman herself emphasized that the extended delay "gave us a lot of time to prepare" and had "provided [Snap] additional time to adopt [SKAN] and begin implementing and testing with our partners."   Thus, Gorman's intended meaning of the "successful implementation" of SKAN was clear: after months of testing, SKAN had proven to be an effective replacement for IDFA, such that the ATT risk was "mitigat[ed]."

*Third*, the TAC establishes that Gorman <u>knew</u> that the market was heavily relying on her statement, and that analysts specifically cited her words to conclude that SKAN's "successful implementation" "<u>would 'mitigate against a meaningful adverse outcome for Snap.</u>'"   Order at 32.   Indeed, the TAC includes reports from numerous analysts, all of which uniformly cited Gorman's false assurances in concluding that "<u>IDFA's Impact [was] Not Likely Material</u>" and that they "<u>now see reduced risks</u>" from ATT, precisely because—as Gorman represented—"<u>the delayed rollout allowed more time to work with advertisers to adopt [SKAN]</u>."   Significantly, analysts also concluded that Snap's "successful implementation" of SKAN distinguished it from primary competitor Facebook—which had waged a public campaign against ATT and issued dire warnings that it would "severely impact" its DR business—such that the ATT risk to Snap was "manageable" and "minor" in comparison.

*Fourth*, the TAC includes additional accounts from former employees— including individuals with close working and personal relationships with Gorman— that confirm that Gorman had no basis whatsoever to make her false statement. These CWs stated that Gorman could not "justify" her statement because in April

2021, Snap had only barely begun to work with its DR advertisers on SKAN, and that, even as late as August 2021, a majority of Snap's DR advertisers had not taken the initial steps to "opt in" to SKAN—let alone "successfully implement" it. As a result, "<u>there [was] no way that Jeremi Gorman could have made a statement like that [in April 2021] based on actual data</u>"—"<u>she just made that up</u>."

In the face of these compelling allegations, Defendants' motion is more remarkable for what it does not dispute than what it does. Indeed, Defendants do not dispute (because they cannot) that Gorman was the officer responsible for communicating with investors about SKAN, and that Gorman <u>knew</u> that the market relied heavily on her statements about SKAN's "successful implementation" in concluding that Snap had "mitigated" ATT. Instead, Defendants ask the Court to conclude, at the pleading stage, that what Gorman *really* meant was that only "some" advertisers had merely "put SKAN in place." DM 1. But this assertion is completely contradicted by Gorman's own words <u>and</u> the avalanche of analysts that cited those words and concluded that they meant the <u>opposite</u> of what Gorman says now. Tellingly, Defendants ignore these critical analyst reports, relegating their response to a single footnote in which they implausibly assert that the analysts were merely noting Gorman's "optimis[m]" about SKAN. DM 17, n.9. That is simply not true— the analysts repeated Gorman's words <u>verbatim</u> in concluding that the ATT risk was "<u>not likely material</u>." There was nothing unclear or confusing about her statement. While Gorman now claims that she was misunderstood, she <u>never once</u> tried to retract or clarify her statements, despite having numerous opportunities to do so.

Defendants' other argument—that Gorman could not have been aware of any issues with SKAN because April 2021 was too "early in the [ATT] rollout"—also fails. DM 3, 19-20. Again, Defendants' assertion is contradicted by Gorman's own words: she did not say that Snap had insufficient time to test SKAN, or that it was too early to know if SKAN worked. Instead, Gorman emphasized that the multi-

month delay "gave us a lot of time" to implement SKAN—which analysts again repeated in concluding that ATT was "not likely material" for Snap.  Moreover, even if this assertion were true, <u>it would only confirm that Gorman had no basis whatsoever to proclaim to investors that any "successful implementation" of SKAN had occurred</u>.  As this Court aptly observed during the hearing on the prior motion to dismiss, even if by April 2021 "nobody had [yet] made [any] determination as to SKAN's success and whether or not it would be successful" (Mar. 13, 2023 Hr'g Tr. at 21:23-22:5), then Gorman <u>had no business making her proclamation</u>—the very definition of recklessness.

In sum, Defendants cannot escape liability simply by saying: "I meant something else"—particularly when that excuse is contradicted by the plain meaning of Gorman's own words, and the visceral reaction of the market.

## II.   <u>THE TAC'S ALLEGATIONS ESTABLISH SCIENTER</u>

### A.   **During The Class Period, SKAN's Viability As A Tracking Tool Was The Single Most Important Issue Facing Snap**

Leading up to the Class Period, Defendants stressed that DR advertising was Snap's most critical business, representing 65-70% of revenue, and the key driver of Snap's revenue growth.  ¶¶34-39, 139.  Snap's DR revenue heavily depended upon advertisers' ability to track users' activity, enabled by IDFA on Apple devices. ¶¶41-46.

In June 2020, Apple announced ATT privacy changes that would discontinue "automatic" IDFA tracking and instead require users to "opt in" to this tracking. ¶¶47-48.  Significantly, because industry participants widely expected most Apple users to "opt out," analysts specifically highlighted that ATT was a "huge problem" for Snap, that "Snapchat…would be at risk," and that advertisers "will have to find other ways to attribute ad effectiveness." ¶¶49-50.  To address this, Apple rolled out SKAN, an alternative tracking tool. ¶51.  As a result, SKAN's viability was the <u>most important issue</u> facing Snap leading up to the Class Period.

**B.**   **Apple Delays ATT A Half-Year To Provide Ample Time To Prepare For The Changes And Test SKAN's Capabilities**

On September 3, 2020, Apple announced that ATT would be delayed by six months "to give developers [*i.e.*, Snap] time to make necessary changes."  ¶66. Analysts celebrated this "positive outcome" as a "sigh [of] relief," precisely because it allowed providers like Snap ample time to test SKAN's capabilities and "compare" them to IDFA.  ¶¶66-67.

Significantly, Gorman specifically represented that Snap took advantage of this delay to conduct this testing, stating on Snap's February 4, 2021 call that Snap was "<u>really well prepared</u>" to deal with ATT because it had been "<u>working really closely with Apple to implement [SKAN]</u>" and "<u>communicating very well with advertisers</u>" about ATT and SKAN to "<u>mitigate</u>" ATT. ¶59.  Gorman also confirmed that she could speak to "<u>what advertisers and agencies are saying to us</u>," and described "<u>a lot of conversations we're having with advertisers</u>" about ATT and SKAN.  ¶94.  Likewise, on February 18, 2021, Snap's own marketing partners announced—after working "directly" with Snap for "several months"—that SKAN had been fully set up for Snap's advertisers to test and use to "ensure there will be no disruption" to their Snapchat campaigns "when Apple releases [ATT]." ¶¶68-71.

**C.**   **Gorman Twice Assures Investors That Advertisers Representing A "Majority" Of Snap's Critical DR Revenue "*Have Successfully Implemented*" SKAN**

In March 2021, Apple delayed the ATT rollout again, giving Snap more time to test and implement SKAN.  ¶72.  Finally, on April 20, 2021—<u>a full ten months</u> after the ATT changes had been announced—Apple announced that ATT would roll out on April 26, 2021. *Id.*  By this time, the only question for the market was whether SKAN was a viable alternative to IDFA.

Two days later, Gorman gave investors that exact reassurance.  On Snap's April 22, 2021 earnings call, Gorman confirmed that Apple's months-long delay "ha[d] provided [Snap with] additional time to adopt [SKAN] and begin

implementing and testing" with Snap's advertisers.  ¶74.  Gorman then explicitly proclaimed that "[a]dvertisers that represent a majority of our direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns." *Id*.

Gorman's words were highly important to investors, and analysts on the call immediately seized upon them, asking "what defined success of that implementation," and whether it would "mitigate some of the IDFA headwinds that have been a source of investor concern." ¶75.  Significantly, in response, Gorman did not qualify or correct her statement in any way.  To the contrary, Gorman repeated that the delay "gave us a lot of time to prepare and [SKAN] is one part of that," and that as a result, "we're really pleased to see that advertisers that represent the majority of our [DR] revenue have implemented [SKAN] so far." ¶156.

**D.    Analysts Repeated Gorman's Words To Conclude That "IDFA's Impact [Was] Not Likely Material" For Snap**

Tellingly, the market responded immediately to Gorman's statements, with Snap's stock price surging over 7%.  ¶77.  Significantly, analyst after analyst repeated verbatim Gorman's assurances, specifically noting her representation that the extended delay had provided advertisers with ample time to implement SKAN:

- **Truist:** "IDFA's Impact [was] Not Likely Material" because "advertisers that represent a majority of [Snap's] [DR] ad revenue have successfully implemented [SKAN] for their Snap campaigns."  ¶79.

- **Guggenheim:** because the "majority of [Snap's] DR advertisers [are] navigating [ATT] with Snap via [SKAN]," Snap "did not experience monetization impacts from [ATT]." ¶80.

- **JMP:** concluded that "given 50%+ of Snap's [DR] advertising partners have adopted [SKAN] . . . we view [ATT] as less of a risk than previously." ¶81.

- **Oppenheimer:** "we now see reduced risks from [Apple's] removal of

IDFA[] as the delayed rollout allowed more time to work with advertisers to adopt [SKAN]." ¶82.

- **Piper Sandler:** Snap was "[c]onstructive" on ATT because "[t]he majority of SNAP's DR advertisers have adopted [SKAN]." ¶82.

- **Raymond James:** "Snap noted that advertisers that represent a majority of its [DR] ad revenue have successfully implemented [SKAN] for their Snap campaigns." ¶83.

- **Canaccord Genuity:** "the delayed roll out [] has given Snap time to implement and test [SKAN] with a majority of its DR advertisers." ¶83.

- **J.P. Morgan:** "Apple's delay in implementing ATT helped SNAP get more marketers onto [SKAN]." ¶83.

- **Bloomberg:** " advertisers representing a majority of [Snap's] [] ad revenue 'have successfully implemented [SKAN],'" which "[e]as[ed] [c]oncerns [o]ver Apple [p]olicy [i]mpact." ¶84.

Gorman's statements were so significant that analysts noted that they gave Snap a competitive advantage, as they sharply contrasted with those of primary competitor Facebook—which had repeatedly warned of ATT's "severe" impact and was widely viewed as facing the same high exposure to ATT as Snap. For example, Truist concluded that "[u]nlike [Facebook]"—"which ha[d] taken a confrontational tone with Apple"—the "[u]pcoming IDFA [d]eprecation [w]as [l]ikely [m]anageable" for Snap. ¶79. *SocialMediaToday* similarly highlighted that "[a]dvertisers that represent a majority of [Snap's] [DR] advertising revenue have successfully implemented [SKAN] for their Snap campaigns," which was a "positive report for Snap" compared to its competitors. ¶84.

### E.   Gorman Never Walks Back Her Statements

At no point did Gorman ever clarify or walk back her highly material remarks, despite repeated opportunities to do so. To the contrary, Gorman continued to assure

investors that SKAN was effective—leading analysts to conclude that the risk ATT posed to Snap was "<u>minimal</u>."  ¶¶97-98.  For example, on a July 22, 2021 call, Gorman touted the "continued success" of Snap's DR business, and repeatedly asserted—including in response to analyst questions about whether ATT was "actually affecting targeting" and whether SKAN was proving to be effective—that "<u>we know [that SKAN] will aid, or we believe [that it] will aid, in attribution for advertisers [*i.e.*, measurement of ad efficacy]</u>." ¶98.

Based on Gorman's repeated assurances, analysts concluded that, in contrast to Facebook, the ATT risk to Snap's business was "minimal."  ¶99-102.  For example, Morningstar reported that "<u>the impact of [ATT] will remain minimal</u>" because "<u>Snap has already been working with Apple to use its [SKAN] data with [Snap's] and its advertisers' first party data</u>." ¶100.  Evercore and Jeffries likewise reported that the ATT risk for Snap would likely "<u>be minimal</u>." ¶99.  Even mere days before the truth was revealed, J.P. Morgan, Truist and MKM Partners all concluded that "<u>SNAP has limited exposure to [ATT],</u>" that IDFA would have a "<u>minor impact</u>" on Snap, and that, in stark contrast to Facebook, Snap had "<u>clearly mitigated [the ATT] headwind</u>." ¶102.

### F.  Snap Shocks The Market, Admitting That SKAN Was Unworkable And ATT Had Severely Impacted Snap's Business

On October 21, 2021, Snap stunned the market by announcing that it had missed the lower end of its third quarter revenue guidance <u>for the first time in Company history</u>. ¶103.  Snap also dramatically reduced its fourth quarter revenue guidance to just $135-$175 million, <u>55% below</u> Wall Street consensus. *Id.*

Significantly, Snap directly attributed these dismal results to SKAN's utter failure as an ad tracking tool, to the point that SKAN was completely "unreliable" and ineffective, such that advertisers had been "rendered blind." ¶¶104-08. Specifically, Gorman admitted that Snap's DR advertisers had in fact only barely begun to "explore[] and test[] [SKAN]," and upon doing so, had immediately

"surfaced a variety of concerns about its limitations" as they were: (i) "unable to target advertising"; (ii) "no longer able to understand the impact of their unique campaigns"; and (iii) unable to observe their ad campaigns in real time.   ¶¶105-06. In sum, SKAN was completely devoid of the key IDFA features that were absolutely critical to Snap's DR advertising business.

In response, Snap's stock price plunged 26%, wiping out $27 billion in market capitalization—the largest one-day decline in Snap's history. ¶109.

### G.   CWs Confirm That Gorman Had No Basis For Her Statement

Well-placed CWs confirmed that Gorman had no basis for her statement.

CW 1, a former Snap Account Strategist who worked directly on transitioning DR advertisers from IDFA to SKAN, stated that, in sharp contrast to Gorman's April 2021 statement, the exact opposite was true.   ¶¶124-25.  CW 1 stated that, in reality, the "majority" of Snap's DR advertisers had instead "dragged their feet as long as possible" due to SKAN's severe drawbacks, and as a result, by April 2021, "there were very few adoptees [of SKAN] in Q1 and Q2 of 2021."  ¶125.

CW 2—known as the "revenue forecasting" person at Snap—had an extremely close working relationship with Gorman, as evidenced by personal messages she received from Gorman.   ¶¶128, 131-35.   CW 2 stated that Gorman could not "justify saying things were successfully implemented" in April 2021 because Snap barely had any data regarding SKAN's viability at that time.   ¶136. CW 2 explained that, in late August 2021, when she was tasked with forecasting ATT's impact on Snap's business—a task senior management later instructed her not to complete lest it give rise to "shareholder fraud"—CW 2 consulted with Ruxan Ouyang, the Data Scientist in charge of DR ad efficacy measurement.   ¶¶137, 141-44.  Ouyang showed CW 2 an internal spreadsheet confirming that, even by that late date, a majority of Snap's DR advertisers had not even "opted in" to SKAN—let alone "successfully implemented" it.   *Id.*  As a result, Ouyang told CW 2: "[I]t's not

1    looking good." *Id*.

2       CW 3, a Partner of Product Marketing at Snap, confirmed that Gorman had

3    no basis for her April 22, 2021 statement, as Snap had "no solution" to effectively

4    deal with ATT at that time. ¶¶145-46. "[T]here is no way that Jeremi Gorman could

5    have made a statement like that based on actual data.  Gorman was shooting from

6    the hip." ¶147.  CW 3 stated that there was no "report" or other support for Gorman's

7    statement: "I think that she just made that up." *Id*.

8    **III.   ARGUMENT**

9       **A.   The TAC Adequately Pleads Scienter**

10      Scienter is a "mental state that not only covers intent to deceive, manipulate,

11   or defraud, but also deliberate recklessness." *Schueneman v. Arena Pharm., Inc.*,

12   840 F.3d 698, 705 (9th Cir. 2016).  A defendant is deliberately reckless "if he had

13   reasonable grounds to believe material facts existed that were misstated or omitted,

14   but nonetheless failed to obtain and disclose such facts although he could have done

15   so without extraordinary effort." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir.

16   2014). A "strong inference" "need not be irrefutable . . . or even the most plausible,"

17   and no "smoking gun" is required—rather, the standard is "[w]hen the allegations

18   are accepted as true and taken collectively, would a reasonable person deem the

19   inference of scienter at least as strong as any opposing inference." *Tellabs, Inc. v.*

20   *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324-26 (2007).  The "Supreme Court []

21   made clear [in *Tellabs*]" that "[i]f the Plaintiff presents facts from which an inference

22   of scienter may be drawn, and that inference is as likely as any nonculpable

23   explanation," then "a tie goes to the plaintiff." *Commc'ns Workers of Am. Plan for*

24   *Emp.' Pension & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D.

25   Ariz. 2007).

26          **1.   As The Senior Most Officer Responsible For Snap's**
            **Response To ATT, Gorman Knew Full Well That SKAN's**
27          **Viability Was The Most Critical Issue Facing The Company**

28   Gorman was personally responsible for overseeing Snap's response to ATT—

<u>indisputably the biggest threat</u> facing Snap during the Class Period.  Far from a mere "general awareness" of Snap's day-to-day business (DM 19), Gorman explicitly represented herself as having first-hand, intimate knowledge about Snap's DR business, ATT and its progress in implementing SKAN.  ¶¶25, 39, 59, 73-76, 88-98, 168-76.  Both Spiegel and Gorman repeatedly described Gorman as a hands-on executive with "detailed involvement in the minutia of [Snap's] operations" (Order at 36), who was personally responsible for overhauling Snap's DR business "from scratch."  ¶¶25-26, 88-96, 168-75.  Gorman specifically asserted that she could personally speak to "what advertisers and agencies [were] saying to [Snap]" about ATT and SKAN, and reported that Snap was "really well prepared" for ATT precisely because Snap had been "working really closely with Apple to implement [SKAN]."  ¶¶59, 94.  Indeed, Gorman's knowledge was so extensive that Spiegel routinely directed analyst questions about ATT and SKAN to Gorman because she was "<u>better positioned</u>" to discuss those issues and "[was] having a lot of conversations with [Snap's advertisers]" about those crucial topics.  ¶¶93-94.  Then, after both Snap and Gorman had repeatedly held Gorman out as being intimately knowledgeable about the most vital issue facing the Company, Gorman proclaimed that a "majority" of advertisers representing Snap's crucial DR revenue had "successfully implemented" SKAN, which she expressly confirmed had "mitigat[ed]" ATT.  ¶¶155-56.

As numerous courts have held under highly similar circumstances, Gorman "'<u>bridge[d] the [scienter] gap</u>' herself by referencing the data directly." *Reese*, 747 F.3d at 572; *In re Quality Sys., Inc. Sec. Litig*., 865 F.3d 1130, 1145 (9th Cir. 2017) (scienter where defendants "repeatedly described the state of [the company's] sales pipeline to analysts and investors"); *Longo v. OSI Sys.,* 2021 WL 1232678, at *9-10 (C.D. Cal. Mar. 31, 2021) ("defendants monitored and specifically discussed" contract and made "numerous public statements" discussing its importance).  Indeed,

"[i]f [Gorman] really had the intimate knowledge of [ATT and SKAN] and conditions in [Snap's DR business] that [she] claimed, <u>it was at least deliberately reckless not to investigate the accuracy of [her] statements</u>." *Evanston Police Pension Fund v. McKesson Corp.,* 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019); *see also Weston v. DocuSign, Inc.,* 2023 WL 3000583, at \*21 (N.D. Cal. Apr. 18, 2023) ("statements on different earnings calls that indicate[d] [defendants] closely tracked [] data" supported scienter); *In re Zillow Grp., Inc. Sec. Litig.,* 2019 WL 1755293, at \*20 (W.D. Wash. Apr. 19, 2019) (defendants "display[ed] their familiarity with how the [] program was designed and operated").

### 2. Gorman Was Acutely Aware That The Market Heavily Relied On Her April 2021 Statements In Concluding That The ATT Changes Were "Not Likely Material" To Snap

The fact that analysts repeated <u>verbatim</u> the very statement that this Court determined was materially false and misleading establishes Gorman's scienter. Indeed, immediately after the April 22, 2021 call, Snap's stock price surged, and a litany of analysts <u>directly quoted</u> Gorman's words in concluding that Snap was insulated from ATT's impact and that Snap's "successful implementation" of SKAN gave it a competitive advantage over competitors like Facebook.  ¶¶78-86, 102.[2] Gorman understood full well that the market adopted the plain meaning of her words and that her assurance gave investors great comfort regarding the biggest threat facing Snap.  *In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at \*7 (N.D. Cal. May 1, 2017) (analysts' "substantial interest" in inventory issue caused "any statement made by [defendants] on the topic [to be] of significant interest and importance to the market").

---

[2] Defendants barely respond to this compelling fact, stating in passing that it purportedly renders Defendants' alleged fraud "implausible" because SKAN had been offered to the entire industry. DM 12, n.7. However, the fact that Defendants' statements made the market believe that Snap would weather ATT much better than its competitors only <u>adds</u> to the plausibility of Defendants' fraud, as analysts concluded that, "unlike Facebook," Snap had "play[ed] nice" with Apple and reaped the benefits through its "successful implementation" of SKAN.  ¶¶61-62, 79, 84, 102, 166.

1    In response, Defendants claim that Gorman really meant that only "some" of

2 Snap's advertisers had merely "put SKAN in place" or "set SKAN up for use." DM

3 1, 5, 11.  Not only is this clearly <u>not</u> what Gorman said, it is belied by the fact that

4 <u>not a single analyst or media report</u> interpreted Gorman's statement in such manner.

5 Instead, throughout the Class Period, analysts credited Gorman's words in

6 concluding that Snap's risk from ATT was "minimal" and "minor."  Moreover,

7 Gorman <u>never once</u> walked back or retracted her statements, which Gorman surely

8 would have done if she were truly misinterpreted—even when an analyst directly

9 asked her what "defined" the "success" of SKAN's implementation.  ¶¶97-102.

10 While Defendants assert that Gorman did qualify her response by omitting the word

11 "success" (DM 11), they ignore that <u>"success" was already included in the analyst's</u>

12 <u>question</u>, obviating any need to repeat it. ¶156.  Rather than clarify that "successfully

13 implemented" only meant that advertisers had "put SKAN in place" (DM 1),

14 Gorman instead directly confirmed that it meant that the ATT risk was "mitigated"—

15 <u>exactly what analysts interpreted Gorman's words to mean</u>.[3]

16    Tellingly, Defendants barely address the damning analyst reaction to

17 Gorman's words, claiming in a footnote that the market was merely reacting to

18 Gorman's "initial[] optimis[m] that SKAN might work."  DM 17, n.9.  However,

19 Gorman's statement was clearly <u>not</u> "ambiguous" or an "optimistic prediction [that

20 did not] pan out" (DM 10, 11)—it was, instead, a concrete, past-tense statement

21 specifically quantifying advertisers' successful implementation of SKAN.  And <u>that</u>

22 <u>is exactly how the market understood it</u>.  ¶¶78-87.[4]

---

[3] Even omitting the word "success," Gorman's statements were <u>still</u> misleading: "implement" is defined by Merriam-Webster's Dictionary to mean "carry out, accomplish, especially:  to give practical effect to and ensure of actual fulfillment by concrete measure"—a far cry from merely "putting SKAN in place."

[4] Defendants cite a handful of cases in support of their assertion that warnings in SEC filings or conference calls negate Gorman's scienter. DM 12.  However, each of those cases involved highly distinguishable facts and largely forward-looking statements that were not false or misleading in the first instance. DM 12, 18; *see In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424 (9th Cir. 1994) (no false or

Similarly, Defendants' argument that Gorman's scienter is negated because she purportedly stated that Snap was "just beginning to implement and test" SKAN (DM 11-12) <u>fundamentally distorts what Gorman said</u>.   Specifically, Gorman highlighted—in past-tense no less—that "[t]he fact that [ATT is] coming later than we anticipated <u>has provided additional time</u> to adopt [SKAN] and begin implementing and testing with our partners." ¶66.  Gorman's assurance was entirely consistent with the expectation of market commentators, who widely celebrated the delay as a "positive outcome" and a "sigh[] [of] relief" precisely because it would allow Snap to "run existing solutions <u>in parallel with testing Apple's [SKAN]</u>." ¶67.  Thus, numerous analysts credited Gorman's statement, taking great comfort in the significance of Apple's delay because, as Gorman had confirmed, "<u>the delayed rollout allowed [Snap] more time to work with advertisers to adopt [SKAN]</u>." ¶177.

### 3. Well-Placed CW Accounts Further Confirm That Gorman Had No Reasonable Basis To Proclaim Any "Successful Implementation" Of SKAN On April 22, 2021—Or Ever

New accounts from CWs further corroborate Plaintiff's allegations establishing that Gorman had no basis for her statement. CW 1, who directly worked on Snap's transition to SKAN, stated that SKAN had obvious and severe limitations from "day one"—such that "there were very few adoptees in Q1 and Q2 of 2021." ¶125.  Similarly, CW 2 also confirmed that Gorman had no basis for her statements because Snap had only barely begun working with advertisers on SKAN at that time. ¶¶131-36.  CW 2 emphasized that Gorman was "ear to the ground" at Snap and met with key advertisers "all the time," such that she "would have heard from multiple people" about SKAN's issues.   ¶138.   Significantly, in August 2021, CW 2

---

misleading statements); *Jasin v. Vivus*, 2016 WL 1570164, at *15 (N.D. Cal. Apr. 19, 2016) (no false statement); *ScripsAmerica, Inc. v. Ironridge Global LLC*, 119 F. Supp. 3d 1213, 1259 (C.D. Cal. 2015) (no false statements); *McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *23 (N.D. Cal. Aug. 7, 2019) (no false statements because alleged omitted information was disclosed).  In contrast, here, this Court has already held that Plaintiff adequately alleged that Gorman's statement was false.  Order at 32.  No amount of "warning" could negate Gorman's scienter under these circumstances.

personally reviewed an internal spreadsheet that tracked DR advertisers' adoption of SKAN, and CW 2 confirmed that this spreadsheet showed that even at that late date, a "majority" of advertisers had not even "opted into" SKAN, let alone "successfully implemented" it. ¶137; *Mulderrig v. Amyris, Inc*., 492 F. Supp. 3d 999, 1027 (N.D. Cal. 2020) (finding scienter, noting "CW stated that [defendant] 'worked closely with the [relevant department], especially with [the department's VP]'").

Defendants' assertion (DM 2) that this spreadsheet is meaningless because it showed that a majority of DR advertisers—as opposed to advertisers representing a majority of DR revenue—had not opted into SKAN is a distinction without a difference. Indeed, Defendants themselves later admitted that advertisers representing a majority of Snap's DR revenue did <u>not</u> "successfully implement" SKAN because SKAN <u>simply did not work</u>, thus dramatically impacting Snap's crucial DR revenue. ¶¶105-08. Moreover, CW 2 described how Ouyang specifically commented that the spreadsheet showed that DR advertisers' adoption of SKAN was "<u>not looking good</u>," such that Snap was desperately trying to find other solutions for ATT. ¶¶136-37.[5]

CW 3, who directly reported to the Head of Global Product Marketing, likewise confirmed Snap "had no solution" for ATT, and that there was "no way" that "Gorman could have made a statement like that based on actual data." ¶¶145-47. CW 4, a former employee of one of Snap's partners, also confirmed that Snap had no workable solution for ATT when it was rolled out in April 2021—resulting in Snap suffering a "super drastic" impact from the changes by no later than May 2021, with advertisers widely "shut[ting] down their campaigns on Snapchat."

---

[5] Defendants' other attacks on CW 2 fall flat. DM 13. Defendants continue to call CW 2 "junior level," despite CW 2's extremely close working relationship with Gorman, substantiated by documentary evidence, which included frequent texts and intimate revenue forecasting meetings. Defendants also assert that CW 2's account of the DR advertiser spreadsheet is unreliable because CW 2 shared no details about it, but this is not true. CW 2 stated she viewed the spreadsheet in August 2021, that Data Scientist Ruxan Ouyang who was overseeing the spreadsheet personally showed it to her, and that it showed the rate of DR advertisers' adoption of SKAN.

¶¶149-52.  The numerous additional CW accounts provide compelling support for scienter.  *Jaeger v. Zillow Grp., Inc.,* 2022 WL 17486297, at *9 (W.D. Wash. Dec. 7, 2022) (CW accounts and core operations inference supported scienter).

Defendants' remaining attacks on Plaintiff's CWs are unavailing.  DM 12-17. While Defendants argue that these CWs did not directly share negative information about SKAN with Gorman, as the TAC's new allegations make clear, and as CW 2 explained, Gorman was heavily and intimately involved in Snap's DR business and would have received reports on these critical matters from "multiple people."  ¶138. Moreover, the CW accounts are corroborated by Defendants' own admissions at the end of the Class Period that SKAN was "unreliable" and "rendered [advertisers] blind," such that no "successful implementation" of SKAN was ever even possible— thus confirming that, as the CWs described, Gorman never had any basis to proclaim that SKAN had been "successfully implemented."  ¶105.[6]

### 4.  The Fact That Gorman's False Statement Concerned Snap's Core Business Supports Scienter

While the Court's Order determined that the scienter analysis under the core operations doctrine was a "close call" (Order at 37), the new allegations fully satisfy that doctrine.  *Reese*, 747 F.3d at 575; *see also Jaeger,* 2022 WL 17486297, at *9 ("The Court may infer 'that facts critical to a business's core operations ... are known to a company's key officers.'").  In addition, the Ninth Circuit has found that core operations allegations can "independently" give rise to a strong inference of scienter in two circumstances:  (1) where they "are particular and suggest that defendants had <u>actual access</u> to the disputed information"; and (2) "where the nature of the relevant fact is of such prominence that it would be '<u>absurd</u>' to suggest that management was without knowledge of the matter."  *Reese*, 747 F.3d at 575-76.  Both prongs are

---

[6] The fact that analysts excoriated Snap's management precisely because Snap's admissions did not align with Defendants' prior statements about the risk that ATT posed to Snap, and concluded that Defendants' credibility was "likely gone" due to their misrepresentations, bolsters an inference of scienter.  *See In re FibroGen, Inc.*, 2022 WL 2793032, at *22 (N.D. Cal. July 15, 2022).

1    satisfied here.

2         *First*, the TAC satisfies the "actual access" prong.  Indeed, the TAC readily

3    establishes that Gorman made <u>numerous</u> public statements demonstrating her

4    intimate, direct involvement overseeing Snap's advertisers' transition to SKAN.

5    ¶¶94-95, 98, 173-74.  As the Ninth Circuit has held, where a defendant makes

6    misleading misstatements concerning matters about which they claim to have

7    detailed knowledge, "[i]t is unclear what further facts plaintiffs would need to plead

8    to create a stronger inference that [they] had access to [the] information [they]

9    discussed publicly." *Reese*, 747 F.3d at 572.  Similar to *Reese*, the inference that

10   Gorman did not have access to advertisers' feedback regarding SKAN is directly

11   contradicted by her own concrete, specific statements to investors that a "majority"

12   of Snap's critical DR advertisers "ha[d] successfully implemented SKAN."

13        *Second*, with respect to the "absurdity" prong, this Court previously found that

14   scienter was a "close call" because Plaintiff had adequately alleged that "<u>any</u>

15   <u>deficiencies with SKAN would be of such prominence that it would be 'absurd' to</u>

16   <u>suggest that management was without knowledge of the matter</u>."  Order at 37.

17   Critically, however, the Court determined that Plaintiff fell short of meeting the

18   absurdity test absent "specific facts showing that Gorman knew of SKAN's

19   deficiencies at the time her allegedly false statements were made." *Id.*  However,

20   under settled Ninth Circuit law, where a plaintiff has alleged (<u>as the Court previously</u>

21   <u>determined here</u>) that "<u>the nature of the relevant fact is of such prominence that it</u>

22   <u>would be 'absurd' to suggest that management was without knowledge of the</u>

23   <u>matter</u>" (Order at 37), such allegations are sufficient <u>on their own</u> to support a strong

24   inference of scienter—"<u>without accompanying particularized allegations</u>" that

25   management had access to contrary information.  *Reese*, 747 F.3d at 576; *see also*

26   *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (under

27   absurdity prong plaintiff did not need to allege "particular facts indicating that

28

[defendants] actually knew" information contradicting false statements).

Moreover, new allegations confirm that it would have indeed been "absurd" for Gorman not to have understood the falsity of her statement. *Reese* is instructive here. In that case, the Ninth Circuit found that the "absurdity" prong was satisfied even if plaintiffs "did not allege *any* specific facts showing that [Johnson] actually knew" about information contradicting her public statements regarding pipeline corrosion rates because she was the "head of the Prudhoe Bay operations and an experienced chemical engineer," and had taken "an active role in communicating to the press regarding the condition of the pipelines." 747 F.3d at 172. Similarly, here, Gorman oversaw Snap's DR business and served as its spokesperson about ATT and SKAN, the most critical issue facing Snap. ¶25, 59, 90-95. Thus, it would be "absurd to believe that [Gorman] did not have knowledge of information contradicting her statements," or, "[a]t the very least," knowledge "that it would be deliberately reckless" to proclaim a "successful implementation" of SKAN. *Reese*, 747 F.3d at 576; *see also Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1145 (N.D. Cal. 2017) ("DAU and MAU were so integral to Twitter's success that it would be 'absurd' to argue" that defendants were unaware of downward trends in those metrics); *Azar v. Yelp, Inc.,* 2018 WL 6182756, at *20 (N.D. Cal. Nov. 27, 2018) (defendants could "be presumed to have knowledge" about advertiser program representing majority of Yelp's revenue); *Berson*, 527 F.3d at 987 ("absurd" for defendants to be unaware of stop-work orders that would have a "devastating effect" on company's business).[7]

Defendants argue that the core operations inference is inapplicable because

---

[7] Defendants' reliance on *In re Twitter, Inc.*, 506 F. Supp. 3d 867, 876 (N.D. Cal. 2020) is misplaced. DM 20-21. In *Twitter*, the court refused to apply the core operations inference because plaintiffs did not adequately allege "that the [privacy change]'s impact…was so dramatic that it would be absurd to think that [defendants] did not know that something was wrong." *Id.* at 889. Moreover, Twitter's advertising only represented 20% of its revenue, while advertising represents substantially all of Snap's revenue here.

there is no basis to assume that Gorman knew about SKAN's problems before ATT was fully rolled out. DM at 19. But this ignores the fact that the Court <u>already held that Gorman's statement was materially false</u>. Order at 32. So even if, as Defendants assert, Gorman had no information about SKAN's capabilities in April 2021, then Gorman was <u>deliberately reckless</u> in proclaiming that it had been "successfully implemented." As this Court observed, if in April 2021 "nobody had made a determination as to SKAN's success," then Gorman had no business "talking about this at all." ECF No. 116 at 21-22; *McKesson,* 411 F. Supp. 3d at 602 (scienter found where defendants attributed generic drug price increases to legitimate factors without investigating the accuracy of their statements); *Patel v. Axesstel, Inc.*, 2015 WL 631525, at *11 (S.D. Cal. Feb. 13, 2015) (defendants were "deliberately reckless" by not "confirming the existence of contracts with set payment terms in place").

Moreover, the TAC establishes that, by April 2021, Snap had been testing SKAN's capabilities extensively with its advertisers <u>for months</u>—a fact Gorman <u>herself</u> highlighted. ¶¶68-71, 74. Defendants also argue that Gorman would not have known about SKAN's issues because SKAN was a third-party product used by third party advertisers, but this is illogical. DM 20. Snap's sole product is Snapchat, which can only run on third-party devices, and virtually all of Snap's revenue comes from third party advertisers who in turn depended on IDFA tracking—rendering it indeed "absurd" that management would fail to pay attention to such critical aspects of Snap's business.[8]

Finally, Defendants' argument that the more "plausible" inference is that

---

[8] Defendants half-heartedly argue that Plaintiff has failed to plead motive (DM 3)—but it is well settled that motive "is not a required element of scienter or of fraud in general[,] [n]or is insider trading required to show scienter." *In re Ramp Networks, Inc. Sec.*, 201 F. Supp. 2d 1051, 174 n.6 (N.D. Cal. 2002); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period.")

Gorman made an "optimistic prediction[] [that] did not pan out," and was merely "trying to respond to uncertainty created by ATT and SKAN," is belied by the facts. DM 1, 21.  Gorman did not make a prediction—she made a cold, hard <u>past-tense statement</u> that was false.  At best, the Court's prior holding on falsity applies equally to scienter: "<u>Defendants' alternative interpretation of Gorman's statement 'only demonstrates that a factual dispute exists which cannot be resolved at the pleading stage</u>.'"  Order at 32.

### B.    The TAC Adequately Alleges A §20(A) Claim Against Spiegel

The Ninth Circuit has held that "to prove a prima facie case under Section 20(a), plaintiff must prove: (1) a primary violation of federal securities laws ... and (2) that the defendant exercised actual power or control over the primary violator"—which "is an intensely factual question." *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1065 (9th Cir. 2000).  Here, Snap's own SEC filings note that "Spiegel alone c[ould] exercise voting control over a majority of [Snap's] voting power," and that he had "control over [Snap's] day-to-day management and the implementation of major strategic investments."  ¶30.

Spiegel also made public statements that mirrored Gorman's false statements during the Class Period (¶¶213-14), and co-hosted the conference "where the challenged statements were made, and he could have corrected the record, disclosed omitted facts, and explained that [Snap] faced issues [] that may undermine its earnings."  *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *14 (N.D. Cal. Nov. 4, 2020).  Spiegel is thus liable as a control person.  *In re Energy Recovery Inc. Sec. Litig.*, 2016 WL 324150, at *25 (N.D. Cal. Jan. 27, 2016) (that CEO "ran the day-to-day operations" of company sufficient at pleadings stage "to state a claim for control person liability").

### IV.    <u>CONCLUSION</u>

Defendants' motion should be denied.

Dated: August 1, 2023

Respectfully submitted,

**SAXENA WHITE P.A.**

By: */s/    David R. Kaplan*

David R. Kaplan (SBN 230144)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
E-mail:       dkaplan@saxenawhite.com

Maya Saxena
Joseph E. White, III
Lester R. Hooker (241590)
Dianne M. Pitre (286199)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone:   (561) 394-3399
Facsimile:   (561) 394-3382
E-mail:       msaxena@saxenawhite.com
                    jwhite@saxenawhite.com
                    lhooker@saxenawhite.com
                    dpitre@saxenawhite.com

Steven B. Singer
Kyla Grant
Marisa N. DeMato
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone:   (914) 437-8551
Facsimile:   (888) 631-3611
E-mail:       ssinger@saxenawhite.com
                    kgrant@saxenawhite.com
                    mdemato@saxenawhite.com

*Lead Counsel for Lead Plaintiff and the Class*

**BIENERT KATZMAN LITTRELL WILLIAMS LLP**
John L. Littrell (SBN 221601)
jlittrell@bklwlaw.com
Michael R. Williams (SBN 192222)
mwilliams@bklwlaw.com
360 E. 2nd St., Suite 265
Los Angeles, CA 90012
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

*Local Counsel for Lead Plaintiff and the Class*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Lead Plaintiff, certifies that this brief contains 6,983 words, which complies with the word limit of L.R. 11-6.1.

<u>/s/ David R. Kaplan</u>
David R. Kaplan

Dated: August 1, 2023

1

2

## **PROOF OF SERVICE**

I HEREBY CERTIFY that, on August 1, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 1, 2023.

*/s/ David R. Kaplan*
David R. Kaplan