UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

KELLIE BLACK,

                  Plaintiffs,

      vs.                     Case No. CV-21-8892
                             CV 22-175

SNAP, INC., et al,

                  Defendants.

_____/

REPORTER'S TRANSCRIPT OF
MOTION TO DISMISS HEARING
Monday, September 11, 2023
8:30 A.M.
LOS ANGELES, CALIFORNIA

_____

TERRI A. HOURIGAN, CSR NO. 3838, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CALIFORNIA  90012
(213) 894-2849

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    SAXENA WHITE PA
    BY:  MAYA SACENA
        LESTER R. HOOKER
        JOSEPH WHITE
        Attorneys at Law
    7777 Glades Road, Suite 300
    Boca Raton, Florida  33434

**FOR THE DEFENDANT:**

    PAUL WEISS RIFKIND WHARTON and GARRISON LLP
    BY:  AUDRA J. SOLOWAY
        DANIEL J. KRAMER
        KRISTINA A. BUNTING
        Attorneys at Law
    1285 Avenue of the Americas
    New York, New York  10019

**FOR THE DEFENDANT:**

    BIRD MARELLA BOXER DOLPERT NESSIM DROOKS
    LINCENBERG RHOW PC
    BY:  EKWAN E. RHOW
        Attorney at Law
    1875 Century Park East, Suite 2300
    Los Angeles, California  90067

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; MONDAY, SEPTEMBER 11, 2023**

**8:30 a.m.**

**--oOo--**

THE COURT:  Let me call the matter of *Black versus Snap*.

Let me have appearances starting with plaintiff's counsel first.

MS. SAXENA:  Good morning, Your Honor.  Maya Saxena from Saxena White on behalf of plaintiffs.

THE COURT:  All right.

MR. HOOKER:  Good morning, Your Honor.  Lester Hooker from Saxena White on behalf of lead plaintiff.

MR. WHITE:  Good morning, Your Honor.  Joseph White from Saxena White.

MR. RANKIN:  Chase Rankin on behalf of plaintiffs.

THE COURT:  All right.  For the defendants?

MS. SOLOWAY:  Good morning, Your Honor.  Audra Soloway from Paul Weiss on behalf of the defendants.

THE COURT:  All right.

MR. KRAMER:  Your Honor, Dan Kramer also from Paul Weiss also for the defendants.

MS. BUNTING:  Good morning, Your Honor.  Kristina Bunting from Paul Weiss, also on behalf of the defendants.

**UNITED STATES DISTRICT COURT**

MR. RHOW:  Good morning, Your Honor.  Ekwan Rhow on behalf of the defendants.

THE COURT:  All right.  We're here on the motion to dismiss third-amended class action complaint.

I issued a tentative on this.  I presume both sides have seen it?

MS. SAXENA:  Yes, Your Honor.

MS. SOLOWAY:  Yes, Your Honor.

THE COURT:  Does somebody want to argue something?

MS. SOLOWAY:  I would like to, Your Honor.

THE COURT:  All right.

MS. SOLOWAY:  Thank you, Your Honor.  Can you hear me okay?

THE COURT:  Sure.

MS. SOLOWAY:  Your Honor, I would like to focus the discussion on the tentative, beginning at page 16, applying the Core Operations Doctrine, because as I understand the tentative, Your Honor, the scienter ruling here largely depends on whether the Core Operations Doctrine can be applied.

Now, the Court --

THE COURT:  To some extent, not entirely.

MS. SOLOWAY:  We will get there, Your Honor.

The Court first finds that the current complaint does not contain particularized allegations that would tell you whether any information about advertisers implementations of

**UNITED STATES DISTRICT COURT**

SKAN had been directly communicated to Ms. Gorman.

So, we I think we're all on the same page, that the confidential witnesses in this case and no other evidence in this case can actually tie Ms. Gorman's knowledge to the information that the plaintiff's claim she should have known or did know at the time she made the one alleged misstatement, which, of course, concerns whether advertisers representing a majority of Snap's direct response revenue had successfully implemented SKAN in April of 2021.

THE COURT:  Well, we have the statement itself.

MS. SOLOWAY:  That is right, Your Honor.

We have the statement, and, of course, we have a dispute about as between the plaintiffs and the defendants what the statement means, and I'm going to come back to that later because we think that the ambiguity of the statement, also counsels against scienter here.

Let me focus -- laser focus right now.

THE COURT:  You say the ambiguity, what do you mean by ambiguity?

MS. SOLOWAY:  Your Honor, as you may recall when were here the first time around, the defendant submitted that the statement successfully implemented, meant that this piece of software, SKAN, which had to be implemented both by Snap on its side of the business as well by as advertisers on their side of the business, that the software had to be implemented

and the pipes had to be connected in order for anyone to even begin the process of testing and using SKAN as a substitute for the signal loss that they were about to experience.

THE COURT:  When you say "signal loss," what do you mean?

MS. SOLOWAY:  Let's take a step back.

Your Honor, you may recall that this entire case is brought about because Apple --

THE COURT:  I understand this.  I want to make sure that I understand, when you use these terms, when you say "signal loss," what exactly do you mean by the term "signal loss"?

MS. SOLOWAY:  What I mean, Your Honor, is that the industry has become aware, not just us, right, but everyone, advertisers, other companies like Snap, that Apple is going to change the privacy settings on users' iPhones, such that IDFA, which is a unique -- essentially piece of data that attaches to everyones' iPhone or their other devices is no longer going to be able to be tracked.

So this old regime where companies, like Snap and their advertisers, could monitor that data and know individual user level data is going to disappear.

Now, that has happened yet by April, it's anticipated to happen, but they have had a bunch of time to plan and prepare for this.

**UNITED STATES DISTRICT COURT**

And the statement on April 22nd, which is the only statement remaining in this case is Ms. Gorman talking about one of what are a number of solutions, if you will, to the loss of IDFA, which is this Apple product called SKAN.

SKAN is one way that advertisers that work with Snap, as well as every other company out there in the industry, can substitute or attempt to substitute for IDFA.

Everyone understands that there is going to be this loss of data from IDFA disappearing.

SKAN is one application that is available.  It's a piece of software that is available that Apple has put out.

THE COURT:  But Apple did not say, or nowhere in the papers is Apple purportedly saying that Snap is going to be similar or exactly the same as what transpired before.

MS. SOLOWAY:  So I don't think there is any dispute, Your Honor, that it's not going to be the same as what transpired before.

We all understand that these new solutions, if you will, to how advertisers are going to make decisions about how to spend their money and how to monitor results across these platforms, we all understand that that is going to change.

SKAN is not a substitute for IDFA.

IDFA is gone.  We cannot monitor people on a person-by-person basis.

What SKAN is seeking to do, and again, it's an Apple

product that is being rolled out by Apple to the entire market, is it attempts to provide advertisers with a different way to measure their results so that they can think about how to target the people they want to target, how to optimize their advertising campaigns, and that is a product.

Again, it's not a product we make.  There are a bunch of solutions out there and there are products that SKAN is itself is developing, but SKAN is an Apple product that is intended to sort of step into this void having lost IDFA.  What can we rely on, and that is this SKAN product.

THE COURT:  All right.  I need to take just a break. I need to get on to my computer, but the problem is now, I have to do this double thing to get on my computer.  I can't just turn it on.

So I need to get my cell phone in order to get a code to get on my computer.

MS. SOLOWAY:  No problem, Your Honor.

(Brief recess.)

THE COURT:  All right.  Sorry.  You were saying?

MS. SOLOWAY:  Thank you, Your Honor.

I believe where we left off, Your Honor, is we were talking a little bit about that the backdrop of SKAN and what it does and that was because I had said that -- and this goes back to Your Honor's last ruling on the last motion to dismiss, what Your Honor said in the last ruling was that defendants had

one interpretation of what it means to successfully implement SKAN, right, which is that we put the product into place, right, the software was set up on our side, it was set up on their side, the system was connected and beginning to work.

But, Your Honor said that it was just as likely that investors would interpret Ms. Gorman's statement as meaning more, and that is the plaintiff's argument, Your Honor, that it meant that it was working, and in some way -- whatever successfully working means here, but that advertisers were relying on it for some kind of a result, successfully at that point.

THE COURT:  Wouldn't that be the whole point of the statement, though?

The whole point of the statement is not necessarily that there would be the connection successfully made, but that the connection successfully made would generate a positive effect.

MS. SOLOWAY:  So I think, Your Honor, what we would show if the case went into discovery, is that successfully implementing the program really just means putting it into place.

THE COURT:  But I don't understand, that doesn't say anything; in other words, the investors' concerns are not necessarily with the connection successfully made, the investors' concerns are minimizing an adverse impact of the change in Apple's procedures in the privacy area.

**UNITED STATES DISTRICT COURT**

MS. SOLOWAY:  That's right, Your Honor.

There is a lot of ways you can mitigate against the consequences of the loss of IDFA.

One way you can mitigate that is to develop an alternate solution, which we were working on, one of which was SKAN, and actually get your advertisers to put that system into place.

If they don't prepare themselves for loss of IDFA, we're really going to have a problem, right?

I don't want belabor this point because --

THE COURT:  We have to belabor it a little bit.

Everybody who is in this particular mode of advertising, which is, in essence, what this all boils down to, I mean Facebook is facing the same situation, and Facebook is not saying this.

Facebook, you know -- the successfully implementation is not what they are touting about around the same period of time.

MS. SOLOWAY:  Your Honor, first of all, I don't know what Facebook was or wasn't saying.  I don't know what all of the other companies out there were or weren't saying, that is something we would need to look at in discovery.

But I think the point is we're at a moment in time where the ATT privacy changes have not yet been ruled out.

So putting a substitute into place, installing the software, is in and of itself important to the market.

Again, what Your Honor held in the last motion to

dismiss, was well, our interpretation of our statement -- I will use Your Honor's own words, "is entirely conceivable, it is just as likely that the investors would interpret the statement to mean more," and you held at this stage of the proceedings, you could not say, as a matter of law, what the statement means.

THE COURT:  That was then.  That is the prior motion to dismiss.

We're in the motion to dismiss that we're in now.

MS. SOLOWAY:  Well, I understand, Your Honor, which is why we have argued scienter, and we haven't retread old ground on falsity.

But clearly, even if the statement is conceivably false, there is a whole other element that the plaintiffs need to plead, which is scienter.

THE COURT:  Well, the thing about it is we have to address the nature of the falsity, to some extent, because from that, will guide our focus on scienter, because depending upon the nature of the falsity is one thing to say that black is white, but it's another thing to say, well, maybe it's gray.

MS. SOLOWAY:  I agree, Your Honor.

I think what that means here is there are two reasonably conceivable interpretations of what Ms. Gorman said.

If one interpretation, which is the defendants is conceivable, then it has to be the case that the plaintiffs, in

UNITED STATES DISTRICT COURT

order to plead and prove scienter, have to show not just that Ms. Gorman made a statement that could conceivably be false, but that she intended to deceive investors by making that statement.

THE COURT:  Well, the thing about it is in these types of situations, unless she comes out and says, oh, yes, it was false when I made it, I know it was false when I made it, which never happens in these types of cases.

Everything is circumstantial evidence as to scienter, isn't it?

MS. SOLOWAY:  Well, Your Honor, these cases can often be pleaded with circumstantial evidence, but we would respectfully submit that this complaint lacks that evidence.

I want to really jump into what the complaint actually says because I think that is important.

THE COURT:  All right.

MS. SOLOWAY:  Frankly, I think when we walk through Your Honor's ruling in the tentative or initial ruling in the tentative, I think that's where we want to focus our attention.

So let me just set up the law on this, then I'm going to jump right into that.

As Your Honor knows, the Ninth Circuit has held that the absurdity prong of the Core Operations Doctrine only applies in rare circumstances.

Of course, that is because, you know, the law, the PSLRA

**UNITED STATES DISTRICT COURT**

Rule 9(b) set a very high standard for pleading scienter.

The plaintiffs have to come up with actual facts showing that people who are speaking to the market acted with actual intent to deceive.

So, I think we have to set up the question here as, does this very rare doctrine apply on these facts?

And the question, Your Honor, is whether Ms. Gorman's knowledge, right, framing this in terms of the one alleged misstatement in the case, does Ms. Gorman's knowledge that advertisers representing a majority of Snap's direct response revenue had not successfully implemented SKAN in April of 2021, can that be implied under the absurdity prong on the Core Operations Doctrine.

In other words, Your Honor, as applied here, the question is was it in April of 2021, when Ms. Gorman made this statement, would it be absurd for her not to know that advertisers representing a majority of direct response revenue were not pleased with SKAN in some way, such that it would make her statement false?

And I think the significant issue here, Your Honor, is that there is a timing issue here about when that information -- about advertisers becoming dissatisfied with SKAN emerged.

I want to, sort of, take Your Honor through that.

We know that it happened eventually, because the corrective disclosure in this case, Your Honor, is an October

statement where Ms. Gorman and Snap tell the world on a call that advertisers were reporting certain problems with SKAN.

Your Honor, you cite that October statement in your tentative.  It's at page 8, and I think we should just pause for a moment and look at exactly what the corrective disclosure is here, because this is the thing that allegedly reveals the truth here.

Now, I'm looking at, again, Your Honor, its tentative at page 8, what Snap said:  The initial results we observed using SKAN were generally aligned with prior industry solutions and we were among the first platforms to lean into this solution and push for widespread industry adoption.

However, over time, we saw SKAN measurement results diverge meaningfully from the results we observed on other first and third party measurement solutions, making SKAN unreliable as a standalone measurement solution.

So the corrective disclosure, Your Honor, says that the initial results we observed using SKAN were aligned with the prior industry standard solutions, but over time, problems emerged, Your Honor.

So that raises the question.  We know these deficiencies emerged by October, but what does the complaint tell us about when these deficiencies purportedly emerged?

And the question, Your Honor, is especially relevant to the Core Operations Doctrine, what we need to assess is whether

it would be absurd as of April of 2021, six months earlier, for Ms. Gorman, in making the statement, to not know that deficiencies in SKAN had already emerged, such that, Your Honor, if we're going to assume Ms. Gorman knew something, she had to know it from someone, right?

So who, at Snap, would have known that information, but even more importantly, who is to say that advertisers had already become unhappy with SKAN in April of 2021?

THE COURT:  Let me ask you, why would the successful implementation of SKAN solve the problem that everybody knew was going to come up?

So, I mean, did she fully understand what SKAN is or was?

Was she -- somehow had a good faith mistake as to what SKAN would do in this particular situation or what?

MS. SOLOWAY:  Look, I think, Your Honor, the truth is that we believe that what the statement meant, as I mentioned earlier, is that this possible solution to the IDFA loss, which is SKAN, had been put into place, meaning the market went out and undertook the process of installing it and setting up it for use.

And what Ms. Gorman said that day in April, was that we have begun testing it with our partners, right?

I mean, that is the contemporaneous record of what happened on April 22nd.

But I think, if Your Honor assumes that it meant more than that, right, that the plaintiffs are correct, that as of April when we said "successfully implement" that didn't just mean we had put it into place, but also that advertisers were in some way successfully relying on it, then the question is where is the evidence in the complaint, that as of April, advertisers were not in fact happy with SKAN as a substitute solution for IDFA.

And that, Your Honor -- that is not just a Snap issue, that is an industry-wide issue, right, because SKAN is not a Snap product, it's an Apple product, and our advertisers who advertise with us advertise on other platforms as well.

The question is where is the evidence that the advertisers, as of April, had already identified problems with SKAN such that that would have been communicated to anyone at Snap, such that we can assume it would be absurd for Ms. Gorman not to know it.

And I think when you really focus on the allegations in the complaint, what we see is that allegation is missing.

And, Your Honor, I, kind of, want to -- I want to jump -- I want to jump right to the complaint, then I want to take a step back and talk about Core Operations Doctrine.

So, if you look at the allegations in the complaint that go to this issue, really, there is only one CW and Your Honor cites the CW, who has any knowledge purportedly about the

implementation of SKAN.

And, Your Honor -- this is at page 17 of the tentative, and it talks about how while the CWs themselves don't connect Ms. Gorman to any fraudulent knowledge, what Your Honor says is we can still look at the CWs to understand what information was out there, right?

So, Your Honor, at page 17 of the tentative talks about how the CWs confirmed that dating back to April, advertisers had already determined that SKAN's limitations severely hampered Snap's advertising performance.

But there is only one CW, Your Honor, who really addresses this. And Your Honor's tentative quotes the plaintiff's characterization of what that CW actually says, but that is not what the CW actually said.

So if Your Honor looks at -- and I'm happy to take Your Honor through the complaint, but if you look at what the complaint actually pleads that CW -- and this is CW-1, Your Honor -- actually said, she said about SKAN, right when it was launched in April of 2021, "I did not find it to be effective."

So she's saying it was launched in April of 2021, and she personally did not find it effective.

THE COURT:  Let me ask, what paragraph are you looking at?

MS. SOLOWAY:  Yes, Your Honor, this is the complaint, I believe it's 125.

THE COURT:  At Paragraph 125?

MS. SOLOWAY:  Yes, Your Honor.

THE COURT:  Okay.

MS. SOLOWAY:  Your Honor, let me actually take you through what is going on here.

If you look back at Paragraph 123 of the complaint, the plaintiffs purport to summarize the information that they get from their own CWs.

And Your Honor cites that in the tentative.

The problem is that's not actually what the CWs say.

So let's look at Paragraph 125.  This is actually what CW-1 says, and she's the only CW who was allegedly involved in transitioning Snap from this IDFA regime to the SKAN system.

What she says, and this is at the bottom of that Paragraph 125, about the timing of all of this, is:  From day one when SKAN support launched, right when it was launched in April 2021, I did not find it to be effective.

And then she says that:  While Snap was one of the first to go to market with SKAN compatibility, that did not mean that the performance was good, because it was not.

And she also says in the top of that paragraph, that:  In her experience, advertisers dragged their feet, they didn't want to implement SKAN right away, and she says, at least, to her experience --

THE COURT:  She says two things:  She says that

Ms. Gorman was incorrect when she said a majority had successfully implemented, because she said, no, the majority had not successfully implemented.

The second thing she says, is, by the way, it doesn't work.

MS. SOLOWAY:  This is problematic.

She, this person, the CW, works in one of 12 verticals of the company.

She only knows about the gaming business, and among the people that she interacts with, the advertisers that she interacts with, she admits, I only knew a few who had even implemented it.

So she has no insight into whether Ms. Gorman is correct when she says that advertisers representing a majority of direct response revenue have successfully implemented SKAN, because she has no company-wide insight at all.

THE COURT:  Let me ask the plaintiff's counsel, what is the allegations that -- the allegations that Snap's customers had not successfully implemented the SKAN program?

MS. SAXENA:  Sure, Your Honor.  There is plenty.

In addition to Paragraph 125 and 126, I think just taking it a step back, one thing that is important is CW-1 was directly involved in transitioning advertisers to SKAN.

So she was part of this endeavor from the time it was announced through the supposed implementation.

THE COURT:  What paragraph are you referring to?

MS. SAXENA:  I'm referring to Paragraphs 125 and 126.

THE COURT:  She doesn't quite say that in 125 or 126.

MS. SAXENA:  So 124, Your Honor, is little bit about her background that she was intimately involved in transitioning advertisers to SKAN.

Then secondly, Your Honor, I think it's important to note that CW-1's characterizations are entirely consistent with CW-2.

And one thing that --

THE COURT:  That is one of the things, as I said, it seems to me that, again, for example, in Paragraph 124, SKAN, as it turns out, was unworkable because it rendered advertisers fully unable to effectively track or monitor their ad campaigns -- I mean, that is right?

And the question is at the time Ms. Gorman made her statements, on what basis is she saying that that is not going to be the case?

MS. SOLOWAY:  Well, I think, Your Honor, the question is on what basis did the plaintiffs plead that this problem with SKAN that emerges in October has emerged as early as April.

THE COURT:  Well, let me ask, what I don't

understand is why did anyone think -- anyone, at this point in time, think that SKAN was going to be able to provide advertisers with even a modicum of the information that they previously had prior to the implementation of the previous on iSOs?

MS. SOLOWAY:  Well, Your Honor, that answer derives from the plaintiff's own alleged corrective disclosure, which said, again, this is on page 8 of your tentative, it quotes the language, the initial results --

THE COURT:  Did you mean plaintiff's or defendant's?

MS. SOLOWAY:  That is right, Your Honor, I should know the difference.

THE COURT:  One pays you, the other one doesn't.

MS. SOLOWAY:  The initial results we observed using SKAN were generally aligned with prior industry solutions, therefore, it goes on to say, we leaned into this solution.

Ms. Gorman's purported correction here is when we first started using this product, it aligned with what we were seeing.

She then goes on to say:  Over time we saw measurement results meaningfully, from the results we observed on other --

THE COURT:  On what basis did it align with the initial expectations?  That is what I don't understand.

I mean, I understand that Apple had a concern about privacy and enacted these changes to the iOSs, and then put out

its product called SKAN, but, I don't understand why -- or how SKAN would restore those advantageous features of the pre-amended iOS programming.

MS. SOLOWAY:  Your Honor, I understand.  I'm not going to be purport to be an expert in the technology, but I have a basic understanding of what SKAN did.

So whereas IDFA allowed advertisers to track every individual user based on what they did on their phone, and let's say, I want to buy a pair of Nike's for my kids, I go on Nike's website, they know what I just did.

THE COURT:  What is SKAN supposed to do?

MS. SOLOWAY:  What SKAN does is it takes away the ability -- what Apple has done they have taken away the ability to know what Audra Soloway is buying her kids, but there is aggregated data out there.

So we can look at what Audra, and Dan Kramer, and Kristina Bunting, what is the whole world at large doing?  And it essentially takes all of this identified data and it helps you draw conclusions based on certain characteristics of users about how they might behave.

So you lose that ability to track people, person-by-person, but SKAN attempts to find ways to predict results based on user data that is on an aggregated basis.

And, of course, this is Apple coming out, right, they are saying, we're taking away all of this IDFA data, but we're

going to provide you with this other solution, and Snap is saying, all right, we leaned into this solution, and the initial results with this solution seemed to be consistent with what we had seen in the past.

THE COURT:  Let me ask this question, although, I don't think it's discussed anywhere.

What about the Android systems?  Do Androids have a similar --

MS. SOLOWAY:  At this time, Your Honor, my understanding is that Android systems did not undergo a similar change, so, of course, one of the things that an advertiser can do is, they can say, well, it's a little harder now for me to predict the results on my Apple system, or maybe it will take some time over time for this to get this sorted out, maybe they direct more of their spending to Android advertising, rather than spending their money targeting people on iPhones.

THE COURT:  Is Snap limited to Apple -- Snap was also on Android?

MS. SOLOWAY:  Yes, Your Honor.

THE COURT:  Okay.  I understand your argument.

Let me hear from the -- well --

MS. SOLOWAY:  If I could make one more point on this same topic?

There are two other things that the company says on October that maybe also answer the question that Your Honor

just asked.

If you look, again, at your tentative at page 8, which happens to quote that disclosure.

It says:  SKAN did not scale as we had expected, making it more difficult for our advertising partners to measure and manage their ad campaigns.

What that means, Your Honor, is when something doesn't scale, it means that when we started using it more and more and more en masse as the legacy signals from IDFA disappeared, it didn't perform as we had hoped that it would, but obviously, that is evolution over time.

And this is also, Your Honor, on page 9 of your tentative, what it says:  That as our advertising partners have explored and tested SKAN solutions, they have surfaced a variety of concerns about its limitations.

And I think, again, there is nothing in the complaint that tells you that advertisers had already started to develop these concerns as early as April.

And I would suggest, Your Honor, that if you read Paragraphs 124 and 125, I actually think CW-1 undermines this, because CW-1 says:  From day one when SKAN launched, right when it was launched in April, I did not find it to be effective.

So it launched in April, and she didn't find it effective, but what did advertisers find?

THE COURT:  Well, let me ask you this question, on

Paragraph 136 of the complaint, you have CW-2 says following: CW-2 -- well, to summarize -- explained that at the time Snap had barely begun working with its advertisers on SKAN, and there was no way that Gorman could have represented that at the time any implementation of SKAN had occurred or been successful.

MS. SOLOWAY: So let me address, Your Honor, CW-2 briefly.

So, CW-2 had absolutely no role in actually implementing SKAN. She's not alleged to have known anything about SKAN implementation.

In fact, Your Honor, I want to read you what Your Honor said about CW-2 -- just give me a moment.

So, in the Court's prior ruling about CW-2, Your Honor said that you had concerns with CW-2's account -- this was page 27 of Your Honor's ruling, because it was not clear that CW-2's account of internal concerns surrounding ATT is a contemporaneous fact, suggesting falsity.

You also held, Your Honor, that CW-2's account doesn't provide sufficient factual support for plaintiff's falsity allegations because she doesn't mention Snap's implementation SKAN, or -- and this is a quote from Your Honor's ruling at page 28 -- plaintiffs don't allege that, quote, CW-2 was involved in the implementation of SKAN or helped advertising partners transition to SKAN.

So the idea that CW-2 can be relied on here, when CW-2 knows nothing about SKAN implementation, as Your Honor previously held, just does not work.

So this leaves us with this question, which, you know, the complaint just doesn't answer.

If we know that from the defendant's statement, and this is a corrective disclosure, the plaintiffs cannot run away from, that the initial results on SKAN aligned with prior industry measurement solutions, but eventually diverged, when did they diverge?  And the complaint does not plead that that had happened.

THE COURT:  What was the prior industry success expectations, or what was the phrase you used?

MS. SOLOWAY:  Right, Your Honor, I was paraphrasing. I am referring to the statement that the initial results we observed using SKAN were generally aligned with prior industry standards solutions.

THE COURT:  What do you think that means?

MS. SOLOWAY:  I think what it means, Your Honor, is in the old days --

THE COURT:  She wasn't talking about SKAN.

MS. SOLOWAY:  She's talking about in the old days when we had IDFA, we had different ways to measure.

You may remember, Your Honor, there was some description of this in the background discussions of the briefing that

these companies are advertising partners relied on these measurement companies. They were third-party measurement companies who had come up with ways using IDFA data to figure out whether advertising dollars were being well spent to optimize campaigns, to help target particular types of customers.

So when she talks about prior industry standard solutions, that is what we're talking about.

Originally, the initial results we observed using SKAN were generally aligned, but later over time, is the quote, Your Honor: We saw SKAN measurement results diverge meaningfully from the results we observed on the first and third party measurement solutions.

Your Honor, if I may just make one more point before I know you wanted to turn it over to plaintiff's counsel to address this point.

The idea that you can take such -- we think thread barren -- and frankly contradictory allegations from the complaint that simply do not show that any problem had emerged with SKAN as early as April, and use that to say, that Ms. Gorman -- it would be absurd for Ms. Gorman to not know something, when we all agree that there is no allegation that anyone actually told Ms. Gorman anything, that would be a dramatic extension of the Core Operations Theory and a dramatic extension of the absurdity prong.

THE COURT:  On what basis is Ms. Gorman saying the successful implementation in response to the particular question, which is directed towards -- we lost our prior system, we have this SKAN from -- the new SKAN system from Apple, you know, why does this solve our problems?

And her response is it's been a successful implementation.

What is she trying to convey?

MS. SOLOWAY:  Again, Your Honor, I think she's trying to convey that everyone in the industry is going out and getting ready for this change, which has not happened, and if you don't put the software in place, you will not be ready.

So successfully implementing the software is absolutely vital.

But even if Mr. Gorman has gone further than that and somehow suggested that "successfully implemented" means that advertisers have now started relying on SKAN as a measurement solution, I would respectfully submit, Your Honor, that is -- there is no fact -- no well-pled factual allegations in this complaint that tells you that as of April of 2021, when CW-1 acknowledges that SKAN is just launching -- this is CW-1's own words -- that this is launching in April, that advertisers have already identified problems with using SKAN as a measurement solution, because we know from the corrective disclosure that those problems did not emerge right away.

Your Honor, if you look at the Core Operations Doctrine, and, you know, there are a few different buckets these types of cases tend to fall in, none of them can be read for the proposition that you can infer knowledge of a senior executive of something that wasn't presented to them when there is no one else at the company purportedly who knew the thing that is, sort of, the baseline fact that you are trying to charge Ms. Gorman with knowledge of.

So, I will give you, Your Honor, I will give you an example.  If you look at the *Bursen* case, which Your Honor cites in the decision, that was a case where the plaintiffs alleged there was an impact to company revenue, based on halted or stop-work orders that were in effect when the misstatements were made.

Now, the senior executive may not have known precisely the details, but the conclusion of the case is it's fair to infer that a senior executive would know about these stock work orders because tens of millions of dollars of revenue is implicated.

But there is no dispute in that case that the stop-work orders are actually in place when the statement is made.

THE COURT:  Well, let me ask you this question, then we will turn it over to plaintiff's counsel, and they are chomping at the bit to respond.

How -- was there anybody who actually believed that the

drastic change from individual tracking to aggregate tracking was going to satisfy the advertisers' need for the information?

MS. SOLOWAY:  So, is the question, did anyone believe that SKAN -- is this about SKAN, in particular, or that any solution, because SKAN was just one of many solutions, Your Honor.

THE COURT:  Yes, but SKAN was the one that defendant jumped on.  I mean, I don't know, did the defendant argue anything else other than SKAN?

MS. SOLOWAY:  Yes, actually.

If you review our disclosures, we talk about a number of measurement solutions that are out there, including a proprietary solution that Snap is developing.

THE COURT:  That wasn't the basis of the comment.

MS. SOLOWAY:  So SKAN -- Your Honor is correct, the only remaining alleged misstatement in this case happens to be about the successful implementation of SKAN.

But, Your Honor, the basis on which the plaintiffs can challenge that no one actually believed that this would work is a factual burden that falls on the plaintiffs.

This is an industry-wide solution that is being presented to the market by Apple that Snap and many other companies are looking at.

Actually, Your Honor, what I would suggest is that this -- our behavior, Snap's behavior undermines an inference of

scienter.

If you lean in to SKAN as a solution, you say, I want to get my advertisers hooked up with this, I'm encouraging them to get out there and get this software installed, why would you lean into a solution that you didn't, yourself, think was going to be a good one, you would have leaned into a different solution.

So the fact that we leaned into this, if anything, shows that we believed that this was going to be the best alternative for our advertisers that existed.

THE COURT:  That's not what she said.

MS. SOLOWAY:  Well, again, Your Honor, I think what she said is that advertisers reflecting a majority of revenue had successfully implemented it.

She didn't say every advertiser successfully implemented it, she said a majority.

And, Your Honor, if the plaintiffs want to say that CW-1 saw a handful of advertisers who didn't like it and didn't implement it or didn't think it worked, Ms. Gorman's statement doesn't rule out that possibility.

She said advertisers representing a majority of direct response revenue had successfully implemented this.  That could mean that there were advertisers who didn't and who maybe didn't like it.

THE COURT:  I understand the defense's position.

**UNITED STATES DISTRICT COURT**

Let me hear a response from the plaintiff's side.

MS. SAXENA:  Good morning, Your Honor.  Maya Saxena on behalf of plaintiffs.

I was told very early on in my career, not to snatch defeat.

THE COURT:  Well, don't assume.  I'm one of those judges, I issue tentatives and I change my mind on the basis of what is said during oral argument.

Don't assume merely because the tentative is what the tentative is will be my final decision.

MS. SAXENA:  Certainly.  There is a few points that defense counsel brought out that I think are worthy of addressing.

THE COURT:  Well, I thought there were a number of good points, I don't know if they will win the day, she made some good points.

MS. SAXENA:  One of the first things I would like to address is the timing issue.  Timing is relevant in two different ways here.

No. 1, I think that one thing that isn't being brought up today is what defendant Gorman said about the time that Snap had to implement and test this with her partner -- with the advertising partners.

If you look at her statements, one of the things that the analyst really picked up on, and this is in Paragraph 86,

is that this additional time gave us time to implement and test this product with our partners.

So, analysts in the market, when they are looking at her statements, and then she essentially doubles down in the same analyst call in April of 2021.

And an analyst asks her:  How do you define success in this context?  How do you define successful implementation?

And further, does this mitigate some of the headwinds that we're seeing with the ATT changes?

And instead of saying, oh, wait a second, that's not what I meant to say, I meant to say our advertisers just implemented it, they just downloaded it.

Who cares, Your Honor, if they download it.  The market didn't care if you download it.

The market knew there was going to be an impact from these privacy changes.  The question was once Snap was kicked would they be able to get back up?

Would they be able to have an alternative solution for tracking data the way that IDFA could.

That's what the market was focused on.

So the fact that she twice in the same statement says, this delay enabled us to test it, is very telling in this circumstance.

I think the other point defense counsel makes on timing is with respect to the October disclosure.

THE COURT:  She says it enables us to test.

MS. SAXENA:  She said the additional time -- I have got it right here, actually, "the fact that these changes are coming later than --

THE COURT:  Let me stop, what paragraph are you referring to?

MS. SAXENA:  This is actually defendant's exhibit, this is Exhibit 2, page 18, on the bottom.

THE COURT:  Just one moment, so you are at this point in time referring to what docket number?

MS. SAXENA:  It is Exhibit 2 to defendant's motion to dismiss, Your Honor.  It's Document No. 121-3.

THE COURT:  All right.  This is Exhibit 2.

MS. SAXENA:  It's page 6, and also Exhibit 2-18 on the bottom, there is two different pages.

THE COURT:  All right.  I always look at the top of the docket.

MS. SAXENA:  It's also Paragraph 74 of our complaint, that might make it easier.

THE COURT:  All right.  Let me go back to that.

MS. SAXENA:  Does Your Honor want me to continue?

THE COURT:  I'm reading this Paragraph 74.

MS. SAXENA:  Sure.

THE COURT:  Let me ask, does the plaintiff have any evidence at the time of the April statement that in fact a

majority of -- sorry -- the advertisers that represented a majority of Snap's direct response advertising revenue had successfully implemented the SKAN network?

MS. SAXENA:  Just to clarify, Your Honor, do you mean had not implemented it?

THE COURT:  Well, no -- well, the evidence one way or the other; in other words, the statement is that Gorman made was that advertisers that represented a majority of our direct response advertising revenue have successfully implemented SKAN network for their Snap campaigns.

MS. SAXENA:  There is quite a bit of information, and it's newly alleged information in this third amended complaint.

I would direct Your Honor's attention to Paragraphs 136, and 137, which references this.

THE COURT:  That is CW-2?

MS. SAXENA:  CW-2.

THE COURT:  Defense counsel is saying this Court previously had some doubts about.

MS. SAXENA:  So those doubts -- the way that I understood Your Honor's rulings were those doubts were, can we independently use CWs to establish scienter.

And Your Honor --

THE COURT:  Obviously, the answer is yes depending on what the CWs say.

MS. SAXENA:  Correct.

What Your Honor found in the order was that CWs here were used for the purpose of establishing the facts necessary under the Core Operations Doctrine.

So, one of the allegations we have which wasn't really mentioned, is the spreadsheet that CW-2 talks about.

Just to take it back in another minute, when we're talking about CW-2, defense counsel is suggesting that this is a person who had no absolutely basis to say what they were saying.

In fact, if you look at what CW-2 was tasked with, she was tasked with determining what the revenue impact was going to be of the SKAN change -- the ATT changes.

That was what this CW was charged with.

And as part of that process, she had to interact with the highest levels of management.

Part of that process she also went and met with the data scientist, which was Roxanne Yuang, who was in the process of making a spreadsheet that detailed that as of August of 2021, there had been hardly any implementation of SKAN, let alone successful implementation.

So it's clear that in August of 2021, there is this detailed spreadsheet out there which says, not only did they not successfully implement it, but they hadn't even implemented it at all.  That is a reasonable inference we're entitled to

that in April of 2021, they hadn't implemented it either.

THE COURT:  All right.

MS. SAXENA:  In addition, we have what CW-1 said which is in 126, 127.  We have the information in 146, 147, 151, and 152.  These are all facts that existed which were contrary to what defendant Gorman said.

But I think one of the most important things, Your Honor, is what you found in the order, which is, let's assume all of this is true.

Let's assume she had absolutely no idea whether SKAN was successful in this point of time.

Why would she then be making this statement, because implicit in her statement are two things:

One, that she knows the underlying data behind how many advertisers had implemented it.

And two, that she had reviewed information and was able to make a determination as to its success.

I think Your Honor's citation to the *Reese* case, there is entirely appropriate, because Your Honor found that similar to the *Reese* situation, when you reference the data directly, what else could possibly be necessary to bridge the scienter gap?

I think this situation is particularly appropriate for that analysis.

THE COURT:  Well, the defense argument is that it

**UNITED STATES DISTRICT COURT**

references is only as to successful implementation, no more.

And that, you know, there is a colorable basis that one could say there was successful implementation, although, I do understand that the plaintiff's response is well, there is no evidence even of that, but it's the plaintiff's burden to establish no evidence, and the defense is saying there is not sufficient evidence alleged in the complaint that there was no -- there was not successful implementation, even just on the -- just a first level of having advertisers adopt the SKAN program.

MS. SAXENA:  There is significant allegations in the complaint about this.

Many of them are from CW-1 and CW-2, and there is also these concerns out in the market.

So what they are saying now in October, with this new story that over time these defects kind of surfaced is really both inconsistent with the complaint and also inconsistent with what is out there in the market.

Because in Paragraphs 52 to 54 of our complaint, the market clearly knew that SKAN had issues.

SKAN is not something that kind of burst on to the scene a few years ago.

SKAN had been out since 2018, and it was known to be problematic.

In the market, it was understood that because it was so

UNITED STATES DISTRICT COURT

problematic, whether or not it could be made to be an effective solution was what investors were keenly focused on.

So it had a host of problems, none of which were latent defects that kind of slowly surfaced.

These were the type of problems that surfaced immediately, and that's what the complaint alleges.

It says:  Upon implementation, advertisers lost all their legacy data, so these were significant problems that were inherent in SKAN and why SKAN still is not a viable alternative.

They still don't have a viable alternative to track ads.

One of the things that they were saying is they had all of these other solutions, but the market didn't care about the other solutions.  They put their eggs firmly in the SKAN basket.

THE COURT:  Is there any replacements at this point in time which operates to give advertisers even a modicum of what they had prior to Apple's changes?

MS. SAXENA:  I don't believe there is.  I don't know the details of the company, but I can tell you that in every subsequent quarterly earnings released since this news was announced in October, the company has been on a significant decline.

So this is a company whose entire trajectory was changed once they were unable to come up with a solution.  They

attribute that decline to their inability to find an effective workaround.

THE COURT:  Is there any other company, like Facebook, that came up with a solution that solved the problem, to your knowledge.  This is kind of going off -- just out of curiosity.

MS. SAXENA:  I think there is, Your Honor.

I think the distinction, also, when you talk about Facebook, is these companies reacted very differently to the situation.

Facebook, you know, when they saw this iceberg, they said, the iceberg is coming, it's going to be devastating.  We don't even know if it's going to make sense to offer this in the future.

But Snap took the opposite road, and they said, well, the iceberg is there, we're the Titanic, but I think we're going to skirt around it.

So Facebook does seem to have come up with a method to recapture the data, so it may not be on the same level that IDFA did, but Snap, to this day, hasn't.

That is really reflected in the decline of the company. You are talking about a company that traded at over $80 a share during the class period, and now trades about $9 a share.

Really, the main reason, as analysts say, the future looks grim.  I think we alleged that in Paragraph 121, when we

talked about this company's decline in fortune.

They really hadn't been able to recapture this area of growth for the business, which is so impactful, and which is why Your Honor found that Core Operations does apply, because this company really derived the lion's share of their revenue from being able to track consumers in realtime.

THE COURT:  Well, let me ask, didn't Snap issue warnings in its SEC filings?

MS. SAXENA:  So the warnings talk about the fact that there is going to be an impact from the ATT changes.  That is no secret.  Everybody knows there is going to be an impact.

Again, the question is, is it going to be something that the company has a viable workaround for?

Here, the fact that this company said we have -- our advertisers have successfully implemented SKAN for their advertising campaigns and then reaffirmed that, really led the market to believe that they had done so.

That is in Paragraph 86.  That is one of the things Your Honor notes is that the market believed that they had been able to come up with an effective solution.

So the issue isn't didn't they warn about the impact, everybody knew there was going to be an impact.  This was something that analysts said is going to turn an $80 billion industry into upheaval.  Everybody knew there was going to be an impact.

What they weren't warned about was SKAN possibly not going to be a workable solution.

When they came out and said it was successfully implemented, and the stock rose dramatically in response to that, that was the key phrase there.

THE COURT:  Anything else you want to argue?

MS. SAXENA:  Just one very quick thing, and I don't think that I need to belabor this point.

There is definitely a rumor that Your Honor like slides.

I thank you again for issuing an order on a Sunday, because I had a lot more slides and now I have much fewer slides; in fact, I only have one, which Your Honor, if I may approach, I will hand it out.

THE COURT:  If you have it on a piece of paper, I don't need slides, I can look at the paper.

Do you have one more my clerk?

MS. SAXENA:  So, Your Honor, many, many years ago when I was a law student out here in LA, I had the misfortune of going on the Price is Right as a contestant.  You were allowed to pick three doors, and you could guess on the prizes behind each door, and if you guessed right, you got everything behind that door.  Some doors were really bad, they had a goat or coal or something like that.

Of course, I didn't get into that opportunity, because I had very bad luck that day, I'm hoping for much better luck

today.

But my point is -- and this is something I wanted to bring up quickly, because defense counsel seemed to be constantly interjecting a knowledge element to Core Operations.

That knowledge element simply isn't there.

Once Your Honor finds that this issue is of the requisite prominence where it would constitute such an issue that it would be absurd for management not to be aware of it, the analysis ends there.

You don't have to know about, well, did she get a document on April 20th?  Did she have a meeting in which this was discussed?

If the issue is under requisite prominence under Ninth Circuit law, including *Reese*, including *Bursen*, including really all of the cases they cite, the analysis doesn't have to continue.

Your Honor not only went through the absurdity analysis properly and didn't need to go further, but actually found out we met the standards under Doors No. 2 and 3 as well.

THE COURT:  All right.

MS. SAXENA:  Thank you very much, Your Honor.

THE COURT:  I will respond to your story of your unsuccessful game show.

One of the people in my law school class was Harvey Levin.  Mr. Levin was on a game show during the period of time

UNITED STATES DISTRICT COURT

he was in law school, and his results, I have heard, were not successful.

MS. SAXENA:  Yeah, it was not my best day.  I honestly have no idea how much some of those things should cost, but it was fun.  I missed a day of class.

THE COURT:  All right.  Let me ask defense counsel before you respond to plaintiff's counsel's contentions, I have a quick question.

Assuming -- I do understand what the requirements are in this area, but one of the contentions is that Ms. Gorman did not have any factual basis to even say there were successful implementations.

I do understand that your response is that the sources from which the plaintiffs are attempting to draw are -- you know, CW-1 and 2, and that that is not sufficient, but there is some basis, and it seems that the evidence on this particular point is entirely within the defense's control.

In other words, the defense can say, well, this is a basis upon which she said there was successful implementation, even if we limit the term, "successful implementation" is just our customers who have successfully connected with the SKAN system, irregardless of how it ultimately worked.

Why aren't those allegations sufficient since all of the evidence is with your client and not with them?

MS. SOLOWAY:  Your Honor, I have two answers to that

**UNITED STATES DISTRICT COURT**

question.

One is sort of a big picture policy answer and the second is dependent on the facts of this case.

The big picture policy answer is that Congress and the federal rules have decided that in a fraud case it's the plaintiff that has to come forward with the facts.

What the plaintiff can't do is come in and say, well, by October, we had seen this problem with SKAN and the advertisers are surfacing concerns about it, so the defendants must have known about those problems six months earlier.

Instead, it's the plaintiff's burden to plead facts, so that takes me to my second answer, Your Honor, what do they plead?

THE COURT:  For example, the spreadsheet.

MS. SOLOWAY:  That's exactly where I was going, Your Honor.

So let's look at what this complaint actually says. The plaintiffs say, you know, you should look at the spreadsheet because the spreadsheet shows that Ms. Gorman either didn't have a piece of paper in front of her that she could rely on or there were spreadsheets that maybe she didn't see it, but it was known at the company, but let's look at what that spreadsheet actually is, because I noticed that in plaintiff's counsel presentation of the spreadsheet, we didn't really get into what the spreadsheet purportedly said.

The spreadsheet is discussed in Paragraph 137 of the complaint.

And again, this is a CW, CW-2 who is undisputed, was not involved in SKAN implementation, it wasn't part of her job.

But what CW-2 says, a colleague showed me a spreadsheet.

When was that, Your Honor?  In August.  Not in April, not even in May, not in the month before April, but in August, three months later, and then CW-2 tells us what that spreadsheet was.

The spreadsheet was purported to show that a majority of advertisers had not implemented SKAN yet, meaning they had not put it in place, that is the plaintiff's allegation.

But there is a problem with that, Your Honor, because that spreadsheet, which is not contemporaneous with April and doesn't tell us anything that was known in April, is about the number of advertisers who had put SKAN into place.

It is not about the advertisers representing a percentage of direct response revenue.  That is a totally different number.

And, Your Honor, to take a step back, and this probably is obvious to Your Honor, but if you were a company and you had to work with your advertising partners to put a new system in place, you would not start with the people who spent $0.05 on advertising on your platform, right?

You would start with the people who spend the most money

on your platform and you work your way through the group of people.

Of course, it makes sense that you are going to trying to talk to advertisers who account for a significant portion of revenue.

There may be dozens and dozens of advertisers who account for a very small number of revenue who haven't implemented it yet, but that is not what Ms. Gorman said.

Ms. Gorman said advertisers representing a majority of direct response revenue.  That is not number of advertisers, it's how much revenue they represent.

The spreadsheet is an apples to oranges problem.  Not only is it apples to oranges, but it was viewed by someone who is not alleged to have had any involvement in SKAN implementation, and it's from August, it doesn't tell us anything in April.

THE COURT:  The problem is all of the evidence is exclusively in the defense's possession.

And if there is a colorable basis upon which to make the accusation, well, it's been made.

MS. SOLOWAY:  Well, Your Honor, the PSLRA at 9(b) say the plaintiffs have to come up with facts.

It's not the defendant's burden to show why -- at the motion to dismiss stage -- to show why the statement was supported, the plaintiffs are supposed to say why it's

unsupported.

If that is not the rule, then every time a defendant makes a false statement, the plaintiffs will throw their hands up in the air and say, you made a false statement, you must not have had a good faith basis to make it, but scienter requires more.

THE COURT:  They are saying something different here.

They are saying, even if we take the defense's argument on its face, the defense's argument is that Gorman only said there was successful implementation referencing the majority of Snap's big advertising clients.

And the plaintiff is saying that that statement is false because there was no evidence at that point in time, and, you know, we have CW-2 references this chart that was in August that shows a majority, even though a majority, I agree, majority is not the same.

I don't understand on what basis, other than something of that sort confidential CW, that they would have any basis upon which to make the statement?

I mean, all of the evidence is with the defense.

MS. SOLOWAY:  Right.

Your Honor, that is true in every case, right?  It's always true that plaintiffs don't get discovery in these cases, that is the law.

They don't get discovery and they have to come up with the facts, and very often they can do that with their CWs, but here, their CWs cannot help them because their CWs are either talking about spreadsheets that may be didn't even exist in April, and don't actually speak to the metric that the defendants are talking about, or their CWs don't know anything about SKAN implementation.

And, Your Honor, this gets to the core problem here, Your Honor, which is, plaintiff's counsel ended on the point that knowledge is very important here, right?  This all comes down to knowledge.

But what the plaintiffs are trying to do here is they are saying to Your Honor, we actually can't point you to evidence that shows Ms. Gorman's knowledge, because we have all agreed now, and it's in Your Honor's first decision and your tentative, that none of the CWs actually know what was in Mr. Gorman's head.

The plaintiffs have to point to other facts.  They have to plead factual allegations showing that someone at Snap, some employee at Snap -- some group of people at Snap, actually had the information that shows that Ms. Gorman spoke incorrectly when she made the statement about a substantial majority of direct response advertising revenue having successfully implemented.

THE COURT:  I have heard your response.

I will give the plaintiff's counsel a minute to respond. You can sit there, and speak into the microphone.

MS. SAXENA:  Thank you, Your Honor.

I don't really need to address much on the spreadsheet, because it wasn't a basis of Your Honor's finding in the order.

But simply to address this metric issue, if you refer to Exhibit 3, which is -- and I apologize, I don't have the document number, it was in an exhibit to defendant's motion to dismiss, it's the first quarter 2021 10Q, which is listed I noted down in Exhibit 3.  When they are talking about this being a very different metric, when they are talking about advertisers that represent the -- revenues that represent the majority of advertisers, and this is something different from the majority of advertisers.

First of all, I think that is an intentionally factual question.

It's also contradicted by their filing, itself, which when they talk about the nature of their revenue, they talk about it being very varied.

They say they don't have any one particular customer that amounts to any significant amount of revenue, that many of their customers are new and are only spending a little bit of money with them.

They specifically say that they don't have a single customer that accounts for more than 10 percent of revenue.

**UNITED STATES DISTRICT COURT**

Also, let's assume that it were true that maybe they had three big customers, and those big customers had all successfully implemented SKAN.

Well then, why would this day assigned to say, it's not looking good.  Wouldn't she then have said, well, it's not looking good in terms of quantity, but quality is there, because our three biggies have already successfully implemented, and that's not what she said.

Paragraph 137, when the person who is compiling the spreadsheet talks about it, it's very negative, it's not looking good.

And that's really, you know, all I have to say, Your Honor.  Thank you so much.

THE COURT:  All right.  Let me ask defense counsel, you were going to argue some other things and respond to that?

MS. SOLOWAY:  Yes, Your Honor.

Let me sort of let me wrap up this issue about Core Operations, then I want to make some additional points.

I actually respectfully submit, Your Honor, that it might be useful here for us to submit a supplemental brief on the Core Operations Doctrine, and how it applies in this situation, because when we have gone back through the case law in Core Operations, in each of the cases that we have identified, there was really no question that at the company at the time the inference is made that if would be absurd for

senior management not to know something, there was

contemporaneous information available at the company.

I will use the *Shenwick* case as an example, because we

see some of the reasoning in Your Honor' decision follows the

train of thought in that decision.

*Shenwick* is an example of a case where the facts are

far, far different, right?

There, you have multiple reasons why the company is

alleged to have contemporaneously been in knowledge of what

would here by knowing that advertisers had started testing this

and were actually not happy with SKAN.

There, you had CWs who said that the conduct at issue

there, which had, of course, to do with user engagement metrics

at Twitter, and whether MAU and DAU, were being properly

represented to the market, you had multiple CWs who said that

data was being presented and discussed at the company and with

management.

You had a letter coming in from the SEC criticizing the

way that the company did its disclosures about engagement data.

You also had a situation where nine out of 13 executives

had left the company by the end of the class period due to

issues with user engagement data, and so, there is multiple

pieces of information in *Shenwick* from which the Court could

conclude that someone at the company knew the problem, even if

the senior executive can't specifically be tied to the

information.

We would respectfully submit -- we would like to submit a supplemental brief explaining why, on these facts, because of that lack of contemporaneous information, it's impossible to apply the absurdity prong on this particular fact pattern.

I want to briefly, Your Honor, address the sort of the analysis that follows as well, because the Core Operations Doctrine, of course, isn't the end of the inquiry.

We, of course, have to go on and say, all right, well even if we can assume that some information could have made its way to Ms. Gorman as of April, which Your Honor, we vigorously refute, we have to take that in the context of a holistic analysis.  We have to look at everything else that is going on.

The first thing I want to address, Your Honor, is how fundamentally inconsistent it would be for Ms. Gorman to intentionally mislead shareholders when she, herself, is out there cautioning about, not just ATT, but about SKAN itself.

But plaintiff's counsel said, well, there were warnings about ATT, they were very general, they weren't about SKAN. Actually, Your Honor, that is not the case.

On April 22nd 2021, the same day of the alleged misstatement, Ms. Gorman said about SKAN, we know there is a lot of work to be done to transition smoothly.

On July 22nd, Ms. Gorman said that ATT adoption remains very early, and is causing some interruptions to demand.

And then she said, this is about the solutions, right, which include SKAN:  The solutions are not yet fully finalized and it's, quote, too early to determine... the scale of the potential interruptions to demand or the ultimate impact on the longer term growth of our business.

THE COURT:  That is June, right?

MS. SOLOWAY:  That is July, Your Honor, this is an important point as well.

In July, when Ms. Gorman starts to warn we are seeing interruptions to demand says that the solutions are not yet fully finalized, she's essentially saying these solutions, which include SKAN, are not yet fully finalized and we're starting to see a financial impact.

THE COURT:  Let me stop.  The problem is if it is found that April statement is misleading and that there was scienter, are you saying then, that this statement in July remedies that, so the period would end in July or something?

MS. SOLOWAY:  I would say that it's not -- I'm not arguing so much it remedies it, Your Honor, I am saying the fact that Ms. Gorman went out and repeatedly cautioned the market, as did the whole company.

THE COURT:  You cited two instances.  One the day after, and this one in July.

MS. SOLOWAY:  Your Honor, there are multiple instances.  I think we found 11 different cautionary statements

made across the class period warning that ATT could have a material impact on the business.

This is not a situation, I'm not sure what the comparison was that plaintiff's counsel was making to Facebook, and I have not gone and scoured every disclosure Facebook made, but I can tell you is we have scoured the disclosures and we have provided them in our papers.

On 11 instances throughout the class period, the defendants came out and said this is going to be a disruption, this is an issue in our industry, and this may have a material impact on our advertising revenue. The solutions are still being finalized, and in July, we're starting to see interruptions.

Of course, that culminates, Your Honor, in October with the company coming out and saying, okay, we missed by 0.3 percent for the third quarter.

Your Honor, even in the third quarter, they have a 0.3 percent miss.

But what happens is the company says, now that we're seeing the impact of this, we're going to lower our guidance for the next quarter, and that, of course, causes the stock price to drop.

THE COURT: Well, let me just ask, in July should she have raised the point as to whether or not there was a successful implementation?

MS. SOLOWAY:  I think, Your Honor, when she says that the solutions are not yet finalized, I think she is putting a point on the fact that we're still working through issues with the systems, but again, Your Honor, we still have a situation where as of July, there is nothing in the complaint that tells us when advertisers really started to surface their concerns.

I mean, this is a 9(b) case, right, Your Honor, who, what, where, when, and how.

What advertiser raised the concern?

When did it happen?

Who are they?

How much revenue did they account for?

Who at Snap, did they raise a concern to?

These are the basic building blocks of a fraud case, and they are completely absent from the plaintiff's complaint.

So to apply the Core Operations Doctrine --

THE COURT:  I didn't understand that last argument. You just said some customers should have raised a complaint?

MS. SOLOWAY:  Sorry, Your Honor.  The premise of the plaintiff's argument is that advertisers surfaced concerns about SKAN.

That is what ultimately gets disclosed in October, right?

As they work to bring the software to scale, even though

it initially performed fine, problems emerged.

So the point I'm making, Your Honor, that is a fact that is not pleaded as of April.

THE COURT:  What was the evidence that it initially performed fine?

MS. SOLOWAY:  Your Honor, the defendants say in October, while initially this performed fine, at some point, results diverged.

THE COURT:  But that is what the defendants say, but what is the evidence that it initially performed fine?

MS. SOLOWAY:  Again, we're not required to come forward with evidence.

The plaintiffs are required to come forward evidence of falsity.

THE COURT:  You cannot rely on your client's statement that it initially performed fine.  On what basis, would I rely on that?

In other words, I agree with you, it's up to them to establish, but when you say, oh yeah, it never broke, it never had a problem, it always worked fine, on what basis would I rely on that?

MS. SOLOWAY:  I guess what I'm saying is there is a record here.  The record is in the pleadings.

What we said, which the plaintiff's claim is an admission is the October statement.

They say that's an admission.

We say, it's not an admission, you are reading out of the statement that Ms. Gorman said that over time, these issues initial results were fine, these issues emerged later.

You are reading that out of the statement, therefore it's not an admission.  They are saying it's an admission.

As for the rest of the facts, it's the plaintiff's burden to come forward with facts.

Your Honor, if there were hundreds or thousands of advertisers out there across the industry that are using this product and the plaintiffs can't find any who say I talked to SKAN in April -- I talked to Snap in April, and I told them that I had started using SKAN, and it wasn't working for me. That is telling.

That is not in their complaint.  They don't say what advertisers raised concerns.  They don't say when they raised concerns.  They don't say how much revenue they accounted for. They don't give you any of those who, what, when, where and how facts at all.

When you couple that, the lack of factual allegations with the fact that we repeatedly warned the market with the fact that this is an -- as, Your Honor previously held, this is a statement susceptible of multiple meanings, which means that it's even a harder argument to make that Ms. Gorman intended to deceive shareholders, because it may well be the meaning

Ms. Gorman meant here was that successful implementation means, as an analyst asked her and she responded, it means we implemented it.

When you add all of that together, Your Honor, plus, and this is really important in the Ninth Circuit, the lack of motive, I mean, what the Ninth Circuit has said -- I know Your Honor knows this, this is in the *Prodanova* case, is the lack of motive is a substantial hurdle that makes a strong inference of scienter much less likely.

So when you weigh all of these things together, and you include the lack of financial gain, the lack of stock sales, there is no scienter articulated here for why Ms. Gorman would lie, much less why she would lie and then offer repeated cautionary language to the market about the impact of this product, it just doesn't carry the day, Your Honor.

THE COURT:  I understand the position of both sides. If I ask for further briefing, I will give each side three days, but I don't know if I'm going to ask for that, I will think about what you guys said.

Any last comments from the plaintiff's counsel?

MS. SAXENA:  Your Honor, we really don't feel that additional briefing is necessary.  The order very clearly --

THE COURT:  I don't care what you think, it's a matter of what I think.

MS. SAXENA:  Well, to that end, Your Honor's

articulation of very clear Ninth Circuit case law indicates it's really not necessary.

*Reese, Bursen*, the *South Fairy* case, these of all seminal cases that talk about the Core Operations Doctrine and they are very clear that this element is not required.

THE COURT:  Let me indicate to the parties, I'm not going to grant your motion to dismiss -- well, with prejudice. The best thing I would do is I would give them another chance to allege.  That is the best you can hope for.

I'm going to deny your motion or I will grant it, but give them leave to amend.

They are very close, if not, they are already crossed line, I can't figure it out now.  I will think about it some more.

MS. SOLOWAY:  We understand, Your Honor.  Of course, we will do that if and when it happens.

Our bottom line position is if the CWs or other facts can be pleaded that show contemporaneous falsity as of April, the plaintiff should come forward with those facts.

Giving them another opportunity to replead would put the onus on them to come forward with those facts.

I think the Core Operations Doctrine, Your Honor understands our argument.

We simply cannot find any cases that suggest you can assume something that was in existence at the time a statement

was made, absent factual allegations that something was in existence at the time the statement was made.

Thank you, Your Honor.

THE COURT:  Thank you very much, both sides.

(The proceedings concluded at 10:01 a.m.)

* * *

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


          I, TERRI A. HOURIGAN, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.


Date: 22nd day of September, 2023.



                            /s/ TERRI A. HOURIGAN
                    _____
                    TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                          Federal Court Reporter


**UNITED STATES DISTRICT COURT**

## $

**$0.05** [1] - 46:23
**$80** [2] - 40:22, 41:23

## /

**/s** [1] - 62:19

## 0

**0.3** [2] - 55:16, 55:17

## 1

**1** [1] - 32:20
**10** [1] - 50:25
**10019** [1] - 2:13
**10:01** [1] - 61:5
**10Q** [1] - 50:9
**11** [4] - 1:13, 3:1, 54:25, 55:8
**12** [1] - 19:7
**121** [1] - 40:25
**121-3** [1] - 34:12
**123** [1] - 18:6
**124** [3] - 20:6, 20:14, 24:20
**125** [8] - 17:25, 18:1, 18:11, 18:15, 19:21, 20:2, 20:4, 24:20
**126** [4] - 19:21, 20:3, 20:5, 37:4
**127** [1] - 37:4
**1285** [1] - 2:13
**13** [1] - 52:20
**136** [2] - 25:1, 35:14
**137** [3] - 35:15, 46:1, 51:9
**146** [1] - 37:4
**147** [1] - 37:4
**151** [1] - 37:5
**152** [1] - 37:5
**16** [1] - 4:16
**17** [2] - 17:2, 17:7
**18** [1] - 34:8
**1875** [1] - 2:18

## 2

**2** [5] - 34:8, 34:11, 34:13, 43:19, 44:15
**2-18** [1] - 34:14
**2018** [1] - 38:23
**2021** [15] - 5:9, 13:11, 13:15, 15:1, 15:8, 17:19, 17:20, 18:17, 28:20, 33:5, 36:19, 36:22, 37:1, 50:9, 53:21

**2023** [3] - 1:13, 3:1, 62:16
**20th** [1] - 43:11
**213** [1] - 1:24
**22-175** [1] - 1:7
**22nd** [5] - 7:1, 15:25, 53:21, 53:24, 62:16
**2300** [1] - 2:18
**27** [1] - 25:16
**28** [2] - 25:23, 62:9

## 3

**3** [3] - 43:19, 50:7, 50:10
**300** [1] - 2:6
**33434** [1] - 2:7
**350** [1] - 1:23
**3838** [2] - 1:22, 62:20

## 4

**4311** [1] - 1:23

## 5

**52** [1] - 38:19
**54** [1] - 38:19

## 6

**6** [1] - 34:14

## 7

**74** [2] - 34:18, 34:22
**753** [1] - 62:9
**7777** [1] - 2:6

## 8

**8** [4] - 14:4, 14:9, 21:8, 24:2
**86** [2] - 32:25, 41:18
**894-2849** [1] - 1:24
**8:30** [2] - 1:14, 3:2

## 9

**9** [2] - 24:12, 40:23
**9(b** [3] - 13:1, 47:21, 56:8
**90012** [1] - 1:24
**90067** [1] - 2:19

## A

**A.M** [1] - 1:14
**a.m** [2] - 3:2, 61:5
**ability** [3] - 22:13, 22:21

**able** [8] - 6:19, 21:2, 33:17, 33:18, 37:16, 41:2, 41:6, 41:19
**above-entitled** [1] - 62:12
**absent** [2] - 56:16, 61:1
**absolutely** [4] - 25:9, 28:13, 36:9, 37:10
**absurd** [6] - 13:16, 15:1, 16:16, 27:21, 43:8, 51:25
**absurdity** [5] - 12:23, 13:12, 27:25, 43:17, 53:5
**account** [6] - 25:15, 25:17, 25:19, 47:4, 47:7, 56:13
**accounted** [1] - 58:17
**accounts** [1] - 50:25
**accusation** [1] - 47:20
**acknowledges** [1] - 28:21
**acted** [1] - 13:3
**action** [1] - 4:4
**actual** [2] - 13:2, 13:3
**ad** [2] - 20:16, 24:6
**add** [1] - 59:4
**addition** [2] - 19:21, 37:3
**additional** [4] - 33:1, 34:2, 51:18, 59:22
**address** [8] - 11:17, 25:7, 27:16, 32:18, 50:4, 50:6, 53:6, 53:14
**addresses** [1] - 17:12
**addressing** [1] - 32:13
**admission** [5] - 57:25, 58:1, 58:2, 58:6
**admits** [1] - 19:11
**adopt** [1] - 38:9
**adoption** [2] - 14:12, 53:24
**ads** [1] - 39:11
**advantageous** [1] - 22:2
**adverse** [1] - 9:24
**advertise** [2] - 16:12
**advertiser** [3] - 23:11, 31:15, 56:10
**advertisers** [63] - 4:25, 5:7, 5:24, 6:15, 6:21, 7:5, 7:19, 8:2,

9:9, 10:6, 13:10, 13:17, 13:22, 14:2, 15:7, 16:4, 16:7, 16:11, 16:14, 17:8, 18:22, 19:10, 19:14, 19:23, 20:8, 20:15, 21:3, 22:7, 24:17, 24:24, 25:3, 28:17, 28:22, 31:3, 31:10, 31:13, 31:18, 31:21, 31:23, 33:11, 35:1, 35:8, 37:15, 38:9, 39:7, 39:17, 41:15, 45:8, 46:11, 46:16, 46:17, 47:4, 47:6, 47:9, 47:10, 50:12, 50:13, 50:14, 52:10, 56:6, 56:21, 58:10, 58:16
**advertisers'** [1] - 30:2
**advertising** [18] - 8:5, 10:11, 17:10, 23:15, 24:5, 24:13, 25:24, 27:1, 27:4, 32:23, 35:2, 35:9, 41:16, 46:22, 46:24, 48:12, 49:23, 55:11
**aggregate** [1] - 30:1
**aggregated** [2] - 22:15, 22:23
**ago** [2] - 38:22, 42:17
**agree** [4] - 11:21, 27:22, 48:16, 57:18
**agreed** [1] - 49:15
**air** [1] - 48:4
**al** [1] - 1:8
**align** [1] - 21:22
**aligned** [7] - 14:10, 14:18, 21:15, 21:18, 26:8, 26:16, 27:10
**allegation** [3] - 16:19, 27:22, 46:12
**allegations** [14] - 4:24, 16:18, 16:23, 19:18, 25:21, 27:18, 28:19, 36:5, 38:11, 44:23, 49:19, 58:20, 61:1
**allege** [2] - 25:23, 60:9
**alleged** [12] - 5:6, 13:8, 21:7, 25:10, 29:12, 30:16, 35:12, 38:7, 40:25, 47:14, 52:9, 53:21
**allegedly** [2] - 14:6, 18:12
**alleges** [1] - 39:6

**allowed** [2] - 22:7, 42:20
**alone** [1] - 36:20
**alternate** [1] - 10:4
**alternative** [4] - 31:9, 33:18, 39:10, 39:11
**ambiguity** [3] - 5:15, 5:18, 5:19
**amend** [1] - 60:11
**amended** [3] - 4:4, 22:3, 35:12
**Americas** [1] - 2:13
**amount** [1] - 50:21
**amounts** [1] - 50:21
**analysis** [6] - 37:24, 43:9, 43:15, 43:17, 53:7, 53:13
**analyst** [4] - 32:25, 33:5, 33:6, 59:2
**analysts** [3] - 33:3, 40:24, 41:23
**Android** [4] - 23:7, 23:10, 23:15, 23:18
**Androids** [1] - 23:7
**ANGELES** [4] - 1:14, 1:24, 3:1, 62:3
**Angeles** [1] - 2:19
**announced** [2] - 19:25, 39:22
**answer** [7] - 21:6, 23:25, 26:5, 35:24, 45:2, 45:4, 45:12
**answers** [1] - 44:25
**anticipated** [1] - 6:23
**apologize** [1] - 50:7
**APPEARANCES** [1] - 2:1
**appearances** [1] - 3:8
**Apple** [17] - 6:8, 6:15, 7:4, 7:11, 7:12, 7:13, 7:25, 8:1, 8:8, 16:11, 21:24, 22:13, 22:24, 23:13, 23:17, 28:5, 30:22
**Apple's** [2] - 9:25, 39:18
**apples** [2] - 47:12, 47:13
**application** [1] - 7:10
**applied** [2] - 4:19, 13:14
**applies** [2] - 12:23, 51:21
**apply** [4] - 13:6, 41:4, 53:5, 56:17
**applying** [1] - 4:16
**approach** [1] - 42:13
**appropriate** [2] - 37:19, 37:23

**UNITED STATES DISTRICT COURT**

April [40] - 5:9, 6:23, 7:1, 13:11, 13:15, 15:1, 15:8, 15:22, 15:25, 16:3, 16:6, 16:14, 17:8, 17:19, 17:20, 18:17, 20:24, 24:18, 24:22, 24:23, 27:20, 28:20, 28:22, 33:5, 34:25, 37:1, 43:11, 46:6, 46:7, 46:14, 46:15, 47:16, 49:5, 53:11, 53:21, 54:15, 57:3, 58:12, 60:18

area [3] - 9:25, 41:2, 44:10

argue [4] - 4:9, 30:8, 42:6, 51:15

argued [1] - 11:11

arguing [1] - 54:19

argument [10] - 9:7, 23:20, 32:8, 37:25, 48:9, 48:10, 56:18, 56:21, 58:24, 60:23

articulated [1] - 59:12

articulation [1] - 60:1

assess [1] - 14:25

assigned [1] - 51:4

assume [9] - 15:4, 16:16, 32:6, 32:9, 37:8, 37:10, 51:1, 53:10, 60:25

assumes [1] - 16:1

assuming [1] - 44:9

ATT [9] - 10:22, 25:17, 33:9, 36:13, 41:10, 53:17, 53:19, 53:24, 55:1

attaches [1] - 6:17

attempt [1] - 7:7

attempting [1] - 44:14

attempts [2] - 8:2, 22:22

attention [2] - 12:19, 35:14

Attorney [1] - 2:18

Attorneys [2] - 2:6, 2:12

attribute [1] - 40:1

Audra [3] - 3:19, 22:14, 22:16

AUDRA [1] - 2:11

August [6] - 36:19, 36:22, 46:6, 46:7, 47:15, 48:15

available [3] - 7:10, 7:11, 52:2

Avenue [1] - 2:13

aware [2] - 6:14, 43:8

**B**

backdrop [1] - 8:22

background [2] - 20:7, 26:25

bad [2] - 42:22, 42:25

barely [1] - 25:3

barren [1] - 27:18

based [4] - 22:8, 22:19, 22:23, 29:12

baseline [1] - 29:7

basic [2] - 22:6, 56:15

basis [21] - 7:24, 20:19, 20:22, 21:22, 22:23, 28:1, 30:14, 30:18, 32:7, 36:9, 38:2, 44:11, 44:16, 44:19, 47:19, 48:5, 48:18, 48:19, 50:5, 57:16, 57:20

basket [1] - 39:15

become [2] - 6:14, 15:8

becoming [1] - 13:22

begin [1] - 6:2

beginning [2] - 4:16, 9:4

begun [2] - 15:23, 25:3

behalf [7] - 3:11, 3:14, 3:17, 3:20, 3:25, 4:2, 32:3

behave [1] - 22:20

behavior [2] - 30:25

behind [3] - 37:14, 42:21, 42:22

belabor [3] - 10:9, 10:10, 42:8

best [4] - 31:9, 44:3, 60:8, 60:9

better [1] - 42:25

between [1] - 5:13

big [5] - 45:2, 45:4, 48:12, 51:2

biggies [1] - 51:7

billion [1] - 41:23

BIRD [1] - 2:16

bit [6] - 8:22, 10:10, 20:6, 29:24, 35:11, 50:22

BLACK [1] - 1:5

Black [1] - 3:6

black [1] - 11:19

blocks [1] - 56:15

Boca [1] - 2:7

boils [1] - 10:12

bottom [4] - 18:14, 34:8, 34:15, 60:17

BOXER [1] - 2:16

break [1] - 8:11

bridge [1] - 37:21

brief [3] - 8:18, 51:20, 53:3

briefing [3] - 26:25, 59:17, 59:22

briefly [2] - 25:8, 53:6

bring [2] - 43:3, 56:25

broke [1] - 57:19

brought [3] - 6:8, 32:12, 32:20

buckets [1] - 29:2

building [1] - 56:15

bunch [2] - 6:24, 8:6

BUNTING [2] - 2:12, 3:24

Bunting [2] - 3:25, 22:17

burden [5] - 30:20, 38:5, 45:11, 47:23, 58:8

Bursen [3] - 29:10, 43:14, 60:3

burst [1] - 38:21

business [6] - 5:24, 5:25, 19:9, 41:3, 54:5, 55:2

buy [1] - 22:9

buying [1] - 22:14

BY [3] - 2:4, 2:11, 2:17

**C**

CALIFORNIA [5] - 1:2, 1:14, 1:24, 3:1, 62:4

California [2] - 2:19, 62:8

campaigns [6] - 8:5, 20:16, 24:6, 27:5, 35:10, 41:16

cannot [5] - 7:23, 26:7, 49:3, 57:15, 60:24

care [3] - 33:14, 39:13, 59:23

career [1] - 32:4

cares [1] - 33:13

carry [1] - 59:15

case [27] - 5:3, 5:4, 6:7, 7:2, 9:18, 11:25, 13:9, 13:25, 20:20, 29:10, 29:11, 29:16,

29:20, 30:16, 37:18, 45:3, 45:5, 48:23, 51:22, 52:3, 52:6, 53:20, 56:8, 56:15, 59:7, 60:1, 60:3

Case [1] - 1:7

cases [8] - 12:8, 12:11, 29:3, 43:15, 48:24, 51:23, 60:4, 60:24

causes [1] - 55:21

causing [1] - 53:25

cautionary [2] - 54:25, 59:14

cautioned [1] - 54:20

cautioning [1] - 53:17

CCRR [1] - 1:22

cell [1] - 8:15

Central [1] - 62:8

CENTRAL [2] - 1:2

Century [1] - 2:18

certain [2] - 14:2, 22:19

certainly [1] - 32:11

CERTIFICATE [1] - 62:1

certify [1] - 62:8

challenge [1] - 30:19

chance [1] - 60:8

change [8] - 6:16, 7:21, 9:25, 23:11, 28:11, 30:1, 32:7, 36:13

changed [1] - 39:24

changes [8] - 10:22, 21:25, 33:9, 33:16, 34:3, 36:13, 39:18, 41:10

characteristics [1] - 22:19

characterization [1] - 17:13

characterizations [1] - 20:10

charge [1] - 29:7

charged [1] - 36:14

chart [1] - 48:15

Chase [1] - 3:17

chomping [1] - 29:24

Circuit [5] - 12:22, 43:14, 59:5, 59:6, 60:1

circumstance [1] - 33:23

circumstances [1] - 12:24

circumstantial [2] - 12:9, 12:12

citation [1] - 37:18

cite [2] - 14:3, 43:15

cited [1] - 54:22

cites [3] - 16:25, 18:9, 29:11

claim [2] - 5:5, 57:24

clarify [1] - 35:4

class [7] - 4:4, 40:23, 43:24, 44:5, 52:21, 55:1, 55:8

clear [4] - 25:16, 36:22, 60:1, 60:5

clearly [3] - 11:13, 38:20, 59:22

clerk [1] - 42:16

client [1] - 44:24

client's [1] - 57:15

clients [1] - 48:12

close [1] - 60:12

coal [1] - 42:23

code [1] - 8:15

Code [1] - 62:9

colleague [1] - 46:5

colorable [2] - 38:2, 47:19

coming [5] - 22:24, 34:4, 40:12, 52:18, 55:15

comment [1] - 30:14

comments [1] - 59:20

communicated [2] - 5:1, 16:15

companies [8] - 6:15, 6:20, 10:19, 27:1, 27:2, 27:3, 30:23, 40:9

company [27] - 7:6, 19:8, 19:16, 23:24, 29:6, 29:12, 39:20, 39:22, 39:24, 40:3, 40:21, 40:22, 41:5, 41:13, 41:14, 45:22, 46:21, 51:24, 52:2, 52:8, 52:16, 52:19, 52:21, 52:24, 54:21, 55:15, 55:19

company's [1] - 41:1

company-wide [1] - 19:16

comparison [1] - 55:4

compatibility [1] - 18:19

compiling [1] - 51:9

complaint [32] - 4:4, 4:23, 12:13, 12:14, 14:22, 16:6, 16:19, 16:21, 16:23, 17:16, 17:17, 17:25, 18:6, 24:16, 25:1, 26:5,

26:10, 27:19, 28:20, 34:19, 35:13, 38:7, 38:12, 38:17, 38:19, 39:6, 45:17, 46:2, 56:5, 56:16, 56:19, 58:15

**completely** [1] - 56:16

**computer** [3] - 8:12, 8:13, 8:16

**conceivable** [3] - 11:2, 11:23, 11:25

**conceivably** [2] - 11:13, 12:2

**concern** [3] - 21:24, 56:10, 56:14

**concerns** [13] - 5:7, 9:22, 9:24, 24:15, 24:18, 25:15, 25:17, 38:14, 45:9, 56:7, 56:21, 58:16, 58:17

**conclude** [1] - 52:24

**concluded** [1] - 61:5

**conclusion** [1] - 29:16

**conclusions** [1] - 22:19

**conduct** [1] - 52:12

**conference** [1] - 62:13

**confidential** [2] - 5:3, 48:19

**confirmed** [1] - 17:8

**conformance** [1] - 62:13

**Congress** [1] - 45:4

**connect** [1] - 17:3

**connected** [3] - 6:1, 9:4, 44:21

**connection** [3] - 9:15, 9:16, 9:23

**consequences** [1] - 10:3

**consistent** [2] - 20:10, 23:3

**constantly** [1] - 43:4

**constitute** [1] - 43:7

**consumers** [1] - 41:6

**contain** [1] - 4:24

**contemporaneous** [6] - 15:24, 25:18, 46:14, 52:2, 53:4, 60:18

**contemporaneously** [1] - 52:9

**contentions** [2] - 44:7, 44:10

**contestant** [1] - 42:19

**context** [2] - 33:7,

53:12

**continue** [2] - 34:21, 43:16

**contradicted** [1] - 50:17

**contradictory** [1] - 27:18

**contrary** [1] - 37:6

**control** [1] - 44:17

**convey** [2] - 28:8, 28:10

**core** [1] - 49:8

**Core** [18] - 4:17, 4:19, 12:23, 13:12, 14:25, 16:22, 27:24, 29:1, 36:4, 41:4, 43:4, 51:17, 51:21, 51:23, 53:7, 56:17, 60:4, 60:22

**correct** [5] - 16:2, 19:13, 30:15, 36:1, 62:10

**correction** [1] - 21:17

**corrective** [6] - 13:25, 14:5, 14:17, 21:7, 26:7, 28:24

**cost** [1] - 44:5

**COUNSEL** [1] - 2:1

**counsel** [17] - 3:9, 19:17, 27:15, 29:23, 32:12, 33:24, 35:18, 36:8, 43:3, 44:6, 45:24, 49:9, 50:1, 51:14, 53:18, 55:4, 59:20

**counsel's** [1] - 44:7

**counsels** [1] - 5:16

**COUNTY** [1] - 62:3

**couple** [1] - 58:20

**course** [13] - 5:7, 5:12, 12:25, 22:24, 23:11, 42:24, 47:3, 52:13, 53:8, 53:9, 55:14, 55:21, 60:15

**COURT** [93] - 1:1, 1:23, 3:6, 3:12, 3:18, 3:21, 4:3, 4:9, 4:11, 4:14, 4:21, 5:10, 5:18, 6:4, 6:9, 7:12, 8:11, 8:19, 9:12, 9:21, 10:10, 11:7, 11:16, 12:5, 12:16, 15:9, 17:22, 18:1, 18:3, 18:25, 19:17, 20:1, 20:4, 20:13, 20:25, 21:10, 21:13, 21:22, 22:11, 23:5, 23:17, 23:20, 24:25, 26:12, 26:18, 26:21, 28:1,

29:22, 30:7, 30:14, 31:11, 31:25, 32:6, 32:14, 34:1, 34:5, 34:9, 34:13, 34:16, 34:20, 34:22, 34:24, 35:6, 35:16, 35:18, 35:24, 37:2, 37:25, 39:16, 40:3, 41:7, 42:6, 42:14, 43:20, 43:22, 44:6, 45:14, 47:17, 48:7, 49:25, 51:14, 54:6, 54:14, 54:22, 55:23, 56:18, 57:4, 57:9, 57:15, 59:16, 59:23, 60:6, 61:4

**Court** [7] - 4:20, 4:23, 35:18, 52:23, 62:7, 62:20

**Court's** [1] - 25:14

**criticizing** [1] - 52:18

**crossed** [1] - 60:12

**CRR** [1] - 62:20

**CSR** [2] - 1:22, 62:20

**culminates** [1] - 55:14

**curiosity** [1] - 40:6

**current** [1] - 4:23

**customer** [2] - 50:20, 50:25

**customers** [7] - 19:19, 27:6, 44:21, 50:22, 51:2, 56:19

**CV** [1] - 1:7

**CV-21-8892** [1] - 1:7

**CW** [11] - 16:24, 16:25, 17:11, 17:13, 17:14, 17:17, 18:12, 19:7, 36:14, 46:3, 48:19

**CW-1** [10] - 17:17, 18:12, 19:22, 24:20, 24:21, 28:20, 31:17, 37:3, 38:13, 44:15

**CW-1's** [2] - 20:10, 28:21

**CW-2** [20] - 20:11, 25:1, 25:2, 25:7, 25:9, 25:13, 25:14, 25:23, 26:1, 35:16, 35:17, 36:6, 36:8, 36:11, 38:13, 46:3, 46:5, 46:8, 48:15

**CW-2's** [3] - 25:15, 25:17, 25:19

**CWs** [16] - 17:3, 17:5, 17:8, 18:8, 18:10, 35:22, 35:25, 36:2, 49:2, 49:3, 49:6, 49:16, 52:12, 52:15,

60:17

---

**D**

---

**Dan** [2] - 3:22, 22:16

**DANIEL** [1] - 2:11

**data** [18] - 6:17, 6:21, 6:22, 7:9, 22:15, 22:18, 22:23, 22:25, 27:3, 33:19, 36:17, 37:14, 37:20, 39:8, 40:19, 52:16, 52:19, 52:22

**Date** [1] - 62:16

**dating** [1] - 17:8

**DAU** [1] - 52:14

**days** [3] - 26:20, 26:22, 59:18

**deceive** [3] - 12:3, 13:4, 58:25

**decided** [1] - 45:5

**decision** [5] - 29:11, 32:10, 49:15, 52:4, 52:5

**decisions** [1] - 7:19

**decline** [4] - 39:23, 40:1, 40:21, 41:1

**defeat** [1] - 32:5

**defects** [2] - 38:16, 39:4

**DEFENDANT** [2] - 2:9, 2:15

**defendant** [6] - 5:21, 30:7, 30:8, 32:21, 37:6, 48:2

**defendant's** [6] - 21:10, 26:6, 34:7, 34:11, 47:23, 50:8

**Defendants** [1] - 1:9

**defendants** [13] - 3:18, 3:20, 3:23, 3:25, 4:2, 5:13, 8:25, 11:24, 45:9, 49:6, 55:9, 57:6, 57:9

**defense** [11] - 32:12, 33:24, 35:18, 36:8, 37:25, 38:6, 43:3, 44:6, 44:18, 48:21, 51:14

**defense's** [5] - 31:25, 44:17, 47:18, 48:9, 48:10

**deficiencies** [3] - 14:21, 14:23, 15:3

**define** [2] - 33:6, 33:7

**definitely** [1] - 42:9

**delay** [1] - 33:22

**demand** [3] - 53:25, 54:4, 54:10

**deny** [1] - 60:10

**dependent** [1] - 45:3

**derived** [1] - 41:5

**derives** [1] - 21:6

**description** [1] - 26:24

**detailed** [2] - 36:19, 36:23

**details** [2] - 29:16, 39:20

**determination** [1] - 37:17

**determine..** [1] - 54:3

**determined** [1] - 17:9

**determining** [1] - 36:12

**devastating** [1] - 40:12

**develop** [2] - 10:4, 24:17

**developing** [2] - 8:8, 30:13

**devices** [1] - 6:18

**difference** [1] - 21:12

**different** [12] - 8:2, 26:23, 29:2, 31:6, 32:19, 34:15, 46:19, 48:7, 50:11, 50:13, 52:7, 54:25

**differently** [1] - 40:9

**difficult** [1] - 24:5

**direct** [12] - 5:8, 13:10, 13:17, 19:15, 23:15, 31:21, 35:2, 35:8, 35:14, 46:18, 47:10, 49:23

**directed** [1] - 28:3

**directly** [3] - 5:1, 19:23, 37:20

**disappear** [1] - 6:22

**disappeared** [1] - 24:9

**disappearing** [1] - 7:9

**disclosed** [1] - 56:23

**disclosure** [9] - 13:25, 14:5, 14:17, 21:7, 24:3, 26:7, 28:24, 33:25, 55:5

**disclosures** [3] - 30:11, 52:19, 55:6

**discovery** [4] - 9:18, 10:20, 48:24, 49:1

**discussed** [4] - 23:6, 43:12, 46:1, 52:16

**discussion** [1] - 4:16

**discussions** [1] - 26:25

**DISMISS** [1] - 1:13

dismiss [9] - 4:4, 8:24, 11:1, 11:8, 11:9, 34:12, 47:24, 50:9, 60:7
dispute [3] - 5:12, 7:15, 29:20
disruption [1] - 55:9
dissatisfied [1] - 13:22
distinction [1] - 40:8
District [2] - 62:7, 62:8
DISTRICT [3] - 1:1, 1:2, 1:3
diverge [3] - 14:14, 26:10, 27:11
diverged [2] - 26:9, 57:8
DIVISION [1] - 1:2
docket [2] - 34:10, 34:17
Doctrine [13] - 4:17, 4:19, 12:23, 13:13, 14:25, 16:22, 29:1, 36:4, 51:21, 53:8, 56:17, 60:4, 60:22
doctrine [1] - 13:6
document [2] - 43:11, 50:8
Document [1] - 34:12
dollars [2] - 27:4, 29:18
DOLPERT [1] - 2:16
done [3] - 22:13, 41:17, 53:23
door [2] - 42:21, 42:22
Doors [1] - 43:19
doors [2] - 42:20, 42:22
double [1] - 8:13
doubles [1] - 33:4
doubts [3] - 35:19, 35:20, 35:21
down [4] - 10:12, 33:4, 49:11, 50:10
download [2] - 33:13, 33:14
downloaded [1] - 33:12
dozens [2] - 47:6
dragged [1] - 18:22
dramatic [2] - 27:24
dramatically [1] - 42:4
drastic [1] - 30:1
draw [2] - 22:19, 44:14
DROOKS [1] - 2:16

drop [1] - 55:22
due [1] - 52:21
during [3] - 32:8, 40:23, 43:25

**E**

early [6] - 20:23, 24:18, 27:20, 32:4, 53:25, 54:3
earnings [1] - 39:21
easier [1] - 34:19
East [1] - 2:18
effect [2] - 9:16, 29:13
effective [8] - 17:19, 17:21, 18:17, 24:22, 24:24, 39:1, 40:1, 41:20
effectively [1] - 20:16
eggs [1] - 39:14
either [3] - 37:1, 45:20, 49:3
EKWAN [1] - 2:17
Ekwan [1] - 4:1
element [4] - 11:14, 43:4, 43:5, 60:5
emerge [1] - 28:25
emerged [9] - 13:22, 14:20, 14:22, 14:23, 15:3, 20:23, 27:19, 57:1, 58:4
emerges [1] - 20:23
employee [1] - 49:20
en [1] - 24:9
enabled [1] - 33:22
enables [1] - 34:1
enacted [1] - 21:25
encouraging [1] - 31:3
end [4] - 52:21, 53:8, 54:17, 59:25
endeavor [1] - 19:24
ended [1] - 49:9
ends [1] - 43:9
engagement [3] - 52:13, 52:19, 52:22
entire [3] - 6:7, 8:1, 39:24
entirely [5] - 4:21, 11:2, 20:10, 37:19, 44:17
entitled [2] - 36:25, 62:12
especially [1] - 14:24
essence [1] - 10:12
essentially [4] - 6:17, 22:18, 33:4, 54:11

establish [3] - 35:22, 38:6, 57:19
establishing [1] - 36:3
et [1] - 1:8
eventually [2] - 13:24, 26:9
everyones' [1] - 6:18
evidence [21] - 5:3, 12:9, 12:12, 12:13, 16:6, 16:13, 34:25, 35:6, 38:5, 38:6, 38:7, 44:16, 44:24, 47:17, 48:14, 48:21, 49:14, 57:4, 57:10, 57:12, 57:13
evolution [1] - 24:11
exactly [4] - 6:11, 7:14, 14:5, 45:15
example [5] - 20:14, 29:10, 45:14, 52:3, 52:6
exclusively [1] - 47:18
executive [4] - 29:4, 29:15, 29:17, 52:25
executives [1] - 52:20
exhibit [2] - 34:7, 50:8
Exhibit [6] - 34:8, 34:11, 34:13, 34:14, 50:7, 50:10
exist [1] - 49:4
existed [2] - 31:10, 37:5
existence [2] - 60:25, 61:2
expectations [2] - 21:23, 26:13
expected [1] - 24:4
experience [3] - 6:3, 18:22, 18:24
expert [1] - 22:5
explained [1] - 25:2
explaining [1] - 53:3
explored [1] - 24:14
extension [2] - 27:24, 27:25
extent [2] - 4:21, 11:17

**F**

face [1] - 48:10
Facebook [10] - 10:13, 10:15, 10:18, 40:4, 40:9, 40:11, 40:18, 55:4, 55:5
facing [1] - 10:13

fact [19] - 16:7, 25:12, 25:18, 28:19, 29:7, 31:8, 33:21, 34:3, 34:25, 36:11, 41:9, 41:14, 42:12, 53:5, 54:20, 56:3, 57:2, 58:21, 58:22
facts [18] - 13:2, 13:6, 36:3, 37:5, 45:3, 45:6, 45:11, 47:22, 49:2, 49:18, 52:6, 53:3, 58:7, 58:8, 58:19, 60:17, 60:19, 60:21
factual [8] - 25:20, 28:19, 30:20, 44:11, 49:19, 50:15, 58:20, 61:1
fair [1] - 29:16
Fairy [1] - 60:3
faith [2] - 15:14, 48:5
fall [1] - 29:3
falls [1] - 30:20
false [8] - 11:13, 12:2, 12:7, 13:19, 48:3, 48:4, 48:13
falsity [7] - 11:12, 11:17, 11:19, 25:18, 25:20, 57:14, 60:18
far [2] - 52:7
features [1] - 22:2
FEDERAL [1] - 1:23
Federal [2] - 62:6, 62:20
federal [1] - 45:5
feet [1] - 18:22
few [4] - 19:11, 29:2, 32:11, 38:22
fewer [1] - 42:11
figure [2] - 27:3, 60:13
filing [1] - 50:17
filings [1] - 41:8
final [1] - 32:10
finalized [5] - 54:2, 54:11, 54:12, 55:12, 56:2
financial [2] - 54:13, 59:11
fine [7] - 57:1, 57:5, 57:7, 57:10, 57:16, 57:20, 58:4
firmly [1] - 39:14
first [15] - 3:9, 4:23, 5:21, 10:17, 14:11, 14:15, 18:18, 21:17, 27:12, 32:17, 38:9, 49:15, 50:9, 50:15, 53:14
FIRST [1] - 1:23

Florida [1] - 2:7
focus [6] - 4:15, 5:17, 11:18, 12:19, 16:18
focused [2] - 33:20, 39:2
following [1] - 25:1
follows [2] - 52:4, 53:7
FOR [3] - 2:3, 2:9, 2:15
foregoing [1] - 62:10
format [1] - 62:12
fortune [1] - 41:1
forward [6] - 45:6, 57:12, 57:13, 58:8, 60:19, 60:21
framing [1] - 13:8
frankly [2] - 12:17, 27:18
fraud [2] - 45:5, 56:15
fraudulent [1] - 17:4
front [1] - 45:20
fully [5] - 15:12, 20:16, 54:2, 54:11, 54:12
fun [1] - 44:5
fundamentally [1] - 53:15
future [2] - 40:14, 40:24

**G**

gain [1] - 59:11
game [2] - 43:23, 43:25
gaming [1] - 19:9
gap [1] - 37:22
GARRISON [1] - 2:10
general [1] - 53:19
generally [4] - 14:10, 21:15, 26:16, 27:10
generate [1] - 9:16
GEORGE [1] - 1:3
Glades [1] - 2:6
goat [1] - 42:22
Gorman [40] - 5:1, 7:2, 11:23, 12:2, 13:15, 14:1, 15:2, 15:4, 15:22, 16:16, 17:4, 19:1, 19:13, 20:18, 25:4, 27:21, 27:23, 28:1, 28:15, 29:8, 32:21, 35:7, 37:6, 44:10, 45:19, 47:8, 47:9, 48:10, 49:21, 53:11, 53:15,

53:22, 53:24, 54:9, 54:20, 58:3, 58:24, 59:1, 59:12

**Gorman's** [8] - 5:4, 9:6, 13:7, 13:9, 21:17, 31:19, 49:14, 49:17
**grant** [2] - 60:7, 60:10
**gray** [1] - 11:20
**grim** [1] - 40:25
**ground** [1] - 11:12
**group** [2] - 47:1, 49:20
**growth** [2] - 41:3, 54:5
**guess** [2] - 42:20, 57:22
**guessed** [1] - 42:21
**guidance** [1] - 55:20
**guide** [1] - 11:18
**guys** [1] - 59:19

## H

**halted** [1] - 29:12
**hampered** [1] - 17:10
**hand** [1] - 42:13
**handful** [1] - 31:18
**hands** [1] - 48:3
**happy** [3] - 16:7, 17:15, 52:11
**harder** [2] - 23:12, 58:24
**hardly** [1] - 36:20
**Harvey** [1] - 43:24
**head** [1] - 49:17
**headwinds** [1] - 33:8
**hear** [3] - 4:12, 23:21, 32:1
**heard** [2] - 44:1, 49:25
**HEARING** [1] - 1:13
**held** [7] - 10:25, 11:4, 12:22, 25:19, 26:3, 58:22, 62:11
**help** [2] - 27:5, 49:3
**helped** [1] - 25:24
**helps** [1] - 22:18
**hereby** [1] - 62:8
**herself** [1] - 53:16
**high** [1] - 13:1
**highest** [1] - 36:16
**holistic** [1] - 53:12
**honestly** [1] - 44:4
**Honor** [153] - 3:10, 3:13, 3:15, 3:19, 3:22, 3:24, 4:1, 4:7, 4:8, 4:10, 4:12, 4:15, 4:18, 4:22, 5:11, 5:20, 6:7, 6:13, 7:16, 8:17, 8:20,

8:21, 8:25, 9:5, 9:7, 9:17, 10:1, 10:17, 10:25, 11:10, 11:21, 12:11, 12:22, 13:7, 13:14, 13:20, 13:23, 13:25, 14:3, 14:8, 14:17, 14:20, 14:24, 15:4, 15:16, 16:1, 16:9, 16:20, 16:24, 17:2, 17:4, 17:7, 17:11, 17:15, 17:16, 17:18, 17:24, 18:2, 18:4, 18:9, 19:20, 20:6, 20:9, 20:21, 21:6, 21:11, 22:4, 23:9, 23:19, 23:25, 24:7, 24:12, 24:19, 25:7, 25:12, 25:14, 25:19, 26:2, 26:14, 26:19, 26:24, 27:11, 27:14, 28:9, 28:18, 29:1, 29:9, 29:10, 30:6, 30:15, 30:18, 30:24, 31:12, 31:17, 32:2, 33:13, 34:12, 34:21, 35:4, 35:23, 36:2, 37:8, 37:19, 40:7, 41:4, 41:19, 42:9, 42:12, 42:17, 43:6, 43:17, 43:21, 44:25, 45:12, 45:16, 46:6, 46:13, 46:20, 46:21, 47:21, 48:23, 49:8, 49:9, 49:13, 50:3, 51:13, 51:16, 51:19, 53:6, 53:11, 53:14, 53:20, 54:7, 54:19, 54:24, 55:14, 55:17, 56:1, 56:4, 56:8, 56:20, 57:2, 57:6, 58:9, 58:22, 59:4, 59:7, 59:15, 59:21, 60:15, 60:22, 61:3
**Honor'** [1] - 52:4
**Honor's** [12] - 8:24, 11:2, 12:18, 17:12, 25:16, 25:22, 35:14, 35:21, 37:18, 49:15, 50:5, 59:25
**HONORABLE** [1] - 1:3
**hooked** [1] - 31:3
**HOOKER** [2] - 2:5, 3:13
**Hooker** [1] - 3:14
**hope** [1] - 60:9
**hoped** [1] - 24:10
**hoping** [1] - 42:25
**host** [1] - 39:3

**HOURIGAN** [4] - 1:22, 62:6, 62:19, 62:20
**hundreds** [1] - 58:9
**hurdle** [1] - 59:8

## I

**iceberg** [3] - 40:11, 40:12, 40:16
**idea** [4] - 26:1, 27:17, 37:10, 44:4
**identified** [4] - 16:14, 22:18, 28:23, 51:24
**IDFA** [19] - 6:16, 7:4, 7:7, 7:9, 7:22, 7:23, 8:9, 10:3, 10:7, 15:18, 16:8, 18:13, 22:7, 22:25, 24:9, 26:23, 27:3, 33:19, 40:20
**immediately** [1] - 39:6
**impact** [15] - 9:24, 29:12, 33:15, 36:12, 41:10, 41:11, 41:21, 41:22, 41:25, 54:4, 54:13, 55:2, 55:11, 55:20, 59:14
**impactful** [1] - 41:3
**implement** [7] - 9:1, 16:3, 18:23, 31:19, 32:22, 33:1, 36:24
**implementation** [28] - 10:15, 15:10, 17:1, 19:25, 21:4, 25:5, 25:11, 25:21, 25:24, 26:2, 28:2, 28:7, 30:17, 33:7, 36:20, 36:21, 38:1, 38:3, 38:8, 39:7, 44:19, 44:20, 46:4, 47:15, 48:11, 49:7, 55:25, 59:1
**implementations** [2] - 4:25, 44:12
**implemented** [29] - 5:9, 5:22, 5:23, 5:25, 13:11, 19:2, 19:3, 19:12, 19:15, 19:19, 28:16, 31:14, 31:15, 31:22, 33:12, 35:3, 35:5, 35:9, 36:24, 37:1, 37:15, 41:15, 42:4, 46:11, 47:8, 49:24, 51:3, 51:8, 59:3
**implementing** [3] - 9:19, 25:9, 28:13
**implicated** [1] - 29:19

**implicit** [1] - 37:13
**implied** [1] - 13:12
**important** [8] - 10:24, 12:15, 19:22, 20:9, 37:7, 49:10, 54:8, 59:5
**importantly** [1] - 15:7
**impossible** [1] - 53:4
**inability** [1] - 40:1
**INC** [1] - 1:8
**include** [3] - 54:2, 54:12, 59:11
**including** [4] - 30:12, 43:14
**inconsistent** [3] - 38:17, 53:15
**incorrect** [1] - 19:1
**incorrectly** [1] - 49:21
**independently** [1] - 35:22
**indicate** [1] - 60:6
**indicates** [1] - 60:1
**individual** [3] - 6:21, 22:8, 30:1
**industry** [16] - 6:14, 7:6, 14:10, 14:12, 14:19, 16:10, 21:15, 26:9, 26:12, 26:16, 27:7, 28:10, 30:21, 41:24, 55:10, 58:10
**industry-wide** [2] - 16:10, 30:21
**infer** [2] - 29:4, 29:17
**inference** [4] - 30:25, 36:25, 51:25, 59:8
**information** [18] - 4:25, 5:5, 13:21, 15:6, 17:5, 18:7, 21:3, 30:2, 35:11, 35:12, 37:4, 37:16, 49:21, 52:2, 52:23, 53:1, 53:4, 53:10
**inherent** [1] - 39:9
**initial** [11] - 12:18, 14:9, 14:18, 21:9, 21:14, 21:23, 23:3, 26:8, 26:15, 27:9, 58:4
**inquiry** [1] - 53:8
**insight** [2] - 19:13, 19:16
**installed** [1] - 31:4
**installing** [2] - 10:23, 15:20
**instances** [3] - 54:22, 54:25, 55:8
**instead** [2] - 33:10, 45:11

**intended** [3] - 8:8, 12:3, 58:24
**intent** [1] - 13:4
**intentionally** [2] - 50:15, 53:16
**interact** [1] - 36:15
**interacts** [2] - 19:10, 19:11
**interjecting** [1] - 43:4
**internal** [1] - 25:17
**interpret** [2] - 9:6, 11:3
**interpretation** [3] - 9:1, 11:1, 11:24
**interpretations** [1] - 11:23
**interruptions** [4] - 53:25, 54:4, 54:10, 55:13
**intimately** [1] - 20:7
**investors** [4] - 9:6, 11:3, 12:3, 39:2
**investors'** [2] - 9:22, 9:24
**involved** [5] - 18:12, 19:23, 20:7, 25:24, 46:4
**involvement** [1] - 47:14
**iOS** [1] - 22:3
**iOSs** [1] - 21:25
**iPhone** [1] - 6:18
**iPhones** [2] - 6:16, 23:16
**irregardless** [1] - 44:22
**iSOs** [1] - 21:5
**issue** [16] - 13:20, 13:21, 16:9, 16:10, 16:24, 32:7, 32:18, 41:7, 41:21, 43:6, 43:7, 43:13, 50:6, 51:17, 52:12, 55:10
**issued** [1] - 4:5
**issues** [5] - 38:20, 52:22, 56:4, 58:3, 58:4
**issuing** [1] - 42:10
**itself** [5] - 5:10, 8:7, 10:24, 50:17, 53:17

## J

**job** [1] - 46:4
**Joseph** [1] - 3:15
**JOSEPH** [1] - 2:5
**JUDGE** [1] - 1:3
**judges** [1] - 32:7
**judicial** [1] - 62:13

**UNITED STATES DISTRICT COURT**

**July** [9] - 53:24, 54:7, 54:9, 54:16, 54:17, 54:23, 55:12, 55:23, 56:5
**jump** [4] - 12:14, 12:21, 16:20, 16:21
**jumped** [1] - 30:8
**June** [1] - 54:6

## K

**keenly** [1] - 39:2
**KELLIE** [1] - 1:5
**key** [1] - 42:5
**kicked** [1] - 33:16
**kids** [2] - 22:9, 22:14
**kind** [6] - 9:10, 16:20, 38:16, 38:21, 39:4, 40:5
**knowing** [1] - 52:10
**knowledge** [14] - 5:4, 13:8, 13:9, 16:25, 17:4, 29:4, 29:8, 40:5, 43:4, 43:5, 49:10, 49:11, 49:14, 52:9
**known** [8] - 5:5, 15:6, 25:10, 29:15, 38:23, 45:10, 45:22, 46:15
**knows** [6] - 12:22, 19:9, 26:2, 37:14, 41:11, 59:7
**KRAMER** [2] - 2:11, 3:22
**Kramer** [2] - 3:22, 22:16
**KRISTINA** [1] - 2:12
**Kristina** [2] - 3:24, 22:17

## L

**LA** [1] - 42:18
**lack** [6] - 53:4, 58:20, 59:5, 59:7, 59:11
**lacks** [1] - 12:13
**language** [2] - 21:9, 59:14
**large** [1] - 22:17
**largely** [1] - 4:18
**laser** [1] - 5:17
**last** [6] - 8:24, 8:25, 10:25, 56:18, 59:20
**latent** [1] - 39:3
**launched** [7] - 17:19, 17:20, 18:16, 24:21, 24:22, 24:23
**launching** [2] - 28:21, 28:22
**Law** [3] - 2:6, 2:12,

2:18
**law** [10] - 11:5, 12:20, 12:25, 42:18, 43:14, 43:24, 44:1, 48:25, 51:22, 60:1
**lead** [1] - 3:14
**lean** [3] - 14:11, 31:2, 31:5
**leaned** [4] - 21:16, 23:2, 31:6, 31:8
**least** [1] - 18:23
**leave** [1] - 60:11
**leaves** [1] - 26:4
**led** [1] - 41:16
**left** [2] - 8:21, 52:21
**legacy** [2] - 24:9, 39:8
**less** [2] - 59:9, 59:13
**Lester** [1] - 3:13
**LESTER** [1] - 2:5
**letter** [1] - 52:18
**level** [3] - 6:22, 38:9, 40:19
**levels** [1] - 36:16
**Levin** [2] - 43:25
**lie** [2] - 59:13
**likely** [3] - 9:5, 11:3, 59:9
**limit** [1] - 44:20
**limitations** [2] - 17:9, 24:15
**limited** [1] - 23:17
**LINCENBERG** [1] - 2:17
**line** [2] - 60:13, 60:17
**lion's** [1] - 41:5
**listed** [1] - 50:9
**LLP** [1] - 2:10
**look** [20] - 10:20, 14:5, 15:16, 16:23, 17:5, 17:16, 18:6, 18:11, 22:16, 24:2, 29:1, 29:10, 32:24, 34:16, 36:11, 42:15, 45:17, 45:18, 45:22, 53:13
**looking** [7] - 14:8, 17:23, 30:23, 33:3, 51:5, 51:6, 51:11
**looks** [2] - 17:15, 40:25
**LOS** [4] - 1:14, 1:24, 3:1, 62:3
**Los** [1] - 2:19
**lose** [1] - 22:21
**loss** [9] - 6:3, 6:4, 6:11, 6:12, 7:3, 7:8, 10:3, 10:7, 15:19
**lost** [3] - 8:9, 28:3, 39:7

**lower** [1] - 55:20
**luck** [2] - 42:25

## M

**main** [1] - 40:24
**majority** [21] - 5:8, 13:10, 13:17, 19:1, 19:2, 19:14, 31:13, 31:16, 31:21, 35:1, 35:2, 35:8, 46:10, 47:9, 48:11, 48:16, 48:17, 49:22, 50:13, 50:14
**manage** [1] - 24:6
**management** [4] - 36:16, 43:8, 52:1, 52:17
**MARELLA** [1] - 2:16
**market** [21] - 8:1, 10:24, 13:3, 15:20, 18:19, 30:22, 33:3, 33:13, 33:15, 33:20, 38:14, 38:18, 38:20, 38:25, 39:13, 41:17, 41:19, 52:15, 54:21, 58:21, 59:14
**masse** [1] - 24:9
**material** [2] - 55:2, 55:10
**matter** [4] - 3:6, 11:5, 59:24, 62:12
**MAU** [1] - 52:14
**MAYA** [1] - 2:4
**Maya** [2] - 3:10, 32:2
**mean** [19] - 5:18, 6:5, 6:11, 6:13, 10:12, 11:4, 15:12, 15:24, 16:4, 18:19, 20:17, 21:10, 21:24, 30:8, 31:23, 35:5, 48:21, 56:8, 59:6
**meaning** [4] - 9:6, 15:19, 46:11, 58:25
**meaningfully** [3] - 14:14, 21:21, 27:11
**meanings** [1] - 58:23
**means** [14] - 5:14, 9:1, 9:9, 9:19, 11:6, 11:22, 24:7, 24:8, 26:18, 26:19, 28:16, 58:23, 59:1, 59:2
**meant** [7] - 5:22, 9:8, 15:17, 16:1, 33:11, 59:1
**measure** [3] - 8:3, 24:5, 26:23
**measurement** [12] - 14:13, 14:15, 14:16, 21:20, 26:9, 27:2,

27:11, 27:13, 28:17, 28:23, 30:12
**meeting** [1] - 43:11
**mention** [1] - 25:21
**mentioned** [2] - 15:18, 36:6
**merely** [1] - 32:9
**met** [2] - 36:17, 43:19
**method** [1] - 40:18
**metric** [3] - 49:5, 50:6, 50:11
**metrics** [1] - 52:13
**microphone** [1] - 50:2
**might** [3] - 22:20, 34:19, 51:20
**millions** [1] - 29:18
**mind** [1] - 32:7
**minimizing** [1] - 9:24
**minute** [2] - 36:7, 50:1
**misfortune** [1] - 42:18
**mislead** [1] - 53:16
**misleading** [1] - 54:15
**miss** [1] - 55:18
**missed** [2] - 44:5, 55:15
**missing** [1] - 16:19
**misstatement** [4] - 5:6, 13:9, 30:16, 53:22
**misstatements** [1] - 29:13
**mistake** [1] - 15:14
**mitigate** [3] - 10:2, 10:4, 33:8
**mode** [1] - 10:11
**modicum** [2] - 21:3, 39:17
**moment** [4] - 10:21, 14:5, 25:13, 34:9
**MONDAY** [1] - 3:1
**Monday** [1] - 1:13
**money** [4] - 7:20, 23:16, 46:25, 50:23
**monitor** [4] - 6:21, 7:20, 7:23, 20:16
**month** [1] - 46:7
**months** [3] - 15:1, 45:10, 46:8
**morning** [7] - 3:10, 3:13, 3:15, 3:19, 3:24, 4:1, 32:2
**most** [2] - 37:7, 46:25
**MOTION** [1] - 1:13
**motion** [10] - 4:3,

8:24, 10:25, 11:7, 11:9, 34:11, 47:24, 50:8, 60:7, 60:10
**motive** [2] - 59:6, 59:8
**MR** [5] - 3:13, 3:15, 3:17, 3:22, 4:1
**MS** [90] - 3:10, 3:19, 3:24, 4:7, 4:8, 4:10, 4:12, 4:15, 4:22, 5:11, 5:20, 6:6, 6:13, 7:15, 8:17, 8:20, 9:17, 10:1, 10:17, 11:10, 11:21, 12:11, 12:17, 15:16, 17:24, 18:2, 18:4, 19:6, 19:20, 20:2, 20:6, 20:21, 21:6, 21:11, 21:14, 22:4, 22:12, 23:9, 23:19, 23:22, 25:7, 26:14, 26:19, 26:22, 28:9, 30:3, 30:10, 30:15, 31:12, 32:2, 32:11, 32:17, 34:2, 34:7, 34:11, 34:14, 34:18, 34:21, 34:23, 35:4, 35:11, 35:17, 35:20, 36:1, 37:3, 38:11, 39:19, 40:7, 41:9, 42:7, 42:17, 43:21, 44:3, 44:25, 45:15, 47:21, 48:22, 50:3, 51:16, 54:7, 54:18, 54:24, 56:1, 56:20, 57:6, 57:11, 57:22, 59:21, 59:25, 60:15
**multiple** [5] - 52:8, 52:15, 52:22, 54:24, 58:23
**must** [2] - 45:9, 48:4

## N

**nature** [3] - 11:17, 11:19, 50:18
**necessarily** [2] - 9:14, 9:23
**necessary** [4] - 36:3, 37:21, 59:22, 60:2
**need** [11] - 8:11, 8:12, 8:15, 10:20, 11:14, 14:25, 30:2, 42:8, 42:15, 43:18, 50:4
**negative** [1] - 51:10
**NESSIM** [1] - 2:16
**network** [2] - 35:3, 35:10
**never** [3] - 12:8, 57:19

**new** [5] - 7:18, 28:4, 38:15, 46:22, 50:22
**New** [2] - 2:13
**newly** [1] - 35:12
**news** [1] - 39:21
**next** [1] - 55:21
**Nike's** [2] - 22:9, 22:10
**nine** [1] - 52:20
**Ninth** [5] - 12:22, 43:13, 59:5, 59:6, 60:1
**NO** [2] - 1:22, 62:20
**none** [3] - 29:3, 39:3, 49:16
**note** [1] - 20:10
**noted** [1] - 50:10
**notes** [1] - 41:19
**nothing** [3] - 24:16, 26:2, 56:5
**noticed** [1] - 45:23
**nowhere** [1] - 7:12
**number** [9] - 7:3, 30:11, 32:14, 34:10, 46:16, 46:19, 47:7, 47:10, 50:8

## O

**observed** [8] - 14:9, 14:14, 14:18, 21:14, 21:21, 26:16, 27:9, 27:12
**obvious** [1] - 46:21
**obviously** [2] - 24:10, 35:24
**occurred** [1] - 25:5
**October** [13] - 13:25, 14:3, 14:22, 20:23, 23:25, 33:25, 38:15, 39:22, 45:8, 55:14, 56:23, 57:7, 57:25
**OF** [6] - 1:2, 1:12, 2:1, 62:1, 62:3, 62:4
**offer** [2] - 40:13, 59:13
**Official** [1] - 62:6
**OFFICIAL** [2] - 1:23, 62:1
**often** [2] - 12:12, 49:2
**old** [4] - 6:20, 11:11, 26:20, 26:22
**once** [3] - 33:16, 39:25, 43:6
**one** [50] - 5:6, 7:3, 7:5, 7:10, 9:1, 10:4, 10:5, 11:19, 11:24, 13:8, 16:24, 17:11, 18:16, 18:18, 19:7,

19:22, 20:12, 20:13, 21:13, 23:11, 23:22, 24:21, 27:14, 29:5, 30:5, 30:7, 30:19, 31:6, 32:6, 32:17, 32:20, 32:24, 34:9, 35:6, 36:5, 37:7, 37:14, 38:2, 39:12, 41:18, 42:7, 42:12, 42:16, 43:24, 44:10, 45:2, 50:20, 54:22, 54:23
**onus** [1] - 60:21
**oOo** [1] - 3:3
**operates** [1] - 39:17
**Operations** [18] - 4:17, 4:19, 12:23, 13:13, 14:25, 16:22, 27:24, 29:1, 36:4, 41:4, 43:4, 51:18, 51:21, 51:23, 53:7, 56:17, 60:4, 60:22
**opportunity** [2] - 42:24, 60:20
**opposite** [1] - 40:15
**optimize** [2] - 8:4, 27:5
**oral** [1] - 32:8
**oranges** [2] - 47:12, 47:13
**order** [8] - 6:1, 8:15, 12:1, 36:2, 37:8, 42:10, 50:5, 59:22
**orders** [3] - 29:13, 29:18, 29:21
**originally** [1] - 27:9
**own** [4] - 11:2, 18:8, 21:7, 28:21

## P

**PA** [1] - 2:4
**page** [14] - 4:16, 5:2, 14:4, 14:9, 17:2, 17:7, 21:8, 24:2, 24:12, 25:16, 25:23, 34:8, 34:14, 62:12
**pages** [1] - 34:15
**pair** [1] - 22:9
**paper** [3] - 42:14, 42:15, 45:20
**papers** [2] - 7:13, 55:7
**paragraph** [4] - 17:22, 18:21, 20:1, 34:5
**Paragraph** [14] - 18:1, 18:6, 18:11, 18:15, 19:21, 20:14, 25:1, 32:25, 34:18,

34:22, 40:25, 41:18, 46:1, 51:9
**Paragraphs** [4] - 20:2, 24:20, 35:14, 38:19
**paraphrasing** [1] - 26:14
**Park** [1] - 2:18
**part** [4] - 19:24, 36:15, 36:17, 46:4
**particular** [8] - 10:11, 15:15, 27:5, 28:2, 30:4, 44:16, 50:20, 53:5
**particularized** [1] - 4:24
**particularly** [1] - 37:23
**parties** [1] - 60:6
**partner** [1] - 32:22
**partners** [8] - 15:23, 24:5, 24:13, 25:25, 27:1, 32:23, 33:2, 46:22
**party** [3] - 14:15, 27:2, 27:12
**past** [1] - 23:4
**pattern** [1] - 53:5
**PAUL** [1] - 2:10
**Paul** [3] - 3:20, 3:22, 3:25
**pause** [1] - 14:4
**pays** [1] - 21:13
**PC** [1] - 2:17
**people** [11] - 7:23, 8:4, 13:3, 19:10, 22:21, 23:16, 43:24, 46:23, 46:25, 47:2, 49:20
**percent** [3] - 50:25, 55:16, 55:18
**percentage** [1] - 46:18
**perform** [1] - 24:10
**performance** [2] - 17:10, 18:20
**performed** [5] - 57:1, 57:5, 57:7, 57:10, 57:16
**period** [7] - 10:16, 40:23, 43:25, 52:21, 54:17, 55:1, 55:8
**person** [7] - 7:24, 19:7, 22:22, 36:9, 51:9
**person-by-person** [2] - 7:24, 22:22
**personally** [1] - 17:21
**phone** [2] - 8:15,

22:8
**phrase** [2] - 26:13, 42:5
**pick** [1] - 42:20
**picked** [1] - 32:25
**picture** [2] - 45:2, 45:4
**piece** [5] - 5:22, 6:17, 7:10, 42:14, 45:20
**pieces** [1] - 52:23
**pipes** [1] - 6:1
**place** [11] - 9:2, 9:20, 10:6, 10:23, 15:19, 16:4, 28:12, 29:21, 46:12, 46:16, 46:23
**plaintiff** [6] - 3:14, 34:24, 45:6, 45:7, 48:13, 60:19
**PLAINTIFF** [1] - 2:3
**plaintiff's** [26] - 3:8, 5:5, 9:7, 17:13, 19:17, 21:7, 21:10, 25:20, 27:15, 29:23, 32:1, 38:4, 38:5, 44:7, 45:11, 45:24, 46:12, 49:9, 50:1, 53:18, 55:4, 56:16, 56:21, 57:24, 58:7, 59:20
**Plaintiffs** [1] - 1:6
**plaintiffs** [26] - 3:11, 3:17, 5:13, 11:14, 11:25, 13:2, 16:2, 18:7, 20:22, 25:23, 26:7, 29:11, 30:18, 30:20, 31:17, 32:3, 44:14, 45:18, 47:22, 47:25, 48:3, 48:24, 49:12, 49:18, 57:13, 58:11
**plan** [1] - 6:24
**platform** [2] - 46:24, 47:1
**platforms** [3] - 7:21, 14:11, 16:12
**plead** [7] - 11:15, 12:1, 20:22, 26:10, 45:11, 45:13, 49:19
**pleaded** [3] - 12:12, 57:3, 60:18
**pleading** [1] - 13:1
**pleadings** [1] - 57:23
**pleads** [1] - 17:17
**pleased** [1] - 13:18
**pled** [1] - 28:19
**plenty** [1] - 19:20
**plus** [1] - 59:4
**point** [25] - 9:11, 9:12, 9:14, 10:9, 10:21, 21:1, 23:22, 27:14, 27:16, 33:24,

34:10, 37:11, 39:16, 42:8, 43:2, 44:17, 48:14, 49:9, 49:13, 49:18, 54:8, 55:24, 56:3, 57:2, 57:7
**points** [4] - 32:11, 32:15, 32:16, 51:18
**policy** [2] - 45:2, 45:4
**portion** [1] - 47:4
**position** [3] - 31:25, 59:16, 60:17
**positive** [1] - 9:16
**possession** [1] - 47:18
**possibility** [1] - 31:20
**possible** [1] - 15:18
**possibly** [2] - 37:21, 42:1
**potential** [1] - 54:4
**pre** [1] - 22:3
**pre-amended** [1] - 22:3
**precisely** [1] - 29:15
**predict** [2] - 22:22, 23:13
**prejudice** [1] - 60:7
**premise** [1] - 56:20
**prepare** [2] - 6:24, 10:7
**presentation** [1] - 45:24
**presented** [3] - 29:5, 30:22, 52:16
**presume** [1] - 4:5
**previous** [1] - 21:4
**previously** [4] - 21:4, 26:3, 35:19, 58:22
**price** [1] - 55:22
**Price** [1] - 42:19
**privacy** [5] - 6:16, 9:25, 10:22, 21:25, 33:16
**prizes** [1] - 42:20
**problem** [16] - 8:12, 8:17, 10:8, 15:10, 18:10, 20:23, 27:19, 40:4, 45:8, 46:13, 47:12, 47:17, 49:8, 52:24, 54:14, 57:20
**problematic** [3] - 19:6, 38:24, 39:1
**problems** [11] - 14:2, 14:19, 16:14, 28:5, 28:23, 28:25, 39:3, 39:5, 39:8, 45:10, 57:1
**procedures** [1] - 9:25

**proceedings** [3] - 11:5, 61:5, 62:11
**process** [5] - 6:2, 15:20, 36:15, 36:17, 36:18
**Prodanova** [1] - 59:7
**product** [14] - 7:4, 8:1, 8:5, 8:6, 8:8, 8:10, 9:2, 16:11, 21:18, 22:1, 33:2, 58:11, 59:15
**products** [1] - 8:7
**program** [3] - 9:19, 19:19, 38:10
**programming** [1] - 22:3
**prominence** [2] - 43:7, 43:13
**prong** [4] - 12:23, 13:12, 27:25, 53:5
**properly** [2] - 43:18, 52:14
**proposition** [1] - 29:4
**proprietary** [1] - 30:13
**prove** [1] - 12:1
**provide** [4] - 8:2, 21:2, 23:1, 25:20
**provided** [1] - 55:7
**PSLRA** [2] - 12:25, 47:21
**purport** [2] - 18:7, 22:5
**purported** [2] - 21:17, 46:10
**purportedly** [5] - 7:13, 14:23, 16:25, 29:6, 45:25
**purpose** [1] - 36:3
**pursuant** [1] - 62:9
**push** [1] - 14:12
**put** [12] - 7:11, 9:2, 10:6, 15:19, 16:4, 21:25, 28:12, 39:14, 46:12, 46:16, 46:22, 60:20
**putting** [3] - 9:19, 10:23, 56:3

### Q

**quality** [1] - 51:6
**quantity** [1] - 51:6
**quarter** [4] - 50:9, 55:16, 55:17, 55:21
**quarterly** [1] - 39:21
**quick** [2] - 42:7, 44:8
**quickly** [1] - 43:3
**quite** [2] - 20:4,

35:11
**quote** [5] - 24:3, 25:22, 25:23, 27:10, 54:3
**quotes** [2] - 17:12, 21:8

### R

**raise** [1] - 56:14
**raised** [5] - 55:24, 56:10, 56:19, 58:16
**raises** [1] - 14:21
**RANKIN** [1] - 3:17
**Rankin** [1] - 3:17
**rare** [2] - 12:24, 13:6
**rather** [1] - 23:15
**Raton** [1] - 2:7
**reacted** [1] - 40:9
**read** [3] - 24:19, 25:12, 29:3
**reading** [3] - 34:22, 58:2, 58:5
**ready** [2] - 28:11, 28:12
**reaffirmed** [1] - 41:16
**really** [24] - 9:19, 10:8, 12:14, 16:18, 16:24, 17:11, 32:25, 36:5, 38:16, 40:21, 40:24, 41:2, 41:5, 41:16, 42:22, 43:15, 45:25, 50:4, 51:12, 51:24, 56:6, 59:5, 59:21, 60:2
**Realtime** [1] - 62:6
**realtime** [1] - 41:6
**reason** [1] - 40:24
**reasonable** [1] - 36:25
**reasonably** [1] - 11:22
**reasoning** [1] - 52:4
**reasons** [1] - 52:8
**recapture** [2] - 40:19, 41:2
**recess** [1] - 8:18
**record** [3] - 15:24, 57:23
**Reese** [4] - 37:18, 37:20, 43:14, 60:3
**refer** [1] - 50:6
**reference** [1] - 37:20
**references** [3] - 35:15, 38:1, 48:15
**referencing** [1] - 48:11
**referring** [5] - 20:1, 20:2, 26:15, 34:6,

34:10
**reflected** [1] - 40:21
**reflecting** [1] - 31:13
**refute** [1] - 53:12
**regime** [2] - 6:20, 18:13
**regulations** [1] - 62:13
**released** [1] - 39:21
**relevant** [2] - 14:24, 32:18
**relied** [2] - 26:1, 27:1
**rely** [5] - 8:9, 45:21, 57:15, 57:17, 57:21
**relying** [3] - 9:10, 16:5, 28:17
**remaining** [2] - 7:2, 30:16
**remains** [1] - 53:24
**remedies** [2] - 54:17, 54:19
**remember** [1] - 26:24
**rendered** [1] - 20:15
**repeated** [1] - 59:13
**repeatedly** [2] - 54:20, 58:21
**replacements** [1] - 39:16
**replead** [1] - 60:20
**reported** [1] - 62:11
**REPORTER** [2] - 1:23, 62:1
**Reporter** [2] - 62:7, 62:20
**REPORTER'S** [1] - 1:12
**reporting** [1] - 14:2
**represent** [3] - 47:11, 50:12
**represented** [4] - 25:4, 35:1, 35:8, 52:15
**representing** [7] - 5:7, 13:10, 13:17, 19:14, 31:21, 46:17, 47:9
**required** [3] - 57:11, 57:13, 60:5
**requirements** [1] - 44:9
**requires** [1] - 48:5
**requisite** [2] - 43:7, 43:13
**respect** [1] - 33:25
**respectfully** [4] - 12:13, 28:18, 51:19, 53:2
**respond** [5] - 29:24, 43:22, 44:7, 50:1, 51:15

**responded** [1] - 59:2
**response** [17] - 5:8, 13:10, 13:17, 19:15, 28:2, 28:6, 31:22, 32:1, 35:2, 35:9, 38:4, 42:4, 44:13, 46:18, 47:10, 49:23, 49:25
**rest** [1] - 58:7
**restore** [1] - 22:2
**result** [1] - 9:10
**results** [21] - 7:20, 8:3, 14:9, 14:13, 14:14, 14:18, 21:9, 21:14, 21:21, 22:23, 23:3, 23:13, 26:8, 26:15, 27:9, 27:11, 27:12, 44:1, 57:8, 58:4
**retread** [1] - 11:11
**reveals** [1] - 14:6
**revenue** [24] - 5:8, 13:11, 13:17, 19:15, 29:12, 29:18, 31:13, 31:22, 35:2, 35:9, 36:12, 41:5, 46:18, 47:5, 47:7, 47:10, 47:11, 49:23, 50:18, 50:21, 50:25, 55:11, 56:13, 58:17
**revenues** [1] - 50:12
**review** [1] - 30:11
**reviewed** [1] - 37:16
**RHOW** [3] - 2:17, 2:17, 4:1
**Rhow** [1] - 4:1
**RIFKIND** [1] - 2:10
**road** [1] - 40:15
**Road** [1] - 2:6
**role** [1] - 25:9
**rolled** [1] - 8:1
**ROOM** [1] - 1:23
**rose** [1] - 42:4
**Roxanne** [1] - 36:18
**RPR** [1] - 62:20
**rule** [2] - 31:20, 48:2
**Rule** [1] - 13:1
**ruled** [1] - 10:22
**rules** [1] - 45:5
**ruling** [8] - 4:18, 8:24, 8:25, 12:18, 25:14, 25:16, 25:22
**rulings** [1] - 35:21
**rumor** [1] - 42:9
**run** [1] - 26:7

### S

**SACENA** [1] - 2:4
**sales** [1] - 59:11
**satisfy** [1] - 30:2

**saw** [5] - 14:13, 21:20, 27:11, 31:18, 40:11
**SAXENA** [33] - 2:4, 3:10, 4:7, 19:20, 20:2, 20:6, 32:2, 32:11, 32:17, 34:2, 34:7, 34:11, 34:14, 34:18, 34:21, 34:23, 35:4, 35:11, 35:17, 35:20, 36:1, 37:3, 38:11, 39:19, 40:7, 41:9, 42:7, 42:17, 43:21, 44:3, 50:3, 59:21, 59:25
**Saxena** [5] - 3:10, 3:11, 3:14, 3:16, 32:2
**scale** [4] - 24:4, 24:8, 54:3, 56:25
**scene** [1] - 38:21
**school** [2] - 43:24, 44:1
**scienter** [15] - 4:18, 5:16, 11:11, 11:15, 11:18, 12:1, 12:9, 13:1, 31:1, 35:22, 37:21, 48:5, 54:16, 59:9, 59:12
**scientist** [1] - 36:18
**scoured** [2] - 55:5, 55:6
**SEC** [2] - 41:8, 52:18
**second** [4] - 19:4, 33:10, 45:3, 45:12
**secondly** [1] - 20:9
**secret** [1] - 41:11
**Section** [1] - 62:9
**see** [5] - 16:19, 45:22, 52:4, 54:13, 55:12
**seeing** [4] - 21:19, 33:9, 54:9, 55:20
**seeking** [1] - 7:25
**seem** [1] - 40:18
**seminal** [1] - 60:4
**senior** [5] - 29:4, 29:15, 29:17, 52:1, 52:25
**sense** [2] - 40:13, 47:3
**September** [2] - 1:13, 62:16
**SEPTEMBER** [1] - 3:1
**set** [5] - 9:3, 12:20, 13:1, 13:5
**setting** [1] - 15:21
**settings** [1] - 6:16
**severely** [1] - 17:9
**share** [3] - 40:22,

40:23, 41:5
**shareholders** [2] - 53:16, 58:25
**Shenwick** [3] - 52:3, 52:6, 52:23
**show** [9] - 9:18, 12:1, 27:19, 43:23, 43:25, 46:10, 47:23, 47:24, 60:18
**showed** [1] - 46:5
**showing** [2] - 13:2, 49:19
**shows** [5] - 31:8, 45:19, 48:16, 49:14, 49:21
**side** [6] - 5:24, 5:25, 9:3, 9:4, 32:1, 59:17
**sides** [3] - 4:5, 59:16, 61:4
**signal** [4] - 6:3, 6:4, 6:11
**signals** [1] - 24:9
**significant** [6] - 13:20, 38:11, 39:8, 39:22, 47:4, 50:21
**similar** [4] - 7:14, 23:8, 23:10, 37:19
**simply** [4] - 27:19, 43:5, 50:6, 60:24
**single** [1] - 50:24
**sit** [1] - 50:2
**situation** [9] - 10:13, 15:15, 37:20, 37:23, 40:10, 51:22, 52:20, 55:3, 56:5
**situations** [1] - 12:6
**six** [2] - 15:1, 45:10
**SKAN** [113] - 5:1, 5:9, 5:23, 6:2, 7:4, 7:5, 7:10, 7:22, 7:25, 8:7, 8:8, 8:10, 8:22, 9:2, 10:5, 13:11, 13:18, 13:22, 14:2, 14:10, 14:13, 14:15, 14:18, 15:3, 15:8, 15:10, 15:12, 15:15, 15:19, 16:7, 16:10, 16:15, 17:1, 17:18, 18:13, 18:16, 18:19, 18:23, 19:15, 19:19, 19:23, 20:8, 20:14, 20:23, 21:2, 21:15, 22:1, 22:2, 22:6, 22:11, 22:12, 22:22, 24:4, 24:14, 24:21, 25:3, 25:5, 25:10, 25:22, 25:24, 25:25, 26:2, 26:8, 26:16, 26:21, 27:9, 27:11, 27:20, 28:4, 28:17, 28:21,

28:23, 30:4, 30:5, 30:7, 30:9, 30:15, 30:17, 31:2, 35:3, 35:9, 36:13, 36:20, 37:10, 38:9, 38:20, 38:21, 38:23, 39:9, 39:14, 41:15, 42:1, 44:21, 45:8, 46:4, 46:11, 46:16, 47:14, 49:7, 51:3, 52:11, 53:17, 53:19, 53:22, 54:2, 54:12, 56:22, 58:12, 58:13
**SKAN's** [1] - 17:9
**skirt** [1] - 40:17
**slides** [4] - 42:9, 42:11, 42:12, 42:15
**slowly** [1] - 39:4
**small** [1] - 47:7
**smoothly** [1] - 53:23
**Snap** [31] - 3:7, 5:23, 6:15, 6:20, 7:5, 7:13, 14:1, 14:9, 15:6, 16:9, 16:11, 16:16, 18:13, 18:18, 23:1, 23:17, 25:2, 30:13, 30:22, 32:21, 33:16, 35:10, 40:15, 40:20, 41:7, 49:19, 49:20, 56:14, 58:12
**SNAP** [1] - 1:8
**Snap's** [8] - 5:8, 13:10, 17:10, 19:18, 25:21, 30:25, 35:2, 48:12
**snatch** [1] - 32:4
**software** [9] - 5:23, 5:25, 7:11, 9:3, 10:24, 28:12, 28:13, 31:4, 56:25
**SOLOWAY** [58] - 2:11, 3:19, 4:8, 4:10, 4:12, 4:15, 4:22, 5:11, 5:20, 6:6, 6:13, 7:15, 8:17, 8:20, 9:17, 10:1, 10:17, 11:10, 11:21, 12:11, 12:17, 15:16, 17:24, 18:2, 18:4, 19:6, 20:21, 21:6, 21:11, 21:14, 22:4, 22:12, 23:9, 23:19, 23:22, 25:7, 26:14, 26:19, 26:22, 28:9, 30:3, 30:10, 30:15, 31:12, 44:25, 45:15, 47:21, 48:22, 51:16, 54:7, 54:18, 54:24, 56:1, 56:20, 57:6, 57:11, 57:22, 60:15
**Soloway** [2] - 3:20,

22:14
**solution** [23] - 10:5, 14:11, 14:16, 15:18, 16:8, 21:16, 23:1, 23:2, 23:3, 28:18, 28:24, 30:5, 30:13, 30:21, 31:2, 31:5, 31:7, 33:18, 39:2, 39:25, 40:4, 41:20, 42:2
**solutions** [22] - 7:3, 7:18, 8:7, 14:10, 14:15, 14:19, 21:15, 24:14, 26:9, 26:17, 27:8, 27:13, 30:5, 30:12, 39:13, 39:14, 54:1, 54:2, 54:10, 54:11, 55:11, 56:2
**solve** [2] - 15:10, 28:5
**solved** [1] - 40:4
**someone** [4] - 15:5, 47:13, 49:19, 52:24
**sorry** [3] - 8:19, 35:1, 56:20
**sort** [7] - 8:9, 13:23, 29:7, 45:2, 48:19, 51:17, 53:6
**sorted** [1] - 23:14
**sources** [1] - 44:13
**South** [1] - 60:3
**speaking** [1] - 13:3
**specifically** [2] - 50:24, 52:25
**spend** [2] - 7:20, 46:25
**spending** [3] - 23:15, 23:16, 50:22
**spent** [2] - 27:4, 46:23
**spreadsheet** [17] - 36:6, 36:19, 36:23, 45:14, 45:19, 45:23, 45:24, 45:25, 46:1, 46:5, 46:9, 46:10, 46:14, 47:12, 50:4, 51:10
**spreadsheets** [2] - 45:21, 49:4
**stage** [2] - 11:4, 47:24
**standalone** [1] - 14:16
**standard** [3] - 13:1, 14:19, 27:7
**standards** [2] - 26:17, 43:19
**start** [2] - 46:23, 46:25
**started** [7] - 21:18,

24:8, 24:17, 28:17, 52:10, 56:6, 58:13
**starting** [3] - 3:8, 54:13, 55:12
**starts** [1] - 54:9
**STATE** [1] - 62:4
**statement** [46] - 5:10, 5:12, 5:14, 5:15, 5:22, 7:1, 7:2, 9:6, 9:13, 9:14, 11:1, 11:4, 11:6, 11:13, 12:2, 12:4, 13:16, 13:19, 14:1, 14:3, 15:2, 15:17, 26:6, 26:15, 29:21, 31:19, 33:21, 34:25, 35:7, 37:12, 37:13, 47:24, 48:3, 48:4, 48:13, 48:20, 49:22, 54:15, 54:16, 57:16, 57:25, 58:3, 58:5, 58:23, 60:25, 61:2
**statements** [4] - 20:19, 32:24, 33:4, 54:25
**States** [3] - 62:7, 62:9, 62:14
**STATES** [1] - 1:1
**stenographically** [1] - 62:11
**step** [5] - 6:6, 8:9, 16:22, 19:22, 46:20
**still** [6] - 17:5, 39:9, 39:11, 55:11, 56:3, 56:4
**stock** [4] - 29:17, 42:4, 55:21, 59:11
**stop** [4] - 29:13, 29:20, 34:5, 54:14
**stop-work** [2] - 29:13, 29:20
**story** [2] - 38:16, 43:22
**STREET** [1] - 1:23
**strong** [1] - 59:8
**student** [1] - 42:18
**submit** [6] - 12:13, 28:18, 51:19, 51:20, 53:2
**submitted** [1] - 5:21
**subsequent** [1] - 39:21
**substantial** [2] - 49:22, 59:8
**substitute** [6] - 6:2, 7:7, 7:22, 10:23, 16:7
**success** [3] - 26:12, 33:6, 37:17
**successful** [18] - 15:9, 25:6, 28:2, 28:6,

30:17, 33:7, 36:21, 37:11, 38:1, 38:3, 38:8, 44:2, 44:11, 44:19, 44:20, 48:11, 55:25, 59:1
**successfully** [31] - 5:8, 5:22, 9:1, 9:9, 9:10, 9:15, 9:16, 9:18, 9:23, 10:15, 13:11, 16:3, 16:5, 19:2, 19:3, 19:15, 19:19, 28:13, 28:16, 31:14, 31:15, 31:22, 35:3, 35:9, 36:24, 41:15, 42:3, 44:21, 49:23, 51:3, 51:7
**sufficient** [4] - 25:20, 38:7, 44:15, 44:23
**suggest** [3] - 24:19, 30:24, 60:24
**suggested** [1] - 28:16
**suggesting** [2] - 25:18, 36:8
**Suite** [2] - 2:6, 2:18
**summarize** [2] - 18:7, 25:2
**Sunday** [1] - 42:10
**supplemental** [2] - 51:20, 53:3
**support** [2] - 18:16, 25:20
**supported** [1] - 47:25
**supposed** [3] - 19:25, 22:11, 47:25
**surface** [1] - 56:6
**surfaced** [5] - 24:14, 38:16, 39:4, 39:5, 56:21
**surfacing** [1] - 45:9
**surrounding** [1] - 25:17
**susceptible** [1] - 58:23
**system** [8] - 9:4, 10:6, 18:13, 23:13, 28:4, 44:22, 46:22
**systems** [3] - 23:7, 23:10, 56:4

## T

**talks** [5] - 17:3, 17:7, 27:7, 36:6, 51:10
**target** [3] - 8:4, 27:5
**targeting** [1] - 23:16
**tasked** [2] - 36:11, 36:12
**technology** [1] - 22:5

**tend** [1] - 29:3
**tens** [1] - 29:18
**tentative** [17] - 4:5, 4:16, 4:18, 12:18, 12:19, 14:4, 14:8, 17:2, 17:7, 17:12, 18:9, 21:8, 24:2, 24:13, 32:9, 32:10, 49:16
**tentatives** [1] - 32:7
**term** [3] - 6:11, 44:20, 54:5
**terms** [3] - 6:10, 13:8, 51:6
**TERRI** [4] - 1:22, 62:6, 62:19, 62:20
**test** [4] - 32:22, 33:1, 33:22, 34:1
**tested** [1] - 24:14
**testing** [3] - 6:2, 15:23, 52:10
**THE** [94] - 2:3, 2:9, 2:15, 3:6, 3:12, 3:18, 3:21, 4:3, 4:9, 4:11, 4:14, 4:21, 5:10, 5:18, 6:4, 6:9, 7:12, 8:11, 8:19, 9:12, 9:21, 10:10, 11:7, 11:16, 12:5, 12:16, 15:9, 17:22, 18:1, 18:3, 18:25, 19:17, 20:1, 20:4, 20:13, 20:25, 21:10, 21:13, 21:22, 22:11, 23:5, 23:17, 23:20, 24:25, 26:12, 26:18, 26:21, 28:1, 29:22, 30:7, 30:14, 31:11, 31:25, 32:6, 32:14, 34:1, 34:5, 34:9, 34:13, 34:16, 34:20, 34:22, 34:24, 35:6, 35:16, 35:18, 35:24, 37:2, 37:25, 39:16, 40:3, 41:7, 42:6, 42:14, 43:20, 43:22, 44:6, 45:14, 47:17, 48:7, 49:25, 51:14, 54:6, 54:14, 54:22, 55:23, 56:18, 57:4, 57:9, 57:15, 59:16, 59:23, 60:6, 61:4
**themselves** [2] - 10:7, 17:3
**Theory** [1] - 27:24
**therefore** [2] - 21:16, 58:5
**third** [7] - 4:4, 14:15, 27:2, 27:12, 35:12, 55:16, 55:17

**third-amended** [1] - 4:4
**third-party** [1] - 27:2
**thousands** [1] - 58:9
**thread** [1] - 27:17
**three** [5] - 42:20, 46:8, 51:2, 51:7, 59:17
**throughout** [1] - 55:8
**throw** [1] - 48:3
**tie** [1] - 5:4
**tied** [1] - 52:25
**timing** [5] - 13:21, 18:15, 32:18, 33:24
**Titanic** [1] - 40:16
**Title** [1] - 62:9
**TO** [1] - 1:13
**today** [2] - 32:21, 43:1
**together** [2] - 59:4, 59:10
**took** [1] - 40:15
**top** [2] - 18:21, 34:16
**topic** [1] - 23:23
**totally** [1] - 46:18
**touting** [1] - 10:16
**towards** [1] - 28:3
**track** [5] - 20:16, 22:7, 22:21, 39:11, 41:6
**tracked** [1] - 6:19
**tracking** [3] - 30:1, 33:19
**traded** [1] - 40:22
**trades** [1] - 40:23
**train** [1] - 52:5
**trajectory** [1] - 39:24
**transcript** [2] - 62:10, 62:12
**TRANSCRIPT** [1] - 1:12
**transition** [2] - 25:25, 53:23
**transitioning** [3] - 18:13, 19:23, 20:8
**transpired** [2] - 7:14, 7:17
**true** [5] - 37:9, 48:23, 48:24, 51:1, 62:10
**truth** [2] - 14:7, 15:16
**trying** [5] - 28:8, 28:10, 29:7, 47:3, 49:12
**turn** [4] - 8:14, 27:15, 29:23, 41:23
**turns** [1] - 20:15
**twice** [1] - 33:21
**Twitter** [1] - 52:14
**two** [9] - 11:22,

18:25, 23:24, 32:18, 34:15, 37:13, 37:16, 44:25, 54:22
**type** [1] - 39:5
**types** [4] - 12:6, 12:8, 27:5, 29:2

## U

**U.S** [1] - 1:3
**ultimate** [1] - 54:4
**ultimately** [2] - 44:22, 56:23
**unable** [2] - 20:16, 39:25
**under** [5] - 13:12, 36:4, 43:13, 43:19
**undergo** [1] - 23:10
**underlying** [1] - 37:14
**undermines** [2] - 24:20, 30:25
**understood** [2] - 35:21, 38:25
**undertook** [1] - 15:20
**undisputed** [1] - 46:3
**unhappy** [1] - 15:8
**unique** [1] - 6:17
**United** [3] - 62:7, 62:9, 62:14
**UNITED** [1] - 1:1
**unless** [1] - 12:6
**unreliable** [1] - 14:16
**unsuccessful** [1] - 43:23
**unsupported** [1] - 48:1
**unworkable** [1] - 20:15
**up** [22] - 9:3, 12:20, 13:2, 13:5, 15:11, 15:21, 27:3, 31:3, 32:21, 32:25, 33:17, 39:25, 40:4, 40:18, 41:20, 43:3, 47:22, 48:4, 49:1, 51:17, 57:18
**upheaval** [1] - 41:24
**useful** [1] - 51:20
**user** [5] - 6:21, 22:8, 22:23, 52:13, 52:22
**users** [1] - 22:19
**users'** [1] - 6:16

## V

**varied** [1] - 50:19
**variety** [1] - 24:15

**versus** [1] - 3:6
**verticals** [1] - 19:7
**viable** [3] - 39:9, 39:11, 41:13
**viewed** [1] - 47:13
**vigorously** [1] - 53:11
**vital** [1] - 28:14
**void** [1] - 8:9
**vs** [1] - 1:7

## W

**wait** [1] - 33:10
**walk** [1] - 12:17
**warn** [2] - 41:21, 54:9
**warned** [2] - 42:1, 58:21
**warning** [1] - 55:1
**warnings** [3] - 41:8, 41:9, 53:18
**ways** [5] - 10:2, 22:22, 26:23, 27:3, 32:19
**website** [1] - 22:10
**weigh** [1] - 59:10
**Weiss** [3] - 3:20, 3:23, 3:25
**WEISS** [1] - 2:10
**well-pled** [1] - 28:19
**WEST** [1] - 1:23
**WHARTON** [1] - 2:10
**whereas** [1] - 22:7
**white** [1] - 11:20
**White** [4] - 3:11, 3:14, 3:15, 3:16
**WHITE** [3] - 2:4, 2:5, 3:15
**whole** [5] - 9:12, 9:14, 11:14, 22:17, 54:21
**wide** [3] - 16:10, 19:16, 30:21
**widespread** [1] - 14:12
**win** [1] - 32:15
**witnesses** [1] - 5:3
**words** [7] - 9:22, 11:2, 13:14, 28:22, 35:7, 44:18, 57:18
**workable** [1] - 42:2
**workaround** [2] - 40:2, 41:13
**works** [1] - 19:7
**world** [2] - 14:1, 22:17
**worthy** [1] - 32:12
**wrap** [1] - 51:17
**WU** [1] - 1:3

## Y

**years** [2] - 38:22, 42:17
**York** [2] - 2:13
**yourself** [1] - 31:5
**Yuang** [1] - 36:18