# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 21-8892-GW-RAOx | Date | September 26, 2023 |
|---|---|---|---|
| Title | *Kellie Black v. Snap, Inc., et al.* | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:**   **IN CHAMBERS - FINAL RULING ON DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT [121]**

Attached hereto is the Court's Final Ruling on Defendant's Motion [121]. The Court GRANTS the Motion with leave to amend. Plaintiff will have until October 27, 2023 to file an amended complaint.

:

Initials of Preparer   JG

***Kellie Black v. Snap, Inc., et al.***; Case No. 2:21-cv-08892-GW-(RAOx)
Final Ruling on Motion to Dismiss Third Amended Class Action Complaint

## I.   Background

Court-appointed Lead Plaintiff Oklahoma Firefighters Pension & Retirement System ("Plaintiff"), individually and on behalf of all others similarly situated, sues Snap Inc. ("Snap"); Evan Spiegel, and Jeremi Gorman (collectively, "Defendants") for: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder; and (2) violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  *See generally* Third Amended Class Action Complaint ("TACAC"), Docket No. 120.[1]

Before the Court is Defendants' motion to dismiss.  *See generally* Motion to Dismiss Plaintiff's TACAC ("Motion" or "Mot."), Docket No. 121.  Plaintiff opposes the Motion.  *See generally* Opposition to Motion to Dismiss ("Opp."), Docket No. 125.  Defendants filed a reply. *See generally* Reply ISO Motion ("Reply"), Docket No. 126.

On September 11, 2023, the Court heard oral argument on Defendants' Motion and took the matter under submission.  *See* Docket No. 130.  Prior to the hearing, the Court issued a tentative ruling.  *See* Docket No. 129.  After considering all of the papers and arguments of counsel, the Court **GRANTS** the Motion with leave to amend.

### A.   Procedural Background

This is Defendants' second motion to dismiss; the Court having previously dismissed Plaintiff's Second Amended Class Action Complaint.  *See* March 13, 2023 Order on Defendants' Motion to Dismiss ("March 2023 Order"), Docket No. 115.  In the March 2023 Order, the Court addressed the substance of Plaintiff's allegations and concluded that, although Plaintiff had sufficiently alleged that Defendants made one material misrepresentation, Plaintiff failed to allege that Defendants acted with the requisite scienter.  *See generally id.*  The Court also dismissed Plaintiff's Section 20(a) claim because Plaintiff failed to state a claim under Section 10(b) and Rule 10b-5.  *See id.* at 38.

On April 21, 2023, Plaintiff filed the TACAC.  *See* Docket No. 120.  Reflecting the Court's

---

[1] The TACAC, however, no longer asserts a Section 10(b) claim against Defendant Evan Spiegel.  *See* TACAC ¶¶ 200-208.  Instead, the TACAC states that "Defendant Spiegel is named as a defendant in this action solely as a control person pursuant to Section 20(a) of the Exchange Act."  *Id.* ¶ 30.

determinations in the March 2023 Order, the TACAC: (1) removes allegations concerning the statements that the Court determined were inactionable because they were either forward-looking statements protected by the Private Securities Litigation Reform Act ("PSLRA") safe harbor, generalized statements of corporate optimism or opinion, or not adequately alleged false; (2) retains allegations concerning Defendant Jeremi Gorman's April 22, 2021 statement, which the Court determined was a material misrepresentation, *see* March 2023 Order at 31-32; and (3) provides additional allegations supporting scienter for the April 22, 2021 statement, which the Court previously described as a "close call," *see id.* at 37.

### B.  Factual Background[2]

#### 1.  The Parties

Plaintiff provides retirement benefits to firefighters in the state of Oklahoma.  TACAC ¶ 23.  Plaintiff "purchased Snap common stock" and was allegedly damaged by Defendants' misrepresentation(s).  *Id.*  Plaintiff brings this securities action individually and on behalf of "all other persons and entities who purchased or otherwise acquired Snap … publicly traded securities, and/or sold Snap put options" between April 23, 2021, and October 21, 2021, inclusive (the "Class Period").  *Id.* ¶ 1.

Snap is a Delaware corporation with its principal executive offices located in Santa Monica, California.  *Id.* ¶ 24.  Snap's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SNAP."  *Id.*

Defendant Evan Spiegel ("Spiegel") is Snap's co-founder, CEO, and Director.  *Id.* ¶ 30.  Per Snap's 2020 Form 10-K, as CEO, "Mr. Spiegel has control over [Snap's] day-to-day management and the implementation of major strategic investments of Snap" and "has been responsible for [Snap's] strategic vision."  *Id.*  In addition, during the Class Period, Spiegel, together with co-founder Robert Murphy, "own[ed] or control[led] voting shares" of Snap that "represent[ed] approximately 99% of the voting power of [Snap's] outstanding capital stock" and "Spiegel alone c[ould] exercise voting control over a majority of [Snap's] voting power."  *Id.*

Defendant Jeremi Gorman ("Gorman") served as the Chief Business Officer of Snap.  *Id.* ¶ 25.  Gorman was responsible for Revenue and Customer Operations, including Global Advertising Sales and oversight over all of Snap's sales and advertising teams.  *Id.*  Indeed, in a

---

[2] The facts in this section are derived from the TACAC and judicially noticeable documents.

2

2020 interview with J.P. Morgan Chase, Gorman stated that she was responsible for "the sales team, sales operation teams, revenue strategy teams" and "also responsible for a lot of [Snap's] customer operations," including Snap's "ad review teams." *Id.* ¶ 92.

    2. Snap's Business

Snap is a "social media company" whose primary product is a free mobile chatting application, Snapchat. *Id.* ¶ 4. Snap generates revenue from Snapchat by selling advertising. *Id.* As stated in Snap's Form 10-Q filing for 2Q 2020, Snap "generate[s] substantially all of [its] revenue from advertising." Declaration of Kristina A. Bunting ("Bunting Decl."), Docket No. 121-1, ¶ 2, Ex. 1 at 9.[3] "Substantially all of [Snap's] revenue is generated from third parties advertising on Snapchat, a trend that [Snap] expect[s] to continue." *Id.* Indeed, "[f]or the years ended December 31, 2019, 2018, and 2017, advertising revenue accounted for 98%, 99%, and 97% of total revenue, respectively." *Id.*

As alleged in the TACAC, the most critical segment of Snap's business is "direct response" advertising, which consists of "in-app ads that would ask the user to take a specific action, such as downloading an app or making a purchase." TACAC ¶ 5. Direct response advertising "accounted for well <u>over half</u> of [Snap's] overall revenue and <u>virtually all</u> of its growth." *Id.* (emphasis in original).

To deliver advertisements to Snapchat users, Snap tracks its users' activity on their devices, which enables advertisers to (1) target their ads to specific users based on their interests and (2) measure the effectiveness of their ads based on how users interact with the ads. *Id.* Prior to mid-2021, Snap's ability to collect user activity, at least on Apple iOS devices, was through Apple's Identifier for Advertisers ("IDFA"). *Id.* IDFA allowed advertisers to target their ad campaigns more precisely to consumers likely to be interested in their products, and also gave them powerful tools to measure the effectiveness of individual ads or ad campaigns within Snapchat. *Id.* ¶¶ 42-44.[4]

    3. Apple Announces iOS Changes

In June 2020, Apple announced changes to privacy features on its devices through an

---

[3] All citations to "Ex." in this tentative ruling refer to the exhibits attached to the Bunting declaration filed in support of this Motion.

[4] For example, IDFA allowed Snap and advertisers to know whether users downloaded the advertised app or made a purchase from the advertiser's website, and enabled real-time measurement of the effectiveness of ads. *Id.* ¶¶ 44-45.

initiative called App Tracking Transparency ("ATT").  *Id.* ¶ 6.  Under ATT, companies like Snap would no longer be able to use IDFA to track and collect user activity unless the user "opted in" to such data sharing.  *Id.*  Before these changes, IDFA automatically tracked a user's data unless the user affirmatively "opted out" of IDFA sharing.  *Id.* ¶ 47.  Absent user opt-in, Snap would no longer be able to share a user's identifying information, and would no longer have access to that user's IDFA.  *Id.* ¶¶ 47-48.  As a result, ATT posed a potential threat to Snap's advertising business, which Snap heavily depended on for revenue.  *Id.* ¶¶ 49, 51.[5]

Following this announcement, Apple promoted its own proprietary measurement solution, SKAdNetwork ("SKAN"), which would allow Snap and its advertisers to continue to target and measure their advertising, albeit on a group basis rather than on an individual-by-individual basis.  *Id.* ¶¶ 6, 51.[6]  Yet, even with SKAN, ATT still posed potential risks to Snap's business.  *Id.* ¶ 42. For example, in its Form 10-Q filing for 2Q 2020, Snap recognized that "Apple's upcoming iOS update [] may impose heightened restrictions on our access and use of user data, may reduce the quantity and quality of the data and metrics that can be collected or used by us and our partners, and adversely affect our ability to effectively target advertisements to users and demonstrate the value of our advertisements to advertisers, any of which could reduce the demand and pricing for our advertising products and seriously harm our business."  Ex. 1 at 10.  Snap noted that the impact of ATT "is uncertain depending on how these changes are implemented, how we and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond" and "could seriously harm our business."  *Id.*  Although Apple announced that the ATT rollout would take place in Fall 2020, it was delayed until April 26, 2021.  TACAC ¶ 72.

### 4.  Snap's Response to ATT

Because "[s]ubstantially all of [Snap's] revenue is generated from third parties advertising on Snapchat," *see* Ex. 1 at 9, Snap was purportedly "under intense pressure to strongly reassure the market that its advertising business was well-equipped to withstand the ATT changes and maintain what had been record advertising and revenue growth," TACAC ¶ 7.  As such, statements

---

[5] Snap warned that because "Snapchat depends on effectively operating with mobile operating systems … that we do not control … [c]hanges … to those operating systems … may seriously harm our user retention, growth, and engagement."  Ex. 1 at 8.  Snap also warned that its "advertising revenue could be seriously harmed" by its "inability to measure the effectiveness of [its] advertising or target the appropriate audience for advertisements."  *Id.* at 10-11.

[6] Unlike IDFA, SKAN did not allow advertisers to track users' activity on an individual-by-individual basis, but instead would "aggregate" users' activity into groups and allow tracking only of these groups.  *Id.* ¶ 52.

relating to Snap's advertising business were highly material.  *Id.*

On February 4, 2021, during Snap's fourth quarter 2020 earnings conference call, a Deutsche Bank analyst asked Defendant Gorman how Snap management could "get comfortable that the momentum in these ad units is sustainable through these upcoming iOS changes that are going to effectively blind ad platforms to down funnel measurement?"  *Id.* ¶ 59; *see also* Ex. 10 at 145-146.  Gorman responded that Snap had "been working really closely with Apple to implement [SKAN]" and that Snap had "been communicating very well with advertisers, we're educating them, talking about them deeply about these coming changes and encouraging them to implement [tools developed by Snap] to mitigate any of this."  TACAC ¶ 59; *see also* Ex. 10 at 146.  Gorman added that "we feel really well prepared for these changes," but cautioned that "changes to this ecosystem are usually disruptive and the outcome is uncertain."  TACAC ¶ 59; *see also* Ex. 10 at 146.  Later on in the call, Gorman said: "I think when we look at the overall industry, the growing focus on brand safety and privacy across the entire industry actually places us in a really unique and beneficial position given what Evan just said, which is that from the beginning of our business, we made design decisions that helped us avoid many of the issues seen on other platforms." TACAC ¶ 59; *see also* Ex. 10 at 149.

Defendant Spiegel echoed Gorman's statements during a CNBC interview the next day, on February 5, 2021.  TACAC ¶ 60.  In response to the interviewer's question about what the "potential greatest impact" of Apple's iOS changes would be, Spiegel stated that "we feel like we're well prepared for these changes … even if it's a little disruptive for advertisers in the near term."  *Id.*  Spiegel also noted that Snap had "implemented" SKAN and started building its own solutions.  *Id.*

On February 23, 2021, Snap held its first ever Investor Day, where Snap's Chief Financial Officer Derek Andersen ("Andersen") announced that Snap "believe[d] … that [it could] grow [its] topline revenue at 50 percent or better year over year for at least the next several years."  *Id.* ¶ 63.  Gorman added that given Snap's "success in major advertising markets, we believe that we can continue to grow revenue at high rates for years to come."  *Id.*  Notably, Gorman did not mention or discuss ATT, SKAN, or the upcoming Apple iOS changes.  *Id.*  Following the Investor Day conference, Snap's share price soared by 11%, with the stock closing at a then all-time high of $70.45 per share.  *Id.* ¶ 64.

5.  Gorman's April 22, 2021 Statements

A few weeks later, on April 22, 2021, Snap held its earnings conference call for the first quarter of 2021.  *Id.* ¶ 73.  During the call, Snap announced that it generated $770 million in revenue for the quarter—66% over the prior year.  *Id.*; Ex. 2 at 17.  Gorman advised that "[m]ore advertisers were active on [Snap's] platform than ever as [Snap's] active advertiser base approximately doubled year-over-year in Q1," adding that "over half [of Snap's] revenue come[s] from direct response campaigns."  TACAC ¶ 73; Ex. 2 at 17.

Turning to SKAN, Gorman stated that Snap is "committed to working with [its] advertisers as we navigate the [ATT]-related changes from Apple."  Ex. 2 at 18.  Gorman also reiterated that Snap is "supportive of Apple's [ATT changes] because we have always believed that advertising should respect customers' privacy."  TACAC ¶ 74; *see also* Ex. 2 at 18.  Gorman explained that the "fact that these changes are coming later than we anticipated has provided additional time to adopt [] SKAN and begin implementing and testing with our partners."  TACAC ¶ 73; *see also* Ex. 2 at 18.  Gorman also noted that "[a]dvertisers that represent a majority of [Snap's] direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns."  TACAC ¶ 73; *see also* Ex. 2 at 18.[7]

During the call, an analyst from Guggenheim Partners asked the following:

> First, you referenced the successful implementation of [] [SKAN] for certain Snap campaigns with your partners.  I'm curious what defined success of that implementation?  And does this mean similar feedback to what you saw previously?  Do you expect this to mitigate some of the IDFA headwinds that have been a source of investor concern?...

TACAC ¶ 75; *see also* Ex. 2 at 20.  To which, Gorman responded as follows:

> Sure.  Thank you so much for the question.  I can take the part about [SKAN].  We are really focused on helping our advertisers make the transition to the best possible measurement and optimization tools smoothly.  The change happened later than we expected, which gave us a lot of time to prepare, and [SKAN] is one part of that.  So we're really pleased to see that advertisers that represent the majority of our direct response revenue have implemented it so far.  But we know there's a lot of work to be done to transition smoothly.

---

[7] On this same call, Andersen noted that Snap "anticipated disruptions associated with [ATT]" and that it was "not clear yet what the longer term impact of the iOS platform changes may be for the topline momentum of [Snap's] business, and this may not be clear until several months or more after the changes are implemented."  Ex. 2 at 23.

Ex. 2 at 20.

As alleged in the TACAC, the market responded favorably to Snap's assurances that a "majority" of Snap's direct response advertisers had already "successfully implemented" SKAN for their Snap campaigns, as Snap's stock price surged by over 7% from $57.05 per share to $61.30 per share the following day.  TACAC ¶ 77.  In addition, analysts quoted or paraphrased Gorman's comments about a "successful implementation" and the additional time to adopt, test, and implement SKAN, due to Apple's delayed rollout of ATT.  *Id.* ¶ 78.

For example, an April 22, 2021 Truist Securities report opined that "**IDFA's Impact [was] Not Likely Material**" given that "[m]anagement stated that advertisers that represent a majority of its [direct response] ad revenue have successfully implemented [SKAN] for their Snap campaigns."  *Id.* ¶ 79 (emphasis in original).  The report added that Gorman's statements reflected Snap's "comfortable stance towards the potential impact of [ATT] on its business."  *Id.*  Indeed, the report noted that "unlike [Facebook], which has taken a confrontational tone with Apple, Snap has decided to be much friendlier."  *Id.*[8]  Ultimately, the report concluded that these efforts "should help mitigate against a meaningful adverse outcome for Snap."  *Id.*  Similarly, a JMP report noted that "given 50%+ of Snap's [direct response] advertising partners have adopted Apple's SKAdNetwork and Snap's planning, we view [Apple's] ATT changes as less of a risk than previously."  *Id.* ¶ 81; *see also* Supplemental Declaration of Kristina A. Bunting ("Supp. Bunting Decl."), Docket No. 126-1, ¶ 3, Ex. 2 at 7.  Likewise, an April 22, 2021 Oppenheimer report highlighted that "we now see reduced risks from Apple's removal of IDFA[] as the delayed rollout allowed more time to work with advertisers to adopt [Apple's] [SKAN]."  TACAC ¶ 82; *see also* Supp. Bunting Decl. ¶ 4, Ex. 3 at 20.

On July 22, 2021, Snap held its earnings conference call for the second quarter of 2021.  TACAC ¶ 98.  On the call, Gorman noted that Snap had seen "some interruptions to demand," but it was "too early to determine how long it [would] take until these changes [were] fully adopted, the scale of the potential interruptions to demand, or the ultimate impact on the longer term growth of our business."  *Id.*; *see also* Ex. 5 at 55.  At the end of the call, an analyst from Bank of America raised the following questions regarding Snap's transition from IDFA to SKAN:

---

[8] The TACAC alleges Snap's response to ATT stood in stark contrast to Facebook's "far more negative [response] and clear warnings of a significant, long-term impact from ATT."  *Id.* ¶¶ 55, 61.

> Were there any unusual positive impacts in May or June or actually even a benefit to Snap shift and spend because of IDFA? And then, secondly, just maybe you can provide a little bit more details on what you're thinking around IDFA. Is it actually affecting targeting? And how do you think about some of the workarounds you're seeing or you're implementing so far?

TACAC ¶ 98; *see also* Ex. 5 at 69-70. Gorman responded that Snap "genuinely support[s]" the ATT changes, and that Snap had "rolled out full support of [SKAN], which we know will aid or we believe will aid in attribution for advertisers." TACAC ¶ 98; *see also* Ex. 5 at 70. Gorman, however, cautioned that "it remains so early in these iOS changes that there's no question that it will be a change for the industry in and of itself. But you know, I think we prepared it the best that we can. The product teams and the engineering teams have been working really closely with all of our partner and our sales teams to make sure that this transition for our advertisers is as smooth as possible." Ex. 5 at 70. The following day Snap's stock price rose almost 24% from $62.97 to $77.97 per share. TACAC ¶ 101.

6. The Purported Truth Emerges

Plaintiff contends that the "truth emerged" on October 21, 2021, when Snap announced that it had missed the lower end of its third quarter revenue—the first time in Snap's history that it had failed to meet this threshold. *Id.* ¶ 103. Snap attributed this result to the "headwinds associated with [Apple's] iOS platform policy changes." Ex. 8 at 107; *see also* TACAC ¶ 104. As Andersen explained:

> Our advertising business was disrupted by changes to iOS ad tracking that were broadly rolled out by Apple in June and July. While we anticipated some degree of business disruption, the new Apple provided measurement solution did not scale as we had expected, making it more difficult for our advertising partners to measure and manage their ad campaigns for iOS.

Ex. 8 at 101; *see also* TACAC ¶ 104. Andersen confirmed that Snap's "[direct response] business, which is the majority of [Snap's] revenue, is facing the headwinds directly from [Apple's] iOS platform changes" and that "the primary driver of the [Q3] impact [was] really about the impacts and headwinds associated with the platform changes on iOS." Ex. 8 at 116, 118; *see also* TACAC ¶ 104.

Gorman added that:

> The initial results we observed using SKAN were generally aligned with prior industry standard solutions, and we were among the first

> platforms to lean into this solution and push for widespread industry adoption.  However, over time, we saw SKAN measurement results diverge meaningfully from the results we observed on other first and third-party measurement solutions, making SKAN unreliable as a standalone measurement solution.
>
> Furthermore, as our advertising partners have explored and tested SKAN's solutions, they have surfaced a variety of concerns about its limitations.  Every advertiser has their own unique, fine-tuned perspective on the optimal parameters to measure ROI for their business, but SKAN requires them to use Apple's fixed definitions of advertiser success.  For example, advertisers are no longer able to understand the impact of their unique campaigns based on things like the time between viewing an ad and taking an action or the time spent viewing an ad.  Additionally, real-time campaign and creative management is hindered by extended reporting delays, and advertisers are unable to target advertising based on whether or not people have already installed their app.

Ex. 8 at 104; *see also* TACAC ¶¶ 105-106.  Indeed, Spiegel confirmed that advertisers had been "rendered blind" by SKAN because it had "ma[de] it more difficult for [Snap's] advertising partners to measure and manage their ad campaigns for iOS."  Ex. 8 at 101, 112; *see also* TACAC ¶ 105.

That same day, on October 21, 2021, Snap filed its Form 10-Q filing for 3Q 2021.  TACAC ¶¶ 108, 114.  In its filing, Snap noted that Apple issued an iOS update in April 2021 and that "[t]hese changes have adversely affected our targeting, measurement, and optimization capabilities, and in turn affected our ability to measure the effectiveness of advertisements on our services."  *Id.* ¶ 114.  Snap further advised that "[t]his has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business."  *Id.*

The next day, on October 22, 2021, Snap's stock price declined by approximately 26%, or $19.97 per share, to close at $55.14 per share—representing an approximately $27 billion drop in market capitalization.  *Id.* ¶ 109.  Plaintiff notes that upon this news, analysts "excoriated" Snap management.  *Id.* ¶¶ 16, 110.  For example, a RBC Capital Markets report commented that "management's credibility is likely gone given recent communications did not indicate these risks," such as accelerating IDFA headwinds in the latter part of Q3.  *Id.* ¶ 110.  And that "management almost couldn't have sounded worse around the effects [the IDFA change] is having."  *Id.*  Other analysts were "surprised with the change of management's tone with regards

9

to the effect of Apple changes on Snap's ad business." *Id.* ¶ 111.

At the November 17, 2021 Morgan Stanley European Technology, Media & Telecom Conference, Andersen remarked on SKAN's impact on Snap's business. *Id.* ¶ 115. He stated that Snap observed "some early promising results with some advertiser spending up against [SKAN] early in the going, but it was challenging [for Snap] to know how to evaluate that [because] advertisers still at that point had access to a lot of their legacy signals to calibrate their [advertising] spending." *Id.*

## II.   **Legal Standard**

### A.   **Rule 12(b)(6)**

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

The court must construe the complaint in the light most favorable to the plaintiff, by accepting all allegations of material fact as true, and drawing all reasonable inferences from well-pleaded factual allegations in favor of the plaintiff. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). The court is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion, the plaintiff must provide grounds demonstrating its entitlement to relief. *Twombly*, 550 U.S. at 555. Under the Supreme Court's decisions in *Twombly* and *Iqbal*, this requires that the complaint contains "sufficient factual matter … to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

### B.   **Rule 9(b)**

"It is well established that claims brought under Rule 10b-5 and section 10(b) must meet the particularity requirements of Federal Rule of Civil Procedure 9(b)." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005). Under Rule 9(b), the plaintiff must plead the "who, what, when, where, and how" of the alleged misconduct. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124-25 (9th Cir. 2009). This requires the plaintiff to allege "an account of the time, place, and specific content" of the false or misleading statements. *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir.

2007) (per curiam) (internal quotation marks and citation omitted).  In addition, the "plaintiff must set forth what is false or misleading about a statement, and why." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

## III.   Request for Judicial Notice

In connection with the Motion, Defendants request judicial notice of fourteen documents, including excerpts of documents Snap filed with the SEC, transcripts of quarterly earnings calls, and analyst reports.  *See* Request for Judicial Notice ("RJN"), Docket No. 122; *see also* Supplemental Request for Judicial Notice ("Supp. RJN"), Docket No. 127.

"Although generally the scope of review on a motion to dismiss for failure to state a claim is limited to the [c]omplaint, a court may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiffs' claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation marks and citations omitted).  Courts may "treat such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).

Exhibits 2, 5, 8, 9, and 10 to Defendants' request for judicial notice and Exhibits 1-4 to Defendants' supplemental request for judicial notice are referenced in the TACAC, and are thus incorporated by reference.[9]   Additionally, Plaintiff does not dispute the authenticity of these documents and the request for judicial notice is not opposed.[10]  As a result, the Court can consider these exhibits in deciding Defendants' Motion under the "incorporation by reference" doctrine. *See, e.g.*, *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (holding that the district court properly considered SEC filings under the incorporation by reference doctrine because their contents were alleged in the complaint), *abrogated on other grounds as recognized in S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004) (taking judicial notice of an analyst report

---

[9] The Court previously took judicial notice of Exhibits 2, 5, 8, and 10 to Defendants' request for judicial notice, and Exhibit 2 to Defendants' supplemental request for judicial notice.  *See* March 2023 Order at 12.

[10] The Court notes, however, that Defendants' supplemental request for judicial notice was filed with their reply, *see* Docket No. 127, so Plaintiff did not have an opportunity to object to this request.

referenced in the complaint); *In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 994 n.1 (N.D. Cal. 2001) ("In a securities-fraud suit, judicial notice can be had of documents directly related to documents referenced in the complaint that bear on the adequacy of the disclosure" (citations omitted)).

In addition, under Federal Rule of Evidence 201, courts may take judicial notice of facts that are "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Accordingly, a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records." *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 999 (9th Cir. 2018) (citation and quotations omitted).

Exhibits 1, 3, 4, 6, and 7 to Defendants' request for judicial notice are not specifically referenced in the TACAC. Exhibits 1, 3, and 4 are Snap's Forms 10-Q filed on July 22, 2020, April 23, 2021, and July 23, 2021, respectively. Because courts can take judicial notice of SEC filings that are publicly available, the Court will take judicial notice of Exhibits 1, 3, and 4. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (stating that SEC filings may be judicially noticed).[11] Exhibits 6 and 7 are two of Snap's press releases. *See In re White Elec. Designs Corp. Sec. Litig.*, 416 F. Supp. 2d 754, 760 (D. Ariz. 2006) ("[J]udicial notice is appropriate for SEC filings, press releases, and accounting rules as they are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned" (internal quotations and citations omitted)); *see also Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020) ("In general, websites and their contents may be judicially noticed."). The Court will take judicial notice of Exhibits 6 and 7; however, the Court can do so only to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (citing *Premier Growth Fund v. All. Cap. Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006)).

In sum, the Court grants Defendants' requests for judicial notice. However, to the extent any facts in these documents are subject to reasonable dispute, the Court does not take judicial

---

[11] The Court previously took judicial notice of Exhibits 1, 3, and 4. *See* March 2023 Order at 12-13.

notice of those facts.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

## IV.   Discussion

### A.   Section 10(b) Claim

Section 10(b) of the Exchange Act provides that it shall be unlawful for any person "to use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations."  15 U.S.C. § 78j(b).  Rule 10b-5 implements this provision by making it unlawful for any person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  In order to allege a violation of Section 10(b) of the Exchange Act, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016).  In addition to the heightened pleading standards for claims sounding in fraud under Fed. R. Civ. P. Rule 9(b), the PSLRA requires that a complaint "plead with particularity both falsity and scienter."  *Daou*, 411 F.3d at 1014.  "Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u–4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' 15 U.S.C. § 78u–4(b)(2)." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007).

Defendants concede that "[t]his case has been narrowed substantially," *see* Reply at 1, as this lawsuit now involves a single statement that Gorman made on April 22, 2021: "[a]dvertisers that represent a majority of [Snap's] direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns" (the "April 2021 Statement").  In the first motion to dismiss order—the March 2023 Order, the Court found that "at this stage, the Court cannot conclude as a matter of law that this statement is not false or misleading."  March 2023 Order at 32.  Thus, the Court concluded that "Plaintiff has plausibly alleged a material misrepresentation" as to Gorman's April 2021 Statement.  *Id.*  While Defendants reserve their right to argue that the

April 2021 Statement was neither false nor misleading, *see* Mot. at 7 n.5, Defendants move to dismiss Plaintiff's Section 10(b) and Rule 10b-5 claim with respect to the second element, arguing that the TACAC does not adequately allege scienter.

       i.   Scienter

"Scienter" as used in the federal securities laws means the "intent to mislead investors" or deliberate recklessness to "an obvious danger of misleading investors." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053, 1059 (9th Cir. 2014).   Deliberate recklessness is a higher standard than mere recklessness and requires more than a motive to commit fraud. *Schueneman*, 840 F.3d at 705.   Instead, it is "an *extreme* departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (alteration in original) (quoting *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017)).   "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (quoting *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004)).

"To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.   The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences." *Tellabs*, 551 U.S. at 324.   The inference of scienter, however, must be "more than merely 'reasonable' or 'permissible' – it must be compelling and cogent, thus strong in light of other explanations." *Id*.   "To determine whether a 'strong' inference has been pleaded, 'the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *Webb*, 884 F.3d at 850 (quoting *Tellabs*, 551 U.S. at 326).

Here, Defendants argue that Plaintiff has failed to adequately allege scienter because (1) Plaintiff fails to plead that Gorman intended to defraud or acted with deliberate recklessness, (2) the core operations inference is unavailable, and (3) Plaintiff's scienter allegations fail under a holistic review. *See* Mot. at 11-21; *see also generally* Reply.   Plaintiff argues that it has adequately pled scienter through (1) a core operations theory, (2) particularized facts demonstrating scienter

for Gorman, and (3) various confidential witness ("CW") statements and other evidence when viewed holistically.  Opp. at 11-21.  As with the March 2023 Order, the Court first addresses each allegation individually and then considers the allegations holistically.  *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702-03 (9th Cir. 2012).

a.  *Core Operations Doctrine*

"The core operations theory of scienter relies on the principle that corporate officers have knowledge of the critical core operation of their companies."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (quoting *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014)).  "Proof under this theory is not easy.  A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring … or witness accounts demonstrating that executives had actual involvement in creating false reports."  *Intuitive Surgical*, 759 F.3d at 1062.  A plaintiff may also meet the standard "[i]n rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."  *Killinger*, 542 F.3d at 786.

In the March 2023 Order, the Court determined that the scienter analysis under the core operations doctrine was a "close call."  *See* March 2023 Order at 37.  On the one hand, simply alleging that advertising is Snap's core business does not give rise to an inference of scienter.  *See, e.g., In re NVIDIA*, 768 F.3d at 1064 (denying application of the core operations theory even when "the problem concerned [NVIDIA's] flagship product and was cause for concern to [NVIDIA's] two largest customers"); *Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*, No. 4:18-cv-07669-HSG, 2020 WL 1244936, at *12 (N.D. Cal. Mar. 16, 2020) ("Simply alleging that gaming is NVIDIA's core business does not give rise to an inference of scienter.").  However, scienter can be inferred even in the absence of more particularized allegations "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."  *Reese*, 747 F.3d at 576.

For example, in *Berson v. Applied Signal Technology, Inc.*, the court found scienter sufficiently pled where "it's hard to believe that [defendants] would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work."  527 F.3d 982, 988 (9th Cir. 2008).  Similarly in *Reese*, the court held that scienter could be imputed to a corporate officer since the statements were specific and reflective of her access to disputed

15

information.  *Reese*, 747 F.3d at 576.

At the outset, the Court notes that Plaintiff has presented a credible argument that any deficiencies with SKAN and its implementation would be of such prominence that "it would be 'absurd' to suggest that [Gorman] was without knowledge of the matter." *Reese*, 747 F.3d at 576. First, Plaintiff sufficiently alleges that the most critical segment of Snap's business is "direct response" advertising, which consists of "in-app ads that would ask the user to take a specific action, such as downloading an app or making a purchase." TACAC ¶ 5.  Indeed, direct response advertising "accounted for well <u>over half</u> of [Snap's] overall revenue and <u>virtually all</u> of its growth." *Id.* (emphasis in original).  Moreover, as stated in Snap's Form 10-Q filing for 2Q 2020, Snap "generate[s] substantially all of [its] revenue from advertising." Ex. 1 at 9.  In fact, advertising revenue accounted for nearly 100% of Snap's total revenue.  *See id.*

Second, Plaintiff plausibly alleges that the Apple iOS changes posed a serious threat to Snap's advertising business, which Snap heavily depended on for revenue.  TACAC ¶¶ 49, 51. Further, Plaintiff alleges that SKAN's viability as a replacement for IDFA was widely reported on by the media.  *See id.* ¶ 53.  Accordingly, it follows that Gorman was aware that SKAN could severely harm Snap's business, especially since Gorman opined on the impact of Apple's privacy changes on Snap's business as early as February 4, 2021.  *See id.* ¶ 59.  When asked how Snap management could "get comfortable that the momentum in these ad units is sustainable through these upcoming iOS changes that are going to effectively blind advertisers," Gorman responded that Snap was "really well prepared for these changes."  *Id.*  Gorman emphasized to investors and analysts that Snap had "been working really closely with Apple to implement [SKAN]" and that Snap had "been communicating very well with advertisers, we're educating them, talking about them deeply about these coming changes and encouraging them to implement [tools developed by Snap] to mitigate any of this."  *Id.*

Given that advertising revenue accounts for most, if not all, of Snap's revenue, Plaintiff argues that it would be "absurd" for Gorman to be unaware of SKAN's effectiveness and implementation during the Class Period as it was so integral to Snap's success.  Plaintiff contends that these allegations suggest that Gorman knew or should have known that Snap was under pressure to mitigate any adverse ATT-related changes, and therefore she made the April 2021 Statement to quell any fears.  *Id.* ¶ 73.

The issue the Court has, however, is that the TACAC lacks factual allegations that, as of

April 2021 (when Gorman made the statement): (1) advertisers were, in fact, displeased with SKAN as a substitute solution for IDFA; and (2) information about advertisers' implementation of SKAN had been communicated to Gorman.  At the hearing, Defendants highlighted that the TACAC fails to allege that advertisers, as of April, had already identified problems with SKAN such that this information would have been communicated to anyone at Snap – let alone Gorman.  The Court agrees that allegations to this effect are noticeably missing.

In response, Plaintiff points to the testimony of the CWs.  Specifically, the TACAC alleges that, throughout 2021, Snap internally expected a significant negative revenue from the Apple iOS changes and that those changes were the central focus of Snap for that entire year.  *Id.* ¶ 135.  Indeed, CW 2 alleges that Snap's senior leadership repeatedly voiced concerns about the expected negative impact of Apple's iOS changes throughout 2021.  *Id.* ¶ 140.  Plaintiff also contends that the CWs confirmed that, dating back to April 2021, "advertisers had already determined that SKAN's significant limitations severely hampered Snap's advertising performance" and that "most of Snap's advertisers had avoided implementing SKAN for as long as possible due to significant concerns about its performance."  *Id.* ¶¶ 123-124.

As a preliminary matter, the CWs' statements are unreliable as to Gorman's state of mind because the TACAC does not allege that any CW shared this information with Gorman before she made the April 2021 Statement.  *See generally id.*  But even if the CWs' statements are unreliable as to Gorman's state of mind, at first glance, they seemingly bolster Plaintiff's argument that SKAN's success was Snap's primary focus at the time of Gorman's April 2021 Statement, rendering Gorman's purported lack of knowledge to be absurd.  However, examining the allegations in the TACAC closely, the Court observes several cracks in the CWs' testimony.

For example, CW 1 contends that "[r]ight when [SKAN] was launched in April 2021, I did not find it to be effective."  *Id.* ¶ 125.  Although CW 1 was "intimately involved in transitioning Snap's advertisers from IDFA to SKAN," *id.*, this statement is problematic for two reasons.  *First*, this testimony only reflects CW 1's *personal* belief regarding the effectiveness of SKAN.  *Second*, the statement does not shed any light into how *advertisers* perceived SKAN's effectiveness.  While CW 1 was unimpressed with SKAN, this testimony does not allege that Snap or advertisers held the same view.  In addition, while CW 2 states that, as of April 2021, "Snap had barely begun working with its advertisers on SKAN, and there was no way that Gorman could have represented at that time that any implementation of SKAN had occurred or been 'successful,'" there are no

allegations in the TACAC that CW 2 was involved in the implementation of SKAN or helped advertising partners transition to SKAN.  *Id.* ¶ 136.  In response, Plaintiff argues that CW 2 was tasked with revenue forecasting, which included the potential revenue impact of SKAN, and points to a purported spreadsheet that CW 2 saw in August 2021 "evidencing that a majority of Snap's direct response advertisers had not adopted SKAN."  *Id.* ¶¶ 128, 137.  This is problematic because the spreadsheet is not contemporaneous with Gorman's April 2021 statement and does not indicate what information was known then.  Indeed, the TACAC lacks allegations that the spreadsheet was even in existence in April, when Gorman made the challenged statement.  In short, the CWs' testimony (1) neither reflects contemporaneous information at Snap, as of April 2021, that advertisers had either encountered issues with SKAN or communicated those problems to Snap (2) nor provides insight into Gorman's state of mind.  Accordingly, at this point, Plaintiff has not provided a sufficient basis to rely on the CWs' testimony to establish that Gorman was aware of SKAN's limitations when she made the April 2021 Statement.

Even if the Court decided it could rely on the CWs' statements, the Court questions whether it can attribute that knowledge to Gorman.  Again, Plaintiff makes no particularized allegations that information about advertisers' implementation of SKAN was communicated to Gorman before she made the April 2021 Statement.  Yet, Plaintiff does argue that Gorman was reckless in proclaiming that SKAN had been "successfully implemented" by "[a]dvertisers that represent a majority of [Snap's] direct response advertising revenue."  Opp. at 20.  Indeed, as this Court previously observed, if in April 2021 "nobody had made a determination as to SKAN's success," then Gorman had no business "talking about this at all."  Docket No. 116 at 22:3-5.  Defendants counter that this assumes Plaintiff's interpretation of the April 2021 Statement is accurate, and notes that this Court previously concluded that Defendants' interpretation of the April 2021 Statement was just as conceivable as Plaintiff's interpretation.  *See* March 2023 Order at 32.

Nevertheless, as Defendants highlight, there are other allegations in the TACAC that make an inference of scienter less likely.  For instance, in October 2021, Gorman made a corrective disclosure that "[t]he initial results [Snap] observed using SKAN were generally aligned with prior industry standard solutions" but "over time" problems with SKAN emerged.  Ex. 8 at 104; *see also* TACAC ¶¶ 105-106.  While it is clear from the TACAC that deficiencies with SKAN emerged by October 2021, it is not clear that these deficiencies had already emerged in April 2021, such that it is reasonable to assume that Gorman was privy to this information.  In other words, there are no

allegations in the TACAC that these issues with SKAN had emerged as early as April or that advertisers had already developed concerns as of the April 2021 Statement. Other than the CWs' testimony, the TACAC is devoid of any well-pleaded factual allegations that advertisers had already identified problems with using SKAN as a measurement solution in April. Presumably because SKAN's deficiencies did not emerge right away, as evidenced by the October 2021 corrective disclosure. *See* Ex. 8 at 104; *see also* TACAC ¶¶ 105-106. In short, the TACAC fails to allege that any problems with SKAN had emerged as early as April.

Given this lack of contemporaneous information, the facts of this case are distinguishable from cases relying on the core operations doctrine. For example, in *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115 (N.D. Cal. 2017), the court found that the core operations doctrine, along with the plaintiff's other allegations, created a strong inference of scienter where the CWs' testimony confirmed that data regarding user engagement metrics was being discussed internally and with management, the SEC sent a letter to the defendants reminding them of the company's need to disclose metrics to explain trends in user engagement, and the departure of multiple senior company officials weeks before the end of the class period. *Id.* at 1129-31, 1149. As such, in *Shenwick*, there were multiple pieces of contemporaneous information to support the conclusion that it would have been "absurd" for the CEO and CFO to not have been aware of adverse user trends during the class period, even if these senior executives were not specifically tied to the information. *Id.* at 1146. The difference here is that – other than the CWs' testimony – Plaintiff has not pointed to any other allegations that Gorman, or anyone else at Snap, possessed contradictory information when she made the April 2021 Statement.

Plaintiff also argues that the "actual access" analysis supports scienter. *See* Opp. at 18. As the Ninth Circuit has explained, where a defendant makes misleading misstatements concerning matters about which they claim to have detailed knowledge, "[i]t is unclear what further facts plaintiffs would need to plead to create a stronger inference that [they] had access to [the] information [they] discussed publicly." *Reese*, 747 F.3d at 572. Plaintiff contends that Gorman's April 2021 Statement "strongly impl[ies] that [s]he had access to the disputed information." *Shenwick* , 282 F. Supp. 3d at 1147. Plaintiff argues that "[t]he inference that [Gorman] did not have access to [ ] [SKAN] data is directly contradicted by the fact that she specifically addressed it in her statement." *Reese*, 747 F.3d at 572. The following question, therefore, arises: How could Gorman have known that "[a]dvertisers that represent a majority of [Snap's] direct response

advertising revenue have successfully implemented [SKAN] for their Snap campaigns" if she did not have access to advertisers' feedback or data regarding SKAN? Nevertheless, for the reasons discussed above, the Court has difficulty concluding that Gorman had actual access to the disputed information given the lack of contemporaneous allegations that Gorman, advertisers, and/or others at Snap knew of SKAN's deficiencies in April.

In sum, while the Court finds this to be a close call yet again, the Court concludes that Plaintiff's argument for scienter under a core operations theory fails as currently pled due to the dearth of factual allegations that advertisers' problems with SKAN had already emerged as early as April 2021 and that this was communicated to anyone at Snap.

### b. *Defendants' Purported Admissions*

In the first motion to dismiss order, the Court found that Gorman's October 2021 statements – that advertisers had encountered numerous issues with SKAN– was equally susceptible to both Plaintiff's characterization (*i.e.* that Gorman was admitting that advertisers had not actually successfully implemented SKAN due to its deficiencies) and Defendants' interpretation (*i.e.* that it is entirely consistent that advertisers successfully implemented SKAN before the rollout and thereafter encountered problems). *See* March 2023 Order at 36. "An after-the-fact statement does not constitute an admission unless it contradicts the substance of an earlier statement and essentially states 'I knew it all along.'" *Lopes v. Fitbit, Inc.*, No. 4:18-cv-06665-JST, 2020 WL 1465932, at *11 (N.D. Cal. Mar. 23, 2020). "In other words, it does not suffice that defendants made an optimistic statement and then a pessimistic statement some time later." *In re Apple Inc. Sec. Litig.*, No. 4:19-cv-02033-YGR, 2020 WL 6482014, at *10 (N.D. Cal. Nov. 4, 2020).

In October 2021, Defendants acknowledged that SKAN was "unreliable" and "rendered [advertisers] blind," such that "successful implementation" of SKAN was likely never possible. TACAC ¶ 105. Defendants, however, may have simply failed to anticipate the extent to which Snap's advertising business would be disrupted by Apple's iOS changes. Thus, Defendants' later statements, by themselves, are "not so indicative of fraudulent intent that [they] carr[y] the weight of the entire [97]–page complaint for purposes of establishing a 'strong inference' of scienter." *Metzler*, 540 F.3d at 1069.

### c. *Analyst Reports*

Plaintiff also argues that "[t]he fact that analysts excoriated Snap's management precisely

because Snap's admissions did not align with Defendants' prior statements about the risk that ATT posed to Snap … bolsters an inference of scienter."  Opp. at 17 n.6.  For example, in *In re Fibrogen, Inc.*, the court found that scienter was also supported "by the reaction of the scientific and financial community to the disclosure of Defendants' manipulation of data."  *In re Fibrogen, Inc.*, No. 3:21-cv-02623-EMC, 2022 WL 2793032, at *22 (N.D. Cal. July 15, 2022).  Similarly here, Plaintiff alleges that Snap faced damning analyst reaction once it was revealed that Snap's advertising business was disrupted by the Apple iOS changes.  *See* TACAC ¶¶ 16, 110, 111.  For instance, a RBC Capital Markets report commented that "management's credibility is likely gone given recent communications did not indicate these risks," such as accelerating IDFA headwinds in the latter part of Q3.  *Id.* ¶ 110.  And that "management almost couldn't have sounded worse around the effects [the IDFA change] is having."  *Id.*  Other analysts were "surprised with the change of management's tone with regards to the effect of Apple changes on Snap's ad business."  *Id.* ¶ 111.  While these reports are very critical of Snap's management and could lend some support to a finding of scienter, they do not, however, establish scienter by themselves.  *See In re Fibrogen*, 2022 WL 2793032, at *22.

### d.  *Confidential Witnesses*

For the reasons discussed in Section IV.A.i.a *supra*, the testimony of the CWs does not establish scienter.  "[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).  "First, the confidential witnesses … must be described with sufficient particularity to establish their reliability and personal knowledge."  *Id.*  "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter."  *Id.*  Although the CWs are described with enough specificity to be reliable, the allegations in the TACAC do not permit the Court to conclude that any CW had personal knowledge of Gorman's state of mind.  While Plaintiff claims that CW2 "frequently communicated with Gorman directly" and "developed [an] extremely close, personal working relationship[] with" Gorman, the TACAC does not allege that CW2, or any other CW for that matter, shared the contradictory information with Gorman before she made the April 2021 Statement.  TACAC ¶ 133.  Instead, the TACAC primarily alleges that Gorman "knew" or "should have known" about advertisers' adoption of SKAN and the technical issues with SKAN.  *See id.* ¶¶ 135, 138-139.

However, in *Zucco*, confidential witnesses stated that the defendant "had to have known what was going on with respect to the Company's inventory accounting manipulation" and that "certain project managers knew" about the accounting fraud. 552 F.3d at 998. The court held that "[t]hese generalized claims about corporate knowledge are not sufficient to create a strong inference of scienter, since they fail to establish that the witness reporting them has reliable personal knowledge of the defendants' mental state." *Id.* The Court finds that the same is true here. As a result, while "the CWs general knowledge of [Snap] … supports Plaintiff's core operations theory," the CWs' statements do not separately give rise to a strong inference of scienter. *Shenwick*, 282 F. Supp. 3d at 1149.

e. *Holistic Review of Scienter Allegations*

The Court now considers the "allegations holistically to determine whether they create a strong inference of scienter taken together." *In re NVIDIA*, 768 F.3d at 1056. "When conducting this holistic review … [the Court] must also take into account plausible opposing inferences that could weigh against a finding of scienter. Even if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco*, 552 F.3d at 1006.

Defendants argue that the TACAC "offers no motive for Gorman to lie" and "identifies no suspicious stock sales or any other financial motive for Gorman to mislead investors." Mot. at 10. However, "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). "But the lack of a plausible motive certainly makes it much less likely that a plaintiff can show a strong inference of scienter. Only where a complaint otherwise asserts compelling and particularized facts showing fraudulent intent or deliberate recklessness will we overlook the failure to allege a plausible motive." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021). Given the lack of "compelling and particularized facts showing fraudulent intent or deliberate recklessness," as discussed above, the lack of a plausible motive here makes a strong inference of scienter much less likely.

Moreover, as this Court previously noted, Defendants repeatedly disclosed that ATT could have a meaningful impact, including serious harm, on Snap's business, *see* March 2023 Order at 21, and such disclosures cut against a finding of scienter. Snap's repeated warnings coupled with

the lack of factual allegations, weighs against a finding of scienter here.  Accordingly, the Court finds that even when viewed holistically, Plaintiff's allegations do not create a strong inference of scienter.  Nevertheless, as noted above, the Court finds this to be a close call.  In any amended complaint, Plaintiff should plead facts demonstrating contemporaneous falsity as of April 2021.

### B.   Section 20(a) Claim

To state a claim for control person liability under Section 20(a) of the Exchange Act, a plaintiff must first allege an underlying violation of Section 10(b).  *See Zucco*, 552 F.3d at 990, 1008 (affirming dismissal of Section 20(a) claims where plaintiffs failed to allege violation of Section 10(b)).  Defendants argue (1) "[b]ecause Plaintiff fails to allege any primary violation of the federal securities laws, Plaintiff cannot sustain its [S]ection 20(a) claim;" and (2) Plaintiff fails to allege that Spiegel "exercised power or control" over the primary violator.  Mot. at 21.  Because the Court finds that Plaintiff has failed to state a claim under Section 10(b) and SEC Rule 10b-5, the Court dismisses Plaintiff's second cause of action as well.

### V.   <u>Conclusion</u>

Based on the foregoing discussion, the Court **GRANTS** the Motion with leave to amend. Plaintiff will have until October 27, 2023 to file an amended complaint.