**SAXENA WHITE P.A.**
Maya Saxena
msaxena@saxenawhite.com
Joseph E. White, III
jwhite@saxenawhite.com
Lester R. Hooker (241590)
lhooker@saxenawhite.com
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382

*Additional Counsel listed on signature page*

*Lead Counsel for Lead Plaintiff
and the Class*

**BIENERT KATZMAN
LITTRELL WILLIAMS LLP**
John L. Littrell (221601)
jlittrell@bklwlaw.com
Michael R. Williams (192222)
mwilliams@bklwlaw.com
360 E. 2nd Street, Suite 625
Los Angeles, CA 90012
Telephone: (213) 528-3400
Facsimile: (949) 369-3701

*Liaison Counsel for Lead Plaintiff
and the Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| KELLIE BLACK, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> SNAP INC., EVAN SPIEGEL, and JEREMI GORMAN, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

No. 2:21-cv-08892-GW (RAO)

CLASS ACTION

DECLARATION OF LESTER R. HOOKER IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION, AND LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT................................................................1

II.   OVERVIEW OF THE ALLEGATIONS.........................................................4

III.  PROCEDURAL HISTORY ................................................................7

    A.    The Commencement of the Action and Lead Plaintiff Appointment...........................................................7

    B.    Lead Plaintiff's Investigation to Prepare the Consolidated Complaint and Amended Complaints, Filing of the Complaints, And Defendants' Motions to Dismiss.......................................8

    C.    Appeal to the Ninth Circuit.................................................9

    D.    Discovery and Class Certification .........................................9

IV.   THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE ........13

    A.    The Parties' Mediation Session and Preliminary Settlement Approval...............................................................13

    B.    Reasons for the Settlement.................................................15

    C.    Notice to the Settlement Class .............................................17

    D.    The Plan of Allocation ......................................................19

V.    LEAD COUNSEL'S APPLICATION FOR LEAD COUNSEL'S ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES ..................................................................20

    A.    Lead Counsel's Application for Attorneys' Fees ..............................21

        1.    The Result Achieved Supports a 30% Fee Award ..................21

        2.    The Risks of Litigation................................................22

        3.    The Skill Required and Quality of Work ..............................23

        4.    The Contingent Nature of the Fee and Financial Burden.........25

        5.    Awards in Similar Actions ............................................26

        6.    Lead Plaintiff's Approval and the Reaction of the Settlement Class to Date..........................................26

        7.    A Lodestar Cross-Check Confirms that Plaintiff's Counsel's Requested Fee is Reasonable...............................27

    B.    Lead Counsel's Application for Reimbursement of Litigation Expenses.................................................................28

HOOKER DECL. ISO MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES – 2:21-CV-08892-GW (RAO)

- i -

C.    Lead Plaintiff's Reimbursement Request ............................................ 30

VI.    CONCLUSION ................................................................................................ 31

HOOKER DECL. ISO MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES – 2:21-CV-08892-GW (RAO)

- ii -

**EXHIBIT LIST**

| EXHIBIT | DESCRIPTION |
| --- | --- |
| A | Declaration Of Chase Rankin On Behalf Of Oklahoma Firefighters' Pension And Retirement System In Support Of Lead Plaintiff's Motion For Final Approval Of Class Action Settlement, The Plan Of Allocation, And Request For Attorneys' Fees And Expenses ("Rankin Declaration") |
| B | Declaration Of Kathleen Brauns Regarding (A) Mailing Of The Postcard Notice; (B) Publication Of Summary Notice; (C) Establishment of Settlement Website and Call Services; And (D) Report On Exclusions And Objections ("A.B. Data Declaration") |
| C | Joint Declaration Of Former United States District Court Judge Layn R. Phillips And Seth Aronson In Support Of (I) Lead Plaintiff's Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (II) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses ("Joint Mediator Declaration") |
| D | Declaration of Lester R. Hooker In Support Of Lead Counsel's Motion For An Award of Attorneys' Fees And Reimbursement Of Litigation Expenses, filed on behalf of Saxena White P.A. ("Saxena White Fee Declaration") |
| E | Declaration Of John L. Littrell In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses, filed on behalf of Bienert Katzman Littrell Williams LLP ("BKLW Fee Declaration") |
| F | Declaration Of Rachel M. Cherington In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses, filed on behalf of Joseph Hage Aaronson LLC ("JHA Fee Declaration") |

I, Lester R. Hooker, of the law firm Saxena White P.A. ("Saxena White" or "Lead Counsel"), respectfully submit this declaration in support of Lead Plaintiff's motion for final approval of the proposed Settlement with Defendants and approval of the Plan of Allocation ("Final Approval Motion"), as well as Lead Counsel's motion for approval of attorneys' fees and reimbursement of litigation expenses ("Fee Motion").[1]

## I.    PRELIMINARY STATEMENT

1.    Saxena White is the Court-appointed Lead Counsel in this action for Court-appointed Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Fire" or "Lead Plaintiff"). I am a Director of my firm and have actively supervised and participated in the prosecution of this Action.

2.    On December 4, 2025, the Court granted preliminary approval of the proposed $65 million cash settlement with Defendants. ECF Nos. 187, 188, 190. Since then, the Court-approved Claims Administrator has notified potential members of the Settlement Class of the Settlement by mail, email, and publication in accordance with the Preliminary Approval Order. Defendants have also caused the $65 million Settlement Amount to be deposited into an escrow account for the benefit of the Settlement Class.

3.    The Court, having presided over this complex securities class action for over four years, is familiar with the claims and defenses asserted. Accordingly, this declaration does not seek to detail every event that has occurred so far in the litigation. Rather, it highlights certain pertinent events leading to the Settlement, and the basis upon which Lead Plaintiff and Lead Counsel recommend its approval.

---

[1] When not defined herein, capitalized terms are defined in the Stipulation of Settlement (ECF No. 183-2, the "Stipulation"), all emphasis has been added, and internal quotation marks have been omitted. All references to "Ex." are to the exhibits hereto. All references to the "Final Approval Memorandum" are to the memorandum in support of the Final Approval Motion. All references to the "Fee Memorandum" are to the memorandum in support of the Fee Motion.

4.      Under any measure, the Settlement is exceptional.   Indeed, the $65,000,000 Settlement is more than six times the $10 million median settlement amount in securities class actions in the Ninth Circuit over the past decade and falls well within the range of settlements courts in this Circuit regularly approve.   The recovery is even more noteworthy when weighed against the risks of continued litigation.   As set forth more fully below, at the time of the Settlement, this Court had dismissed all but one of the statements that Lead Plaintiff had challenged in the SAC, and Defendants had credible arguments that the sole remaining April 22, 2021 statement was not false or misleading, and that the resulting October 22, 2021 stock drop was impacted by factors unrelated to any alleged fraud.

5.      While Lead Plaintiff believed that it had strong arguments to respond to these points, there is no question that Defendants' arguments could easily have been accepted by this Court at class certification, summary judgment or by a jury at trial.   And if the Court or jury ultimately concluded that Defendants' statement regarding the Apple privacy changes and the implementation of SKAN by Snap's advertisers was not material or otherwise actionable, or that all (or a substantial portion) of the stock price decline that occurred at the end of the Class Period was not attributable to the alleged fraud, the potential recovery would be reduced dramatically—and potentially to zero.   Even a favorable jury verdict would have been subjected to an inevitable and lengthy appeals process, the conclusion of which would have been highly uncertain.   Accordingly, even if Lead Plaintiff had prevailed at trial, it is highly questionable as to whether Lead Plaintiff would have recovered more than (or even as much as) the substantial Settlement Amount.

6.      Considering these arguments and the other risks inherent in continued litigation, Lead Counsel respectfully submits that the Settlement represents an outstanding recovery for the Settlement Class that is supported by each of the factors that the Ninth Circuit advises courts to consider in the settlement approval process, as set forth in Federal Rule of Civil Procedure 23, *Churchill Vill., L.L.C. v. Gen.*

*Elec.*, 361 F.3d 566, 575-76 (9th Cir. 2004) and *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011).

7.     In addition, the Settlement is the result of Lead Plaintiff's and Lead Counsel's extensive litigation efforts, including: (i) an in-depth investigation into the claims giving rise to the complaints; (ii) the preparation of detailed complaints, including the operative Third Amended Class Action Complaint (the "Complaint" or "TAC"); (iii) consultation with experts, including on advertising, SKAN, materiality, loss causation and damages; (iv) successfully opposing Defendants' motion to dismiss the TAC on appeal to the Ninth Circuit; (v) moving for class certification and engaging in extensive class certification discovery; (vi) engaging in comprehensive fact discovery, including obtaining, reviewing, and analyzing over 63,000 pages of documents; (vii) defending depositions of Lead Plaintiff, Lead Plaintiff's investment manager, Lead Plaintiff's investment consultant, a confidential witness cited in the Complaint, and Lead Plaintiff's expert on market efficiency, and preparing for fact witness depositions; (viii) the submission of detailed mediation statements setting forth Lead Plaintiff's positions on the hotly disputed issues in the case; and (ix) preparing for and attending a day-long mediation session before prominent mediators involving rigorous and extensive negotiations.

8.     The Parties reached an agreement to settle only after the Ninth Circuit reversed the Court's order granting the motion to dismiss the TAC, and the Parties had engaged in significant document discovery, arms'-length settlement negotiations and an all-day mediation session before independent mediators, the Hon. Layn R. Phillips and Seth Aronson of Phillips ADR Enterprises, P.C.

9.     Lead Plaintiff supervised Lead Counsel, participated in all aspects of the Litigation, remained informed throughout the settlement negotiations, and ultimately approved the Settlement.

10.     In addition to seeking the Court's final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation as fair and reasonable.

To prepare the Plan of Allocation, Lead Plaintiff engaged Peregrine Economics, LLC, a well-recognized firm of financial consulting professionals with extensive experience in preparing similar plans. Under the proposed Plan of Allocation, the Net Settlement Fund will be distributed on a *pro rata* basis to members of the Settlement Class who timely submit valid proofs of claim based on their "Recognized Loss" amount as calculated pursuant to the Plan.

11. Lead Counsel also requests an award of attorneys' fees for Plaintiff's Counsel's efforts, which resulted in a substantial recovery for the Class in the face of significant risks, and for reimbursement of its litigation expenses. Specifically, Lead Counsel is applying for an attorneys' fee award of 30% of the Settlement Fund (*i.e.,* 30% of the Settlement Amount, plus interest earned thereon), to be paid from the Settlement Fund. Lead Counsel's requested fee is well within the range of fees routinely approved by courts in this Circuit and nationwide in comparable securities class actions and is amply supported by each of the factors set forth in *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002).

12. The reasonableness of Lead Counsel's requested 30% fee is also confirmed by a lodestar cross-check, which yields a multiplier of 1.86. This too is well within the range of multipliers routinely approved within the Ninth Circuit.

13. Likewise, Plaintiff's Counsel's requested out-of-pocket litigation costs of $602,359.78, plus interest thereon, and Lead Plaintiff's requested reimbursement of costs pursuant to the PSLRA, including lost wages and time, in the amount of $10,531.75 to Lead Plaintiff, are also fair and reasonable. Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of litigation expenses should be approved.

## II.    OVERVIEW OF THE ALLEGATIONS

14. As alleged in the Complaint, Snap is a social media company whose primary product is a free mobile chatting application called Snapchat. Snap

relied almost entirely on advertising revenue from Snapchat, especially "direct response" ads that depend on tracking user activity for targeting and measurement.

15.    Before 2021, Snap used Apple's Identifier for Advertisers (IDFA) to collect app user data on iOS devices. Apple's App Tracking Transparency (ATT) initiative, announced in 2020 and implemented in April 2021, required users to opt in to tracking, sharply limiting Snap's access to data and threatening its ad business. Absent user opt-in, the Company would no longer be able to share a user's identifying information with advertisers and would no longer have access to that user's IDFA.

16.    The Complaint alleges that Apple promoted an alternative tool, SKAdNetwork (SKAN), but SKAN offered only aggregated—not individualized—measurement. Beginning in February 2021, Defendants assured investors that the Company's advertising business was prepared for Apple's ATT changes and would continue delivering the record-level advertising and revenue growth it had recently achieved.

17.    The Complaint further alleged that Snap's Chief Business Officer Jeremi Gorman told investors that the majority of Snap's direct-response advertisers had already successfully implemented SKAN for their ad campaigns and that the Company was well positioned to withstand the ATT changes. Specifically, on April 22, 2021, during Snap's Q1 2021 earnings call, Gorman stated that "[a]dvertisers that represent a majority of our direct response advertising revenue have successfully implemented [SKAN] for their Snap campaigns." Snap's stock rose from $57.05 on April 22, 2021, to a high of $83.11 on September 24, 2021.

18.    As alleged, on October 21, 2021, the "truth emerged" when Snap announced that it had missed the lower end of its third quarter revenue—the first time in Snap's history that it had failed to meet this threshold—attributing the shortfall to ATT-related "headwinds." According to the TAC, the Company's Form 10-Q confirmed that Apple's changes had harmed Snap's ad

targeting, measurement, and optimization, reducing demand and pricing for its ad products. The next day, Snap's stock price fell over 26%, or $19.97 per share, to close at $55.14 per share.

19.    As explained herein and in the memoranda filed herewith, Defendants vigorously deny that they violated the federal securities laws in connection with the allegations described above and asserted myriad defenses in response to Lead Plaintiff's claims. Defendants asserted aggressive defenses throughout the litigation and would have continued to do so.

20.    Notably, following the rulings on the motions to dismiss and subsequent appeal, Plaintiff's claims had been narrowed to a single alleged misstatement, namely Defendant Gorman's April 22, 2021 statement, for which Plaintiff would have continued to face significant challenges. Indeed, Defendants appeared prepared to vigorously argue that Gorman's remaining statement was not false when read according to its plain meaning, considered in context, and evaluated in light of its pre-ATT timing.  Defendants thus would have vigorously defended the case on the merits and would have made numerous arguments regarding both liability and damages that could have defeated Plaintiff's claims at class certification, summary judgment, or trial, thus reducing or even eliminating the damages available to the Class.

21.    The technical and factually complex nature of the issues in this case also created obstacles to establishing scienter, as reflected in the motion to dismiss proceedings. Defendants would further contend that Gorman lacked scienter when making the April 22 statement because she repeatedly acknowledged that ATT could affect Snap's business; Gorman had no financial motive; and scienter is more difficult to prove when a challenged statement is open to multiple reasonable interpretations. Defendants would have also disputed the allegations attributed to confidential witnesses, including the basis for those witnesses' claims.

HOOKER DECL. ISO MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES – 2:21-CV-08892-GW (RAO)

6

22.    Moreover, Defendants would have challenged whether the alleged corrective disclosure was sufficiently connected to the sole remaining false statement and thus caused any damages.  Defendants would have had several opportunities to raise these challenges—including on price-impact grounds at class certification and on loss-causation grounds at summary judgment and trial. They would argue that Plaintiff cannot show that the April 22 statement affected Snap's stock price, nor that Snap ever "corrected" the statement by later reporting that advertisers responsible for most of its DR revenue had not implemented SKAN as of April 2021. As to the October 22, 2021 stock drop, Defendants would contend that Snap's disappointing results were driven by factors unrelated to the alleged fraud, such as macroeconomic factors, supply chain disruptions and labor shortages—none of which were tied to SKAN.

## III.    PROCEDURAL HISTORY

### A.    The Commencement of the Action and Lead Plaintiff Appointment

23.    Plaintiff Kellie Black commenced this Action on November 11, 2021. ECF No. 1.

24.    On January 10, 2022, Oklahoma Fire moved the Court for entry of an order appointing it as Lead Plaintiff in the Action and approving their selection of Saxena White P.A. ("Saxena White") as Lead Counsel and Bienert Katzman Littrell Williams LLP ("BKLW") as Liaison Counsel. ECF No. 28.

25.    On January 18, 2022, Oklahoma Fire filed its response in further support of its motion for appointment as Lead Plaintiff and in opposition to the four remaining competing motions.  ECF No. 40.

26.    On January 31, 2022, following a telephonic hearing with the Court, the Court consolidated this Action with *Buscaglia v. Snap Inc.*, No. 2:22-cv-00175 (C.D. Cal.), and appointed Oklahoma Fire as Lead Plaintiff pursuant to the

HOOKER DECL. ISO MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES – 2:21-CV-08892-GW (RAO)

7

requirements of the PSLRA and approved Lead Plaintiff's selection of Lead Counsel.  ECF Nos. 54-55.

**B.      Lead Plaintiff's Investigation to Prepare the Consolidated Complaint and Amended Complaints, Filing of the Complaints, And Defendants' Motions to Dismiss**

27.      Prior to filing the consolidated complaint, Lead Counsel had begun an exhaustive investigation into the facts underlying the Action. This investigation continued as the litigation progressed and included a comprehensive review and analysis of: (i) Snap's public filings with the SEC and materials posted on the Company's website; (ii) press releases and other public statements issued by Snap, including during earnings calls and conference calls with analysts and investors; (iii) research reports by securities analysts covering Snap; (iv) publicly available news articles, press releases, documents, and other information regarding Snap and the industry in which Snap operates; (v) data and other information regarding Snap securities; (vi) expert economic analyses; (vii) expert advertising analyses; (viii) expert social media and digital technology analyses; and (ix) interviews of numerous former Snap employees and Company partners.

28.      On March 18, 2022, Plaintiff filed its consolidated complaint. ECF No. 65. Defendants moved to dismiss on May 3, 2022. ECF No. 78. After the filing of Defendants' motion to dismiss, Plaintiff amended the consolidated complaint and thereafter filed the SAC on August 3, 2022. ECF Nos. 90, 92, 94, 95.

29.      After full briefing and a hearing on Defendants' motion to dismiss, on March 13, 2023, the Court granted Defendants' motion, with leave to amend. ECF Nos. 114-115. The Court held that "Plaintiff ha[d] plausibly alleged a material misrepresentation" as to the April 22, 2021 statement that "[a]dvertisers that represent a majority of [Snap's] direct response advertising revenue have successfully implemented SKAdNetwork for their Snap campaigns." *Id*. at 5, 32. The Court found that Plaintiff failed to adequately allege scienter. *Id*. at 38.

HOOKER DECL. ISO MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES – 2:21-CV-08892-GW (RAO)

8

30.     On April 21, 2023, Plaintiff filed the TAC. ECF No. 120. Defendants moved to dismiss on June 9, 2023. ECF No. 121. The motion was fully briefed on August 25, 2023. ECF Nos. 125-26. Following full briefing and oral argument, the Court took Defendants' motion under submission. ECF No. 130. On September 26, 2023, the Court granted the motion with leave to amend. ECF No. 135. On October 27, 2023, the Lead Plaintiff filed a notice of intent not to amend the complaint. ECF No. 137. On October 30, 2023, the Court entered final judgment dismissing the case with prejudice. ECF No. 138.

### C.     Appeal to the Ninth Circuit

31.     On November 28, 2023, Plaintiff filed a notice of appeal. ECF No. 139. On December 4, 2023, the Ninth Circuit Court of Appeals opened Case No. 23-3932. ECF No. 1. On February 26, 2024, Lead Plaintiff filed the Appellant's Opening Brief and appellate briefing concluded on June 17, 2024. ECF Nos. 24, 29, 41. Oral argument was held on December 5, 2024. ECF No. 48.

32.     On December 20, 2024, the Ninth Circuit reversed the dismissal of the Action. *Oklahoma Firefighters Pension & Ret. Sys. v. Snap Inc.*, 2024 WL 5182634 (9th Cir. Dec. 20, 2024). The Appellate Court ruled that Lead Plaintiff had adequately alleged scienter under both the holistic inquiry and core operations theory, adequately alleged the falsity of Defendants' April 22, 2021 statement, and reversed the dismissal of the § 20(a) claims.

33.     Defendants filed their Answer to the Amended Complaint on February 21, 2025. ECF No. 161.

### D.     Discovery and Class Certification

34.     The Parties thereafter engaged in discovery. Lead Plaintiff submitted a First Set of Requests for Production of Documents to All Defendants on February 4, 2025 and Subpoenas to Produce Documents to multiple third parties, including Apple and Branch (May 14, 2025), Adjust, Singular, and Kochava (May 15, 2025), AppsFlyer (May 20, 2025), and adMixt (June 26, 2026).

35.     Defendants served their responses and objections to the Requests on March 6, 2025 and produced documents in rolling productions responsive to the Requests with an initial production in May 2025 and final production in August 2025.

36.     On February 14, 2025, Defendants submitted their First Request for the Production of Documents Directed to Lead Plaintiff and their First Set of Interrogatories Directed to Lead Plaintiff.  Lead Plaintiff served its responses and objections on March 24, 2025.  Lead Plaintiff served its Supplemental Responses And Objections To Defendants' First Set Of Interrogatories on May 15, 2025.

37.     Defendants served Lead Plaintiff with notice of their document subpoena to Lead Plaintiff's money manager, Fred Alger Management LLC ("Fred Alger"), on March 10, 2025, with notice of their deposition subpoena to Fred Alger on May 23, 2025, and with their amended notice of deposition to Fred Alger on August 14, 2025.

38.     Defendants served Lead Plaintiff with notice of their document subpoenas to confidential witnesses on April 10, 2025, with notice of their deposition subpoena to one of Plaintiff's confidential witnesses on June 6, 2025, and with their amended notice of deposition subpoena to the same confidential witness on June 20, 2025.

39.     Defendants served Lead Plaintiff with notice of their document subpoena to an additional confidential witness on April 15, 2025, and with notice of their document subpoena to another confidential witness on April 30, 2025. Defendants served Lead Plaintiff with their notice of deposition subpoena to one of Plaintiff's confidential witnesses on June 23, 2025, and with their amended notice of deposition subpoena to that same confidential witness on August 4, 2025.

40.     Defendants served Lead Plaintiff with notice of their document subpoena to Lead Plaintiff's investment consultant, Mariner Institutional, LLC ("Mariner"), on May 16, 2025, with notice of their deposition subpoena to Mariner

on May 23, 2025, and with their amended notice of deposition to Mariner on August 14, 2025.

41. Defendants served Lead Plaintiff with a notice of deposition on May 23, 2025, with their amended notice of deposition on July 18, 2025, and Lead Plaintiff was deposed by Defendants on July 31, 2025.

42. Lead Plaintiff served its First Set of Interrogatories on All Defendants on June 16, 2025. Defendants served their responses and objections on July 16, 2025.

43. Lead Plaintiff served Snap with a notice of deposition on July 18, 2025, and Defendants served their responses and objections on August 15, 2025.

44. One of Plaintiff's confidential witnesses was deposed on August 5, 2025, Mariner was deposed on August 18, 2025, and Fred Alger was deposed on August 26, 2025.

45. Lead Plaintiff served Defendants with its notice of deposition to Plaintiff's confidential witness on September 2, 2025.

46. The Parties exchanged numerous discovery correspondence between March and September; and engaged in multiple meet and confer conferences in an attempt to come to an agreement on, among other things, the Parties' respective scope of discovery, including, for example, preservation, custodians, search terms, sources of ESI, and complex particular ESI issues like the production of hyperlinked documents and ephemeral messages.

47. In total, Defendants produced, and Lead Plaintiff reviewed, approximately 27,000 pages of documents in eight (8) separate productions and an additional four (4) overlay productions over the course of approximately three (3) months. Additionally, nine (9) third parties produced, and Lead Plaintiff reviewed, over 36,000 pages of documents. The amount of work done by Lead Plaintiff during this short time period is evidence of Lead Plaintiff's vigorous prosecution of and commitment to this Action.

48.    Lead Counsel and their experts devoted substantial time to reviewing and analyzing these documents and organizing them for depositions.  Specifically, Lead Counsel prepared for eight depositions, which the Parties had either scheduled or were in the process of scheduling at the time that they agreed to the Settlement.  Through their analysis of these documents, Lead Counsel were also able to determine which additional custodians were likely to have relevant documents and information, and to develop further insight into the key departments and personnel likely to have been involved in the events that gave rise to this Action.

49.    The productions came in a wide variety of formats and styles, necessitating detailed analyses of emails, spreadsheets, text messages, and other complex compilations of data.  To analyze and process this vast amount of information within the discovery period, Lead Counsel required an effective and efficient discovery plan.  This plan leveraged a sophisticated electronic document hosting system, and a dedicated team of attorneys experienced in electronic document discovery and deposition and trial preparation.  Staff attorneys were trained to code documents based on specific issues in the case and their potential relevance to specific deponents.  Lead Counsel also developed reference resources to aid members of the document review team, including lists of key witnesses and a framework for understanding key facts supporting Plaintiff's claims. Throughout document discovery, the attorneys regularly discussed key facts uncovered by the review.

50.    From May 2025 to June 2025, Plaintiff produced four (4) productions, totaling over 2,400 pages of documents, along with an additional approximately 14,500 pages of documents produced on behalf of Plaintiff's expert, Chad Coffman. Plaintiff's productions generally consisted of documents cited in the Complaint, trade reports, investment policies, agreements with investment services providers, and board minutes.

51.    On May 16, 2025, Plaintiff moved for class certification. ECF No. 167.

HOOKER DECL. ISO MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES – 2:21-CV-08892-GW (RAO)

12

## IV.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

52.    The $65 million cash settlement (plus interest) was the result of arm's length negotiations between experienced counsel, conducted under the auspices of the Honorable Layn R. Phillips and Seth Aronson of Phillips ADR Enterprises, P.C., highly qualified and well-respected independent mediators with extensive experience mediating securities class actions.  The Settlement provides the Class with an immediate and substantial benefit before trial, and eliminates the very real risk of protracted litigation against Defendants under circumstances where a favorable recovery—or any recovery at all—cannot be assured.  Lead Counsel accordingly believes that the Settlement is fair, reasonable, and an excellent result for the Class considering the risk of recovering a lesser amount, or nothing at all, after substantial delays that would likely have lasted several years.

### A.    The Parties' Mediation Session and Preliminary Settlement Approval

53.    The Parties engaged Judge Phillips and Mr. Aronson to facilitate a mediation between the Parties scheduled for September 3, 2025. The Parties agreed to exchange detailed mediation statements setting forth their respective arguments on several key issues prior to the mediation, to ensure that the Parties thoroughly and completely understood the likely issues that would be extensively litigated should the Action continue.  The Parties exchanged their comprehensive opening mediation statements and reply mediation briefs addressing the facts and law of the case, including, among other things, Defendants' challenges on the key issues of falsity, scienter, loss causation, and damages.

54.    On September 3, 2025, the Parties and Defendants' directors' and officers' liability insurance carriers (the "D&O Insurers") participated in a mediation session. During the mediation session, the Parties discussed the merits of the case, including liability and damages.

55.    At the conclusion of the mediation session, Judge Phillips issued a mediator's recommendation to resolve the Action for $65,000,000, which the Parties subsequently accepted, subject to the negotiation of the terms of a term sheet and a stipulation of settlement and subsequent approval by the Court.

56.    On October 27, 2025, Lead Plaintiff filed its motion for preliminary approval of the proposed Settlement and memorandum of law in support ("Preliminary Approval Memorandum"), along with the Stipulation and related documents.  ECF No. 183.

57.    On December 3, 2025, the Court issued its Tentative Ruling on Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement ("Preliminary Approval Ruling").  ECF No. 187.  On December 4, 2025, following a hearing, the Preliminary Approval Ruling was adopted as the Court's Final Ruling. ECF No. 188.

58.    The Preliminary Approval Ruling certified the Settlement Class (*see* ECF No. 187 at 8-13), found that "each of the requirements delineated in Rule 23(e)(2) is satisfied" (*see id.* at 14-20), and held that the notice plan "appear[ed] to the Court to lack any apparent deficiencies and to be adequate to apprise Class Members of their status and associated rights" (*id.* at 20-21).

59.    Specifically, regarding class certification, the Court: (i) was "satisfied that the proposed settlement class is so numerous that joinder of all members would no doubt be impracticable"; (ii) found "the commonality requirement is met"; (iii) found that given there was "no conduct alleged unique to Plaintiff[] or apparent defenses unique to their claims, the Court would conclude that Plaintiff'[s] claims are sufficiently typical"; (iv) held that based on "[Plaintiff's] representations and the litigation that ensued before settlement was reached, the Court is persuaded that Lead Plaintiff understands its duties and is sufficiently motivated to perform them, that there is no apparent conflict with other Class Members, and that Lead Counsel has substantial experience in litigating large securities class actions"; (v) held "that

common questions predominate"; and (vi) concluded "that a class action is the superior method for fairly and efficiently adjudicating Lead Plaintiff's securities fraud claims." *Id*. at 9-13.

60.    The Court found no signs of collusion, noting that "the proposed settlement was reached with the assistance of two experienced mediators and after the parties exchanged opening and reply mediation briefs that set forth their respective views of the merits of this action and any supporting evidence obtained through discovery. . .  This suggests that the proposed Settlement was negotiated at arm's length and that neither the process nor the result has any apparent indicia of collusion." *Id*. at 15. The Court added that "the fact that Lead Counsel is highly experienced in litigating securities class actions and has worked extensively on this case cuts in favor of finding the Settlement procedurally robust." *Id*.

61.    The Preliminary Approval Ruling also stated that given "the settlement of this action provides an early resolution, ensuring a recovery and eliminating the risk of no recovery at all. . . the Settlement is in the best interest of the Class and that this factor thus weighs in favor of approval." *Id*. at 18.

62.    Also on December 4, 2025, the Court issued its order preliminarily approving the Settlement and authorizing notice for the proposed Settlement to be sent to potential members of the Settlement Class.  ECF No. 190 ("Preliminary Approval Order").

### B.    Reasons for the Settlement

63.    Lead Plaintiff and Lead Counsel fully endorse the Settlement. *See* Ex. A (Rankin Declaration) attached hereto.  Lead Plaintiff is the Court-appointed Class representative and a sophisticated institutional investor who has actively overseen the prosecution of this Action and who understood its fiduciary duty to act in the best interest of the Settlement Class.

64.    Lead Counsel is a law firm that specializes in complex securities class action litigation, and is highly experienced in such litigation. *See* Ex. D (Saxena

White firm resume, attached as Exhibit C). Based on their experience and knowledge of the facts and applicable law in this Action, Lead Counsel and Lead Plaintiff have determined that the Settlement is in the best interest of the Settlement Class.

65. Although Lead Plaintiff and Lead Counsel believe that the claims asserted in this Action are meritorious, continued litigation against Defendants posed significant risks that made any recovery from them uncertain. Indeed, at the pleading stage, the Court dismissed 17 of the 18 alleged misstatements as inactionable and concluded that Plaintiff had not adequately alleged scienter with respect to the sole remaining statement. The substantial risk associated with proving liability for this single surviving statement further supports approval of the Settlement.

66. For example, Lead Plaintiff was aware of the significant challenges Defendants raised at the motion to dismiss stage, on appeal, and in their mediation statement on the key issues of falsity, scienter, loss causation, and damages.

67. Defendants vigorously asserted that the Class suffered no cognizable damages attributable to the alleged fraud, and even if damages could be established, Lead Plaintiff was further aware that Defendants' damages expert had calculated maximum possible damages far below the maximum aggregate damages Lead Plaintiff's expert had calculated—which would undoubtedly result in a "battle of the experts" at trial with no certainty as to which of the experts the jury would credit. Thus, there were very significant risks attendant to the continued prosecution of the Action against Defendants.

68. Had any of these arguments been accepted in whole or in part, any potential recovery would have been dramatically limited or completely eliminated altogether. Moreover, Lead Plaintiff would have had to prevail against Defendants on these and other issues at class certification, summary judgment and trial, and even if they prevailed at those stages, on the appeals that would most assuredly follow.

69.    The Settlement eliminates these substantial risks and guarantees the Settlement Class a favorable cash recovery.  Lead Counsel firmly believes that settling the Action with Defendants at this stage of the litigation is in the best interest of the Settlement Class.

**C.    Notice to the Settlement Class**

70.    As required by the Court's Preliminary Approval Order, beginning on January 6, 2026, Plaintiff, through the Court-approved Claims Administrator A.B. Data, notified potential members of the Settlement Class of the Settlement by mailing and emailing a copy of the Postcard Notice to potential members of the Settlement Class and their nominees.  *See* Ex. B ("A.B. Data Declaration").

71.    A.B. Data used several resources of data to reasonably identify members of the Settlement Class.  For example, under the Preliminary Approval Order, Snap was required to provide A.B. Data records reasonably available to Snap or its transfer agent concerning the identity and last known address of Settlement Class Members.  A.B. Data also sent the Postcard Notice to entities identified on a proprietary list maintained by A.B. Data of the most common banks, brokers, and other nominees.  *See* Ex. B, ¶¶4-5.  In total, 4,892 copies of the Postcard Notice were mailed in the initial mailing.  *Id*. at ¶5.

72.    The Preliminary Approval Order also requires brokers and nominees, within seven calendar days of receipt of the Postcard Notice, to either (i) request additional copies of the Postcard Notice to send to the beneficial owners of the securities, or (ii) to provide to A.B. Data the names and addresses of such persons. A.B. Data has mailed 38,076 copies of the Postcard Notice to potential Settlement Class Members whose names and addresses were received from individuals or nominees, 200,950 Postcard Notices to nominees who requested same to forward to their customers, and 368 Postcard Notices to record holders identified in a data file provided by counsel to Defendants.  *Id*. ¶¶8-10.

73. In the aggregate, as of March 12, 2026, A.B. Data has disseminated 244,286 Postcard and Email Notices to potential members of the Settlement Class and their nominees. *Id*. ¶11.

74. In addition, on January 21, 2026, the Summary Notice was published in the national edition of *The Wall Street Journal* and over *PR Newswire*. *Id*. ¶12. Information regarding the Settlement, including copies of the Notice, Stipulation, and Claim Form, was posted on the website established by A.B. Data specifically for this Settlement, and on Lead Counsel's website. *Id*. ¶13. This method of giving notice is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]." Fed. R. Civ. P. 23(e)(1).

75. The Postcard Notice, Summary Notice, and Notice advise members of the Settlement Class of the essential terms of the Settlement, sets forth the procedure for objecting to or opting out of the Settlement, and provides specifics on the date, time and place for the Final Approval Hearing.

76. The Postcard Notice, Summary Notice, and Notice also contain information regarding Lead Counsel's fee and expense application and the Notice outlines the proposed plan of allocating the Settlement proceeds among members of the Settlement Class.

77. As explained in the Final Approval Memorandum, the notices fairly apprise members of the Settlement Class of their rights with respect to the Settlement, and therefore is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, Federal Rule of Civil Procedure 23, and due process.

78. In addition, Lead Counsel were informed that Defendants caused the notice contemplated by the Class Action Fairness Act of 1995 ("CAFA") to be served.

HOOKER DECL. ISO MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES – 2:21-CV-08892-GW (RAO)

18

79.    As the Court held in its Preliminary Approval Ruling, "[t]he (long-form) Notice provides all of the required information in plain, easily understandable language, and the Postcard Notice and Summary Notice list most of the required information. As such, the Court finds the proposed notice and notice plan sufficient to satisfy both Rule 23(e)(2)(C)(ii) and the PSLRA requirements."  ECF No. 187 at 20-21.

### D.    The Plan of Allocation

80.    Lead Plaintiff has proposed a plan to allocate the proceeds of the Net Settlement Fund among members of the Settlement Class who submit valid proofs of claim.   The objective of the proposed Plan of Allocation (the "Plan") is to equitably distribute the Settlement proceeds, on a *pro rata* basis, to those members of the Settlement Class who suffered economic losses as a result of Defendants' alleged misrepresentations and omissions.

81.    Lead Plaintiff engaged Peregrine Economics as an expert to assist in formulating the Plan.  The Plan reflects the assumption that Defendants' alleged false and misleading statements proximately caused the price of Snap common stock and Snap call options to be artificially inflated and Snap put options to be artificially deflated throughout the Settlement Class Period. In calculating the estimated artificial inflation (deflation) allegedly caused by Defendants' alleged misrepresentations, Lead Plaintiff's damages expert considered price changes in Snap common stock and Snap call and put options in reaction to the public announcement allegedly revealing the truth concerning Defendants' alleged misrepresentations, adjusting for price changes that were attributable to market or industry forces.

82.    The Notice set forth and explained the proposed Plan to members of the Settlement Class.  It was prepared in consultation with Lead Plaintiff's expert, tracks a theory of damages asserted by Lead Plaintiff, is substantially similar to numerous

other plans that have been approved in this District and around the country, and is fair, reasonable, and adequate to the Settlement Class as a whole.

83.    Notably, there have been no objections to date to the proposed Plan of Allocation.

84.    As the Court noted in its Preliminary Approval Ruling, "The Plan of Allocation appears to treat Class Members equitably, dividing the settlement proceeds among Authorized Claimants on a *pro rata* basis with each eligible Class Member subject to the same formulas for distribution."  ECF No. 187 at 19.

## V.    LEAD COUNSEL'S APPLICATION FOR LEAD COUNSEL'S ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

85.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Plaintiff also requests approval of Lead Counsel's application to the Court for an award of attorneys' fees and reimbursement of litigation expenses. Specifically, Lead Counsel is applying for a fee of 30% of the Settlement Fund ($19,500,000, plus interest earned at the same rate as the Settlement Fund).  Lead Counsel also requests reimbursement of $602,359.78 in litigation expenses (plus interest earned at the same rate as the Settlement Fund).

86.    In determining whether a requested award of attorneys' fees is fair and reasonable, district courts are guided by the factors enumerated in *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1048-50 (9th Cir. 2002), which include: (i) the results achieved; (ii) the risk of litigation; (iii) the skill required and the quality of work; (iv) the contingent nature of the fee; and (v) awards made in similar actions.

87.    Based on consideration of these factors, and on the additional legal authorities set forth in the Fee Memorandum, filed contemporaneously herewith, Lead Counsel respectfully submits that its requested 30% fee should be granted.

### A.    Lead Counsel's Application for Attorneys' Fees

#### 1.    The Result Achieved Supports a 30% Fee Award

88.    For its extensive efforts on behalf of the Settlement Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis.  As set forth in the Fee Memorandum, the percentage method is the preferred method of fee recovery in the Ninth Circuit because, among other things, it aligns the attorneys' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery efficiently and in the shortest amount of time. Indeed, use of the percentage fee method to calculate attorneys' fees in common fund cases represents the overwhelming current trend in the Ninth Circuit and in other circuits.

89.    Based on the highly favorable result Lead Counsel achieved for the Settlement Class before trial, the extent and quality of work Lead Counsel performed, and the risks of the litigation and the contingent nature of the representation, Lead Counsel submits that a 30% fee award is justified and should be approved.  Lead Plaintiff, who is a sophisticated institutional investor, approves of Lead Counsel's fee request.

90.    Lead Counsel respectfully submits that the work it completed in prosecuting this case, and arriving at the successful Settlement, has been both time-consuming and challenging.  As explained above, litigation against Defendants posed substantial risks that made any recovery against them uncertain.  In the face of those risks, Lead Counsel took this case on a contingent basis, committed significant resources to the prosecution of the Action, and litigated the Action for over four years now without any compensation or guarantee of success against Defendants.

91.    As the Court stated in the Preliminary Approval Ruling, "it would be noted that said counsel did very successfully represent the positions of the Lead Plaintiff/class. For example, it took a strategic decision not to file a fourth amended

complaint but rather to take an adverse judgment and appeal this Court's decision as to whether the Lead Plaintiff had adequately alleged scienter; and convinced the United States Court of Appeals to overturn this Court's determination." ECF No. 187 at 16 n.9.

92. Despite the numerous challenges that Lead Counsel faced in prosecuting the Action, Lead Counsel successfully obtained a recovery of $65 million. The $65,000,000 Settlement Amount is more than four times the $14 million median settlement amount for securities class actions in 2024, and almost six times more than the $11.3 million median settlement amount for federal securities class actions from 2015-2023. It is also $55 million more than the $10 million median settlement for securities class actions in the Ninth Circuit from 2015-2024. Class Members will enjoy the benefit of the Settlement immediately while avoiding the credible prospect of obtaining no recovery at all.

93. Based on the excellent result achieved for the Settlement Class, the quality of work performed, the significant risks of continuing the Action against Defendants, and the contingent nature of Lead Counsel's representation, Lead Counsel submits that a 30% fee award is fair and reasonable, and consistent with similar cases in the Ninth Circuit.

### 2. The Risks of Litigation

94. Lead Counsel undertook this Action on a wholly contingent basis. Lead Counsel understood, from the outset, that it was embarking upon a complex and expensive litigation with no guarantee of compensation for its investment of time, money and effort that a case of this size would undoubtedly require. Lead Counsel also anticipated that Defendants would raise a myriad of challenges to the sufficiency of the pleadings and to Lead Plaintiff's ability to prove liability and damages. Further, had the litigation continued against Defendants, Defendants would have continued to dispute essentially all elements of the claims during all phases of the litigation, including on class certification, summary judgment, at trial,

and on appeal. Additionally, this significant recovery for investors captures virtually the entirety of Defendants' remaining available directors' and officers' insurance tower—funds that would have quickly depleted had the litigation continued.

95. In undertaking the responsibility for prosecuting the Action, Lead Counsel ensured that sufficient attorney resources were dedicated to the investigation of the claims, and that sufficient resources were available to advance the expenses required to pursue and complete such a complex litigation. Plaintiff's Counsel, in total, incurred $602,359.78 in expenses prosecuting this Action for the benefit of the Settlement Class.

96. Significantly, Lead Counsel bore the risk that it would obtain no recovery at all. As discussed herein, this case presented a number of significant risks and uncertainties which could have eliminated the possibility of any recovery against Defendants. Indeed, despite the vigorous and competent efforts of Lead Counsel, success in contingent-fee complex litigation such as this is never certain.

97. Lead Counsel firmly believes that the commencement of a securities class action does not guarantee a settlement, particularly in light of the heightened pleading standards of the PSLRA. To the contrary, it takes hard work and diligence by skilled and experienced counsel to develop the facts and theories necessary to sustain a complaint or win at trial, or to induce sophisticated defendants and their insurers (and their equally sophisticated counsel) to engage in serious settlement negotiations.

### 3. The Skill Required and Quality of Work

98. Lead Counsel completed considerable work to prepare allegations it believed would be sufficient to overcome Defendants' motion to dismiss, be successful at class certification, summary judgment and at trial. To accomplish this, Lead Counsel conducted an extensive investigation, including, as stated above, review and analysis of publicly available information concerning Snap, SKAN, and ATT; identifying and interviewing percipient witnesses with direct knowledge of the

facts alleged; consulting with experts on the specialized issues of mobile technology and advertisement, SKAN, loss causation and damages; and reviewing over 63,000 pages of documents produced by Defendants and third parties that directly bore on key issues in the case. Lead Counsel also engaged in significant discovery and defended depositions of Plaintiff, Plaintiff's expert, Plaintiff's investment consultant, Plaintiff's investment manager, and Plaintiff's confidential witness; and prepared for three additional fact witness depositions.

99.     Lead Counsel also committed substantial time and resources to, among other things, drafting and filing the consolidated and amended complaints; successfully defeating Defendants' motion to dismiss on appeal; moving for class certification; preparing comprehensive mediation statements; preparing materials in response to Defendants' equally comprehensive mediation statements, which raised significant issues pertaining to materiality, loss causation, and damages; engaging and conferring with various consultants and experts; researching the applicable law related to Lead Plaintiff's claims and key issues in the case, including Defendants' potential defenses; participating in a full-day mediation session; engaging in hard-fought settlement negotiations with experienced defense counsel who vigorously disputed several key issues in the case; and drafting and negotiating the Stipulation and preparing related documents.

100.     Lead Counsel's experience and expertise should be considered in approving an appropriate fee. As shown by Saxena White's firm resume (*see* Ex. C to Ex. D), each of Saxena White's attorneys are experienced and skilled class action securities litigators, and each has a successful track record in securities cases across the country—including before this Court and within this Circuit.

101.     Regarding Appellate Counsel, Joseph Hage Aaronson LLC ("JHA"), a preeminent firm with a national reputation for handling complex, high-stakes appellate litigation in federal and state courts, with a focus on finance, securities, civil RICO, and white-collar matters. JHA is recognized for integrating appellate

strategy from the earliest stages of a case through final resolution and is frequently engaged to navigate cases involving substantial financial exposure or precedent-setting questions.

102.   Bienert Katzman Littrell Williams LLP ("BKLW") provided essential support by applying their deep familiarity with the District's local rules, ensuring that filings, motions, and procedural steps were executed.  BKLW also has extensive experience in all types of complex civil litigation, including securities class actions.

103.   The quality of the work performed by Plaintiff's Counsel in achieving this favorable Settlement should also be evaluated in light of the quality of opposing counsel.  Defendants here were represented by Paul Weiss, a global and highly-respected defense firm with extensive experience litigating complex securities class actions.  Defendants' Counsel spared no effort in the vigorous defense of their clients, and yet, in the face of this knowledgeable and formidable defense, Lead Counsel was able to develop a case that was sufficiently strong to persuade Defendants to settle on highly favorable terms prior to class certification, summary judgment and trial.

### 4.    The Contingent Nature of the Fee and Financial Burden

104.   Courts have repeatedly recognized that it is in the public interest to have experienced and qualified counsel privately enforce the securities laws.  However, as recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private plaintiffs, and particularly institutional investors, take an active role in protecting the interests of investors.  If this important public policy is to be carried out, Plaintiff's Counsel should be adequately compensated, taking into account the substantial risks undertaken in prosecuting securities class actions.  Indeed, Lead Counsel took this case on a contingency basis, committing its resources and litigating it for over four

years, without any compensation or guarantee of success, a factor which supports the requested fee.

### 5. Awards in Similar Actions

105. Lead Counsel respectfully submit that the requested 30% fee award is merited under the circumstances here, and is in line with the range of fee awards approved by courts within this District, Circuit and nationwide in complex common-fund cases involving comparably sized settlements.

106. Indeed, as the Preliminary Approval Ruling held, "several courts in the Ninth Circuit – including this Court – have noted that 'in most common fund cases, the award exceeds that benchmark.'" ECF No. 187 at 16, *Rentech II*, 2019 WL 5173771, at *10 (citing cases). The Court added, "[i]ndeed, '[d]istrict courts in this circuit have routinely awarded fees of one-third of the common fund or higher after considering the particular facts and circumstances of each case,' and the Ninth Circuit has upheld such awards." ECF No. 187 at 16 (citing cases). "Accordingly, the Court does not find the anticipated 30% attorney fee request so unreasonable or disproportionate on its face as to weigh against granting the present Motion." ECF No. 187 at 16.

### 6. Lead Plaintiff's Approval and the Reaction of the Settlement Class to Date

107. Lead Plaintiff—a sophisticated institutional investor with extensive experience in successfully serving as a lead plaintiff in complex securities class actions—wholly endorses the Settlement and Lead Counsel's request for an attorneys' fee award of 30% of the Settlement Fund. Moreover, as set forth above, 244,286 notices have been disseminated to potential members of the Settlement Class and their nominees. In addition, the Summary Notice was published in *The Wall Street Journal* and over *PR Newswire.* The Notice explains the Settlement and that Lead Counsel would seek fees of up to 30% of the Settlement Fund. The

deadline to object to Lead Counsel's fee request is March 26, 2026.  To date, no member of the Settlement Class has objected.

### 7.   A Lodestar Cross-Check Confirms that Plaintiff's Counsel's Requested Fee is Reasonable

108.   As described in the Fee Memorandum, the reasonableness of Plaintiff's Counsel's requested fee is verified by the lodestar "cross-check."  Attached hereto as Exhibits D-F are declarations from Plaintiff's Counsel in support of an award of attorneys' fees and reimbursement of Litigation Expenses, which include schedules detailing Plaintiff's Counsel's lodestar amount (by showing each specific timekeeper, title, time, hourly rate and lodestar), as well as the expenses incurred, listed by category.

109.   As set forth in Exhibits D-F, Plaintiff's Counsel expended a total of 12,315.15 hours in the prosecution and investigation of this action up through March 9, 2026.  The resulting lodestar is $10,484,366.25.  In light of this, the requested fee of 30% of the Settlement Fund, or $19,500,000 (plus interest thereon), yields a multiplier of 1.86, which is at the lower end of the range of multipliers commonly awarded in comparable securities class actions.  Such a multiplier is fair and reasonable based upon the significant risks in this litigation against Defendants, and by Lead Counsel's substantial efforts to obtain the highly favorable Settlement – which, again, exceeds the rate of recovery for most securities class actions.  Lead Counsel also obtained this successful Settlement after success at the motion to dismiss stage on appeal, sparing the Settlement Class from significant risks and years of delays caused by protracted litigation.

110.   As stated in Exhibits D-F, the lodestar summaries were prepared from daily time records regularly prepared and maintained in the ordinary course of business.  Plaintiff's Counsel's hourly rates are the same as, or comparable to, the regular current rates charged for their services in non-contingent matters and/or the

rates submitted by comparable firms for lodestar cross-checks in other securities class action fee applications that have been granted in this Circuit.

111.    Additionally, as shown in Plaintiff's Counsel's firm biographies, many of the firms' attorneys – at all levels – have worked for counsel for years, and have extensive experience in securities class action litigation and appellate practice.  Each attorney that prosecuted this Action performed substantive work that directly benefitted the Settlement Class.  The time spent by each attorney was reasonable, non-duplicative, beneficial to effective and efficient litigation, and was important to Plaintiff's Counsel's and Lead Plaintiff's ability to understand the strengths and weaknesses of the case in order to negotiate intelligently and evaluate the Settlement, which ultimately led to the successful and favorable resolution of the case.

112.    In sum, based on the excellent result achieved for the Settlement Class, the quality of work performed, and the risks of prosecuting the Action against Defendants, Lead Counsel submits that its request for a 30% fee award is fair, reasonable, and consistent with other similar cases in this Circuit.

**B.      Lead Counsel's Application for Reimbursement of Litigation Expenses**

113.    Lead Counsel also requests $602,359.78 in reimbursement of litigation expenses reasonably and necessarily incurred in prosecuting this Action, to be paid from the Settlement Fund.  Lead Counsel respectfully submits that reimbursement of the Litigation Expenses is fair and reasonable.

114.    As stated above, from the outset of the case, Lead Counsel was aware that it might not recover any of its expenses, and, at the very least, would not recover anything until the Action was successfully resolved (whether through trial and appeals or settlement).  Lead Counsel also understood that, even if the case were ultimately successful, an award of expenses would not compensate Lead Counsel for the lost use of the funds advanced to prosecute this Action.  Thus, Lead Counsel

was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous prosecution of the Action.

115.   Plaintiff's Counsel's expenses were necessary and appropriate for the prosecution of this Action.   They include charges for experts and consultants, mediation costs, computer research, travel expenses to attend client meetings, hearings, depositions and mediations, photocopying, investigation expenses, discovery costs, and other case-related costs.   *See* Exhibits D-F.

116.   Because of the complex issues presented by this case and how deep this Action went into the litigation process before a fair and reasonable settlement could be achieved, Lead Counsel was required to utilize the services of multiple experts. For example, via Round Table Group, Saxena White consulted with Stephen Johnson, a mobile advertising expert. Via IMS Consulting and Expert Services LLC, Lead Counsel also consulted with Ashley Black, a digital marketing technology expert. Saxena White consulted with Global Economics Group LLC ("Global Economics") and Peregrine Economics LLC ("Peregrine"), economic consulting firms to analyze data and provide expert opinions and consultations regarding the issues of market efficiency, class certification, price impact, insider trading, loss causation, and damages.   Additionally, Peregrine also consulted directly on the development of the Plan of Allocation.

117.   Plaintiff's Counsel also incurred significant expenses for electronic storage, photocopying, imaging and electronic management of thousands of pages of documents, and online factual and legal research.   In particular, Plaintiff's Counsel utilized the services of Gemean to create an electronic document review platform that allowed Plaintiff's Counsel to review, code, and classify the documents produced in this case. This allowed Plaintiff's Counsel to categorize documents based on, among other things, relevance, issue, and potential use in class certification briefing, depositions, settlement negotiations, and trial.   These expenses are a necessary part of litigation of this magnitude and scale and were essential to enable

Plaintiff's Counsel to achieve the results now before the Court—the $65 million Settlement.

118. Lead Counsel's application for Plaintiff's Counsel's Litigation Expenses of $602,359.78—over $112,000 less than the upper limit of $715,000 contained in the Notice mailed to the Settlement Class—supports approval. Further, as noted above, in response to the dissemination of over 244,000 notices, to date, no objections have been received to Lead Counsel's seeking of reimbursement of Litigation Expenses.

### C.    Lead Plaintiff's Reimbursement Request

119. In accordance with the PSLRA, Oklahoma Fire seeks reimbursement of its reasonable costs and expenses incurred directly in connection with their representation of the Settlement Class, in the amount of $10,531.75. The amount of time and effort devoted to this Action by the representatives of Lead Plaintiff—who expended considerable time and effort in actively supervising the litigation over a multi-year period, including by collecting and producing numerous documents; preparing for, traveling to and attending its deposition; attending the Court's and Ninth Circuit hearings, and participating in ongoing settlement discussions—is detailed in the accompanying Lead Plaintiff Declaration. Ex. A (Rankin Decl.).

120. Lead Plaintiff respectfully submits that the reimbursement requested is fully consistent with congressional intent, as expressed in the PSLRA, encouraging institutional and other highly experienced plaintiffs to take an active role in bringing and supervising actions of this type. As set forth in the Lead Plaintiff declaration, Oklahoma Fire has throughout the litigation of the Action been fully committed to pursuing the interests of the Settlement Class. Lead Plaintiff has actively and effectively complied with all of the many demands that arose during the litigation and settlement of this Action. Lead Plaintiff's effort is precisely the type of activities that courts have found to support reimbursement to class representatives, and fully support Lead Plaintiff's request for reimbursement.

HOOKER DECL. ISO MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES – 2:21-CV-08892-GW (RAO)     30

## VI.   CONCLUSION

121.   For all the reasons discussed above, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel respectfully request that the Court award attorneys' fees in the amount of 30% of the Settlement Fund and expenses in the amount of $602,359.78, plus the interest earned thereon. In addition, Lead Counsel respectfully submit that Lead Plaintiff should be awarded the total sum of $10,531.75 related to its active participation in the Action.

I declare, under penalty of perjury, that the foregoing facts are true and correct under the laws of the United States of America.

Executed this 12th day of March, 2026.

*/s/  Lester R. Hooker*
Lester R. Hooker