UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-8892-GW-RAOx | Date | April 22, 2026 |
|---|---|---|---|
| Title | *Kellie Black v. Snap, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |
|---|---|

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:**   **IN CHAMBERS - TENTATIVE RULING ON LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION [191]; and LEAD PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES [192]**

Attached is the Court's Tentative Ruling on Plaintiff's Motions [191, 192], set for hearing on April 23, 2026 at 8:30 a.m.

|  |  | : |  |
|---|---|---|---|
| | Initials of Preparer | JG | |

***Kellie Black v. Snap Inc. et al***; Case No. 2:21-cv-08892-GW-(RAOx)
Tentative Rulings on: (1)Motion for Final Approval of Class Action Settlement and Plan of
Allocation and (2) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation
Expenses

Plaintiff Oklahoma Firefighters Pension & Retirement System ("Lead Plaintiff"),
individually and on behalf "of all those who purchased, or otherwise acquired publicly traded Snap
securities, or who sold Snap put options, between April 23, 2021 and October 21, 2021" sued Snap
Inc. ("Snap"); Evan Spiegel ("Spiegel"), and Jeremi Gorman ("Gorman") (collectively,
"Defendants") for: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 (the
"Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder; and (2) violations
of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). *See generally* Third Amended
Complaint ("TAC"), Docket No. 120.

Now before the Court are Lead Plaintiff's Motion for Final Approval of Class Action
Settlement and Plan of Allocation ("Final Approval Motion"), *see* Final Approval Motion, Docket
No. 191, and Motion for Attorneys' Fees and Reimbursement of Litigation Expenses ("Attorneys'
Fees Motion"), *see* Attorneys' Fees Motion, Docket No. 192. Lead Plaintiff also filed a Notice of
Non-Opposition and Reply in Support of its Final Approval Motion and Attorneys' Fees Motion
("Reply"). *See* Reply, Docket No. 197. For the reasons stated herein, the Court **GRANTS** both
the Final Approval Motion and the Attorneys' Fees Motion (with the precise amount to be
determined at the hearing on these motions).

I.    **Background**

   A. **Factual Background**

Snap is a social media company that derives substantially all of its revenue from its free
mobile chatting application called "Snapchat." TAC ¶ 4. Snap generates revenue from this
product by selling advertising. *Id.* The most critical segment of Snap's business is "direct
response" advertising, which consists of "in-app ads that would ask the user to take a specific
action, such as downloading an app or making a purchase." *Id.* ¶ 5. Direct response advertising
"accounted for well <u>over half</u> of [Snap's] overall revenue and <u>virtually all</u> of its growth." *Id.*
(emphasis in original).

To deliver advertisements to Snapchat users, Snap tracks its users' activity on their devices,
which enables advertisers to (1) target their ads to specific users based on their interests and (2)

1

measure the effectiveness of their ads based on how users interact with the ads. *Id.* Prior to mid-2021, Snap's ability to collect user activity, at least on Apple iOS devices, was through Apple's Identifier for Advertisers ("IDFA"). *Id.* IDFA allowed advertisers to target their ad campaigns more precisely to consumers likely to be interested in their products, and also gave them powerful tools to measure the effectiveness of individual ads or ad campaigns within Snapchat. *Id.* ¶¶ 42-44.

In June 2020, Apple announced changes to privacy features on its devices through an initiative called App Tracking Transparency ("ATT"). *Id.* ¶ 6. Under ATT, companies like Snap would no longer be able to use IDFA to track and collect user activity unless the user "opted in" to such data sharing. *Id.* Before these changes, IDFA automatically tracked a user's data unless the user affirmatively "opted out" of IDFA sharing. *Id.* ¶ 47. Absent user opt-in, Snap would no longer be able to share a user's identifying information and would no longer have access to that user's IDFA. *Id.* ¶¶ 47-48. As a result, ATT posed a potential threat to Snap's advertising business. *Id.* ¶¶ 49, 51.

Following this announcement, Apple promoted its own proprietary measurement solution, SKAdNetwork ("SKAN"), which would allow Snap and its advertisers to continue to target and measure their advertising, albeit on a group basis rather than on an individual-by-individual basis. *Id.* ¶¶ 6, 51. Yet, even with SKAN, ATT still posed potential risks to Snap's business. *Id.* ¶ 42. Although Apple announced that the ATT rollout would take place in Fall 2020, it was delayed until April 26, 2021. *Id.* ¶ 72.

Beginning in February 2021, Gorman – Snap's Chief Business Officer – had made a number of statements to investors in an attempt "to strongly reassure the market that [Snap's] advertising business was well-equipped to withstand the ATT changes and maintain what had been record advertising and revenue growth." *Id.* ¶ 7. As Apple rolled out ATT in late April of that year, "Gorman staunchly reassured the market that any prospective negative impact on Snap's business from the ATT changes would be 'mitigated' precisely because a 'majority' of Snap's critical [direct response] advertisers had purportedly ***already*** 'successfully implemented' SKAN for their Snap ad campaigns." *Id.* ¶ 9 (emphasis in original). Gorman's statements to investors suggested that "Snap was uniquely insulated from any significant business impact stemming from [Apple's privacy] changes." *Id.* ¶ 10. Snap's stock price soared thereafter, climbing 46% from a $57.05 closing price on April 22, 2021 to an all-time high closing price of $83.11 on September

2

24, 2021.  *Id.* ¶ 11.

On October 21, 2021, the "truth emerged" when Snap announced that it had missed the lower end of its third quarter revenue – the first time in Snap's history that it had failed to meet this threshold.  *Id.* ¶ 103.  Snap "directly attributed these catastrophic results to 'headwinds' from ATT."  *Id.* ¶ 104.  On the same day, Snap also filed its Form 10-Q filing for 3Q 2021.  *Id.* ¶¶ 108, 114.  In its filing, Snap noted that Apple issued an iOS update in April 2021 and that "[t]hese changes have adversely affected our targeting, measurement, and optimization capabilities, and in turn affected our ability to measure the effectiveness of advertisements on our services."  *Id.* ¶ 114.  Snap further advised that "[t]his has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business."  *Id.*  The next day, Snap's stock price declined by approximately 26%, or $19.97 per share, to close at $55.14 per share – representing an approximately $27 billion drop in market capitalization.  *Id.* ¶ 109.

### B.  Procedural Background

This securities class action commenced on November 11, 2021.  *See* Docket No. 1.  Following the Court's consolidation of the related cases in this action and the appointment of lead plaintiff and lead counsel, Lead Plaintiff filed a consolidated complaint.  *See* Docket No. 65.  On May 3, 2022, Defendants moved to dismiss the action.  *See* Docket No. 78.  On August 3, 2022, Lead Plaintiff filed its Second Amended Complaint ("SAC").  *See* SAC, Docket No. 95.

On September 19, 2022, Defendants moved to dismiss the SAC.  *See* Docket No. 100.  On March 13, 2023, the Court granted Defendants' motion with leave to amend.  *See* Docket Nos. 114-15.  On April 21, 2023, Lead Plaintiff filed its TAC.  *See* TAC.  On June 9, 2023, Defendants moved to dismiss the TAC.  *See* Docket No. 121.  Following full briefing and oral argument, the Court took Defendants' motion under submission.  *See* Docket No. 130.  On September 26, 2023, the Court granted the motion with leave to amend.  *See* Docket No. 135.  On November 28, 2023, Lead Plaintiff filed a notice of appeal.  *See* Docket No. 139.  On December 20, 2024, the Ninth Circuit reversed this Court's dismissal of the TAC.  *See* Docket No. 142.  The parties thereafter engaged in discovery.  *See* Declaration of Lester R. Hooker ("Hooker Decl."), Docket No. 193, at ¶¶ 34-50.  On May 16, 2025, Lead Plaintiff moved for class certification.  *See* Docket No. 167.

The parties then engaged neutral, third-party mediators, former U.S. District Court Judge Layn R. Phillips and Seth Aronson to facilitate a mediation on September 3, 2025.  Hooker Decl.

3

¶ 53.  The parties exchanged detailed mediation statements setting forth their respective arguments on several key issues prior to the mediation.  *Id.* ¶ 53.  At the conclusion of the mediation session, the parties accepted Judge Phillips' recommendation to resolve this action for $65,000,000, subject to the negotiation of the terms of a term sheet and a stipulation of settlement and subsequent approval by this Court.[1]  *Id.* ¶ 55.

On October 27, 2025, Lead Plaintiff moved for preliminary approval of the Settlement. *See* Docket No. 183.  On December 3, 2025, the Court certified the proposed class solely for the purpose of effectuating the Settlement and granted preliminary approval of the Settlement.  *See* Preliminary Approval Order ("Prelim."), Docket No. 187.

### C. The Settlement

#### 1. Settlement Class

For purposes of settlement, the parties have agreed upon a class definition of "all Persons or entities who purchased or otherwise acquired Snap publicly traded securities or call options, or sold Snap put options, between February 5, 2021 and October 21, 2021, inclusive," excluding "(1) Defendants, (2) the officers and directors of Snap during the Class Period, (3) the immediate family members of any Defendant or any officer or director of Snap during the Class Period, and (4) any entity that any Defendant owns or controls, or owned or controlled, during the Class Period" as well as "those Persons and entities who timely and validly request exclusion from the Class pursuant to the Notice and where such exclusion is accepted by the Court."[2]  Settlement § 1.7.

#### 2. Settlement Amount

"The Settlement Amount shall be paid as follows: Snap shall cause to be deposited sixty-five million dollars ($65,000,000.00) on behalf of all Defendants into an interest-bearing escrow account controlled by Lead Counsel by wire transfer(s) or check(s) within thirty (30) business days after the later of: (i) preliminary approval of the Settlement; and (ii) the provision to Defendants' Counsel of all information necessary to effectuate a transfer of funds . . . ."  Settlement § 2.1. "These funds, together with any interest and income earned thereon once transferred, shall constitute the Settlement Fund."  *Id.*

If the Settlement Amount is not deposited into the Escrow Account in the manner upon

---

[1] The terms and conditions of the settlement are set forth in the Stipulation of Settlement (the "Settlement").  *See generally* Settlement, Ex. 1, Docket No. 183-2.

[2] The Court adopts the capitalization and corresponding definitions of terms within the Settlement as applicable.

which the parties agreed, then Lead Counsel may terminate the Settlement only if the following two conditions are met: (1) Lead Counsel provides Defendants' Counsel with written notice of the former's intention to terminate the Settlement; and (ii) the Settlement Amount is not transferred to the Escrow Account within five business days of the latter's receipt of such written notice. *See id.* at § 2.2.

As the Settlement is not a claims-made settlement, "no Released Defendants Party, or any person or entity who or which paid any portion of the Settlement Amount, shall have any right to the return of the Settlement Fund or any portion thereof for any reason whatsoever . . . ." *Id.* at § 2.3.

3. Settlement Distribution

The Settlement provides that, following a preliminary approval order, the Escrow Agent may disburse at the direction of Lead Counsel "up to $300,000 from the Settlement Fund" to cover Notice and Administration Costs prior to the Effective Date and "up to a total of $300,000" after such date "for any necessary additional Notice and Administration Costs." *See* Settlement § 2.8. All Taxes and Tax Expenses will also be paid out of the Settlement Fund. *See id.* § 2.9.

The Settlement further provides that Lead Counsel may seek an award of attorneys' fees and expenses and Lead Plaintiff may apply for an award from the Settlement Fund pursuant to 15 U.S.C. § 78u-4(a)(4) in connection with its representation of the Class.[3] *See id.* § 6.1. Lead Counsel now seeks (1) an award of attorneys' fees in the amount of 30% of the Settlement Fund; and (2) reimbursement of litigation expenses in the amount of $602,359.78, plus interest thereon. Attorneys' Fees Motion at 2. Lead Plaintiff seeks a PSLRA reimbursement in the amount of $10,531.75 for its expenses and lost wages in connection with representing the Class in this action. *Id.*

Following these deductions, the remainder of the Settlement Amount will be "distributed to Authorized Claimants" in accordance with the Plan of Allocation. *See id.* § 5.5. To be entitled to a distribution from the Net Settlement Fund, an Authorized Claimant must "submit to the Claims

---

[3] The Private Securities Litigation Reform Act of 1995 ("PSLRA") provides that while "[t]he share of any . . . settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the . . . settlement awarded to all other members of the class[,] [n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4).

Administrator a completed Proof of Claim and Release, substantially in the form of Exhibit A-2[, Docket No. 183-5], . . . signed under penalty of perjury and supported by such documents as are specified in the Proof of Claim and Release." *See id.* § 5.6. The Plan of Allocation distributes the Net Settlement Fund among Authorized Claimants on a *pro rata* basis, with each Authorized Claimant entitled to receive at least ten dollars.[4] *See id.* § 5.11.

Because the Net Settlement Fund is "non-reversionary," any balance remaining in the Net Settlement Fund following the date of the initial distribution of the Net Settlement Fund will be reallocated among Authorized Claimants "in an equitable and economical fashion" until the balance remaining is *de minimis*. *See id.* § 5.12. The balance thereafter will be donated to the Bluhm Legal Clinic Complex Civil Litigation and Investor Protection Center at Northwestern Pritzker School of Law. *See id.*

### 4. Settlement Administrator

The parties have selected A.B. Data, Ltd. ("A.B. Data") to administer the Settlement. *See* Settlement § 1.6.

### 5. Release of Claims

Pursuant to the Settlement, Defendants are released by Class Members from "all claims (including, but not limited to, Unknown Claims), demands, losses, rights, and causes of action of any nature . . . which arise out of, or relate to, directly or indirectly: (i) any of the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, or referred to, in the Complaints; and (ii) the purchase, acquisition, holding, sale, or disposition of Snap common stock or options by any member of the Settlement Class during the Settlement Class Period." *See* Settlement § 1.39.

### 6. Notice Plan

The Settlement provides that Snap will use "reasonable efforts" to provide the Claims Administrator with access to "record shareholder lists of Snap shareholders during the Class Period to the extent such lists exist" and "contact information for Snap's transfer agent(s) during the Class Period" for purposes of providing notice of the Settlement. *See* Settlement § 5.2; *see also* Declaration of Eric A. Nordskog ("Nordskog Decl."), Ex. 2, Docket No. 183-9, ¶ 8.

---

[4] Lead Plaintiff indicates that "[i]t is standard practice in securities class actions to utilize a $10 minimum check threshold." Motion at 5 n.5 (citing *Hefler v. Wells Fargo & Co.*, No. 4:16-cv-05479-JST, 2018 WL 4207245, at *12 (N.D. Cal. Sept. 4, 2018) and *Cheng Jiangchen v. Rentech, Inc.*, No. 2:17-cv-01490-GW-(FFMx), 2019 WL 5173771, at *7 (C.D. Cal. Oct. 10, 2019).

The Claims Administrator will email, or mail by first class mail where no email is available, a Postcard Notice, *see* Ex. A-4, Docket No. 183-7, to "all Class Members who can be identified with reasonable effort," including to thousands of brokerage firms and other nominees who regularly act as nominees for beneficial purchasers of stock.  *See* Nordskog Decl. ¶¶ 6-16.  A Summary Notice, *see* Ex. A-3, Docket No. 183-6, will also be published in *The Wall Street Journal* and transmitted over *PR Newswire* within ten business days of a preliminary approval order.  *See* Nordskog Decl. ¶ 13.  The Claims Administrator will also establish a Settlement Website, from which Class Members can (1) access and download copies of the (long-form) Notice, *see* Ex. A-1, Docket No. 183-4, the Claim Form, *see* Ex. A-2, Docket No. 183-5, and other related documents; and (2) submit their claims.  *See* Nordskog Decl. ¶ 14.  The Postcard Notice will direct Class Members to this website.  Settlement § 3.2.

The Postcard Notice, Summary Notice, and long-form Notice will inform Class Members of, *inter alia*, the pendency of this class action, the essential terms of the Settlement, and information regarding Lead Counsel's application for an award of attorney's fees and litigation expenses.  *See* Nordskog Decl. ¶ 10; Hooker Decl. ¶¶ 75-76.

### D.  Class Notice and Reaction

On January 6, 2026, pursuant to the Preliminary Approval Order, A.B. Data began notifying potential members of the Settlement Class of the Settlement by mailing and emailing copies of the Postcard Notice to potential members of the Settlement Class and their nominees. *See* Declaration of Kathleen Brauns[5] ("A.B. Data Decl."), Docket No. 193-2, at ¶¶ 4-5.  A.B. Data used its proprietary database with names and addresses of the largest and most common banks, brokers, and other nominees to reasonably identify potential members of the Settlement Class.  *See id.* ¶ 5.  In total, 4,892 copies of the Postcard Notice were mailed in the initial mailing.  *Id.*  A.B. Data also provided an electronic copy of the Notice and Claim Form to the Depository Trust Company ("DTC") for posting on its Legal Notice System, which may be accessed by any nominee that participates in DTC's security system.  *Id.* ¶ 7.

The Preliminary Approval Order also requires brokers and nominees, within seven calendar days of receipt of the Postcard Notice, to either (1) request additional copies of the Postcard Notice to send to the beneficial owners of the securities; or (2) provide A.B. Data with

---

[5] Kathleen Brauns is a "project manager" with A.B. Data who is supervising the notice process/procedures in this class action.  *See* Docket No. 197-1 at ¶ 1.

the names, mailing addresses, and email addresses of such persons. *Id.* ¶ 8. On December 16, 2025, A.B. Data received a data file provided by Defendants' counsel containing the names and addresses of 368 unique persons or entities who were identified as record holders of Snap shares during the Class Period. *Id.* ¶ 9. As of March 12, 2026, A.B. Data received (1) requests from brokers and other nominee holders for 200,950 Postcard Notices to be forwarded by the nominees to their customers; and (2) an additional 38,076 names and address of potential members of the Settlement Class from individuals or brokerage firms, banks, institutions, and other nominees. *Id.* ¶ 10. As of March 12, 2026, A.B. Data disseminated 244,286 Postcard and Email Notices to potential members of the Settlement Class and their nominees. *Id.* ¶ 11. Of the 244,286 sent, 768 were returned as undeliverable. *Id.* A.B. Data has since re-mailed eighty Postcard Notices to persons and entities whose original mailings were returned by the U.S. Postal Service and for whom A.B. Data obtained updated addresses. *Id.* As of April 9, 2026, an aggregate of 244,385 Postcard and Email Notices have been mailed to potential members of the Settlement Class and their nominees. Supplemental Declaration of Kathleen Brauns ("A.B. Data Supp. Decl."), Docket No. 197-1, at ¶ 5. Of the 244,385 sent, 1,997 were returned as undeliverable. *Id.* A.B. Data has since re-mailed 784 Postcard Notices to persons and entities whose original mailings were returned by the U.S. Postal Service and for whom A.B. Data obtained updated addresses. *Id.*

On January 21, 2026, the Summary Notice was published in the national edition of *The Wall Street Journal* and over *PR Newswire*. *Id.* ¶ 12; *see also id.*, Exs. E-F. Information regarding the Settlement, including copies of important documents such as the Preliminary Approval Order, were posted on the Settlement Website, which became operational on January 6, 2026. *Id.* ¶ 13. The Settlement Website allows potential members of the Settlement Class to file claims online and provides instructions and a claim filing template for institutional investors, as well as individuals or entities filing claims with a large number of transactions. *Id.* ¶ 14. A.B. Data also established a case-specific, toll-free telephone helpline with an interactive voice response system and live operators to respond to any questions from potential members of the Settlement Class. *See id.* ¶ 16. As of March 12, 2026, 664 calls were received by the toll-free telephone from potential members of the Settlement Class. *Id.* ¶ 17. As of April 9, 2026, 867 calls were received by the helpline. A.B. Data Supp. Decl. ¶ 9.

The deadline for submission of exclusions from or objections to the Settlement was March 26, 2026. *Id.* ¶ 10. Out of the approximately 383 million damaged shares held by tens of thousands

of members of the Settlement Class, not a single shareholder who purchased Snap common stock during the Class Period opted out of the Settlement.  Reply at 1-2.  A.B. Data received thirty-five valid requests for exclusion (thirty-one of which were timely and four of which were late),[6] which amount to 132,883 shares and three options.  A.B. Data Supp. Decl. ¶ 10.  A.B. Data reports that thirty-four of these requests are from former stockholders of Popwallet, Inc. ("Popwallet") who acquired Snap shares as partial consideration for their sale of Popwallet to Snap during the Class Period.[7]  *Id.*  The remaining request was from an individual who sold three call option contracts during the Class Period.  *Id.*  Lead Plaintiff indicates that the total number of requests for exclusion represent less than 0.01% of all damaged shares.  Reply at 2.  No member of the Settlement Class objected to the Settlement.  *See id.* at 1.

The deadline for the submissions of claims is May 6, 2026.  A.B. Data Supp. Decl. ¶ 12.  As of April 9, 2026, A.B. Data received a total of 6,942 claims.[8]  *Id.*

## II.    Legal Standards

To be effectuated, a proposed class action settlement must initially be reviewed and approved by the district court.  *See* Fed. R. Civ. P. 23(e).  "Approval under 23(e) involves a two-step process in which the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted."  *Nat'l Rural Telecommc'ns Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).  The first step is already complete.  The Court preliminarily certified the proposed Settlement Class, finding that the requirements of Fed. R. Civ. P. 23(a) and (b)(3) were met; preliminarily determined that the proposed settlement was "fair, reasonable, and adequate" under Rule 23(e)(2); and approved of the Settlement's notice plan under Fed. R. Civ. P. 23(e)(2)(C)(ii) and the PSLRA.  *See generally* Prelim.

---

[6] A.B. Data received an additional request for exclusion, but the information submitted in that request revealed that the individual did not purchase any Snap shares during the Class Period.  A.B. Data Supp. Decl. ¶ 10 n.2.  As such, that individual is not a member of the Settlement Class.  *Id.*

[7] This transaction is the subject of pending litigation in Delaware Chancery Court.  *See id.* at ¶ 10.  The Settlement Class includes Elias Guerra and those individuals and entities he purports to represent in his capacity as Securityholder Representative in the matter captioned *Guerra v. Snap Inc.*, C.A. No. 2024-1009-JTL (Del. Ch.).  Settlement § 1.7.

[8] As explained by Ms. Braun, "[a]s is typical in securities cases of this nature, the majority of institutional investors, brokers, and nominees file claims electronically at or near the filing deadline.  Accordingly, the response rate to date is consistent with our experience in other securities class action claims administrations.

### A.  Class Certification

To approve a class action settlement, a court must first "assess whether a class exists." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  The proposed class must meet the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a).  Additionally, the class must fall into one of the categories within the subparagraphs of Rule 23(b).  *See* Fed. R. Civ. P. 23(b).  As relevant here, Rule 23(b)(3) authorizes a class action where "questions of law or fact common to class members predominate over any questions affecting only individual members" and a class action is the "superior" method of resolution.  Fed. R. Civ. P. 23(b)(3).

### B.  Notice

"For any class certified under Rule 23(b)(3) – or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3) – the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  "Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (internal quotation marks omitted).

The PSLRA also imposes notice requirements.  *See*  15 U.S.C. § 78u-4(a)(7).  "Under the PSLRA, any proposed final settlement agreement 'shall include each of the following statements, along with a cover page summarizing the information contained in such statements:' a statement of plaintiff recovery, a statement of potential outcomes of the case, a statement on attorneys' fees or costs, identification of lawyers' representatives, reasons for the settlement, other information as required by the court."  *Rentech*, 2019 WL 5173771, at *8 (quoting *id.*).

### C.  Rule 23(e)

"Rule 23(e) imposes on district courts an independent obligation to ensure that any class settlement is 'fair, reasonable, and adequate,' accounting for the interests of absent class members."  *Briseno v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)).  Rule 23(e) instructs courts to consider:

> (A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).  Additionally, the Ninth Circuit has advised consideration of the following factors in assessing whether a proposed settlement is fair, adequate, and reasonable:

(1) the strength of the plaintiffs' case;

(2) the risk, expense, complexity, and likely duration of further litigation;

(3) the risk of maintaining class action status throughout the trial;

(4) the amount offered in settlement;

(5) the extent of discovery completed and the stage of the proceedings;

(6) the experience and views of counsel;

(7) the presence of a governmental participant; and

(8) the reaction of the class members to the proposed settlement.

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (quoting *Churchill*, 361 F.3d at 575).

Courts must "emplo[y] extra caution and more rigorous scrutiny [ ] when it comes to settlements negotiated prior to class certification." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 (9th Cir. 2019); *Henderson*, 998 F.3d at 1024 ("[C]ourts should scrutinize pre-class certification settlements because plaintiffs' counsel may collude with the defendant to strike a quick settlement without devoting substantial resources to the case.").  Where "a settlement agreement is negotiated prior to formal class certification," the court must therefore not only review the proposed settlement pursuant to the aforementioned factors, but also ensure that the "settlement is not the product of collusion among the negotiating parties." *Bluetooth*, 654 F.3d at

11

946-47 (internal quotation marks and brackets omitted).  Collusion may be indicated by (1) "counsel receiv[ing] a disproportionate distribution of the settlement;" (2) "a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds;" and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."  *Id*. at 947 (internal quotation marks omitted).

Courts examine "the settlement taken as a whole, rather than the individual component parts . . . for overall fairness."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  In the end, courts cannot "delete, modify or substitute certain provisions.  The settlement must stand or fall in its entirety."  *Id*. (quotations and citation omitted).

## III.    Discussion

### A.  Class Certification

The Court analyzed the proposed Settlement Class at length in its Preliminary Approval Order under the requirements of Rule 23(a) and (b) and issued a preliminary certification.  *See* Prelim. at 8-13.  The facts bearing upon numerosity, commonality, typicality, and adequacy of the class, as well as predominance of common questions and superiority of a class action, remain unchanged.  *See* Final Approval Motion at 19-20.  "Accordingly, the Court need not find anew that the settlement class meets the certification requirements of Rule 23(a) and (b)."  *Gonzalez v. BMC W., LLC*, No. 5:17-cv-00390-JGB-(RAOx), 2018 WL 6318832, at *5 (C.D. Cal. Nov. 19, 2018) (internal quotation marks omitted).  "All the criteria for class certification remain satisfied," and as such "the Court hereby confirms its order certifying the Settlement Class."  *Id*.

### B.  Notice

In its Preliminary Approval Order, the Court approved the notice plan and proposed notice provided within the Settlement (as outlined in Section I.C.6, *supra*).  *See* Prelim. at 20-21.  A.B. Data has provided notice to potential members of the Settlement Class in accordance with the procedures approved by this Court.  *See* Section I.D, *supra*.  As such, the Court finds that notice to the Settlement Class is satisfactory.

### C.  Proposed Settlement

#### 1.  Signs of Collusion

"[N]ot[ing] that the proposed settlement was reached with the assistance of two experienced mediators and after the parties exchanged opening and reply mediation briefs that set

forth their respective views of the merits of this action and any supporting evidence obtained through discovery," the Court concluded at the preliminary approval phase that "the proposed Settlement was negotiated at arm's length and that neither the process nor the result ha[d] any apparent indicia of collusion." *See* Prelim. at 15 (citation omitted).  The Court also took note of Lead Counsel's extensive experience in litigating securities class actions.  *See id.*  The Court did not find the anticipated 30% attorneys' fees request to be so unreasonable or disproportionate on its face as to weigh against granting preliminary approval.  *Id.* at 15-16.  Absent from the Settlement was also any "clear-sailing" arrangement or kicker clause.  *See id.* at 16.  The Court remains satisfied that the process by which the Settlement was reached was adversarial and fair.

   2. Rule 23(e)(2) and *Churchhill* Factors

  The Court analyzed the Settlement under Rule 23(e)(2) at length at the preliminary approval stage and preliminarily found the Settlement to be fair, adequate, and reasonable.  *See* Prelim. at 16-20.  The Court incorporates by reference its prior analysis insofar as the underlying facts remain unchanged.  At this juncture, the Court proceeds with an analysis of the Settlement under the *Churchill* factors.

    a. *Strength of the Plaintiffs' Case; Risk,, Expense, Complexity, and Likely Duration of Further Litigation; and Risk of Maintaining Class Action Status Throughout the Trial*

  Given their relatedness, the Court will analyze the first three *Churchill* factors together. Although Lead Plaintiff believes in the merits of its case, Lead Plaintiff acknowledges the uncertainty created by the risks of continuing to litigate this complex securities fraud class action. Final Approval Motion at 9-10.  Lead Plaintiff would have had to prove all elements of its claims to prevail, but Defendants would have needed to succeed on only one affirmative defense to defeat the entire action.  *Id.* at 10.  At the pleading stage, this Court granted two motions to dismiss, effectively reducing the action to a single alleged misstatement and a single alleged corrective disclosure.  *Id.*  Defendants would have continued to challenge the alleged falsity of the remaining alleged misstatement and the presence of any scienter or inference of fraudulent intent, as well as contested price impact.  *Id.*  Despite Lead Plaintiff's "strong counterarguments," a reasonable jury could very well conclude that Defendants' remaining alleged misstatement was not false when made.  *Id.*  Without settlement, the parties would likely face years of additional litigation, which would have carried considerable risk and expense.  *Id.* at 11.  While the parties have not presented this Court with any reason to doubt that class certification would remain appropriate, the Court

recognizes that "there is never certainty that certification would be maintained throughout the proceedings" and that such "risk [is] worth taking into consideration." *Baten v. Mich. Logistics, Inc.*, No. 2:18-cv-10229-GW-(MRWx), 2022 WL 17481068, at *4 (C.D. Cal. Dec. 6, 2022). Therefore, the Court finds that the first three *Churchill* factors weigh in favor of approval.

### b. Amount Offered in Settlement

Lead Plaintiff's damages expert estimated that the likely maximum recoverable damages that could be realistically established in this case ranged from $989 million to $1.2 billion. Final Approval Motion at 8. As such, the Settlement Amount represents a recovery of approximately 5.4% to 6.6% of Plaintiff's likely maximum damages. *Id.* Lead Plaintiff indicates that Defendants arguments, if credited by this Court or a jury, would have made it "extremely unlikely" that the Settlement Class would have recovered anything close to the estimated range of maximum recoverable damages in this case. *Id.* at 8-9. Resolution of the disputed issues, particularly loss causation and damages, would have ultimately boiled down to a battle of the experts. *Id.* at 8 n.7. Given the great deal of uncertainty and the challenges of prevailing at trial, the Court finds that the Settlement Amount is fair and thus that the fourth *Churchill* factor weighs in favor of approval.

### c. Extent of Discovery Completed and Stage of the Proceedings

Lead Plaintiff and Lead Counsel indicate that they had sufficient information to make an informed decision about settlement based on their "thorough investigation of the relevant claims; the filing of detailed complaints; success in defeating a motion to dismiss on appeal; extensive review of approximately 63,000 pages of documents; consultation with experts; research and preparation for depositions; and a vigorous and highly detailed mediation process." *Id.* at 15 (citations omitted). The Court finds that the parties arrived at a compromise based on a full understanding of the legal and factual issues in this case and thus that the fifth *Churchill* factor weighs in favor of approval.

### d. Experience and Views of Counsel

Lead Counsel has substantial experience in securities class action lawsuits, *see generally* Declaration of Lester R. Hooker ("Saxena White Fee Decl."), Docket No. 193-4, Ex. C, and has vigorously pursued Lead Plaintiff's claims over a four-year period, including through two rounds of motions to dismiss, amended complaints, an appeal to the Ninth Circuit Court of Appeals, and a motion for class certification. Lead Counsel considers the Settlement to be "fair, reasonable, and an excellent result" for the Settlement Class, especially considering the uncertainty and risks

14

associated with protracted litigation.  *See* Hooker Decl. ¶ 52.  Therefore, the Court finds that the sixth *Churchill* factor weighs in favor of approval.

### e.  Presence of a Governmental Participant

As there is no stated involvement of any governmental entities, there is no apparent governmental participation concern that would preclude approval.  In other words, the seventh *Churchill* factor does not weigh against approval.

### f.  Reaction of the Class Members to the Proposed Settlement

As already indicated, A.B. Data has received thirty-five valid requests for exclusion and no objections to the Settlement.  *See* Section I.D, *supra*.  The thirty-five requests represents less than 0.01% of all damaged shares.  Reply at 2.  Lead Plaintiff asserts that this "wholly positive reaction from the Settlement Class is particularly meaningful here because the vast majority of Snap's shares – approximately 70% – are owned by institutional investors, including some of the largest, most sophisticated institutions in the world such as T. Rowe Price, Vanguard, Goldman Sachs and JP Morgan."  *Id.* at 2-3.  Lead Plaintiff, a sophisticated institutional investor with a substantial financial stake in the litigation, has also expressed its approval of the Settlement.  *See* Final Approval Motion at 16; Declaration of Chase Rankin ("Rankin Decl."), Docket No. 193-1, at ¶ 8.  Therefore, the Court finds that the eighth *Churchill* factor weighs in favor of approval.

Upon consideration of the Rule 23(e)(2) and *Churchhill* factors, the Court concludes that the Settlement is "fair, reasonable and adequate to all concerned parties."  *Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 997 (9th Cir. 1985) (citation omitted).

### D.  Plan of Allocation

The Plan of Allocation was created with the assistance of a consulting damages expert and reflects the assumption that Defendants' alleged false and misleading statements proximately caused the price of Snap common stock and Snap call options to be artificially inflated and Snap put options to be artificially deflated throughout the Class Period.  Ex. A-1, Docket No. 183-4, at ¶ 34.  In calculating the estimated artificial inflation (deflation) allegedly caused by Defendants' alleged misrepresentations, Lead Plaintiff's damages expert considered price changes in Snap common stock and Snap call and put options (collectively, "Snap Securities") in reaction to a public announcement allegedly revealing the truth concerning Defendants' alleged misrepresentations, adjusting for price changes that were attributable to market or industry forces.  *Id.*  The Plan of Allocation calculates a Recognized Loss Amount for each purchase or acquisition

of Snap common stock and call option and each sale (writing) of Snap put options during the Class Period that is listed on the Claim Form and for which adequate documentation is provided. *Id.* ¶ 36. The Recognized Loss Amount is based primarily on the difference in the amount of alleged artificial inflation or deflation in the price of Snap Securities at the time of purchase and at the time of sale, or the difference between the actual purchase price and sale price. *Id.* ¶ 37.

Because the Plan of Allocation allows for members of the Settlement Class to recover their *pro rata* damages based upon the dates on which they purchased or sold Snap Securities and limits recovery to only those members who suffered actual losses, the Court finds that the Plan of Allocation is "proportional to actual injury" and thus "fair, reasonable and adequate." *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045-46 (N.D. Cal. 2008).

### E. Attorneys' Fees

As already indicated, Lead Counsel seeks (1) an award of attorneys' fees in the amount of 30% of the Settlement Fund; and (2) reimbursement of litigation expenses in the amount of $602,359.78, plus interest thereon. Attorneys' Fees Motion at 2. Lead Plaintiff seeks a PSLRA reimbursement in the amount of $10,531.75 for its expenses and lost wages in connection with representing the Class in this action. *Id.*

"This circuit has established 25% of the common fund as a benchmark award for attorney fees." *Hanlon*, 150 F.3d at 1029. "However, the exact percentage varies depending on the facts of the case, and in 'most common fund cases, the award exceeds that benchmark.'" *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 491 (E.D. Cal. 2010) (quoting *Knight v. Red Door Salons, Inc.*, No. 3:08-cv-01520-SC, 2009 WL 248367, at *6 (N.D. Cal. Feb. 2, 2009)) (citing *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1377-78 (N.D. Cal. 1989)). When determining the benchmark percentage to be applied in a given case, courts consider: (1) the results achieved for the class; (2) the risk of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee; and (5) awards made in similar cases. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002).

#### 1. Results Achieved

"The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award." *Omnivision*, 559 F. Supp. 2d at 1046 (citation omitted). Lead Counsel indicates that its successful appeal not only revived the case but directly enabled the Settlement now before the Court. Attorneys' Fees Motion at 6. Indeed, the result achieved is a notable result

for the Class, members of which would have faced an uncertain outcome had settlement not been reached and further litigation ensued.  As already discussed, the Settlement Amount represents a favorable outcome in light of the challenging nature of securities class action cases such as the one at bar.  Lead Plaintiff represents that the Settlement Amount is more than four times the median settlement amount for securities class actions in 2024 and nearly six times more than the median settlement amount for federal securities class actions from 2015 to 2023.  *Id.* (citing Cornerstone Research, 2024 Review & Analysis: Securities Class Action Settlements, https://www.cornerstone.com/wp-content/uploads/2025/03/Securities-Class-Action-Settlements-2024-Review-and-Analysis.pdf ("Cornerstone Report"), at 1).  It is also substantially more than the median settlement amount for securities class actions in the Ninth Circuit from 2015 to 2024. *Id.* (citing same at 20).  The Settlement Amount is approximately 5.4% to 6.6% of the likely maximum recoverable damages that could be realistically established in this case.  *Id.*  Courts have found fair and adequate even lesser percentage recoveries.  *See, e.g.*, *Baron v. HyreCar Inc.*, No. 2:21-cv-06918-FWS-(JCx), 2024 WL 3504234, at *8 (C.D. Cal. July 19, 2024) (approving securities fraud class action settlement where recovery was approximately 2% of estimated maximum damages); *In re LJ Int'l, Inc. Sec. Litig.*, No. 2:07-cv-06076-GAF-(JWJx), 2009 WL 10669955, at *4-5 (C.D. Cal. Oct. 19, 2009) (approving securities fraud class action settlement where recovery was 4.5% of estimated maximum damages); *In re Broadcom Corp. Sec. Litig.*, No. 8:01-cv-00275-DT-(MLGx), 2005 WL 8153007, at *6 (C.D. Cal. Sept. 12, 2005) ("In any event, even a 2.7 cent recovery for every dollar of claimed damages would not be inconsistent with the average recovery in securities class action cases.").  Therefore, the Court finds that the results achieved in this case support Lead Counsel's fee request.

   2.  Risk of Litigation

   "The risk that further litigation might result in Plaintiffs not recovering at all, particularly a case involving complicated legal issues, is a significant factor in the award of fees." *Omnivision*, 559 F. Supp. 2d at 1046-47 (citation omitted).  In its Preliminary Approval Order, the Court acknowledged that Lead Counsel successfully represented Lead Plaintiff and the Class by strategically appealing this Court's decision on the issue of whether Lead Plaintiff had adequately alleged scienter instead of filing an amended complaint.  *See* Prelim. at 16 n.9.  Had settlement not been reached, Defendants would certainly have continued to contest every element of liability and damages.  Even if Lead Plaintiff managed to certify the Class, the parties would have undoubtedly

been headed toward a high-stakes battle of the experts on issues central to liability and damages. Specifically, Defendants would have renewed at trial the same arguments they made at the pleading stage and on appeal, including that the remaining alleged misstatement was neither false nor misleading. Lead Plaintiff would have argued for its interpretation of the alleged misstatement. The jury would, therefore, have been left to choose between the parties interpretations of a single statement. As Lead Counsel recognizes, this would have been "an inherently risky proposition for the Class." Attorneys' Fees Motion at 8. Lead Plaintiff would have also faced steep challenges on the issues of scienter, loss causation, and damages, with Defendants likely to mount an aggressive defense against Lead Plaintiff's ability to make out any of these elements at trial. "These complex, expert-driven disputes – each carrying the potential to eliminate or drastically reduce any recovery – underscore the substantial litigation risk Lead Counsel confronted." *Id.* at 9. Lead Counsel also identifies the risks associated with post-trial motions and an appeal, as well as points out that it did not have the benefit of certain advantages other plaintiffs in securities fraud class actions often have (*e.g.*, the existence of a parallel government investigation). *See id.* at 9-10. Therefore, the Court finds that the risk of Lead Plaintiff obtaining no recovery for the Class as a result of further litigation in this action supports Lead Counsel's fee request.

 3. Skill Required and Quality of Work

 "The 'prosecution and management of a complex national class action requires unique legal skills and abilities.'" *Omnivision*, 559 F. Supp. 2d at 1047 (quoting *Edmonds v. United States*, 658 F. Supp. 1126, 1137 (D.S.C. 1987)). "This is particularly true in securities cases because the [PSLRA] makes it much more difficult for securities plaintiffs to get past a motion to dismiss." *Id.* (citing *In re Ikon Off. Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 181, 194 (E.D. Pa. 2000)). The Court has already described the substantial experience of Lead Counsel in the field of securities class actions. *See* Section III.C.2.d, *supra*. The mediators involved in the Settlement "attest that the attorneys working on this matter for both sides are outstanding lawyers who worked with a high level of skill, efficiency and creativity on behalf of their clients." Joint Declaration of Former U.S. District Court Judge Layne R. Phillips and Seth Aronson, Docket No. 193-3, at ¶ 27. That Lead Plaintiff's case withstood two dismissals and an appeal, among other challenges, is certainly testament to the expertise and skill of Lead Counsel. The favorable result obtained for members of the Settlement Class is the product of Lead Counsel's expertise, experience, and diligence in pursuing this litigation. Therefore, the Court finds that the skill required and quality

18

of work produced in this action supports Lead Counsel's fee request.

    4.    <u>Contingent Nature of the Fee</u>

"The importance of assuring adequate representation for plaintiffs who could not otherwise afford competent attorneys justifies providing those attorneys who do accept matters on a contingent-fee basis a larger fee than if they were billing by the hour or on a flat fee." *Omnivision*, 559 F. Supp. 2d at 1047 (citations omitted). Lead Counsel litigated in this action on an entirely contingent basis and advanced reasonable litigation costs for over four years with no recovery and no revenue from their work. *See* Attorneys' Fees Motion at 11-13. Lead Counsel invested over 12,300 hours of work and fronted $602,359.78 in out-of-pocket costs. *Id.* at 12. Despite the substantial risk of being entirely uncompensated for their efforts, they persisted in obtaining the best possible settlement for the Class. Therefore, the Court finds that the contingent nature of the fee supports Lead Counsel's fee request.

    5.    <u>Awards in Similar Cases</u>

Lead Counsel seeks an award of attorneys' fees in the amount of 30% of the Settlement Fund, which is in excess of the benchmark of 25% established by the Ninth Circuit. *See Hanlon*, 150 F.3d at 1029. "However, in most common fund cases, the award exceeds that benchmark." *Omnivision*, 559 F. Supp. 2d at 1047 (first citing *Activision*, 723 F. Supp. at 1377-78; and then citing *Ikon Off. Sols.*, 194 F.R.D. at 194). In *Activision*, the court concluded that "absent extraordinary circumstances that suggest reasons to lower or increase the percentage, the rate should be set at 30%." *Activision*, 723 F. Supp. at 1378. Lead Counsel cites a number of cases in this Circuit and in other federal jurisdictions that suggest an award of 30% of the settlement amount in a securities class action is reasonable. *See* Attorneys' Fees Motion at 13-15. Therefore, the Court finds that awards in similar cases supports Lead Counsel's fee request.[9]

    6.    <u>Reaction of the Class</u>

"The reaction of the class may also be a determining factor in the . . . the fee award." *Omnivision*, 559 F. Supp. 2d at 1048 (citation omitted). In response to the 244,385 Postcard and

---

[9] Although this Court acknowledges the existence of other cases that support Lead Counsel's 30% fee request, the Court notes that it would not normally award that much in excess of the established 25% benchmark (particularly in cases where litigation has barely made it past the pleading stage). The Court observes, however, that this case has been litigated over the course of four years, including multiple rounds of motions to dismiss, an appeal, substantial discovery, and a motion for class certification. For all of the other reasons discussed herein, the Court does not find a 30% fee request to be inappropriate.

Email Notices sent to potential members of the Settlement Class and their nominees, there were thirty-five valid requests for exclusion and no objections.  *See* A.B. Data Supp. Decl. ¶¶ 5, 10-11. The (long-form) Notice clearly informs members of the Settlement Class that "Lead Counsel will apply to the Court for an award of attorneys' fees from the Settlement Fund of no more than 30% of the Settlement Amount, plus interest earned at the same rate and for the same period as earned by the Settlement Fund," as well as reimbursement for litigation expenses.  *See* Ex. A-1, Docket No. 183-4, at ¶ 5.  Therefore, the Court finds that the absence of any objections to the Settlement, including the 30% fee award, supports Lead Counsel's fee request.

       7.   <u>Lodestar Comparison</u>

"As a final check on the reasonableness of the requested fees, courts often compare the fee counsel seeks as a percentage with what their hourly bills would amount to under the lodestar analysis." *Omnivision*, 559 F. Supp. 2d at 1048 (citing *Vizcaino*, 290 F.3d at 1050-51).  Under the lodestar method, courts "calculate[ ] the fee award by multiplying the number of hours reasonably spent by a reasonable hourly rate and then enhancing that figure, if necessary, to account for the risks associated with the representation." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) (citations omitted).  "Where a lodestar is merely being used as a cross-check, the court 'may use a rough calculation of the lodestar.'" *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-(EPG), 2017 WL 2214936, at *5 (E.D. Cal. May 19, 2017) (quoting *Bond v. Ferguson Enters., Inc.*, No. 1:09-cv-1662-OWW-(MJS), 2011 WL 2648879, at *12 (E.D. Cal. June 30, 2011)).  According to Lead Counsel, a total of 12,315.15 hours was spent on this case, which, at their various hourly rates, results in a total lodestar of $10,484,366.25.  Attorneys' Fees Motion at 16.  Lead Counsel submitted hourly rates that range between $325 and $1,800, depending on the experience of the attorneys and paraprofessionals who worked on this case.[10] *See* Saxena White Fee Decl., Ex. A; Declaration of John L. Littrell ("BKLW Fee Decl."), Docket No. 193-5, Ex. A; Declaration of Rachel M. Cherington ("JHA Fee Decl."), Docket No. 193-6,

---

[10] The Court notes that it would have discounted the hourly rate of $1,800 for Gregory P. Joseph ("Mr. Joseph") from the firm of Joseph Hage Aaronson LLC, which appears outside of the normal range for partners practicing litigation in New York. *See* Wolters Kluwer/CEB, *2024 Real Rate Report*, at 18 (indicating that partners bill between $452 and $1,250 with a median of $786).  Mr. Joseph presumably has more than twenty-one years of experience, so his hefty $1,800 hourly rate may be just within range. *See id.* at 58.  The Court recognizes that Mr. Joseph is the only lawyer billing at that rate and that he is no longer with us (and thus cannot make any arguments to this Court to justify his rate). *See* Gregory P. Joseph: In Memoriam, https://jhany.com/attorneys/gregory-p-joseph/ (last visited Apr. 20, 2026).  As such, the Court finds no need to adjust his rate.

Ex. A.

The requested 30% fee award would amount to $19,500,000. This represents a multiplier of approximately 1.86. In securities class actions, "courts have approved multipliers ranging between 1 and 4." *Omnivision*, 559 F. Supp. 2d at 1048 (citing *In re Chiron Corp. Sec. Litig.*, No. 3:04-cv-04293-VRW, 2007 WL 4249902, at *17-18 (N.D. Cal. Nov. 30, 2007)). Therefore, the Court finds that comparison with the lodestar supports Lead Counsel's fee request.

In sum, the Court finds ample support for Lead Counsel's fee request. Notwithstanding, "[t]he district court can impose a small reduction, no greater than 10 percent – a 'haircut' – based on its exercise of discretion and without a more specific explanation." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008); *accord*, *Costa v. Comm'r of Soc. Sec. Admin.*, 690 F.3d 1132, 1136 (9th Cir. 2012). The Court is inclined to impose a five-percent haircut on the $19,500,000 fee request but will allow Lead Counsel to convince this Court otherwise at the hearing on these motions.

### F. Lead Counsel's Expenses

"Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters." *Omnivision*, 559 F. Supp. 2d at 1048 (citing *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)). Lead Counsel includes a detailed breakdown of the $602,359.78 in litigation expenses, which include charges for experts and consultants, mediation costs, computer research, travel expenses to attend client meetings, hearings, depositions and mediations, photocopying, investigation expenses, discovery costs, and other case-related costs. *See* Saxena White Fee Decl., Ex. B; BKLW Fee Decl., Ex. B; JHA Fee Decl., Ex. B. Lead Counsel indicates that they took "significant steps to minimize expenses whenever practicable without jeopardizing the vigorous prosecution of the Action." Hooker Decl. ¶ 114. The requested reimbursement is also below the maximum amount of $715,000 provided for in the (long form) Notice. *See* Ex. A-1, Docket No. 183-4, at ¶ 5. Therefore, the Court finds it appropriate to reimburse Lead Counsel for their reasonable litigation expenses.

### G. Lead Plaintiff's Expenses

Lead Plaintiff has expended considerable time and effort in fulfilling its fiduciary duties, including reviewing pleadings and motion briefs, regularly consulting with Lead Counsel, producing documents and written responses in response to Defendants' discovery requests, preparing supporting declarations for certain motions, and reviewing the Court's orders and

opinions.  *See* Rankin Decl. ¶ 6.  During the course of this litigation, Lead Plaintiff also worked with Lead Counsel to prepare for depositions and actively participated in mediation and settlement discussions.  *Id.* at ¶ 7.  Lead Plaintiff's reimbursement request for $10,531.75 in costs and expenses in connection with its efforts in this action is based on 102.25 hours spent on this case at a rate of $103 per hour.  *See id.* ¶ 13.  All potential members of the Settlement Class were informed that "Lead Plaintiff may seek an award in an amount not to exceed $15,000, pursuant to 15 U.S.C. § 78u-4(a)(4), in connection with its representation of the Class."  Ex. A-1, Docket No. 183-4, at ¶ 5.  Because there have been no objections to the Settlement and the amount sought for reimbursement is below the maximum amount provided for in the (long form) Notice, the Court finds it appropriate to reimburse Lead Plaintiff for its reasonable costs and expenses.

## IV.    Conclusion

Based on the foregoing discussion, the Court **GRANTS** both the Final Approval Motion and the Attorneys' Fees Motion (with the precise amount to be determined at the hearing on these motions).